Rene L. Valladares
Federal Public Defender
Nevada Bar No. 11479
David Anthony
Assistant Federal Public Defender
Nevada Bar No. 007978
David_Anthony@fd.org
Benjamin A. Gerson
Assistant Federal Public Defender
New York State Bar No. 5505144
Benjamin_Gerson@fd.org
Lisa C. Brunner
Assistant Federal Public Defender
Pennsylvania Bar No. 318543
Lisa_Brunner@fd.org
411 E. Bonneville Ave., Ste. 250
Las Vegas, NV 89101
(702) 388-6577
(702) 388-5819 (fax)

Attorneys for Petitioner

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Frank Winfield Anderson,<br><br>　　　　　Petitioner,<br><br>　　v.<br><br>David Shinn, Director,<br>Arizona Department of Corrections,<br>Rehabilitation, & Reentry *et al.,*<br>　　　　　Respondents. | Case No. CV-23-08023-PCT-GMS<br><br>**Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 by a Person in State Custody**<br><br>DEATH PENALTY CASE |

1

TABLE OF CONTENTS

2

INTRODUCTION .................................................................................. 1

3

   A.   State and federal proceedings ....................................................... 3

4

   B.   Procedural allegations ................................................................. 4

5

      1.   Exhaustion ......................................................................... 4

6

      2.   Equitable tolling................................................................. 4

7

      3.   Request for discovery and leave to amend .......................... 4

8

      4.   Procedural default.............................................................. 4

9

      5.   Incorporation by reference ................................................. 5

10

CLAIMS FOR RELIEF ......................................................................... 5

11

Claim One: Denial of life sentencing verdict and improper instructions regarding parole eligibility .................................................................................... 5

12

13

   A.   The denial of a unanimous sentencing verdict violated Anderson's right to a jury trial. ................................................................ 6

14

   B.   Anderson was denied the right to affirmatively instruct the jury regarding his parole ineligibility. .................................................. 11

15

16

      1.   The Supreme Court requires Arizona to follow *Simmons*........................ 12

      2.   The trial court failed to instruct the jury as required by *Simmons*......... 13

17

      3.   Future dangerousness was at issue in the case........................ 15

18

   C.   Trial and appellate counsel were ineffective in failing to raise Claims One(A) and (B). ................................................................ 17

19

20

      1.   Trial counsel performed deficiently by failing to object to the invalid instructions and request correct instructions. ...................................... 18

21

22

      2.   Appellate counsel performed deficiently by failing to raise these constitutional issues on direct appeal.................................. 20

23

   D.   Anderson is entitled to habeas relief. ........................................ 20

ii

Claim Two: Retrial counsels Kehm and Sutherland were ineffective because they were unqualified to represent individuals facing capital punishment and the trial court violated Anderson's constitutional rights by selecting and appointing unqualified counsel in his case. ................................................................................ 23

A.    Judge Chavez's selection of trial counsel to serve as re-trial counsel violated Anderson's constitutional rights to due process and a fair trial. ... 23

1.    Judge Chavez's selection of defense counsel was improper state action that denied Anderson his fundamental Fifth and Sixth Amendment right to a fair trial with the assistance of counsel. ............................... 24

2.    Selected lead counsel, Thomas Kehm, lacked the demonstrated proficiency and commitment required to represent Anderson in his capital case. ............................................................................... 28

a)    Prior to his appointment to represent Anderson, Kehm had a history of bar discipline and neglecting his clients..................................... 29

b)    At the time that he was appointed to represent Anderson, Kehm did not have a contract with the Mohave County Public Defender's Office due to his history of neglecting clients. .............................................. 31

c)    Kehm continued to neglect his obligations to communicate with Anderson about his case and to keep Anderson informed about case progress....... 32

3.    Selected second chair counsel Sutherland was unqualified to represent Anderson in a capital case.......................................................... 35

B.    The trial judge created a conflict of interest for defense counsel by interfering in the defense function and in so doing undermined the reliability of the adversarial process. ...................................... 37

C.    Resentencing counsel failed to investigate or present mitigation evidence. ........................................................................... 42

1.    Trial counsel failed to seek mitigation resources or to conduct any independent mitigation investigation....................................... 42

a)    Trial counsel failed to seek mitigation resources from the court............ 43

b)    Trial counsel failed to conduct a constitutionally adequate mitigation investigation. ...................................................... 44

2.    Had counsel investigated further, they would have found abundant, available mitigating evidence from Anderson's family members. ............ 46

iii

3.    Counsel failed to investigate and present evidence about Anderson's mental health as mitigation. ................................................................... 47

    a)   Resentencing counsel failed to provide context for Dr. Thal's resentencing evaluation. ............................................................... 47

    b)   Dr. Watson found evidence of neurocognitive impairment that should have been presented to the resentencing jury.......................................... 48

    c)   Dr. Cunningham found numerous Adverse Developmental Factors that negatively affected Anderson and these factors should have been presented to the sentencing jury.............................................................. 49

4.    Trial counsel failed to gather any evidence from Anderson's family members, which was readily available. ................................................... 57

5.    There is a reasonable probability that but for trial counsels' deficient performance in failing to investigate and present compelling, readily available mitigating evidence, at least one juror would have voted for a sentence less than death........................................................................... 66

D.    Both trial counsel and state postconviction counsel were ineffective for failing to investigate and present reasonably available mitigation evidence. ...................................................................................................... 69

1.    Anderson served his country honorably during the Vietnam War, yet he was deprived of the military career he desired........................................ 69

2.    Anderson lived a transient and dysfunctional lifestyle............................ 75

3.    Anderson suffers from Dependent Personality Disorder, which easily allowed other individuals to control him. ................................................ 80

4.    Anderson's cognitive impairments are, in part, due to extended time spent in a dissociative state that began when he was sexually abused by his father Winfield, who also sexually abused many other family members. ................................................................................................. 84

5.    Trial counsel failed to investigate or present evidence that Anderson suffered from brain damage. ................................................................... 88

6.    Anderson was cooperative with law enforcement and assisted with the arrest of his co-defendants........................................................................ 93

7.    Poyson was the more culpable actor in the offenses and he controlled Anderson during the crimes. ................................................................... 94

iv

E.    Trial counsel was ineffective for failing to impeach Cooper's assertions that Anderson's statement was voluntary. .......................................................... 96

    1.    Trial counsel were ineffective for failing to move to suppress the statements Anderson gave during the August 19, and September 2, 1996, interviews. .................................................................................... 100

    2.    Trial counsel were ineffective for failing to demonstrate to the jury that Anderson's statements were involuntary. .............................................. 101

F.    Trial counsel failed to advise Anderson of his right to allocute as a substitute for his penalty hearing testimony. ............................................ 104

G.    Trial counsel was ineffective for failing to impeach Kim Lane with her prior statements. ................................................................................ 106

    1.    Trial counsel was ineffective for either inadequately impeaching or completely failing to impeach Kim Lane with readily available material during the penalty hearing.......................................................... 107

        a)    Failure to effectively impeach Lane on the facts of the crime magnifying Anderson's culpability. ......................................................... 108

            (1)    Inadequate impeachments. .............................................. 108

            (2)    Omitted impeachments. ................................................... 109

        b)    The failure to impeach Lane's credibility magnified Anderson's culpability. .................................................................. 110

            (1)    Inadequate impeachments. .............................................. 110

            (2)    Omitted impeachments. ................................................... 111

        c)    Trial counsel's failure to impeach lane during the penalty trial was prejudicial because the State proved Lane's culpability at her own trial using the same material.......................................................... 112

    2.    Trial counsel was ineffective for failing to impeach Lane during the guilt trial. .................................................................................. 114

H.    Trial counsel were ineffective for submitting invalid jury instructions on premeditation to the court. .......................................................... 116

    1.    Invalid premeditation instruction.......................................................... 116

2.     Invalid accomplice liability instructions ................................................. 118

I.     Trial counsel were ineffective in failing to move for a change of venue due
       to the significant media coverage the case received. ................................. 120

J.     Trial counsel were ineffective for failing to maintain Anderson's sentencing
       date post-*Ring* making Anderson eligible for the death penalty ............... 124

       1.     Trial counsel was ineffective for failing to advocate for Anderson by
              requesting a sentencing hearing while Arizona's capital sentencing
              statute was invalidated. ........................................................................ 126

       2.     Trial counsel was ineffective for failing to pursue an agreed upon
              disposition. ............................................................................................. 128

K.     Counsel was ineffective for failing to challenge the duplicitous indictment.
       ........................................................................................................................ 128

       1.     Trial counsel's performance was deficient for failure to timely challenge
              the indictment. ........................................................................................ 130

       2.     Trial counsel's failure to litigate the duplicitous indictment prejudiced
              Anderson ................................................................................................... 131

L.     Anderson was denied a fair trial and resentencing in 2002 and a fair
       postconviction proceeding due to the cumulative impact of the errors of
       both resentencing and postconviction counsel. ........................................... 132

Claim Three: The State violated *Brady v. Maryland* by failing to disclose detailed
       information about the criminal investigation into Detective Cooper's sexual
       misconduct and the non-prosecution benefit Cooper received. ........................ 134

A.     The State violated *Brady* by failing to disclose the KPD report detailing
       Cooper's history of coercing witnesses and suspects into sex................... 135

       1.     Cooper displayed a pattern of using predatory, high pressure tactics to
              have sex with women he was investigating and took a particular interest
              in suspects with diminished capacity..................................................... 139

       2.     Cooper laid the foundation for the admission of Anderson's statements
              and so his credibility on the issue of voluntariness was paramount...... 140

B.     The State violated *Brady* by failing to disclose that Yavapai County
       declined to prosecute Cooper so that he could testify against Anderson. . 142

Claim Four: Invalid Aggravating Circumstances and Failure to Provide Close Appellate Scrutiny of Death Sentence ................................................................. 143

    A.    The Heinous, Atrocious, or Cruel Aggravating Circumstance was Improperly Found by the Jury..................................................... 143

    B.    The Arizona Supreme Court Failed to Provide Close Appellate Scrutiny of Anderson's Death Sentences........................................... 150

    C.    Direct appeal counsel was ineffective in failing to ensure that all mitigation evidence from the first sentencing hearing was argued to the Arizona Supreme Court as part of its independent reweighing............................ 153

Claim Five: Prosecutorial misconduct denied Anderson a fair trial and reliable sentence. ................................................................................ 155

    A.    The introduction of Anderson's sexual relationship with Lane was so prejudicial it violated Anderson's due process rights. ................................ 155

    B.    The State committed misconduct by presenting contradictory evidence and argument about the relative culpability of Anderson, Poyson and Lane.. 158

        1.    The State adduced evidence and argued that Lane was the most culpable, then ignored that evidence to argue Anderson was the most culpable. ................................................................. 158

            a)    Contradictory testimony adduced at trial............................... 158

            b)    Contradictory prosecution argument. ................................... 160

        2.    The State adduced testimony of Poyson's culpability and then falsely used it to argue Anderson's culpability.................................... 160

    C.    The State misled the jury about the admissibility of mitigation evidence. ................................................................................ 162

        1.    The prosecutor misled the jury by arguing that a causal nexus was required to consider certain mitigation evidence. ................................ 163

        2.    After misleading the jury, the State argued repeatedly that the law *required* the imposition of the death penalty.......................... 165

Claim Six: Trial court error in the admission of evidence. ............................ 167

    A.    The trial court erred in admitting inflammatory and unduly prejudicial photographs of the victims...................................................... 167

vii

B.    The admission of Lane and Poyson's hearsay statements violated Anderson's confrontation clause rights. ...................................... 172

Claim Seven: Arizona's system of elected judges is unconstitutional. ........................... 173

Claim Eight: Cumulative Error ...................................................................... 175

Claim Nine: The Eighth Amendment's protections against cruel and unusual punishment make Anderson ineligible for the death penalty due to his numerous severe medical conditions and advanced age. ................................. 176

Claim Ten: The intervening change in sentencing procedure following *Ring v. Arizona* violated Anderson's procedural due process rights............................. 178

Prayer for Relief ....................................................................................... 181

Verification ............................................................................................... 182

## INTRODUCTION

Frank Anderson spent the majority of his boyhood at construction sites with his father. On the drive to the job sites, young Anderson would pray that other trucks would already be parked there. Other trucks meant other people, which meant no opportunity for his father to force him to perform oral sex in the empty, half-built houses. When there were no other trucks, Anderson would sit in the back corner of the room, hoping not to be noticed. When the abuse was happening, he tried, mentally, to go away and make himself disappear. Anderson's mother did nothing to protect him or intervene to stop the abuse. Anderson learned to survive by mentally disappearing while physically submitting. As presented below, the influence of this trauma, including the prevalence of these coping mechanisms, would follow Anderson forever and negatively impact every aspect of his life, including his service to his country and his marriage to a woman old enough to be his mother.

From the time he was a baby, his father, Winfield Anderson, would pack the family in the car and crisscross the country looking for work. Anderson lived in a world of instability and uncertainty. In fact, the steadiest time of Anderson's life was from 1967-1970, when he voluntarily enlisted in the Army at the height of the Vietnam War when he was 17 years old.

After his service in the Vietnam War, Anderson's adult life mirrored his childhood. Anderson, his wife Mary, and his step-children lived much of their life together in their car. As he had learned to simply "go along" and avoid conflict as a small child, Anderson worked very hard to make those around him happy, even going into severe debt to please Mary, which ultimately cost him his career in the Army. Mary

1

exerted vast influence on Anderson, controlling most aspects of his life. Mary's interference left Anderson unable to maintain regular employment, so he collected recyclables and worked a few hours here and there where he could—as a gas station attendant, as a dishwasher in diners—so that the family could get by. The family slept in the car and motel rooms, when they could afford to.

Those who came to know Anderson, including his step-children, his in-laws, and neighbors at different trailer parks where Anderson lived and worked, described him as someone who wanted desperately to make others happy and a "push-over" who never stood up for himself. This absolute drive to please others came at the expense of his military career, his jobs, secure housing, and, ultimately, his freedom.

The ease with which others could control Anderson became apparent when he met Bobby Poyson. Anderson had no history of violence, but was easily persuaded into a plot hatched by Kim Lane and Bobby Poyson to rob and murder the residents of Yavapai Drive in Golden Valley Arizona.

At trial, Anderson was represented by two attorneys who were not even remotely qualified to litigate a capital case. Thomas Kehm had been recently reinstated to the bar following suspension, and Douglas Sutherland had never tried a felony criminal case before. The two attorneys lacked foundational skills; failed to investigate and present plentiful and readily available mitigation evidence or to fully explore Anderson's cognitive deficits with mental health experts; and failed to understand aspects of the law specific to capital cases. This allowed numerous trial court errors and prosecutorial misconduct, including *Brady* violations, to go unchecked.

1    **A.      State and federal proceedings.**

2         Anderson was indicted on charges of conspiracy, armed robbery, and three counts

3    of first-degree murder on September 5, 1996. Anderson's first trial commenced on

4    January 12, 1998. Anderson was convicted on January 21, 1998 and sentenced to death

5    by a single judge on June 2, 1998. On direct appeal the Arizona Supreme Court reversed.

6    *State v. Anderson*, 4 P.3d 369, 372 (Ariz. 2000). Anderson's second trial commenced on

7    October 1, 2001. Anderson was convicted a second time on October 9, 2001. The second

8    penalty phase trial, presented to a jury following *Ring v. Arizona*, 536 U.S. 584 (2002),

9    commenced on November 18, 2002, and Anderson was sentenced to death a second time

10   on November 26, 2002. The Arizona Supreme Court then affirmed his conviction and

11   sentence. *State v. Anderson*, 111 P.3d 369, 399 (Ariz. 2005).

12        Anderson filed a timely petition for state postconviction relief in April 2010.

13   Following a hearing, that petition was denied in September 2020. Anderson sought

14   review in the Arizona Supreme Court, but was denied on November 1, 2022.

15        Anderson executed a statement of intent and sought appointment of federal habeas

16   counsel on December 21, 2022. Document Nos. 1, 2, 3. However, he did not receive the

17   timely appointment of counsel as the Capital Habeas Unit in Arizona had a conflict of

18   interest and could not accept appointment to the case. Document No. 3. Substitute

19   counsel filed a notice of appearance on February 9, 2023, Document No. 6, but also

20   identified a conflict necessitating that office's withdrawal. Document No. 7.

21        Undersigned counsel were appointed by the Court to represent Anderson on

22   March 29, 2023. Document No. 14. Pursuant to this Court's scheduling order, Anderson

23   files this timely petition for writ of habeas corpus. Document No. 19.

3

As demonstrated below, a series of errors, including deficient counsel for trial and sentencing, prosecutorial misconduct, and erroneous instructions to the juries, have so infected the proceedings that Anderson's constitutional rights have been violated.

**B.    Procedural allegations.**

**1.    Exhaustion.**

Anderson has included a statement with respect to exhaustion at the end of each claim for relief as required by Rule 2(C) of the Rules Governing Section 2254 Cases and this Court's schedule order. Document No. 14.

**2.    Equitable tolling.**

As explained in the procedural history above, Anderson did not receive the timely appointment of unconflicted federal habeas counsel to represent him until approximately four months after executing his statement of intent. The time during which Anderson did not have unconflicted counsel to represent him cannot be imputed to him, and he is entitled to equitable tolling of the statute of limitations during this time. *Cf. Christeson v. Roper*, 574 U.S. 373, 378-79 (2015).

**3.    Request for discovery and leave to amend.**

Pursuant to Fed. R. Civ. P. 15(a)(2) and *Christeson*, Anderson reserves the right to seek leave to amend his petition if new facts and arguments come to light as the result of his continuing investigation as well as the result of discovery of information that could only be obtained by means of formal discovery and expansion of the record.

**4.    Procedural default.**

The failure to raise any of the claims contained in this petition in prior state proceedings was due to state impediments concerning the appointment and provision of

resources to qualified state appointed counsel; the State's suppression of material evidence, *Banks v. Dretke*, 540 U.S. 668 (2004)[1]; ineffective assistance of first state postconviction counsel, *Martinez v. Ryan*, 566 U.S. 1 (2012)[2]; and an inadequate state corrective process. 28 U.S.C. § 2254(b)(1)(B)(i, ii). Anderson reserves the right to make any available procedural arguments to obtain a review of the merits of each of his claims.

### 5. Incorporation by reference.

Anderson hereby incorporates by reference each of the exhibits to his petition into each and every one of his claims for relief as if fully set forth herein.

## CLAIMS FOR RELIEF

**Claim One: Denial of life sentencing verdict and improper instructions regarding parole eligibility.**

Anderson's death sentences are invalid under the federal constitutional guarantees of due process, right to a jury trial, effective assistance of counsel, equal protection, and a reliable sentence, because the jury was deprived of the ability to render a life-sentence verdict consistent with state law and was improperly instructed regarding the prospect of Anderson's release. Trial counsel were ineffective in first offering invalid and incorrect jury instructions to the court, and then for failing to object to invalid questionnaires, penalty instructions, and verdict forms that removed the only valid non-death sentencing

---

[1] Under *Banks*, Anderson can overcome any procedural default of claims of prosecutorial misconduct that were not raised in prior state proceedings: Claim Three and Five(B).

[2] Under *Martinez*, Anderson can overcome any procedural default of ineffective assistance of trial counsel claims that were not raised by first state postconviction counsel: Claims One(A, C) (in part, as to unanimity), Claims Two(D, E, G, H, I, K, and L), Three, Four, Seven, and Eight.

1    option from the jury's consideration. Appellate counsel was ineffective for failing to raise

2    these verdict and instructional issues on appeal. U.S. Const. amends. V, VI, VIII, XIV.

3    **A.    The denial of a unanimous sentencing verdict violated Anderson's right to a jury trial.**

4

5    In 1993, the Arizona State Legislature abolished parole for adults who commit

6    felony offenses. It did so by appending a single phrase to the statute that governs parole-

7    eligibility in Title 41: "This section applies to . . . [a] person who commits a felony

8    offense before January 1, 1994." A.R.S. § 41-1604.09(I). To this day, the Legislature has

9    not amended the first-degree murder sentencing statute in Title 13 to reflect the abolition

10   of parole. That statute still refers to "parole" as one possible form of "release." A.R.S. §

11   13-751(A). Anderson was never eligible for parole because his offenses occurred in 1996.

12   *See* A.R.S. § 41-1604.09(I). The jury questionnaires, sentencing instructions, and verdict

13   forms all erroneously informed the jurors that the trial court could impose a sentence that

14   would allow for Anderson's release if he was not sentenced to death.

15   The penalty jury in Anderson's case was unconstitutionally deprived of the ability

16   to render a life verdict consistent with state law. Under Arizona law, there are two

17   sentences available for a defendant convicted of first-degree murder: death and life in

18   prison. A.R.S. § 13-751(A)(1). Life in prison means life without the possibility of parole.

19   *Id.*; A.R.S. § 41-1604.09(I). Anderson's jury was not given a verdict form allowing them

20   to render a unanimous verdict of life without the possibility of parole. Instead, the jury

21   was incorrectly instructed that if they chose the "life" option, the trial court would impose

22   a sentence of life with *or* without parole. But life *with* parole was not a valid sentence

23   under state law. The jury was therefore misinformed in the instructions and not given a

6

verdict form upon which they could unanimously find the only available non-death sentencing option.

The constitutional jury trial right requires unanimity of guilt and sentencing verdicts when a jury is the entity under the law charged with rendering a decision in a criminal case. *Andres v. United States*, 333 U.S. 740, 748 (1948). When a verdict contains a sentence not permitted under the law, fundamental error has occurred and the sentence must be set aside even when no objection is raised by defense counsel. *Reynolds v. United States*, 98 U.S. 145, 168–69 (1878) (granting petition for rehearing and vacating sentence when trial court imposed sentence of imprisonment at "hard labor" when law permits "imprisonment only"). The right to a jury trial is so fundamental that it requires Anderson's personal waiver, and he did not knowingly, voluntarily, and intelligently give up that right.

The jury was consistently mis-instructed throughout the case that Anderson could be sentenced to life in prison with parole. The jury was misinformed in the jury questionnaires that Anderson could receive a life sentence in "prison for a minimum of 25 years before he *was eligible* for parole." ROA[3] 311 at 11 (emphasis added). The questionnaires further stated to the jurors that they must be able to consider life *with* parole as a sentencing option. *Id.* (emphasis added).

At sentencing, the issue of release was submitted to the jury as a mitigating factor and argued by the parties based on Anderson's advanced age at the time of his potential

---

[3] There are two designations for the record on appeal: (1) Record on Appeal (ROA) refers to the court record from Mohave County, covering the 1998 and 2002 trials and relevant appellate proceedings, while (2) Record of Appeal (RA) refers to the record from the Arizona Supreme Court in connection with Anderson's state PCR proceedings and subsequent Petition for Review.

release. 11/26/2002 Tr. at 9–10. The prosecutor argued this circumstance should not be considered a mitigating factor. 11/25/2002 Tr. at 216. The defense argued that because of Anderson's age at the time of release it was unlikely he would return to the community. *Id*. at 226.[4]

The jury was instructed to consider as a mitigator the "[n]onlikelihood that if released in the future after completing a lengthy prison sentence [Anderson] would be a threat to society." 11/26/2002 Tr. at 9–10. The court further instructed, if "you unanimously agree that death is not appropriate, your foreperson shall sign the verdict form so indicating. If you find that death is not appropriate, then I will decide whether defendant should be sentenced to a life sentence *with or without parole*." *Id*. at 12 (emphasis added).

Finally, the verdict forms for each victim failed to afford the jury the ability to unanimously find in favor of a non-death sentencing option. The first blank form was for death, "in which case the defendant shall be sentenced to death." 11/26/2002 Tr. at 13. The second blank form was for "life, in which case the defendant shall be sentenced to life imprisonment with or without parole." *Id*. The same special verdict forms were given verbatim for each of the three victims. *Id*. at 13–14.

The denial of the right to a jury trial constitutes structural error and is prejudicial *per se*. Alternatively, the denial of Anderson's right to a unanimous jury verdict had a substantial and injurious effect on the penalty verdicts. As explained above, the jury was deprived of the ability to render a unanimous verdict on the only non-death sentencing

---

[4] Anderson incorporates the allegations of Claim One(C) below regarding trial counsel's ineffectiveness in raising the prospect of Anderson's release in connection with a proposed mitigating circumstance.

option allowed under state law. The disjunctively worded verdict forms permitting the jury to fix a sentence that (1) does not exist under state *or* (2) one that does exist violates the constitutional unanimity requirement. The removal of one of the sentencing options available under state law inherently results in a procedure that violates the right to a jury trial. The resulting error was necessarily so prejudicial that the death sentence is invalid.

The submission of invalid instructions and verdict forms also violated Anderson's right to due process and had a substantial and injurious effect on the penalty verdicts. *Murtishaw v. Woodford*, 255 F.3d 926, 969–71 (9th Cir. 2001). The materially incorrect jury instructions and the invalid verdict forms misled the jury to believe that if they did not impose the death penalty the trial court could impose a sentence of life with parole. If any juror believed Anderson's moral culpability was so great that he should not receive a sentence that would allow for parole then the jury was also precluded from considering a sentence of life without parole. Moreover, Anderson had a liberty interest in having the jury correctly instructed consistent with state law. The failure to properly instruct the jury necessarily rendered the sentencing proceeding fundamentally unfair and had a substantial and injurious effect on the penalty verdicts.

The submission of invalid instructions and verdict forms violated Anderson's Eighth Amendment right to a reliable sentencing determination. *Mills v. Maryland*, 486 U.S. 367, 383–84 (1988). If even one juror opposed a life sentence with parole that would have prevented the jury from rendering a verdict of life without parole. This likelihood, combined with the submission of a sentencing option that did not exist under state law, creates an impermissible risk of an arbitrary and unreliable decision by the jury, which had a substantial and injurious effect on the penalty verdicts.

Finally, trial counsel's performance was deficient and there is a reasonable probability of a more favorable outcome if trial counsel had objected to the erroneous language in the jury questionnaires, objected to the instruction to the jury regarding the availability of release, objected to the invalid verdict forms that deprived the jury of unanimously rendering a verdict of life without parole, and proffered correct instructions and verdict forms. *See* Claim One(C), below. As explained above, due to the fundamental nature of the error and the fact that the right to a jury trial is a right that must be knowingly, voluntarily, and intelligently waived Anderson can demonstrate prejudice as a result of counsel's deficient performance in allowing instructions and verdict forms that prevented the jury from unanimously rendering a non-death verdict.

Similarly, appellate counsel was ineffective in failing to raise the issue on appeal as one of fundamental error, and there is a reasonable probability of a more favorable outcome if counsel had raised that issue. *See* Claim One(C), below.

The constitutional jury trial right claim above has not been previously presented to the state courts for review. However, it is the type of claim requiring Anderson's personal waiver under Ariz. R. Crim. P. 32.2(a)(3) &(b), and it implicates the jurisdiction of the state courts and the legality of the sentence under Ariz. R. Crim. P. 32.1(b, c). Therefore, the claim would not be precluded if presented to the state courts for review.

The due process, Eighth Amendment, and effective assistance of counsel arguments were raised in the state postconviction review (PCR) proceeding as claim 19 in the supplemental petition. RA0291 at 1-11. The state court did not decide the claims based on the mis-instruction of the jury and the invalid verdict forms, so this Court's review of that issue is *de novo*. Instead, the state court's decision was limited to

Anderson's related claim that he was entitled to affirmatively instruct the jury regarding his parole ineligibility. RA0368 at 10. *See* Claim One(B), below. The state court's decision was limited to the latter claim. The court decided the issue based on its determination that future dangerousness was not in issue based on the evidence, which is not relevant to Anderson's separate claim that his jury was mis-instructed and he was denied the right to a unanimous jury verdict.

Alternatively, the state court's decision was an unreasonable determination of the facts and an unreasonable application of clearly established federal law. As explained in Claim One(B) below, the court's factual determination that future dangerousness was not in issue ignores the instructions that erroneously informed the jury that Anderson could be released in the future. It also ignored the mitigation instruction concerning future release. The decision was also an unreasonable application of federal law because it is clearly established that penalty instructions that provide for release in the future raise the prospect of future dangerousness.

**B.    Anderson was denied the right to affirmatively instruct the jury regarding his parole ineligibility.**

The constitution requires additional instruction if future dangerousness was placed in issue during trial proceedings. *Simmons v. South Carolina*, 512 U.S. 154, 169 (1994). Anderson's death sentences are invalid because his future dangerousness was placed at issue and he was entitled to affirmatively and correctly inform the sentencing jury that he would never be eligible for parole. Notably, a *Simmons* claim exists even where the instructions are otherwise consistent with state law. Here, however, the *Simmons* claim is raised in addition to the instructional errors identified in Claim One(A) above.

### 1.    The Supreme Court requires Arizona to follow *Simmons*.

In *Lynch v. Arizona*, the United States Supreme Court determined that a defendant who had been convicted of first degree murder, robbery, kidnapping, and other offenses was entitled to instruct the penalty phase jury that he would never be eligible for parole if they did not impose a death sentence. 578 U.S. 613, 616 (2016). In that case, the trial court granted the State's motion to prevent Lynch's attorneys from arguing that the only sentence available as an alternative to the death penalty was life without parole, arguing that there were other future prospects for the defendant to achieve potential release. *Id*. at 614. The Supreme Court, however, rejected the State's argument that the mere possibility that a change in legislation could one day render Lynch eligible for parole amounted to the possibility of release. *Id*. at 615–16. The Supreme Court held that Lynch was entitled to inform his sentencing jury of his parole ineligibility because the State had placed his future dangerousness at issue in arguing for a death sentence, despite his statutory ineligibility for parole. *Id*. at 616.

It has long been established that a defendant in a capital case has the right to a properly instructed jury regarding potential release. *See California v. Ramos*, 463 U.S. 992, 1001–02 (1983). *Ramos* has been specifically extended to a capital defendant's right to instruct the jury regarding parole ineligibility. *Simmons v. South Carolina*, 512 U.S. 154, 169 (1994).

The United States Supreme Court recently held that the rule announced in *Lynch* changed the way in which Arizona courts interpreted the rule in *Simmons*. *Cruz v. Arizona*, 143 S. Ct. 650, 655 (2023). This change in application was necessarily a change in the law in Arizona. *Id*. The petitioner in *Cruz* went to trial in 2005. *Id*. at 656. Like

Anderson, the petitioner's future dangerousness was in question, and like Anderson, the change in Arizona law abolishing parole meant that the petitioner would never be eligible for parole. *Id*. at 654–657; A.R.S. § 41-1604.09(I). Cruz accordingly sought an instruction to inform the jury that he would never be parole eligible. *Cruz,* 143 S. Ct. at 655.

*Cruz* thus requires that Anderson's death sentences be set aside, just as *Simmons* and *Lynch* mandated, because his jury was incorrectly instructed that he would possibly be eligible for parole in the future.

### 2.    The trial court failed to instruct the jury as required by *Simmons*.

The trial court repeatedly and erroneously instructed the jurors that if they did not sentence Anderson to death, the trial court could impose a sentence that would allow for parole:

> If you find that death is not appropriate, then I will decide whether the defendant should be sentenced to a life sentence with or without parole.

11/22/2002 Tr. at 17; 11/26/2002 Tr. at 12.  The trial court repeated this instruction three more times in outlining the verdict forms. *Id*. at 13-14. Each of the three verdict forms for first-degree murder included three boxes, one for "DEATH," one for "LIFE," and one for "NO UNANIMOUS AGREEMENT." ROA 327 at 4–6. The life option for each of the three verdicts read as follows:

> [] "LIFE"
>
> (In which case the Defendant shall be sentenced to life imprisonment with or without the possibility of parole)

*Id*. This instruction was also repeated before the sentencing jury was sent to

deliberate:

> If you find that death is not appropriate, then I will decide
> whether the defendant should be sentenced to a life sentence
> *with or without* parole.

11/26/2002 Tr. at 12. Trial counsel neither objected, moved for mistrial, nor

requested a positive *Simmons* instruction informing the jurors that Anderson could

never be released.  Instead, counsel specifically argued that Anderson could receive

parole after 25 years. 11/13/2002 Tr. at 11–12. Likewise, trial counsel failed to object

or move for a mistrial based on question number 69 of the juror questionnaire, which

read as follows:

> Similarly, if after hearing the evidence, reviewing the
> instructions and deliberating with your fellow jurors, you
> believed that life was the appropriate sentence, would you
> personally be able to enter a verdict that would allow the
> defendant to live the rest of his life in prison, or *be in prison
> for a minimum of 25 years before he was eligible for parole?*
> YES   NO

ROA 311 at 11 (emphasis added). This was deficient performance that prejudiced

Anderson.

     If not properly instructed, a jury is likely to mistakenly believe that the

defendant could be released on parole if not sentenced to death.  *Simmons,* 512 U.S.

at 156; *see also Ovante v. Arizona,* No. 22-7229, 2023 WL 6377686 (U.S. Oct. 2,

2023 (granting petition for a writ of certiorari, vacating the judgment of sentence,

and remanding to the Superior Court of Arizona, Maricopa County, for further

consideration in light of *Cruz v. Arizona*, 598 U. S. 17 (2023), when the trial court

erroneously informed the jury that Petitioner could receive a "life with the possibility

14

of parole" as a potential sentence.). The instant case is even stronger: The trial court's error here not only omitted vital information that Anderson could *never* be released, it inserted the opposite, false information that he *could* one day be released. Even worse, the jury was not allowed by their verdict to select the "life" sentencing option that would be without parole, *i.e.,* the only valid non-death sentence option under state law, without risking their misimpression that a sentence of life with parole was equally likely and outside of their control. The trial court's plainly incorrect instructions to the jury in combination with the verdict forms that Anderson could one day be released if not sentenced to death violated his constitutional rights.

### 3.    Future dangerousness was at issue in the case.

For purposes of the *Simmons/Lynch/Cruz* analysis, it is sufficient if future dangerousness is implicit in or "a logical inference from the evidence," or is otherwise inserted by the State into the proceedings. *See Simmons* at 162; *see also Kelly v. South Carolina*, 534 U.S. 246, 247, (2002) ("A jury hearing evidence of a defendant's demonstrated propensity for violence reasonably will conclude that he presents a risk of violent behavior, whether locked up or free…Evidence of future dangerousness under *Simmons* is evidence with a tendency to prove dangerousness in the future. Its relevance to that point does not disappear merely because it might support other inferences or be described in other terms."); *State v. Escalante-Orozco*, 386 P.3d 798, 829 (Ariz. 2017), *abrogated by State v. Escalante*, 425 P.3d 1078 (2018) (quoting *Kelly v. South Carolina*) ("The prosecutor did not have to explicitly argue future dangerousness for it to be at issue; instead, it is sufficient if future dangerousness is 'a logical inference from the evidence' or is 'injected into the case through the State's closing argument.'").

15

1        In *Escalante-Orozco*, the Arizona Supreme Court found future dangerousness

2   implicit in the prosecutor's repetition of the violent and graphic details of the offense

3   during his closing, including the defendant's violence towards his ex-wife, the

4   introduction of graphic photographs of the autopsy, and the brutality of the murder. 386

5   P.3d at 829–30. Identically, future dangerousness was implicitly at issue during

6   Anderson's trial in the State's repetition of the facts of the murders themselves given the

7   violence inflicted on at least two of the victims, one being a 15-year-old boy who had a

8   knife pounded into his ear and out his nose by Poyson, Anderson's co-defendant, and the

9   fact that the motive for the killing was to acquire the victim's truck.  The prosecutor

10  emphasized Anderson's involvement in the violence inflicted on the 15- year-old victim:

11          The defendant took away a couple things from two young
12          people. Kimberly Lane took away much of her future. But for
            Robert Delahunt -- Robert Delahunt, that's why we're here.
13          Because he didn't have much except his future.  And the
            defendant pounded that out of him (indicating).

14  11/25/2002 Tr. at 221; *see also id*. at 191 ("he cut Delahunt…just sliced his throat."),

15  204, 205. The State also repeated that Anderson hit Ronald Wear with the lantern. *Id*. at

16  203  The State ultimately argued that Anderson was the most dangerous of those

17  involved:

18          Who enlisted children, teenagers…to help him out in this case
19          and do the killing for him? He was actively involved. He was
            in the planning. He slashed Robert Delahunt's throat to start
20          the killing.

21  *Id*. at 210. Thus, future dangerousness was inherent in the facts of the crimes and placed

22  in issue by State.

23

16

The State also placed an emphasis on future dangerousness during closing arguments by emphasizing the number of victims. *Id*. at 185, 187, 188. Additionally, the State continued to repeat Anderson's prior acts of stealing, associating with prostitutes, and his relationship with Kim Lane as a way to paint Anderson as someone likely to be dangerous in the future. *Id*. at 196, 210, 211, 218.

The failure to properly instruct the jury had a substantial and injurious effect on the penalty verdicts. The jury questionnaires, instructions, verdict forms, and the State's evidentiary presentation placed future dangerousness in issue. Thus, Anderson was entitled to affirmatively instruct the jury regarding the unavailability of parole. The failure to do so rendered the proceedings fundamentally unfair.

Anderson presented this claim to the state court as claim 19 in his November 19, 2010, Supplemental Petition for Postconviction Relief. The PCR court did not expressly address Anderson's substantive constitutional claim, so this Court's review is *de novo*. As explained below, the state court's decision was limited to Anderson's claim of ineffective assistance of trial counsel. In the alternative, the state court's decision was contrary to, and an unreasonable application of, clearly established federal law and an unreasonable determination of the facts. *See* Claim One(C).

## C.    Trial and appellate counsel were ineffective in failing to raise Claims One(A) and (B).

*Andres* was decided in 1948, *Ramos* was decided in 1983, and *Simmons* was decided in 1994. The Arizona Court of Appeals specifically recognized the unavailability of parole under the statutory scheme in a published decision in 1999. *State v. Rosario*, 987 P.2d 226, 231 (Ariz. Ct. App. 1999). Anderson's penalty

17

hearing began in 2002. Trial counsel did not object to the court's incorrect instruction that Anderson could be sentenced to a term of life with the possibility of parole, move for a mistrial, or request a positive *Simmons* jury instruction. Appellate counsel did not raise this issue as fundamental error under *Andres*, *Ramos*, and *Simmons*. Such failures fell below the standard of care applicable at the time as counsel are charged with knowledge of the applicable law.

1.   **Trial counsel performed deficiently by failing to object to the invalid instructions and request correct instructions.**

At the time of the sentencing phase trial in 2002, it was below the standard of care for trial counsel not to object to invalid instructions and to fail to request a *Simmons* instruction, and likewise deficient performance not to object or move for a mistrial when the trial court gave the opposite, incorrect instruction. Further, the ABA Guidelines inform the standard of care and provide that "Counsel must ... anticipate changes in the law that might eventually result in the appellate reversal of an unfavorable judgment." American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, Guideline 1.1 (rev. ed. Feb. 2003), *reprinted in* 31 Hofstra L. Rev. 913 (2003). The failure to anticipate that Arizona would be required to follow *Simmons* was beneath the standard of care, which competent capital defense practitioners understood at the time. Even more importantly, any reasonable counsel would object to the jury being affirmatively mis-instructed in violation of state law that the only way to avoid a sentence that would permit parole was to impose the death penalty.

Counsel's performance fell below the standard of care by failing to request a

*Simmons* instruction and by at least arguing that Anderson could never be released. In

fact, trial counsel's performance was so deficient that incorrect *proposed* jury instructions

were submitted to the court by the defense:

> Under the law of the State of Arizona every person guilty of first degree murder shall be punished by death, or imprisonment for life without the possibility of commutation, parole, work furlough, work release, or release from confinement on any basis, or imprisonment for life with the possibility of parole after 25 years, or after 35 years if the murdered person was under 15 years of age.

ROA 287 at 3. This proposed instruction incorrectly asked the court to instruct the jury

that Anderson could one day be eligible for parole after either 25 or 35 years, despite

Anderson's wholesale ineligibility for release. This proposed instruction highlights

counsel's misunderstanding of capital sentencing law in Arizona. As explained in Claim

Two, trial counsel's proffer of invalid instructions was due to the fact that counsel had no

knowledge or experience litigating capital cases. Anderson incorporates those allegations

as if fully set forth herein.

In pretrial conferences to specifically review and determine the jury instructions,

trial counsel failed to request that the jury be told of Anderson's parole ineligibility.

5/29/2001 Tr. Nor did trial counsel request any such instruction at the time of trial.

10/1/2001 Tr.

Trial counsel's performance was deficient in proffering invalid questionnaires,

instructions, and verdict forms. Counsel were also deficient in failing to object to the

invalid instructions and verdict forms and for failing to proffer correct instructions and

19

verdict forms. There is a reasonable probability of a different outcome at the penalty hearing if counsel would have performed effectively.

### 2. Appellate counsel performed deficiently by failing to raise these constitutional issues on direct appeal.

Anderson's direct appeal counsel failed to raise any claims related to the improper instructions given to his jury regarding parole eligibility. Capital appellate counsel have a duty of care to raise all legal claims and to fully preserve all arguably meritorious issues. 2003 ABA Guideline 10.8, Commentary.

Anderson's resentencing jury was actively misled to believe that he might one day be released if it did not impose a death sentence. This was a due process violation under *Simmons* and its progeny and was fundamental error because it went to the foundation of the case, took away a right essential to the defense, deprived the jury of the ability to consider a life sentence, and was of such magnitude that Anderson could not have received a fair penalty determination. Accordingly, appellate counsel performed deficiently by failing to raise this claim on direct appeal. Had he done so, there is a reasonable probability they would have prevailed.

### D. Anderson is entitled to habeas relief.

As Anderson's jury was improperly instructed about the range of potential penalties that they were to consider, his death sentences must be vacated. Even worse, the jury was mis-instructed that they could not control whether Anderson was sentenced to life without the possibility of parole, the only valid non-death sentencing option under state law. Further, resentencing counsel were ineffective for asking the trial court to instruct the jury incorrectly. The trial court's incorrect jury instructions, combined with

resentencing counsel's submission of incorrect jury instructions, denied Anderson his constitutional right to a fair trial assisted by competent counsel under the Fifth and Sixth Amendments. This resulted in the denial of Anderson's Fourteenth Amendment right to due process and equal protection. Under these facts, prejudice must be presumed, and Anderson is entitled to a new trial independent of any specific showing of prejudice. Alternatively, there is a reasonable probability that at least one juror would have voted to spare Anderson's life if the jury had been properly informed that Anderson would never actually become eligible for parole.

Anderson presented this claim to the state courts as claim 19 of his November 19, 2018 Supplemental Petition for Postconviction Relief. The state postconviction court denied the claim because "future dangerousness was not at issue" and, because of that, and counsel's own argument to the jury that Anderson would never be released, counsel's failure to object to invalid instructions and to request a *Simmons* instruction was not unreasonable. RA0368 at 10.

The state court's decision was contrary to, and an unreasonable application of, clearly established federal law. The state court's decision was objectively unreasonable under *California v. Ramos*, 463 U.S. 992, 1002-03 (1983), which recognizes that a penalty instruction regarding future release places in issue a "defendant's probable future dangerousness." The state court's decision does not acknowledge the mis-instruction of the jury in the questionnaires, penalty instructions, and verdict forms so its decision also constitutes an unreasonable determination of the facts. Anderson can therefore prevail because it was objectively unreasonable to hold that the instructions and verdict forms did not place future dangerousness in issue.

The state court's reliance on trial counsel's closing argument was also an unreasonable determination of the facts and an unreasonable application of federal law. Trial counsel did not argue that Anderson could not be released because state law did not permit it. To the contrary, trial counsel submitted a mitigating circumstance predicated entirely on the assumption that Anderson was eligible for release and asked the jury to consider, as a mitigator, Anderson's advanced age at the time of his future release—to show he would not be a danger to the community. 11/26/02 Tr. at 9–10. The fact that trial counsel also argued that Anderson would not likely live long enough to be released does not substitute for accurate instructions informing the jury that life with parole was not an available sentencing option under state law. The state court's contrary finding was contrary to, and an unreasonable application of, *Kelly v. South Carolina*, 534 U.S. 246, 257 (2002), where the Court, citing *Shafer v. South Carolina*, 532 U.S. 36, 53-54 (2001), rejected the state's argument that defense counsel's closing argument that the defendant would never live to be released from prison did not cure the error.

The state court's decision was independently unreasonable because it was inconsistent with extensive state authority recognizing the facts of the capital offense can themselves invoke future dangerousness. For example, Anderson cited *State v. Escalante-Orozco*, 386 P.3d 798, 828-30 (Ariz. 2017), to the PCR court where future dangerousness was found in part where the defendant's prior bad acts consisted of domestic violence and a random sexual assault murder. Anderson's case consisted of triple murder convictions by an alleged drifter of the Good Samaritans who allowed him to live with them. These circumstances in combination with the jury questionnaires, penalty instructions, verdict forms, mitigation instruction regarding Anderson's advanced

age at release, and the prosecutor's closing argument all necessarily invoked the specter of future dangerousness. Moreover, the court in *Escalante-Orozco* granted relief even though the defendant was "in his forties, and the jury could have believed he would live to see release." *Id.* at 830. The state PCR court's decision was accordingly unreasonable in light of inconsistent state authority recognizing future dangerousness was inherent in the capital offense and the presentation of other bad acts.

**Claim Two: Retrial counsels Kehm and Sutherland were ineffective because they were unqualified to represent individuals facing capital punishment and the trial court violated Anderson's constitutional rights by selecting and appointing unqualified counsel in his case.**

Anderson's convictions and death sentences are invalid under the federal constitutional guarantees of due process, effective counsel, confrontation equal protection, freedom from cruel and unusual punishment, and a reliable sentence due to the ineffective assistance of trial counsel and the trial court's appointment of ineffective counsel to represent Anderson in a capital case, during the culpability and penalty phases of his second trial. U.S. Const. amends. V, VI, VIII, and XIV.

**A.    Judge Chavez's selection of trial counsel to serve as re-trial counsel violated Anderson's constitutional rights to due process and a fair trial.**

Judge James Chavez personally selected and appointed Thomas Kehm as lead counsel to represent Anderson. First, the appearance of impropriety in such a selection process is insurmountable where the trial judge himself had previously weighed in on the merits of the defense's mitigating evidence and sentenced Anderson to death. Second, that selection was made off the record with apparently no input or oversight from the defense bar. RA0059 at 53. As a result, the attorney Chavez selected was someone the

Public Defender had refused to hire: Kehm was not the quality of counsel "appropriate to capital cases" given Kehm's well-documented state bar disciplinary record. RA0060 at 151, RA0061 at 3. By choosing an attorney without the demonstrated proficiency and commitment necessary to act as lead counsel in a capital case, Judge Chavez denied Anderson his Fifth and Sixth Amendment rights to due process and the assistance of counsel. State action in the denial of a fundamental right is a violation of Fourteenth Amendment due process and amounts to fundamental, structural error under the present facts. *See Powell v. Alabama,* 287 U.S. 45, 65 (1932). Thus, Anderson is entitled to a new trial independent of any specific showing of prejudice. *See id.*

1.     **Judge Chavez's selection of defense counsel was improper state action that denied Anderson his fundamental Fifth and Sixth Amendment right to a fair trial with the assistance of counsel.**

The Arizona Rules of Criminal Procedure distinguish between selection of counsel from appointment of counsel. *See* Ariz. R. Crim. P. 6.2; Comment to 6.5(c). The process for appointing capital counsel is clear: "the presiding judge shall appoint two attorneys pursuant to the standards set forth in Rule 6.8(b)." Ariz. R. Crim. P. 6.2. But the process of selecting counsel is only clear if the county has a public defender's office and that office can take the case. Ariz. R. Crim. P. 6.5 (a) & (b). If not, the Arizona Rules give no specific guidance regarding who should make that selection. Ariz. R. Crim. P. 6.2; 6.5(c); 6.8(a).

At the time of trial, Mohave County bore responsibility for ensuring the protection of Anderson's constitutional rights to counsel and due process. This obligated the county to provide Anderson with competent and effective counsel. *Strickland v. Washington*, 466

U.S. 668 (1984). Arizona does, and did at the time of Anderson's trial and re-trial, provide specific rules concerning eligibility to accept appointment as counsel in capital cases; it was the responsibility of the appointing agent of Mohave County to ensure that Anderson's attorneys met those criteria.

Selection of counsel became an issue on retrial in the instant case because the public defender's office no longer had a capital qualified attorney available to take the case. *See* RA0058 at 3, RA0060 at 127. Mohave County had a Public Defender Office; that office was responsible for appointment of counsel.  RA0059 at 53. Pursuant to this procedure, the Mohave County Public Defender's Office would either take the case, or, if unavailable, would identify qualified private counsel for appointment by the court. Rather than leave the selection of counsel for Anderson to the Public Defender's Office, whose representatives were present for the initial status conference following the Arizona Supreme Court's remand, even if the office would have  qualified contract attorney, Judge Chavez took it upon himself to locate defense counsel, stating, "I have someone in mind, but I need to talk to them again before I appoint them." 8/14/2000 Tr. at 3. There was no further discussion during this conference concerning whether the Public Defender's Office would be able to act as lead counsel or identify lead counsel. Judge Chavez thereafter selected and appointed Kehm as lead counsel, without consulting anyone other than Kehm or considering other more qualified attorneys. RA0060 at 129; ROA 173, 338; 8/14/2000 Tr. at 3; 8/28/2000 Tr. at 2.  As outlined below, Kehm and Sutherland were unqualified to provide capital representation, and their errors are glaring. By this selection process, Judge Chavez violated the rules of criminal procedure and Anderson's right to due process and a fair trial.

The practice of having a defender-specific institution select counsel is endorsed by the American Bar Association's *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (ABA Guidelines), to which the Arizona Supreme Court subscribed.[5] 2003 ABA Guideline 3.1 (b) & (c); 1989 ABA Guideline 3.l(a), (b). Placing the selection of qualified counsel on defender organizations removes the political pressures faced by judges presiding over capital cases and provides higher quality counsel.[6] Anderson incorporates the allegations of Claim Seven regarding the unconstitutionality of a system of elected judges as if fully set forth herein.

Mohave County had a responsibility to follow the criminal rules, including the ABA Guidelines, for capital representation as endorsed by the Arizona Supreme Court. The selection of qualified capital counsel to represent Anderson, therefore, should have been in the hands of the Mohave County Public Defender's Office, rather than the presiding judge. Judge Chavez was an elected official in a pro-death penalty county who had a reputation for being tough on crime, campaigned on that platform, and was up for reelection in November of 1998 and November of 2002. *See* RA0060 at 127, RA0061 at 169. Additionally, the pool of qualified capital counsel was even further diminished by the conflicts created by the number of co-defendants in the present case and by attrition at the Mohave County Public Defender's Office. *Id.*

---

[5] *See, e.g., State v. Kiles,* 213 P.3d 174, 84 n. 13 (Ariz. 2009) (citing Ariz. R. Crim. P. Rule 6.8(b)(l)(iii)).

[6] Tabek, *Why an Independent Appointing Authority is Necessary to Choose Counsel for Indigent People in Capital Punishment Cases,* 31 Hofstra L. Rev 1105 (2003); *see also* Brace and Boyea, *State Public Opinion, the Death Penalty, and the Practice of Electing Judges,* 52 American Journal of Political Science 360 (2008).

1       Moreover, Judge Chavez had himself acted as the trier of fact during Anderson's

2 first penalty-phase trial in 1998. In that capacity, the judge had already made extensive

3 findings of fact with respect to the mitigating evidence, or lack thereof, and the slight

4 weight he thought they deserved. ROA 155, 156, 157.  Based on those findings, Judge

5 Chavez sentenced Anderson to death on June 2, 1998. ROA 155-157; 6/2/1998 Tr. at 15,

6 18. Chavez was reelected in November, 1998. Anderson's second penalty-phase trial

7 occurred in November, 2002-the same month Judge Chavez was once again reelected.

8       This history created an insurmountable appearance of impropriety in having Judge

9 Chavez personally select Anderson's defense counsel. *See In re Murchison*, 349 U.S. 133,

10 136 (1955). *See* Claim Seven. Judge Chavez's selection of counsel in the present case

11 together with the choice he made—by definition in the absence of any institutional

12 defender agency who could provide input—struck at the very foundation of Anderson's

13 right to a fair trial represented by competent, independent counsel, and was therefore a

14 violation of the Fourteenth Amendment's guarantee of due process. *See Powell*, 287 U.S.

15 at 65 ("[T]he failure of the trial court to make an effective appointment of counsel was

16 likewise a denial of due process within the meaning of the Fourteenth Amendment.").

17       As detailed further below, Judge Chavez chose as lead counsel an attorney who

18 lacked the demonstrated proficiency and commitment required to act as lead counsel in a

19 capital case. *See* Ariz. R. Crim. P. 6.8(a)(3). By his selection, the judge created

20 circumstances that made the likelihood of a fair trial so improbable that Anderson's trial

21 must be deemed inherently unfair and a violation of due process. *See Powell*, 287 U.S. at

22 65; *Glasser v. United States*, 315 U.S. 60, 71 (1942). This is true independent of any

23 specific showing of prejudice. *See Powell*, 287 U.S. at 65 (prejudice presumed where

27

court's appointment of capital counsel created circumstances so unlikely to result in a fair

trial that trial was deemed inherently unfair); *Glasser*, 315 U.S. at 71 ("To determine the

precise degree of prejudice sustained by Glasser as a result of the court's appointment of

Stewart as counsel for Kretske is at once difficult and unnecessary."); *see also Bell v.

Cone*, 535 U.S. 685, 696 & n.3 (2002) (accumulating cases of Sixth Amendment error

where the right to counsel was compromised by judicial or other government action and

prejudice was presumed).

> ## 2. Selected lead counsel, Thomas Kehm, lacked the demonstrated proficiency and commitment required to represent Anderson in his capital case.

To be eligible for appointment in a capital case in Arizona, an attorney "[s]hall

have demonstrated the necessary proficiency and commitment which exemplify the

quality of representation appropriate to capital cases." Ariz. R. Crim. P. 6.8 (a) (3); *see

also* 2003 ABA Guidelines 3.1; 5.1 (requiring "high quality legal representation"); 1989

ABA Guideline 5-1. The record in the present case is devoid of any demonstration of

such proficiency and commitment or any indication that Judge Chavez performed any

due diligence whatsoever in vetting Kehm before selecting and appointing him.

Following this complete failure, Anderson's case proceeded to retrial under the

stewardship of inexperienced capital counsel with a history of failing to communicate

with clients and then lying to both those same clients and the court. Judge Chavez's

failure to select experienced, qualified capital counsel to represent Anderson resulted in

the deprivation of Anderson's constitutional rights.

1

2

     **a)**     **Prior to his appointment to represent Anderson, Kehm had a history of bar discipline and neglecting his clients.**

3

     In November 1984, Kehm submitted a resignation in lieu of disbarment to the

4

State Bar of Arizona.[7] RA0061 at 123. This resignation followed a complaint filed

5

against Kehm for his failure to take promised legal action on behalf of two clients; for

6

then lying to those clients about what actions he had actually taken; and finally, when a

7

default judgment was entered against one of the clients, forging a false affidavit and

8

filing it with the court in an attempt to direct blame away from himself. RA0061 at 125.

9

     Kehm applied for reinstatement in 1988 as "a member who [had] been disbarred

10

for professional misconduct." RA0061 at 123–4. After a hearing on September 7, 1990, at

11

which Kehm and other witnesses testified in favor of reinstatement, including testimony

12

of the prosecutor in Anderson's case,[8] the Committee recommended that he not be

13

reinstated.[9] The Committee expressed concerns that Kehm had not taken enough steps to

14

ensure that he would not engage in the same misconduct again in the future.[10] Kehm

15

sought review. The Arizona Supreme Court Disciplinary Commission, without holding a

16

hearing or receiving evidence, recommended that Kehm be reinstated. RA0061 at 47.

17

     Although Kehm was reinstated after a three-year term of probation, the same

18

character and habits that led to his earlier disciplinary problems led to later additional

19

20

     [7] The resignation was accepted in December 1984.

21

     [8] One of those witnesses was James Zack, the prosecutor in the present case. RA0061 (*In re Kehm,* State Bar Statement on Review at 1,5; *In re Kehm,* Bar Committee

22

Report, No. 84-8-1, Resignation In Lieu of Disbarment at 2.). Zack "worked with [Kehm] during the period of time during which [Kehm] committed the misconduct leading to his resignation in lieu of disbarment." *Id. (In re Kehm,* State Bar Statement on Review at 1).

23

     [9] RA0061 (*In re Kehm,* State Bar Statement on Review at 1, 5-6.).
     [10] *Id.*

disciplinary action by the bar, including (1) procrastinating[11] or failing outright to perform work promised to a client, (2) failing to communicate with the client or to respond to the client's inquiries unless cornered, (3) allowing, through his inaction and/or his deficient performance, a negative outcome for his client, and (4) failing to protect his client's interests and/or to put those interests before his own. RA0060 at 137, 140.

In August 2005, Crystal Mowry retained Kehm to represent her in a divorce action that also involved the division of property. RA0061 at 8. Mowry wrote that her case was neglected by Kehm in numerous ways, including failure to subpoena witnesses and to disclose documents that she provided to him to opposing counsel. *Id*. Most significantly, however, Kehm demonstrated a repeated pattern of failing to communicate with his client, just as he did before. Mowry wrote "I repeatedly would try to call him and I would get no answer, no machine, no fax. The phone line would ring 3–4 times then go dead." RA0061 at 9. Mowry was unable to contact Kehm for several weeks. *Id*. "Many times, he would tell me a date, time and I would not hear from him for days after the time he said he would call." *Id*. at 10. "I made repeated attempts to contact him to discuss the case. He rarely returned my phone calls. When he did he would make excuses rather than discuss the case." RA0060 at 137. Mowry's attempts to use email and regular mail were also unsuccessful. *Id*. In June 2006, Mowry kept a log of all her attempts to contact Kehm. In short, Mowry had no communication with Kehm until the day of her trial on October 3,

---

[11] The person who had brought the matter of Kehm's forgery and other misconduct to the Bar's attention, Kehm's former employer H. Louis Hiser, later noted that Kehm's difficulties had their origin in a character flaw, namely "his tendency to procrastination." H. Louis Hizer, Letter in Support of Reinstatement, at 1 (February 1, 1988).

2006. RA0061 at 8, 10–11. Mowry was completely left in the dark during the course of Kehm's representation: "Mr. Kehm failed to send me any documents concerning hearings that had been rescheduled or continued, correspondence between himself and opposing counsel, or any other documents pertaining to my case." RA0060 at 138. Ultimately, Mowry wrote to the Arizona State Bar:

> I feel that Mr. Kehm was completely unprepared himself and failed to prepare me for a case of huge magnitude. I feel that due to his negligence in all matters, I felt forced to accept a settlement instead of continuing with a fair hearing so as not to point a finger of blame and negligence at Mr. Kehm in the courtroom. I was extremely intimidated by the situation.

*Id*. at 11.  In June 2007, Senior Bar Counsel notified Mowry that, as a result of her complaint, Kehm would be placed on probation. *Id*. at 7. Although Mowry's 2005–2007 case began after Anderson's second trial and sentencing had concluded, Kehm continued to demonstrate the same pattern of neglecting his duty to communicate with his clients that had previously resulted in his disbarment.

> **b)** **At the time that he was appointed to represent Anderson, Kehm did not have a contract with the Mohave County Public Defender's Office due to his history of neglecting clients.**

Kehm was appointed to represent Anderson following a status conference on August 14, 2000. ROA 180.  Although Kehm did contract work for the Mohave County Public Defender following his re-admission to the State Bar of Arizona, in 2001, his contract was specifically not renewed because "Thomas Kehm did not have a sufficient reputation in the community to justify pursuing a criminal representation contract with him . . .  on any level of criminal case." *See* RA0060 at 151. Thus, while Kehm was representing Anderson as lead counsel in his capital case, the Mohave County Public

31

Defender would not hire him to represent clients on any type of criminal case, let alone a capital case.

The Mohave County Public Defender would normally have been appointed automatically to represent Anderson at his 2001 retrial, and under the Mohave County court's own rules, the public defender should have selected counsel for Anderson's retrial. Ariz. R. Crim. P. 6.5 (a) & (b). The circumvention of that process by Judge Chavez violated Anderson's Fourteenth Amendment right to due process and a fair trial. The fundamental, structural nature of this error is demonstrated by the absence of anyone who could effectively object to it and the resulting denial of a right essential to the defense: the right to qualified counsel with the proficiency and commitment necessary to defend a capital case. There was therefore no one representing Anderson qualified to provide the adversarial testing required to protect the integrity of the trial process. *See Strickland v. Washington*, 466 U.S. 668, 685 (1984).

The responsibility for the absence of qualified counsel in the present case must fall to Judge Chavez and be imputed to the State. *Powell*, 287 U.S. at 65. Under these facts, the error is structural and Anderson is entitled to a new trial independent of any showing of prejudice. *Powell*, 287 U.S. at 65.

> **c)    Kehm continued to neglect his obligations to communicate with Anderson about his case and to keep Anderson informed about case progress.**

Kehm's pattern of client neglect continued throughout his representation of Anderson. Kehm failed to maintain contact with Anderson or to keep Anderson informed about developments in the case.

1    Kehm spent little to no time with Anderson in person during the course of the

2    representation. Kehm spent a total of three hours visiting with Anderson during the first

3    year of his representation, an additional 2.5 hours during the week before the guilt phase

4    trial, and 1.5 hours three months later.  RA0060.  He made no visits during the last 11

5    months of his representation, which included the penalty phase trial. *Id*. Sutherland spent

6    an additional 5 to 10 hours with Anderson during the penalty phase of the trial. *Id*.

7    Mitigation specialist Holly Wake spent just 1 hour with Anderson the day before she

8    testified at trial. *Id*. There were no other legal visits. *Id*.

9        Kehm's billing records also reveal minimal client communications and

10    misrepresentations about actions taken on the case in the same way he misrepresented

11    that work was completed to past clients. On the entry for February 15, 2002, Kehm noted

12    that he spoke with Anderson at the time of a hearing. RA0060 at 5. On March 19, 2002,

13    he billed for a letter that he drafted to Anderson. *Id*. at 6. On that same bill, Kehm

14    included an entry on March 29, 2002, for 2 hours and 45 minutes, "Review prior

15    psychologicals [sic]; make notes for sentencing on Defendant's medical condition." *Id*.

16    Notably, Kehm did not call any medical experts to testify about any medical condition

17    from which Anderson might have been suffering at the time of the resentencing. *See*

18    11/25/2002 Tr. at 8. Kehm did call Dr. James Thal, a psychologist, who testified that

19    Anderson did not have a stable childhood, rather than offering a diagnosis or condition

20    from which Anderson suffered. *Id*. at 24.  In April 2002, Kehm did not bill for any phone

21    calls or correspondence to Anderson. RA0060 at 7. In May and June 2002, the only times

22    that Kehm billed for client communications was in conjunction with status conferences

23    about the case in court. *Id*. at 8-9. Kehm did not submit billing for July or August 2002.

In September, he did not bill for any communications with Anderson. *Id*. at 11-12. In October 2002, Kehm's only reference to communication with Anderson involved a billing entry for October 3, 2002, "letters from client," with no indication of whether he replied to those letters. *Id*. at 14.

Kehm also failed to even open many of Anderson's letters to him. In 2010, an investigator on Anderson's postconviction team found unopened letters that Anderson had sent to Kehm. RA0061 at 171. These letters were sent to Kehm via the Mohave County Jail mail delivery, which had a system of hand-delivery to local attorneys. *Id*. Anderson had written numerous letters requesting to meet with Kehm. *Id*. Although Kehm visited Anderson on August 24, 2000, following his appointment, Kehm's visits to Anderson were few with months between visits. RA0060 at 38. After that initial visit, Kehm did not see Anderson again until January 2001. *Id*. Kehm then saw Anderson in March with Sutherland. However, five months passed before Kehm returned. *Id*. Kehm visited Anderson in September, and then again in January 2002. *Id*. Sutherland was the only attorney to visit Anderson in 2002 prior to the resentencing. *Id*. at 39. In short, despite Kehm acting as lead counsel for Anderson for two years before Anderson's retrial commenced, Kehm only visited Anderson seven times. *Id*.

Anderson, left in the dark about what was going on in his case, sent letters, first to Kehm, then to the trial court, and finally to the prosecutor, asking for help in contacting his attorney. RA0060 at 44, 124; RA0061 at 171. Anderson even filed a pro se motion for a continuance based on the fact that he had no idea what was going on in his case. ROA 242, 243. Kehm's file contained at least half a dozen unopened letters from Anderson requesting information and contact. RA0061 at 171. Kehm's State Bar disciplinary file is

34

consistent with, and even predictive of, Kehm's conduct and performance in the present case, and Kehm was therefore not the quality of capital counsel contemplated by Rule 6.8, the ABA Guidelines, or even by the Supreme Court pursuant to *Strickland*.

### 3. Selected second chair counsel Sutherland was unqualified to represent Anderson in a capital case.

Douglas Sutherland was the second chair attorney appointed at Anderson' retrial. Sutherland's inexperience with criminal cases made him unqualified to represent anyone on a capital case, despite his appointment to represent Anderson.

Sutherland was appointed to represent Anderson during the retrial proceedings after speaking with Kehm and Judge Chavez. 9/17/2019 Tr. at 8. Sutherland had limited experience with criminal law: while he had represented criminal defendants while living in Kansas, he had not represented any since moving to Arizona. RA0061 at 195. Sutherland's primary case load was civil, including insurance defense, land and title actions, and personal injury cases; he had never worked on a capital case before. *Id.*; *see also* 9/17/2019 Tr. at 9–13. The few criminal cases that Sutherland had ever worked on consisted primarily of DUIs for divorce clients. 9/17/2019 Tr. at 12–13. He did not belong to any defense organizations such as Arizona Attorneys for Criminal Justice or National Association of Criminal Defense Lawyers. Ex. 34 at 2. He had never acted as first chair counsel on a felony jury trial. 9/17/2019 Tr. at 63.

The only preparation or specialized training for capital cases that Sutherland completed prior to starting work on Anderson's case was a six-hour CLE. RA0058 at 175; RA0061 at 195. There is no information available concerning who hosted this training. *Id*. Sutherland did not attend any specific trainings related to utilizing mental

health professionals in capital cases. 9/17/2019 Tr. at 14. In fact, Sutherland did not

attend any additional trainings on defending capital cases prior to commencing

representation of Anderson. *Id*. at 19. Sutherland was not even aware of the 1989 ABA

*Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty*

*Cases* and did not learn of them during his representation of Anderson. Ex. 34 at 3.

Sutherland never possessed the credentials required by the ABA Guidelines, despite

believing himself to be qualified. *Id*. at 6. In fact, Sutherland acknowledged "I was not

skilled or proficient in the specialized practice of capital representation and had not been

involved or committed to capital representation or capital cases." *Id*. at 5.

Sutherland's lack of knowledge about capital cases or any significant criminal jury

trial experience resulted in an over-reliance on Kehm, who himself (as outlined above)

also lacked the proficiency and commitment to adequately represent a capital defendant.

Sutherland trusted Kehm's decisions concerning how to proceed with the case, which

primarily consisted of replicating some of what first trial counsel Ken Everett had

previously presented. 9/17/2019 Tr. at 9-11; RA0058 at 175-76. "We relied upon the

investigation that was done by Ken Everett's office and his investigator." 9/17/2019 Tr.

at 21. Sutherland and Kehm did not seek the appointment of a new investigator. *Id*., *see*

*also* RA0058 at 176-77. Nor did the retrial team seek new mental health evaluations of

Anderson. RA0058 at 176-78. Despite this reliance,[12] however, neither Kehm nor

Sutherland contacted Everett during their preparation for Anderson's resentencing

proceedings. 9/17/2019 Tr. at 40-41. Although he leaned heavily on Kehm to act as lead

---

[12] This reliance, however, is belied by the record, as Kehm and Sutherland
disregarded much of the mitigation that Everett presented in 1998. *See* Claim Two(C, D).

counsel on Anderson's case, Sutherland was unaware of Kehm's previous disciplinary history at the time he had agreed to join Kehm in representing Anderson. Ex. 34 at 5.

Sutherland did not have the experience necessary to represent Anderson for his capital retrial and resentencing. Sutherland had no appreciable experience with significant criminal jury trials and thus depended upon an attorney with an extensive record of neglecting his clients. Together, Kehm and Sutherland were unqualified to represent Anderson in his capital case. They failed to undertake any new investigation of Anderson's case in preparation for the retrial, including seeking out any new witnesses. They failed to contact prior counsel. They also failed to communicate with Anderson about the case.

**B.     The trial judge created a conflict of interest for defense counsel by interfering in the defense function and in so doing undermined the reliability of the adversarial process.**

The selection of defense counsel by Judge Chavez created an employment relationship that made Kehm subservient to the court. Such a relationship, under these facts, created a conflict of interest: the subservient party is responsible to his supervisor, not to the client. A criminal defense lawyer whose primary allegiance is to someone other than his client has a conflict of interest.

Conflicts of interest broadly embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or by their own interests. *See*, *e.g.*, *Wood v. Georgia,* 450 U.S. 261, 269–72 (1981).

In the sections below, Anderson alleges specific acts and omissions by trial counsel which he incorporates by reference here.  For present purposes, trial counsel's

failure to conduct a mitigation investigation or even hire an investigator was influenced by their interest in placating the judge and his interests in speed and thrift rather than the interests of their client. Judge Chavez admonished Kehm and Sutherland, both on and off the record, to keep costs down:

> As far as the witnesses are concerned, I understand the County has no choice but to pay those, but I have asked counsel to keep that to a minimum.

10/02/2002 Tr. at 3-4.

> As I told you before, I am asking to you [sic] keep the costs down. But I realize that the Court is going to be liable for the reasonable costs of getting witnesses here. That's evident. So anything that's within reason. The Court's probably going to approve. I just want to see it and know that you have attempted to keep the cost down. And based on the other previous discussion, I know you're trying to do that.

10/22/2002 Tr. at 14-15.

The Court was not only thrifty with money, but also with time. The judge let it be known early and often he wanted counsel to get the job done on time and at or under budget. 2/15/2002 Tr., at 6-8; 10/22/2002 Tr. at 2–3. For their part, the attorneys were dutifully compliant. Kehm asked for modest extensions of time and pushed ahead with the penalty hearing despite the fact that more experienced capital defense counsel, in the wake of *Ring v. Arizona*, were seeking substantial extensions of time in order to educate themselves regarding jury sentencing. 2/15/2002 Tr. at 12; RA0058 at 66. In this way, Kehm became the first Arizona defense attorney to try a capital sentencing trial to a jury post-*Ring*.

Kehm also complied with the judge's directive to be thrifty, spending just $2,546.06 total for experts and all of their other combined expenses (except attorney

fees), which was even less than what Judge Chavez had authorized. RA0058 at 11–12, RA0060 at 4–36, RA0061 at 202–3; ROA 266, 315. Even when making these conspicuously frugal requests, Kehm and Sutherland repeatedly assured the court that every effort had been made to keep costs down. 8/19/02 Tr.at 4–5; 10/22/02 Tr. at 14–15. The result was that, in addition to conducting no investigation, trial counsel presented *less* mitigation evidence than Judge Chavez had previously found to be insufficient to warrant a life sentence.

　　　To put these numbers in perspective, another capital case that went to trial at about the same time in Judge Chavez's court was *State v. Nicklasson*, CR 96-503. Lead counsel in that case, John Bailey, was selected by the public defender, not by Judge Chavez. Chavez denied Bailey's request for funds for a mitigation investigation and also denied his request for approval of an expensive out-of-state expert. Bailey filed special actions regarding both of these denials and won relief on both in the Arizona Supreme Court. Bailey spent $54,484.84 for his mitigation specialist, his out-of-state expert, and for all other expenses. Ex. 32 at 4; Ex. 35. Importantly, and proof that the efforts of defender-selected and appointed-counsel makes a difference to the quality of advocacy, the penalty phase jury hung in *Nicklasson* and the State thereafter dropped its death notice. *Id.*

　　　By contrast, Kehm spent less than 10% of what Bailey spent in *Nicklasson*. Unlike Bailey, Kehm seemed to refrain from any action that might pass for zealous advocacy, that might disrupt the smooth and efficient progress of the proceedings, that would exceed arbitrary funding caps, or that might annoy Judge Chavez. In contrast, Bailey zealously and tireless advocated for his client's interests, and the tension between Bailey and Chavez was often palpable. RA0061 at 169.

Such tension is at times indispensable to the functioning of an adversarial system. The absence of tension in the present case is but one more indication that the system had broken down. While the absence of conflict or friction may have enhanced defense counsel's relationship with the judge, along with Kehm's prospects for consistent employment, it compromised Anderson's right to a fair trial. *See Murchison*, 349 U.S. at 136. Because this is a case where a man's life is at stake, the kind of doubt raised by such a conflict is fundamental, structural error and prejudice must be presumed. *United States v. Cronic*, 466 U.S. 648, 659 (1984). The instant case is even stronger where, because of a conflict of interest, it is impossible to know whether trial counsel's actions, or more importantly their failures to act, were tainted by considerations extraneous to and potentially in conflict with the interests of Anderson. *Holloway v. Arkansas*, 435 U.S. 475, 490-91 (1978). Likewise, Judge Chavez's personal selection of defense counsel created a conflict of interest that colored every decision made by Kehm and Sutherland.

The court's selection and appointment of defense counsel who were unqualified and ineffective denied Anderson his fundamental, constitutional right to a fair trial assisted by competent counsel under the Fifth and Sixth Amendments. This resulted in the denial of Anderson's Fourteenth Amendment right to due process. Under these facts, prejudice must be presumed, and Anderson is entitled to a new trial independent of any specific showing of prejudice.

In the alternative, as evidenced above and expounded further below, there is a reasonable likelihood that the outcomes of the retrial and resentencing would have been different but for Kehm and Sutherland's deficient performance.

1      Anderson presented Claims Two(A) & (B) to the state courts in subsection II(A) -

2  (C) of his state PCR Petition. This claim was also developed during the evidentiary

3  hearing held in December 2018, with additional testimony in September 2019. The

4  postconviction court's order did not address the entirety of Anderson's claim—

5  specifically, the postconviction court did not address whether Judge Chavez's selection of

6  unqualified counsel violated Anderson's right to counsel and due process. Nor did the

7  postconviction court address the conflict of interest that arose as a result of this

8  mechanism. Finally, the court did not address Anderson's due process arguments.

9  Accordingly, this claim must be reviewed in its entirety *de novo*.

10      Alternatively, the portion of Anderson's claim the state court addressed resulted in

11  a decision that was contrary to, and an unreasonable application of, clearly established

12  federal law. The state court's discussion of the claim was limited to the qualifications of

13  Kehm and Sutherland. Order Denying Postconviction Relief at 4. The court cited to the

14  Supreme Court's decision in *Weaver v. Massachusetts*, 582 U.S. 286, 294 (2017).

15  However, *Weaver* was expressly limited by the Court to "the context of trial counsel's

16  failure to object to the closure of the courtroom during jury selection." *Id*. *Weaver* does

17  not address circumstances such as "state interference with counsel's assistance" or a

18  conflict of interest by counsel. *Id*. at 307 (Alito, J., joined by Gorsuch, J., concurring in

19  the judgment). *Weaver* also does not apply to errors by counsel that render the trial

20  proceedings fundamentally unfair. *Id*. at 304. The state court's reliance on *Weaver* was

21  therefore objectively unreasonable.

22

23

41

**C.    Resentencing counsel failed to investigate or present mitigation evidence.**

Capital defense counsel have a duty to investigate, develop, and present reasonably available mitigating evidence at penalty phase proceedings. *Wiggins v. Smith,* 539 U.S. 510, 521-23 (2003). "Counsel *at every stage* of the case have a *continuing* duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation." RA0058 at 25; 2003ABA Guideline 10.1 l(A) (citing 2003 Guideline 10.7 (A)) (emphasis added).

Despite this constitutional requirement, trial counsel pursued no social history or mental health investigation, and indeed, lacked the expertise needed to know how to conduct one. *See* RA0058 at 5, 66, 175. Trial counsel collected no documents not already in the file, interviewed no friends or family members, and unearthed no new evidence. RA0058 at 5, 175. Such evidence was reasonably available to the defense had counsel conducted an investigation.

**1.    Trial counsel failed to seek mitigation resources or to conduct any independent mitigation investigation.**

Trial counsel failed to seek resources for a constitutionally adequate mitigation investigation from the court. Counsel also failed to conduct a thorough mitigation investigation, even with the resources available to them. The available information "would have led a reasonable attorney to investigate further." *Wiggins,* 539 U.S. at 534–35, 37.

1

2

### a)   Trial counsel failed to seek mitigation resources from the court.

3       Kehm and Sutherland were appointed after Anderson's conviction was reversed on

4   appeal. The case was first tried in 1998 with Ken Everett as lead counsel. RA0058 at 3.

5   Everett's team included second-chair counsel, mitigation specialist Holly Wake, and an

6   investigator. *Id.* Wake was put in charge of the mitigation investigation. *See id.* Her

7   investigation consisted almost exclusively of telephone interviews with Anderson and a

8   few of his friends and family members. 11/25/02 Tr. at 100-02, 193-95. Wake reviewed

9   the report of IQ testing by psychologist James Thal, though she did not meet with or

10  speak to Dr. Thal or sit through his testimony. *Id*. at 114. She also reviewed Anderson's

11  incomplete school and military records. RA0059 at 7. Based on this research and review,

12  Wake produced her Alternative Sentencing Report and testified at the sentencing trial. *Id.*

13  Notably, she did not travel to meet with mitigation witnesses in person, nor did she

14  follow up on investigative leads "because funds were not available." 11/25/2002 Tr. at

15  103, 110, 114.

16      As outlined above in Claim Two(B), Judge Chavez was adamant about keeping

17  the costs of the case low. *See* 10/02/2002 Tr. at 3–4; 10/22/2002 Tr. at 14–15. Trial

18  counsel never argued that this amount was unreasonably low. They did not file any

19  motions seeking additional funding for the mitigation investigation, nor did they file a

20  special action with the Arizona Supreme Court to contest the trial court's funding

21  limitations. *Compare State v. Nicklasson*, CR 96-503 Ex. 32 at 4; Ex. 35 (counsel for the

22  defendant in that case spent $54,484.84 for mitigation, and the defendant received a life

23

sentence.). Trial counsel were thus ineffective for failing to ensure that they had the necessary resources.

### b)  Trial counsel failed to conduct a constitutionally adequate mitigation investigation.

Trial counsel at the resentencing did not conduct any mitigation investigation. Rather, they relied almost entirely on the "groundwork" that prior counsel had set in 1998, believing that Everett "completely and adequately" completed all investigation that needed to be done during the first sentencing. Ex. 34 at 5. Kehm and Sutherland improperly believed that there was not much investigation left to do. *See id*., *and* RA0058 at 176-77. They did not conduct further investigation.

Counsel contacted Holly Wake, the mitigation specialist from the 1998 trial, and re-hired her to serve as the mitigation specialist. RA0058 at 5. Wake was retained for a flat fee of $1,000. *Id*. at 7. The totality of mitigation investigation for Anderson's resentencing was a mere 26 hours. *Id*. This included a review of her 1997 file, a phone call with a few witnesses who had never met Anderson personally, brief interactions (minutes) with corrections officers who were familiar with Anderson, and a one-hour meeting with Anderson before her testimony. *Id*. at 5-6.

For Anderson's resentencing, Wake did not review police reports, mental health reports, or transcripts. *Id*. at 1. Nor did she seek out additional witnesses, such as Anderson's extended family, or request records from his schools, jobs, and military service. Wake did not travel to California to interview Anderson's extended family members, specifically family members who had endured the same sexual abuse from the same abuser in their childhoods.

Trial counsel similarly failed to engage with any record sources. Counsel even failed to engage with the prior investigation record. Sutherland did not know that Anderson had a half-sister, despite having reviewed Wake's 1998 report, in which June Meeker was mentioned. *See* RA0058 at 178, RA0059 at 10. Had trial counsel played an active role in the mitigation investigation, counsel could have directed the investigation, including witnesses to interview and records collection. Counsel also would have been able to see that additional funding was necessary. According to Wake, she was unable to take significant action in the investigation, including travel to interview Anderson's family members, "because funds were not available for such a trip." RA0058 at 9. However, there is nothing to suggest that Wake even asked for such funding. Neither Kehm nor Sutherland requested additional funding for Wake and the mitigation investigation.

This narrow scope of the investigation was inadequate. Counsel did not direct Wake to collect any records. Nor did counsel direct Wake to meet with prospective witnesses in person. Counsel did not direct Wake to re-interview the witnesses who had previously provided her with information. Counsel also failed to direct Wake to seek out new witnesses, including family members or additional leads generated during the course of the previous investigation. Finally, counsel failed to secure proper funding. As outlined below, abundant mitigation existed and was available for presentation during the resentencing.

45

1

2

> **2.    Had counsel investigated further, they would have found abundant, available mitigating evidence from Anderson's family members.**

3

4

5

6

7

8

9

A constitutionally adequate mitigation investigation would have uncovered abundant evidence that could have been presented to the resentencing jury, and particularly evidence from Anderson's family members who knew him directly. Such witnesses were available and did testify on Anderson's behalf for the first penalty hearing; they were also available for the resentencing. Of particular importance was the contribution of Anderson's mother, who was alive and available to testify on behalf of her son in 2002. RA0058 at 9.

10

11

12

13

14

15

16

Anderson's mother, Dorothy Sallows, gave a declaration, corresponded with the attorneys, and testified at the first sentencing trial. 4/16/98 Tr. at 3-43; ROA 140. She declared that Anderson was her only child but that he had a half-sibling, June Meeker, through his father's previous marriage. RA0059 at 58. Sallows described how she discovered Anderson's father, Winfield, molesting Anderson as a young child, and later learned that this was not the full extent of the sexual contact between Anderson and his father. *Id,* at 59. She thought it best not to call attention to the matter. *Id.*

17

18

19

20

21

22

23

Sallows testified that Anderson was born prematurely and from birth was sickly and failed to thrive. 4/16/98 Tr. at 6–7. As a child he had seizures and may have been exposed to lead poisoning. *Id.* at 13; RA0059 at 58–9. Anderson attended 50 different schools because of the family's transient lifestyle, had "poor to medium" grades, and at times was put in classes for slow learners. RA0059 at 58. At age 17, Anderson was seduced by the 34-year-old mother of his teenage girlfriend. 4/16/98 Tr. at 10-11. Sallows tried unsuccessfully to put a stop to it. *Id.* at 10.

1    All of this information was available to trial counsel when they were appointed for

2    Anderson's retrial. Anderson's mother was also still alive at the time. 11/25/02 Tr. at 109.

3    Nevertheless, counsel made no contact with her or with Anderson's half-sister, and

4    pursued no further investigation. RA0058 at 177-78. Sallows died in 2005. RA0059 at

5    51.

6            **3.      Counsel failed to investigate and present evidence about**
              **Anderson's mental health as mitigation.**
7

8        The Sixth Amendment requires counsel to enlist expert services where necessary

9    to explain the significance of mitigating evidence to the jurors. *Ake v. Oklahoma,* 470

10   U.S. 68 (1985). Accordingly, capital attorneys have an obligation to investigate and

11   present mitigating evidence of mental or emotional impairment. *See, e.g., Bean v.*

12   *Calderon,* 163 F.3d 1073, 1080 (9th Cir. 1998).  Counsel "should secure the assistance of

13   experts where it is necessary or appropriate for ... presentation of mitigation." RA0058 at

14   50, ABA Guideline l l.4.l(D)(7)(D) (1989); *see* RA0058 at 25, ABA Guideline 4.l(B)

15   (2003). This may include using "[e]xpert witnesses to provide medical, psychological,

16   sociological, or other explanations for the offense(s) for which the client is being

17   sentenced, [and] to give a favorable opinion as to the client's capacity for rehabilitation."

18   RA0058 at 50, ABA Guidelines l 1.8.3(F)(2); 1l.8.6(B)(1)–(8) (1989); *see* RA0058 at 25,

19   ABA Guideline 10.11 (F) (2) & (3) (2003).

20           **a)      Resentencing counsel failed to provide context for Dr.**
                       **Thal's resentencing evaluation.**
21

22       Trial counsel called psychologist James Thal to testify during Anderson's retrial in

23   2002. 11/25/2002 Tr. at 8. Dr. Thal testified that he was asked to conduct intelligence

     testing on Anderson. *Id*. at 11. Dr. Thal administered the testing and found Anderson's

intelligence to be "low-average". *Id*. at 13–16. Other than meeting with Anderson and administering the testing, Dr. Thal did not review any of Anderson's school or military records, speak with family members about key events in his life, or assess his adaptive functioning. Ex. 36. This numerical data did not provide the jury with any understanding of Anderson's mental health, ability to maintain basic affairs in his life, or how he interacted with or was easily influenced by other individuals.

A competent expert would have explained how Anderson's many adverse developmental factors impeded and damaged his ability not only to function in society, but also how those risk factors helped explain Anderson's participation in the present offenses and therefore lessened his moral culpability. As detailed in the various declarations and reports by Dr. Dale Watson (RA0059 at 107) and Dr. Mark Cunningham (RA0058 at 93) during postconviction, there was abundant readily available evidence presented of adverse developmental factors and of other mental conditions that would have served to explain and contextualize Anderson's actions. Trial counsel were ineffective for failing to seek out and present such evidence. *See also* Claim Two(D) (recounting additional evidence of Anderson's mental health that would have contextualized his day to day functioning for the jury, had it been presented).

### b) Dr. Watson found evidence of neurocognitive impairment that should have been presented to the resentencing jury.

The resentencing jury did not hear any evidence that Anderson suffered from brain damage and neurocognitive impairment. Dr. Watson was asked to complete a comprehensive neuropsychological evaluation of Anderson in conjunction with the state postconviction proceedings. RA0059 at 107. This evaluation required multiple meetings

with Anderson in the span of two months. *Id*. This evaluation also included review of nearly 20 distinct sets of records, including demographic information about Anderson's parents, Anderson's school records, Anderson's military history, and affidavits or testimony from witnesses at the first penalty hearing. *Id.* at 109–10. The testing battery administered included over 30 separate tests. *Id*. at 108–9.

Dr. Watson considered Anderson's history alongside his test scores. For example, Dr. Watson found that Anderson "is able to attend well but that learning is difficult for him." *Id*. at 126. Dr. Watson made reference to Anderson's history of learning disability and acknowledged that this disability could be compounded by his transient childhood and unstable school attendance. *Id*. at 136. Dr. Watson ultimately found that Anderson displayed impaired neurocognitive abilities. *Id*. at 135. Anderson's brain damage was characterized as moderate which places him in the bottom five percent of the community in terms of functioning. *See id*. Such information would have been critical for the sentencing jury to consider; thus, Kehm and Sutherland were ineffective for failing to present this evidence.

      **c)**    **Dr. Cunningham found numerous Adverse Developmental Factors that negatively affected Anderson and these factors should have been presented to the sentencing jury.**

Trial counsel also failed to present any evidence from a mental health professional that would have contextualized Anderson's life to the jury. *See Williams v. Taylor*, 529 U.S. 362, 395–96 (2000) (finding that trial counsel was ineffective for failing to investigate and present evidence including the defendant's tumultuous and neglected childhood, including a history of parental incarceration; parental neglect; physical abuse

by caretakers; and mental health). At the evidentiary hearing in 2018, postconviction counsel presented the testimony and report of clinical psychologist Dr. Mark Cunningham, who determined that there were 22 Adverse Developmental Factors bearing on Anderson's life trajectory. 12/7/2018 Tr. and 12/10/2018 Tr.; RA0058 at 93. Such mitigation evidence was readily available to resentencing counsel had they investigated, and it should have been presented to the sentencing jury.

In addition to interviewing Anderson and administering his own testing, Dr. Cunningham was able to draw on a range of sources when forming his opinions, including Anderson's educational records and military records, interviews with Anderson's family members, and previously conducted neuropsychological testing. RA0058 at 95-97.

Dr. Cunningham found that Anderson was the product of a "disturbed family system." *Id*. at 108. The foundation of this system, beginning with Anderson's parents, was built on abandonment and sexual abuse. *Id*. at 104-6. He then married a woman with a similar history who also lived a transient and marginal lifestyle. *Id*. at 106-7. The sentencing jury did not hear that both Anderson's father and mother were given up for adoption as infants. *Id*. at 104-3. Dr. Cunningham opined that "This generational history was critically important for a capital sentencing jury to have as they examined the formative influences on [Anderson]'s history, his character and his psychological limitations. This history provides vital insights into the origin and nature of his psychological vulnerabilities." *Id*. at 108.

The sentencing jury did not hear that Anderson was born prematurely and with substantial complications, including serious illness for the first month of his life. *Id*. at

110. Nor did the jury hear about substantial developmental issues, including weeks in a

body cast when he when he was three years old. *Id*. at 111. Similarly, trial counsel never

informed the sentencing jury that Anderson suffered from seizures from ages three to

seven, other than in passing. *Id*.; 11/25/2002 Tr. at 44. As a child, when accompanying

his father to worksites, Anderson was exposed to lead-based paint. *Id*. at 111-12. These

early health issues, as well as exposure to lead-based paint, show a significant impact on

Anderson's neurocognitive functioning and intellect. *Id*.

       Although the sentencing jury was told that Anderson attended 50 different schools

by Dr. Thal, the jury was left with no ability to appreciate the magnitude, the frequency,

or the sudden nature of these moves. *See* 11/25/2002 Tr. at 22; RA0058 at 127. In reality,

the experience of moving was lonely and jarring:

> [Anderson] reported that at times his mother would be upset
> with his father for moving again, particularly when Winfield
> did not even allow them time to pack the house, so that they
> left belongings, family photographs, and school records.
> [Anderson] described that at times he would be aware of a
> pending move 1-2 days in advance as Winfield packed his
> tools and Dorothy packed the house. On other occasions, they
> would be waiting outside the school to leave or he would come
> home from school to find the car packed. On these occasions,
> they would leave without his even having the opportunity to
> say goodbye to teachers or peers.
>
> [Anderson] described that his parents usually pulled a U-Haul
> containing Winfield's tools and limited personal property. He
> recalls that his clothes moved with them, but could not recall
> any toys that moved with him. [Anderson] reported that he
> did not have a bicycle until junior high. Typically, they would
> be on the road for a day or two traveling to the next destination.
> His parents alternated drivers and drove straight through. On
> their arrival they would stay in the motel where Winfield was
> working or rent a house.

RA0058 at 127. This experience was never shared with the resentencing jury. Although the jury was told that this had a negative impact on his education, the jury was not told of Anderson's actual experience:

> With each school change, there was a new building with different smells, sounds, people, and routine. The teacher, and that teacher's behavior, expectations, and routine, were a recurrent challenge to decipher. Each new classroom had its own culture to learn and pecking orders to sort through.

*Id*. at 129. Anderson was routinely ostracized and ridiculed by his new peers. *Id*. at 130.

At home, Anderson's father drank continuously starting first thing in the morning. *Id*. In fact, Anderson could not recall his father without a beer in his hand, even at job sites. *Id*. The more his father drank, the more irritable he became and it created a greater risk that he would sexually abuse Anderson. *Id*. Dr. Cunningham determined that the presence of an alcoholic parent in the home creates a substantial risk for a child to develop psychological problems, self-control deficits, behavioral disorders, and other problems. *Id*. The jury never heard this evidence. Nor did the jury hear that "parental substance dependence represents a corruptive mode of how to cope with life demands and stresses." *Id*. at 131.

The fact that Anderson was sexually abused by his father as a child was shared with the sentencing jury, however, the jury was not "provided with a description or mental picture that would allow them to reasonably grasp the reality of what occurred." *Id*. at 132. In fact, Anderson reported that "some sort of sexual encounter would occur whenever he was alone with his father." *Id*. Anderson recalled that his father told him not to tell his mother. *Id*. As it turned out, Anderson's mother was aware of the abuse, but did

52

not leave his father, did not report the abuse to authorities, and did not seek any

counseling for her child. *Id.*; *see also* 11/22/2002 Tr. at 70; 11/25/2002 Tr. at 47–48.

Other than presenting the fact that the abuse occurred, trial counsel did not tell the

jury how this experience shaped Anderson's life. Counsel did not ask Dr. Thal any

questions about what impact such abuse would have had on a child. 11/25/2002 Tr. at 8-

29 (Dr. Thal's direct examination). The sentencing jury never heard that

> *Traumatic sexualization* may occur as the child's sexuality
> is inappropriately shaped by the abuse experience. Being
> sexually abused represents a profound *betrayal* as someone
> whom the child was dependent on or vulnerable to has
> caused the child harm. This betrayal may subsequently be
> associated with relationship distrust, feeling unlovable,
> interpersonal dependency, and retaliatory aggression. The
> child experiences a marked sense of *powerlessness* in the
> face of sexual abuse - as the child's will and sense of control
> are overwhelmed. This may result in continuing feelings of
> incompetence, depression, anxiety, and adult victimization
> or domination.

RA0058 at 132 (emphasis in original). Nor did the jury hear that "the negative

repercussions of the sexual abuse suffered by Frank are evident in his adolescence and

adulthood relationships and adjustment." *Id.* at 41. Dr. Cunningham further noted that

Anderson's entanglement with his wife who was old enough to be his mother is a part of

the legacy of Anderson's abuse and exploitation. *Id.* Dr. Cunningham further found that

this abuse was a contributing factor to Anderson's inability to adjust to adulthood,

difficulty in social situations, and functional immaturity. *Id.*

This disturbed childhood meant that Anderson had a distorted sense of what was

age appropriate, or "normal." 12/10/2018 Tr. at 23. According to Dr. Cunningham,

Anderson did not see anything unusual in the fact that his wife was 17 years older. *Id.*

The sentencing jury did not hear about Anderson's wife's traumatic life history, either: that she had been sexually abused in her childhood by multiple perpetrators and that her own mother had encouraged the abuse. RA0058 at 139. Anderson met Mary, the woman who would later become his wife, when he began dating her daughter, who was in his high school class. *Id.* Anderson's first sexual encounter with Mary occurred when he was in high school, in circumstances that appeared similar to the circumstances when he was abused by his father. *Id.* Dr. Cunningham concluded that Anderson was never able to establish autonomy, independence, or self-reliance due to his exploitative relationship with Mary. *Id.* at 140.

The combined effect of the traumatic and damaging experiences that Anderson endured in his childhood led to poor choices, and a further disturbed adulthood, or what Dr. Cunningham termed a "disturbed trajectory." *Id.* Trial counsel did not present any evidence of Anderson's disturbed trajectory to the sentencing jury. For example, other than mentioning that Anderson had served during the Vietnam War as a field wireman and that his wife called someone to bring him home, the jury heard nothing substantive about his service. 11/22/2002 Tr. at 77-79.[13] Trial counsel also failed to inform the sentencing jury of Anderson and his wife's nomadic lifestyle, which very much mirrored his own upbringing. Dr. Cunningham found that this lifestyle

> served to increase Frank's dependence on Mary and their subsistence-level lifestyle. Frequent employment changes meant no advancement, development of advanced skills, or financial security. Changes in geographic area blocked the formation of friendships that could have diversified Frank's emotional support system. The moves also prevented the

---

[13] *See* Claim Two(D) concerning Anderson's military service. Like resentencing counsel, postconviction counsel also failed to present a complete picture of this service to the court.

development of a life structure of apartment/house,
furniture, and personal belongings that can provide an
anchoring sense of home.

RA0058 at 144.

Upon considering all of the adverse developmental factors, completing clinical

interviews, and reviewing additional documentation about Anderson's life, such as

interviews from his family members and important records such as his school and

military service, and reviewing his test scores from prior neuropsychological

evaluations and conducting new testing, Dr. Cunningham determined that Anderson

showed signs of Asperger's disorder. 12/7/2018 Tr. at 99-139. Dr. Cunningham

explained the disorder as a "continuum." *Id*. at 105. He found four primary symptom

arenas that demonstrate the presence of this Asperger's spectrum disorder: (1)

deficient inter-personal reciprocity; (2) poor hygiene; (3) a restricted, repetitive life

pattern; and (4) poor occupational adaptation. *Id*. at 106. The people in Anderson's

life described him as "helpful and friendly," but having no truly meaningful

relationships outside of his wife. *Id*. at 107. He was regarded as "childlike" and

easily bullied. *Id*. Dr. Cunningham referenced a report from Anderson's step-son

David White to illustrate:

> "Frank has always needed guidelines. Without guidelines,
> he can't function in the big world. If he has too many
> options, he can't function. It's like his brain gets overloaded.
> It's like his hard drive, his brain, just doesn't work."

> "Frank was always in the moment and did not think things
> out. He would agree to everything, and after the moment,
> would realize that he wasn't thinking before he acted. I've
> seen Frank face a guy with a gun pointed in Frank's face,
> and I had to step between them. This occurred at the
> Holbrook truck stop in Arizona."

> "A truck driver came in and began to argue with Frank. Frank was too stupid to realize the truck driver had a gun pointing at him right in his face. I was in my 20s then. I told him, what are you stupid? When someone is pointing a gun at you, you say what you think they want to hear."

> "I saw Frank physically beaten once, and all he did to fight back was put his hands up. He did not know how to fight."

*Id.* at 109-110.

The jobs that Anderson held were menial and barely supported the transient lifestyle he lived with his wife.

> He would solicit a few hours of work from businesses off the exit ramps, cleaning bathrooms or pulling weeds, washing dishes. Nobody talks about Frank being lazy or unwilling to work. It's just that the work that he is doing, he is willing for that to be just extraordinarily primitive and repetitive. And he's working in exchange for food and gas, just enough money for the next meal or a tank of gas. He might work all day for $5 or $10.

*Id.* at 126-127. Dr. Cunningham also noted that Anderson's self-reports about his occupational roles were exaggerated and not tied to "real-world achievements." *Id.* at 106-107.

The multitude of factors that Dr. Cunningham found that impacted Anderson's life, formed the foundation for his interaction with the co-defendants in the instant offenses. RA0058 at 146-50. Again, trial counsel failed to use Dr. Thal's testimony or report for such an explanation or to present this evidence to the sentencing jury. Evidence of the many adverse forces impacting Anderson during his childhood was readily available to resentencing counsel. Trial counsel failed to conduct any investigation to find such evidence, let alone present it to the jury. This failure to investigate and present mitigation evidence amounted to constitutionally deficient

performance. But for this deficient performance, there is a reasonable probability that at least one of the jurors would have opted for a sentence less than death.

### 4. Trial counsel failed to gather any evidence from Anderson's family members, which was readily available.

As outlined above in Claim Two(B) and (C)(1), trial counsel relied entirely on the mitigation evidence produced by mitigation specialist Holly Wake. *See also* 9/17/2019 Tr. at 26. During the first sentencing, Wake testified that she interviewed Anderson's mother, step-daughter, and two people who once lived in the same trailer park as Anderson and his wife. 4/16/1998 Tr. at 49–50. Wake summarized these conversations in her 1998 Alternative Sentencing Report. RA0059 at 7.

Second chair trial counsel Sutherland did not recall directing Wake in a particular way, but rather, left it to Wake to determine which witnesses to approach and how to approach them. 9/17/2019 Tr. at 26. Sutherland did not know what additional mitigation investigation was conducted, if any. *Id*. Other than a few phone calls with individuals from Anderson's ministry, Wake did not seek out mitigation evidence from friends or family members who personally knew Anderson. *Id*. Wake did not produce a new report to accompany her 2002 testimony.

A number of Anderson's family members had compelling mitigation evidence to offer, yet were never contacted by Wake or trial counsel. These witnesses could have spoken to the pervasive pattern of sexual abuse by Anderson's father in a manner identical to the abuse that Anderson endured. Additionally, these witnesses could have spoken to the transient and unstable lifestyle of Anderson and his wife.

For example, Ken Meeker, Anderson's nephew, had knowledge of the Anderson family history from his mother June Meeker. RA0059 at 62. June is Anderson's paternal half-sister. *Id*. Ken described Winfield Anderson (called Andy by Meeker and other family members), Frank Anderson's father, as a "piece of shit" and a "child molester." *Id*. at 63. Meeker knew that his mother June had been molested as a child by Winfield. *Id*. Ken also knew that his mother had been physically abused by Winfield. *Id*. Ken recalled his mother telling him that she and Anderson did not have a very good childhood. *Id*.

Ken was also one of Winfield's victims. Winfield started to molest Ken when Ken was just 7 or 8 years old. *Id*. at 63. The abuse continued until Ken was 12 or 13. *Id*. Ken recalled that Winfield lived nearby and would be called upon for childcare. *Id*. Ken recalled that Winfield would bake with him and his siblings. *Id*. Winfield would molest Ken when they were alone, offering money and cookies if Ken obeyed. *Id*. Additionally, Ken was afraid of physical punishment from his mother June if he had broken a rule, and Winfield would promise to not tell her about the transgression in exchange for Ken's compliance with Winfield's sexual demands. *Id*.

Lorie Sarvey, Ken Meeker's sister and Anderson's niece, was also abused by Winfield in an identical manner. RA0059 at 66. Lorie recalled that Winfield was a frequent caretaker when her mother June was working and her father was not home. *Id*. Lorie remembered the abuse occurring from the time that she was a baby until she was 8 or 9 years old. *Id*. The abuse would begin the moment June would drop her off at Winfield's house before going to work. *Id*. Winfield would tell Lorie to sit on the couch where he would place a blanket over her and molest her. *Id*. This would happen three or four times during the day when in Winfield's care. *Id*. Lorie recalled that her mother June

once walked into the room while the abuse was happening. *Id*. June told Lorie to get off the couch, and the abuse stopped. *Id*. The next day, however, June brought Lorie back to Winfield's house while she went to work. *Id*. Lorie recalled that the abuse finally stopped when she and her siblings were removed from their parents' custody and placed in foster care. *Id*.

Katherine (Meeker) Langlier was another granddaughter of Winfield's, sister to Ken and Lorie. Ex. 41. When Katherine was 8 or 9 years old, Winfield moved into the studio apartment that was converted from the garage that sat behind the family home. *Id*. Winfield lived there for approximately two years before the family moved. *Id*. Winfield was the primary babysitter for Katherine and her brothers and sisters. *Id*. Katherine remembered that Winfield would sneak into the bedroom where the girls slept and molest them. *Id*. She recalled that she was abused by Winfield at least once a week; she suspected that Winfield had also been molesting her sisters. *Id*. Katherine told her mother June that Winfield was abusing her, but June did not react when Katherine told her what was going on; rather, June seemed to ignore the conversation entirely and acted as though it was just a normal part of family interactions. *Id*. Katherine reported that the only reason she knew that this was *not* normal was because she had friends with nice families and would spend time at their houses, watching how they interacted. *Id*. June would beat Katherine for using her babysitting money to purchase school clothes and food, instead of giving it to June. *Id*. At 16, Katherine had her first baby and June kept the child to try and claim welfare. *Id*. Katherine later learned that her other siblings were abused by Winfield, and they had many issues: substance abuse, violent crimes, domestic violence and unstable relationships, and homelessness. *Id*.

Ken Meeker would have been available to testify on behalf of Anderson had he been contacted by trial counsel. RA0059 at 64. He was not. Similarly, Lorie Sarvey was never contacted by trial counsel. Thus, the sentencing jury never heard that Winfield was perpetrating abuse identical to the abuse Anderson suffered on other family members.

Similarly, had trial counsel conducted any investigation into Anderson's wife's family, who were available and willing to speak to trial counsel, the sentencing jury could have been presented with a contextualized understanding of Mary's own trauma and how her history formed a dysfunctional relationship with Anderson, thereby giving the jury a complete picture of Anderson's day to day functioning. For example, Lillian Hamel, Mary's younger sister, recalled that one of their father's friends was arrested when Mary was 10 years old because he had molested Mary. RA0059 at 69. Lillian recalled that the man had tried to molest her, as well. *Id*. This was not the first time that an older man would abuse Mary: when she was 12, another neighbor, Mortimer Welch, raped Mary. *Id*. The second man who raped Mary was sexually involved with Mary and Lillian's mother Doris. *Id*. Mary and Lillian's parents divorced, and Mary remained living with their mother while Lillian lived with their father. *Id*. Doris would actively encourage Mary to engage in sex with Mortimer and would also pressure Lillian to participate with them. *Id*. at 69-70. Lillian recalled that around this time she and her siblings did not have a stable home because they moved frequently between relatives. *Id*. At 16 years old, Mary had her first child with Mortimer. *Id*. at 70. Mary had two more children with him. *Id*. All of these children were taken away from Mary. *Id*. Mary learned who had adopted two of her children and would drive past the home to harass the family. *Id*. At some point, Mary and Mortimer married even though he was over 40 years her senior. *Id*.

At one point, Lillian worked as a waitress in the same restaurant as Mary. *Id*. at 71. Lillian only stayed at that job for one day. *Id*. Mary would allow customers to pat her and encouraged Lillian to do the same "in order to get good tips." *Id*.

Mary became sexually involved with a man named Roy, who she met while babysitting his children. *Id*. Mary had four more children with Roy. *Id*. Mary and Roy lived in squalor and fought constantly. *Id*. Mary and Roy were transient and would live in their car at times. *Id*.

Mary met Anderson while she was still with Roy. *Id*. Lillian recalled that Anderson was "not well kempt, not well dressed, he seemed dirty in his hygiene." *Id*. Lillian recalled that when she met Anderson, he seemed "lost in the woods." Ex. 41. Mary treated Anderson as another child she could boss around. *Id*. But Anderson did try and help the family. Lillian recalled that he was passing bad checks to buy them food. *Id*. Lillian told postconviction counsel that "I can't think of a person that [Mary] had any connection with who came out better for it. I can't think of anyone who came out better for knowing her." *Id*.

One of Mary's brothers, Peter Zeestraten, also would have been available and willing to speak with trial counsel. RA0059 at 76. Peter also recalled that Mary was raped by a neighbor as a child. *Id*. at 74. Like Lillian, he remembered their parents' divorce, and like Lillian, lived with their father. *Id*. Peter recalled that Mortimer and his wife were neighbors before Mortimer and his mother became sexually involved; Peter later learned that Mortimer was involved with Mary. *Id*. at 75. Mary had three children, all of which were removed from her care by social services. *Id*. Mary was also involved with a man their father's age named LeRoy White. *Id*. Mary and LeRoy lived in their car, and once

61

asked Peter if they could stay with him, but Peter refused because they were dirty and he was worried about protecting his home and children from a vermin infestation. *Id*. at 76. Peter recalled Mary and Anderson having an identical lifestyle: dirty and living in a car. *Id*. Peter once let Mary and Anderson occupy a home on a farm where he lived. *Id*. Peter had to ask them to leave after a few months because the home had turned into a "pigsty." *Id*.

David White, one of Mary's children, recalled living with Anderson and Mary as a child. RA0059 at 91. David described Anderson as a "dummy," but a "good guy." *Id*. David recalled that Anderson would always help family members, "unconditionally." *Id*. David described Mary as a "monster." *Id*. She would "beat me and my brothers and sisters with anything that she would get her hands on: sticks, water hose, and licorice rope." *Id*. On one occasion she set David on fire to teach him not to play with matches. *Id*. David recalled that Anderson was always trying to hold jobs, but Mary would tell him to quit them. *Id*.

After Anderson left the Army, the family lived in a car. *Id*. Anderson would drive around and work in exchange for food for the family. *Id*. Anderson would also collect cans to make money for food. *Id*.

David learned that Anderson and Mary became involved while Mary was still married to David's father, LeRoy White. *Id*. at 92. David also learned that Mary and Anderson were sexually involved with others, including other family members. *Id*. at 91-2.

David learned at 14 years old that he could overpower Anderson to get what he wanted. *Id*. at 92. David recalled that Anderson was afraid of him. *Id*. David recalled

Anderson being afraid of everyone and never standing up for himself. *Id*. On one occasion, while working at a truck stop, a man pointed a gun in Anderson's face, and David had to intervene because Anderson did not seem to understand the severity of the situation. *Id*. On another occasion, David saw someone beat Anderson and Anderson did not fight back. *Id*. David recalled that Anderson could not function in a world without guidelines. *Id*. "If he has too many options he can't function, it's like his brain gets overloaded." *Id*.

The sentencing jury never heard from anyone who had first-hand experience, like David, watching Anderson's interactions with others. Testimony like David's would have given the jury a picture of exactly how submissive Anderson was to others and what it looked like when Anderson became overloaded and unable to function. Such testimony would have clearly demonstrated for the jury the severity of Anderson's cognitive deficits.

Santana Molina was once married to two of Mary's daughters, Anderson's step-daughters. RA0059 at 87. Santana recalled observing Anderson and Mary together. "The family's life involved a lot of yelling and slamming of doors." *Id*. Anderson "acted like an adolescent," and would have "tantrums" and stomp his feet. *Id*. Santana recalled that Anderson's thinking was very childlike and Anderson would do what was asked of him in exchange for a reward. *Id*. Mary was very dominant, and Anderson always did what she said. *Id*. Santana remembered the pair as very dirty. *Id*. They frequently lived in cars. *Id*. at 88. They were often mobile, and sometimes collected aluminum cans to make money. *Id*. Trial counsel never contacted Santana, even though no one outside of the family had a better firsthand observation of the dynamic between Anderson and Mary.

In addition to failing to reach out to Anderson's family members, trial counsel also failed to contact any other friends or neighbors who knew Anderson. Most significantly, trial counsel failed to contact Dena Swader, who was romantically involved with Anderson immediately before the events of this case and had a child with him. RA0059 at 103. Dena met Anderson when he was managing a mobile home park in California. *Id*. Anderson gave her a job as a secretary in the office. *Id*. Dena recalled that Anderson was giving to a fault: on the first day she met him, he took her to a thrift store to buy clothing when she did not have anything; however, she become annoyed with the fact that Anderson always did what everyone told him to and never stood up for himself. *Id*. Dena described Mary as "hateful" and dirty. *Id*. at 104. Mary did not treat Anderson well. *Id*.

Anderson came to see Dena at the hospital after Dena gave birth to their child. *Id*. The child was stillborn. *Id*. Anderson was upset over the death of their child. *Id*. Mary accompanied Anderson to the funeral and was very disruptive. *Id*.

Much like David White's observations of Anderson, Dena also described Anderson as "childlike." *Id*. She recalled that Anderson was never violent, and the "most Frank ever showed was a stomping fit, one like a child would have. He would stomp his feet and move his arms in a child tantrum like manner." *Id*.

Ramona Cornett lived in the mobile home park Anderson managed during his tenure as manager. RA0059 at 84. She described Anderson as "nice" whenever she would go to pay the rent, and she never witnessed him act in a violent manner. *Id*. at 85. Ramona also described Anderson as "dirty." *Id*. at 84. Anderson was always a mess: he did not comb his hair or wear socks, and his shoes were untied. *Id*. When Ramona would go to pay her rent, she noticed that his trailer was filthy. *Id*.

64

Another resident of the mobile home park, Holly Hawthorn, would have been available and willing to meet with Anderson's trial counsel. RA0059 at 98. Holly lived next door to Anderson and Mary. *Id*. at 94. Holly would play cards with Mary and have coffee with the couple. *Id*. Holly described Anderson as having a dirty appearance and not taking care of himself. *Id*. Anderson and Mary did not have a lot of friends, but they were always social with her. *Id*. at 95. Mary was mean and abusive to Anderson. *Id*. She would yell at him in front of people. *Id*. "Frank told me that although I saw Mary being mean to him he loved her." *Id*. Anderson was basically a caretaker to Mary. *Id*. Holly described how, after meeting Dena, Anderson changed: he cleaned up, but started using drugs. *Id*. at 95-6. Holly believed that the drug usage contributed to Anderson's mental decline. *Id*. at 96. "I think Frank lost his mind because of all the drugs." *Id*. Even after Anderson and Mary split up, Anderson continued to care for Mary and take her to doctor's appointments. *Id*. at 97. Holly could have provided the sentencing jury with a glimpse into Anderson's true level of functioning and how the changes in his life, such as becoming the park manager, the presence of Dena in his life, drug usage, and the breakup of his marriage impacted him.

Anderson's family and friends, including his stepchildren, his wife's siblings, and neighbors were available and willing to speak with counsel about Anderson's history, including the abuse that he and other family members suffered from Winfield; his marginal, dysfunctional existence; and his puerile dependence on his wife Mary. Such evidence would have provided the sentencing jury with first hand examples of Anderson's low functioning, inability to lead, and inability to resolve even minute problems in his life. Similarly, trial counsel could have provided such anecdotal

information to Dr. Thal or other mental health experts to include in his analysis as real-world examples of any clinical impressions. *See e.g.,* RA0058 at 114-21 (incorporating information about Anderson's life into his analysis).

**5.    There is a reasonable probability that but for trial counsels' deficient performance in failing to investigate and present compelling, readily available mitigating evidence, at least one juror would have voted for a sentence less than death.**

This claim was presented to the state postconviction court. The postconviction court found that:

> Perhaps Kehm and Sutherland could have conducted a more exhaustive investigation, retained more experts, presented more witnesses, attended more training, and spent more time in preparation. However, Kehm and Sutherland were fare from passive observers. Their reliance on the work of their predecessor, an experienced criminal defense attorney with capital experience, was not unreasonable.

> \*\*\*

> Indeed, the lay witnesses may have presented a more complete picture of Anderson as a human being. However, that picture is not entirely favorable to the defense. It includes Anderson's history of dysfunctional sexual relationships, his molestation of a 12-year old relative, his drifting, unstable lifestyle, his capacity for dishonesty, his being jailed for arson, his willingness to follow others, and his apparent willingness to commit murder if asked.

> Further, Sutherland testified that he was skeptical a jury would be sympathetic to Anderson's traumatic childhood since he was 48 when he participated in the murders.

RA0368 at 8.

The postconviction court's decision clearly misapprehended the record and was unreasonable. None of the evidence referenced by the postconviction court was actually presented to the resentencing jury. Despite Kehm and Sutherland's claims of reliance

1    upon prior counsel Everett's work, the evidence they actually presented to the sentencing

2    jury was far from the mitigation presentation by Everett in 1998. Kehm and Sutherland

3    neglected to even speak with Everett, Dr. Thomas Thomas, Dorothy Sallows, and other

4    witnesses who did, in fact, testify during the 1998 sentencing. Accordingly, the

5    postconviction court's assertion that Kehm and Sutherland properly relied on the work

6    that was completed by prior counsel is belied by the record and this decision presents an

7    unreasonable application of law and an unreasonable determination of facts.

8        The court distinguished Anderson's case from *Porter v. McCollum*,[14] but found

9    that it would be engaging in "20/20 hindsight" by finding trial counsels Kehm and

10   Sutherland ineffective for their failure to present adequate mitigation evidence to the jury.

11   *Id*. at 9. The court, however, never addressed the prospect that, if the sentencing jury had

12   heard the mitigation evidence that just one could have been moved to vote for a sentence

13   less than death. Further, the court never addressed trial counsels' failure to present a

14   complete picture of Anderson's mental health. Accordingly, this claim must be reviewed

15   by this Court *de novo*. Alternatively, the postconviction court's conclusions amount to an

16   unreasonable misapplication of clearly established federal law and an unreasonable

17   determination of the facts in light of the evidence presented.

18       The court's finding that it would be engaging in "20/20 hindsight" if it found

19   Kehm and Sutherland ineffective for failing to investigate and present mitigation

20   evidence, including evidence from lay witnesses who know Anderson personally, is

21   unfounded—it assumed that trial counsel was even aware of such evidence. Neither

22

23       [14] As explained in Claim Two(D), the postconviction court's findings
     distinguishing *Porter* were based on an incomplete record that omitted Anderson's
     honorable military service.

Kehm nor Sutherland spoke with any of Anderson's family members by blood relation or marriage. Neither Kehm nor Sutherland directed Holly Wake to seek out these individuals and interview them. If, following a reasonable investigation, trial counsel had made a decision concerning who they would call to testify based on what information that witness might have to say and how that witness would respond on that stand, that would at least have permitted counsel to make a strategic decision. However, this is not what happened. Rather, trial counsel was not aware that these lay witnesses existed or were available to testify on Anderson's behalf.

The postconviction court should not have credited Sutherland's testimony that he was "skeptical" that a jury would be sympathetic to Anderson's traumatic childhood. Sutherland did not conduct a full mitigation investigation of the extent of the trauma that Anderson suffered or how it impacted him, including the effects on Anderson's relationships, his transient lifestyle, and how easily he was manipulated by others. Sutherland could not have had a properly formed assessment of how the jury may have received such evidence when he never bothered to look for it in the first instance. Trial counsel had a clear obligation to conduct an investigation into the mitigating circumstances of Anderson's life and did not do so. Had trial counsel properly investigated and presented the available mitigation evidence from both mental health experts and those who knew Anderson, there is a reasonable likelihood that the outcome of the proceeding would have been different.

**D.     Both trial counsel and state postconviction counsel were ineffective for failing to investigate and present reasonably available mitigation evidence.**

Anderson was constitutionally entitled to a complete, contextualized mitigation investigation and presentation by his counsel at both the trial and postconviction proceedings. *Porter v. McCollum*, 558 U.S. 30 (2009); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 592 U.S. 362 (2000). Both trial and postconviction counsel were ineffective for failing to fully investigate Anderson's life history for mitigation evidence and to present such evidence to the jury and postconviction court, respectively. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Martinez v. Ryan*, 566 U.S. 1 (2012).

**1.     Anderson served his country honorably during the Vietnam War, yet he was deprived of the military career he desired.**

Neither the resentencing jury nor the postconviction court received complete or accurate information about Anderson's military service during the Vietnam War.

Holly Wake's 1998 report contained no information about Anderson's military service. In 2002, when called to testify during the resentencing, Wake acknowledged that her collection of Anderson's military records was incomplete. 11/25/2002 Tr. at 57–58. Further, Wake testified that Anderson had "owned up" to returning from Vietnam early as a hardship from the American Red Cross, as though this was a situation that he had control over and that he was shirking his responsibilities. *Id.* at 58.

When Anderson testified at the resentencing, counsel asked Anderson for the year that he entered the military and whether Anderson went to Vietnam. 11/22/2002 Tr. at 77–78. Trial counsel then proceeded to minimize Anderson's service to the jury:

Q.     But you were only there for a short time; is that right?

69

A.   Yes.

Q.   As a matter of fact, your wife had something to do with you coming back; is that right?

A.   Yes. She had called somebody and stated that there was an emergency and that I needed to come home.

*Id.* This minimization conveyed to the sentencing jury that there was nothing remarkable about Anderson's service. As outlined below, the reality of Anderson's military service was far different from what was presented to the jury.

Although postconviction counsel presented some information about Anderson's service to his country, he failed to present a complete picture of Anderson's time in the military, including the honorable, successful aspects of his service. In 2018, Dr. Cunningham told the postconviction court that one of the factors of Anderson's disturbed trajectory was his "failed military service." 12/7/2018 Tr. at 37. Dr. Cunningham testified that Anderson was accepted into the Army under special circumstances related to the Vietnam War and that he struggled during his time in the Army due to his adaptive deficits. *Id.* at 129-130. Dr. Cunningham incorrectly testified that Anderson's enlistment began a year later than it actually did (Anderson enlisted in March 1967, not April 1968). *Id.* Dr. Cunningham's report noted Mary's role in controlling and manipulating the length of Anderson's service. RA0058 at 140–1, 144. While it is true that Anderson's military record was not flawless, the picture presented by Dr. Cunningham—that Anderson's service was nothing more than an illustration of his low functioning—materially omitted his successful achievements. Aside from Dr. Cunningham's references to Anderson's struggles during his service, the postconviction court did not receive a complete or accurate account of Anderson's time in the Army. Anderson's military service was

honorable, and demonstrated that, in a structured environment, Anderson could be successful. It was the first time in his life that Anderson had such structure.

In March 1967, at the height of the Vietnam War, Anderson voluntarily enlisted in the United States Army when others attempted to avoid service. Ex. 16 at 7–8. Anderson did not score very well on the Armed Forces Qualification Test and was placed in the lowest accepted group.[15] *Id*. at 8. Anderson enlisted for a term of three years. *Id*. During his basic training, Anderson received excellent reviews for conduct and efficiency and an award for rifle marksmanship. *Id*. at 8-9.

After the successful completion of his basic training, Anderson was promoted and transferred to Fort Huachuca, Arizona, for his Military Occupation Specialty Training, where he was trained as a field wireman. *Id*. at 9. Anderson received technical skills training to install, repair, and replace temporary telephone communications systems in combat environments—and extremely important job in Vietnam. *Id*. at 10.

There were significant changes in Anderson's life outside of the military during this time. He married Mary, who was 17 years older than him and his ex-girlfriend's mother. Mary had five children, who were now Anderson's dependents, and the eldest of which was his former high school girlfriend. As described above in Claim Two(C), Mary was very controlling. Mary would attempt to control Anderson when he was away in the Army.

---

[15] During this time, due to the need for soldiers, many men were accepted despite low scores on the Armed Forces Qualification Test, under Project 100,000. Dr. Cunningham discussed this program during his testimony, positing that Anderson would not have been accepted into the Army otherwise. 12/7/2018 Tr. at 129. Notwithstanding this testimony, the positive aspects of Anderson's service were overlooked.

In July 1967, Anderson was absent without leave (AWOL) for two days. *Ex.* 16 at 9. As a result of his absence, Anderson was restricted to the barracks during his off time. *Id*. He broke that restriction and was subsequently charged at a Summary Court Martial with AWOL and Breaking Restriction. *Id*. Following a guilty plea, Anderson was demoted, placed on further restriction, and fined. *Id*. Despite this mark in his record, Anderson was ultimately able to redeem himself.

Anderson was successful in Field Wireman training. *Id*. at 10. He then transferred from Fort Huachuca, Arizona, to Fort Carson, Colorado, where he was promoted in November 1967. *Id*. In January 1968, Anderson was promoted again. Anderson also sought self-improvement and received his GED. *Id*. All of these steps showed that Anderson was overcoming his prior Summary Charge. *Id*.

In March 1968, Anderson and his unit began to make preparations to deploy to Vietnam. *Id*. at 11. This was an involved process, requiring equipment inspections; substantial inventories of food, water, vehicles, weapons, gear, communications equipment, medical supplies, and tools. *Id*. Anderson and his unit also underwent additional combat training. *Id*. at 12. All personnel were in Vietnam by July 22, 1968. *Id*. Anderson and his unit arrived in Quang Tri Province, Vietnam. *Id*. Anderson and his unit were tasked with defending the Demilitarized Zone separating North and South Vietnam. *Id*. at 13. Anderson and his unit were stationed at the northernmost Quang Tri Province. *Id*. In August 1968, Anderson was present for two major tactical encounters with the North Vietnamese Army. *Id*. at 13. The area where Anderson and his unit were stationed was a consistent fighting zone- both hand-to-hand and shelling. *Id*. During this time, Anderson's unit reported 43 killed-in-action casualties. *Id*. at 14. Anderson left Vietnam

72

on emergency family leave through the American Red Cross on September 12, 1968. *Id*. at 14. Anderson had spent 48 days in one of the most dangerous combat zones of the war. *Id*. at 13-14. While serving in combat, Anderson again distinguished himself with excellent conduct and excellent efficiency ratings. *Id*. at 14.

Requests through the American Red Cross for emergency family leave to bring soldiers home was not uncommon at the time. *Id*. Mary requested that Anderson return home because her eldest daughter, Anderson's now-step-daughter, had been molested by her biological father, who then forced her into a marriage. *Id*. The man Anderson's step-daughter was forced to marry then tried to kill her. *Id*. Mary then sought the assistance of the American Red Cross to bring Anderson home. *Id*. There is no indication that Anderson advocated for his leave from the combat zone. *Id*.

Anderson returned to the United States and was stationed at Fort Ord in California. *Id*. at 15. He was able to live with his wife and step-children. *Id*. His initial conduct and efficiency ratings at Fort Ord were again excellent. *Id*. However, things began to turn: over the next several months as Anderson developed financial difficulties. *Id*. His already below-poverty-level pay for a family of five was delayed for several months. *Id*. at 15-16. Anderson began to incur debt. *Id*. at 15.

Anderson informed his superiors of his problems, and they formed a plan for Anderson to resolve the situation: Anderson would transfer to Germany while Mary and the step-children would live with Mary's family in Michigan rent-free. *Id*. at 16. Anderson would then re-enlist. *Id*. This would allow Anderson to use the bonuses to pay off his debts. *Id*. Although this plan was initially endorsed by Anderson's original commanding officers, new commanders refused to follow through with Anderson's

transfer to Germany and barred him from re-enlisting. *Id*. The new commanders believed that Anderson was not truly financially struggling, but rather, demonstrating a dishonorable pattern of failing to repay debts, despite Anderson's low pay and large family. *Id*.

One of the debts again related to Anderson's efforts to assist his step-daughter. A few months after he returned to the United States, Anderson learned that his step-daughter's husband again made an attempt to kill her. Ex. 38 at 95. Anderson and Mary rented a car to go and retrieve her because her husband had thrown her out of the house. *Id*. Anderson did not own a car at the time. *Id*. During that trip, Anderson had to restrain his step-daughter's husband from attacking her. *Id*. On the way back to the base, the rental car broke down. *Id*. at 96. Anderson contacted Mary's ex-husband to assist with the car. *Id*. The car was taken to a garage, and an arrangement was made for Mary's ex-husband to assist with the payment, but that did not work out. *Id*. Anderson then sent the $20.00 payment to the garage by American Express Money Order. *Id*.

Around this time, Anderson had another instance in which he failed to report for guard duty. Ex. 16 at 15-16. Although the commander could have reduced Anderson's rank, the commander did not do that, but instead merely imposed a fine. *Id*.

Anderson received a bar to re-enlistment due to his habitual indebtedness. *Id*. at 17. Anderson's conduct and efficiency ratings were also reduced from "excellent" to "fair" and "satisfactory" primarily based on his indebtedness. *Id*. Anderson's commanders forwarded their request for separation (seeking to remove Anderson from service) to their superiors. *Id*. at 17-18. Originally, the commander's superior officers

rejected this request. *Id*. at 18. Anderson's commanding officer re-submitted the request, however. *Id*.

Anderson's separation hearing occurred in December 1969. Ex. 38 at 74. Anderson fought against his separation, and argued that his performance had always been satisfactory, at minimum. Ex. 16 at 19. Anderson had planned to make the military his career. *Id*. Despite these arguments, Anderson was separated from service. *Id*. On February 5, 1970, Anderson was *honorably discharged* from the Army. *Id*. He had served for nearly three years, and earned medals for his service in Vietnam. *Id*.

Though imperfect, Anderson's service to our country during the Vietnam War was a highpoint his life. As will be demonstrated below, Anderson never had meaningful stability in his life before his Army service and would never have such stability in his life again. Unfortunately, factors outside of his control, mainly the demands of his wife Mary and her family, impeded his efforts to establish the military career he sought.

The full scope of Anderson's honorable military service during the Vietnam War was never presented to the resentencing jury or to the postconviction court. Accordingly, both trial and postconviction counsel were ineffective for failing to properly present such evidence. But for counsel's errors, there is a reasonable likelihood that one juror would have voted for a sentence less than death.

### 2.    Anderson lived a transient and dysfunctional lifestyle.

During her testimony, Holly Wake told the sentencing jury that Anderson had an "unusual" childhood because his father was "itinerant, someone who never wanted to stay in one place." 11/25/2002 Tr. at 43. She described how Anderson would be forced to move with his family on short notice. *Id*. at 44. Wake stated that Anderson had attended

over 50 schools in his educational career. *Id*. However, the sentencing jury was not given a complete picture of the transient life that Anderson lived as a young child, nor were they informed that this was the lifestyle that he continued to live under the control of his wife Mary.

In reality, Anderson and his parents were on the move constantly. 4/16/1998 Tr.at 6. Although he attended over 50 different schools, he enrolled and re-enrolled in some schools two or three times as the family traveled. *Id*. As a result, Anderson was unable to form friendships with other children his age. *Id*. at 9.

The sheer ground covered by Anderson as a child is overwhelming. Before his 18th birthday, Anderson, born in Harrisburg, lived as far west as the Los Angeles area and as far northeast as Morristown, New Jersey. Ex. 14 at 2[16]; Ex. 39. [17] The first 11 moves of Anderson's life were around Central and Southeastern Pennsylvania. Ex. 39. The Anderson family then moved completely across the country to Riverside County, California. *Id*. Anderson's mother Dorothy Sallows described how the family would stay in apartments, hotels, motels, and even occasionally, just "on the road." 4/16/1998 Tr. at 13. This indicates that the family was moving around in their car.

After Riverside, the Anderson family drove north again to Pewaukee, Wisconsin. Ex. 14 at 2; Ex. 39. However, the family next returned to California, residing in Los Angeles County. *Id*. These vast distances would have meant weeks on the road,

---

[16] This map is based on the information available in Anderson's life history records. It is quite possible that there are many more places that remain unaccounted: overnight stays, locations where Anderson was not enrolled in school, etc.

[17] This exhibit is a Powerpoint presentation including animation that chronologically displays the movements of the Anderson family. This presentation with working animation is contained on a separate flash drive that will be manually filed with the clerk as Exhibit_39.

depending on the number of stops and length of time. After moving around within Los Angeles County, the family again traversed the country back to Findlay, Ohio, before returning again to Los Angeles County, and again heading east to Louisville, Kentucky and back to Los Angeles, in a ping-pong fashion. Ex. 14 at 2; Ex. 39. After remaining in Los Angeles County, the family drove back to Louisville and then headed back to Harrisburg. *Id*. After Harrisburg, the family headed south: first to the Baltimore area, but then further south to Florida, before returning to Maryland. *Id*. The family had a number of moves in Maryland along the east coast, before ultimately returning to California in what would be move number 29. *Id*. Move 30 took the Anderson family back to Bethlehem, Pennsylvania, followed by another move all the way back to Los Angeles. *Id*. After Los Angeles, the family moved to Atherton, California (move 32), before turning back to Rimrock, Arizona followed by Chicago, and back to Los Angeles. *Id*.

The family then lived in Kingman, Arizona for a time. *Id*.; 4/16/1998 Tr. at 9. This was move number 36 for the Anderson family, just as Anderson was beginning elementary school. 4/16/1998 Tr. at 9. Sallows recounted the experience of living in Kingman during the first sentencing proceeding, illustrative of Sallows' and Anderon's life on the road with Winfield: "We were not here that long. We came through, stopped at the old hotel, and [Winfield] did some work there. I got the flu, that kept us here another week." *Id*.

The family bounced between Los Angeles County and Kingman. Ex. 14 at 2; Ex. 39. They then moved to Las Vegas, but returned to Los Angeles County. *Id*. After several moves back and forth across Los Angeles County, the family moved back to Louisville, but returned to Los Angeles. *Id*. After another series of moves between Los Angeles

County, and even extending out to Orange County, California, the family moved to Salt Lake City, Utah. *Id*. After Salt Lake City, the Andersons traversed the country again, back to Philadelphia. *Id*.

This made a total of 50 moves before Anderson turned 18 years old. Ex. 14 at 2. The 2002 resentencing jury never heard about these moves. The jury was not told about the number of moves, the length of time spent on the road, or the sheer distance between several of the moves. The jury did not hear about Sallows' experiences stopping at hotels where Winfield could find work and then moving on after the work was completed.

When Anderson testified before the jury, he told them that he had lived all across the continental United States. 11/22/2002 Tr. at 68. He told the jury that his father would get a job painting a hotel, finish the job, and then leave to find the next one. *Id*. at 70. He recalled that his mother would complain about losing things in the moves and that Winfield would just throw his tools in the car and tell the family "let's go." *Id*. at 73-74. He did not have friends because he would have to move again in a few days or weeks, and ultimately never see those friends again. *Id*. at 74. Resentencing counsel did not ask Anderson to provide the jury with details about life in the car, life in hotels, or the impact of changing schools so frequently, for example. The jury was informed merely of the fact that Anderson had lived in many places. Without this level of detail, the jury was not able to have a complete understanding of the transient foundation for Anderson's life.

Anderson continued this transient lifestyle as an adult. Ex. 14 at 3. Resentencing counsel did not present any evidence of Anderson's transient adult life. As an adult, Anderson lived between Eastern Pennsylvania and Western Ohio before returning to California. *Id*. Anderson continued to live a life of travel, which now included military

transfers between forts and Vietnam. *Id*. Even though Anderson's testimony at the resentencing briefly touched on his transient childhood, resentencing counsel did not ask Anderson anything about the fact that Anderson maintained this lifestyle as an adult. Nor did resentencing counsel ask mitigation specialist Holly Wake to explore this topic.

Although postconviction counsel presented evidence from a number of family members about Mary Anderson's life history and the way that she controlled Anderson, postconviction counsel did not present evidence about Anderson's transient adult life. In passing, evidence from Anderson's son-in-law, Santana Molina, husband to Anderson's first girlfriend and Mary's daughter, Peggy, mentioned "I recall Mary and Frank as people who lived in cars. When their car broke down, Frank and Mary, would buy another car. I recall that Mary and Frank would go to dumpsters to get aluminum cans and things to resell. I perceived them as homeless, mobile people." RA0059 at 88 at 2. Similarly, David White, Mary's son and Anderson's step-son recalled:

> Soon after Frank returned from the Army, my mother, sister, brother, Frank and I were homeless and lived in a car. This occurred more than one time. We would travel around and Frank would ask for work to make money for food. At times, he would work just a couple of hours to feed the family. Frank would also pick up cans to make money for food.

RA0059 at 91 at 1. Postconviction counsel did not ask for additional details from either Molina or White. Neither witness testified at the postconviction hearing.

Accordingly, neither the jury nor the postconviction court received a complete, detailed understanding of Anderson's transient adult life, including the vast mileage covered, the difficulties and uncertainty of where to sleep or if the car would still start, or worries about where to obtain the next meal for the family.

### 3. Anderson suffers from Dependent Personality Disorder, which easily allowed other individuals to control him.

In 1998, during the first sentencing proceeding, Dr. Thomas Thomas diagnosed Anderson with dependent personality disorder. 4/29/98 Tr. at 7. As Dr. Thomas explained, this is a "pattern of behavior that is so highly dysfunction that it interferes with social, occupational, and interpersonal aspects of one's life." *Id*. People with dependent personality disorder "tend to avoid conflict" and "do things against their better judgment, who let themselves get into situations that people with more strength or character might not do." *Id*. Dr. Thomas explained that this diagnosis was made using information from the Diagnostic and Statistical Manual- 4th Edition (DSM-4). *Id*. at 8. In establishing this diagnosis, Dr. Thomas used information from Anderson's life history and matched it against various diagnostic criteria. *Id*. at 10. Anderson had frequently gotten himself into trouble because of the outrageous efforts he would take to please people. *Id*. at 11.

Dr. Thomas noted that Anderson had gotten into trouble from his intense need to please people, particularly people he was in a relationship with. *Id*. at 11. Anderson had been involved in relationships that were "inappropriate because others were controlling the process." *Id*. Dr. Thomas found that Anderson always needed someone to take care of him. *Id*.

When discussing Anderson's involvement in the crimes, Dr. Thomas ultimately found that someone like Anderson who had a dependent personality was easily led in such situations and was not typically the "prime mover." *Id*. at 12–13. Indeed, Dr. Thomas found that Anderson was "in the throw of Poyson" at the time of the events. *Id*. at 13. "Poyson was running the show." *Id*. Anderson would not have been able to stop

Poyson once the events were in motion because Anderson was "an inadequate person. He's not the kind of guy who assumes command of a situation, takes control of a situation. He's sort of a psychological 'Pilsbury Dough Boy.'" *Id*. at 14.

On further explanation of the DSM-4 criteria, Dr. Thomas found that Anderson had difficulty controlling his own life. *Id*. at 16. Anderson also showed difficulty expressing disagreement with others due to a fear of losing support and approval. *Id*. Anderson also had difficulties taking initiative and doing things on his own. *Id*. at 16-17. Dr. Thomas pointed to Anderson's inappropriate relationship with Kim Lane as an example: Anderson began this relationship "at the behest of his late wife." *Id*. Dr. Thomas also explained that Anderson would not have the "strength of character" to go against a lead actor and report that person, here Poyson, to authorities. *Id*. at 18. Dr. Thomas also opined that the fact that Anderson was arrested in the truck from the scene was indicative of his inability to plan ahead. *Id*. at 20–21. Finally, Dr. Thomas opined that Anderson would actually do well in the structured prison environment. *Id*. at 21. However, Dr. Thomas expressed concern about other inmates acting violently toward Anderson with no resistance from Anderson. *Id*. at 28.

Dr. Thomas explained that personality disorders "tend to arise out of bad upbringing." *Id*. at 30-31. He testified that the fact that Anderson was sexually abused as a child created a higher risk for Anderson to develop a personality disorder. *Id*. at 31. He also found that, because of his dependent personality, Anderson had a pattern of relationships with women who exerted a great deal of control over him. *Id.* at 32. Dr. Thomas explained that "people who are inadequate will often times boast." *Id*. at 13. Such boasting could include claims of association in tough organizations, like the mafia.

*Id*. Dr. Thomas also found that Anderson is "helpless, fearful and uncomfortable when alone, urgently seeks relationships with and advice from others, and has difficulty expressing disagreement." Ex. 40 at 1.

Dr. Thomas' testimony was presented to the sentencing judge alone in 1998, not a jury. Post-*Ring*, trial counsels Kehm and Sutherland did not present Dr. Thomas to the resentencing jury in 2002. Ex. 40 at 1–2. Dr. Thomas was available and willing to testify at that time, had he been called. *Id*. Without his testimony, the jury never heard that Anderson was suffering from a personality disorder or how that disorder manifested in Anderson's daily functioning. Nor did the jury hear any explanation of the symptoms of the disorder, such as needing to be directed by another person at all times. Without this testimony as an explanation, the jury had no way to contextualize Anderson's role in the events or to understand his lifelong functional limitations. Such evidence would have been highly mitigating, and there is thus a reasonable likelihood that at least one juror would have voted against a death sentence had the jury been aware of such evidence.

Similarly, although postconviction counsel sought information that Mary, Anderson's wife, was very controlling (*see* Claim Two(C)), counsel failed to present evidence that others, too, were easily able to control Anderson. For example, in his taped interrogation with Detective Cooper, Anderson told Detective Cooper how he feared going against Poyson because Poyson was a member of the "Mexican Mafia." Ex. 15 at 40, 45. While describing life on the road before his arrest, Anderson described how Poyson dictated what the group did: at one point, Anderson was permitted to make a phone call by Poyson, but only with Poyson monitoring. *Id*. at 56. Poyson also directed where the group would stop, telling Anderson to stop the truck at a Shell station outside

of Chicago and demanding Lane accompany him to make a phone call. *Id*. at 57. At stops, Anderson was directed to search for work and food. *Id*. at 58–59. Poyson handled any money they received, taking the bills from Anderson; was the person to personally decide where to stay at night and to pay for the hotel rooms; directed Anderson to look for work; and told Anderson where to drive. *Id*. at 51,59, 61, 64.

Throughout his narrative of the days on the road leading up to their arrest, Anderson did not question Poyson or express objections to Poyson about being told what to do and where to go. Rather, as he did when directed by Mary, Anderson simply did as he was told. Similarly, as he had previously done when he and Mary lived out of their car, Anderson stopped at each restaurant, truck stop, or gas station and asked for work, often with success.

Anderson's former probation officer, Bruce Franer, also commented that Anderson was easily led and manipulated. Ex. 18 at 1–2. Under Franer's supervision, Franer observed that Anderson's thinking was limited to his immediate situation and that Anderson had difficulty considering long-term consequences. *Id*. at 1.

Cheryl Paradis, Psy.D., is a clinical and forensic psychologist who was retained by federal habeas counsel. Dr. Paradis described Anderson's inability to meet community standards of personal independence and functioning within society as "adaptive functioning." Ex. 24 at 15. She further found that, despite the overwhelming evidence that Anderson's adaptive functioning was deficient, this area was not fully assessed by prior mental health experts or presented in prior court proceedings. *Id*. at 25.

The fact that Anderson suffers from Dependent Personality Disorder and the ease with which others, including Mary and Poyson, were able to control and manipulate him,

was never presented to the resentencing jury or the postconviction court. Both trial and

postconviction counsel were ineffective for failing to properly present such evidence.

Both sets of counsel had the transcript of the first judge sentencing available for use but

unreasonably failed to use either the transcript or to contact Dr. Thomas to testify. But for

counsel's errors, there is a reasonable likelihood that one juror would have voted to spare

Anderson's life.  There is also a reasonable probability of a more favorable outcome at

the state postconviction proceeding.

**4.     Anderson's cognitive impairments are, in part, due to extended time spent in a dissociative state that began when he was sexually abused by his father Winfield, who also sexually abused many other family members.**

The resentencing jury in 2002 was only presented with passing reference to the

fact that Anderson was sexually abused by his father for an extensive time as a child.

11/25/2002 Tr. at 47. Postconviction counsel presented evidence from Dr. Cunningham

that Anderson's father Winfield abused numerous family members, including Anderson's

half-sister June, June's children, and June's grandchildren. 12/7/2018 Tr. at 168-169.

During the postconviction proceeding, Dr. Cunningham opined that this abuse had a

long-lasting impact on Andersons's ability to relate to others and make decisions about

his life. *Id*. at 169–181; RA0058 at 132–34. Significantly, Dr. Cunningham did not

address exactly how Anderson coped with that abuse as a child or how those learned

coping mechanisms impacted him throughout his life.

Dr. Matt Mendel is a psychologist retained by federal habeas counsel who has

conducted forensic evaluation of Anderson. Dr. Mendel found that Anderson's primary

response to the ongoing trauma of sexual abuse by his father was to "go somewhere else

in his mind," or dissociate. Ex. 17 at 5. Anderson described going to a corner to "pretend I wasn't there, hope he wouldn't notice me." *Id*. Anderson estimated that the abuse occurred at least twice a week from the time that Anderson was 6 years old until he was about 14, though he had trouble remembering at different times. *Id*. at 4–5. Dr. Mendel found that Anderson has "exaggerated" beliefs about himself that he genuinely believes. *Id*. at 6. For example, Anderson describes himself as the manager or supervisor or otherwise in a position of control in his various places of employment, rather than a more accurate depiction of his role as a clerk or janitor or cashier. *Id*. Dr. Mendel found that this powerful and extensive fantasy life has its roots in the early childhood dissociation that Anderson took on in order to survive the chronic, severe abuse by his father. *Id*. Dr. Mendel found that this dissociation became a way for Anderson to cope in adulthood, and became a way for Anderson to have some power in a life that was largely controlled by his wife Mary and others. *Id*. This dissociation is the likely explanation for Anderson's "tall tales" exaggerations, or the appearance that he is living in a different reality. *Id* at 5.

Dr. Mendel also found it very striking that, as an adult with his wife Mary, Anderson formed a family that mirrored the dysfunction he experienced as a child. *Id*. Anderson never established healthy patterns of sexual boundaries, and these boundaries did not exist in his home with Mary. *Id*. at 6–7. Also mirroring childhood, and as outlined above (Claim Two(D)(2)), Anderson and Mary lived in extreme poverty, always on the move. Ex. 17 at 7.

Dr. Mendel noted a number of cognitive issues during his time evaluating Anderson. He found that Anderson's "cognitive struggles were readily apparent." *Id*. at 9. Dr. Mendel found that Anderson would get lost in the detail of a topic and ramble. *Id*. at

10. Anderson would sometimes respond to questions quickly and erroneously, and then get lost in the details of the erroneous answer. *Id*. Anderson sometimes switches topics mid-sentence. *Id*. He would forget or confuse names, and would forget from one day to the next what topics had already been covered. *Id*. Although Anderson testified that he did not remember much about the abuse, such gaps in memory would not be uncommon for someone spending much of their time in a dissociative state. *See* 11/22/2002 Tr. at 69; Ex. 17 at 10. Dr. Mendel found that Anderson's memory problems were significant. *Id*. Because Anderson learned to dissociate early in childhood in order to survive horrendous circumstances, and because he spent much of his childhood in a dissociative state, he will, almost inevitably, have gaps in his memory. *Id*. Dr. Mendel also found that Anderson severely underestimated the presence of post-traumatic stress disorder (PTSD) in his life. *Id*. at 13.

Dr. Mendel ultimately noted the presence of significant cognitive deficits, including the prospect of dementia due to his advanced age, that should be assessed by other mental health professionals, including Dissociative Identity Disorder, Autism Spectrum Disorders, and Fetal Alcohol Spectrum Disorders. Anderson thus reserves his right to discovery and to amend this petition pending that investigation.

Dr. Cunningham's view of the scope of Winfield's abuse against the children in his family was limited, and the fact of the abuse alone was briefly summarized in his report. RA0058 at 104–5. Most significant, however, is that Anderson's half-sister, June, much like Anderson, was not able to stop the abuse, even when it was committed against her own children. Winfield lived with June and her 11 children when the family lived in Lake Elsinore, California. Ex. 2 at 1; Ex. 1 at 1. Winfield groomed June's children,

Winfield's grandchildren, in the same way that he groomed Anderson. Ex. 2 at 1; Ex. 1 at 1. Winfield would sexually abuse the children after inviting them to help him with baking. Ex. 1 at 1. Winfield would also wake the children in the middle of the night and take them away from the children's shared bedroom to abuse them. *Id.* at 1-2; Ex. 2 at 1.

Kathrine Langelier, Anderson's niece, recalled that her mother, June (Anderson's half-sister), seemed to "not want to hear it. It seemed like a normal thing to her." *Id.* at 2. In the same way that Anderson's mother Dorothy Sallows never attempted to affirmatively intervene on behalf of Anderson, June did not intervene to stop Winfield from abusing her children. *Id.* The abuse only stopped when June and her children moved away from Lake Elsinore to Palmdale. *Id.*

Dr. Paradis found that the sexual abuse Anderson suffered from his father was the most destructive adverse developmental factor in his background. Ex. 24 at 23–24. She found that this chronic and enduring trauma had a "devastating effect" on the development of his personality, and significantly contributed to the development of his Dependent Personality Disorder. *Id.* at 24. The extent of the trauma that Anderson suffered was not fully presented to the sentencing jury. *Id.* at 23.

The full scope of Winfield's sexual abuse of Anderson and the other children in the family was not presented to the resentencing jury or the postconviction court. Nor was the full, long-term impact of Anderson's coping mechanism of dissociation on his mental state ever investigated or presented. Both trial and postconviction counsel were ineffective for failing to investigate and present such evidence. But for counsel's errors, there is a reasonable likelihood that the outcome of the proceedings would have been different.

### 5. Trial counsel failed to investigate or present evidence that Anderson suffered from brain damage.

The 2002 sentencing jury never heard from Anderson's mother Dorothy Sallows or anyone who had personally crossed paths with Anderson in his life before the events of this case. Because of this, the jury did not hear any first-hand information about Anderson's mannerisms, personality, or life experiences. Rather, trial counsel called mitigation specialist Holly Wake to summarize this information to the jury. 11/25/2002 Tr. at 35. Wake was not a mental health professional—her bachelor's degree was in criminal justice, not psychology. Ex. 24 at 26. Wake was not trained to assess mental illness or personality disorders. *Id*. Nor was she trained in trauma-informed-assessment. *Id*. Wake testified that she spoke with Anderson's mother Dorothy Sallows in preparation for the first sentencing proceeding in 1998, but that it had been approximately five years since Wake had contacted her. *Id*. at 43.

Wake recalled that in this conversation, Sallows noted that Anderson suffered from pneumonia almost immediately after his birth. *Id*. at 44. Wake also recalled that Sallows informed her that Anderson's growth was so stunted as a child that, even when he entered kindergarten, he was so small that he was wearing toddler-sized clothing. *Id*. Sallows also advised that Anderson had suffered from seizures as an infant. *Id*. at 44-45.

Trial counsel did not ask Wake any targeted follow-up questions concerning Anderson's physical development as an infant. Nor did trial counsel attempt to meet with Dorothy Sallows in person. Trial counsel never attempted to acquire Anderson's childhood medical records or birth records to investigate the full extent of any birth or prenatal injuries that would have impacted his early childhood development.

Postconviction counsel attempted to collect these records without success. Ex. 13 at 2. The mitigation specialist in charge of the postconviction records collection, Mary Durand, advised that she normally would attempt to collect every available record for a client at the time the case was opened. Ex. 21 at 2. She recalled being especially concerned about Anderson's mental limitations and wanted to seek records to learn whether Anderson had ever been diagnosed with brain damage or another disorder. *Id*. She remembered that her normal procedure would have been for her assistant to fax the records request, and to notify her if the request did not go through. *Id*. at 2–3. Durand would assume that the requests had gone through if she did not receive notification of any issues. *Id* at 3. In this instance, Durand could not recall receiving information that the request for Anderson's birth records did not go through, so she assumed that the records had been requested. *Id*. Had Durand known that the fax did not properly transmit and Anderson's birth records were not properly requested, she would have advised her assistant to continue fax attempts and to send the request by mail. *Id*. To Durand's knowledge, the postconviction office never received Anderson's birth records. *Id*. Durand emphasized that such records were important to the social history investigation that should be conducted in every capital case in order to present the jury with a complete picture of the client's life. *Id*. at 5,11.

Without these records, neither trial nor postconviction counsel were able to fully understand any developmental limitations that Anderson faced. Neither set of attorneys were able to request additional records based on information contained in the records from Anderson's birth and early pediatric history. Nor were the attorneys able to question additional witnesses about any conditions from which he suffered. Further, without these

records, none of the attorneys were able to provide this information to any of the mental health experts, who certainly would have factored such information into their analysis and conclusions.

Indications Anderson suffered from medical issues at birth and very early in childhood was produced in a declaration that Sallows signed in 1997. Sallows recalled that she was in labor with Frank for 9 and a half hours and that the labor was very difficult. RA0059 at 57. Anderson was a "sickly child" from the beginning. *Id*. Although he had a birth weight of 7 pounds, 7 and a half ounces, Anderson lost two pounds in the three days after his birth. *Id*. At two weeks old, he developed pneumonia so severe that doctors were sure he would die. *Id*. Anderson also lost a lot of weight during this illness. *Id*.

Anderson's early childhood was also marked by a series of medical issues. At three years old, Anderson spent three weeks in a full body cast due to a spinal issue that was never fully corrected. *Id*. When he was five years old, he suffered from whooping cough, the chicken pox, measles, and the mumps. *Id*. at 58. Anderson also suffered seizures. *Id*. As Sallows described, Anderson would "be in a daze." *Id*. Doctors were unable to determine the cause, and Anderson was given medication. *Id*. Sallows did not provide detailed information about the seizures: how long they lasted; how frequently they occurred; whether certain conditions served to trigger the seizures; how Anderson would react immediately after the seizures; and other information that might have provided insight into the impact of these seizures on his neurological wellbeing. Further, there are no details about what medical treatment Anderson received for these seizures: what medication he was prescribed; the dosage; how frequently he needed to be

evaluated by the doctor; or whether Sallows did, in fact, take Anderson to regular appointments.

Anderson was "always a very small child." *Id*. He was so small, in fact, that he still wore toddler sized clothing at six years old. *Id*. Sallows described that a friend would make special clothing for Anderson because he was so small. *Id*. Anderson did not start to catch up to other children in size and weight until high school. *Id*.

Trial counsel did not call Sallows to testify during the 2002 resentencing. Had counsel called her, the jury would have heard that, despite her declaration saying that her pregnancy with Anderson was "normal," Anderson was born two months prematurely. 4/16/1998 Tr. at 4. Anderson contracted pneumonia within days of his birth and he was severely ill for nearly a month. *Id*. a 5. Had trial counsel called Dorothy Sallows to testify, the jury would have heard that Anderson was not expected to live. *Id*.

Similarly, the sentencing jury never heard that Anderson was exposed to lead-based paint as a child. Trial counsel did not ask Wake any questions about whether Anderson was exposed to lead-based paint as a child during her testimony in November 2002. Nor is this information included in Wake's Report. RA0059 at 7. However, had Kehm or Sutherland contacted Sallows, or even reviewed the 1998 trial transcripts, they would have learned that Anderson had been exposed to lead-based paint as a child.

In 1998, trial counsel Ken Everett called Sallows as a witness. 4/16/1998 Tr. at 3. Sallows testified that Anderson's father Winfield was not able to maintain employment in one location, so the family was transient, constantly moving while Winfield looked for work. *Id*. at 6. The family lived in hotels and motels, sometimes living in apartment buildings. *Id*. at 13. Winfield would labor for their stay and sometimes Sallows would act

as a superintendent. *Id*. While maintaining the buildings where they lived, Winfield would paint using lead-based paint. *Id*. Although Winfield would do the painting, he would often have young Anderson with him, and Anderson would get into the paint. *Id*. Sallows testified that the family rarely lived anywhere that Winfield did not paint and fix himself, always using lead-based paint. *Id*. The jury never heard that Anderson had been exposed to lead-based paint both at his father's work sites and in his homes throughout his childhood.

Information about Anderson's birth and early childhood years would have been crucial to the investigation of Anderson's childhood development. Severe, frequent, and early childhood illness could have impacted Anderson's brain development. In addition, the absence of regular prenatal care and information about his birth could have provided Anderson's defense teams, including mental health professionals, with the ability to investigate and present evidence of brain damage and the potential source. Such data would have been important to presenting a complete picture of Anderson's cognitive abilities. Additionally, such information would have been important in determining whether any of these factors, for example the seizures or exposure to lead-based paint, resulted in permanent brain damage.

Dr. Cunningham did identify that Anderson's developmental vulnerabilities and delay impacted his trajectory. RA0058 at 103–4. However, as outlined above in Claim Two(C), the jury did not hear this evidence. Nor did Dr. Cunningham assess Anderson for brain damage. Postconviction counsel sought a neuropsychological evaluation from neuropsychologist Dr. Dale Watson. However, Dr. Watson was never called as a witness.

Accordingly, expert neuropsychological testimony regarding Anderson's brain damage was not presented.

### 6.    Anderson was cooperative with law enforcement and assisted with the arrest of his co-defendants.

As outlined in Claim Two(E), Anderson spoke with law enforcement officers immediately following his arrest. The information officers received from Anderson directly aided law enforcement's capture of co-defendant Robert Poyson.

In 1998, defense counsel Ken Everett called Ralph Stegall, a master sergeant with the Illinois State police and one of the officers involved in the apprehension of Poyson and Lane. 3/4/1998 Tr. at 3-6. Stegall had searched for Poyson and Lane in various motel rooms and in the streets. *Id.* at 5-6. Officers used Anderson's statements about his travels with Poyson and Lane to narrow the search. *Id.* at 6. According to Stegall, the information officers received from Anderson led directly to Lane and Poyson. *Id.* at 7.

In 2002, during the resentencing, trial counsel Kehm and Sutherland did not recall sergeant Stegall. Nor did they cross-examine any of the officers called by the State, including Detective Cooper, about the usefulness of Anderson's statements to the investigation and apprehension of Poyson and Lane. Cooper admitted that the investigating officers were unaware of Poyson and Lane without Anderson's statements. 11/20/2002 Tr. at 59. However, Kehm never followed up on this point or called Stegall regarding Anderson's contributions to the investigation in front of the jury. The jury was unaware that the information provided by Anderson was accurate or that officers had actually depended upon this information while apprehending Poyson and Lane.

Anderson's cooperation with law enforcement was never presented to the

sentencing jury. Nor was this evidence previously presented to the postconviction court.

Accordingly, both trial and postconviction counsel were ineffective for failing to properly

present such evidence. But for counsel's errors, there is a reasonable likelihood that the

outcome of the proceedings would have been different.

### 7.    Poyson was the more culpable actor in the offenses and he controlled Anderson during the crimes.

As explained above, Anderson was easily and often controlled by other

individuals. Such was the case during the commission of these offenses: Poyson was the

more culpable party who directed the offenses. The resentencing jury heard none of this.

The Arizona Supreme Court found as much when directed by the Ninth Circuit to

re-weigh Poyson's mitigation evidence against the aggravating factors. The Arizona

Supreme Court found

> Poyson took preparatory steps, such as cutting the telephone
> wires to prevent calls for help, checking the murder weapon to
> ensure proper functioning, and obtaining bullets beforehand.
> Additionally, he made conscious attempts to conceal his crimes
> after the fact, such as covering Wear's body with debris.

*State v. Poyson*, 475 P.3d 293, 299 (Ariz. 2020).[18]

Poyson's history prior to this offense was one of violence. By the time that he was

16 years old, Poyson had committed multiple violent offenses: multiple assaults, burglary

with a knife, and sexual assault. Ex. 5 at 4. In one instance, he set another boy's hair on

fire "for fun." Ex. 4 at 6. In another, Poyson sexually abused another boy and threatened

---

[18] Anderson incorporates the allegations of Claim Five(B) regarding prosecutorial misconduct in asserting inconsistent theories of culpability regarding Anderson, Poyson, and Lane.

94

physical harm to that boy if he did not cooperate. Ex. 7 at 1. He was also suspended for threatening to rape a girl at his school. *Id.* As a juvenile, Poyson was ultimately diagnosed with conduct disorder. *Id.* at 2. He was also later convicted of "lewd and lascivious conduct with a minor" after being accused of raping his thirteen year old cousin. Ex. 6 at 4. In 1998, Poyson was diagnosed with anti-social personality disorder. *Id.* at 5.

A neuropsychological evaluation in 2002 found that Poyson had a Full Scale IQ of 110, scoring in the "high average" range. *Id.* His neuropsychological functioning was found to be in the "normal" range. *Id.* at 15. The evaluation further found that Poyson showed no signs of brain damage; the scores of the Halstead Impairment Index showed that none of his scores were withing the range for brain damage (0.0 score). *Id.* at 6. The examiner further found that Poyson had actually made attempts to manipulate the examination consistent with "feigning mental disorder." *Id.* at 7. The evaluator found that Poyson displayed anti-social traits and behaviors, including ego-centricity; a lack of impulse control; a disregard for others; disloyalty; and recklessness. *Id.* at 8. When Poyson lost control of his temper, he was more likely to act with anger and threats of violence, or actual violence, against others. *Id.* at 9. The combination of anti-social personality disorder with the high average, normal neurological functioning stands in stark contrast to Anderson, who, as shown time and again throughout his life, could only complete tasks when specifically directed by others. Anderson, without mature coping skills or normal adaptive functioning abilities, easily acceded to the demands of others, including Poyson, and was unable to stand up for himself. Ex. 24 at 25. Dr. Paradis found ample evidence that Anderson was dominated and controlled by Poyson. *Id.* This

influence from Poyson led Anderson to act in a manner that was entirely out character for him: those who knew Anderson before the offense remarked on how eager he was to avoid confrontation and how hard he worked to please others, which is consistent with his behavior in prison since his arrest. *Id*. at 28.

This evidence was contained within the state court record and thus was available to both resentencing counsel and postconviction counsel. Neither resentencing nor postconviction counsel investigated or utilized the available evidence of Poyson's control over Anderson. Neither the resentencing jury nor the postconviction court heard how Poyson was easily able to control and manipulate Anderson, both during the crimes and after, for his own gain. Thus, both resentencing counsel and postconviction counsel were ineffective for failing to investigate and present this evidence.

Claims Two(D)(1) through (D)(7) have not been presented to the state courts. Anderson is entitled to *de novo* review of these claims.

### E.    Trial counsel were ineffective for failing to impeach Cooper's assertions that Anderson's statement was voluntary.

Police interrogations of Anderson violated *Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966), because Anderson was never provided counsel and was subject to high pressure, coercive tactics designed to force him to waive his right to remain silent. Trial counsel was ineffective for failing to move to suppress Anderson's involuntary statements before trial despite having access to a plethora of information which undermined the State's claim that Anderson waived his *Miranda* rights knowingly, intelligently, and voluntarily.

Trial counsel was also ineffective for failing to impeach Detective Cooper, Anderson's primary interrogator, during Anderson's second trial as to Cooper's claims that Anderson's waiver was voluntary. Had trial counsel effectively impeached Cooper, the jury could have disregarded Anderson's statements if they found them to be involuntary. 10/9/2001 Tr. at 127 (instructing the jury to disregard statements they found were involuntary). Because Anderson's statement made during interrogation were central to the State's case in chief, there is a reasonable probability of a more favorable outcome if counsel had performed reasonably by litigating a pretrial suppression motion and/or effectively impeaching Cooper.

Anderson was interrogated by police three times without counsel. Illinois state Detective Shields interrogated Anderson following his arrest on August 18, 1996 (first interrogation). Mohave County Sherriff's Office (MCSO) Detective Cooper, who had travelled to Illinois, interrogated Anderson in the middle of the night on August 19, 1996 (second interrogation). Finally, on September 2, 1996, Cooper interrogated Anderson a third time in the early morning hours before his court appearance and before he was appointed counsel Ken Everett from the Mohave County Public Defender's office (third interrogation).

Anderson was never provided with counsel between his arrest on August 18, 1996, in Illinois and his arraignment on September 2, 1996, in Arizona, despite being subject to extradition and waiving extradition proceedings. Anderson signed a *Miranda* waiver at the first and second interrogations. State Exhibit 1, 2. There is no evidence that Anderson was ever mirandized by law enforcement at the third interrogation. The only reference to the *Miranda* warnings in the third interrogation is when Anderson

spontaneously and incompletely recited the warnings to Cooper at the beginning of the interview. Ex. 29 at 3. Anderson asked to stop the interrogation multiple times during the second interview. Ex. 15 at 13, 14. Anderson was not reminded of his *Miranda* rights when the interrogation resumed. Anderson also became confused at several points during the questioning. Ex. 15 at 14, 17–18, 23, 25, 27, 45, 68, 77; Ex. 29 at 4.

Prior to Anderson's first trial, counsel Ken Everett moved to suppress statements Anderson made to law enforcement upon his arrest in Illinois. Motion to Suppress 2/18/1997. In that motion, Everett argued that Anderson did not voluntarily, intelligently, or knowingly waive his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), due to police deceptions, Anderson's low intelligence, lack of sleep, and lack of counsel. *Id.* at 1–2. Following argument, the trial court denied the motion to suppress in its entirely. 3/26/1997 Tr. at 28–29; 3/26/1997 Minute Order. Everett then sought leave and funding to have Anderson's assessed by Dr. Thomas Thomas, M.D.

Dr. Thomas diagnosed Anderson as having dependent personality disorder. 4/29/1998 Tr. at 7. Dr. Thomas described individuals with dependent personality disorder as conflict avoidant, lacking strength of character to make cognizant choices, and becoming overwhelmed and acting against their better judgement. *Id.* Dr. Thomas described Anderson as a "sort of psychological Pilsbury Dough Boy" whose will could be easily overridden by an influential person. *Id.* at 14. Indeed, Dr. Thomas commented that people with dependent personality disorder like Anderson ". . . don't tend to be very resistant to the interrogation process . . . [t]hey tend to want to please even those who are interviewing them from a law enforcement perspective." *Id.* at 25.

Prior to Anderson's second trial, the State made *Brady* disclosures that Detective Cooper was being investigated internally by the MCSO. Ex. 25 at 2. The investigation centered on allegations that Cooper had sexually assaulted Cathy Griffith while investigating a case in which she was a complainant. Griffith notified the Kingman Police Department (KPD) and later filed a civil rights lawsuit against the County. *Id*. The state disclosed a "five to six page" synopsis summarizing the MCSO internal investigation[19,20]. 7/10/2001 Tr. at 10–11. Pages from the *Brady* disclosure revealed that Cooper had also engaged in inappropriate activity with Judy Forsythe, Melva Boyce[21], and Liz Hastings. The report also summarized an incident in Pima County in which Cooper was known to have sex with an arson suspect and then told her he "would take care of it" in an attempt to cover up both her crime and the sex. Ex. 25 at 2.

Boyce recalled that Cooper had been assigned to investigate a sexual assault case in which Boyce's younger sister was the victim. Cooper insisted that Boyce and her sister meet in his hotel room in St. George, Utah. During the meeting he sat uncomfortably close to the women and fixated on Boyce. He asked Boyce about her personal life and divorce, and commented that "sex can be very relaxing with the right person." Cooper continued to call Boyce for approximately one to one-and-a-half years, but ceased communication after she complained to the MCSO. Ex. 19 at 1–2. Hastings recalled that Cooper was assigned to a sexual assault case in which Hastings's boyfriend was a

---

[19] This disclosure was incomplete and violated *Brady v. Maryland*, 373 U.S. 83 (1963). *See* Claim Three.

[20] The *Brady* disclosure file was partially destroyed following Anderson's second direct appeal. *See* Claim Three(A) n.1.

[21] Boyce's maiden name was Best. She is referred to as Best on page 4 of the *Brady* disclosure. Ex. 25 at 2.

suspect. When Cooper interviewed Hastings he began to give Hastings a back rub to "relieve the tension". Ex. 19 at 2–3.

Kim Lane, Anderson's co-defendant, was arrested on August 24, 1996, in Evanston, Illinois. Cooper travelled to Illinois and interrogated Lane after interrogating Anderson days before. Following Lane's conviction, the Arizona Court of Appeals reversed, finding Lane's statements to Cooper were involuntary. *State v. Lane*, 1-CA-CR 98-0565 (Ariz. Ct. App. Nov. 30, 1999) (memorandum decision). Lane's interrogation is remarkably similar to Anderson's in that it does not contain a *Miranda* warning and Lane was interviewed in the middle of the night. The Arizona Court of Appeals reasoned that Lane's will had been overpowered given her age, low intelligence, and confusion during the interrogation. *Id*. at 5–6. The Arizona Court of Appeals relied on Lane's youth as a primary factor in their *Miranda* analysis. *Id.* at 7. However, aspects of Lane's interrogation clearly overlap with Anderson's: the late hour, confusion, low IQ, and expert testimony about Lane's dependent and passive personality. *Id.* at 10.

At Anderson's second trial, the State moved to admit the unedited tape recording and transcript of Anderson's second interrogation without objection. State's Exhibit 80; Ex. 15. The State also moved to admit the unedited video and transcript of the third interrogation without objection. State's Exhibit 83; Ex. 29. The State relied on Detective Cooper's testimony to lay the foundation for the admission of Anderson's statements.

### 1. Trial Counsel were ineffective for failing to move to suppress the statements Anderson gave during the August 19, and September 2, 1996, interviews.

At the beginning of Anderson's second trial, trial counsels Kehm and Sutherland had at their disposal 1) the "synopsis" which recounted how Cooper would approach

women while on the job and pressure them for sex,[22] going so far as to sexually assault one woman, Griffith, and that he lied about his behavior; 2) the recordings and transcripts of Anderson's second and third interviews which were devoid of *Miranda* warnings or assurances Anderson understood his rights; 3) the same recordings and transcripts in which Anderson was frequently confused and asked to stop multiple times, but Cooper continued; 4) Dr. Thomas Thomas's report explaining that Anderson was particularly vulnerable to coercion; 5) The Arizona Court of Appeals analysis reversing and suppressing Lane's statements on very similar facts, including the missing *Miranda* warnings; and 6) the motion and arguments for suppression filed by Ken Everett, first trial counsel, in the first trial. Because Kehm and Sutherland had ample bases to move to suppress Anderson's statements as involuntary there was no strategic reason not to do so. The failure to move to suppress Anderson's confessions was deficient performance.

### 2.    Trial counsel were ineffective for failing to demonstrate to the jury that Anderson's statements were involuntary.

At Anderson's second trial, Cooper testified that he was the subject of internal investigation at MCSO following an extramarital affair. 10/4/01 Tr. at 6. This was untrue and an attempt by the State to hide the full extent of the criminal investigation into Cooper's sexual assault of Griffith. *See* Claim Three. On direct examination, Cooper testified that he advised Anderson of his *Miranda* rights and that Anderson voluntarily waived them. *Id.* at 11–12. The bulk of Cooper's testimony laid the foundation for the admission of the tapes and transcripts of Anderson's second and third interrogations. Because Cooper could testify to the police investigation from his own experience, the

---

[22] To the extent trial counsel did not investigate Cooper's interactions with Hastings, Boyce, or in Pima County, they were ineffective.

only viable line of defense was to attack the voluntariness of Anderson's statements before the jury. Trial counsel failed to conduct any investigation and failed to properly prepare to impeach Cooper.

Trial counsel had ample information with which to impeach Cooper's statements that Anderson voluntarily waived his *Miranda* rights using Ariz. R. Evidence 608. In Arizona, an examiner may attack a witness's character for untruthfulness by presenting testimony about the witness's reputation for truthfulness or by impeaching the witness with specific instances of conduct. Ariz. R. Evidence 608(a)–(b). Arizona has recognized that certain acts are characteristic of untruthfulness. *See e.g., State v. Lee*, 728 P.2d 298, 299 (Ariz. 1986) (theft probative of untruthfulness because it "involve[s] the requisite element of dishonesty."). The Arizona rule reflects a broad consensus that acts which involve an element of dishonesty can be used to impeach a witness's truthfulness. *See generally*, 1 Robert P. Mosteller, Ed. et. al., *McCormick On Evid.* § 41 n.7 (8th ed. 2022). Bribery, the illegal use of money, as opposed to threats, to compel action, suppression of evidence, and witness tampering are cognizable ground for impeachment under Rule 608. *United States v. Page*, 808 F.2d 723, 730 (10th Cir. 1987) (collecting examples of conduct indicative of untruthfulness); *United States v. Manske*, 186 F.3d 770, 776 (7th Cir. 1999) (history of witness intimidation probative of untruthfulness).

Cooper had a long history of coercing suspects and witnesses in cases he was investigating which fits within the framework of established methods to impeach his credibility under Rule 608. Cooper would routinely use his power as a law enforcement officer to confront women in isolated settings and pressure them for sex. Cooper's tactics ranged from overt comments to uninvited touching to sexual misconduct, and he had no

qualms about covering it up. Ex. 25 (noting Cooper offered to "take care" of a suspect's arson case after they had sex). There is evidence that Cooper used these tactics since the early 1990s, and that he was persistent, stalking Boyce for over a year. Cooper found individuals with diminished mental capacity, such as Kim Lane and Cathy Griffith particularly easy prey.

Trial counsel could have used the information available to them to impeach Cooper on his history of coercing those he investigated and covering it up. With the information available at the time of Anderson's second trial, trial counsel could have made a good-faith inquiry about his prior dishonest conduct and could have used the reports to, at the very least, refresh Cooper's recollection regarding his prior incidents of misconduct. *See Milke v. Ryan*, 711 F.3d 998, 1009 (9th Cir. 2013) (explicating impeachment using Rule 608 under similar circumstances); Tracey Timlin, *A Quick Guide to Rule 608(b): An Underutilized Impeachment Tool*, ABA Practice Points (June 7, 2019), https://www.americanbar.org/ groups/litigation/committees/trial-practice/practice/2019/rule-608-b-impeachment-tool/.

Cooper's high pressure, coercive and predatory tactics dovetail with the circumstances of Anderson's interrogation. He was repeatedly forced to continue to interrogation when he asked to stop, he was not properly mirandized or provided counsel, he was interrogated in the middle of the night, and he had diminished capacity to resist Cooper's tactics. These arguments were laid out for trial counsel in the motion filed by first trial counsel Ken Everett and in the Arizona Court of Appeals reversal of Lane's case.

Trial counsel's lack of foundational skills in cross examination and failure to review and utilize readily available records had a substantial and injurious effect on the verdicts, and there is a reasonable probability of a more favorable outcome if counsel had performed reasonably.

This claim has not previously been raised to the state courts. Postconviction counsel was ineffective for failing to raise this claim because postconviction counsel made no efforts to reconstruct the flood-damaged file containing the "synopsis" of the investigation into Cooper, and did not investigate the issue. That investigation would have revealed both the *Brady* violation and the ineffectiveness of trial counsel. *See* Claim Three. This claim must therefore be reviewed *de novo*.

### F. Trial counsel failed to advise Anderson of his right to allocute as a substitute for his penalty hearing testimony.

The Due Process Clause to the United States Constitution recognizes the right of allocution. *Boardman v. Estelle*, 975 F.2d 1523 (9th Cir. 1992). The right to allocute springs as well from the Eighth Amendment and the broad mandate of *Lockett v. Ohio*, 438 U.S. 586 (1978) and *Eddings v. Oklahoma*, 455 U.S. 104 (1982), because the sentencing body must be free to consider all relevant evidence in mitigation that is offered by the defense.

Anderson was never advised of his state law (Ariz. R. Crim. P. 19.1(e)(7)) and constitutional rights to allocute; rather, he was directed by counsel to testify at his sentencing. Counsels' failure to address the right of allocution with Anderson invalidates the decision because, without counsel's advice, Anderson cannot be said to have made a knowing, voluntary, or intelligent waiver as to whether to exercise his right to allocution.

The trial court did not address Anderson about his right to allocution. *See* 11/22/2002 Tr. at 67. Anderson was never made aware that he had that choice.

By virtue of counsels' ineffectiveness, Anderson was denied his right to allocute, which would have allowed Anderson to express his remorse to the jury in a confined way without being needlessly subjected to a devastating cross-examination. Had he not testified, the State would not have called co-defendant Kimberly Lane for rebuttal testimony.[23] The State would not have thereafter had repeated opportunities to emphasize the prejudicial facts regarding Anderson's sexual relationship with Lane had she not taken the stand. All of this prejudiced Anderson as his own counsel opened the door to the admission of such inflammatory evidence from direct examination . There is a reasonable probability of a more favorable outcome if trial counsel had advised Anderson of his right to allocate to the jury rather than being called as a witness and subjected to harmful cross-examination and rebuttal testimony.

This issue was presented to the state court in Anderson's state postconviction petition as Claim 3. The postconviction court did not address any aspect of this claim. Accordingly, this Court must review this claim *de novo*. Kehm and Sutherland's complete failure to advise their client of his constitutional right to allocute had a substantial and injurious effect on the sentencing. There is a reasonable probability of a more favorable outcome at the penalty hearing if counsel had performed effectively.

---

[23] In Claim Five(A), Anderson argued the presentation of evidence of a sexual relationship with Lane violated his right to due process.

### G.    Trial counsel was ineffective for failing to impeach Kim Lane with her prior statements.

Kim Lane was arrested on August 23, 1996, at a homeless shelter in Evanston, Illinois. *State v. Lane*, CR-96-1057 (Super. Ct. Mohave Cnty.) Ex. 31 at 13. On August 24, 1996, Detective Cooper interrogated Lane in Evanston. The statements Lane made to Cooper during that interview became an integral part of the State's case against Lane at her trial. Ex. 9 at 57–66. Lane made numerous incriminating statements to Cooper that placed her at the center of the plot to kill Kagen, Delahunt, and Wear, and cemented her culpability in the plot. Ex. 27 at 22.

Lane testified in her own defense. During cross examination, the State impeached Lane multiple times with statements she made to Cooper. Ex. 8 at 24–25; 33–34; 39–40; 63–65. At closing, the State argued to the jury that she was not an innocent child caught up in Anderson and Poyson's malfeasance, but that she actively participated in planning the murders, had multiple opportunities to abort the murder plot either at the outset or by seeking help after Delahunt was killed, that she supplied items to support the two men during the murders to facilitate the killing, and that she had a long history of lying to manipulate people. Ex. 9 at 57-67.

Lane testified as a prosecution witness at Anderson's guilt trial in 2001. Lane repeatedly made statements inconsistent with her statements to Cooper and inconsistent with her testimony at her own trial. Trial counsel had ample opportunity to impeach Lane's credibility but failed to do so. This omission directly impacts Anderson's conviction for premeditated murder, as well as his moral culpability at the penalty hearing, because Lane's unimpeached testimony framed him as the driver of the murders.

1    Lane later testified as a prosecution witness at Anderson's penalty trial. On cross

2    examination trial counsel attempted to impeach Lane with the statements she made to

3    Cooper. However, despite having both the statements Lane made to Cooper and the

4    State's successful impeachment from Lane's own trial, trial counsel failed to effectively

5    impeach Lane. In multiple instances Lane evaded impeachment by claiming she did not

6    remember her prior statements. Trial counsel did not refresh her recollection or confront

7    her with either her trial testimony or her prior statements to Cooper. In other instances,

8    trial counsel failed to impeach Lane at all. Despite her prior statements being readily

9    available, trial counsel either lacked the necessary skill or knowledge of the record. These

10   missed opportunities allowed the State to rest on Lane's false testimony and which

11   improperly magnified Anderson's culpability. Impeachment is a foundational skill and

12   the failure of trial counsel to execute an impeachment with readily available material is

13   deficient performance.

### 1. Trial counsel was ineffective for either inadequately impeaching or completely failing to impeach Kim Lane with readily available material during the penalty hearing.

16   During Anderson's penalty phase trial, the State called Lane as a witness against

17   Anderson to argue a theory that Anderson was primarily responsible for the murders.

18   11/25/02 Tr. at 218–221. However, Lane's testimony at the penalty trial was inconsistent

19   with her prior statements to Cooper and bore directly on the core issue of Anderson's role

20   and culpability. Lane's credibility before the jury was a fundamental component of

21   Anderson's penalty trial. Had trial counsel properly impeached Lane, the State's theory

22   would have been undermined.

23

Impeachment by a prior inconsistent statement is a foundational skill necessary to subject the government's case to meaningful adversarial testing. Trial counsel failed to exercise the requisite skill to impeach Lane. In multiple instances trial counsel botched their attempted impeachment despite having the impeachment material at their disposal. In other instances trial counsel completely failed to recognize opportunities to impeach Lane. *Strickland v. Washington*, 466 U.S. 668, 688 (1984) (trial counsel required to bring to bear such skill and knowledge to effect meaningful adversarial testing); *Rompilla v. Beard*, 545 U.S. 374, 386 n.5 (2005).

### a) Failure to effectively impeach Lane on the facts of the crime magnifying Anderson's culpability.

By Lane's own admission, she, Anderson, and Poyson hatched a plot to murder Kagen, Delahunt, and Wear. At Anderson's penalty trial the State posited that Anderson was the primary driver of the plot. Had Lane's role been successfully conveyed to the jury on cross examination, Anderson's culpability would have necessarily been diminished.

### (1) Inadequate impeachments.

In multiple instances, trial counsel attempted to impeach Lane but failed to properly confront her with a prior inconsistent statement. On cross examination, trial counsel asked Lane if she told Cooper that she had a role in Delahunt's murder. 11/25/02 Tr. at 149–50. Lane stated she did not remember multiple times. *Id.* Lane made a prior statement to Cooper that she had a role to play in the murders by luring Delahunt to the trailer. Ex. 27 at 14. Trial counsel attempted to impeach Lane with her statements to Cooper but did not confront Lane with her prior statements when she stated she did not

remember making the statements (or even to refresh her recollection). 11/25/2002 Tr. at 150.

Trial counsel attempted to cross examine Lane on her role in Delahunt's murder because she repeatedly fetched rocks for Poyson to use. 11/25/02 Tr. at 151. After Lane admitted handing the rocks to Poyson, trial counsel asked her if she remembered her prior statement to Cooper. 11/25/02 Tr. 17. In that statement Lane admitted that she knew "they were doin' somethin' with his head . . ." when she retrieved the rocks. Ex. 27 at 17. Trial counsel failed to impeach Lane by confronting her with her prior statement to Cooper, and Lane was able to rest on her answer that she had "no idea" what the rocks were for, despite her earlier statements.

### (2)    Omitted impeachments.

At Anderson's penalty trial, Lane testified that to her knowledge there was no plan to kill anyone in Golden Valley. 11/25/2002 Tr. at 142. However, Lane told Cooper that during the planning stages of the murders she said "why don't you just kill 'em and take the truck." Ex. 27 at 11. Lane also told Cooper that all three co-defendants came up with and agreed to the plan to kill Kagen, Delahunt, and Wear. Ex. 27 at 20. When Cooper asked Lane if she was a willing participant in the plot, she answered "[y]es I was." Ex. 27 22. Lane admitted that she knew about the plan, and although she was scared, she understood the outcome, and that she knew it was the only way to escape Golden Valley. Ex. 27 at 24–25, 26–27. She also told Cooper she was motivated to leave Golden Valley because she disliked the filthy living conditions and disliked the victims. Ex. 27 at 12, 22. Lane stated that she was not lying about her involvement in the plan. Ex. 27 at 22. Trial counsel did not impeach Lane using her statements to Cooper. Because trial counsel

failed to impeach Lane, the State, on redirect, was able to rest on Lane's answer that she was never a full participant in the murders, shifting the culpability to Anderson. 11/25/2002 Tr. at 166.

The State used Anderson's sexual relationship with Lane to frame him as a child predator in the eyes of the jury. 11/26/2002 Tr. at 218. To support that theory, the State asked Lane during the penalty trial if Anderson had ever tried to force Lane to have sex. 11/25/2002 Tr. at 126. Lane stated that Anderson surprised her as she was getting out of the shower at a friend's house. *Id.* However, in her statement to Cooper, Lane stated she "didn't know" the first time she and Anderson had sex and omitted any mention of Anderson forcing her to have sex. Ex. 27 at 7. Trial counsel failed to impeach her on either the inconsistent statement or the omission. At her own trial, Lane testified that Frank protected her and was kind during their travels from Lancaster to Mohave to Golden Valley. Ex. 8 at 26. Trial counsel failed to impeach Lane using her trial testimony.

### b) The failure to impeach Lane's credibility magnified Anderson's culpability.

Lane was central to the State's penalty trial theory. In multiple instances she either lied or feigned that she did not remember statements or facts. Trial counsel's failure to impeach her credibility allowed the State to rest on Lane's false testimony.

### (1) Inadequate impeachments.

At Anderson's penalty phase trial, the State asked Lane on direct examination if she had previously been pregnant or had previously miscarried. 11/25/02 Tr. at 125. Lane answered "no" to each question. However, Lane previously told Cooper that she had

"miscarried before, a couple months ago." Ex. 27 at 2. On cross examination, trial

counsel attempted to impeach Lane using her prior statements but failed to confront Lane

with the transcript of the Cooper interrogation. 11/25/2002 tr. at 137–138.

At Anderson's penalty trial, defense counsel repeatedly asked Lane if she had a

romantic relationship with Poyson. 11/25/2002 Tr. at 145–46. Lane denied ever having

romantic feelings for Poyson. *Id.* at 145. Lane made a prior statement to Cooper in which

she detailed a burgeoning relationship with Poyson in which she was "falling for him"

and that they shared a kiss while Anderson was in a gas station. Ex. 27 at 35. Trial

counsel asked if she remembered making the prior statement to Cooper, to which Lane

replied "no." *Id.* Trial counsel failed to properly impeach Lane by confronting her with

her prior statement.

### (2)    Omitted impeachments.

Trial counsel asked Lane if Poyson had a lot of blood on him after Delahunt's

murder. 11/25/2002 Tr. at 151. Lane had previously told Cooper that she had seen "a lot

of blood." Ex. 27 at 18. However, at Anderson's penalty trial Lane answered that she

didn't remember how much blood she had seen and it was dark outside. 11/252002 Tr. at

152. Trial counsel failed to impeach her on her inconsistent statement.

On cross examination trial counsel asked Lane if she had used a fictitious name of

"Kim Anderson" while in Las Vegas prior to the murders. Lane answered yes.

11/25/2002 Tr. at 143. At her trial, Lane admitted to using fictitious names on hotel

registrations and when she registered at the Evanston homeless shelter. Ex. 8 at 49–50.

Trial counsel failed to impeach Lane's credibility using readily available information

about her ongoing use of fictitious names.

111

### c) Trial counsel's failure to impeach lane during the penalty trial was prejudicial because the State proved Lane's culpability at her own trial using the same material.

Lane testified in her own defense at her trial. On cross examination, the State successfully impeached Lane and later argued that she was highly culpable in the plot and deserved the maximum sentence. The State impeached her on the claim that Anderson had asked her to prostitute herself. Ex. 8 at 24–25. Lane confirmed that she had refused Anderson's requests that she prostitute herself, to hitchhike, and to have sex. *Id*. The State's impeachment clearly established that Lane was not under Anderson's control. *Id.* at 39–40. Lane admitted that Anderson protected her and was kind during their travels from Lancaster to Mohave to Golden Valley. *Id.* at 26.

The State impeached Lane using her statements to Cooper that she said "let's kill them and take the truck". Ex.8 at 28. Lane had, in fact, denied making that statement to Cooper when she was interviewed by Hawkins, and tried to fabricate the assertion that Anderson and Poyson had told law enforcement she made that statement. *Id.* This further damaged Lane's credibility when the State successfully impeached her twice. On cross Lane testified that her role in the murders was to engage Delahunt. *Id.* at 39. When Lane tried to evade questioning the State successfully impeached her using her statements to Cooper. Ex. 8 at 33–34; 63–65. On cross examination, the State elicited testimony where she adopted the statements she made to Cooper that the group planned to shoot, rather than tie up, the victims and sought out additional ammunition. *Id.* Lane testified that Anderson wanted to back out. *Id.* at 35.

The State impeached Lane on her prior statement that she had retrieved rocks for Anderson and Poyson as they struggled with Delahunt in the trailer. Lane confirmed that she had cleaned the trailer prior to the murder, and that there were no rocks in the trailer prior to the murder. *Id.* at 41-42. Lane supplied the rocks used to murder Delahunt with full knowledge of what has happening in the trailer.

The State impeached Lane on her refusal to seek help or alert the authorities after Delahunt's murder. Lane confirmed her statement to Cooper that during a two-hour period following Delahunt's death she did not seek help. She also omitted that she did not try to telephone for help even though the phone line was intact until later in the evening. *Id.* at 44. Lane admitted that she did not call the authorities because she cared about Anderson. *Id.* at 45. Lane also admitted that even though Poyson suggested surrendering to the police and she had the opportunity to do so, she refused. *Id.* at 45. Lane could not blame her failure to surrender on Anderson, because from August 19–23, 1996, she and Poyson were alone at the homeless shelter in Evanston, Illinois. The State impeached Lane's credibility based on her use of a fictitious name when she checked into a hotel. Poyson did not falsify his name. Ex. 8 at 49-50.

The State's impeachment of Lane using the Cooper interrogation transcript was highly effective at discrediting Lane and proving her involvement to the jury. Ex. 8 at 57–66. The State argued that, based on the statements she made to Cooper, she was involved in nearly every aspect of this plan. She planned to kill the victims and take the truck, she brought Poyson rocks as he was bludgeoning Delahunt, and she tried to get ammunition. *Id.* at 67. The State pressed Lane's ability to lie, as uncovered through inconsistent statements on cross examination. The State argued that because Poyson and

Anderson wanted to back out of the plan, Lane had the most to gain and manipulated them into going forward. *Id.* at 68-69.

Lane's trial transcript, including the cross examination and closing argument, provided an excellent template of how to impeach Lane, destroy her credibility, and prove her central role in the murders. The fact that this roadmap was readily available underscores trial counsel's deficient performance. More importantly, the State's successful impeachment of Lane at her own trial clearly demonstrate the effect trial counsel could have achieved. Trial counsel's deficient performance prejudiced Anderson because the State's impeachment of Lane at her own trial provided clear evidence that trial counsel could have shifted the question of culpability in the plot towards Lane during the penalty trial and reduced Anderson's culpability. Trial counsel's failure to utilize foundational skills in cross examination and failure to review and utilize readily available records was prejudicial, and there is a reasonable probability of a more favorable outcome if counsel had performed reasonably.

This claim has not previously been raised to the state courts. Postconviction counsel was ineffective for failing to raise this claim because the records of Lane's trial and interview with Cooper were discovered in postconviction counsel's files. This claim must therefore be reviewed *de novo*.

### 2. Trial counsel was ineffective for failing to impeach Lane during the guilt trial.

Lane testified against Anderson at his guilt trial. 10/5/2001 Tr. at 98. Lane repeatedly deviated from her prior statements and testimony, and trial counsel failed to impeach her credibility. Lane testified that Anderson demanded that she seduce Delahunt.

10/5/2001 Tr. at 109. Lane testified that Anderson threatened her to dissuade her from leaving the group after the murders and that he was extremely possessive of her. 10/5/2001 Tr. at 118, 124, 126. On cross examination Lane testified that Anderson had control over her. 10/5/2001 Tr. at 146. Trial counsel failed to impeach Lane on her ability to resist Anderson using her testimony from her trial. *See* Ex. 8 at 39–40. On cross-examination trial counsel asked Lane if she had any plans to kill anyone, tie anyone up, or if she had any knowledge of a plan to do so.  Lane answered "no" to each question. 10/5/2001 Tr. at 133. Trial counsel failed to impeach Lane on these answers using either her trial testimony or her statement to Cooper. Lane denied admitting to Cooper that she said "let's kill them and take the truck". 10/5/2001 Tr. at 144. Despite readily available impeachment material, trial counsel failed to impeach Lane. Lane denied any knowledge of the plot repeatedly on cross examination. 10/5/2001 Tr. at 155–157. Trial counsel failed to impeach her with testimony from her trial. Ex. 8 at 33–34; 63–65.

Trial counsel's failure to impeach Lane's credibility during the guilt trial was deficient performance. The failure to impeach Lane prejudiced Anderson because, as a testifying co-defendant, Lane was able to frame Anderson as a controlling figure who orchestrated the murders. This bore directly on Anderson's conviction of premeditated murder. Trial counsel's failure to utilize foundational skills in cross examination and failure to review and utilize readily available records was prejudicial, and there is a reasonable probability of a more favorable outcome if counsel had performed reasonably.

This claim has not previously been raised to the state courts. Postconviction counsel was ineffective for failing to raise this claim because the records of Lane's trial

1  and interview with Cooper were discovered in postconviction counsel's files. This claim

2  must therefore be reviewed *de novo*.

3  **H.  Trial counsel were ineffective for submitting invalid jury**
   **instructions on premedition to the court.**

4
5  **1.  Invalid premedition instruction**

6  The trial court asked trial counsel to turn in their proposed jury instructions prior

7  to seating the second guilt-phase jury in 2001. 9/20/2001 Tr. at 5. During that colloquy,

8  trial counsel Kehm informed the court that he would be submitting a list of the

9  instructions he was requesting and that he did not "anticipate a whole bunch of

10 manufactured instructions." *Id*. at 6.[24] The Defendant's Proposed Jury Instructions simply

11 listed "37. First Degree Murder by Premedition" and requested the standard instruction

12 with change. ROA239 at 3. During the next hearing, Kehm made no attempt to object to

   or argue for changes to the premedition instruction. 10/1/2001 Tr. at 2.

13
14 The jury was thus informed as follows:

15      premedition means that the defendant's intention or
16      knowledge existed before the killing long enough to permit
        reflection. However, the reflection differs from the intent or
        knowledge that conduct will cause death. It may be as
        instantaneous as successive thoughts in the mind**,** and it may
17      be proven by circumstantial evidence. It is this period of
        reflection, regardless of its length, which distinguishes first
18      degree murder from intentional or knowing second degree
        murder. An act is not done with premedition if it is the instant
19      effect of a sudden quarrel or passion.

20 10/9/2001 Tr. at 133-134. This instruction is defective as it erases the distinction between

21 first- and second-degree murder.

22

23
   _____

   [24] This claim is symptomatic of trial counsel's absence of the expertise necessary
   to represent a client charged with a capital offense. *See* Claim Two(A).

   116

The Arizona Supreme Court has specifically found that the standard jury instruction, as submitted by Kehm, was unconstitutionally vague as it erased any "meaningful distinction between first and second degree murder." *State v. Thompson*, 65 P.3d 420, 427 (Ariz. 2003). This was specifically based on the inclusion of the language "as instantaneous as successive thoughts of the mind." *Id*. Anderson had a constitutional right to a properly instructed jury and a fair trial. Due to trial counsel's proffer of incorrect instructions, the jury was left without any ability to meaningfully distinguish between first- and second-degree murder when rendering their verdict.

The jury's inability to distinguish these offenses impaired their ability to consider the defense theory of guilt of lesser-included offenses. The record establishes that Kehm did, indeed, seek to argue for lesser included offenses, as evidenced by the fact that he sought instructions for second degree murder and manslaughter. ROA239 at 3. However, by failing to seek a correct instruction for premeditation, he undermined his own defense strategy. A jury could not have found a lesser included offense if they did not understand the distinction between premeditation required for first-degree murder and the intention to kill characterizing second-degree murder. Accordingly, but for counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceeding would have been different.

Even if trial counsel invited the error by presenting the trial court with incorrect instructions, trial counsel was still ineffective for first, presenting the trial court with an incorrect and vague instruction; and second, for failing to object to the incorrect and vague instruction. Anderson was prejudiced because his jury was not able to distinguish between first- and second-degree murder. The fact that counsel requested this instruction

117

does not cure the constitutional defect found by the *Thompson* court: that the State was essentially relieved of its burden to establish the sole element distinguishing first from second degree murder. *Thompson*, 65 P.3d at 427. As the sentencing jury received an unconstitutional instruction, even at counsel's request, it could not have been properly instructed on the law; therefore, the error is structural and Anderson is entitled to a new sentencing proceeding.

As this finding of premeditation was the foundation upon which the Arizona Supreme Court rested its conclusions about Anderson's other claims, for example, the conclusion that "the murders were premeditated and taking Wear's truck was the object to be gained,"[25] the error had a substantial and injurious effect on the verdicts. Because the Arizona Supreme Court relied upon the determination that the murders were premeditated as a reason to deny Anderson's other claims, there is a reasonable probability of a more favorable outcome if trial counsel had performed effectively by submitting valid instructions.

The Court must review this claim *de novo*, as the Arizona Supreme Court, in dismissing this claim as "invited error," did not reach the merits. Moreover, the ineffective assistance of trial counsel claim has not been raised in state court; therefore, it is reviewed *de novo*.

## 2.    Invalid accomplice liability instructions

Trial counsel were ineffective in submitting invalid instructions to the court regarding accomplice liability. Anderson's jury was instructed he could be found guilty of premeditated murder if he was an accomplice in the offenses. 10/09/01 Tr. at 129.

---

[25] *State v. Anderson*, 111 P.3d 369, 385.

However, the jury was not instructed Anderson had to have the specific intent to commit premeditated murder to be found liable as an accomplice. The jury was instructed regarding the following definition of an accomplice:

> A person is criminally accountable for the conduct of another if the person is an accomplice of such other person in the commission of the offense.
> An accomplice is a person who, with intent to promote or facilitate the commission of an offense, aids, counsels, agrees to aid, or attempts to aid another person in planning or committing the offense.
> Intentionally or with intent to as used in these instructions means that a person's objective is to cause that result or to engage in that conduct.

10/09/01 Tr. at 129.

The accomplice instructions allowed the jury to find Anderson guilty of premeditated murder without also finding he had the specific intent required for that offense. The instructions permitted Anderson to be found liable as an accomplice if he merely intended to "engage in that conduct." The mental state required under the instructions to find Anderson guilty of premeditated murder as an accomplice was therefore no different than the intent to kill that constitutes second-degree murder.

There is a reasonable probability of a more favorable outcome if trial counsel had not provided the court with invalid accomplice instructions. The instructions were prejudicial to Anderson as his defense was that Poyson committed the acts that killed the three victims and that he was merely present and did not himself premeditate the murders. Trial counsel's proffer of invalid instructions effectively foreclosed Anderson's defense. Counsel submitted instructions and verdict forms for second-degree murder and argued the jury should find him guilty of that lesser included offense. However, the accomplice instructions meant Anderson could be found guilty of premeditated murder

119

even if his mental state only rose to the level of second-degree murder if he also intended to "promote or facilitate the commission of an offense." 10/09/01 Tr. at 129.

The closing arguments of the prosecutor and defense counsel also highlighted the prejudicial parts of the accomplice instructions. The prosecutor argued Anderson's guilt as an accomplice meant he was necessarily guilty of premeditated murder. 10/09/01 Tr. at 13-14. Trial counsel also acknowledged in argument Anderson was liable for first-degree murder if Poyson premeditated the murders of the three victims. Trial counsel argued in closing, "Accomplice liability is sort of a substitute for pre – well, the murder still has to be premeditated, but I guess it could be premeditated by somebody else." 10/09/01 Tr. at 77-78. Without addressing the issue of intent, trial counsel was left to argue Anderson's actions did not assist Poyson and Lane. *Id*. at 77-78. In rebuttal, the prosecutor argued Anderson was guilty of first-degree regardless of whether Poyson or Anderson committed the killings. *Id*. at 108-09. The parties' closing arguments demonstrate prejudice from the invalid instructions and further show a reasonable probability of a more favorable outcome if trial counsel had performed effectively.

This claim has not been presented to the state courts for review and is reviewed *de novo*.

### I.   Trial counsel were ineffective in failing to move for a change of venue due to the significant media coverage the case received.

Trial counsel were ineffective in failing to move for a change of venue due to the existence of prejudicial pre-trial publicity that undermined Anderson's ability to receive a fair and impartial jury as well as a reliable sentence. The seating of even one juror who

does not meet constitutional standards of impartiality is prejudicial per se. *Dyer v. Calderon*, 151 F.3d 970, 983 (9th Cir. 1998) (en banc).

Anderson' case was the subject of prejudicial press coverage that included inflammatory and false information. Prejudicial coverage in the local news continued at the time of the retrial. Anderson was arrested for the offenses committed in Mohave County, Arizona, which, as of the 2000 census,[26] had a small population of 155,032 residents. By the time they had arrived for jury duty, several potential jurors had already heard about Anderson's prior conviction and death sentences that were reversed by the Arizona Supreme Court. However, trial counsel never moved the trial court to change the venue of the trial to another county where Anderson could have received a fair trial before an impartial jury. Counsel's failure to litigate such a motion, given the expansive news coverage in a small town, constitutes deficient performance.

For example, one news story from the Arizona Republic, titled "Helping others brings death 'Bad mistake' ends in spree in Kingman desert," reported a series of misfortunes that had befallen Leta Kagen and her "descent into hell" with her fourteen year old son. Ex. 33 at 1. The story characterized the offenses as a "nightmarish scene straight out of the pages of *In Cold Blood*." *Id*. at 2. It referred to Anderson and Poyson as "scheming ex-cons" who "butchered" Kagen and her son, Delahunt. *Id*. The story also mentioned false information regarding how Kagen met Anderson and Lane and it alluded to a sexual relationship between them. *Id*. None of this information would have been

---

[26] *Available at* https://www.azcensus.com/wp-content/uploads/2019/12/Mohave-County-Census-2000.pdf (last visited October 8, 2023).

admissible if presented at trial, yet it was presented to the public, including the pool of potential jurors who would be sitting in judgment of Anderson.

Trial counsel were ineffective in failing to utilize the pleadings and exhibits filed by Poyson's counsel in connection with the case to support a motion for change of venue. After Anderson's first trial, Poyson's counsel filed a motion for change of venue that included as exhibits the intensive media coverage the case had received from the time of the offenses up to the start of Poyson's trial on February 17, 1998. Ex. 37. However, trial counsel unreasonably failed to utilize those documents and include additional media coverage from that time up to the start of Anderson's second trial.

During voir dire, several potential and chosen jurors reported hearing about the case in the news. Moreover, the news coverage included information about Anderson's prior conviction and death sentence that had been reversed by the Arizona Supreme Court. The trial court recognized the prejudicial nature of such information and ordered potential jurors not to reveal that information to others on the venire, yet denied trial counsel's motions to strike such jurors for cause. 10/01/02 Tr. at 1064-65 (potential juror S.), 1074-75; *see id.* at 247-48 (potential juror H.); *id.* at 312 (potential juror G.).[27] One potential juror, Potential Juror G, was excused for cause after learning about the sexual relationship between Anderson and Lane from both the prosecutor's statements and the pretrial media publicity. *Id.* at 280 (potential juror G.); *see id.* at 317 (potential juror J.) (noting same concerns). Potential juror P. stated that she had also formed a fixed opinion regarding Anderson's guilt as the case had been litigated by her high school mock trial

---

[27] The trial court only excused a potential juror with knowledge of the prior trial proceedings if they also stated they could not remain fair and impartial as a result of such information. 10/01/2001 Tr. at 324–25 (potential juror N.).

1   team. *Id*. at 299-300.  Many of the seated jurors expressed concerns about how long

2   criminal cases took to go to trial, which prejudiced Anderson given the lapse of time

3   between the offenses and the retrial and resentencing. The record thus reveals that the

4   pre-trial news coverage reached the jury pool and influenced the prospective jurors, with

5   many of them having a prejudicial judgment against Anderson before even setting foot in

6   the courtroom.

7          Anderson did not receive a fair and impartial jury for his retrial and resentencing

8   juries in Mohave County. As detailed in his direct appeal brief in state court, the trial

9   court denied several motions by trial counsel to remove potential jurors who did not meet

10  constitutional standards for impartiality, which forced trial counsel to expend peremptory

11  challenges to remove those individuals from the venire. 12/18/02 Opening Brief,

12  Arguments 9 and 12. *State v. Anderson*, 111 P.3d 369, 379-81, 390-91 (Ariz. 2005).[28]

13  Consequently, the juries that were ultimately empaneled were skewed in favor of the

14  State and against Anderson.

15         Anderson was prejudiced by trial counsel's deficient performance in failing to

16  move to change the venue of the trial. There is a reasonable probability of a more

17  favorable outcome if trial counsel had moved to change the venue of the trial to another

18  county.

19         This claim has not been presented to the state courts for review and is reviewed *de*

20  *novo*.

21

22

23

---

[28] Anderson incorporates those allegations as if fully set forth herein.

**J.    Trial counsel were ineffective for failing to maintain Anderson's sentencing date post-*Ring* making Anderson eligible for the death penalty.**

Between June 24, 2002, and August 1, 2002, Arizona had no mechanism for imposing the death penalty. The U.S. Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584, 609 (2002) invalidated the statutory scheme by which death could be imposed by a judge in Arizona. Arizona did not create a jury based sentencing mechanism until August 1, 2002. *See* 2002 Ariz. Legis. Serv. 5th Sp. Sess. Ch. 1 (S.B. 1001). Anderson's sentencing fortuitously fell within this interstitial period. Trial counsel however failed to take advantage of this opening in the law by twice agreeing to continue Anderson's sentencing hearing until the window of opportunity closed, despite knowing that the Arizona legislature was busy passing a new death statute.

Anderson was convicted on all counts on October 9, 2001. On October 16, 2001, the State filed notice of aggravating factors in anticipation of Anderson's sentencing hearing before Judge Chavez. ROA 258. Anderson's sentencing hearing was originally scheduled for December 13, 2001, but was continued at defense counsel's request until March 4, 2002. ROA 261. The court then continued the hearing until May 20, 2002, and again until June 5, 2002. ROA 266; ROA 267. At the pre-hearing conference on May 24, 2002, trial counsel stated that he was prepared for the June 5, 2002, sentencing, and planned to call witnesses including Dr. Thal. 5/24/02 Tr. at 4. The State confirmed that they ready to proceed and stated that they did not plan to call any witnesses. *Id.* Quixotically, the June 5, 2002, sentencing hearing did not happen. No minute entry appears on the docket, and the record contains no motions or stipulations by the parties that the sentencing was rescheduled. The Supreme Court opinion in *Ring v. Arizona*

issued on June 24, 2002. Without reference to the June 5 sentencing hearing, Judge

Chavez held a status conference on June 27, 2002, to address developments in light of

*Ring*.

        At the June 27, 2002, status conference the State acknowledged that *Ring* would

affect Anderson's sentencing and asked to delay sentencing sixty to ninety days. 6/27/02

Tr. at 2. Notably, the State argued that a delay would not prejudice Anderson since he

was eligible for lengthy non-capital sentences on the robbery charges, despite the State's

clear intention to seek death should it become available under a new statute. *Id.*

Addressing the court, trial counsel admitted that he was unclear on the holding of *Ring*,

and while he suggested proceeding to sentencing without the option of the death penalty

he failed to forcefully litigate the issue:

> I'm not comfortable in immediating [sic] taking the position of
> what Mr. Frank Anderson's rights are at the moment. This is
> not the simplest issues so I'm kind of working my way through
> it, thinking my way through it, and talking to other counsel.
>
> One thing, just some thoughts that I've come up with, number
> one, there's one option the Court could do. I assume Mr. Zack
> is not in agreement with this, but the Court could proceed with
> sentencing with the understanding the Court would not have
> the ability to impose a death sentence.
>
> I base that on page 22 where they say…we over rule Walton to
> the extent that it allows a sentencing judge sitting without a
> jury to find and aggravating circumstance necessary for
> imposition of the death penalty. I really think that is the
> holding. They don't give additional instructions or say how the
> State has to incorporate that idea.
>
> …
>
> Mr. Zack's recommendation that we wait 60 or 90 days – once
> again, I understand where the State is coming from, but I'm not
> sure it's in Mr. Anderson's best interest or that he would agree
> to sit and wait…so I assume he could make a request for

1    sentencing. I'm not doing that at the moment, I'm just throwing
2    the idea around.

3   6/27/02 Tr. at 4–5. Kehm ultimately suggested a 30-day continuance and stated that "I

4   don't think it would be harming Mr. Anderson's interests too much". 6/27/02 Tr. at 9.

5        Kehm filed a motion to sentence Anderson to life on July 26, 2002. In that motion

6   Kehm argued that *Ring* precluded a sentence of death in Anderson's case because the

7   guilt phase jury had been discharged and either re-empaneling that jury or empaneling a

8   new penalty phase jury would be unconstitutional. ROA 273. Mere days after Kehm filed

9   that motion, the Arizona legislature passed S.B. 1001 which established a statutory

10  framework for sentencing capital defendants to death with a penalty phase jury. The

11  passage of S.B. 1001 closed the window during which Arizona had no capital sentencing

12  mechanism. Had Anderson been sentenced during that time period he would have been

13  eligible for a maximum sentence of life without parole. *See*, A.R.S. § 13-703 (2001).

14
        **1.    Trial counsel was ineffective for failing to advocate for**
                **Anderson by requesting a sentencing hearing while**
15              **Arizona's capital sentencing statute was invalidated.**

16       Kehm should have insisted the sentencing date occur and objected to continuances

17  for the sole reason of waiting for the Legislature to pass a new capital sentencing statute.

18  Kehm was presented with a singularly unique opportunity to avoid a sentence of death.

19  Had Kehm forcefully advocated to proceed with sentencing before Judge Chavez

20  immediately, the Arizona sentencing scheme in effect at the time would have precluded a

21  sentence of death. *See* A.R.S. § 13-703 (2001). One month earlier, Kehm had announced

22  that he was prepared for the sentencing hearing and had no strategic reason to delay

23  sentencing. It is clear from his statements that the delay sprung from his poor

126

understanding of the issues in *Ring*. Failure to grasp a point of law that is fundamental to the case is the touchstone of ineffective assistance of counsel. *Hinton v. Alabama*, 517 U.S. 263, 274 (2014) (per curiam).

Had Kehm formally moved the court to conduct the aggravation/mitigation hearing and proceed to sentencing and been denied, the issue would have been preserved for appellate review. Likewise, had Kehm proceeded with the hearing as originally scheduled on June 5, 2002, there is a reasonable probability that the trial court would have imposed sentence during the interstitial period when death was not an option. Had the trial court imposed sentence before June 24, 2002, Anderson would have been included in the group of capital defendants pending direct appeal who were entitled to the retroactive application of *Ring*. *See State v. Ring*, 65 P.3d 915, 946 (Ariz. 2003) (enumerating effects of the Supreme Court's decision in *Ring v. Arizona*).

Anderson raised this claim in state postconviction. *See* 9/23/2020 Order Denying PCR relief at 9;10/14/2021 Petition For Review at 47. The state PCR court denied relief finding that the death penalty "remained a potential punishment for Anderson, even before the Arizona legislature amended the sentencing statute to comply with *Ring*". The state PCR court's finding was an unreasonable determination of the law as at the time Arizona had no mechanism in place authorizing the imposition of the death penalty. In the alternative the state PCR court's conclusion was an unreasonable application of the law and an unreasonable determination of the facts as the only potential exception to the rule in *Ring* whereby a judge alone could impose death is a qualifying prior conviction, which did not exist here. *See Ring v. Arizona*, 536 U.S. 584, 609 (2002); *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). Anderson's claim of ineffective assistance of counsel

127

1   for failing to pursue timely sentencing must therefore be reviewed *de novo*. The failure of

2   trial counsel to understand the issues at bar and effectively litigate them had a substantial

3   and injurious effect on Anderson's death sentences.

### 2.    Trial counsel was ineffective for failing to pursue an agreed upon disposition.

Kehm was ineffective for failing to pursue an agreed upon sentence. The ABA

Guidelines specifically require capital counsel to seek an agreed upon disposition.

American Bar Association, *Guidelines for the Appointment and Performance of Defense

Counsel in Death Penalty Cases,* Guideline 10.9.1 (rev. ed. Feb. 2003), *reprinted in* 31

Hofstra L. Rev. 913 (2003). During the interstitial period the State was facing more

uncertainty than Anderson. The State had no mechanism to constitutionally impose the

death penalty, and as of the hearing on June 27, 2002, the State was only aware of

"meetings" to address *Ring*. 6/7/2002 Tr. at 2. With the death penalty unavailable,

Anderson could only have been sentenced to life without the possibility of parole. Kehm

should have pursued an agreed upon sentencing recommendation, even if it meant

stipulating to life without the possibility of parole. The failure of trial counsel to seek and

agreed upon sentence had a substantial and injurious effect on Anderson's death

sentences, and there is a reasonable probability of a more favorable outcome if counsel

had done so. This claim has not been raised before the state courts for review.

### K.    Counsel was ineffective for failing to challenge the duplicitous indictment.

Anderson was indicted on September 5, 1996. ROA002. The indictment alleged

five counts:

    I.    Conspiracy to commit first degree murder.

128

II.     Murder in the first degree (Delahunt).

III.    Murder in the first degree (Kagan).

IV.     Murder in the first degree (Wear).

V.      Armed Robbery.

ROA002. On appeal from his first trial Anderson challenged the indictment as duplicitous. 6/14/1999 Appellant's Opening Brief at 26–32. Anderson argued that the charges contained in Count V, armed robbery, failed to state a victim of the robbery or what was taken from the victim. *Id.* at 27. Because any of the murder victims may have been the robbery victim, this defect exposed Anderson to a non-unanimous jury verdict and the possibility that he might be re-tried for the same offense. *Id.* Anderson also argued that Count I, conspiracy to commit first degree murder, did not specify a victim. *Id.* at 29. The indictment charged that the three defendants conspired to murder "the residents of 2725 Yavapai Drive." The defect was not cured by a jury instruction or special interrogatory, and so the jury verdict may have been non-unanimous. Anderson also argued that the murder verdicts may not have been unanimous because the indictment did not specify the theory of first degree murder the State sought to prosecute. *Id.* at 31. Because the armed robbery and conspiracy charges were deficient there is no way to ensure a unanimous verdict for a felony murder or premeditated murder theory of liability. *Id.* at 32. The Arizona Supreme Court acknowledged this issue on Anderson's first direct appeal but declined to rule directly, citing the disposition of the appeal on other grounds. *State v. Anderson*, 4 P.3d 369, 380 (Ariz. 2000) (noting the indictment may be amended prior to Anderson's second trial to resolve the issue).  The State did not

129

amend the indictment and proceeded to try Anderson on the original indictment. 9/5/1996 Indictment.

At Anderson's second trial, trial counsel failed to timely challenge the indictment, moving to dismiss the indictment only after the State had presented their case-in-chief. *See Anderson*, 111 P.3d at 377–378. The trial court denied the motion. *Id.* On his second direct appeal Anderson argued again that because the counts of robbery and conspiracy lacked specificity and were therefore duplicitous, neither a theory of felony murder nor premeditated murder could stand. 12/18/2003 Appellant's Opening Brief at 19–23.

The Arizona Supreme Court denied Anderson's claim on procedural grounds. *Anderson*, 111 P.3d at 377–378. The Arizona Supreme Court, however, also addressed the merits of Anderson's claim. The Arizona Supreme Court held that the conspiracy count was constitutional as there may be multiple objects to a conspiracy. *Id*. at 378. The Arizona Supreme Court characterized the armed robbery charge as better addressed by the jury instructions, which trial counsel requested.[29] *Id.* at 379. While tacitly acknowledging the defect in the armed robbery charge, the Arizona Supreme Court did not address the merits of the argument alleging a defect in the first-degree murder theories of liability. *Id.*

> **1.    Trial counsel's performance was deficient for failure to timely challenge the indictment.**

In Arizona, an indictment must be challenged at least twenty days prior to trial or be precluded. Ariz. R. Crim. P. 13.5(e), 16, 16.1(c). *Anderson*, 111 P.3d at 377–378. By the time of Anderson's second trial, trial counsel had before them Anderson's first appeal

---

[29] To the extent trial counsel requested invalid or erroneous jury instructions, they were ineffective. *See* Claim Two(H).

and the Arizona Supreme Court's dicta flagging the indictment as an issue. *See Anderson*, 4 P.3d at 380. Trial counsel failed to grasp the gravity of the duplicitous indictment despite the fact that first appellate counsel and the Arizona Supreme Court had flagged it. Tr. 10/4/01 at 77(" . . . back . . . when I read the original decision from the Supreme Court . . . I didn't think too much of it. This was just brought to my attention essentially yesterday."). Indeed, the State and the trial court recognized the issue even when trial counsel did not. The trial court stated, "I know I certainly did expect early on in the case someone to file a motion either to amend or remand [the indictment], and it's never happened." Tr. 10/4/01 at 82.

Failing to recognize the issue despite having reviewed the Arizona Supreme Court's opinion in Anderson's first appeal was deficient performance, as everything necessary to litigate the issue was within the file trial counsel received. *Rompilla v. Beard*, 545 U.S. 374, 388 (2005). Not only did trial counsel fail to grasp the issue of the duplicitous indictment, trial counsel also failed to understand and act within the time limits set forth by the Arizona Rules of Criminal Procedure. Failure to understand the law is the quintessential example of deficient performance. *Hinton v. Alabama*, 571 U.S. 263, 274 (2014).

### 2. Trial counsel's failure to litigate the duplicitous indictment prejudiced Anderson.

Because trial counsel failed to timely challenge the indictment Anderson was tried on an instrument that failed to give adequate notice of the charges against him. Anderson's trial was based on a duplicitous charging document which exposed him to the genuine possibility of juror confusion and the possibility of a non-unanimous verdict.

*United States v. UCO Oil Co.*, 546 F.2d 833, 835 (9th Cir. 1976) *cert denied* 430 U.S. 966 (1977); *see also United States v. Romero-Coriche*, 840 F.Appx. 138 140 (9th Cir. 2020) (duplicitous indictments violated Sixth Amendment unanimity guarantee absent curative jury instruction). In addition, the duplicitous indictment exposed Anderson to double jeopardy. *Abney v. United States*, 431 U.S. 651, 661 n.6 (1977). The State of Arizona has long recognized the vices of duplicitous indictments. *State v. Axley*, 646 P.2d 268, 277 (Ariz. 1982). Anderson has a due process liberty interest in the correct application of Arizona's law concerning duplicitous indictments. *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980).

Anderson's second trial was rife with evidence that undermined the State's theories of premeditation and felony murder. The duplicitous indictment masked the unanimity requirement for a conviction under any theory. Had counsel performed reasonably and challenged the indictment, there is a reasonable probability of a different outcome. Anderson raised this claim on his second direct appeal. The Arizona Supreme Court denied it on procedural grounds. *State v. Anderson*, 111 P.3d 369, 377–378 (Ariz. 2005). This Court's review is therefore *de novo*. In the alternative, the Arizona Supreme Court's determination was an unreasonable application of clearly established federal law because it failed to analyze the duplicity claim and instead recast it as a jury instruction issue. *Id.* at 379.

**L.    Anderson was denied a fair trial and resentencing in 2002 and a fair postconviction proceeding due to the cumulative impact of the errors of both resentencing and postconviction counsel.**

Anderson incorporates all of the allegations contained in Claim Two(A through K) as if fully set forth herein.

1    The cumulative effect of trial counsel's ineffectiveness denied Anderson a fair

2    retrial. Unqualified to accept appointment on capital cases, trial counsel nevertheless

3    failed to investigate, develop, and adequately present a defense to the charges and

4    mitigation evidence at sentencing. This ultimately left Anderson without counsel. *See*

5    *United States v. Cronic*, 466 U.S. 648, 654 (1984) (noting that the constitutional

6    guarantee of the right to counsel is violated where there is no actual assistance provided

7    to the defendant.)

8    This claim was raised by state postconviction counsel as Claim (E) of Anderson's

9    state postconviction petition. Although the postconviction court's decision addressed

10   many of the claims raised in the petition, the postconviction court opinion did not address

11   the cumulative impact of the errors by trial counsel. Accordingly, this Court must review

12   this claim *de novo*.

13   To the extent Anderson identifies new subclaims of ineffectiveness of trial counsel

14   that were not presented in state court those subclaims must be reviewed *de novo* along

15   with the previously raised claim of cumulative error raised by first state postconviction

16   counsel.

17   When evaluating cumulative error, "all errors are relevant to the sentence." *Darks*

18   *v. Mullin*, 327 F.3d 1001, 1018 (10th Cir. 2003) (emphasis added) (citing *Moore v.*

19   *Johnson*, 194 F.3d 586, 619 (5th Cir. 1999)). Even in cases where no single error

20   examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative

21   effect of multiple errors may still prejudice a defendant. *See Harris v. Wood*, 64

22   F.3d 1432, 1439 (9th Cir. 1995) (cumulative impact of numerous deficiencies in

23   defense counsel's performance was prejudicial to the defense, rendering proceedings

1    improper and warranting habeas relief); *Mak v. Blodgett*, 970 F.2d 614, 622 (9th

2    Cir. 1992) (per curiam) (finding counsel's deficiencies taken in combination with

3    two other errors constituted denial of petitioner's due process rights).

4         As the claims above and throughout the instant petition show, the prejudice from

5    the multitude of errors were compounded during Anderson's retrial proceedings.[30]

6    These errors are apparent when comparing the evidence produced during the retrial to the

7    evidence produced during Anderson's first trial. Even if the above errors are deemed

8    harmless when viewed individually, their cumulative effect substantially prejudiced

9    him. "[T]he 'cumulative effect of two or more individually harmless errors has the

10   potential to prejudice a defendant to the same extent as a single reversible error.'"

11   *Duckett v. Mullin*, 306 F.3d 982, 992 (10th Cir. 2002) (quoting *United States v.*

12   *Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990)). Here, the cumulative effect of the

13   errors in this case undermined the fundamental fairness of the trial process and there is a

14   reasonable probability of a more favorable outcome if counsel had performed effectively.

15   **Claim Three: The State violated *Brady v. Maryland* by failing to disclose detailed
16   information about the criminal investigation into Detective Cooper's sexual
     misconduct and the non-prosecution benefit Cooper received.**

17        Anderson's convictions and death sentences are invalid under federal

18   constitutional guarantees of due process, a fair trial, and a reliable sentence due to the

19   State's failure to disclose critical impeachment material about Detective Cooper. U.S.

20   Const. amends V, VI, VIII, XIV.

21

22

23

    [30] Anderson incorporates the entirety of Claim Two and Claim One(C), as well as
all of the claims in the instant petition that were susceptible to review at trial.

134

**A.    The State violated *Brady* by failing to disclose the KPD report detailing Cooper's history of coercing witnesses and suspects into sex.**

Prior to Anderson's second trial, the State moved the court for an *in camera* review of Detective Cooper's personnel file, which was discoverable under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972). ROA 211. At that hearing the State produced two reports of Cooper's misconduct. 7/10/01 Tr. at 6–7. The State disclosed that Cooper had engaged in oral sex with Judy Forsythe on several occasions while on duty, and that the matter was investigated internally by the Mohave County Sherriff's office (MCSO). *Id.* The State also disclosed that Cathy Griffith had alleged that Cooper sexually assaulted her in 1998, also while on duty. *Id*. While the State noted that the matter was "investigated fully" the State only referred to "internal investigations." *Id.* at 7; *see also* 9/14/2001 Motion in Limine to Preclude Impeachment of Detective Cooper (referring to two "internal investigations" of Cooper, and twice referring to Griffith's assault as an "internal investigation"); Tr. 10/4/2001 (the State refers to Cooper's misconduct as an "affair" that was the subject of an "internal investigation" rather than a criminal investigation of sexual assault, on direct examination); 10/4/2001 Tr. at 28–29 (trial counsel clearly only aware of the "internal investigation").

The material concerning Griffith was condensed into a "five to six page" synopsis and included the transcripts of tapes recorded during the investigation of Cooper's misconduct. *Id.* at 10–11. The State led the court to believe that the two reports constituted the entirely of the file. *Id.* at 8 ("[s]o that, in a nutshell, is what the information is before the Court, and let the Court proceed from there."). The synopsis

provided in the *Brady* disclosures listed two additional women, Liz Hastings and Melva Best,[31] who alleged Cooper pressured them for sex while on duty, and an account of Cooper soliciting sex from a suspect during an arson investigation in Pima County in 1991, where Cooper then tried to cover up the suspect's involvement and the sex. Ex. 25. *See also* Claim Two(E). During a bench conference at Anderson's second trial, trial counsel read page 4 of the MCSO internal investigation into the record verbatim, confirming this was the only report he received. 10/4/2001 Tr. at *Id.* at 30–31.

The State failed to disclose the much more detailed and extensive report from the Kingman Police Department (KPD), who originally investigated the report of Cooper sexually assaulting Griffith. Ex. 30. Failure to disclose the KPD investigation report violated *Brady* and *Giglio* because the report detailed that Cooper was criminally investigated by the KPD, rather than merely investigated internally by the MCSO, as the State had led the trial court to believe. That investigation contained Cooper's statements, taped interviews, physical evidence such as clothes, hair, the bedspread, ejaculate, DNA evidence, photographs, and a polygraph. *Id.* at 16, 28–32, 35. The State was aware of the KPD investigation because the KPD specifically notified Zack, the prosecutor in

---

[31] Following Anderson's second direct appeal, appellate counsel stored Anderson's files in a basement. A desert monsoon flooded the basement and considerable portions of the file were lost. Upon receiving the file, postconviction counsel notified the court about the condition of the files. 2/11/2008 Notice of Damage to Capital Case File; 11/8/2008 Motion to Extend Filing Deadline for Petition for Post-Conviction Relief. Postconviction counsel attempted to document the damaged files. Postconviction counsel's records indicate that only three pages concerning Cooper survived the flood. Postconviction counsel noted that "Box 5" contained a file labeled "Folder – Eric Cooper internal investigation" but the file was badly damaged. Ex. 26 at 6. The only salvageable pages were one page numbered "4" presumably from the State's synopsis, a notice of a pending civil rights action Griffith filed against Cooper, and a letter of non-prosecution from the Yavapai County attorney dated January 8, 1999. Ex. 25. "Page 4" described Cooper's interactions with Hastings in Kingman, AZ, and Best in St. George, UT.

Anderson's case. *Id.* at 23. Had the State disclosed the more detailed KPD investigation, material about Cooper's long history of coercing women into having sex using his power as a law enforcement officer would have been available to trial counsel. Because Cooper's primary role in Anderson's second trial was to lay the foundation for the admission of Anderson's statements, Anderson's voluntary waiver of his *Miranda* rights, and whether Cooper coerced Anderson's confessions, the undisclosed information was of central importance. *See* Claim Two(E).

On October 26, 1998, KPD opened an investigation when Griffith reported that Cooper had sexually assaulted her earlier that day. Ex. 30 at 3–4. Cooper contacted Griffith the morning of October 26, 1998, and visited her residence for approximately 15 minutes between 9:00 a.m. and 10:00 a.m. as part of an ongoing investigation into harassing phone calls to Griffith. *Id.* at 7. Cooper then telephoned Griffith at 11:30 a.m. and asked if he could "stop by" her residence again. Cooper arrived at 11:35 a.m., indicating that he was already on his way. *Id.* Cooper left Griffith's residence at approximately 1:00 p.m. *Id.* Griffith reported that while he was at her house Cooper fondled her breasts, performed oral sex on her, and that they had sexual intercourse. When investigators from the KPD and MCSO interviewed Griffith she stated that Cooper had undressed and removed his firearm from the holster, placing it first on the coffee table, then on the bedside table. *Id.* at 13. Griffith stated that she was afraid Cooper would "set [her] up" because she was on probation. *Id.* This was not Griffith's first encounter with Cooper, and the KPD investigation made clear that Cooper stalked and targeted Griffith for sex. On October 17, 1998, Cooper arrested Griffith in relation to an arson

case that was ultimately reduced from a felony to a misdemeanor. *Id.* at 6. At the time of the sexual assault Griffith was on unsupervised probation for that offense. *Id.* at 13.

Investigators learned that following the assault Griffith called Novak, the attorney who represented her in the arson case, and told him about the incident. Novak told KPD investigators Griffith said she felt scared of Cooper and that she had avoided a struggle with Cooper because she was afraid of being injured. Novak told KPD investigators that Griffith was "hysterical" when she contacted him. *Id.* at 14, 15. Novak also relayed a story he had heard years earlier where Cooper had pressured a female into sex under duress. *Id.* at 14. KPD investigators contacted two counselors from the Mohave Mental Health Office, one of whom had spoken with Griffith on October 26, 1998, following the assault. Each confirmed Griffith's details of the event, and the counselor who spoke to her on the day of the assault stated that she thought Griffith sounded very afraid and upset. *Id.* at 14, 17. In a civil filing Griffith admitted to being particularly vulnerable because of childhood rape and incest and diminished mental capacity Ex. 25 at 4.

When KPD detectives arrived at Cooper's residence on the evening of October 26, 1998, to question him, he responded that the allegations were "bullshit," that nothing had happened, and that he knew better than to go to a woman's house alone. Ex. 30 at 8. Cooper lied and denied the allegations despite the fact that KPD had already verified his whereabouts from MCSO dispatch and from his pager and cell phone records. *Id.* at 6–7. When questioned at KPD headquarters, Cooper conceded he had contacted Griffith twice that day but continued to deny any sexual activity. *Id.* at 8, 9. Cooper did admit that he had sexual contact with a woman in Dolan Springs, Arizona, the prior year. Notably, Cooper described the woman in Dolan Springs as a "mental case" who was taking

psychiatric medication. Cooper admitted it "[didn't] look good" because he was aware that Griffith was a patient at the Mohave Mental Health Office. *Id.*

Cooper agreed to take a polygraph exam and answer questions about whether he had sexual relations with Griffith. *Id.* at 16. After Cooper failed the polygraph he admitted to having sex with Griffith, but maintained that it was consensual.

The KPD collected physical evidence from Cooper, as well as DNA evidence from Cooper and Griffith. *Id.* at 7–8, 24, 25–26, 28–32 The KPD referred the investigation to the Yavapai county attorney. *Id.* at 23. The Yavapai county attorney declined to prosecute citing "insufficient evidence". Ex. 25 at 3. Griffith later sued Cooper and the MCSO for injuries and civil rights violations claiming Cooper intimidated her into having sex by displaying his firearm and using his position as a law enforcement officer. Ex. 28.

Prior to trial the State filed a notice to preclude impeachment of Cooper in an attempt to limit cross examination of Cooper based on lies he told during the investigation. ROA 225; *see also* 9/18/2001 A [sic] Response to Motion in Limine to Preclude Impeachment of Detective Cooper. The motion asked the court to prevent trial counsel from impeaching under Ariz. Rule of Evidence 608 for lying during the investigation.

### 1. Cooper displayed a pattern of using predatory, high pressure tactics to have sex with women he was investigating and took a particular interest in suspects with diminished capacity.

The State-provided synopsis repeatedly characterized the investigation as merely "internal" and motion to preclude impeachment framed Cooper's misdeeds as mere

untruthfulness. In reality, Cooper's ongoing pattern of sexual assaults reveal a deeper issue: that Cooper had a pattern of coercing victims and suspects in his investigations using unsanctioned and illegal methods, in some cases to alter the outcome of the investigation. The synopsis provided in the *Brady* disclosures glossed over Cooper's conduct towards Griffith, Forsythe, Best, and Hastings. It also minimized another incident in Pima County in which Cooper was known to have sex with a suspect and then told her "I'll take care of this" in an attempt to cover up both her crime and the sex[32]. Ex. 25.

However, the actual, full-text KPD report, which was not disclosed, included much more detailed information about the investigation of Griffith's assault, including Cooper's encounter with the Dolan Springs victim, and Novak's retelling of Cooper's reputation in the community for his prior assault. The detailed KPD investigation made clear that Cooper was experienced in applying pressure and coercing suspects and witnesses he was investigating. Cooper found victims with diminished mental capacity particularly easy prey. Cooper was also adept at lying about his predatory tactics. Ex. 30.

### 2. Cooper laid the foundation for the admission of Anderson's statements and so his credibility on the issue of voluntariness was paramount.

Cooper's testimony at Anderson's second trial was primarily to lay the foundation for the admission of Anderson's statements. ROA 225. The issue of Cooper's credibility was highly relevant to whether Anderson made statements to Cooper voluntarily during the two interrogations. *See* Claim Two(E) (detailing interrogations).

---

[32] To the extent trial counsel were aware of these incidents and did not investigate further or impeach Cooper, they were ineffective. *See* Claim Two(E).

1    Custodial interrogation is inherently coercive. *Miranda v. Arizona*, 384 U.S 436

2  458 (1966). The State bears the burden of demonstrating that incriminating statements are

3  made voluntarily. *Id*. at 475. While Anderson signed a *Miranda* waiver during the first

4  interview, the recordings, both in Illinois and in Arizona, do not contain recorded audio

5  of Cooper ever giving a *Miranda* warning. Anderson was known to be low IQ, and the

6  interview took place without counsel in the middle of the night. This coercive

7  environment and Anderson's diminished intellectual capacity were fertile ground for

8  Cooper's well practiced coercive tactics. *See Miranda* 384 U.S. at 476 (" . . . any

9  evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course,

10  show that the defendant did not voluntarily waive his privilege."). Of particular note is

11  that Anderson's co-defendant, Kim Lane, had her conviction reversed because the

12  Arizona Court of Appeals found Cooper had overborne her will during the interrogation.

13  *State v. Lane*, 1-CA-CR 98-0565 (Ariz. Ct. App. Nov. 30, 1999) (memorandum

14  decision). That court noted Lane's low IQ and the fact that Cooper failed to give *Miranda*

15  warnings at any point during the interrogation.

16    By failing to disclose details of Cooper's investigation and moving to preclude

17  impeachment, the State failed to disclose valuable impeachment evidence from trial

18  counsel. In *Milke v. Ryan*, 711 F.3d 998, 1008, 1019 (9th Cir. 2013) the Ninth Circuit

19  granted capital habeas relief where the State withheld *Brady* material concerning a

20  Phoenix, Arizona, detective's sexual misconduct with suspects and coercive interrogation

21  practices that could have been used to impeach the State's claims of a voluntary *Miranda*

22  waiver. In that case Judge Kozinski described the detectives' coercive and abusive

23  interrogation techniques as "disturbing", found that impeaching the detective could have

141

made all the difference given the centrality of the defendant's confession. *Id.* at 1008, *see also id.* at 1023–1024 ("Could the people of Arizona feel confident in taking Milke's life when the only thread on which her conviction hangs is the word of a policeman with a record of dishonesty and disrespect for the law?").

**B.    The State violated *Brady* by failing to disclose that Yavapai County declined to prosecute Cooper so that he could testify against Anderson.**

The State needed Cooper to testify in Anderson's second trial so that Anderson's confession would be admissible. The Yavapai County Attorney declined to prosecute Cooper for sexual assault due to "insufficient evidence" despite a full KPD investigation, blood and bodily fluid samples containing DNA, clothing, Cooper's failed polygraph, and Cooper's history of improper sexual contact, witnesses to Griffith's present sense impressions, and Griffith's ongoing willingness to prosecute the case in civil proceedings. Many sexual assault cases have been prosecuted with less. Indeed, if Yavapai County was worried about Griffith's credibility, it is worth noting that she proceeded to sue Cooper and Mohave county, and Mohave settled the case.

Of note in the Yavapai County Attorney's letter is that it was also sent to Zack, the prosecutor in Anderson's case. Under *Brady* and *Giglio*, Zack's dealings with the Yavapai County Attorney were discoverable, but were not disclosed. The undisclosed KPD investigation reveals that the criminal investigation into Cooper was far reaching and fully developed. Anderson is entitled to formal discovery against state entities to develop the facts of his claim to show the resolution of the case against Cooper constituted a benefit to him that was not disclosed to the defense.

142

This claim has not previously been raised in state court. The KPD report was discovered by federal habeas counsel's investigation in July 2023. Ex. 20. There is a reasonable probability of a more favorable outcome had the KPD report been disclosed.

**Claim Four: Invalid Aggravating Circumstances and Failure to Provide Close Appellate Scrutiny of Death Sentence**

Anderson's death sentences are invalid under federal constitutional guarantees of due process, equal protection, right to a jury trial, and a reliable sentence due to the jury's finding of invalid aggravating circumstances, and due to the Arizona Supreme Court's failure to provide close appellate scrutiny of Anderson's death sentence. U.S. Const. amends V, VI, VIII, XIV.

### A.    The Heinous, Atrocious, or Cruel Aggravating Circumstance was Improperly Found by the Jury.

Anderson's jury was improperly instructed he could be found eligible for the death penalty if he "committed the offense in an especially heinous, cruel, or depraved manner." ARS § 13-751.F.6 (HAC). This statutory language is so vague, pejorative, and lacking in any objective standards that it is unconstitutional for the jury to be so instructed. *Maynard v. Cartwright*, 486 U.S. 356, 363-64 (1988). Here, the jury was further instructed that any of the three theories of liability, i.e., heinousness, depravity, or cruelty, were a separate aggravating factor and the jury did not specify, and was not instructed to specify, which of the disjunctive elements it found. 11/19/2002 Tr. at 22. The jury was also informed they did not have to be unanimous regarding their finding of the three factors. *Id.*; 11/21/2002 RT at 13.

The additional instructions given to the jury defining the elements of the HAC aggravator were also unconstitutionally vague. Heinousness could be found by "the

143

defendant's mental state and attitude at the time of the offense" if it was "hatefully or shockingly evil." 11/19/02 Tr. at 22. Depravity was "marked by debasement, corruption, perversion or deterioration." *Id*. Heinousness or depravity were further defined as (1) relishing ("debasement or perversion"), (2) violence beyond what was necessary to kill, or (3) mutilation. *Id*. at 22–23.

The jury was instructed on the definition of cruelty as follows:

> The term 'cruel' focuses on the victim's state of mind. 'Cruelty' refers to the pain and suffering the victim experiences before death. A murder is especially cruel when there has been the infliction of pain and suffering in an especially wanton, insensitive, or vindictive manner. The defendant must know or should have known that the victim would suffer.
> A finding of cruelty requires conclusive evidence that the victim was conscious during the inflicting of the violence and experienced significant uncertainty as to his or her ultimate fate. The passage of time is not determinative.

11/22/2002 Tr. at 23.

In closing argument in the aggravation phase, the prosecutor emphasized the vague and pejorative terminology of the HAC aggravator. 11/21/2002 Tr. at 12-13. The prosecutor acknowledged, "it's hard to put words to these things. They're concepts. They're thoughts and feelings involved in these words, and it's very hard to define. It's more like you know it when you see it." *Id*. at 13. The prosecutor argued "you can dissect and debate [the HAC aggravator] forever and maybe not come up with a real satisfactory feeling about what they are." *Id*. The prosecutor emphasized the cruelty factor as applied to the death of Delahunt. *Id*. at 14–16. The prosecutor argued, "Pick cruel, heinous, depraved. Pick whichever one you want." *Id*. at 16. The prosecutor further argued for the HAC factor because the killing was "insensitive." 11/21/02 Tr. at 16–17.

With respect to Wear, the prosecutor argued the factor applied due to Wear's purported knowledge of Kagen's death and the uncertainty with respect to his own fate as he fled. 11/21/2002 Tr. at 17–18. The prosecutor again emphasized the killing of Wear was "insensitive" because the "defendants pile rubbish on his body." *Id*. at 19 ("Especially cruel, heinous, and depraved? No doubt.").

On rebuttal, the prosecutor again emphasized the cruelty factor as to Wear and Delahunt. *Id*. at 53–54. The prosecutor concluded by pounding on the table as he argued the knife was pounded into Delahunt's skull. *Id*. at 54. The prosecutor concluded: "And especially cruel? (Indicating.) Hearing and feeling the knife." *Id*.

After argument, the trial court again instructed the jury regarding the HAC aggravator as asserted by the prosecutor for Delahunt and Wear. 11/21/02 Tr. at 60–61, 62-64. The court also instructed the jury that each aggravating circumstance "increase[es] the guilt or enormity of the offense." *Id*. at 61. The jury subsequently found the HAC aggravator as to Delahunt and Wear. *Id*. at 71–72.

In closing argument in the selection phase, the prosecutor mentioned the three theories of liability but focused his argument on the cruelty theory. The prosecutor argued, "I'm not going to show you the pictures. But look at them and remind yourself how brutal this was, how painful the death was for the two of the victims." 11/25/2002 Tr. at 187. The prosecutor made cruelty his argument for the death penalty "to show the revoltion [sic] of how they died, to make this different than just an ordinary murder case." *Id*.

The HAC aggravating circumstance was unconstitutionally vague in violation of Anderson's constitutional rights. An aggravating circumstance must have objectively

145

defined criteria to properly guide the jury's decision whether Anderson is eligible for the death penalty. Terms such as "hatefully and shockingly evil" do not provide any meaningful criteria for distinguishing ordinary murder from capital murder. Terms such as "insensitive" also fail to provide such guidance as every murder can be defined in such a way. The prosecutor's reliance on the problematic language in the instructions and his acknowledgment to the jury that the HAC aggravator cannot be explained, but instead constitutes a "feeling" where you "know it when you see it" is precisely the reason the aggravator is unconstitutionally vague.

The cruelty element highlighted by the prosecutor suffers from the same vagueness concerns above. Moreover, the cruelty element is problematic as it focuses only the victim's experience, not the defendant's knowledge of the victim's experience. To be constitutional, an aggravating circumstance must be based on the intentions of the defendant, not just the experience of the victim. The cruelty element also is invalid as it permits vicarious liability where the jury is permitted to impute the actions of Poyson to Anderson. The instructions permit a finding of the factor against Anderson merely if he "should have known" that Poyson's actions were cruel to the victims. A negligence standard for vicarious imputation of the conduct of a co-defendant falls short of the recklessness mens rea that is required as a matter of federal law. And the cruelty factor fails to distinguish between murder and capital murder as every death that is not instantaneous would allow the jury to find the factor and to base it upon speculation regarding the victims' suffering as the prosecutor exhorted the jury to do in Anderson's case. Finally, the state courts arbitrary allowance of a vicarious theory of liability violates Anderson's due process right to fair notice and equal protection.

The jury's finding of the invalid HAC aggravating circumstance(s) had a substantial and injurious effect on their aggravation findings and penalty verdicts. The jury was not required to specify, or be unanimous in, its findings with respect to the HAC aggravator. And the prosecutor expressly argued all three theories of liability to the jury so this Court must assume the jury could have based its decision on any of the theories of liability. The failure to require jury unanimity also violated due process given the absence of moral equivalence between the vague elements. The prosecutor did not argue the relishing, mutilation, or infliction of pain beyond the act of killing parts of the HAC aggravator and there accordingly is no basis for this Court to find that there was any legitimate basis for it. Finally, the jury was expressly instructed that each aggravating circumstance rendered Anderson "more guilty" and "increases the enormity of the offense" so this Court must consider the prejudice resulting from the weighing of vague elements in aggravation against mitigation, which meets the grave doubt standard for assessing the prejudice resulting from the error.

This claim was raised before the Arizona Supreme Court as argument numbers 18, 19, and 20 (pages 60-68) in Anderson's opening brief on direct appeal. The claim challenging the instruction regarding the "greater guilt" and "enormity of the offense" instruction was raised as argument number 17 (page 60) in Anderson's opening brief on direct appeal. Anderson specifically raised the violation of his right to a jury trial from the Arizona Supreme Court's reweighing of the death sentence in a motion for rehearing as Issue II(B) (pages 8-11).

The Arizona Supreme Court found the HAC aggravator invalid as applied to both Delahunt and Wear on direct appeal. *State v. Anderson*, 111 P.3d 369, 398-99 (Ariz.

2005). However, the court did not determine whether the jury's penalty verdicts were affected by the submission of the invalid factor. Instead, the court removed the factor from consideration and it conducted its own "resentencing" of Anderson on appeal. *Anderson*, 111 P.3d at 398-99. This Court's review of the claim is therefore *de novo* as the state courts did not determine whether the submission of the invalid HAC aggravator was harmful to the jury's penalty verdicts.

Alternatively, the Arizona Supreme Court's finding was an unreasonable application of federal law and an unreasonable determination of the facts in light of the evidence presented. The court found the HAC aggravator was not unconstitutionally vague, *Anderson*, 111 P.3d at 394–96, but did not acknowledge the jury was instructed in the disjunctive without any requirement for unanimity as to the theory of liability. This allowed the prosecutor to cherry-pick the vague elements from each theory of liability without any requirement that the jury find a narrowing construction. The court later acknowledged that the (1) disjunctive wording and (2) the absence of unanimity required the court to invalidate the HAC aggravator because the narrowed construction did not apply. *Id*. at 396-98. The court concluded that "we cannot be sure that the jury unanimously found a proper basis for the (F)(6) aggravator for the murders of Wear and Delahunt." *Id*. at 398. This acknowledgment renders unreasonable the court's prior ruling that the HAC aggravator was not unconstitutionally vague: if the valid parts of the instruction are not present then only the vague parts remain.

The unreasonableness of the Arizona Supreme Court's decision is also highlighted by its failure to apprehend why its independent reweighing was prejudicial when the sentencer was a jury. In particular, the court attempted to distinguish the Ninth Circuit's

decision in *Valerio v. Crawford*, 306 F.3d 742 (9th Cir. 2002) (en banc), because, in that case, the penalty instructions "failed to define two of the three factors ('torture' and 'mutilation')." *Anderson*, 111 P.3d at 3495. However, there was no contention in *Valerio* that the undefined torture or mutilation factors were vague or otherwise constitutionally problematic.  In fact, the Nevada Supreme Court in *Valerio* specifically placed a narrowing construction on the aggravating circumstance and found torture and serious physical abuse. *Valerio*, 306 F.3d at 755. There was no contention that the torture or serious physical abuse theories were unconstitutional. Instead, it was the fact that the jury's finding of the factor could have been based on the invalid theory that the Ninth Circuit rejected the state supreme court's decision rejecting the claim. *Id*. at 758. That is precisely the situation in Anderson's case: the jury's finding could have been based on the vague parts of the instruction. The Arizona Supreme Court's contrary finding and its attempt to distinguish *Valerio* was an unreasonable determination of the facts.

Anderson's right to a jury trial is violated when an appellate court fails to consider the effect of an error on the jury that decided the case, and instead, adopts the position of an appellate sentencer to determine what the sentence "should be" in the absence of the error. Anderson's claim regarding the violation of his right to a jury trial is also reviewed *de novo* as the Arizona Supreme Court did not address that issue. The violation of Anderson's right to a jury trial necessarily had a substantial and injurious effect on his death sentences.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**B.     The Arizona Supreme Court Failed to Provide Close Appellate Scrutiny of Anderson's Death Sentences.**

As explained above, the Arizona Supreme Court found the HAC aggravator was improperly found by the jury in Anderson's case. *State v. Anderson*, 111 P.3d 369, 356 (Ariz. 2005). However, after finding the aggravating circumstance invalid, the Arizona Supreme Court failed to apply close appellate scrutiny of Anderson's death sentence as required by *Clemons v. Mississippi*, 494 U.S. 738, 753-54 (1990).

The Arizona Supreme Court purportedly conducted its own independent review of the sentence after invalidating the HAC aggravating circumstance. Former A.R.S. § 13-703.04 (Supp. 2003). During this review, the state court does not defer to any of the jury's findings. *State v. Newell*, 132 P.3d 833, 849 (Ariz. 2006). This also means the court does not consider the prejudice flowing from the jury's finding of a vague aggravating circumstance. The jury was also instructed in Anderson's case that each aggravating circumstance made him "more guilty," which is not something that Arizona Supreme Court considers when performing its own resentencing.

The Arizona Supreme Court determined the HAC aggravator was invalid as it "'may have been based, in whole or in part' on the heinous/depraved prong." *Anderson*, 111 P.3d at 356. This acknowledgement renders unreasonable the state court's failure to also acknowledge, as explained in Claim Four(A), the jury's penalty verdict could have been based on the vague elements of the aggravating circumstance. *See* Claim One(A), above. The Arizona Supreme Court also failed to acknowledge the statistical analysis conducted by the Arizona Attorney General's Office in its Capital Case Commission

Final Report, dated December 31, 2002, concerning the HAC aggravator.[33] That analysis acknowledged that the HAC aggravator was found in 62.7 percent of all death penalty cases (of 228 cases), and that 39 of the cases had the HAC aggravator as the sole aggravating circumstance rendering the defendant death eligible. *Id*. at 25. By failing to acknowledge these facts the Arizona Supreme Court failed to provide close appellate scrutiny of the sentence as a vague aggravating circumstance improperly skews the weighing process.

The Arizona Supreme Court's reweighing of the sentence was an unreasonable application of clearly established federal law and an unreasonable determination of the facts. In finding the mitigation evidence insufficient to warrant leniency, the court found the mitigation did not rise to the level of a categorical exclusion from the death penalty:

> We conclude that these mitigating circumstances are not sufficiently substantial to call for leniency. Although there was evidence at trial that Anderson's I.Q. was below average and that he did not have a leader-type personality, he was not mentally retarded, unable to make his own decisions, or lacking the capacity to judge right from wrong. We similarly cannot give much weight to Anderson's fear of Poyson; there is simply no credible evidence that Anderson was coerced into committing these murders.

*Anderson*, 111 P.3d at 399.

The Arizona Supreme Court's reweighing was unreasonable because the factors considered by the court would have rendered Anderson ineligible for the death penalty. In such circumstances, Anderson's case could not have been a death penalty case and no weighing would occur. For example, the Arizona Supreme Court did not find Anderson's

---

[33]Ex. 23. https://www.azag.gov/sites/default/files/docs/criminal/ccc/CapitalCaseCommission-FinalReport.pdf (last visited August 9, 2023).

1 low IQ evidence sufficiently mitigating because he was not intellectually disabled.

2 However, it was clearly established at the time of the state court's decision that a person

3 with intellectual disability is exempt from capital punishment under *Atkins v. Virginia*,

4 536 U.S. 304 (2002). Moreover, a person who is unable to make decisions or lacks the

5 ability to determine right from wrong is legally insane and would have been excluded

6 from criminal punishment. A.R.S. § 13-502(A).[34] The state court's finding that

7 Anderson's mitigation was not sufficient to rise to the level of a categorical exclusion

8 from the death penalty was unreasonable because no weighing would occur at all in such

9 circumstances. *Clemons* presupposes that reweighing would occur for a defendant who

10 was otherwise eligible for capital punishment. By requiring that Anderson's mitigation

11 rise to that level to warrant leniency, the Arizona Supreme Court's reweighing decision

12 was unreasonable.

13       Finally, the Arizona Supreme Court failed to perform close appellate scrutiny

14 when it failed to consider the mitigation evidence presented in Anderson's first judge

15 sentencing.  The record on appeal included the record from the first sentencing hearing as

16 entries 139, 140, 143, and 151. 1/23/03 Index of record on appeal. Moreover, the record

17 on appeal under Ariz. Sup. Ct. Rule 7(c)(10) includes "aggravation and mitigation

18 hearings." The Arizona Supreme Court's reweighing did not include consideration of the

19 mitigation evidence from the first judge sentencing hearing. This was unreasonable as the

20 Arizona Supreme Court requires trial courts to consider all mitigation evidence before

21 them. *State v. Jeffers*, 661 P.2d 1105, 1132-33 (Ariz. 1983). The Arizona Supreme

22

23

---

[34] Finally, coercion is a complete defense to non-homicide charges. *State v. Jones*, 582 P.2d 645, 648 (Ariz. 1978).

152

Court's failure to include such evidence in its own reweighing was particularly

prejudicial as it included compelling testimony from Dr. Thomas regarding the coercive

effect of Poyson's influence over Anderson. *See* Claim Four(C).

The Arizona Supreme Court's failure to conduct close appellate scrutiny of

Anderson's death sentences had a substantial and injurious effect on the outcome of the

appeal. As explained above, by conducting independent reweighing untethered from the

manner in which the case was presented to the jury, the state court did not consider the

prejudice that Anderson suffered before the jury that rendered the penalty verdicts.

### C.    Direct appeal counsel was ineffective in failing to ensure that all mitigation evidence from the first sentencing hearing was argued to the Arizona Supreme Court as part of its independent reweighing.

Direct appeal counsel was ineffective in failing to direct the Arizona Supreme

Court to the record of the first sentencing hearing as part of its independent reweighing

determination.  Counsel was aware of the prior trial proceedings as he referenced them in

his briefs. The record on appeal also included the record from the first sentencing hearing

as entries 139, 140, 143, and 151. 1/23/2003 Index of record on appeal.  Counsel also

knew that trial counsel's sentencing presentation was so egregiously ineffective at the

resentencing that he argued the defense's evidentiary presentation constituted a due

process violation. *Anderson*, 111 P.3d at 382 (noting Anderson's "own counsel elicited

evidence of Anderson's sexual relationship with Lane during the testimony of both

Anderson and Lane"); *id*. at n.9 (noting "Anderson also claims ineffective assistance of

counsel with respect to his own lawyer's handling of this issue at trial"). Moreover, while

counsel argued the Arizona Supreme Court could not conduct independent reweighing of

his death sentence, counsel did not direct the court tp the proceedings of the first

sentencing hearing. *See* Ariz. Sup. Ct. Rule 7(c)(10) (record on appeal may include "aggravation and mitigation hearings"). Finally, after the Arizona Supreme Court engaged in reweighing, and direct appeal counsel moved for reconsideration attacking the court's reweighing, counsel still did not direct the court to the first sentencing hearing to ensure it was part of the court's reweighing. *See* Motion for Reconsideration, Case No. CR-02-0402-AP at 8-11 (filed May 16, 2005). Direct appeal counsel's failure to point the court to the record of the first sentencing for consideration by the Arizona Supreme Court as part of its reweighing determination constituted deficient performance.

There is a reasonable probability of a more favorable outcome on direct appeal if counsel had argued from the record of the first sentencing hearing so it could be considered with the Arizona Supreme Court's reweighing. Unlike the sham of a penalty hearing put on by resentencing counsel, the first sentencing hearing contained expert testimony specifically linking Anderson's mental health issues to his diminished culpability in the offense relative to Poyson. Specifically, Dr. Thomas Thomas testified in the first penalty hearing that Anderson's dependent personality disorder was directly related to his participation in the offenses and his passivity to Poyson's influence. 4/29/98 Tr. at 7-32. Anderson incorporates the allegations of Claim Two(D)(3) regarding resentencing counsel's failure to present the testimony of Dr. Thomas as if fully set forth herein. The failure to direct the court to Dr. Thomas's testimony, as well as the record of the first sentencing, was prejudicial because it would have directly addressed the issue of Anderson's susceptibility to Poyson. The failure to argue such evidence was prejudicial because it was relevant to the Arizona Supreme Court's decision to affirm the sentences as the existence of coercion of Anderson by Poyson was a relevant factor specifically

154

mentioned by the court. *See Anderson*, 111 P.3d at 399. There is a reasonable probability of a more favorable outcome on appeal if counsel had effectively litigated this issue by arguing from the transcript of the first sentencing.

This issue has not been raised before the state courts for review. It is reviewed *de novo*.

**Claim Five: Prosecutorial misconduct denied Anderson a fair trial and reliable sentence.**

Anderson's convictions and death sentences are invalid under the federal constitutional guarantees of due process, a fair trial, effective assistance of counsel, and a reliable sentence because information about Anderson's relationship with a then-underage Lane was irrelevant to the case and extremely prejudicial. U.S. Const. amends V, VI, VIII, XIV.

**A.    The introduction of Anderson's sexual relationship with Lane was so prejudicial it violated Anderson's due process rights.**

The State violated Anderson's rights by casting him as a child predator early in the case. Immediately upon opening the case in chief, the State stated "…the defendant had run away from his wife in California with a 14-year-old girl–girlfriend, Kimberly Lane." 10/2/01 Tr. at 24. The State specifically emphasized "girlfriend" to underscore the intimate nature of Lane and Anderson's relationship. Anderson was 48 years old at the time of his second trial, and his age would have been apparent to anyone in the courtroom. The State knew that exposing an age-inappropriate relationship would cast Anderson as a child predator and bolster the prosecution theory that Anderson was the ringleader of the murder offenses. *See* 10/2/2001 Tr. at 23.

155

The State brought up Anderson's relationship with Lane in the first minutes of the opening statement to the jury. The State did not focus on the facts of the crime or the theory of the case. Had the State wanted to ensure a fair trial on the facts before the jury, the prosecutor could have referred to Lane as "a young woman", as Anderson's traveling companion, as a runaway, or even just as "a girl". To pause and invoke "girlfriend" underscores that the State sought to prejudice Anderson before the trial even began.

Anderson's trial counsel failed to object. During the defense opening, trial counsel at first attempted to skirt the issue by recounting the nature of Lane's upbringing. 10/2/01 Tr. at 47. However, Kehm adopted and ultimately bolstered the State's proffer of a sexual relationship between Lane and Anderson. *Id.* at 50 ("Mr. Zack described….Kim Lane as Mr. Anderson's girlfriend[]…there it is[]…boyfriend and girlfriend."). After the State invoked the relationship, trial counsel admitted the distasteful nature of the relationship, and that it was a crime for Anderson to have sexual relations with Lane[35]. *Id.* at 48–50.

The State continued its narrative of Anderson as a sexual predator when they called Lane as a witness. On direct examination, Zack questioned Lane about the times she and Anderson had sex, including wholly irrelevant questioning about whether Lane and Anderson had sex while she was menstruating. 10/5/2001 Tr. at 103. Even if the State sought to demonstrate that Lane's involvement in the instant crime was coerced and Anderson was the primary actor, other testimony such as Anderson's storytelling about "mafia" connections, dependance on Anderson for food and shelter, and her youth and

---

[35] To the extent trial counsel failed to object to these highly prejudicial statements, failed to understand A.R.S. §13-1405 (1997) or Cal. Penal Code § 261.5 prohibiting sex with minors, as evidenced by his comments about rape, and introduced additional information about the relationship, he was ineffective.

156

impressionability would have sufficed. *See* 10/05/2001 Tr. at 103–05. Continuing to press Lane and Anderson's sexual relationship served no purpose other than to prejudice him in the eyes of the jury. Eliciting additional lurid details of an already age-inappropriate relationship was meant only to cast Anderson as a predator.

This claim was raised before the Arizona Supreme Court as Argument 33 in Anderson's second direct appeal opening brief on direct appeal. 12/18/2003 Opening Brief at 95. The Arizona Supreme Court denied relief finding that Anderson's counsel elicited evidence of the sexual relationship and thus invited the error. *State v. Anderson*, 111 P.3d 369, 382 (Ariz. 2005). The Arizona Supreme Court's finding was an unreasonable determination of the facts. The State was the first to characterize Lane as Anderson's "girlfriend" thereby identifying the relationship as intimate to the jury. 10/2/2001 Tr. at 24. Kehm should have moved *in limine* to prevent the introduction of this information, and his efforts at damage control were deficient, but it was the State that put the relationship before the jury, and thus Anderson did not invite the error. The Arizona Supreme Court's application of the invited error doctrine was misplaced because it rested on an unreasonable determination of the facts. The introduction of highly prejudicial and irrelevant information necessarily had a substantial and injurious effect on Anderson's convictions and death sentences. The Arizona Supreme Court did not otherwise rule on the merits of Anderson's claim. Therefore, this Court's review of the issue is *de novo*.

**B.    The State committed misconduct by presenting contradictory evidence and argument about the relative culpability of Anderson, Poyson and Lane.**

Anderson, Poyson, and Lane were tried separately. At each trial the State presented evidence and argued that each was the most culpable in relation to the offenses. Because Anderson's case was tried to a penalty phase jury, the issue of relative culpability and who was the primary driver of the plot was central to his sentence. The State's evidentiary presentation and arguments regarding the relative culpability of co-defendants to support a capital sentence is different than the finding of mere participation in a conspiracy. As explained below, the State's reliance on contradictory theories and arguments in each of the three cases violated Anderson's constitutional rights.

**1.    The State adduced evidence and argued that Lane was the most culpable, then ignored that evidence to argue Anderson was the most culpable.**

When Lane testified at her own trial the State impeached her using her statements to Detective Cooper. That testimony supported the State's theory that Lane was deeply involved in the planning and executing the plot to kill Kagen, Delahunt, and Wear. The State argued that theory to the jury and the sentencing judge, and requested the maximum sentence. *State v. Lane*, CR-96-1057 (Super. Ct. Mohave Cnty.) (*State v. Lane*). At Anderson's penalty trial, the State called Lane as a witness against Anderson and adduced testimony that Anderson was in fact the primary driver of the plot. 11/25/02 Tr. at 127–30.

**a)    Contradictory testimony adduced at trial.**

Lane testified in her own defense at her trial. The State impeached her on the claim that Anderson had asked her to prostitute herself. Ex. 8 at 24–25. Lane confirmed

that she had refused Anderson's requests that she prostitute herself, to hitchhike, and to have sex. The State's impeachment clearly established that Lane was not under Anderson's control. *Id.* at 39–40. The State impeached Lane using her statements to Cooper where she said "let's kill them and take the truck." Ex. 8 at 28. On cross-examination Lane testified that her role in the murders was to engage Delahunt. *Id.* at 39. Lane adopted the statements she made to Cooper that the group planned to shoot, rather than tie up, the victims and sought out additional ammunition. *Id.* Lane confirmed her statement to Cooper that during a two-hour period following Delahunt's death she did not seek help. She also omitted that she did not try to telephone for help. *Id.* at 44. Lane admitted that she did not call the authorities because she cared about Anderson. *Id.* at 45. Lane testified that Anderson wanted to back out. *Id.* at 35. Lane also admitted that even though Poyson suggested surrendering to the police and they had the opportunity to do so, she refused. *Id.* at 45. Lane could not blame her failure to surrender on Anderson, because from August 19–23, 1996, she and Poyson were traveling without Anderson.

The State called Lane as a witness against Anderson at his penalty trial. On direct examination Lane testified that Anderson induced Lane and Poyson into the plot with promises of a better life in Chicago. 11/25/2002 Tr. at 127–28. Lane also testified that Anderson had instructed her to seduce Delahunt. *Id.* at 129. The State specifically covered the time period between the murders but did not ask why Lane had not sought help, as they had during her testimony. On redirect the State asked Lane if she ever intended to be part of a plan to murder anyone in Golden Valley, to which Lane answered "no". *Id.* at 162–63, 166.

b)    **Contradictory prosecution argument.**

The State argued that based on the statements Lane made to Cooper she was involved in nearly every aspect of this plan. She planned to kill the victims and take the truck, she brought Poyson rocks as he was bludgeoning Delahunt, and she tried to get ammunition. Ex. 9 at 67. The State argued that because Poyson and Anderson wanted to back out of the plan, Lane had the most to gain and manipulated them into going forward. Ex. 9 at 68-69.

The State argued at Lane's sentencing that ". . . she was in many respects a catalyst . . . she was instrumental in [the victims] being murdered." Ex. 10 13–14, *see also Id.* at 69–71. The State argued that Poyson had lived in Golden Valley for six months and didn't murder anyone, and that Frank Anderson had only been traveling through the area because of Lane. *Id.* at 13–14.

At the close of Anderson's penalty trial the State argued that "Nobody died until [Anderson] arrived." 11/25/2002 Tr. at 211. The State minimized Lane's role by arguing that her participation was not knowing or intentional despite her admissions. *Id.* at 214; *cf.* Ex. 27 at 17. The State argued that Lane was a 14-year old girl being led astray by Anderson. *Id.* at 209; 217–218. The State argued that Lane was a victim of Anderson. *Id.* at 214.

2.    **The State adduced testimony of Poyson's culpability and then falsely used it to argue Anderson's culpability.**

At Poyson's trial the State argued that Poyson committed all of the killing acts during the crime. *State v. Poyson,* CR-96-865 (Super. Ct. Mohave Cnty.) Ex. 11 at 10–11 ("[t]hen he takes the rock and uses it to smash Robert Delahunt's head."). The State

relied on the admission Poyson made to Cooper during his interrogation. *Id*. at 73, 77–80. The State argued that Poyson was the leading participant in the murders. Ex. 12 at 50, 61.

At Anderson's penalty trial the State falsely argued that Anderson "pounded [the life] out of [Delahunt]."). 11/25/2002 Tr. at 221. This argument was made despite knowing from Poyson's admissions, which were admitted as evidence, and the evidence in all three codefendant's trials, that Anderson did not do the actual killing.

A guilt phase conspiracy conviction requires only that each participant be involved. The penalty phase requires a precise examination of the relative culpabilities of the codefendants. *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (circumstances of the offense may not be disregarded). The State committed misconduct by presenting evidence and arguing conflicting theories as to the primary culpability of each of the co-defendants in the plot. Inconsistent theories violate due process if the prosecutor knowingly uses false evidence or acts in bad faith. *Thompson v. Calderon*, 120 F.3d 1045 (9th Cir. 1997) (en banc) rev'd on other grounds, *Calderon v. Thompson*, 521 U.S. 1140 (1997); *cf. Nguyen v. Lindsey*, 232 F.3d 1236, 1240 (9th Cir. 2000) (no due process violation if prosecution relies on the same theory at each trial). A prosecutor cannot manipulate evidence and witnesses in contradiction of a theory he had used to obtain a conviction for a co-defendant. The State misled the jury about Anderson's level of involvement by selectively ignoring evidence and argument *the State itself* had presented in Lane's and Poyson's cases. When viewed through the lens of the rights of a capital defendant facing a penalty phase jury, the State presented inconsistent and fundamentally incompatible theories and deprived Anderson of due process.

1    This claim was raised in Anderson's state PCR petition as claim V(1) RA0057 at

2    41. The PCR court severed the issue of prosecutorial misconduct from the postconviction

3    evidentiary hearing and ordered supplemental briefing. RA0223. Following oral

4    argument the PCR court denied Anderson's claim. RA0276. The argument was raised

5    before the Arizona Supreme Court in the PFR at page 14 as claim IV(A)(2). 10/14/2001

6    Petition for Review from Denial of Post-Conviction Relief. The PCR court's denial is the

7    last reasoned opinion on the issue.

8        The PCR court unreasonably applied federal law. The PCR court centered on a

9    theory of conspiracy in which all three codefendants were major participants, and framed

10   its analysis within *Nguyen*, where an overarching theory may be supported by facts that

11   are somewhat inconsistent. 232 F.3d at 1240. This analysis is unreasonable because the

12   guilt of the three co-conspirators is a different legal issue than the relative culpability of a

13   single defendant when facing a capital sentencing jury. The correct analysis is not that the

14   three conspired, but to what degree Anderson participated in the offenses. The PCR court

15   applied the incorrect standard and Anderson is entitled to *de novo* review. *Echavarria v.*

16   *Filson*, 896 F.3d 1118, 1130–31 (9th Cir. 2018). Because the penalty phase jury was

17   misled as to Anderson's relative culpability the prosecutorial misconduct had a

18   substantial and injurious effect on Anderson's death sentences.

19   **C.    The State misled the jury about the admissibility of mitigation**
     **evidence.**

20       Following the Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002),

21   a new jury was impaneled for the penalty phase of Anderson's second trial. Anderson's

22   penalty trial was the first to apply Arizona's post-*Ring* death penalty statute.  *See* 2002

23

Ariz. Legis. Serv. 5th Sp. Sess. Ch. 1 (S.B. 1001). S.B. 1001 included mandatory

language that a trier of fact *shall* impose death if at least one aggravating factor is found

and the mitigation evidence is insufficient to call for leniency. *Id.* The State capitalized

on the novel process by making statements which misled the jury as to *how* to apply the

new law. The State made several statements which rose beyond mere argument or

sanctioned attacks on credibility and caused the jury to apply the facts before them

incorrectly. The State implied an artificial test for the relevance of mitigation evidence

that created an unconstitutionally high threshold and prevented otherwise competent

mitigation evidence from being weighed properly.

### 1.    The prosecutor misled the jury by arguing that a causal nexus was required to consider certain mitigation evidence.

From the beginning of the penalty trial the State immediately sought to prevent the

jury from considering competent evidence in Anderson's mitigation case by telling the

jury "[i]f he was sick when he was a baby, is that *relevant* to anything we're doing

here?". 11/19/2002 Tr. at 27–8 (prosecution opening statement) (emphasis added). It is

important to recognize that Zack, an experienced prosecutor trying a capital case,

understood the difference between relevance and credibility. While the State misled the

jury, trial counsel made the task of weighing credibility clear. *See e.g.,* 11/19/2002 Tr. at

48 ("…you have to do something that's called '*determine their credibility*.'[]…If a

person gets on the stand and says a story or gives a version of facts and you just say, 'I

don't believe what they're saying. They've got motives or their story doesn't make

sense…You have to determine credit (sic)") (emphasis added).

The State continuously pressed mitigation witnesses for a link between Anderson's past adversity and current conduct. The State then argued to the jury that a link to the instant office was required for mitigation from Anderson's past to be considered. Holly Wake, Anderson's mitigation specialist, testified to Anderson's dysfunctional upbringing. 11/25/02 Tr. at 89, 92. Wake testified only to facts that she had uncovered in her investigation. *Id.* On cross examination the State attacked Wake's testimony as lacking a connection to the instant offense, despite the fact that Wake had drawn no such inference. 11/25/2002 Tr. at 111 ("…you have no degree in psychology or psychiatry or emotional development or these various disability developments to make any connection between upbringing and adult conduct, do you?"). This line of questioning was not a mere attack on the weight or credibility of Wake's testimony, but was in fact an attack on relevance, and therefore admissibility, meant to misdirect the jury. Another mitigation witness, Dr. Thal, testified that frequent relocation and childhood abuse had a "tremendously negative" impact on Anderson as an adult. 11/25/2002 Tr. at 22–5. Dr. Thal's testimony gave important information about Anderson's culpability as an accomplice since he was not actually the killer of the three victims. On cross-examination the State asked whether, because of his childhood adversity, Anderson had difficulty telling the difference between right and wrong. 11/25/2002 Tr. at 29–32. At closing, the State attacked Dr. Thal's testimony for failing to draw a link between Anderson's childhood adversity and the instant murders. 11/25/2002 Tr. at 193.

The State consistently misled the jury about the admissibility of mitigation evidence. All mitigation evidence is relevant and therefore admissible. *Lockett v. Ohio,*

438 U.S. 586, 605 (1978); *Eddings v. Oklahoma*, 455 U.S. 104 at 114 (1982). However, the State insisted that jurors find a causal link between otherwise competent mitigation evidence and the crime:

> Is there any connection between this piece of information before you to even call it a mitigator? You have to decide whether it's relevant to the murder case.
>
> And, for example, Holly Wake talked about the defendant's pneumonia as a child. Is that even relevant? And even more so, she talked about the defendant's wife's first marriage and not being legally divorced before they got married. What does that have to do with mitigation in a death penalty case? None.

11/25/02 Tr. at 188. The State's argument was improper because no causal relationship is required, only that Anderson's individual character and record be considered in their entirety. *Eddings* 455 U.S. at 114. The State's argument imposed an artificial barrier to the jury's consideration and weighing of mitigation evidence. By telling the jury that a causal link to the offenses was required to make childhood adversity relevant, and therefore admissible during the penalty phase, the State misled the jury as to both the facts in mitigation and Anderson's right to an individualized sentencing under *Lockett v. Ohio*, 438 U.S. 586, 605 (1978) and *Eddings v. Oklahoma*, 4555 U.S. 104 at 114 (1982). This error had a substantial and injurious effect on the penalty verdicts.

### 2. After misleading the jury, the State argued repeatedly that the law *required* the imposition of the death penalty.

The State repeatedly told the jury that the death penalty was required. *See* 11/13/2002 Tr. at 7 ("..you will find that the law does require the imposition of the death penalty…"); 11/19/2002 Tr. at 28 ("..you'll find the defendant will be required by law to receive the death penalty…"); 11/25/2002 Tr. at 186 ("…by itself the law says a death

sentence shall be imposed."). In several instances, the State couched this requirement in the mandatory language of S.B. 1001, which stated that the court *shall* impose death upon the finding of an aggravator and no sufficient mitigators. For the State to rest on the statutory language is in error when the State also misled the jury about the proper consideration of mitigation. By the time the State addressed the "requirement" for death under the statute, it had already infected the penalty trial with unfairness by arguing to the jury that certain mitigation evidence was not relevant. While the State may argue that the aggravators, weighed against mitigators, require death under the statute, they may not argue that the aggravators require death when they have previously argued that competent mitigation evidence must be excluded. This unfairly biases the jury's decision when it applies the law to the facts before it.

Anderson raised this claim in his direct appeal, Claims 29 and 30. 12/18/2003 Opening Brief at 84–90. The Arizona Supreme court denied relief. *Anderson*, 111 P.3d 369, 382; 392. The Arizona Supreme Court held that the statements were "substantially accurate" or "arguments about the facts". *Anderson*, 111 P.3d at 382 n.10. This was an unreasonable determination of the facts, as viewed in the context of the entire penalty trial the statements by the prosecutor misled the jury. Prosecutorial misconduct in the form of improper argument deprives a defendant of due process of law when, in the context of the entire trial, it infects the proceeding with unfairness. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974). The Supreme Court has held that it is constitutional error when the prosecutor misstates or manipulates the evidence, or when the comments implicate specific rights of the accused. *Darden*, 477 U.S. at 181–82. Here, there can be no doubt that the State

166

misstated both the law and the evidence. By arguing to the jury that a causal link was required to bridge Anderson's dysfunctional childhood to the instant murder the State undercut the command of *Lockett*. Under *Lockett*, Anderson is entitled to an individualized sentencing based on all available mitigation. *Lockett* 538 U.S. at 605. Any evidence that bears on the "character, record, and…circumstances of the offense" is relevant. *Id., see also Eddings*, 455 U.S. at 114. The State's argument that Anderson show a causal relationship between his childhood and adult conduct likely prevented the jury from considering evidence relevant to his character, but also relevant to the circumstances of the offense, because a primary feature of the mitigation case was Anderson's willingness to follow Poyson's directions. By then arguing that the mandatory language of the statute should be applied, the evidence to be weighed was improperly before the jury. The prosecutor's improper arguments had a substantial and injurious effect on the penalty verdict.

**Claim Six: Trial court error in the admission of evidence.**

Anderson's convictions and death sentences are invalid under the federal constitutional guarantees of due process, confrontation, and reliable sentence because the State introduced inflammatory and gruesome photographs with no probative value as well as hearsay statements from Kim Lane and Bobby Poyson and the trial court erred by admitting both pieces of evidence. U.S. Const. amends. V, VI, XIII, XIV.

**A.    The trial court erred in admitting inflammatory and unduly prejudicial photographs of the victims.**

At Anderson's second guilt phase trial the State admitted numerous highly prejudicial photographs of the victims and crime scene. State's Exhibits 5, 6, 14 16, 21,

28. Trial counsel objected to all of these photographs on the grounds that they were unduly gruesome and merely cumulative. 10/2/2001 Tr. at 64, 67–68, 78, 116. Any facts supported by the photos had already been proven by easily understood testimony from witnesses and the medical examiner.  The State moved to introduce the photos early in the case-in-chief, arguing their relevance, and then introduced less prejudicial evidence later in their case. This tactic unfairly prejudiced the jury against Anderson. The trial court error was not properly vetting the photos in the context of the State's case-in-chief. The State avoided an objection that the photos were cumulative and prejudicial by presenting them before the admission of more meaningful and less prejudicial evidence. The photos were taken days after crime when the effects of heat and decomposition had greatly affected the state of the bodies. This superadded disturbing imagery that went beyond the facts necessary to prove the elements of the crime.

The State introduced Exhibits 5, 14, 16, and 21 through the testimony of Mohave County Sherriff's Office Detective Steven Parker. 10/2/2001 Tr. at 64, 67–68, 78. The State moved to admit Exhibit 16 based on Parker's testimony of where he discovered Delahunt's body. The photograph shows Delahunt face down in the trailer with blood soaked clothing, discolored skin from decomposition, and a knife handle protruding from his head. Trial counsel correctly objected to the gruesome nature of the photograph. 10/2/2001 Tr. at 64. The State argued that the photograph corroborated Anderson's statements and established the location of the body. However, the location of the body had already been established by Parker's testimony. 10/21/2001 Tr. at 63. In addition, the location of the body was never at issue.

The State the moved to admit Exhibit 5 based on Parker's testimony that he attended Delahunt's autopsy. 10/2/2001 Tr. at 67–68. Exhibit 5 is a color close-up photograph of Delahunt's face showing his blood-stained clothing, pallid and decaying skin, eyes wide, with a knife protruding from the area of his nose. Nothing about this photograph is probative. All that Parker's testimony established was that he saw Delahunt's body at the crime scene and again at the autopsy. *Id.* There was nothing to demonstrate to the jury anything that was not established by testimony alone. Trial counsel objected and the State argued that the photograph corroborated Anderson's statement about the crime. *Id.* However, as trial counsel correctly noted, an x-ray clearly showed the path of the knife without the superadded gore. To underscore the complete lack of Exhibit 5's probative value, the State later called Donald Nelson, the Mohave county Medical Examiner.  On direct examination the State questioned Nelson about the knife wound:

> Q: Would that would by itself have been fatal?

> A: Not in this case, no.

> Q: Why would that be?

> A: The blade never entered into the calvarium, inside the head.

10/2/2001 Tr. at 171. The State also moved to introduce Exhibit 14, a photograph of Delahunt's discolored and decomposed body with a laceration across his throat. This Exhibit also lacked probative value. Trial counsel had already admitted the throat slashing during opening statement. 10/2/2001 Tr. at 50. In addition, Nelson's testimony on direct examination made clear that the throat wound was not fatal. 10/2/2001 Tr. at 174 ("[the laceration] did not transect the corroded [sic] arteries or jugular vain [sic]").

169

The State also moved to admit Exhibit 21, a photograph of Kagan's body, based on Parker's testimony. 10/2/2001 at 78. The photograph depicts Kagan's body apparently bloated and discolored from decomposition. Later, the State elicited testimony from Nelson that Kagan died from a single gunshot wound to the head. 10/2/2001 Tr. at 178. Nowhere in Exhibit 21 is the wound visible. All Exhibit 21 shows is a decomposing body in a trash filled room, which had no probative value.

The State admitted Exhibit 28 based on the testimony of MCSO evidence technician Harry Traxler. Traxler testified that he discovered Wear's body beneath a pile of rubbish. Tr. 10/2/2001 at 116–17. Trial counsel objected to the admission of the photo and the objection was overruled. Despite Traxler testifying to injuries he observed on Wear's body, Exhibit 28 shows no such injuries. Testimony from Nelson established the extent of Wear's injuries. 10/2/2001 Tr. at 180. The photograph in Exhibit 28 is taken from some distance away and shows only Wear's dirty and decomposing body with no detail as to the injury. The State had already admitted Exhibits 65 and 77 which showed an overview of the property, and it could have demonstrated to the jury where the body was found on the diagrams. Exhibit 28 had no probative value.

Finally, the State moved to admit Exhibit 6, photographs of Delahunt's defensive wounds, through Nelson's testimony. 10/2/2001 at 176. Exhibit 6 shows Delahunt's badly decomposed and discolored hand. Nelson described the wound as "lacerations . . . where your thumb and first finger come together." 10/2/2001 Tr. at 176. No further explanation is necessary, and the wound is not probative of any element of the crime.

The admission of the photographs of Delahunt, Kagan, and Wear's decomposing bodies infected Anderson's trial with unfairness and denied Anderson due process. *See Romano v. Oklahoma*, 512 U.S. 1, 12 (1994). In *Spears v. Mullin*, 343 F.3d 1215, 1227–1128 (10th Cir. 2003), the court held that gruesome photographs which failed to reach the threshold of being probative of a particular fact denied the petitioner a fair penalty phase trial. The court in that case specifically cited the State's decision to only present gruesome photographs at the penalty phase, relying on more innocuous photographs during the guilt phase. This tactic, the court reasoned, was to improperly focus upon the shock value of the photographs on the jury.

In Anderson's second trial the State relied on a similar tactic. All of the evidence the State sought to adduce was available by other means: x-rays, medical testimony, and diagrams. The State ultimately used these exhibits, but relied *first* on the gruesome and disturbing photographs to improperly inflame the jury. Because these photographs had no probative value, Anderson was denied a fair trial. Moreover, the improper admission of gruesome photographs had a substantial and injurious effect on the guilt and penalty verdicts.

Anderson raised this claim as Argument 31 in his second direct appeal. 12/18/2003 Appellant's Opening Brief at 91. Anderson argued that the admission of the gruesome exhibits violated his Fifth, Fourteenth, and Eighth Amendment Rights. The Arizona Supreme Court reviewed the claim under the incorrect standard, applying Arizona Rule of Evidence 403, and failing to address the federal constitutional question. *State v. Anderson*, 111 P.3d 369, 381 (Ariz. 2005). Anderson is entitled to *de novo* review.

171

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**B.    The admission of Lane and Poyson's hearsay statements violated Anderson's confrontation clause rights.**

At Anderson's second trial the State played Cooper's September 2, 1996 interrogation of Anderson into the record. 10/4/2001 Tr. at 26; State's Exhibit 4, 83. In that interrogation Cooper restated multiple statements that Lane and Poyson allegedly made to Cooper during prior interrogations. *See* Exhibit 4 [[9/2/1996 Tr.]] at 5 (" . . . Bobby and Kim both said this whole thing was premeditated."), 6, 10, 13. 16, 18. Cooper's recitation of those statements before the jury was hearsay. Trial counsel objected to the introduction of the hearsay statements. 10/3/2001 Tr. at 147–48. The trial court overruled the objection on state evidentiary grounds, holding that because Anderson did not challenge the veracity of the Lane and Poyson's statements, he had made an adoptive admission. 10/3/2001 Tr. at 150.

In *Lee v. Illinois*, 476 U.S. 530, 540 (1986) the Supreme Court held that a guilty verdict which relies on the extra-judicial statement of a co-defendant without affording the defendant the opportunity to cross examine the co-defendant violates the Sixth Amendment. In *Lee* the trial court found the co-defendant's statements reliable because the statements were "interlocking" with the defendant's admissions. *Id.* Neither the trial court nor the Supreme Court have explicated what "interlocking" means, however, in *Lee*, as in Anderson's case, the statements are generally congruous. *See id*. at 532–35. The Supreme Court held that regardless of the congruence between co-defendants' admissions, the statements should be viewed as particularly unreliable as co-defendants are self-interested and will implicate one another. Thus co-defendants' statements must

be subject to the truth-finding function of confrontation and cross-examination. *Id.* at 541; *accord Bruton v. United States*, 391 U.S. 123, 142 (1968) (White, J., dissenting).

Because the statements Cooper attributed to Poyson and Lane went directly to premeditation, an element of first degree murder and central to a culpability finding in the penalty phase, the admission of Poyson and Lane's hearsay statements had a substantial and injurious effect on the verdict and sentences.

Anderson raised this claim as Argument 26 in his second direct appeal. 12/18/2003 Appellant's Opening Brief at 79. On direct appeal Anderson argued that the violation was not a matter of state evidentiary law, but a question of constitutional law implicating his confrontation rights under the Sixth Amendment. *Id.* The Arizona Supreme Court denied relief, but ruled only based on Arizona evidentiary rules, and failed to address the federal constitutional question. *State v. Anderson*, 111 P.3d 369, 381 (Ariz. 2005). Because the Arizona Supreme Court never reached the federal constitutional claim Anderson is entitled to *de novo* review.

**Claim Seven: Arizona's system of elected judges is unconstitutional.**

Andersons's convictions and death sentences are invalid under the federal constitutional guarantees of due process, a fair trial, an impartial tribunal, and a reliable sentence due to the system for electing judges in Mohave County, Arizona. U.S. Const. amends. V, VI, XIII and XIV.

The Due Process Clause of the Fourteenth Amendment requires a trial before a judge with no bias against the defendant or interest in the outcome of the case. *Bracy v. Gramley*, 520 U.S. 899, 904–05 (1997). In determining whether a judge's failure to recuse is a constitutional question, "[t]he inquiry is an objective one. The Court asks not

whether the judge is actually subjectively biased, but whether the average judge in his

position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for

bias.'" *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 881 (2009); *see Rippo v.*

*Baker*, 137 S. Ct. 905, 907 (2017).

At the time of the adoption of the federal constitution, the common law definition

of due process of law included the requirement that judges who presided over trials in

capital cases, which at that time potentially included all felony cases, have tenure during

good behavior. This mechanism was intended to, and did, preserve judicial independence

by insulating judicial officers from the influence of the sovereign that would otherwise

have improperly affected their impartiality.

Judges in Arizona are either popularly elected, or in counties with populations

over 250,000 people, appointed and subject to retention elections. Ariz. Const. IV §§ 12,

37. Mohave County falls below the population threshold and does not benefit from the

merit selection process for judges. Mohave County relies on a system of elected judges

who participate in a non-partisan election. However, there is no mechanism to insulate

them from majoritarian pressures. *See* Brennan Center for Justice, *Rethinking Judicial*

*Selection in State Courts*, https://www.brennancenter.org/our-work/research-

reports/rethinking-judicial-selection-state-courts at 10 ("Justice requires that judges put

aside their political preferences and loyalties when deciding cases, and rule based on their

understanding of the law and the facts at issue. But when judges look no different than

other politicians during the election season . . . they will not be able to avoid political

biases when they sit in the courtroom."); *see also* Sandra Day O'Connor & RonNell

174

Anderson Jones, *Reflections of Arizona's Judicial Selection Process*, 50 Ariz. L. R. 15, 17–19 (2008) (detailing the shortcomings and populist pressures of elected judges).

Indeed, Judge Chavez was subject to those populist pressures. Judge Chavez wanted Anderson's defense to fit within a certain budget so as not to burden the county. 10/2/02 at 3–4 ("As far as witnesses are concerned, I understand the County has no choice but to pay those, but I have asked counsel to keep that to a minimum"); 10/22/02 at 14–15 ("I just want to see it and know that you have attempted to keep the cost down. And based on the other previous discussion, I know you're trying to do that."). Anderson's trial and re-trial were before the same elected judge.

The bias of the trial court constitutes structural error and is prejudicial per se. This claim has not been previously raised to the state courts.

**Claim Eight: Cumulative Error**

Anderson's convictions and death sentences are invalid under the federal constitutional guarantees of due process, equal protection, the effective assistance of counsel, a fair tribunal, an impartial jury, and a reliable sentence due to the impact of cumulative errors in the admission of evidence and instructions, improper jury selection, venue, prosecutorial misconduct, unconstitutional aggravating circumstances, elected judges, systematic ineffective assistance of counsel, and Anderson's age and declining health. U.S. Const. amends. V, VI, VIII, XIV.

Anderson incorporates each of the claims and sub-claims for relief contained in this petition as if fully set forth herein.

"The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial

fundamentally unfair" *Parle v. Runnels*, 5050 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284 (1973)). Each claim specified in this petition requires vacating Anderson's convictions and death sentences. Anderson hereby incorporates each and every factual allegation contained in this petition as if fully set forth herein. The cumulative effect of errors demonstrated in this petition deprived Anderson's trial of fundamental fairness and resulted in a constitutionally unreliable sentence. Even if no individual error warrants relief, the totality of these multiple errors and omissions substantially prejudiced Anderson. *Parle*, 505 F.3d at 927. The constitutional claims in the instant petition must be considered cumulatively with all of the other errors raised before the Arizona Supreme Court. Taken cumulatively these errors had a substantial and injurious effect on Anderson's convictions and death sentences. This claim has not been previously raised and is reviewed *do novo*.

**Claim Nine: The Eighth Amendment's protections against cruel and unusual punishment make Anderson ineligible for the death penalty due to his numerous severe medical conditions and advanced age.**

Anderson's death sentences are invalid under federal constitutional guarantees of due process, equal protection, and freedom from cruel and unusual punishments due to his advanced age and serious medical conditions that render his execution unconstitutional. U.S. Const. amends. VIII & XIV.

Anderson is seventy-five years old and in poor health. He is nearly entirely immobile, and spends his day confined to his wheelchair. Anderson receives assistance with his daily routine from another inmate. Anderson's assistant wheels him to the medical unit and to attorney visits. Anderson also requires help from his assistant with getting dressed and his hygiene. Anderson's assistant also cleans his cell.

Anderson's health conditions are severe and have only worsened with age. He suffers from severe, chronic conditions, including high blood pressure. Ex. 22 at 4-7. He suffers from diabetes and its side-effects, including ulcers and neuropathy. Ex. 3 at 20, 27; Ex. 22 at 4-7. He also has serious respiratory conditions, including asthma, COPD, and shortness of breath. Ex. 3 at 28; Ex. 22 at 4-7. Anderson also suffers from stomach pains and nausea when he eats or drinks. Ex. 3 at 43, 52. In August 2016, Anderson was evaluated for congestive heart failure. *Id*. at 292. Anderson has also been assessed for stages of kidney failure since 2015. Ex. 22 at 4-7. In April 2023, Anderson had hand surgery, which still troubles him. Ex. 22 at 16. His vision is suffering and he awaits eye surgery for cataracts. *Id*. at 4

He has also had two falls in early 2023: In February, he fell while getting out of the shower and had to be taken to the emergency room. *Id*. In March, Officers found Anderson on the floor of his cell, unresponsive. *Id*. He lost consciousness due to low blood sugar related to his diabetes. *Id*.

Further, Anderson has also been presenting symptoms of dementia. In his evaluation of Anderson, Dr. Mendel noted "clear memory problems" and "gaps." Ex. 17 at 10. He also displayed confusion about names. *Id*. Ultimately, Dr. Mendel recommends further evaluation in this area. Accordingly, Anderson preserves his right to discovery and to amend this petition pending that investigation as well as the results of future deterioration. A diagnosis of dementia would prohibit the State from carrying out a death sentence against Anderson. *See Ford v. Wainwright*, 477 U.S. 399, 409–410 (1986), *Panetti v. Quarterman*, 551 U.S. 930, 934–35 (2007).

Given Anderson's advanced age and serious medical conditions, including dementia, his execution would violate the Eighth Amendment's prohibition against cruel and unusual punishment. The execution of a person who is ineligible for that sanction is prejudicial per se. Anderson's severe health conditions will make it extremely difficult, if not impossible, to secure IV access into Anderson's veins. And because under information and belief IV access is a primary source of problems with botched executions, it is an issue of particular importance to Anderson. Thus, the current execution protocol constitutes deliberate indifference to a substantial risk of serious harm to Anderson.

This claim is based on Anderson's physical deterioration subsequent to the denial of first state habeas petition it has not been presented to the state courts for review.

**Claim Ten: The intervening change in sentencing procedure following *Ring v. Arizona* violated Anderson's procedural due process rights.**

Anderson's death sentences are invalid under the federal constitutional guarantees of due process, effective assistance of counsel, equal protection, and a reliable sentence because trial counsel anticipated a judicial sentencing in preparation for trial and was forced to litigate Anderson's sentence before a jury. U.S. Const. amends. V, IV, VIII, XIV.

The timing of Anderson's conviction subjected him to an abrupt change in Arizona's capital sentencing procedures following *Ring v. Arizona*, 536 U.S. 584 (2002). *See* Claim Two(J) (explaining the timeline of Anderson's sentencing post-*Ring*). Trial counsel ostensibly made decisions during the guilt phase anticipating a sentencing hearing before a judge only. Anderson was then forced to proceed to capital sentencing

before a jury. The decisions trial counsel made during the guilt phase trial could not have anticipated the eventual presentation to a newly empaneled jury. Indeed, trial counsel was inexperienced and unqualified to litigate a capital case, and litigating death sentences before a jury was a subject of much discussion amongst experienced capital defense attorneys post-*Ring*. *See* Claim Two(B)–(D).

In *Coleman v. McCormick*, 974 F.2d 1280, 1281 (9th Cir. 1989) (en banc) the Ninth Circuit held that a procedural change in capital sentencing law violated due process when trial counsel anticipates one sentencing procedure, and is later, because of a change in the law, forced to litigate a different sentencing procedure. In *Coleman*, trial counsel anticipated a mandatory death sentence upon conviction of aggravated kidnapping. Following the imposition of sentence, the law changed such that death sentences were subject to a hearing before the sentencing judge to weigh aggravating and mitigating factors. 874 F.2d at 1285. The Ninth Circuit held that this change in sentencing procedure is a properly analyzed as a due process issue, rather than an *ex post facto* challenge. *Id.* at 1286; *accord State v. Ring*, 65 P.3d 915, 928 (Ariz. 2003); *Schriro v. Summerlin*, 542 U.S. 348, 353 (2004). A change in sentencing procedure violated due process when the defendant cannot anticipate and prepare for the new procedure. *Coleman*, 874 F.2d at 1286–1287.

The intervening change in sentencing procedure is structural error which violated Anderson's due process rights. In the alternative, the change in procedure had a substantial and injurious effect on the penalty verdicts.

Anderson raised this claim in Argument 16, Appellant's Opening Brief 12/18/2003 at 59. The Arizona Supreme Court failed to consider the question of whether

1   an intervening change in sentencing procedure violated Anderson's procedural due

2   process rights. *State v. Anderson* 111 P.3d 269, 388–389 (Ariz. 2005). Anderson is

3   entitled to *de novo* review.

**PRAYER FOR RELIEF**

For the reasons stated above, this Court should issue a writ of habeas corpus and vacate Anderson's convictions and death sentences.

Dated this 10th day of October, 2023.

Respectfully submitted,

Rene L. Valladares
Federal Public Defender

*/s/ David Anthony*
David Anthony
Assistant Federal Public Defender

*/s/ Benjamin A. Gerson*
Benjamin A. Gerson
Assistant Federal Public Defender

*/s/ Lisa C. Brunner*
Lisa C. Brunner
Assistant Federal Public Defender

181

1

**VERIFICATION**

2        I declare under penalty of perjury under the laws of the United States of America

3   and the State of Arizona that the facts alleged in this petition are true and correct to the

4   best of counsel's knowledge, information, and belief.

5        Dated this 10th day of October, 2023.

6

7                                        */s/ David Anthony*
                                        David Anthony
                                        Assistant Federal Public Defender
8
                                        */s/ Benjamin A. Gerson*
9                                       Benjamin A. Gerson
                                        Assistant Federal Public Defender
10
                                        */s/ Lisa C. Brunner*
11                                      Lisa C. Brunner
                                        Assistant Federal Public Defender
12

13

14

15

16

17

18

19

20

21

22

23