# EXHIBIT 6

# EXHIBIT 6

## REPORT OF NEUROPSYCHOLOGICAL EVALUATION

Name: Robert (Bobby) A. Poyson
Date of Birth: ███████ 1976
Education: 11 years (completed GED in 1993)
Date of Examination: March 12, 2002

**Reason for Referral:**

A neuropsychological evaluation was requested by Mr. Poyson's counsel and approved by the Court to determine the patient's current intellectual and cognitive abilities and whether there are any neuropsychological deficits contributing to his current situation.

**Current Complaints and Pertinent History:**

Mr. Poyson is presently housed at the Arizona State Prison – Eyman in the SMU II in Florence. Discussion with Mr. Poyson's attorney, Conrad Baran, indicated the appropriateness of neuropsychological evaluation. Information was based on interview with the patient and records made available to me from the referral source. (Please see attached Neuropsychological History Questionnaire).

<u>Familial:</u>

In an interview with Blair Abbott on June 4, 1998, Ruth Garcia, Mr. Poyson's mother, reported that she had lived in numerous places around the Jack Pot, Nevada area. She reported living in Idaho, which is approximately 40 miles from Jack Pot, and had maintained living in a close proximity to her mother, Mary Leisure-Milner, Robert's grandmother. Although she reported living in various places, the different places she described were within an hour's drive of each other. [NOTE: At the time of this interview, it was reported that Ms. Garcia had recently made a suicide attempt. She reported that she had taken an overdose of medication. While she was unconscious, her 16 year old son discovered her and called the paramedics. This information was being kept from Mr. Poyson].

Ms. Garcia reported having a history of grand mal and petite seizure activity since birth. She was diagnosed as having left frontal lobe epilepsy in 1993, yet has discontinued taking her medication. She further reported that her oldest son also suffered with grand mal seizures until he was approximately 17 years old.

Mr. Poyson is the second oldest son born to Ms. Garcia. She reported that his birth was "head first," and that the delivery process took over 60 hours. No additional information regarding the birth is unknown. Ms. Garcia indicated that she had two other sons, and that all four of her children are surviving. She indicated that she had a sustained drug history, which may have contributed to the medical conditions of her three youngest sons, which includes Mr. Poyson. In addition, each son has a different biological father. Ms. Garcia stated that she never was married to Mr. Poyson's father, who she identified as being Richard Sandoval. She stated that while pregnant with Mr. Poyson, she would take as much L.S.D. as was made available to her. She estimated her use to range from 2 to 5 "hits" of L.S.D. per day. She stated that she discontinued using L.S.D. when she realized she was pregnant, which was not until the second month of her pregnancy. In addition to abusing L.S.D., she reported using marijuana on a daily basis. This too was discontinued when she learned of her pregnancy. Furthermore, she admitted minor alcohol consumption while pregnant with Mr. Poyson, which also ended when she learned of her pregnancy.

1

H003629

Ms. Garcia reported that Mr. Sandoval was a heavy abuser of drugs, and would engage in self-injurious behaviors. She reported that he made one or more suicide attempts by strangulation, which included attempts at hanging himself. Mr. Sandoval confirmed his heavy drug and alcohol abuse in an interview with Blair Abbott on September 24, 1998.

In addition, Ms. Garcia reported that Mr. Poyson would be severely beaten by his grandmother. She stated that she observed her mother repeatedly striking Mr. Poyson in the head with her fists. Ms. Garcia stated that this occurred while her mother was providing daycare for her children, and felt that the abuse occurred on a frequently. Ms. Garcia reported that she Mr. Poyson had a series of 5 to 6 step-fathers while growing up. She stated that one of the step-fathers, Mr. Sabas, had greatly influenced Mr. Poyson. However, Mr. Sabas was suffering with stomach cancer, and committed suicide by gunshot when Mr. Poyson was 10 years old. Shortly after the suicide, Mr. Poyson was sexually assaulted by Mr. Sabas' best friend, who was also known to be Mr. Poyson's godfather. According to Ms. Garcia, it was about this same age that Mr. Poyson's personality changed, and she described him as becoming violent and rebellious. She also believed it was about this same time that he began abusing substances in excess.

### Developmental:

According to an interview conducted by Blair Abbott on June 4, 1998, Ms. Garcia, Mr. Poyson's mother, reported that he was delayed in attaining his developmental milestones. She reported that he could not crawl well, and added that he took his first steps when he was 18 months old. She reported that he walked with a limp until he was 7 to 9 years of age. She further indicated that he was unable to speak until he was approximately 2 ½ years old. In addition, she reported that Mr. Poyson received special educational services for speech when he began school. In addition, she recalled that Mr. Poyson did have difficulty related to bedwetting, and added that he was difficult to toilet train. Moreover, Ms. Garcia reported that Mr. Poyson would "drop over", similar to her epilepsy, but without convulsions. She did not indicate that she had him evaluated for epilepsy, however. She further noted that he experienced childhood diseases of mumps, measles, and other common illnesses. She also stated that he experienced a high fever, yet the temperature and duration were unknown.

During an interview conducted by Blair Abbott on June 4, 1998, Mr. Poyson reported that while he was 3 to 4 years of age, an adult male had placed bourbon in his Seven-Up, which made him feel dizzy, nauseous, and violently ill. He further reported that by seeing a Seven-Up can, the intense memories of the experience would surface. In addition, he stated that this was his earliest memory from childhood.      During this interview, Ms. Abbott reported that Mr. Poyson recalled that he limped favoring his left side when he walked. He reported having numerous injuries while growing up, including having his two front teeth being knocked out by his mother. Aside from this event, he denied that his mother had physically abused him as a child. However, he reported that one of his 6-7 step-fathers had frequently and severely beaten him with a power cord when he was a child.
Mr. Poyson also reported that he was a chronic bed-wetter, and indicated that he stopped bed-wetting when he was about 7 or 8 years of age. Furthermore, he reported being raped by his godfather following the suicide of one his step-fathers.

In an interview conducted by Blair Abbott on September 26, 1998 with Laura Salas, Mr. Poyson's aunt, Ms. Salas reported that he was slow in virtually all aspects of his development. She reported that, while growing up, Mr. Poyson lived in numerous places, and indicated that his mother and various stepfathers were seldom home due to their work schedules. This was collaborated in an interview with Marie Scott, conducted by Blair Abbott on September 26, 1998. Ms. Scott is a cousin of Mr. Poyson. She added that he had an unstable home life.

2

H003630

### Health:

According to Ms. Abbott, Mr. Poyson reported that his family has a history of epilepsy. His mother and older brother have reportedly been diagnosed with epilepsy, and Mr. Poyson indicated that he has assisted them on numerous occasions while they were experiencing seizures. Moreover, he recalled that he experienced his first blackout when he was child. He described that he was getting ready to eat his eggs when he blacked out. As a result of this experience, he stated he avoided eggs.

When he was approximately 10 years of age, Mr. Poyson suffered an injury to his head. He was struck in the head by a pointed stick that impaled itself midline. The stick was removed by paramedics, and he was treated as if it were an epidural injury. Mr. Poyson also reported suffering from a history of headaches, which he would relieve by consuming alcohol until he would pass out. He indicated that after he began shaving his head, he noticed a "deep scar" in the occipital area, immediately left of the midline. When questioned about this scar, Ruth Garcia, Robert's mother, denied having any specific knowledge of the scar, and added that Robert would routinely pass out and otherwise get knocked around a lot. Mr. Poyson indicated that he would get headaches in the right, anterior parietal area, and experienced headaches which alternated between his left and right parietal areas. He treated his headaches by using marijuana, and stated that he would abuse alcohol until he would blackout.

Moreover, Mr. Poyson described having Tinnitus, or ringing, in both of his ears. He stated that he would become suddenly violent whenever he experienced his ears ringing, which he described as being so distracting that he was unable to sleep. Mr. Poyson was taught, from his Hispanic culture, that this ringing sensation meant that people were talking about him. Therefore, whenever he experienced a sudden on-set of his ears ringing, he would become aggressive towards the people closest to him. He reported that he believed that they were "talking or thinking about him."

Mr. Sandoval, Mr. Poyson's biological father, reported experiencing debilitating headaches since childhood. He stated that he had a brother who died from a brain tumor, and that another brother had committed suicide. He reported that he would abuse substances for his headaches.

### Substance Abuse:

Robert reported that began abusing alcohol during his pre-teen years. He stated that he would drink until he would pass out. He indicated that he would drink to relieve his headaches, but later added that he would "drink anyway." He stated that he would usually consume two six packs before he would pass out. He added that when he was drinking, he would use marijuana, methamphetamines, phencyclidine, or any other drug that was available. During the interview with Ms. Abbott, Mr. Poyson reported that he has no clear recollection of his drug abuse history. He does, however, acknowledge that he is a poly-substance abuser to include drugs and alcohol, and that he has also abused inhalants (paint).

When he was 15 years old, Mr. Poyson was treated at an in-patient facility called Westcare, which is located in Las Vegas, Nevada. He reported that while there he began using Phencyclidine (PCP), which became his drug of choice. While taking PCP, he described feeling as if everything was in slow motion. He added that it felt as if he were unable to move, and would frequently urinate in his pants. He further described feeling paranoid and vulnerable, and that he was powerless. However, at other times, the PCP made him react violently. He stated that he enjoyed fighting in this state because he was immune to pain or anxiety. Ruth Garcia reported to Ms. Abbott that when he was 15 years old, she was aware that Robert would be sniffing glue while in high school. She added that his nostrils would be colored due to his inhaling paint.

H003631

## Education:

According to the records, Mr. Poyson attended elementary school at Twins Falls Public Schools located in Twin Falls, Idaho, and the Elko County School District, located in Jackpot, Nevada. While in elementary school, he received numerous awards and certificates for his achievement in reading, math, and social studies. However, his performance was inconsistent regarding his abilities with reading, math, and social studies. He attended junior high at the Jackpot School, part of the Elko County School District, in Jackpot, Nevada. While there, he received an award for being the most improved student. He made the honor roll and received an athletic award while attending the C.O. Bastian High School in Lincoln County. Mr. Poyson attended enrolled with the Laughlin High School, Las Vegas, Nevada, yet did not complete the tenth grade. He was withdrawn from school at that time. Mr. Poyson reported that he earned his GED, after enrolling in Horizon High School, in Las Vegas, Nevada on his employment applications.

## Employment:

According to the records, Mr. Poyson was employed at the Pioneer Hotel and Gambling hall for two weeks in 1994. He then worked as a bus person at the Ramada Express Hotel-Casino in 1995. He was subsequently employed at Cactus Pete's in 1995 as a bus person, yet only worked for about one month. He then worked as a dishwasher at the Silver Spoon Family Restaurant in 1996. His employer reported that his attendance was good, and his appearance was neat.

## Legal History:

According to the records, Mr. Poyson was placed in the substance abuse treatment program with Westcare by the Nevada Youth Parole in 06/92. His referring information indicated that he was experiencing behavioral problem that included stealing, battery, alcohol use, drug abuse, burglary, school difficulties, and implicated in a sexual assault against a male juvenile. He also had set fire to another male's hair, and had problems with his parents. He was discharged in 11/92 after successfully completing the program.

The records reflected that Mr. Poyson initial offense occurred when he was 11 years old and involved destruction of property, and burglary with the use of a knife. He was given 12 days in the detention center for these two offenses. At age 14, he was convicted of assault and battery and placed on 8 months of probation. In addition, while 14 years old, he set fire to a child's hair and charged with aggravated assault. He was sentenced to the Caliente Youth Center. Furthermore, while 14, he was also charged with sexual assault. Moreover, when he was 16, Mr. Poyson was sent to St. Anthony's Youth Center, where he remained until he was 18. This was due to his being convicted of lewd and lascivious conduct with a minor. He was accused of raping a minor female (cousin). In a psychological evaluation prepared by Ronald W. Jacques, Ed.D., it was reported that Mr. Poyson had forced sexual contact with a minor cousin.

According to the pre-sentence investigation conducted on 9/30/98, Mr. Poyson has previously been convicted of the following:

| 11/13/88 | Destruction of Property, petty larceny, burglary |
| 5/5/89 | Probation violation |
| 9/21/89 | Vandalism |
| 2/19/90 | Battery |
| 4/24/90 | Battery |
| 6/29/90 | MIC-Alcohol |

4

H003632

Prior Evaluations:

According to the records, Mr. Poyson underwent a psychiatric evaluation conducted by Bruce A. Guernsey, D.O. on May 24, 1990. At that time, he was diagnosed with the following: conduct disorder, solitary aggressive type. He underwent a psychological evaluation on July 20, 1993, conducted by Ronald W. Jacques, Ed.D. However, no diagnosis was given. A psychological evaluation was conducted on 8/19/97 by Daniel T. Malatesta, Ed.D., to determine whether Mr. Poyson was competent to stand trial. He was diagnosed with having polysubstance dependence and antisocial personality disorder. He was deemed competent to stand trial based on the results of this evaluation. On 9/9/97, he was given a psychiatric evaluation for the purpose of determining competency. This was conducted by Vasilios Kaperonis, M.D., and was found to be competent to stand trial as well.  On September 15, 1998, Mr. Poyson underwent a medical examination by Harry S. Tamm, M.D. In this report, Dr. Tamm indicated that a diagnosis of epilepsy was not a probable diagnosis.  On October 7, 1998, Mr. Poyson was given a forensic evaluation conducted by Celia A. Drake, Ph.D. This report summarizes much of Mr. Poyson's history, and indicated that he had previously been diagnosed with the following: adjustment disorder with depressed mood, mild intensity; alcohol abuse, by history; polysubstance dependence, by history; and antisocial personality disorder.

**Tests Administered:**

Halstead-Reitan Neuropsychological Test Battery (HRB) including:
  Halstead Neuropsychological Test Battery for Adults
  Trail Making Test (Parts A and B)
  Reitan-Klove Lateral Dominance Examination
  Reitan-Indiana Aphasia Screening Examination
  Reitan-Klove Sensory-Perceptual Examination
Memory Assessment Scales (MAS)
Wechsler Adult Intelligence Scale (WAIS)
Wide Range Achievement Test – 3rd Edition (WRAT-3)
Personality Assessment Inventory
Test of Memory Malingering (TOMM)

**Attitude of the Patient toward Testing:**

The patient was polite, friendly, and cooperative throughout the testing period. The testing room was closely supervised by guards who would look through the window, Mr. Poyson noted that because he was used to constant supervision, that this situation would not interfere with his ability to complete the testing, nor create stress that would lower his performance. He noted that he had slept as usual night before the test and that he was looking forward to doing something different during the day.   Mr. Poyson completed the testing in 6.5 hours, within normal expectations. Minimal breaks were taken, although they were suggested.  In the examiner's opinion, this was a typical, optimal effort on the part of the patient. The test results are considered a valid representation of his current neuropsychological functioning. No evidence of malingering was noted. Mr. Poyson was administered the TOMM to determine validity of effort on memory tasks and he demonstrated normal limit performance with no evidence of faking bad or malingering.

**Intellectual Abilities:**

On the WAIS, the patient earned a Verbal IQ in the Average range, with a Performance IQ in the Superior range, and Full Scale IQ in the High Average range.  The Full Scale IQ of 110 falls at

H003633

the 75th percentile in comparison with others of his age. This IQ provides an assessment of general intelligence and of general occupational and scholastic aptitude.

Mr. Poyson obtained a Verbal IQ of 100, which falls at the 50th percentile. This IQ provides an indication of his verbal abilities, which include language comprehension and expression, recall of information, and the ability to reason with words. None of the scores contributing to Mr. Poyson's Verbal IQ differed significantly from his average verbal score. Therefore, Mr. Poyson's Verbal IQ seems to be a good indication of his abilities in this area.

Mr. Poyson's Performance IQ of 122 falls at approximately the 92nd percentile. This IQ contributes an understanding of his perceptual organization, which reflects certain perceptual-motor skills as well as the ability to employ visual images in thinking and to process visual material efficiently. None of the scores differed significantly from the average performance scores. Therefore, the Performance IQ is probably a good indication of his abilities in this area.

Given his educational level and pattern of performance on the WAIS subtests, the current results seem to be consistent with pre-morbid intellectual functioning.

**Academic Abilities:**

On the WRAT-3, the patient achieved the following estimated grade equivalents. Reading, Spelling, and Arithmetic – High School level. His performances are equivalent to standard scores of 92, 104, and 105, respectively. These performances are with expectations given his education and intelligence. By report, Mr. Poyson indicated that after 6th grade that "thing fell apart" as his step-father committed suicide and Bobby was sexually assaulted. He failed 7th grade and then "just went through the motions." He reportedly didn't have difficulty with academic subjects. He wasn't sure if he repeated third grade (see above review of records). Current results do not suggest any significant loss of basic academic abilities.

**General Neuropsychological Functioning:**

On tests that are more sensitive to the biological integrity of the brain, the patient earned **Halstead Impairment Index** of **0.0**. This indicates that 0% of the component tests were within the brain-damaged range. A value of this magnitude represents performance in the normal range of neuropsychological function. On the **General Neuropsychological Deficit Scale,** the patient earned a score of **20**. This score indicates an overall clinical level within the normal range (0-26). Mr. Poyson displayed a relatively consistent pattern of neuropsychological results in which he had good and intact functions with a few impaired performances.

Abstract reasoning and logical analysis, complex psychomotor problem solving, attention and concentration on quickly- and slowly presented auditory material, flexibility of thought for simple and more complex stimuli, and incidental learning of simple and complex material was good. Overall, the results suggest normal findings.

**Specific Neuropsychological Functioning:**

With regards to tests specific to the neuropsychological functions of each cerebral hemisphere, the patient did not demonstrate a pattern of cognitive dysfunction. There were neither aphasic symptoms nor constructional dyspraxia noted on this exam. Mr. Poyson is able to use and understand alphanumeric symbols and is able to draw expected objects without impairment. Mr. Poyson's short-term memory was shown to be in the 66th percentile, verbal memory in the 63rd percentile, visual memory in the 96th percentile, and overall (global) memory to be in the 90th percentile.

6

H003634

**Sensorimotor Functioning:**

Examination of his sensorimotor function indicated some right-sided grip weakness in relation to his left hand. His finger tapping was also slow, comparatively, with his dominant hand. There were more errors (3/1) on the fingertip number writing task with his right hand. Right-sided slowness was noted on the complex psychomotor problem-solving task. There was one auditory imperception on the left side on double simultaneous stimulation. There was an error, bilaterally on visual double simultaneous stimulation. The results are seen to be peripheral, given the history of damage to his hands and wrists. Other sensory findings were within normal limits. No errors were made in tactile modalities.

**Emotional Status:**

*Validity of Test Results*

The PAI provides a number of validity indices that are designed to provide an assessment of factors that could distort the results of testing. Such factors could include failure to complete test items properly, carelessness, reading difficulties, confusion, exaggeration, malingering, or defensiveness. For this protocol, the number of uncompleted items is within acceptable limits.

Also evaluated is the extent to which the respondent attended appropriately and responded consistently to the content of test items. The respondent's scores suggest that he did attend appropriately to item content and responded in a consistent fashion to similar items.

The degree to which response styles may have affected or distorted the report of symptomatology on the inventory is also assessed. Certain of these indicators fall outside of the normal range, suggesting that the respondent may not have answered in a completely forthright manner; the nature of his responses might lead the evaluator to form a somewhat inaccurate impression of the client based upon the style of responding described below. With respect to positive impression management, there is no evidence to suggest that the respondent was unduly defensive or motivated to portray himself as being relatively free of common shortcomings or minor faults.

With respect to negative impression management, there are subtle suggestions that the client attempted to portray himself in a negative or pathological manner in particular areas. Some concern about distortion of the clinical picture must be raised as a result; the respondent presents with certain patterns or combinations of features that are unusual or atypical in clinical populations but relatively common among individuals feigning mental disorder. It is suggested that the critical items, as well as certain aspects of the clinical history, be reviewed to evaluate the possibility of such distortion. Although this pattern does not necessarily indicate a level of impression management that would render the test results uninterpretable, the clinical hypotheses presented in this report should be reviewed with these considerations in mind

*Clinical Features*

The PAI clinical profile is marked by significant elevations across several scales, indicating a broad range of clinical features and increasing the possibility of multiple diagnoses. Profile patterns of this type are usually associated with marked distress and, unless there is extensive distortion or exaggeration of symptomatology, severe impairment in functioning is typically present. The configuration of the clinical scales suggests a person with a history of

H003635

From: Robert A. Briggs, Ph D  4309499882  To: Conrad Baran                    Date: 5/19/02  Time: 2.12.06 PM

polysubstance abuse, including alcohol as well as other drugs. When disinhibited by the substance use, other acting-out behaviors may (or were) become apparent as well. The substance abuse is probably causing (and caused) severe disruptions in his social relationships and his work performance, with these difficulties serving as additional sources of stress and perhaps further aggravating his tendency to drink and use drugs.

The respondent indicates that his use of drugs has had many negative consequences on his life at a level that is above average even for individuals in specialized treatment for drug problems. Such a pattern indicates that his use of drugs has had numerous ill effects on his functioning. Problems associated with drug abuse are probably found across several life areas, including strained interpersonal relationships, legal difficulties, vocational failures, financial hardship, and/or possible medical complications resulting from prolonged drug use. He reports having little ability to control the effect that drugs are having on his life. With this level of problems it is increasingly likely that he is drug-dependent and withdrawal symptoms may be a part of the present clinical picture. The withdrawal syndrome will vary according to the substance of choice, but such syndromes can include many psychopathological phenomena such as concentration problems, anxiety, and depression.

The respondent reports that his use of alcohol has had a negative impact on his life. Alcohol-related problems are likely, including difficulties (and past difficulties) in interpersonal relationships and possible health complications.

He describes a personality style that is consistent with a number of antisocial character features. His responses suggest that he has a history of antisocial behavior and may have manifested a conduct disorder during adolescence. He may have been involved in illegal occupations or engaged in criminal acts involving theft, destruction of property, and physical aggression toward others. Other features of the antisocial personality constellation, such as egocentricity, lack of impulse control, disregard for others, disloyalty, and recklessness, do not appear to be particularly prominent characteristics of the respondent's clinical picture by comparison.

The respondent describes a number of problematic personality traits. He reports problems of many different types. He is likely to be quite emotionally labile, manifesting fairly rapid and extreme mood swings and in particular probably experiences episodes of poorly controlled anger. It is likely that he has a history of involvement in intense and volatile relationships and tends to be preoccupied with consistent fears of being abandoned or rejected by those around him. He is also quite impulsive and prone to behaviors likely to be self-harmful or self-destructive, such as those involving spending, sex, and/or substance abuse; he may also be at increased risk for self-mutilation or suicidal behavior.

The respondent's self-description indicates significant suspiciousness and hostility in his relations with others. He is likely to be a hyper vigilant individual who often questions and doubts the motives of those around him. Although he may not describe himself as unduly suspicious, others are likely to view him as very sensitive and easily insulted in his interactions. As a result, working relationships with others are likely to be strained and may require an unusual degree of support and assistance in order to succeed.

Bobby reports a number of difficulties consistent with a significant depressive experience. The quality of Bobby's depression seems primarily marked by cognitive features such as negative expectancies and low self-esteem. He is likely to be quite pessimistic and plagued by thoughts of worthlessness, hopelessness, and personal failure. Experienced sadness and physiological disturbances, however, appear to play only a minimal to moderate role in the clinical picture.

Bobby describes himself as a socially isolated individual who has few interpersonal relationships that could be described as close and warm. He may have difficulty interpreting the normal

8

H003636

nuances of interpersonal behavior that provide the meaning to personal relationships. His social isolation and detachment may serve to decrease a sense of discomfort that interpersonal contact fosters.

Mr. Poyson mentions that he is experiencing some degree of anxiety and stress; this degree of worry and sensitivity is still within what would be considered the normal range.

According to Bobby's self-report, he describes NO significant problems in the following areas: unusually elevated mood or heightened activity; problematic behaviors used to manage anxiety; difficulties with health or physical functioning.

### Self-Concept

The self-concept of Mr. Poyson appears to involve a generally harsh, negative self-evaluation. He is prone to be self-critical and pessimistic, dwelling on past failures and lost opportunities with considerable uncertainty and indecision about his plans and goals for the future. Given this self-doubt, he tends to blame himself for setbacks and sees any prospects for future success as dependent upon the actions of others.

### Interpersonal and Social Environment

Bobby's interpersonal style seems best characterized as being very uncomfortable in social situations. He appears to have little interest or need for interacting with others and, for the most part, takes a passive, submissive stance when dealing with others. This passivity may lead to feelings of resentment when others attempt to secure his cooperation. It would be expected that he would avoid most social interactions rather than run the risk of being forced to make an active commitment to a relationship.

In considering the social environment of Mr. Poyson with respect to perceived stressors and the availability of social supports with which to deal with these stressors, his responses indicate that he believes that his social relationships offer him little support; family relationships may be somewhat distant or ridden with conflict, and friends are seen as unavailable when needed. These relationship issues may be a source of some stress for him, although they are likely to be part of an enduring and generalized pattern of conflict in close relationships. Nonetheless, interventions directed at current problematic relationships (such as those involving family or marital problems) may be of some use in alleviating one source of current stress.

### Treatment Considerations

Treatment considerations involve issues that can be important elements in case management and treatment planning. Interpretation is provided for three general areas relevant to treatment: behaviors that may serve as potential treatment complications, motivation for treatment, and aspects of Bobby's clinical picture that may complicate treatment efforts.

With respect to anger management, the pattern of responses suggests that aggressive behaviors play a prominent role in the clinical picture and that such behaviors may represent a potential treatment complication. His responses suggest that he is an individual who is easily angered, has difficulty controlling the expression of his anger, and is perceived by others as having a hostile, angry temperament. When he loses control of his anger, he is likely to respond with more extreme displays of anger, including damage to property and threats to assault others. However, some of these displays may be sudden and unexpected, as he may not display his anger readily when it is experienced. It is likely that those around him are intimidated by his potentially explosive temper and the potential for physical violence. It should also be noted that

9

H003637

his risk for aggressive behavior is further exacerbated by the presence of a number of features, such as a limited capacity for empathy, affective lability, and impulsivity, that have been found to be associated with increased potential for violence.

With respect to suicidal ideation, Bobby does report experiencing periodic and perhaps transient thoughts of self-harm.  He is probably pessimistic and unhappy about his prospects for the future.  Furthermore, concerns about his potential for suicide are heightened by the presence of a number of features, such as situational stresses, poor impulse control, and a lack of social support, that have been found to be associated with suicide risk.  Specific follow-up regarding the details of his suicidal thoughts and the potential for suicidal behavior is warranted.

Bobby's interest in and motivation for treatment is comparable to that of adults who are not being seen in a therapeutic setting.  However, his level of treatment motivation is somewhat lower than is typical of individuals being seen in treatment settings.  Despite his recognition that several areas of his life are not going well at this time, his responses suggest possible resistance to the idea that personal changes are needed.  The combination of problems that he is reporting suggests that treatment would be quite challenging and that the treatment process is likely to be arduous, with many reversals.

If treatment were to be considered for this individual, particular areas of attention or concern in the early stages of treatment could include:

- Current difficulties in his social support system may give a special significance to the therapeutic relationship and any impasse may need to be handled with particular care.
- He may have initial difficulty in placing trust in a treating professional as part of his more general problems in close relationships.
- He is likely to have difficulty with the treating professional as an authority figure, and he may react to the therapist in a hostile or derogatory manner.

## DSM-IV *Diagnostic Possibilities*

Listed below are *DSM-IV* diagnostic possibilities suggested by the configuration of personality testing.  The following are advanced as hypotheses; all available sources of information should be considered prior to establishing final diagnoses.

10

H003638

his risk for aggressive behavior is further exacerbated by the presence of a number of features, such as a limited capacity for empathy, affective lability, and impulsivity, that have been found to be associated with increased potential for violence.

With respect to suicidal ideation, Bobby does report experiencing periodic and perhaps transient thoughts of self-harm. He is probably pessimistic and unhappy about his prospects for the future. Furthermore, concerns about his potential for suicide are heightened by the presence of a number of features, such as situational stresses, poor impulse control, and a lack of social support, that have been found to be associated with suicide risk. Specific follow-up regarding the details of his suicidal thoughts and the potential for suicidal behavior is warranted.

Bobby's interest in and motivation for treatment is comparable to that of adults who are not being seen in a therapeutic setting. However, his level of treatment motivation is somewhat lower than is typical of individuals being seen in treatment settings. Despite his recognition that several areas of his life are not going well at this time, his responses suggest possible resistance to the idea that personal changes are needed. The combination of problems that he is reporting suggests that treatment would be quite challenging and that the treatment process is likely to be arduous, with many reversals.

If treatment were to be considered for this individual, particular areas of attention or concern in the early stages of treatment could include:
- Current difficulties in his social support system may give a special significance to the therapeutic relationship and any impasse may need to be handled with particular care.
- He may have initial difficulty in placing trust in a treating professional as part of his more general problems in close relationships.
- He is likely to have difficulty with the treating professional as an authority figure, and he may react to the therapist in a hostile or derogatory manner.

## DSM-IV Diagnostic Possibilities

Listed below are *DSM-IV* diagnostic possibilities suggested by the configuration of personality testing. The following are advanced as hypotheses; all available sources of information should be considered prior to establishing final diagnoses.

10

H003639

Axis I Diagnostic Considerations:

304.90    Other (or Unknown) Substance Dependence (Psychoactive substance
          dependence)
303.90    Alcohol Dependence
296.20    Major Depressive Disorder, Single Episode, Unspecified

Axis I Rule Out:

312.34    Intermittent Explosive Disorder

Axis II Diagnostic Considerations:

301.7     Antisocial Personality Disorder
301.9     Personality Disorder NOS (Passive-aggressive Personality Disorder)
301.0     Paranoid Personality Disorder

Axis II Rule Out:

301.83    Borderline Personality Disorder

## Critical Item Endorsement

A total of 27 PAI items reflecting serious pathology have very low endorsement rates in normal samples. These items have been termed critical items. Endorsement of these critical items is not in itself diagnostic, but review of the content of these items with Mr. Poyson may help to clarify the presenting clinical picture. Significant items with item scores of 1 (Slightly true), 2 (Mostly true), or 3 are listed below.

### Delusions and Hallucinations

90.    Sometimes it seems that my thoughts are broadcast so that others can hear them. (ST, 1)

### Potential for Self-Harm

206.   I have no interest in life. (ST, 1)

### Potential for Aggression

21.    People are afraid of my temper. (MT, 2)
61.    Sometimes my temper explodes and I completely lose control. (ST, 1)
101.   Sometimes I'm very violent. (ST, 1)
181.   I've threatened to hurt people. (MT, 2)

### Substance Abuse

55.    I have trouble controlling my use of alcohol. (MT, 2)
222    My drug use is out of control. (MT, 2)

11

H003640

## Unreliability / Resistance

31.    I've borrowed money knowing I wouldn't pay it back. (ST, 1)
311.   When I make a promise, I really don't need to keep it. (ST, 1)

## Traumatic Stressors

34.    I keep reliving something horrible that happened to me. (MT, 2)
114.   I've been troubled by memories of a bad experience for a long time. (MT, 2)
194.   I have had some horrible experiences that make me feel guilty. (ST, 1)
274.   Since I had a very bad experience, I am no longer interested in some things that I used to enjoy. (ST, 1)

Given the background of abuse, lack of boundaries, no respect taught or shown by Mr. Poyson by the surrounding adults in his life, the above profile description is not only **not** surprising but also almost expected. Having learned to not trust anyone in authority, and expecting others to hurt or use him, it is likely that Mr. Poyson reacted with instinct and not reasoning. When substance abuse entered the picture at an early age, the stage was set for continual and chronic acting out and lack of ability to be sympathetic or empathetic to those around him.

12

13

H003641

Achenbach & Edelbrock, 1983) have found child witnesses of domestic violence to exhibit more aggressive and antisocial (often called "externalized" behaviors) as well as fearful and inhibited behaviors ("internalized" behaviors), and to show lower social competence than other children. Children who witnessed violence were also found to show more anxiety, self-esteem, depression, anger, and temperament problems than children who did not witness violence at home. Children from homes where their mothers were being abused have shown less skill in understanding how others feel and examining situations from others' perspectives when compared to children from non-violent households. Peer relationships, autonomy, self-control, and overall competence were also reported significantly lower among boys who had experienced serious physical violence and been exposed to the use of weapons in their homes.

Another aspect of the effects on children is their own use of violence. Social learning theory would suggest that children who witness violence might also learn to use it. Several researchers have looked at this link between exposure to violence and subsequent use of it. Support for this hypothesis has been found. For example, Singer et al. (1998) studied 2,245 children and teenagers and found that recent exposure to violence in the home was a significant factor in predicting a child's violent behavior.

In addition, the following description is suggested by the content of the client's item responses. He has endorsed a number of items suggesting that he is experiencing low morale and a depressed mood. He reports a preoccupation with feeling guilty and unworthy. He feels regretful and unhappy about life, and he seems plagued by anxiety and worry about the future. He feels hopeless at times and feels that he is a condemned person. He is rather high-strung and believes that he feels things more, or more intensely, than others do. He feels quite lonely and misunderstood at times. Again, given research in the area, these results are expected.

One of the most direct consequences of witnessing violence may be the attitudes a child develops concerning the use of violence and conflict resolution. Jaffe, Wilson and Wolfe (1986) suggest that children's exposure to adult domestic violence may generate attitudes justifying their own use of violence. Spaccarelli, Coatsworth and Bowden's (1995) findings support this association by showing that adolescent boys incarcerated for violent crimes who had been exposed to family violence believed more than others that "acting aggressively enhances one's reputation or self-image" (p. 173). Believing that aggression would enhance their self-image significantly predicted violent offending. Boys and girls appear to differ in what they learn from these experiences. Carlson (1991) found that boys who witnessed domestic abuse were significantly more likely to approve of violence than were girls who had also witnessed it.

Hughes, Parkinson and Vargo (1989) have suggested that both witnessing abuse and also being abused is a "double whammy" for children. Their study compared children who were both abused and had witnessed violence to children who had only witnessed violence and to others that had been exposed to neither type of violence. They found that children who were both abused and witnesses exhibited the most problem behaviors.

Numerous studies have linked many different aspects of family functioning to delinquent behavior. Family characteristics suggesting familial antisocial behavior or values such as family history of criminal behavior, harsh parental discipline, and family conflict have been among the most consistently linked (Loeber & Dishion, 1983; Loeber & Stouthamer-Loeber, 1987; McCord, 1991; McCord, McCord, & Howard, 1963; Patterson & Stouthamer-Loeber, 1984; Tolan & Loeber, 1993). Lack of parental monitoring represented at its extreme by neglect and poor discipline methods and conflict about discipline have been related in several studies to participation in delinquent and violent behavior for a range of populations (Capaldi & Patterson, 1996; Farrington, 1989; Gorman-Smith et al., 1996; Patterson, Reid, & Dishion, 1992). Regardless of ethnic and socioeconomic group, it seems important for parents to be involved with their children, to monitor their child's whereabouts and functioning when not in their company,

13

14

H003647

From: Robert A. Briggs, Ph.D  480/943-9002  to: Conrad Guras

and to be effective and consistent in disciplining (Gorman-Smith, Tolan, & Henry, in press; Patterson, 1982; Patterson et al., 1992). Similarly, across various studies of low levels of parental warmth, acceptance and affection, low cohesion, and high conflict and hostility have been associated with delinquent behavior (Farrington, 1994; Henggeler, Melton, & Smith, 1992; Tolan & Lorion, 1988). Further, in some studies, disruption of families through divorce, parental absence, and other loss seems to mark increased risk (McCord, 1982).

Farrington (1989) similarly identified a number of childhood family characteristics that were associated with convictions for violent offenses. Among four-hundred eleven 8 to 10-year-old boys, he assessed family factors as well as a number of individual-difference characteristics in childhood. A number of family factors (e.g., socioeconomic status, parental criminality, harsh discipline, authoritarian child-rearing attitudes, and parental disagreement on discipline) were associated with later violent outcomes. In addition, several individual-difference characteristics (e.g., impulsivity, risk-taking behavior, and lack of concentration) were found to be associated with violent outcomes.

### Diagnostic Impressions and Neurological Implications:

Examination of this patient's neuropsychological functioning indicates performance in the normal range. As would be expected in a history of reported head injuries and drug use, improvement in function occurs as time (and sobriety) from the incidents increase. This is a recovered picture from the reported head traumas and toxic abuse. There are some impaired performances, bilaterally, which do not appear to have major clinical significance. Residual effects from earlier peripheral hand injuries are seen to contribute to some of the impaired performances. .

The results indicate a very significant psychological factor, which contributes to and exacerbates Mr. Poyson's current complaints. There is likely an interaction between his emotional status and his mild neuropsychological deficits, causing greater overall impairment of function.   The validity scales were well within acceptable limits and no malingering was noted. The Test of Memory Malingering was also used and showed no indication of malingering.  As discussed the emotional component in this case is the most significant factor. Biologically, Mr. Poyson's brain's is intact and he has good abilities when he accesses it. Obviously, being under the influence of drugs inhibits those abilities, and being taught to fear and hate creates an atmosphere where the problem solving process is more "take advantage of the person before the person does it to me." While part paranoid and part anti-social, this stance makes perfect sense in the world where adults have and teach no boundaries and no respect, much less sympathy and feelings other than inappropriate touch and abuse.

Given the relevant research cited above, this profile is most likely a natural progression of undersocialized abilities, fear, and action based on instinct. There is little doubt that Mr. Poyson is exhibiting some antisocial characteristics. Given the history, it is believed that decision-making, especially when compromised by alcohol, was not based on any consequence-driven thought process, but rather a leaned behavior that bypassed right or wrong. When subjected to the abuse noted by Mr. Poyson and collateral sources, it is believe that the mindset was developed in which instinct took over and reason could not be accessed.

### Implications and Recommendations for Adaptive Function:

It seems a bit obvious to discuss the needs of this person to set up structure in his life when the world around him is nothing but structure. The tendency is for the more complex the task, the greater the feelings of frustration, anxiety, or depression. However, he needs to have a routine and stick to it religiously so that he can focus on one thing at a time. As much time away from his confining cell would be helpful although I am aware of the restrictions of the environment. He noted both in testing and on interview that he sticks to himself and doesn't like to be around

14

H003643

anyone. I am relatively sure it is because of the distrust and the anger which surfaces relatively quickly. Depression and anxiety in a prison setting are common and not totally without being based in fact.

I strongly recommend that Robert become involved in structured, behavioral psychological intervention, which might prove very helpful in alleviation of stress, and in the education of alternate problem-solving strategies. It is apparent that he seems himself trying to grapple with upsetting material and needs reassurance and education in that struggle. Cognitive-behavioral therapy, if he would commit to the process, might educate him in the realities of emotional health.

I would not recommend retesting this patient from a neuropsychological point of view unless, of course, significant changes in ability warrant further evaluation.

Robert A. Briggs, Ph.D.
Clinical Neuropsychology

14

16

H003644

**LAW OFFICE OF J. CONRAD BARAN, P.C.**
408 N. Kendrick, Suite 1
P.O. Box D
Flagstaff, AZ 86002-0868
(520)779-3649 Fax (520) 556-0042
State Bar No. 002148

SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MOHAVE

| | |
|---|---|
| THE STATE OF ARIZONA, | |
| Plaintiff, | CAUSE NO.   CR 96-865 |
| v. | |
| | EXHIBITS E & F TO RULE 32 PETITION |
| ROBERT A. POYSON, | |
| Defendant. | |

Defendant submits the attached exhibits, E and F, to his Rule 32 Petition, filed this date.

RESPECTFULLY SUBMITTED this 23 day of May, 2002.

J. Conrad Baran, SBN 002148
Attorney for Petitioner

17

H003645

# EXHIBIT E

H003646

VITA

ROBERT A. BRIGGS

NEUROPSYCHOLOGIST

7257 E. Softwind Drive
Scottsdale, Arizona
85255
(480) 563-7916

Excellent health
Married
6'5"; 270 pounds
Born ███████, 1949

## PROFESSIONAL OBJECTIVES

To serve as a psychologist in a private setting with opportunity for neuropsychological assessment, clinical and forensic consulting, administrative responsibility, and research opportunity.

## EDUCATION

Doctor of Philosophy, University of Missouri--Kansas City. Kansas City, Missouri, 1984, Counseling Psychology.
Master of Arts, University of Missouri--Kansas City. Kansas City, Missouri, 1977, Counselor Education.
Bachelor of Arts, University of Missouri--Kansas City. Kansas City, Missouri, 1975, Psychology.

## PROFESSIONAL EXPERIENCE

January 1986 - Present                           Neuropsychology Consulting
Services

Private consulting service offering assessment and evaluation of brain trauma and other head injuries suffered by adults, adolescents, and younger children using standardized neuropsychological test battery. Clients seen are typically victims of injury suffered in work or school-related settings although other situations are evaluated. Sources of referral are neurologists, family physicians, and victims or their families. Forensic consultation is also performed as personal injury cases are referred for evaluation. Presentations are made to community agencies as well as private corporations. Volunteer services are offered to state head injury associations. Recommendations for rehabilitation, expert witness testimony, psychometrics and psychotherapy are also performed.

September 1986 - July, 1994                       Industrial Rehabilitation
Center

Director of Outpatient Services. Was responsible for conducting individual, couple, and family psychotherapy. Conducted group therapy with substance abuse population. Performed neuropsychological and psychological

19

H003647

assessments.   Also supervised up to three certified substance abuse counselors in their clinical duties. Assisted the Director of the agency in administrative decisions relative to outpatient service delivery. Presentations were also made to current and prospective employee assistance program organizations on regular basis.

April 1994 - August 1996                               Tri-County Mental Health Center

Community outpatient psychologist responsible for psychotherapy and associated assessment of individuals, couples, and families. Children and adults were seen, evaluated, and treated.  Minimum of 26 hours per week patient contact. Individual and group treatment modalities used in addition to marital treatment.  Also responsible for neuropsychological evaluations, multidisciplinary in-service presentations, and emergency room on-call rotations.   Received post-doctoral supervision in neuropsychological assessment and clinical psychological interventions from licensed psychologists.

October 1992 - January 1996                          Salva, Wenger & Associates

Conducted workshops, seminars, group and individual psychotherapy in a private practice setting.  Groups typically consisted of 4-7 patients conducted weekly. Community workshops and seminars were organized and presented on selected topics.

September 1982 - August 1983                          Psychology Internship

                                                    Kansas City V.A. Medical Center

Pre-doctoral internship requirements were fulfilled in this APA-approved site. The internship was divided into three rotations of four months. Predominant in the internship was training and education in neuropsychological assessment with other rotations including alcohol dependency treatment units, ambulatory care units, inpatient and outpatient psychiatry, transition living unit, and consultation to the Medical Center on requested topics.  The internship required weekly supervision with licensed psychologist. Duties performed were standard neuropsychological evaluations, individual and group psychotherapy, and psychological evaluations, participation in team treatment planning, biofeedback training and pain management skills, provision to supervision to masters' level psychology interns, and consultation and training of multidisciplinary staff as well as patients' families.

January 1982 - September 1982                        Kansas City V.A. Medical Center

Worked as a volunteer with chronic psychiatric inpatient population in transition from hospitalization to community living.  Developed and implemented programs that afforded patients opportunities for learning and practicing life skills in a structured setting.  Was supervised by a licensed psychologist.

September 1980 - May 1981                             Saint Peter's Elementary School

2

H003648

Performed as consultant to school staff for assessment of children. Provided testing, feedback, and recommendations to school personnel and families. Assessments included intelligence, aptitude, and ability evaluations.

May 1978 - August 1982                                    Gale Grossman, Incorporated

Developed and organized inventory control in addition to assisting in the supervision of office management. Work experience was invaluable in gaining knowledge about business transactions, obtaining additional contact with the public, and earning money toward continuing education.

November 1970 - May 1978                              Division of Family Services

                                                              State         of
Missouri

Started as caseworker with responsibility for family and individual counseling. Promoted to supervisory level with primary responsibility for instructing caseworkers in my unit and overseeing quality of counseling activity. Received promotion to supervisor at regional level in charge of supervisory staff and additional quality assurance duties. Developed training materials for staff and acted as a consultant for the Kansas City community for counseling services and other client-centered activities. Was appointed to state committees to assist in the organization and development of statewide policy and procedures.

## WORKSHOPS/ SEMINARS/ PRACTICUM EXPERIENCES

July 14-15, 2001                             Reitan Society Postgraduate Seminar

                                    Scientific Approach to
Neuropsychological
        Assessment Batteries

The focus of this two-day seminar is to methodically evaluate the scientific bases of neuropsychological test batteries that are currently used. Fixed batteries and the less reliable, less valid flexible battery approaches were examined. Only practitioners experienced in the administration, scoring, and interpretation of the complete Halstead-Reitan Neuropsychology Test Battery were eligible for attendance. APA-approved for 12 CEUs.

May 31, 2001                                             Rehab Without Walls

Participated in workshop offered to health care providers in the assessment and delivery of services to home-based patients. The program: Inter-relationships for Cognitive, Behavioral, and Emotional Sequelae of Acquired Brain Injury. Credit: 2 classroom hours.

May 11, 2001                                          AZ Legal and Ethical Issues

3

One day interactive seminar offered to health care providers in updated legal and ethical guidelines in the State of Arizona. Case presentations with discussion regarding application of statutes were presented. APA-approved for 6 CEUs

April 4, 2001                                      Rehab Without Walls

Participated in workshop offered to health care providers in the assessment and delivery of services to home-based patients. The program is geared toward evaluation and treatment of basic brain injury. Credit: 2 classroom hours.

October 25, 2000                                   Rehab Without Walls

Participated in full-day workshop offered to health care providers in the assessment and delivery of services to home-based patients. The program is geared toward evaluation, treatment decision based on objective data directed toward increased functional abilities of patient.

August 23-25, 2000                         2000 Training Mental Health Experts in
                                            Legal Competency and Restoration

Two-and-one-half days invitation-only workshop sponsored by the Arizona Supreme Court and presented by psychologist, judges, and associated professionals in order to educate and present information on the evaluation of juvenile and adult defendants in areas of competency and restoration to competency. A.R.S. Rule 11 evaluations were discussed and reviewed. 16 hours of training was received.

July 27-29, 2000                           Advanced Interpretation of Child Clinical

Cases

Three-day workshop presented to neuropsychologists by neuropsychologists emphasizing interpretation of difficult and complex neurological cases using the Halstead-Reitan Neuropsychological Test Battery for Older Children and the Reitan-Indiana Neuropsychological Test Battery for Young Children. Cases were presented by the attendees and stressed evaluation skills, integration of clinical history and neurological findings, differential diagnosis, and determination of educational, treatment or rehabilitation needs for patient population of five through 14 years of age. APA-approved for 16 CEUs.

June 2-4, 2000                             Reitan Society Postgraduate
Seminar

                                           Neurological Patterns of Medical

Disorders

H003650

The focus of this two-day seminar is to enhance skills of experienced clinicians regarding neuropsychological characteristics of individuals with medical disorders. Only practitioners experienced in the administration, scoring, and interpretation of the complete Halstead-Reitan Neuropsychology Test Battery were eligible for attendance. The seminar followed the format of grand rounds case conferencing. APA-approved for 12 CEUs.

March 31-April 1, 2000                    Legal and Ethical Risks and Risk Management in
                                          Professional Psychological Practice
                    Sequence I: General Risk Management Strategies
                    Sequence II: Risk Management in Specific High Risk Areas

Two-day workshop encompassing description and discussion of factors that create complaints against practitioners. Informed consent, confidentiality and exceptions, requests of information from the legal system, record keeping, and potential vicarious liabilities were discussed. Sponsored by the AZ Psychological Association and The American Psychological Association Insurance Trust. APA-approved for 12 CEUs. (six units, each workshop)

November 19, 1999                                    Healing ADD from the Inside Out

One-day workshop presented to psychologists and physicians as well as other providers of services to children who suffer from Attention Deficit Disorders and the subtypes identified through clinical and nuclear imaging by Daniel Amen, M.D.    Strategies for identification as wells as pharmacological intervention with clinical intervention was discussed. APA-approved for 7 C2Us.

April 15-17, 1999                        Neuropsychological Patterns in Neurological

                                          Disorders

Three-day workshop presented to neuropsychologists by neuropsychologists emphasizing neuropsychological patterns of test results seen in various neurological disorders and conditions. Conditions illustrated included head injury, cerebrovascular disorder, cerebral tumor, dementia and Alzheimer's disease, and toxic/metabolic disorders. APA-approved for 16 CEUs.

September 17-19, 1993                                Legal Applications of the
                                                      HRB

Three-day workshop presented to neuropsychologists by neuropsychologists emphasizing consultation, testing, interpretation, and case preparation in legal situations using the Halstead-Reitan Neuropsychological Test Battery for Adults. Common and unusual issues in clinical neuropsychological practice including depositions and trial work were discussed. APA-approved for 16 CEUs.

June 11-13, 1999                        Advanced Interpretation of Child Clinical
Cases

Three-day workshop presented to neuropsychologists by neuropsychologists emphasizing interpretation of difficult and complex neurological cases using

5

H003651

the Halstead-Reitan Neuropsychological Test Battery for Older Children and the Reitan-Indiana Neuropsychological Test Battery for Young Children. Cases were presented by the attendees and stressed evaluation skills, integration of clinical history and neurological findings, differential diagnosis, and determination of educational, treatment or rehabilitation needs for patient population of five through 14 years of age. APA-approved for 15 CEUs.

March 6-8, 1998                          National Assn. of Criminal Defense Lawyers

Three-day workshop discussing the necessary information from expert witnesses for the trier of fact in death penalty cases. Mitigation strategies and use of psychological data was included in the presentation. 22.8 CEUs.

June 19-21, 1997          Puzzling Cases: Advanced Interpretation Seminar

Three-day workshop presented to neuropsychologists by neuropsychologists emphasizing difficult and/or puzzling cases presented by peers and faculty using the Halstead-Reitan Neuropsychological Test Battery. APA-approved for 16 CEUs.

April 17-19, 1997                          Legal Applications of the HRB

Three-day workshop presented to neuropsychologists by neuropsychologists emphasizing consultation, testing, interpretation, and case preparation in legal situations using the Halstead-Reitan Neuropsychological Test Battery for Adults. Common and usual issues in clinical neuropsychological practice including depositions and trial work were discussed. APA-approved for 16 CEUs.

October 17-19, 1996          Advanced Interpretation of Child Clinical Cases

Three-day workshop presented to neuropsychologists by neuropsychologists emphasizing interpretation of difficult and complex neurological cases using the Halstead-Reitan Neuropsychological Test Battery for Older Children and the Reitan-Indiana Neuropsychological Test Battery for Young Children. Cases were presented by the attendees and stressed evaluation skills, integration of clinical history and neurological findings, differential diagnosis, and determination of educational, treatment or rehabilitation needs for patient population of five through 14 years of age. APA-approved for 17 CEUs.

April 16-20, 1996          Advanced Interpretation Adult Clinical Cases

Three-day workshop presented to neuropsychologists by neuropsychologists emphasizing interpretation of difficult and complex neurological cases using the Halstead-Reitan Neuropsychological Test Battery for Adults. Cases were

6

H003652

presented by the attendees and stressed evaluation skills, integration of clinical history and neurological findings, differential diagnosis, and determination of educational, treatment or rehabilitation needs for patient population of 15 and older. APA-approved for 17 CEUs.

April 10-12, 1996                    Defense and Evaluation of Brain Damage Claims

Three-day seminar presented to attorneys, insurance representatives, and neuropsychologists regarding the use of competent testimony and how to undermine the practice of incompetent providers of neuropsychological services.

November 2-5, 1995                    National Academy of Neuropsychology

                                      Annual

Meeting

Attended three-day workshop that involved participation in the following discussion sessions: syndrome specific assessment of head injury sequelae, and differentiating psychiatric from neurologic conditions. APA-approved for 6 CEUs.

August 6, 1995          Advanced      Workshop      in      Clinical Neuropsychology

One-day workshop presenting recent research in the areas of clinical assessment of malingering and discussion of the validity of age and education norms in the brain-damaged patient population. Principal presenter: Ralph Reitan, Ph.D. with Deborah Wolfson, Ph.D. APA approved for 6 CEUs.

June 21, 1995                    Annual    Neuro    Update-Research    Medical Center

One day workshop consisting of didactic presentations on current information on brain tumors, Parkinson's disease, and the use of the Gamma Knife in the obliteration of specific neoplasms, AVMs, and other bodies in the brain. Approved for 6.1 hours of CEUs.

May 25-27, 1995                    Cognitive and Behavioral Techniques and
                          Relationship Issues in the Treatment of Brain-Injured
Adults

Two and one-half day seminar consisting of didactic and experiential teaching methods regarding patient deficits in learning and routine living as a result of head injury and remediation of these deficits. APA-approved for 16.5 CEUs.

March 16, 1995                    Memory: A Seminar for Health Care Professionals

One-day seminar reviewing the neuroanatomical storage structure of memory and strategies on how to understand and improve its retention. Emphasis was

7

25

H003653

placed on learning disabilities, depression, amnesia, and Alzheimer's disease. APA-approved for 6 CEUs.

November 10-11, 1994                                Defense and Evaluation of Psychological                                                          and
Neuropsychological Injury Claims

Two-day seminar presented to attorneys, insurance representatives, and neuropsychologists regarding the use of competent testimony and how to undermine the practice of incompetent providers of neuropsychological and psychological services.

July 15-17, 1994                          Advanced      Workshop      in      Clinical
Neuropsychology

Participated in a three-day workshop presented by Drs. Ralph Reitan and Deborah Wolfson on Advanced Issues in Clinical Neuropsychology: Interpretation, Research, and Litigation. Participated in small groups and didactic lectures. APA-approved for 21 CEUs.

October 28-30, 1993                                      National Academy of
Neuropsychology

                                                            Annual
Meeting

Attended three-day workshop that involved participation in the following discussion sessions: neglected issues in forensic neuropsychology; cognitive changes associated with dementia, neurobehavioral aspects of non-Alzheimer patients, issues in interpretation of difficult cases using the Halstead-Reitan batteries, and advances in the detection of malingering on neuropsychological tests. APA-approved for 12 CEUs.

April 1-3, 1993                                West Coast Neuropsychology Conference

Attended three-day workshop that involved participation in the assessment and management of neuropsychological issues in children. Evaluations, interpretation, report writing and recommendations were presented. APA-approved for 14.5 CEUs.

November 5-7, 1992                                National Academy of
Neuropsychology

                                                            Annual
Meeting

Attended three-day workshop that involved participation in the following discussion sessions: corrections for Halstead-Reitan Norms (1991), frontal lobe impairments, malingering, estimation of premorbid IQ, psychotherapy in rehabilitation, and memory disorders. APA-approved for 12 CEUs.

September 4-6, 1992                                Workshop on Eating
Disorders

8

H003654

Attended three-day workshop entitled Eating Disorders: A Practical Clinical Update that involved participation and didactics on recent clinical updated information. APA-approved for 20 CEUs.

February 14-17, 1992                                    Seminar on Clinical Issues

Attended four-day workshop entitled "Identifying and Managing Consequences of Sexual Abuse" that involved participation in discussion of clinical issues for therapists. APA-approved for 18 CEUs.

October 31,                                            National Academy of Neuropsychology
November 1-2, 1991                                                          Annual Meeting

Attended three-day workshop that involved participation in the following discussion sessions: assessment of frontal lobe functioning, neuroimaging and neuropsychological assessment, clinical memory assessment, grand rounds, and driving advisement and neuropsychology. APA-approved for 12 CEUs.

July 19-21, 1991                                       Trauma and Dissociation Workshop

Participated in three-day workshop that focused on multiple personality disorder and post-traumatic stress disorder. The process of depersonalization and splitting from reality was a key issue. APA-approved for 21 CEUs.

March 22-25, 1991                                      Association for Advanced Training

Participated in four-day workshop geared toward continuing education and update of most recent research and education in the field of psychology. This workshop was done in preparation for licensure in additional state. APA-approved for 40 CEUs.

November 1-3, 1990                                     National Academy of Neuropsychology
                                                                          Annual
Meeting

Attended three-day workshop that involved participation in the following discussion sessions: computerized test interpretation, MMPI-II interpretation, assessment of malingering, ecological validity of neuropsychological assessment, and the forensic aspects of traumatic brain injury. APA-approved for 12 CEUs.

August 10-14, 1990                                     American Psychological Association
                                                                          Annual
Meeting

9

27

H003655

Attended five-day workshop that included a variety of topic discussions and participant-led conversations including assessment and treatment of borderline personality disorder, major and minor head trauma and impact on family, forensic work as a neuropsychologist, rational emotive therapy, marriage and family therapy issues and techniques, substance abuse assessment and treatment, and general issues regarding private practice development. APA-approved 12 CEUs.

August 6-7, 1990                                              Expert Witness
Seminar

Two-day workshop presented by Ralph Reitan, Ph.D. and associates covering the forensic skills needed to testify as expert witness on neuropsychological evaluation. APA-approved for 16 CEUs.

April 2-3, 1990                                       Rehabilitation Institute of
Chicago

Two-day workshop entitled "Psychological, social, and family consequences of traumatic brain injury." Involved in learning advanced principles of cognition, behavior, and new techniques in the treatment of brain injured patients. APA-approved for 13 CEUs.

November 2-4, 1989                                       National Academy of
Neuropsychology
                                                              Annual
Meeting

Participated in workshops in assessment of mild traumatic brain injury (adults and children); decision-making in the assessment of brain injury; current imaging techniques in neuropsychology; assessment of functional abilities of the head injured patient; and selected topics in forensic neuropsychology.
Approved for 12 CEUs.

July 23, 1989                                            Rational Emotive
Therapy
                                                            Refresher
Seminar

One-day meeting with Albert Ellis, Ph.D., for practitioners versed in Rational Emotive Therapy. In order to sharpen skills and discuss individual implementation of the approach.

June 9-11, 1989                                          University of
Minnesota
                                                  Continuing       Education
Seminar

Participated in three full-day meetings regarding assessment and rehabilitation of major and minor head trauma in children.

10

H003656

September 3-4, 1999                Violence Prediction: An Advanced Tutorial

A licensed psychologist presented this two-day workshop in order to assist in dangerousness prediction of patients. This information included prediction from the perspective of the practitioner, the common errors made in dangerousness prediction, the violence prediction decision tree, forensic distortion analysis, historical influences, triggering stimuli, and opportunity variables, graphing violence acceleration, and writing high impact dangerousness prediction reports.

October 29-30, 1997                National Academy of Neuropsychology

                                                     Annual

Meeting

Participated in full-day workshop on neuropsychological implications and assessment of substance abuse patients; half-day seminars included forensic neuropsychology and its contribution to legal community; contribution of neuropsychology to the assessment of medical disease; consulting practice to the community; and the Brain Electrical Activity Mapping (BEAM) technique.

October 27-29, 1996                National Academy of Neuropsychology

                                                     Annual

Meeting

Participated in full-day workshop on assessment and rehabilitation of major and minor head trauma; half-day seminars included forensic neuropsychology, and developing treatment plans for head-injury victims.

July 16-18, 1996                Advanced Workshop in Child Neuropsychology
                                                     and
Learning Disabilities
Participation in three full-day workshops involving advanced methods of assessing brain dysfunction and rehabilitation strategies for children. Principal presenter: Ralph Reitan, Ph.D.

June 18-20, 1996                Clinical Applications of Neuropsychology

Participation in three full-day workshops involving assessment and rehabilitation techniques for patients with documented minimal neurological deficits but who demonstrate significant neuropsychological findings. Populations included aging patients, medically complicated patients, and forensic cases. Principal presenter: Ralph Reitan, Ph.D.

May 9-11, 1996                Advanced Workshop in Head Injury

                                                     and

Rehabilitation

11

H003657

Participation in three full-day workshops involving assessment and rehabilitation strategies for patients with head injuries from a variety of sources. Extensive case review and techniques were presented. Principal presenter: Ralph Reitan, Ph.D.

May 2-4, 1986                                                    Basic Training
Workshop
                                                                Human
Neuropsychology

Participation in three full-day workshops involving the fundamental training in administration and interpretation of all Halstead-Reitan Test Batteries (including the Reitan-Indiana Test Battery for Young Children). Organization, methodological principles, and scoring considerations were discussed with extensive review of cases. Principal presenter: Ralph Reitan, Ph.D.

March 10-11, 1986                                    Developmental Disabilities
VIII

Two-day workshop held at Johns Hopkins University School of Medicine centered on neurological and behavioral aspects of disabled children and adults with emphasis on treatment.

March 7, 1986                                        Problem-Centered Therapy
Workshop

This eight-hour workshop focused on an integrative approach to psychotherapy utilizing existing treatment modalities in an eclectic and novel synthesis.

November 5, 1985                                    Professional Malpractice
Workshop

This eight-hour workshop was presented by an attorney to examine elements of mental health malpractice and its avoidance.

October 24, 1985                                          Mental Wellness
Conference

This eight-hour conference was sponsored by Tri-County Mental Health Center in seminar format to discuss with community leaders and pastoral officials the concern of mental health maintenance in community settings.

August 24, 1985                                Neuropsychological Diagnosis
Workshop                                                          American
Psychological Association
                                                                  Annual
                                                        Meeting

Full-day workshop focused on childhood problems that could be approached and treated via neuropsychological assessment and diagnosis. Treatment recommendations were stressed.

12

July 18, 1985                                    Borderline Personality Diagnosis
Seminar

Eight-hour seminar on the assessment, evaluation, and treatment of this
particular psychiatric diagnosis in adults and adolescents.

June 13, 1985                                    Psychiatric Emergency
Seminar

This four-hour seminar was presented with focus on acute medical and
psychological treatment for emergency intervention. Management approaches
to psychiatric emergencies and treatment strategies were discussed.

June 6, 1985                                     Learning Disabilities
Workshop

This six-hour workshop focused on learning disabilities in children, the
treatment and rehabilitation of same, and current modalities of
rehabilitation.

March 30 - April 3, 1985                         Current Topics
Workshop

This 50-hour intensive workshop was centered on current topics in psychology
and related area of specialty in preparation for the national licensure
examination.

February 27, 1985                                Cocaine and Alcohol
Workshop

This eight-hour workshop was presented by David Smith, M.D., as a means of
information for the diagnosis and treatment of patients with these specific
addictions.

February 14, 1985                                Endocrine
Seminar

This eight-hour seminar was presented for the purpose of assisting in
diagnosis and treatment of patients suffering with hormonal and glandular
dysfunction.

February 1-4, 1985                               Hypnosis
Workshop

Four-day workshop sponsored by Associate Trainers in Clinical Hypnosis on
basic through advanced skills in a variety of treatment situations.

October 1, 1984                                  Seminar on
Antipsychotics

13

H003659

Continuing education program covering the clinical use of anti-psychotic medication and the most efficacious schedules and administration of specific compounds.

August 27, 1984
Seminar
Association

Rational Emotive Therapy
American    Psychological

Annual
meeting

Full-day seminar on theory and practice of cognitive strategies in psychotherapeutic settings. Albert Ellis, Ph.D., and Robert Harper, Ph.D., moderators.

August 26, 1984
Seminar

Progressive Relaxation

Full-day seminar on advanced methods of progressive relaxation for use in a variety of therapeutic settings.    American Psychological Association. Annual meeting.

May 24-25, 1984
Workshop

Cognitive    Therapy

Two-day workshop to enhance clinical skills in basic and advanced applications of cognitive therapy through experiential and didactic exercises.

January 1983 - April 1984
Seminar

Neuropsychology

A seminar conducted by staff neuropsychologist to provide education and training in basic neuropsychology, use of the Halstead-Reitan Neuropsychology Test Battery, and diagnosis and treatment of head injury.

June 3, 1983
the
Patient

Behavioral Management of
Head Trauma

Workshop conducted by a neuropsychologist in practical techniques of behavioral management and rehabilitation strategies for the head trauma patient.    Emphasis was placed on interdisciplinary team/family treatment of the patient in hospital, home, rehabilitation, and vocational settings.

September 1982 - August 1983
Center

Kansas City V.A. Medical

Weekly clinical seminars conducted by licensed psychologists to discuss treatment modalities, current developments in the profession, and current articles in relevant journals.

14

H003660

June 1992 – August 1992                                      Advanced Practicum
Supervision

                                                            University          of
Missouri

Practicum consisted of supervising four master's level students.    Duties
included assessment of trainee's therapeutic skills, progress, caseload
management skills,—and treatment recommendations.

## RESEARCH ACTIVITY

September 1997 –                              Neuropsychology      Consulting
Services

Project involving a correlative study of demography, psychological, and
physiological assessments and their relationships to neuropsychological
findings.

September 1983 – April 1985                        Kansas City V.A. Medical
Center

Project was accepted by the Veterans Administration Hospital to examine
variables that correlated with post-traumatic stress disorder diagnosis in
Vietnam combat veterads and in an alcoholic population.  The examination was
performed with the use of both previously designed instruments and
instruments that were devised specifically for this project.

## WORKSHOP PRESENTATIONS

August 8, 2000                                Concentra     Managed     Care
Services

Presented a ninety-minute session composed of lecture and question-and-
answers from a panel of managers responsible for patient assessment,
evaluation, and referral to community-based health care providers.

January 10, 1997                              Missouri Society of CPAs

Two-hour presentation to 12 hourly and salaried workers.   Didactic and
audience participation styles were used to identify, clarify, and
demonstrate stress-producing behaviors.  Stress reduction measures were
taught to the participants for use in both personal and professional
situations.  Cognitive-behavioral therapy principles were taught in the
workshop.

October 16, 1994                                             Read Oven
Company

One and one-half hour presentation to 51 hourly and salaried workers.
Didactic and audience participation styles were used to identify, clarify,

15

and demonstrate stress-producing behaviors. Stress reduction measures were taught to the participants for use in both personal and professional situations.

July 24, 1994                                            Reed Oven
Company

One and one-half hour presentation to 45 hourly and salaried workers. Didactic and audience participation styles were used to identify, clarify, and demonstrate assertive communications skills and their development in both personal and professional situations.

February 23, 1994                                       Federal Reserve
Bank

Presented two one-hour sessions to hourly and salaried employees on subject of assertive communication skill development. Didactic lecture, discussion of individual case scenarios, and suggestions for homework assignments were given. Approximately 90 people attended the presentations.

June 7, 1993                                            Thomas J. Lipton Tea
Company

Two-and-one-half hour presentation on stress management to a group of approximately 45 first-tier and mid-range supervisors. Didactics and experiential exercises were used that involved identification of stress styles, reduction of stress, and assertive communication instruction.

January 15, 1993                                        O'Halloran, Wilson &
Key
                                                        Certified          Public
Accountants

Two-hour presentation on time and stress management in an office setting to certified public accountancy firm. Didactic lectures and experiential exercises were methods of instruction used.

May 29, 1992                                            Federal Reserve
Bank

Presented two 1 1/4 hour sessions to hourly and salaried employees of prospective EAP client company in which the topic of stress management was presented. Didactic lectures, discussion of individual case histories, and suggestions for individual stress reduction were given in this workshop. Approximately 54 employees attended the presentation.

December 21, 1993                                       O'Halloran, Wilson &
Key
                                                        Certified          Public
Accountants

16

H003662

Two-hour presentation on time and stress management in an office setting to certified public accountancy firm. Didactic lectures and experiential exercises were methods of instruction used.

December 13, 1990                                                    Mobay Chemical
Company

Presented 1 3/4 hour session to hourly and salaried employees of EAP client company in which the topic of assertive communication style was presented. Didactic lectures, role-playing, and discussion were used in this workshop. Approximately 25 employees attended the presentation.

November 13, 1990                                                   Mobay Chemical
Company

Presented 1 3/4 hour session to hourly and salaried employees of EAP client company in which the topic of stress management was presented. Didactic lectures, discussion of individual case histories, and suggestions for individual stress reduction were given in this workshop. Approximately 25 employees attended the presentation.

March 6, 1990                              Mental Health Association of Johnson
County

Presented two-hour session composed of didactic lecture and experiential exercises in which the topic of assertive communication was discussed. Approximately 30 attendees from the Kansas City Depressive/Manic Depressive Support Group.

February 16, 1990                            Missouri Association of Trial
Attorneys

                                                                          Annual

meeting

Presented "Identifying brain injury in the soft tissue case" in program entitled "Soft Tissue Diagnostics and Evaluation." Other faculty members were plaintiff and defense counsel and physicians. Discussed salient points of neuropsychological evaluation and how such information could be invaluable in forensic arena.

December 14, 1989                                                    Mobay Chemical
Company

Presented two 1 3/4 hour sessions to hourly and salaried employees of the client company in which the topic of assertive communication style was presented. Didactic lectures, role-playing, and discussion were used in this workshop. An average of 13-15 employees attended each presentation.

November 16, 1989                                                   Mobay Chemical
Company

17

H003663

Presented two 1 3/4 hour sessions to hourly and salaried employees of EAP client company in which the topic of stress management was presented. Didactic lectures, discussion of individual case histories, and suggestions for individual stress reduction were given in this workshop. An average of 15-18 employees attended each presentation.

September 29, 1989                                    Magazine, Lerner &
Company
                                                     Certified        Public
Accountants

Two-hour presentation on assertive communication in an office setting to certified public accountancy firm. Didactic lectures and experiential exercises were methods of instruction used.

April 6, 1989                         Mental Health Association of Johnson
County

Presented two-hour session composed of didactic lecture and Experiential exercises in which the topic of assertive communication was discussed. Approximately 45 attendees from the Kansas City Depressive/Manic Depressive Support Group.

October 1, 1988-                                   Kansas City Veterans
Administration
September 30, 1989                                            Medical
Center

Was appointed as psychology consultant for the purpose of presenting lectures to interns. Presentations were didactic and included the practice of cognitive therapy as well as the practice of neuropsychological evaluation in a private practice setting.

December 2, 1988                                    Magazine, Lerner &
Company
                                                     Certified        Public
Accountants
Two-hour presentation to certified public accountancy firm on stress management techniques and implementation of same on daily basis. Didactic lecture and role-plays were methods utilized.

August 18, July 21                                       Mobay Chemical
Company
and May 19, 1988

Presentation to hourly and salaried employees of EAP client company in which the topic of assertive communication style was presented. Didactic lectures, role-playing, and discussion were the methods used in this workshop. An average of 15-18 employees attended each presentation.

July 21, June 16, and                              Mobay        Chemical
Company

19

36

H003664

May 19, 1988; November 11, 1987

Presentation to hourly and salaried employees of EAP client company in which the topic of stress management was presented. Didactic lectures, discussion of individual case histories, and suggestions for individual stress reduction were given in this workshop. An average of 15-18 employees attended each presentation.

September 11, 1987                                          Reed Oven Company

Presentation to 45 hourly and salaried workers of prospective EAP contract in which the topics of chemical abuse and psychological outpatient treatment were discussed.

June 19, 1987                                          Kansas    Head    Injury
Association
        Seminar

Presentation to 75 physicians, attorneys, and family members in seminar entitled "Traumatic Head Injury: Cause, Consequence, and Challenges to the Legal Community." Scope of material presented involved specific aspects of brain damage and head injury as well as what could be expected as a consequence of head trauma.

July 14, 1986                                          Western Missouri Mental Health Center

Inservice

Presented advanced techniques in neuropsychological assessment to psychology interns in a roundtable format. Presented case studies and discussed methods of arriving at accurate diagnosis and rehabilitation strategies.

January 10, 1986                                          Personal injury attorney
group

Presented to invited personal injury attorneys regarding the background and viability of neuropsychological assessment and its interface with the legal system. Involved creation and presentation of didactic material and handouts.

November 15, 1985                                          Tri-County Mental Health
Center
    Inservice

Presentation of material regarding specific applications of mental health professional malpractice avoidance. Seminar format was used after presentation of materials in order to discuss individual concerns.

September 11, 1984                                          Tri-County Mental Health Center
Advisory Council

19

37

H003665

Presentation of the theory and practice of cognitive psychotherapy in clinical settings to the 17-member council of the mental health center.

July 12 - July 19, 1984                                    Tri-County Mental Health Center
  Inservice

Presentation was made in two segments to the clinical staff of the center. Instruction was given in the use of cognitive therapy techniques with different patient populations.

1982 - 1983                                    Kansas City V.A. Medical Center
                                               Training in Individual and
Group                                                              Effectiveness
Resources

Workshop was presented two times per year to new employees of the V.A. Medical Center including topics of communication skills, problem-solving techniques, assertiveness training, and stress management.

1982 - 1983                                    Kansas   City   V.A.   Medical Center                                                              Advanced
Supervisory Training

Workshop was presented two times per year to supervisory level personnel at the V.A. Medical Center including topics of leadership styles, communication skills, delegation of responsibility, office efficiency materials, and assertiveness training in the work setting.

December 5, 1982                                    Saint Mary's
Hospital

Developed and presented instruction and training in counseling and interpersonal communication with difficult patients, e.g., seriously ill, excessively demanding, etc.

September 1982 - December 1982                                    Saint James
Church

Developed and presented training in assertiveness skills, communication skills, and problem-solving techniques to religious and lay groups.

## PUBLICATIONS

Cowan, D. G., Ed.D. and Briggs, R. A., Ph.D. "How the defense can use neuropsychological assessment." For The Defense 32, (5), May, 1990.

Briggs, Robert A.  "Combat level and family support:  Correlates   of post-Vietnam adjustment." Doctoral dissertation. April, 1983.

20

H003666

## LICENSURE

Licensed as a Psychologist, State of Arizona. 1998 (# 3262)

Licensed as a Psychologist, State of Kansas. 1997 (# LP-950)

Licensed as a Psychologist and Certified as a Health Service Provider, State of Missouri. 1985 and 1993, respectively. (# PY01164)

## MEDICAL CENTER AFFILIATIONS

Member, Allied Staff, Paradise Valley Hospital
Member, Affiliate Staff, Samaritan Behavioral Healthcare - Scottsdale
Member, Allied Staff, Good Samaritan Hospital (pending)

## ACADEMIC APPOINTMENTS

Clinical Adjunct Training Faculty, Arizona School of Professional Psychology

## ORGANIZATIONS

Member, National Academy of Neuropsychologists
Member, American Psychological Association (APA)
Member, APA Division 40 (Clinical Neuropsychology)
Member, National Register of Health Service Providers in Psychology
Diplomate, Board Certified Forensic Examiner, American Board of Forensic
    Examiners
Fellow, American College of Forensic Examiners
Member, Arizona Psychological Association
Member, Missouri Psychological Association

## HONORS

Elected member-at-large of executive committee. Greater Kansas City Psychological Association. 1990, 1991.

Elected treasurer of Greater Kansas City Psychological Association. 1988, 1989.

Cited for merit as chairperson of committee working toward APA-accreditation of the University of Missouri-Kansas City counseling psychology program. 1981-82.

Cited for merit for work accomplished on volunteer basis for Concerned Care, Inc., in individual and group treatment settings with mentally retarded and developmentally disabled adults, children and their families. 1980-81.

Cited for merit by the State of Missouri for work performed in committees as regional supervisor. 1978.

21

39

## HOBBIES

Scuba diving and other participatory sports, playing piano, photography, and collecting original art, especially pottery.

## REFERENCES

Full references will be furnished upon request.

22

H003668

# EXHIBIT H

H003669

TIME **FILED**

NOV 20 1998

LINDA SEAPY
CLERK SUPERIOR COURT
DEPUTY

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MOHAVE

THE STATE OF ARIZONA, ) CAUSE NO. CR-96-865

Plaintiff, ) HONORABLE STEVEN F. CONN

vs. ) DIVISION III

ROBERT ALLEN POYSON, )

Defendant. )

## PRESENTENCE INVESTIGATION

**PRESENT CHARGE**:

Count I: Conspiracy to Commit First Degree Murder, a Class 1 Felony, all in violation of ARS 13-1003, 13-1105, 13-604, 13-701, and 13-801;

Count II: Murder in the First Degree, a Class 1 Felony, all in violation of ARS 13-1105, 13-604, 13-703, 13-701, and 13-801;

Count III: Murder in the First Degree, a Class 1 Felony, all in violation of ARS 13-1105, 13-604, 13-703, 13-701, and 13-801;

Count IV: Murder in the First Degree, a Class 1 Felony, all in violation of ARS 13-1105, 13-604, 13-703, 13-701, and 13-801;

Count V: Armed Robbery, a Class 2 Felony, all in violation of ARS 13-1904, 13-604, 13-701, and 13-801;

1

H003670

ROBERT ALLEN POYSON                              CAUSE NO. CR-96-865


The defendant lists an extensive work history and at the present time is unemployed due to his incarceration in the Mohave County Jail.  He describes his occupation as a kitchen worker.  The defendant lists no assets and no debts.

The defendant states his health is good and lists no forms of disability, nor is he taking any prescription medications at this time.  The defendant however states he suffers from impulsive conduct disorder, which was diagnosed at the age of thirteen.  He also states he talked to a psychiatrist at that time in Elko, Nevada.

The defendant, at the time under advisement of counsel, would not answer any questions on his substance abuse history or juvenile record.

STATEMENT OF VICTIM:

Please see attached statements from the family of the deceased.

On April 9, 1998, this officer telephoned Elliot Kagen, the husband of the deceased, Leta Kagen, and was notified the telephone number given to the Mohave County Attorney's Office had been disconnected.

On April 13, 1998, this officer spoke to Elmer Wear, the father of victim, Roland Wear. Mr. Wear stated the whole family would be at the sentencing and that some of them will make statements at that time.  The Wear's also request $2,000 in funeral and travel expenses due to their son's murder.

Also on the above date, this officer spoke to Elma Delahunt, the grandmother and legal guardian of victim, Robert Delahunt.  Ms. Delahunt stated the situation has torn her family apart.  Robert's younger brother, a straight-A student, is failing

10

43

**ROBERT ALLEN POYSON**                                    **CAUSE NO. CR-96-865**

all his classes and has a "who cares" attitude.    Robert's father, Robert, Sr., has just been released from a mental institution and has not been able to deal with his son's death.    Her final comments on the defendant's were that she "didn't care if they lived or died, as long as they were never out on the street again."

**RESTITUTION:**

Ms. Delahunt indicated Robert, Sr. had paid for his son's expenses, but asked this officer not to contact him.    She estimated the loss at between $1,000 and $2,000.    Elmer Wear stated his daughter, Joyce, Roland's sister, took care of the his son's arrangements, incurring $2,000 in expenses.

**STATEMENT OF INTERESTED PARTIES:**

On April 9, 1998, this officer spoke with Det. Cooper of the Mohave County Sheriff's Office, who stated his only comment was really two words, "death penalty".    He stated the murders were so brutal that these defendants definitely deserve the death penalty. He stated he has no sympathy for any of them and since Lane cannot get the death penalty, natural life is the next best thing.

**COMPANION ACTION:**

Frank Anderson was convicted of similar charges and was sentenced to the death penalty.    Kimberly Lane was also convicted of similar charges and was sentenced to life without parole until 25 years has been served.

11

44

H003672