# EXHIBIT 8

# EXHIBIT 8

ORIGINAL

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MOHAVE

TIME FILED
JUL 2 6 2001
VIRLYNN TINNELL
BY: CLERK SUPERIOR COURT
DEPUTY M

STATE OF ARIZONA,          )
                          )
            Plaintiff,    )    1 CA-CR 98-0508
                          )
    vs.                   )    Cause No. CR-96-1057
                          )
KIMBERLY LYNN LANE,       )    JURY TRIAL - VOLUME VI
                          )
            Defendant.    )
_____)

Before the Honorable Steven F. Conn, Judge

Tuesday, May 26, 1998
9:40 a.m.
Kingman, Arizona

DIVISION 1
COURT OF APPEALS
STATE OF ARIZONA
FILED
NOV 1 8 1998
GLEN D. CLARK, CLERK
By

Reporter's Transcript of Proceedings

Appearances:

    For the State:          Derek Carlisle
                            Deputy County Attorney
                            315 North 4th Street
                            Kingman, Arizona 86401


    For the Defendant:      Larry S. Rosenthal
                            Mohave County Legal Defender

                            Eric J. Engan
                            Deputy Legal Defender
                            313 Pine Street
                            Kingman, Arizona 86401

Reported by:  Sandra R. Brice, Official Reporter

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

SCANNED

PD PCR Anderson 019224

# I N D E X

DEFENSE WITNESSES:                                              PAGE

KIMBERLY LANE

Continued Direct Examination by Mr. Engan                        16

Cross-Examination by Mr. Carlisle                               19

Redirect Examination by Mr. Engan                               65

Recross-Examination by Mr. Carlisle                            91


CHERYL L. KARP, Ph.D.

Direct Examination by Mr. Rosenthal                             99

Cross-Examination by Mr. Carlisle                              118

Redirect Examination by Mr. Rosenthal                         150


CHARITY ANZALONE

Direct Examination by Mr. Engan                                153

Cross-Examination by Mr. Carlisle                              162


DAVID C. STARR

Continued Direct Examination by Mr. Engan                      165

Cross-Examination by Mr. Carlisle                              168

Redirect Examination by Mr. Engan                              170

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019225

3

<u>E X H I B I T S</u>

|  | <u>FOR ID</u>. | <u>IN EVD</u>. |
|---|---|---|
| State's Exhibit Number 73 | 46 | 46 |
| State's Exhibit Number 74 | 46 | -- |
| State's Exhibit Number 75 | 47 | 48 |
| State's Exhibit Number 76 | 126 | -- |

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019226

(The proceedings resumed following the taking of the weekend recess.)

(The following was held out of the presence of the jury.)

THE COURT:  Thank you.  Be seated.

This is a continuation of CR-96-1057, State versus Kimberly Lynn Lane.  Show the presence of the Defendant, Counsel and the absence of the jury.

I understand there is a matter that we need to address on the record concerning a letter possibly written by the Defendant possibly to Mr. Anderson that has been disclosed some time during the trial.

And I believe, Mr. Engan, that it is essentially your request to preclude any use of the letter so why don't you go ahead and place your request on the record at this time.

MR. ENGAN:  Thank you, your Honor.

As we briefly discussed in Chambers, Mr. Carlisle gave us the letter about lunchtime on Friday.  He said he didn't have it until somewhere in the vicinity of a day or two of that time.

It is a letter that is addressed simply Frank.  There is no envelope.  Apparently the original is not available or -- I am not sure why but even the State only apparently has a xerox of it.  It is dated Wednesday, March 25th and, basically, it is kind of a chatty, how are you doing,

PD PCR Anderson 019227
SCANNED

affectionate letter directed to this individual by the name of Frank and it is signed lots of love and respect Pee Wee.

It is obvious that the State purports to introduce this as rebuttal to Miss Lane's testimony that I can take or leave Frank. I don't care for him. I was really trying to get rid of him.

Since we have learned of this letter, we have done some investigation as to its origin and so forth. It turns out it was written by Miss Lane. It was addressed to a person named Frank Reynaga. Frank Reynaga is some relatively minor offender who was incarcerated in the annex. Apparently he did a ninety-day sentence. I don't know what the offense was for but Kim met him in November and was attempting to communicate with him.

I don't know how the State came in custody of this letter. Clearly, if the envelope was available it probably would say Frank Reynaga.

Another subject that does not necessarily apply to Kim Lane but that I need to address is that Mr. Rosenthal did represent Mr. Reynaga. We would like to find him and put him on the stand but that clearly calls some conflict problems in question because Mr. Rosenthal would be put in the position of examining an ex-client of his on the stand in this case after previously representing him -- Mr. Reynaga -- in a previous case.

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019228

So that, first of all, it was not timely disclosed.  It is not what it purports to be or what the State believes it is; namely, a letter to Frank Anderson.  And we submit that it would require us to put on evidence as to the actual intended recipient of that letter that would raise a conflict question that we believe is a side issue that actually would be disruptive to the proceedings and turn the jury's attention from the real issue here which is the guilt or innocence of Miss Lane.

THE COURT:  Response, Mr. Carlisle?

MR. CARLISLE:  Your Honor, with respect to the timeliness issue, I just received a copy of the letter earlier in the week.  I believe Wednesday or Thursday.  I was not aware of its existence and so I didn't have it before then.  I also didn't know what Miss Lane was going to testify to on the stand.

As Mr. Engan indicated, it is basically just a letter that expresses a great deal of affection for Frank and, you know, throughout the interview she always said that she cared for him so I thought that it was interesting that she would get on the stand and say now she doesn't care for him or that she never really did but -- so I didn't have any idea that if I had received the original why that would have been useful at all or that would have any kind of meaning at all.

And with respect to the issue Mr. Engan addressed, I

PD PCR Anderson 019229

think that Miss Lane can obviously testify that it was some Frank other than Anderson, you know, and I since all I have is the letter, I am not sure how I could rebut that. I don't have the envelope. I don't know how the jail received it beyond that so that's just the information that I have.

THE COURT: And, Mr. Carlisle, how did you go about receiving this letter? Did you receive it from the jail?

MR. CARLISLE: Yes.

THE COURT: All right. Mr. Engan, anything further on the letter?

MR. ENGAN: Your Honor, not knowing how you are going to rule, we would like time to find Mr. Reynaga and produce him to help explain his position in this and whether he and Miss Lane actually enjoyed some type of friendly relationship.

I would also point out again in reading the entire letter that there are a couple things in here that would lead one to believe that it is Frank Reynaga and not Mr. Anderson. It talks about getting out of jail and that it has been three months since some sort of event between them. I don't know if that was a meeting or what. As far as I know, the jail has been very diligent in keeping Miss Lane away from both Mr. Anderson and Mr. Poyson the entire time that she's been over there and there has not been any communication that I am aware of. I am not certain that they would allow that.

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019230

When it refers to people getting out, I know she knows that Frank Anderson is not going anywhere and that clearly tends to be more corroborative of the fact of it being Mr. Reynaga as we indicated.

But the bottom line, your Honor, is if you allow the State to use this, we will need some time to attempt to produce Mr. Reynaga and clarify their relationship on the stand.

THE COURT: Well, this raises some interesting issues. I was kind of under the impression that Ms. Lane was kept away not only from Mr. Poyson and Mr. Anderson but from every other adult in the main Mohave County Jail and it would be hard for me to imagine that -- and we already heard testimony about her communicating to someone through an air vent and normally, I would think that that would not be the kind of relationship that one would form with someone without having seen them. And knowing that there is that person that you know only because they are incarcerated in the Mohave County Jail, normally I would think that that would not be the foundation for a lasting relationship or -- or some sort of affectionate relationship.

And it occurs to me that the State might have a legitimate argument that if the Defendant is able to form this sort of emotional attachment with someone she met in jail that she presumably didn't have much contact with, maybe

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019231

she is not the person that could be taken advantage of by Poyson and Anderson as she has essentially portrayed herself on the stand.

I have concern more than that with the discovery aspect of this.  It sounds to me as if Mr. Carlisle has disclosed this letter in a timely manner but I have concern as to whether the letter was disclosed to him in a timely manner and I just don't think that it makes for a good presentation of a case either for the State or the Defense to have stuff coming in in mid-trial that is going to create obvious problems for both sides to react to.

And I know we still have this videotape issue that I need to rule on but I am really convinced that the letter has not been disclosed in a timely manner and, again, that is by the State which includes the sheriff's office and it is ordered precluding the State from being allowed to use the letter in evidence.

Counsel, is there anything further we need to discuss on the record --

MR. CARLISLE:  Your Honor --

THE COURT:  -- just while we are in here?

MR. CARLISLE:  I am sorry.  I thought you were through talking.

There are two other things I want to bring up.  One, I would move to preclude the videotape.  That wasn't disclosed

PD PCR Anderson 019232

to me until Monday of the trial. Also, I don't think it is relevant.

And, second, I would move for a motion in limine to preclude all the witnesses that are going to testify later from Lancaster from testifying about any prior bad acts of either Cecil Lane or Frank Anderson or any reputation testimony with respect to Frank Anderson. The defenses that are listed in the notice of defenses are good character -- obviously, they can testify about good character -- coercion, duress and like mistake of fact and --

THE COURT: Let me just interrupt you for a second. Let's take these up one at a time.

I understand that that is a videotape that was made of the trailer park and its surroundings.

What would be the Defense's response to the oral motion to preclude the videotape?

MR. ENGAN: Your Honor, we concede to the State that we did not disclose that immediately and that was simply an oversight. This is a fairly complicated case. There are a lot of component pieces that were disclosed at one time or another by either side.

We shot this tape some time in early April. We had problems copying it. Eventually we did copy it and disclose it to Mr. Carlisle as he said a week ago Monday so I agree it was not timely disclosed. However, I don't believe the State

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019233

has shown any prejudice as a result of the late disclosure.

What the tape is, again, essentially is kind of a tour from inside a vehicle where the person shooting the video -- Mr. Williams -- drives around the park just to give an idea of what the park is like, what the surroundings are like in order to show the isolation of the Lancaster Trailer Park.

And then Mr. Williams takes us inside the trailer nearby Mr. Lane's -- Cecil Lane's house where Kim and her brother stayed and shows the room she was in and the way the trailer was set up and so forth.

It just serves to illustrate the type of testimony that we are presenting regarding the isolation Kim felt and how she felt she really didn't have much alternative than to leave Lancaster due to the sad state she found herself living in there and we would ask the Court not to preclude this but to allow us to introduce it by one of our Lancaster witnesses to show what we believed was the living conditions Kim found herself in in Lancaster.

THE COURT:  I can't see any legitimate reason to hold you to some lesser standard than I already indicated that I was going to hold the State to.  I think this is something that certainly could have been disclosed prior to the trial.

It is ordered precluding the Defense from using the videotape of the trailer park.  Certainly that doesn't

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

SCANNED

PD PCR Anderson 019234

preclude any of the witnesses from giving a description that might be tantamount to the videotape.

And then your other request, Mr. Carlisle -- I know I sort of cut you off in the middle of it -- that was a request to preclude people from testifying about prior bad acts of either Cecil Lane or Frank Anderson?

MR. CARLISLE:  That's correct, your Honor.

THE COURT:  Anything more you want to add on that?

MR. CARLISLE:  Well, just the notice of defenses listed were coercion, duress and/or good character. Obviously, the Lancaster witnesses can testify about that but I don't think that they should be allowed to testify about prior bad acts because -- because of the rules of criminal procedure and rules of evidence.

THE COURT:  And do you know what specific prior bad acts it is that you are asking me to preclude?

MR. CARLISLE:  Well, I think that any evidence of Cecil Lane abusing or committing child abuse on Kim Lane, any reputation evidence about Frank Anderson being a child molester, any -- I guess that would be the two primary things.  I guess simply evidence of Cecil Lane using marijuana would also be a prior bad act.

THE COURT:  All right.  What would be the Defense's response?

MR. ENGAN:  Your Honor, first, I would point out

PD PCR Anderson 019235

that Cecil Lane is not on trial here so that introducing prior bad acts is not being offered for any purpose against him. The only thing we are calling the Lancaster witnesses for is to testify as to their direct observations of the way Kim was treated by her immediate family within the trailer park and how they in turn treated Kim when they encountered her. Therefore, we will directly show evidence that Cecil Lane has, in fact, physically abused Kim and that he has been involved in drug use and essentially was a very poor father. That's the impression we wish to leave with the jury. We are not bringing things up to implicate him. Just the sole purpose for doing that -- really, the reason we are doing that is to again reflect the environment Kim was in while residing in the trailer park.

As to reputation evidence, I don't intend to ask that. In fact, I will tell my witnesses that they are not to comment on the reputation of Mr. Anderson as being a child molester or anything of that matter but only their direct observations of things they have seen with own eyes or heard with their own ears. That would be the subject of that testimony.

THE COURT: Mr. Carlisle, anything further on that?

MR. CARLISLE: No, your Honor.

THE COURT: Well, as to Frank Anderson's reputation as being a child molester, I think that's already pretty much

PD PCB Anderson 019236

SCANNED

been established from the Defendant's testimony. I guess as to what, if any, reputation testimony that he molested some other person, I really don't think there is any way that would be relevant and it sounds as if the Defense isn't going there anyway.

As far as the eye witness testimony as to how Cecil Lane treated the Defendant, I believe that that would be relevant because it is not being offered to necessarily prove that Cecil Lane is a bad person. It is being offered to explain why the Defendant did certain things that she did and why she didn't do things that might have seemed to have been options that were available to her and I really don't see any impropriety in allowing witnesses to testify either that they saw Cecil Lane abuse the Defendant or that they saw Cecil Lane using illegal drugs.

I would not be allowing reputation or hearsay type evidence. So, anyone who has eye witness testimony about such things will be allowed to testify as to Cecil Lane. They're not allowed to testify about hearsay or reputation and no one will be allowed to testify about reputation evidence concerning Frank Anderson.

Do Counsel need any more clarification on that order?

MR. ENGAN: No, your Honor.

MR. CARLISLE: No.

THE COURT: All right. Anything further to put on

PD PCR Anderson 019237

the record before we resume?

MR. CARLISLE:  Not from the State, your Honor.

THE COURT:  Let's take about a one minute break just so we can get the jury in here and then we will get started again.

(There was a break in the proceedings from

9:57 a.m. until 10:00 a.m.)

(The following was held in open court.)

THE COURT:  Thank you.  Be seated.

This is a continuation of CR-96-1057, State versus Kimberly Lynn Lane.  Show the presence of the Defendant, Counsel and the presence of the jury panel.

And I believe that we are still on direct examination of the Defendant.

You may proceed, Mr. Engan.

MR. ENGAN:  Thank you, your Honor.

Thereupon --

KIMBERLY LANE,

the witness on the stand at the time of the taking of the weekend recess, resumed the stand and testified further as follows:

. . . . . . . . . .

. . . . . . . . . .

. . . . . . . . . .

PD PCR Anderson 019238

CONTINUED DIRECT EXAMINATION

BY MR. ENGAN:

Q.   Kim, you were present -- you've been present throughout the whole trial; right?

A.   Yes.

Q.   And were you present when Robert Hunter testified?

A.   Yes.

Q.   Did you recognize Robert Hunt?

A.   Uh-huh.

Q.   Where did you recognize him from?

A.   The jail.

Q.   And what was his job there?

A.   He was a guard.

Q.   So, did you see him fairly frequently while you were in there?

A.   Yeah.

Q.   Okay.  And you heard him testify; right?

A.   Yeah.

Q.   Okay.  And I believe he said that you were at one point inside medical fifteen down here; is that right?

A.   Yes.

Q.   And that's a cell you remember being in --

A.   Uh-huh.

Q.   -- inside of at one time or another?

A.   Yeah.

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019239

Q. Okay. And he testified regarding a conversation that you supposedly had with someone; right?

A. Yeah.

Q. Do you remember having a conversation like that?

A. Yeah.

Q. Who were you talking to?

A. Danny Miller.

Q. Who is Danny Miller?

A. He was the person in this room right here.

Q. And what did you say about blood on the wall?

A. Well, I was going to move in this room. Before me -- the girl in there, Christine Maynard, had wiped blood on the wall.

Q. This is in fifteen?

A. Yeah. And the wall had been cleaned when I got put in there and I was asking about it and he told me that Christine Maynard wiped blood on the wall.

Q. And that's what you were referring to when you talked to him that day?

A. Yeah.

Q. And that was State's 66. I don't think I properly introduced the exhibit.

Kim, did you kill Robert Delahunt?

A. No.

Q. Did you knowingly participate in a plan to kill

PD PCR Anderson 019240

Robert Delahunt?

A.  No.

Q.  Did you kill Leta Kagen?

A.  No.

Q.  Did you knowingly participate in a plan to kill Leta Kagen?

A.  No.

Q.  Did you kill Roland Wear?

A.  No.

Q.  Did you knowingly participate in a plan to kill Roland Wear?

A.  No.

Q.  So, did you ever talk with Frank Anderson and/or Bobby Poyson about making plans to kill these people knowing that is what the intent was?

A.  No.

Q.  Did you rob Roland Wear and take his keys from him?

A.  No.

Q.  Did you rob Roland Wear and take his truck?

A.  No.

MR. ENGAN:  I have no further questions.  Thank you.

THE COURT:  Cross-examination, Mr. Carlisle?

. . . . . . . . . . .

. . . . . . . . . . .

. . . . . . . . . . . .

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019241

SCANNED

CROSS-EXAMINATION

BY MR. CARLISLE:

Q. The reason that Robert Delahunt, Leta Kagen and Roland Wear were killed was to steal Roland Wear's truck; is that right?

A. Later they told me that.

Q. And the reason that truck was stolen was to go to Chicago?

A. Yeah.

Q. Okay. You didn't like it in Lancaster where you were living before you ran away?

A. No, I didn't.

Q. It was messy?

A. That's not the reason I didn't like it.

Q. But, that's one of the things you described --

A. Yeah.

Q. -- it being messy and you were sick of living in the trailer that you lived in?

A. It was mainly my father the reason I didn't like it.

Q. And when you left, you packed several items; is that correct?

A. Yeah.

Q. You packed them into this blue backpack?

A. No.

Q. That was a different blue backpack?

PD PCB Anderson 019242

A.  No.

That one you showed me?

Q.  Yeah.

A.  Yeah.  That's a different one.

Q.  Okay.  You packed your watch?

A.  Yeah.

Q.  Your brother had moved out; is that right?

A.  Yeah, about -- about a month and -- month, two months before that.

Q.  And he went to live with your mom?

A.  Yeah, he was living with my mom.

Q.  You lived with your mom at one point in time?

A.  Yeah.

Q.  Before you moved back to Lancaster?

A.  Yeah.

Q.  And you didn't move back to live with your mom?

A.  No.

Q.  The reason you didn't move back to live with your mom was because you had falsely accused your stepfather of sexually molesting you; is that right?

A.  Yeah.

Q.  You accused him but it wasn't true?

A.  Yeah.

Q.  When you got to Golden Valley you didn't like Golden Valley either?

PD PCR Anderson 019243

SCANNED

21

A.  No.

Q.  You wanted to leave?

A.  Yeah.

Q.  You wanted to go to Chicago?

A.  Yeah.

Q.  When you were in Golden Valley, you thought Frank Anderson was going to try to get a job to get up enough money so you could keep going?

A.  Yeah.

Q.  So that meant you were going to stay in Golden Valley for quite a while?

A.  Well, I didn't know of Golden Valley.  When I was in Las Vegas he said knew somebody in Kingman and that was intention of coming down here to Kingman.

Q.  So, once you got to Golden Valley though you were going into Kingman during the day; right?  You went to Kingman a couple different times?

A.  Yeah.

Q.  So that you knew you would have to stay there for a while?

A.  I don't -- I don't know.

Q.  And you thought you would have everything you wanted in Chicago?

A.  Yeah.

Q.  That included living in a big house?

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019244

22

A.   Yeah.

Q.   Having somebody to take care of you?

A.   Uh-huh.

Q.   You wanted to go to Chicago?

A.   Yeah.

Q.   And all this was going to be provided to you as a goddaughter of the Mafia?

A.   Yeah.

Q.   So, in your mind the Mafia was a good thing.  They were going to be helping you?

A.   This was part of the Mafia.  Frank was supposed to be the godfather next and he was mainly supposed to provide me with all that.

Q.   But you thought even before that the person that was the godfather then was going to adopt you as a goddaughter; is that right?

A.   Yeah.

Q.   And you understood that the godfather ruled over people that sold drugs?

A.   I didn't know that until later on.  At that time when I talked -- well, Frank told me about him.  I thought somebody that was going to help us.  I didn't hear anything bad about the Mafia until later on into our journey.

Q.   You said Vince was part of the Mafia?

A.   I didn't know that until awhile after I left home.

SCANNED

PD PCR Anderson 019245

Q.   But you knew that before you went to Golden Valley?

A.   Yeah.

Q.   You knew that before talking about going to Chicago?

A.   No.

Q.   You didn't know that before talking about going to Chicago?

MR. ENGAN:  Objection; asked and answered.

THE COURT:  Overruled.

You can answer the question.

THE WITNESS:  Are you talking before getting to Golden Valley?

Q.   (BY MR. CARLISLE)  No.  I am talking about when you first made plans to go to Chicago.  When you first wanted to go to Chicago, you knew Vince was part of the Mafia?

A.   Yeah, but I didn't really hear much about him.

Q.   You knew Vince sold drugs?

A.   Yeah.

Q.   And part of the Mafia was involved with prostitution?

A.   Yeah, but I didn't learn that until later on.

Q.   Until after you got to Chicago?

A.   Yeah, I started learning about the Mafia.

Q.   But you didn't think that you would have to sell drugs?

A.   No.

Q.  Did you think that you would have to prostitute?

A.  Frank had brought it up two times but -- that's when we hit Chicago but I talked him out of it.

Q.  Both times you said no?

A.  I did, yeah.

Q.  Okay.  So, you didn't think you would have to prostitute?

A.  No, I didn't.

Q.  You were interviewed by Eric Cooper?

A.  Yeah.

Q.  You were interviewed by Jeff Hedrich?

A.  Yeah.

Q.  You were interviewed by Dave Hawkins?

A.  Yeah.

Q.  You never told any of these three people that Frank wanted you to prostitute; is that correct?

A.  When -- well, that's correct but when Dave Hawkins interviewed me, I wasn't supposed to talk about that.

Q.  Now, when you talked to Jeff Hedrich --

A.  Uh-huh.

Q.  -- you thought he was there to assist you and help you; is that right?

A.  Yeah.

Q.  And he was a police officer?

A.  Yeah.

PD PCR Anderson 019247

Q.   He was very friendly?

A.   Uh-huh.

Q.   Trying to help you in your mind?

A.   Yeah.

Q.   And you didn't ever mention to him that Frank wanted you to prostitute?

A.   Yeah, I didn't mention to him.

Q.   And, in fact, the whole goal in getting to Chicago was to be part of the Mafia in Chicago?

MR. ENGAN:  Objection; asked and answered.

THE COURT:  Overruled.

You can answer the question.

THE WITNESS:  Yeah.

Q.   (BY MR. CARLISLE)  So, you weren't running away from the Mafia.  You were running to the Mafia; is that correct?

A.   Like when we were in California, people from the Mafia supposedly were chasing us or something and -- but then the godfather was supposed to be helping us.

Q.   Isn't the godfather part of the Mafia?

A.   Yeah.

Q.   You thought Frank was going to protect you while you were in Lancaster?

A.   Yeah.

Q.   Also while in Palmdale to Mohave and through your trip until you got to Golden Valley?

PD PCR Anderson 019248

A.   Yeah.

Q.   You weren't afraid of Frank at that point?

A.   There were some things that he scared me but then other times he was like loving.

Q.   He was the one protecting you?

A.   Yeah.

Q.   Okay.  And you said that the very first day he told you about this threat by some guy named Vince; is that right?

A.   Yeah.

Q.   But he continued to call Vince?

A.   I tried to convince him to help us.

Q.   But he was protecting you?

A.   Yeah.

Q.   Before you came in and you testified, did Eric Engan write out the questions he was going to ask you?

A.   Before I come in and testified?

MR. ENGAN:  I would object.  That's an intrusion into the attorney-client privilege.

THE COURT:  Well, Mr. Carlisle, I will allow you to elicit this information from her but not in a way that asks her to speculate as to what Mr. Engan may have done out of her presence so you can rephrase the question if you want.

Q.   (BY MR. CARLISLE)  Did Eric show you the questions that he was going to ask you?

A.   Yeah, I seen them.

PD PCR Anderson 019249

Q.   Okay.   You had a chance to look at them?

A.   Yeah.

Q.   And read them?

A.   Yeah.

Q.   Okay.   You had a chance to go over his testimony -- your testimony with him?

MR. ENGAN:   Objection.

MR. ROSENTHAL:   Your Honor, I am going to approach.

THE COURT:   Well, Mr. Engan -- it is Mr. Engan's objection so, Mr. Engan, if you want to approach, come on up and you anyone else can come up with you so --

(Off-the-record discussion at the Bench between
the Court and Counsel.)

THE COURT:   All right.   You may continue, Mr. Carlisle.

Q.   (BY MR. CARLISLE)   You had a chance to go over and -- and know the testimony -- know what your testimony was going to be; is that right?

A.   Yeah.   Just to go over and see what the -- what the questions were going to be.

Q.   Okay.   Now, getting closer to the actual murders --

A.   Uh-huh.

Q.   -- you told Eric Cooper you said let's kill them and take the truck --

A.   Uh-huh.

SCANNED

PD PCR Anderson 019250

28

Q.  -- is that right?

And the first person you talked to was Jeff Hedrich with the Illinois State Police?

A.  Yeah.

Q.  And you didn't mention that at all; is that correct?

A.  I don't remember.

Q.  Okay.  You told Eric Cooper you said -- you said let's kill them and take the truck; is that correct?

A.  Yeah.

Q.  That's what you told Eric Cooper?

A.  Yeah.

Q.  When you talked with Dave Hawkins, you denied that you ever said that at all?

A.  Yeah.

Q.  You denied that very strongly?

A.  Uh-huh.

Q.  In fact, you said that you couldn't say that ever no matter how much you hated somebody?

A.  Yep.

Q.  And then your testimony Friday was that your co-defendants said that you said that?

A.  Yeah.

Q.  You also said that -- that Frank went to the pawn shop to pawn his pager to buy bullets?

A.  Yes.

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019251

29

Q.   And you did that on Tuesday?

A.   I don't remember which day.

Q.   During the interview Eric Cooper asked you when did they go to the pawn shop and you answered that they went to the pawn shop Tuesday okay.

MR. ENGAN:  What page, Counsel?

MR. CARLISLE:  Page thirteen.

THE WITNESS:  Uh-huh.

Q.   (BY MR. CARLISLE)  That's what you said during the interview?

A.   Yeah.

Q.   So, is it your recollection that you went to the pawn shop on Tuesday?

A.   I am not sure of that.  I was not sure of the dates and I still am not sure about the dates.

Q.   Okay.  Well, you got there Sunday; is that right?

A.   I don't remember.

Q.   That picture of you was taken on August 11th in Nevada at the casino.

A.   Uh-huh.

Q.   That picture is dated August 11th.

Does that appear to be your picture?

A.   Yeah.

Q.   That was the night that you went to Golden Valley.

MR. ENGAN:  Is that a question?

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019252

THE COURT:  Let's make sure that you are asking her a question.

Q.  (BY MR. CARLISLE)  Was that the night you went to Golden Valley?

A.  I think next day I went to -- wait.  Yeah.

Q.  Okay.  August 11th was a Sunday.  Do you know that?

A.  No.

Q.  Okay.  Assume for the sake of argument that August 11th, 1996 was a Sunday.  The next day, Monday, you went to the restaurant; right?

A.  Yeah.

Q.  You didn't go to the pawn shop that day?

A.  No.

Q.  And the next day was Tuesday.  You went to the pawn shop on Tuesday?

A.  Yeah.

Q.  Okay.  That was after you had the conversation where you said let's kill them and take the truck according to your co-defendants?

A.  No.  I never said that.

Q.  Okay.  It was after you had been out in back of the truck with the other three people, is that correct, or with the other two people?

A.  I don't --

Q.  Tuesday was the day that everybody was killed.

PD PCB Anderson 019253

31

MR. ENGAN:  Again, is that a question?

Q.  (BY MR. CARLISLE)  Is that correct?  Tuesday was the day everybody was killed?

A.  It may have been Tuesday.  Tuesday or Wednesday.

Q.  And the original plan was to shoot all three of them?

A.  I didn't know that until on the way to Illinois.

Q.  But that was the original plan?

A.  I later found that out by them.

Q.  Then you decided to change the plan because you couldn't get all the bullets; is that right?

A.  They told me that on the way to Illinois.

Q.  The reason that you went to the pawn shop was to get bullets to kill three people?

A.  No.

Q.  Tuesday you also went to a thrift store; is that right?

A.  Yeah, I think so.

Q.  And you came up with new plans at the thrift store?

A.  It was first time ever heard about tying people up.

Q.  But, in fact, at the thrift store is where you were talking about killing people?

A.  No.

Q.  Again, on page thirteen you said well, Frank is sitting there discussing it.  We were sitting outside of the

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019254

thrift store.

A.  I was sitting away from them.

Q.  Right after that Eric Cooper said so, all three of you are planning this.  And you said yeah.  Well, I am sitting there and I am listening to what this is going on, okay, and that was Tuesday afternoon.

Right?

A.  Yeah.

Q.  So, that's what you told Eric Cooper?

A.  I said -- yes, I said that.

Q.  And you were talking about getting bullets to kill three people at that time?

A.  No.

Q.  That's what you were talking about when you talked to Eric Cooper; is that correct?

A.  No.

MR. ENGAN:  Your Honor, may we approach for a second?

THE COURT:  Sure.

(Off-the-record discussion at the Bench between the Court and Counsel.)

MR. CARLISLE:  Can I give everyone a copy, your Honor?

THE COURT:  Yes, you may.

Q.  (BY MR. CARLISLE)  All right.  On the transcript

look at page twelve, please.

Are you on page twelve?

A.  Yeah.

Q.  The bottom of page twelve says we're starting Monday.  Okay.  After the conversation -- let's see.  Then Robert -- well, Bobby was supposed to -- he wanted to shoot them all three in the head and get it over with.

Right?

A.  Uh-huh.

Q.  Okay.  Then you start talking about getting bullets from Carmen?

A.  Uh-huh.

Q.  You went over with him to get bullets from Carmen?

A.  Uh-huh.

Q.  Okay.  About the middle of the page you say he had gotten two which he needed one more.  They were going to pawn Frank's beeper to get the bullets.

A.  Uh-huh.

Q.  Right?

That's what you said?

A.  Oh, yeah.

Q.  Okay.  You said they had went to the pawn shop.  Cooper asked when did they go to the pawn shop.  You say they went to the pawn shop Tuesday okay.

You said that; is that correct?

PD PCR Anderson 019256

A.  Yeah.

Q.  Okay.  A couple lines down Cooper says again Tuesday they tried to pawn.  You say to get the other one that they needed.

So, you are still talking about shooting them all; right?

A.  I guess.

Q.  No where between there are you talking about tying them up?

A.  No.

Q.  Okay.  You talk about the people wouldn't accept the beeper.  Okay.  And then you all wanted to get out of there.  Bobby had moved it up a bit to where he wasn't going to do it Thursday.  He decided to do it earlier.

A.  Uh-huh.

Q.  So, Bobby's planning all this.  Frank is sitting there discussing it.  We were sitting outside of a thrift store.

Right?

A.  Uh-huh.

Q.  So, all three of you are planning this.  You said yeah.  Well, I am sitting there and I am listening to what this is going on, okay.  And that was Tuesday afternoon.

So, what you are talking about at the thrift store, according to what I just read, is talking about killing them

PD PCR Anderson 019257

not talking about tying them up according to what you said there?

A.   No.   No.   This paper -- I don't know the name of it here.  The two bullets, that was after Delahunt was killed. I don't -- in the tape and here I don't remember why I said needed one more.  There was never no discussion about that. And the pawning of Frank's beeper was for bullets because needed for target practicing up on a bus.

Q.   Frank was trying to get money to get out of there; is that right?

A.   Yes.

Q.   One way to get money would be pawning things?

A.   Yeah.

Q.   Okay.  You also indicated that at one point in time Poyson wanted to back out; is that right?

A.   After they killed Robert Delahunt.

Q.   And --

A.   Anderson wanted to back out too.

Q.   Both of them wanted to back out?

A.   Yeah.

Q.   But that wasn't until after Robert Delahunt was dead?

A.   Yeah.

Q.   Turn to page twenty-one of the transcript, please. At the top of the page Detective Cooper says now, you

PD PCR Anderson 019258

SCANNED

knew about Robert was going to be killed.  You say I knew but I didn't.  Detective Cooper said you knew what your role was in it is to get him so it would appear that Frank got jealous.  You answer yes.  Detective Cooper said okay.  And that was your whole role in this -- that was your role in this whole thing; right.  You say yes, in which I -- Frank kept telling me he wasn't -- that he was backing out of it and Bobby told me the same thing.  I didn't think it was really going to go on.

Right?

A.  Uh-huh.

Q.  So, wouldn't you agree it sounds like they were telling you that before Robert was killed?

A.  It sounds like that but wasn't -- it wasn't.  And the jealousy part, I didn't know about that until on the way to Illinois when they were discussing over it.

Q.  But -- all right.  So, you are saying now that they didn't tell you that until after Robert was dead; is that right?

A.  Yeah.

Q.  Didn't you testify earlier that after Robert was dead you said why don't we, you know, just borrow the truck?

A.  I was trying to get them just to ask that borrow the truck instead of killing them and they said that they had to go on with it.  That it was too late.

PD PCR Anderson 019259

Q. But that was after Robert was dead?

A. Yeah.

Q. So, they had both wanted to back out of it after Robert was dead?

A. It was kind of on and off thing.

Q. You would agree that if this all was just a big joke, there would be no reason to back out of it?

A. This is after the killing of Delahunt.

Q. Okay. Wouldn't you agree that if it was just a big joke, there would be no reason to back out of it?

A. Yeah.

Q. And that if they were just joking about tying everybody up, there would be no reason to scare Robert Delahunt?

A. I didn't know. I still thought it was a joke. I felt it was a joke. I didn't take it serious.

Q. Okay. While you were in the trailer, were you kissing Robert?

A. He was kissing on my cheek.

Q. Okay. And you knew that kissing Robert would make Frank jealous?

A. I didn't know that. I thought that's what Frank wanted me to do.

Q. When you first got there, the next morning you went out and you took a walk with Bobby Poyson?

SCANNED

PD PCR Anderson 019260

38

A.  Yes.

Q.  You didn't tell Frank about it?

A.  Yes, I did.

Q.  But he didn't go along?

A.  I asked -- not specifically asking each one of them that want to go on a walk with me.  I asked if anybody wants to go on a walk with me and he got mad because I didn't specifically ask him.

Q.  He was jealous of you going for a walk with Bobby Poyson?

A.  I didn't see jealousy.  Mad.  He was mad at me for it.

Q.  You said that he would be jealous of you if you looked at another man?

A.  Yeah.

Q.  If you ever talked to another man?

A.  Yeah.  He was usually always there with me.

Q.  So, just to be clear.  If you are looking at another man he would get jealous.  If you talk to another man he would get jealous.  Wouldn't he get jealous if you were kissing somebody else?

A.  This again that's just how I felt he wanted me to do.  He told me.  I did what he told me to do.

Q.  Are you still on page twenty-one of the transcript?

A.  Yeah.

PD PCR Anderson 019261

SCANNED

Q. Okay. Eric Cooper asked you in the third line down you knew what your role was in it is to get him so it would appear that Frank got jealous. And you answered yes.

Is that correct?

A. Uh-huh.

Q. All right. You testified that when Frank first asked you to prostitute to get a ticket you told him no?

A. Yes.

Q. And he didn't bring this up any more after you were in Chicago; is that correct?

A. Yes.

Q. And when Frank wanted you to hitchhike outside of the casino that was outside of Las Vegas, you said no?

A. Yeah.

Q. You didn't want to hitchhike?

A. Yeah.

Q. And later when Frank wanted to have sex with you, you told him no?

A. I made excuses. Didn't tell him no.

Q. But you didn't have sex with him?

A. No.

Q. Because you didn't want to?

A. No.

Q. Even though that's what he wanted to?

A. Yeah.

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019262

Q. Then once you got to Chicago and he wanted you to prostitute again, again you told him no?

A. I talked him out of it.

Q. Because you didn't want to?

A. Yeah.

Q. When you went back into the little trailer, you had gone there the day before to clean it out; is that right?

A. Yes.

Q. You were planning on staying there?

A. Yeah.

Q. And when you cleaned it out, you threw out the trash that didn't need to be in there?

A. There was no trash.  It was just dusty and dirty.

Q. Okay.  So, there wasn't any debris?

A. Couple beer cans but that was it.

Q. Okay.  And while they're killing Robert Delahunt, Poyson and Anderson had their hands full; is that correct? They were pretty busy killing him?

A. Oh, yeah.

Q. And he was struggling to get away?

A. I don't know.  I didn't sit there and watch it.

Q. Did you ever see Poyson and Anderson leave the trailer?

A. No.

Q. Okay.  And Poyson used the rock and cinder block

PD PCR Anderson 019263

41

that have been introduced to smash Robert's head?

A.   Those aren't -- I guess.   Those aren't the rocks I got him.

Q.   But he used that rock and that cinder block to smash his head and he threw them way in the burn barrel?

MR. ENGAN:   Objection.   She just said that is not the same rocks.

THE COURT:   Well, I will overrule the objection.   I am not sure that it is clear that is the same question.

You can answer the question.

THE WITNESS:   I don't know.   I never seen that burn barrel.   I don't -- never seen him do it.

Q.   (BY MR. CARLISLE)   Okay.   But you brought him two rocks?

A.   Yes.

Q.   On two different occasions; one rock each time?

A.   Yes.

Q.   But there were no rocks that were found in the trailer?

A.   I don't know.

Q.   There were no rocks in the trailer when you started because you had cleaned it out?

A.   Yes, there was.

Q.   And you knew that Poyson was using the rocks that you brought to do something with Robert's head?

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019264

42

A.   I didn't know that.

Q.   Can you turn to page seventeen of the transcript, please.

A.   Uh-huh.

Q.   At the top of the page Detective Cooper says how many times did you have to get him a rock.  You said twice I got little size rocks.  I didn't know what they were going to be used for.

A.   Uh-huh.

Q.   Cooper says what -- what they're going be used for. You say I thought -- I guess that he was -- I -- they were doing something with his head.

A.   I didn't know that until later when I overheard them talking about it.

Q.   Okay.  That's what you told Cooper; right?

A.   Yes.

Q.   Then afterwards you brought them water and matches --

A.   And clothes.

Q.   -- and clothes to help them get inside without being detected by Leta and Roland?

A.   Uh-huh.  Frank told me to.

Q.   Then Carmen May came over and gave Bobby a note?

A.   No.

Q.   She never came over?

PD PCR Anderson 019265

A. No.

Q. She never gave him a note?

A. No.

Q. Then she walked back with you to her house to get bullets?

A. I didn't walk with her. Neither one of us did.

Q. And while -- going back a step.

While Frank Anderson and Bobby Poyson are in the trailer killing Robert Delahunt, you didn't call the police?

A. Yes, I tried.

Q. You didn't tell Detective Cooper that you couldn't call the police because the phone was dead; did you?

A. No, I did not tell him that I tried.

Q. Can you turn back to page twenty-one again.

A. Uh-huh.

Q. About a third of the way down Detective Cooper said now, you got a two-hour period here -- two hours before -- at least before Leta and her boyfriend were killed. How come you didn't call the cops. You say how -- how come. Because -- because I was -- I mean I was afraid, yeah.

Is that right?

A. I said that.

Q. You didn't say I tried to call the police earlier and the phone was dead; is that right?

A. No, I did not say that.

SCANNED

PD PCR Anderson 019266

Q.  Isn't it true that the phone line wasn't actually cut until midnight by Bobby Poyson?

A.  When I tried the phone, the phone was dead.  There was no dial tone at all.

Q.  You also did not tell Leta her son was being murdered?

A.  No.

Q.  You didn't tell Roland Wear that Robert Delahunt was being murdered?

A.  No.

Q.  You didn't go to any neighbor's house?

A.  No.

Q.  What you told Eric Cooper was that the reason you didn't tell anybody was because you cared about Frank Anderson; right?

A.  Uh-huh.

Q.  This was about a week after the murders happened that you talked to Eric Cooper; is that right?

A.  I am not sure.

Q.  A week and -- a week and a half, two weeks maybe?

A.  Something like that.  I don't know.

Q.  You also never told the police on the trip to Chicago; is that right?

A.  That's right.

Q.  Poyson wanted to turn himself in?

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019267

A.   He talked about it.

Q.   And in Evanston you and Poyson were alone.  It was just you and Poyson for four or five days; is that right?

A.   I don't know that it was that long.

Q.   You checked into the homeless shelter on August 19th.  Does that sound right?

A.   Maybe.  I am not sure.

Q.   Okay.  It is your testimony Frank Anderson was arrested on August 18th?

A.   Yeah.

Q.   So, you were not picked up until August 23rd; is that right?

A.   I am not sure.

Q.   And during that time that you were alone with Poyson, you never turned yourself in?

A.   No.

Q.   And once you found out Frank Anderson had been arrested, you never turned yourself in?

A.   No.

Q.   But Poyson wanted to turn himself in?

A.   Like couple days after the murders, yeah.

Q.   When you went to the homeless shelter you had to fill out a form?

A.   Yes.

Q.   Handing you what has been marked as State's

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019268

Exhibit 73.

Do you recognize that?

A. Yeah.

Q. Can you tell us what it is, please?

A. It's the form that the lady had filled out.

Q. What is the name on the form?

A. Leah Poyson.

MR. CARLISLE: The State moves admission of Exhibit 73.

MR. ENGAN: No objection.

THE COURT: It is ordered admitting in to evidence State's Exhibit Number 73.

Q. (BY MR. CARLISLE) Showing you what has been marked State's Exhibit 74.

Do you recognize that?

A. No. It's the same form but I wasn't there when he did this.

Q. And whose name is on State's Exhibit 74?

A. Robert Poyson.

Q. You were present?

A. No.

Q. So, that was filled out by him?

A. I never seen him fill that out. When they did that forms, females go with females and males go with males.

Q. Okay. Did you ever see Bobby Poyson's signature?

A.  No.

MR. CARLISLE:  Okay.  The State would move admission of Exhibit 74.

MR. ENGAN:  Object as to relevance, your Honor.

THE COURT:  Let me see it, please.

MR. ENGAN:  I also object that there is a lack of foundation and authentication.

THE COURT:  I don't think you have laid sufficient foundation to get in it so on that basis I will not allow it in at least at this point.

Q.  (BY MR. CARLISLE)  And when you stayed at a hotel in Wisconsin, do you know who checked you in?

A.  I believe Poyson.

Q.  Okay.  Handing you what has been marked as State's Exhibit 75.

Do you know what that is?

A.  No.  I guess it is a thing you fill out for a hotel. I wasn't there.

Q.  Is that a guest registration?

A.  I guess.  I didn't see him fill it out.

Q.  Is there a name on that hotel registration?

A.  Traveler's Inn Motel and Campground.

Q.  Okay.  Does that say it is in Wisconsin?

A.  Yeah.

Q.  And what is the date on that registration form?

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019270

A.  8/16/96.

Q.  Is that about the date that you stayed in a hotel in Wisconsin?

A.  Yes.

Q.  Was that before you went to the homeless shelter?

A.  Yes.

MR. CARLISLE:  The State would move admission of Exhibit 75.

MR. ENGAN:  Same objection, your Honor.  No showing of authentication on this particular exhibit.

THE COURT:  All right.  Let me see it, please.

Well, I believe that coupled with her testimony about where they were and when they were there that there is sufficient foundation.

It's ordered admitting in to evidence State's Exhibit Number 75.

Q.  (BY MR. CARLISLE)  You stayed at the hotel in Wisconsin a couple days before checking into the homeless shelter; is that correct?

A.  I stayed in a hotel?

Q.  The hotel that you stayed in in Wisconsin was a couple days before you checked into the homeless shelter?

A.  Oh, yeah.

Q.  And you signed State's Exhibit 73; is that correct?

A.  Yes.

PD PCR Anderson 019271

SCANNED

Q.  You signed it with the name Leah Poyson?

A.  Uh-huh.

Q.  Bobby checked in there as Robert Poyson?

A.  Yes.

Q.  Now, on that form that asks you why you are homeless; is that correct?

A.  I don't remember.

Q.  Okay.  On that form, isn't there a place that says why are you homeless at this time?

MR. ENGAN:  Objection.  She just said she doesn't remember.  The evidence speaks for itself.

THE COURT:  Well, I will overrule the objection.  You can answer the question.

THE WITNESS:  Yeah, it does say that.

Q.  (BY MR. CARLISLE)  Okay.  And there is a box checked that says neighbor violence?

A.  Uh-huh.

Q.  There is a box checked that says in transit parentheses traveling; right?

A.  Uh-huh.

Q.  And a space that says other; is that right?

A.  Uh-huh.

Q.  Under other that says car accident and robbery four days ago?

A.  Yes.

PD PCR Anderson 019272

Q. So, the reason you were homeless is because of that robbery four days ago?

A. Yes.

Q. Okay. And you changed your name and registered under Poyson's name?

A. Yes.

Q. You also changed your first name and didn't register as Kim but you registered as Leah?

A. Yeah.

Q. When Bobby Poyson checked into the hotel, he gave the address of 2725 Yavapai, Golden Valley as his address; is that right?

A. If it says that on the paper.

Q. And he also gave his name as Robert Poyson?

A. Yeah, if it says that on the paper.

Q. After being at the homeless shelter a few days, were you arrested and spoke with Jeff Hedrich?

A. Yes.

Q. You weren't in cuffs when speaking to him?

A. No.

Q. After speaking to him you were taken to a homeless shelter kind of house?

A. Yeah. Hours later.

Q. Okay. At that house people were free to come and go?

PD PCR Anderson 019273

SCANNED

A.   Yeah.

Q.   You thought Jeff Hedrich was trying to help you?

A.   Yeah.

Q.   He didn't really treat you like you were under arrest?  You weren't in handcuffs?

A.   No.

Q.   When you got to that house, you felt free to come and go?

A.   Yes.

Q.   And you told him or started to tell him what happened?

A.   Yes.

Q.   The first time you lied to him?

A.   Yes.

Q.   And the second time you gave him an incomplete story?

A.   Yes.

Q.   Did you tell him that the reason you had come to Chicago was because Frank had Mafia ties?

A.   Yes.

Q.   You also told him that as soon as you got to Chicago Frank told you he didn't have Mafia ties and that it was a lie?

A.   No.  Frank never told me that he was not in the Mafia.  I thought -- I thought all the way coming here to

PD PCR Anderson 019274

Arizona that it was all true.

Q. Frank never told you that he was not in the Mafia?

A. Never told me.

I have to go to the bathroom.

THE COURT: All right. Let's take about a five minute break.

During the break, remember my admonitions. So, we'll stand at recess for about five minutes.

(There was a break in the proceedings from 10:48 a.m. until 10:58 a.m.)

(The following was held in open court.)

THE COURT: Thank you. Be seated.

This is a continuation of Cause Number CR-96-1057, State versus Kimberly Lynn Lane. Show the presence of the Defendant, Counsel and the presence of the jury panel.

And you may proceed, Mr. Carlisle.

Q. (BY MR. CARLISLE) Now, when you were being questioned by Jeff Hedrich with the Illinois State Police, you never told him that Frank threatened you?

A. No.

Q. You never told him that he asked you to become a prostitute?

A. No.

Q. You never told him that the Mafia was trying to eliminate you?

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019275

A.   I believe -- I don't believe that I told him that or not.  I believe I told him a lot about the Mafia and he got the impression that I was lying and I never gave him numbers and everything that I knew.  I told him everything that I knew about the Mafia and he made me feel that I was lying about it.

Q.   But you never told him -- you never specifically said look, I need protection because the Mafia is trying to kill me?

A.   No.

Q.   All right.  And you never told him anything about your statement let's kill them and take the truck?

A.   No.  I don't remember.

Q.   You didn't tell him that you took rocks to Bobby Poyson?

A.   I don't remember.

Q.   And you didn't tell him that you went with Bobby Poyson when he got bullets from Carmen May?

A.   I don't remember.  I told half of the story.

Q.   Okay.  That was the part that you left off though; right?

A.   I don't remember.

Q.   Then the next day Detective Cooper came and interviewed you; right?

A.   Yeah.

PD PCR Anderson 019276

Q.  And you willingly spoke with him?

A.  Yeah.

Q.  And you did so voluntarily?  You were willing to speak with him; right?

A.  Yeah.

Q.  Okay.  And he took a card out and read you your rights?

A.  I don't remember.  He read my rights twice.

Q.  Okay.  You have the right to remain silent.  He told you that?

A.  Yes.

Q.  You understood that you didn't have to say anything.  You could remain silent?

A.  I didn't understand that.

Q.  Okay.  And that anything you say can be used against you in a court of law.  You have the right to the presence of an attorney to assist you prior to questioning and be with you during questioning if you so desire and if you cannot afford an attorney, you have the right to have an attorney appointed for you prior to questioning.

Those were the rights that he read to you?

A.  Yes.

Q.  The original plan was to kill everybody.  That wasn't changed until Robert overheard the plan; is that right?

PD PCR Anderson 019277

SCANNED

A.   No.

Q.   Can you turn to page ten of the transcript.

You still have the transcript; right?

A.   Yeah.

Q.   Kind of about the top third.  Cooper says now, let -- so, let's back up and I'm trying to help you time-wise, Kim.  I am not that concerned about the times because I've already got that established so, let's go to Monday and let's talk about the conversation that Robert overhears.  You say yeah.

A.   Uh-huh.

Q.   Cooper says do you know what the conversation I'm talking about.  You say yes, I do.  Cooper says okay.  Go ahead.  You say they were talking about um killing and then -- and the guy -- but they were planning to stay.  They were planning to do it Thursday to kill the husband too but then it ended up happening earlier but I guess Robert was eavesdropping so that Bobby talked to Robert and told Robert that he just going to tie them up.

So, was the original plan that they were talking about was killing and they changed it to tying them up after Robert overheard?

A.   No.

Q.   Okay.

MR. ROSENTHAL:  Excuse me, your Honor.  I would like

to have five minutes in front of the Court without the jury present.

THE COURT:  All right.  Mr. Engan, it is your witness.  Is there something that you want to put on the record concerning the questioning of this witness?

MR. ENGAN:  May I have a moment, your Honor?

THE COURT:  Sure.

Well, I am going to give you this opportunity so, ladies and gentlemen, you know the drill by now.  Get out of here and come back when we tell you to come back.  Don't talk about the case.

I'll tell you what.  We are also going to take a break and we will take care of whatever emergency we have and then we will come back in.

(There was a break in the proceedings from 11:05 a.m. until 11:07 a.m.)

(The following was held out of the presence of the jury.)

THE COURT:  All right.  This is a continuation of CR-96-1057, State versus Kimberly Lynn Lane.  Show the presence of the Defendant, Counsel and the absence of the jury.

And if either Mr. Rosenthal or Mr. Engan has something to put on the record at this time, I will allow you to do that.  I am not sure that I can necessarily say that I am not

PD PCR Anderson 019279

going to allow Mr. Rosenthal to make motions because he is the one who has the primary responsibility for representing the Defendant although I don't mean to suggest that I am now giving the two of you permission for basically each of you to do things on behalf of any given witness but since this is the Defendant, I will allow either one of you to make whatever motion you want to make.

MR. ENGAN: Well, your Honor, with that said and I apologize to the Court. I also guess a juror has injured himself but in consultation with Mr. Rosenthal, we are withdrawing our reason for a motion outside the presence of the jury.

THE COURT: All right. And maybe you all can understand that I don't like to keep shuffling them in and out and that's whether they fall down and hit their head or not so I would certainly like everyone to think ahead of time before you indicate you need to do something on the record out of the presence of the jury so we will not be shuffling people in and out. I'd hate to think that someone actually injured themselves for no valid reason.

And I have absolutely no problem whatsoever with the fact that the Defendant needs to take breaks. I understand that there are medical reasons for that but I do not like taking breaks just because of some indecision on the part of Counsel.

So, let's take a break and see how -- how or what we are doing to the juror who apparently hit his head and apparently has indicated all he needs is some ice so we will get that resolved and then come back in.

(There was a break in the proceedings from 11:10 a.m. until 11:20 a.m.)

(The following was held in open court.)

THE COURT:  Thank you.  Be seated.

This is a continuation of CR-96-1057, State versus Kimberly Lynn Lane.  Show the presence of the Defendant, Counsel and the presence of the jury panel who have all made it back in here safely.  And if any of you need to take a break or anything while we are in here, let me know and we will do that and we will allow you to slowly get out of here to relax and feel better so, I am sorry for the delay.  We will try to minimize that as much as possible.

Mr. Carlisle, you may continue.

MR. CARLISLE:  Thank you.

Q.  (BY MR. CARLISLE)  You indicated you've been in a couple different cells in the medical pod; is that right?

A.  Yes.

Q.  You were moving into medical pod fifteen on December 5th, 1996; is that right?

A.  I don't remember.

Q.  Does that sound about right?

PD PCR Anderson 019281
SCANNED

MR. ENGAN:  Objection; asked and answered.

THE WITNESS:  I don't remember.

THE COURT:  I think does that sound about right is maybe a different question than asking an exact date so the objection is overruled.

You can answer the question.

THE WITNESS:  I can't remember.

Q.  (BY MR. CARLISLE)  Okay.  It was over a week before you had this conversation with Danny Miller?

A.  I can't remember.  Ever since I got locked up there, I've known him.  We talked not about this but I don't remember.

Q.  Okay.  And going back to something.  Frank Anderson had described what the godfather in the Mafia was; hadn't he?

A.  Yeah.

Q.  And the way he described it was as someone that ruled over a lot of people, that sold drugs, ran prostitutes, had something to do with gambling machines and killed people; is that right?

A.  I didn't start hearing about killing people until we hit Las Vegas and then I learned about prostitution and gambling all that in -- in Illinois -- Chicago.

Q.  Okay.  And we talked earlier about you being at the thrift store.

A.  Uh-huh.

SCANNED

Q. Again, that part of the transcript sounds like they were talking about killing at the thrift store. The parts we have read earlier; is that right?

A. It sounds like that but it wasn't.

Q. Okay. And you indicated that you were scared while you were laying there in the small trailer with Robert Delahunt?

A. I was uncomfortable.

Q. You weren't scared?

A. I wasn't scared. My impression that they were going to scare him. I didn't know how but I was real uncomfortable.

Q. Will you turn to page fourteen of the transcript, please.

About a third of the way down you start off with saying yes, I did after Eric Cooper said but you had a role to play, is that correct.

A. Where?

Q. About a third of the way down. Yes, I did.

A. Okay.

Q. Then later in that same paragraph you say well, I had to lay on the bed and at the time I didn't really think that it was going to happen. I mean, it scared me pretty bad.

Is that right?

A.   Uh-huh.

Q.   Now you are saying you weren't scared because they were only going to scare him.  If they were only going to scare him, then there would be no reason for you to be scared.

A.   I was talking about they're supposed to scare him and when I saw him come off with the knife, it scared me.

Q.   Okay.  And then when you ran outside, you saw Bobby Poyson and you said he's going to do it.  He's going to kill him.

Right?

A.   I don't remember saying that.

Q.   Okay.  Turn to the next page, page fifteen.

A.   Uh-huh.

Q.   There is -- kind of in the middle there is a long paragraph where you are talking.  The very last thing you are saying in that paragraph is I said he's going to do it.  He's going.  And Cooper says he's going to do what.  And you say he was going to kill him.

Right?  Is that what you are saying?

A.   Uh-huh.

Q.   You didn't say he was going to tie him up; correct?

A.   Correct.  And I didn't know when --

Q.   You didn't say he was going to scare him to Cooper?

A.   No.

PD PCR Anderson 019284

Q.   When you were talking to him you said he was going to kill him?

A.   Uh-huh.

Q.   Cooper said well, wasn't that -- well, wasn't that the plan.  And you said I didn't think it was going to go through.  And he said but that was the plan.  And you say it was a plan.

Right?  That's what you told Cooper?

A.   Uh-huh.

Q.   Okay.  And, again, when you were describing the killing of Robert later, you say that plan was at the store; right?

A.   No.

Q.   Okay.  Can you turn to page twenty of the transcript, please.

Just after halfway down Cooper says and during those couple of hours.  Then he stops and said now, the killing of Robert, whose idea was that.

Do you see that line?

A.   Uh-huh.

Q.   Your response is the killing of Robert that was like -- that was brought up in the store.

Right?  That's what you said to Cooper?

A.   Uh-huh.

Q.   Okay.  And then you said it was just brought up.

SCANNED

PD PCR Anderson 019285

Then Cooper said so, was everybody's basically.  Everybody.  And you said yeah.

A.  Uh-huh.

Q.  Right?  That's what you said?

A.  Yeah.

Q.  Okay.  So, then you knew Robert was going to be killed?

A.  No.

Q.  Okay.  Turn to the next page, page twenty-one.

The very first line Cooper says now, you knew about Robert was going to be killed.  Right?  Your response is I knew but I didn't.

That's what you told Eric Cooper?

A.  Yes.

MR. ENGAN:  Your Honor, I believe we already went over this.

THE COURT:  I will overrule the objection.

Q.  (BY MR. CARLISLE)  When the plan was hatched, you were a willing participant with Frank and Bobby; right?

A.  What plan?

Q.  The plan to kill three people?

A.  No.

Q.  All right.  Can you turn to the next page, page twenty-two.

The very first line Cooper says but when this plan was

PD PCR Anderson 019286

SCANNED

hatched.  You say yeah.  He said and thought of, you were a willing participant in this plan with Frank.  You say yes, I was.

Is that what you told Eric Cooper?

A.  Yes.

Q.  And the whole idea was for the murders to happen; right?

A.  No.

Q.  Okay.  Can you turn to page twenty-four.

Cooper on the second line on that page says but for -- but the whole idea was for it.  Than you say yes.  And Cooper said to happen.  And you say yes.

Is that what you told Eric Cooper?

A.  Yes.

Q.  Okay.  And you guys -- the three of you plotted and planned to kill Robert Delahunt?

A.  No.

Q.  Can you turn to page twenty-six.

Okay.  Just after halfway down Cooper said because he needed Bobby to carry this out.  He needed you to carry it out.  So, you guys planned and plotted the killing of Robert.  Your answer is yes.

Is that what you told Eric Cooper?

A.  Yes.

Q.  Okay.  And you were an important part because Frank

needed to get jealous or needed to appear jealous; right?

A. I didn't know about that until on the way to Illinois.

Q. Okay. A little bit further down Cooper said you -- he said you were very important for them to be able to kill Robert because they needed him to be kissing you so Frank would be in there and act angry and be able to do it; right. And you said yes.

A. Uh-huh.

Q. That was the plan. You say that was a plan. Right?

A. Uh-huh.

MR. CARLISLE: Okay. No more questions.

THE COURT: Redirect examination, Mr. Engan?

MR. ENGAN: Thank you, your Honor.


REDIRECT EXAMINATION

BY MR. ENGAN:

Q. Okay. Kim, just to kind of go back in the same sequence Mr. Carlisle asked you these questions.

A. Uh-huh.

Q. Mr. Carlisle asked you a question about falsely accusing your stepfather.

A. Yes.

Q. Did you reside in Canyon City with your father --

PD PCR Anderson 019288

stepfather and your mother for a while?

A.  No.

Q.  Did you ever live in Arizona?

A.  Yes.

Q.  Where?  What city did you live in?

A.  Prescott Valley I believe.  We lived somewhere else I don't remember.  Mainly Prescott.

Q.  Do you recall about how many years ago this was?

A.  About last I lived there?

Q.  Yes.

A.  It was when I was ten and a half.

Q.  About five years ago?  Five and a half?

A.  Yeah, something like that.

Q.  And how long did you live in Arizona?

A.  I don't remember.  Two, three years.  I don't remember.  I don't remember.

Q.  Okay.  Did you like living in Arizona?

A.  Yeah.

Q.  Okay.  Did you want to move back to Lancaster?

A.  Yeah.

Q.  Why?

A.  Because I missed my father.

Q.  So, did you ask your stepfather and your mom about moving back to Lancaster?

A.  I don't remember specifically asking but I know that

PD PCR Anderson 019289

SCANNED

they didn't want me to move back there.  They didn't think it was a good idea.

Q.  Did you make up allegations about your stepfather?

A.  Yes.

Q.  Why did you do that?

A.  Because I wanted to live with my dad.

Q.  Do you know how serious something like that is accusing somebody of something like that?

A.  I do now.

Q.  Did you at that time?

A.  At the time I was making up stories, I didn't really think about the consequences.

Q.  Do you know that you are under oath the whole time you have been testifying?

A.  Yep.

Q.  What did that mean to you?

A.  You are to tell the truth.

Q.  Have you told us the truth the whole time?

A.  Yep.

Q.  Did you tell the truth the whole time you spoke to Sergeant Hedrich?

A.  No.

Q.  Why didn't you tell him the truth?

A.  The second time I talked to Hedrich I told partly the -- partly what happened.  The first time I didn't because

PD PCR Anderson 019290

I was scared.

Q. Of what?

A. Poyson had told me Mexican Mafia would get me if I said anything and I told him -- Hedrich what Poyson told me wanted me to tell them.

Q. Didn't Sergeant Hedrich tell you that he was there to help you and protect you?

A. Yeah.

Q. And weren't you -- didn't you know that Poyson was arrested the same time you were?

A. Yeah.

Q. So, how was Poyson going to be able to get you once you were talking to Sergeant Hedrich?

A. It wasn't Poyson. I was told -- it wasn't Poyson that was going to get me. It was people in the Mafia and his Mafia.

Q. Who is his Mafia?

A. Mexican Mafia.

Q. And then when you talked to Eric Cooper, did you tell him the truth?

A. I told him the truth but I mixed around things.

Q. Why did you tell more things to Eric Cooper about what happened in Golden Valley than you told Sergeant Hedrich?

A. Partly I was scared. Hedrich was standing right

PD PCR Anderson 019291

behind him.  I felt Hedrich would protect me.

Q.  Did you know at that time that Poyson had confessed by this time?

A.  Yes.  Well, I was told.  I didn't know for a fact.

Q.  Were you still afraid of Bobby Poyson or the Mexican Mafia at the time you talked to Eric Cooper?

A.  Yes.

Q.  So, why did you tell Eric Cooper the truth if you were afraid to tell the truth?

A.  After the second time I talked to Hedrich which I only told half of the story, they came and told me that Bobby confessed and that I can tell the truth now and so I told him halfway the truth.

Q.  How did that make you feel before talking knowing that Bobby had confessed?

A.  I felt that if he confessed then I wouldn't see any reason why I was harmed but then way that felt that they were lying.

Q.  Who?  The police?

A.  Yeah.

Q.  Mr. Carlisle asked you some questions about the Mafia and I asked you some questions on direct examination also fairly early on.

A.  Uh-huh.

Q.  Tell us today as you sit here right now what is your

understanding of what the Mafia is all about?

A. My understanding? Do I believe it? Is that what you are asking?

Q. I want you to say today, Kim, what the Mafia -- what is it? What do you think?

A. I don't know because everything that I was told before I do not believe now.

Q. So, you don't know what the Mafia is then?

A. No.

Q. Okay. Back in Lancaster when you were left with Frank, did you know what the Mafia was then?

A. No.

Q. Had you ever heard the word Mafia before?

A. No.

Q. And the first time you heard the word Mafia was where?

A. I started hearing about the Mafia on the way to Mohave -- Mohave, California.

Q. And throughout your trip to get to Golden Valley, did you ever hear anything about the Mafia that wasn't something that Frank Anderson told you?

A. No.

Q. Did Frank Anderson tell you that if you went with him you would get a big house?

A. Uh-huh.

SCANNED

PD PCR Anderson 019293

Q.   Did he tell you that there would be a lot of animals for you to take care of?

A.   Uh-huh.

Q.   What else did he tell you about the Mafia?

A.   That if I went, I would live in a big house.  I would have all the animals I wanted and at that time I had a lot of bladder infections.  He said that there would always be a doctor there.  If I was hungry and wanted to eat he said there would always be food there.  Everything I ever wanted.

Q.   And at that point did Frank tell you that the Mafia is an evil organization that sells drugs and kills people?

A.   No.

Q.   Did he ever tell you that?

A.   He didn't make it sound like that.  We were in Chicago he was telling me -- he was telling me how the prostitution and -- prostitution, gambling machines and stuff like that were all owned by the Mafia.  He owned all -- own all of them.

Q.   At that time did you think that was a good thing or a bad thing?

A.   I didn't really think about it.

Q.   Did you ever think gee, now that I know about the Mafia, it sounds pretty bad.  Maybe I should not associate myself with them?

A.   After getting in to Illinois I started to get scared

PD PCR Anderson 019294

because Frank was telling me that the Mafia were after us now and wanted to kill us and --

Q. Okay. You said when Mr. Carlisle was asking you about this that some times you thought the Mafia was chasing you.

A. Uh-huh.

Q. Is that right?

A. Yeah.

Q. Up until that time you thought they were trying to help you?

A. Uh-huh.

Q. How could there be two separate things like that?

A. Because godfather seen that trying to help us and people that the godfather was close to -- people associated with all the time and Vince, which was the guy that was supposed to be after us. Frank never -- well, talked how he had any association with -- talking to the godfather was part of it. He was part of all the other people that were in it.

Q. So, did you think that the godfather was a good guy?

A. Yeah. He was protecting us.

Q. I am sorry?

A. Protecting us.

Q. And did you think the other people from the Mafia were trying to get you?

A. At that time I know Vince was.

PD PCR Anderson 019295

Q. This -- again, this source of information was who?

A. Frank.

Q. Did you ever hear of the Godfather movies?

A. No.

Q. Did you ever hear of a guy by the name of John Gotti?

A. No.

Q. Mr. Carlisle was asking you about reviewing questions that you were going to be asked on the stand.

A. Yes.

Q. And I wrote out those questions and you looked at them; right?

A. Uh-huh.

Q. Did I ever tell you what to say?

A. No.

Q. Mr. Carlisle didn't review any of his questions with you; did he?

A. No.

Q. And you got up there knowing he was going to throw some pretty tough questions at you; didn't you?

A. Yes.

Q. Mr. Carlisle asked you about a number of things that were in the transcript of the interview you gave to Detective Cooper. One thing he asked you about had to do with getting bullets or attempting to get bullets from a pawn shop.

PD PCR Anderson 019296
SCANNED

Do you remember that?

A.   Yes.

Q.   Okay.  Did you guys go to a pawn shop?

A.   Yes.

Q.   Did you try to pawn Frank's beeper?

A.   I didn't.

Q.   Okay.  Did Frank try to pawn his beeper?

A.   I believe it was Bobby.

Q.   Where you actually inside the pawn shop when this went on?

A.   No.

Q.   Where were you?

A.   I was in the back of the truck with Robert Delahunt and Frank Anderson and Leta and Roland were up front.

Q.   So, everyone that went into town was -- was in the truck except Poyson; is that right?

A.   He was in the pawn shop.

Q.   And what was your understanding of the purpose for pawning the beeper?

A.   Was to get bullets because Robert and Bobby were over there talking to us about how they used to target practice on the big bus that was on the property and they didn't have no bullets and they wanted to target practice.

Q.   At this time did anybody say anything about killing anybody or planning to steal the truck?

SCANNED

PD PCR Anderson 019297

A.   Before -- I believe -- I believe it was before was when Roland threw Bobby over his shoulder and out of anger Bobby said I want to kill him.

Q.   But there was -- at this point was not any talk about a plan to do so?

A.   No.

Q.   Mr. Carlisle asked you also about a discussion that went on in front of a thrift store.

A.   Yes.

Q.   Was that -- do you remember if that was before or after you went to the pawn shop?

A.   That was after.

Q.   And who did all the talking in front of the thrift store?

A.   Bobby.

Q.   Did Frank ever contribute to that conversation?

A.   He agreed.

Q.   Did you do any of the talking there?

A.   No.  I was away from them.

Q.   Could you hear everything that was going on?

A.   Most of it.

Q.   Were they discussing tying up people or killing people or what were they discussing as far as that goes?

A.   Tying people up.

Q.   Did you believe them?

PD PCR Anderson 019298

A.   No.

Q.   Why not?

A.   I thought it was a joke.

Q.   Were they laughing when they talked about this?

A.   They didn't seem serious.

Q.   Why didn't they seem serious?

A.   They seemed like that they were chatting more than serious kind of talk.

Q.   Did they ask your opinion about this?

A.   No.

Q.   Mr. Carlisle went over -- if you still have your transcript there -- on pages twelve and thirteen.

Were you confused as to the time of getting bullets from Carmen May?

A.   Yeah.

Q.   Did you get -- did Poyson get -- you went with him to get bullets from Carmen May after Robert Delahunt was dead?

A.   I went with Bobby because I was told to and Bobby was telling me that was to get bullets.

Q.   Okay.  That is not what you told Eric Cooper; is that right?

A.   No.

Q.   Why is that?

A.   I didn't tell him that because he didn't really seem

PD PCR Anderson 019299

that he wanted to know what happened. He didn't know what happened to me or how I felt or what I was told so I didn't tell him.

Q. Were you confused when you talked about getting the bullets?

A. Yeah.

Q. Mr. Carlisle was asking you about either Anderson or Poyson wanting to pull out from this entire thing.

Do you remember when he asked you about that?

A. Yes.

Q. And I believe that your response was well, it was an on and off thing?

A. Yeah.

Q. What did you mean by that?

A. Well, after Delahunt was dead, Poyson would tell me that Anderson was backing out of it and then Anderson would tell me Poyson wanted out of it so --

Q. So, did you talk together about everybody wanting to give up?

A. No.

Q. Why did you go to the trailer to pretend to make up or make out with Robert?

A. Because that's what Frank wanted me to do.

Q. Frank had previously wanted you to be a prostitute for him; didn't he?

PD PCR Anderson 019300

78

A.   Yes.

Q.   Did Frank also want you to hitchhike?

A.   Yes.

Q.   Okay.  What did you tell Frank when he had said you can make extra money for us if you go prostitute?  What did you say to him?

A.   Talked him out of it.  I asked him if we could try washing windows instead of doing that and he said all right and he changed.  The subject was dropped.

Q.   Did you ever directly refuse anything Frank Anderson asked you to do?

A.   No.

Q.   What was there about hitchhiking?  Why didn't you want to do that?

A.   I was cold.  I never hitchhiked before in my life. I felt uncomfortable.  I just asked if I could sit on the side where he was hitchhiking in sight of him and I asked just wanted to sit down.

Q.   Did you ever say no when he said go out and hitchhike for us?

A.   No.

Q.   Did you just think of ways to get out of it and do that?

A.   Yeah.

Q.   So, why did you go along with him when he told you

PD PCR Anderson 019301
SCANNED

79

to go in and make out with Robert Delahunt?

A.  When first Bobby brought it up to me I said no and then Frank told me that he wanted me to go and lay on the bed and -- because wanted to scare him.

Q.  So why did you go along with that?

A.  Because that's what he wanted me to do.  Told me to go do it.

Q.  How come you didn't try to talk him out of it like you did when he wanted you to hitchhike or prostitute?

A.  I didn't think I was going to be able to talk him out.  That's what he wanted me to do.

Q.  Did he order you to go and do that?

A.  He told me to.

Q.  You also said prior to arriving in Golden Valley was the last time you ever had sex with Frank Anderson; is that right?

A.  Yes.

Q.  And did Frank continue to want to have sex with you?

A.  Yeah.

Q.  Did --

A.  He walked up to me like wanting to and he asked me and I made up excuses.

Q.  Did you ever say no, I don't want to have sex with you?

A.  No.

PD PCR Anderson 019302

Q.   Why not?

A.   Because I didn't want him to get mad at me.

Q.   Mr. Carlisle asked you about bringing rocks.

A.   Yeah.

Q.   In your mind, what were the rocks for?

A.   Hold the door open.  There had been previous rocks that were there before holding the door opened.

Q.   And then Mr. Carlisle told you or asked you later working off that transcript that you found out that they were doing something with Robert's head.

A.   Yes.

Q.   When did you learn that?

A.   On the way to Illinois.

Q.   How did you learn that?

A.   Because they were over talking about it.  I didn't really -- I knew that doing something with his head.  I didn't know what until I got arrested.

Q.   When you were arrested someone told you?

A.   Yeah.  They told me what the rock was used for.

Q.   Mr. Carlisle also said that he never turned yourself in.

A.   Yeah.

Q.   I mean, you didn't turn yourself in; did you?

A.   No.

Q.   Why not?

SCANNED

PD PCB Anderson 019303

A.   Because I was scared.  All the way to Illinois they told me that if I tried to turn myself in, all would be blamed on me.  That I'd be the one blamed for all the murders and I was scared.  No way I could turn myself in.  I was never left alone.

Q.   Why did you believe that you would get all the blame?

A.   Because that's what they told me.  Because I was there they said.

Q.   Why did you believe what they told you?

A.   I don't know.  I just did.  I've never been in trouble before.  I didn't know at that time -- didn't know no murder cases or -- I believed that I would be blamed for everything that had happened.

Q.   How many times did Frank Anderson threaten you once the first murder occurred?

A.   After that?  All the way to Illinois.

Q.   Every day?

A.   No.  He threatened me once right after the murder of Delahunt.  He'd be like -- couple of times like I tried to run.  He told me that he had killing in his blood now and I took that as a threat.  And there were previous -- other ones after that.

Q.   And didn't he tell you -- when you and Poyson were together in the motel room, didn't he tell you that if I had

PD PCR Anderson 019304

a gun, I would shoot you?

A. Yep.

Q. What about Poyson. How many times did he threaten you after the first murder happened?

A. He threatened me once after the first murder. He had threatened me right before the first murder happened. I believe that I felt threatened by him knowing he had a knife.

Q. What do you mean by threatened? Did he say something like if you ever tell I will kill you or --

A. No.

Q. -- how did he threaten you?

A. After the first murder when -- on the walk to go to get bullets from Carmen May he told me that if I try to run he would kill me too.

Q. How many times did he talk about the Mexican Mafia after you guys left?

A. He really didn't start talking about the Mafia -- Mexican Mafia until after Frank left to go to Kentucky.

Q. And Anderson was telling you about the Italian Mafia and Poyson was telling you about his Mexican Mafia. Can you tell a difference between the two?

A. Unt-un. I knew more about the Italian Mafia than I did the Mexican Mafia.

Q. Okay. Mr. Carlisle asked you about arriving at the homeless shelter.

SCANNED

PD PCR Anderson 019305

A. Uh-huh.

Q. And he showed you an exhibit that was an application to stay at the homeless shelter; right?

A. Yes.

Q. And did you give your name as Leah Poyson there?

A. Yes, I did.

Q. Why did you give your name as Leah Poyson?

A. Because that's what Poyson wanted me to put on this thing to go by because I was under eighteen and couldn't be in the shelter unless I was eighteen or over and he didn't want us to get caught.

Q. Okay. I think you testified that the interview that you did at the homeless shelter was done by a female person who worked there; right?

A. Yes.

Q. And then you also said that Poyson was taken away for an interview by a male because he lived in the male section; is that right?

A. Yes.

Q. So, were you away from Poyson when that interview went on?

A. Yeah, by not far. Eye sight.

Q. Okay. So, you were in eye sight of him?

A. Yeah, but eye sight was like -- was like right about -- about as far from me and him.

PD PCR Anderson 019306

SCANNED

Q.   Mr. Rosenthal?

A.   Yeah.

Q.   Why didn't you tell the person interviewing you that my name is Kim Lane and this guy is a murderer?

A.   Because I thought the Mafia was after us.  I thought I would be blamed for all of it.

Q.   Did you ever think about doing that?

A.   No.

Q.   There was something on that form about you said you were the victim of a robbery or something.  What can you tell us about that?

A.   That is what Poyson wanted me to say.

Q.   What did he want you to say?

A.   Wanted me to say that we were coming up to Illinois to see my grandpa.  My grandpa had died and we got in a car accident and Poyson had a cut on -- I can't remember what arm and I said that he cut his arm on I don't know what.  I don't remember.  And the car -- we got in a car wreck and were on the side of the road and a bunch of black people beat him up.

Q.   Poyson told you to say that?

A.   Yeah.

Q.   Why did you go along with that?

A.   Because that's what I was told to do.  I was scared.

Q.   Okay.  Mr. Carlisle asked you about your Miranda rights and, in fact, he borrowed a Miranda card from

PD PCR Anderson 019307

Detective Cooper and read them as you sat here.

A. Yeah.

Q. When was the first time in this case you heard someone read you your Miranda rights?

A. Cooper.

Q. And did he have that card that you saw Mr. Carlisle with?

A. I don't remember.

Q. Okay. Had you heard -- heard the Miranda rights off t.v. or anything before like that?

A. No.

Q. Did you ever watch cop shows or anything like that?

A. No.

Q. Okay. So, you remember that he said you have the right to remain silent. Anything that you say can be used against you in a court of law. You have the right to an attorney.

A. Yeah.

Q. Did that sound pretty clear when he said that?

A. No.

Q. Why not?

A. That's the first time I ever heard my rights read to me and I didn't really know what they were. At the time I didn't understand the part about the attorney. I felt my parents aren't here. I don't have no money. How am I going

PD PCR Anderson 019308

SCANNED

to get an attorney.  I felt I had to talk.

Q.  Is part of your Miranda rights you have the right to an attorney and if you could not afford an attorney, one would be appointed to represent you?

A.  I didn't understand all that.

Q.  Did you tell Detective Cooper when he was through reading it to you that you didn't understand that?

A.  Yeah.

Q.  Did you ask him to explain them to you?

A.  Yes.

Q.  Did he try to explain your rights to you again?

A.  Yeah, he tried to be specific.  He didn't read the whole thing over.  He tried to explain certain parts.

Q.  When he was through explaining them, did you understand them then?

A.  No.

Q.  Why didn't you tell him that you did not want to talk to him until you understood your rights?

A.  I felt I had to talk.  I felt Hedrich was on my side so I talked.

Q.  Look at page fourteen of the transcript.

Mr. Carlisle had you look about a third of the way down where you start off saying something like yes, I did.

Do you see that?

A.  Unt-un.

PD PCR Anderson 019309

Q.  Right there.

A.  Okay.

Q.  Okay.  You said yes, I did.

A.  Yeah.

Q.  And you testified earlier that you were uncomfortable being in there with Robert Delahunt; right?

A.  Yeah.

Q.  And here you say well, I had to lay on the bed and at the time I didn't really think that it was going to happen.

A.  Yeah.

Q.  It scared me pretty bad.

A.  Uh-huh.

Q.  I didn't think that they were really going to do something like that.  I was laying on the bed with Robert and Frank grabbed his head.

A.  Yep.

Q.  So, why were you uncomfortable when you were on the bed with Robert Delahunt?

A.  I was uncomfortable because -- for the fact he was kissing me.  Anderson kept walking up and down the hall and that made me uncomfortable.

Q.  When did you get scared?

A.  When I saw the knife come out.

Q.  Were you scared before that?

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019310

A. No.

Q. When did you know something seriously bad was going to happen to Robert Delahunt?

A. When I saw the knife coming out.

Q. And look at page fifteen now.

A. What page?

Q. Fifteen. The next page.

In the middle of the page there's -- and I am not going to read this whole thing but you kind of say he's going to do it. He's going to.

What was going through your mind at that point?

A. When I was being interviewed?

Q. No. When you were out there and ran over to Bobby after running out of the little trailer?

A. I was scared. My mind was -- I was out there. I wasn't thinking. I didn't do nothing.

Q. Was this the first time you realized that this no longer was a joke? This wasn't funny?

A. Yes.

Q. That people are going to get killed?

A. Yep.

Q. Okay. Look at page twenty-four.

Mr. Carlisle went over the part about -- looking at the top of the page -- Cooper said okay. You are talking about Anderson's activity right before he started to cut Delahunt

PD PCR Anderson 019311

and you say and he -- he kept walking back and forth and that's the reason I thought no, it is not going to happen. Cooper said but the whole idea was for it. You said yes. Cooper said to happen. You said yes, but I didn't at the time.

What were you trying to say there?

A. I thought that they were going to scare him and I didn't think that they were going to kill somebody.

Q. Mr. Carlisle asked you that part about but I didn't at the time and he just stopped when you said yeah; didn't he?

A. Yeah.

Q. And I asked that on direct but Mr. Carlisle brought it up in cross so, I will just ask you. On page twenty-six just below halfway down Cooper said because he needed Bobby to carry this out. He needed you to carry it out. So you guys planned and plotted the killing of Robert. You say yes. And Cooper said and you're very integral on to that. You're a very important piece of it, aren't you. You made an inaudible statement.

When he said you guys planned and plotted the killing of Robert and you say yes, who was you guys to you?

A. To me?

Q. What did that mean to you?

A. Poyson and Anderson.

PD PCR Anderson 019312

Q. Did you guys include you?

A. I didn't -- at that time didn't think he did because I didn't plot to kill anybody.

Q. Do you wish to make that more clear here?

A. Yeah.

Q. What was your overall thinking like when you did this entire interview with Cooper?

A. What do you mean?

Q. Were you thinking straight and focused or were you confused?

A. I was confused.

Q. Is everything in here accurate?

A. What do you mean accurate?

Q. Is everything in here giving an accurate impression of what you intended to say to Cooper actually happened out in Golden Valley?

A. No.

MR. ENGAN: I don't have any other questions. Thank you.

THE COURT: Mr. Carlisle, do you have more than say five or ten minutes of recross?

MR. CARLISLE: I can't say that I don't, your Honor.

THE COURT: All right. We might as well break now. Let's break for lunch and let's come back at 1:15. That will give you an hour and ten minutes off for lunch.

SCANNED

PD PCR Anderson 019313

During the break, remember my admonitions.  Do not discuss this case either among yourselves or with anyone else.  Don't talk to any of the parties involved in the case. Don't form an opinion as to what your verdict will be until the case has been turned over to you.

Don't leave yet.

Don't allow yourselves to be exposed to any possible media coverage and get out of here as slowly and deliberately and carefully as possible.

So, we will see you back here at 1:15 this afternoon.

(There was a break in the proceedings from

12:07 p.m. until 1:20 p.m.)

(The following was held in open court.)

THE COURT:  Thank you.  Be seated.

This is a continuation of CR-96-1057, State versus Kimberly Lynn Lane.  Show the presence of the Defendant, Counsel and the presence of the jury panel.

And, Mr. Carlisle, you may proceed with recross-examination.

MR. CARLISLE:  Thank you, your Honor.


RECROSS-EXAMINATION

BY MR. CARLISLE:

Q.  Now, when you checked in to the homeless shelter, you said Bobby Poyson told you what to put on your form;

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019314

right?

A. Uh-huh.

Q. And it is easier if you say yes or no for the Court Reporter --

A. Yes.

Q. -- to take it down.

Thank you. You said that he was afraid of you getting caught and that's why you put down a different name?

A. Yes.

Q. But he went by his own name; right?

A. Yes.

Q. And would it be surprising to you that he put down the address on Yavapai?

A. No, because on job applications he put Yavapai.

Q. All right. And would it be surprising to you that as far as indicating why he is homeless at this time, the only thing he put was that he was in transit; that he was traveling?

A. I don't know what he put. I told them what he told me to say to them.

Q. Okay. So, would it be surprising to you that he didn't say anything about a robbery four days before?

A. I don't know. When he was by me, he told them that. He told the doctors that when they were caring for the cuts on his arm.

PD PCR Anderson 019315

SCANNED

Q.  Okay.  And I want to talk about what Mr. Engan did or did not tell you.  Did Mr. Engan tell you to cover up your tattoo with a band-aid?

A.  Not Mr. Engan didn't.

Q.  Okay.  When did you give yourself that tattoo?

MR. ENGAN:  Objection; lack of relevance, your Honor.

THE COURT:  I'll overrule the objection.

You can answer the question.

THE WITNESS:  Probably about four or five months ago.

Q.  (BY MR. CARLISLE)  Okay.  I think that you testified that you wanted to tell Detective Cooper more of the story than you told Jeff Hedrich; is that right?

A.  Yeah.

Q.  But, in fact, when you started off, you pretty much were just telling essentially the same story you told Jeff Hedrich?

A.  I don't remember.

Q.  Well, let's refresh your memory.  Can you turn to page eight of the transcript, please.  Actually, I am sorry, page nine.

Now, a little over halfway down there's kind of a long statement you are making on that page.

Is that correct?

SCANNED

PD PCR Anderson 019316

94

A.   Yeah.

Q.   Okay.  At the end of it you say I don't remember too much about Tuesday.

Right?

A.   Yeah.

Q.   That's the first time that Detective Cooper stops you and said okay.  Let me stop you.  Okay.

Is that right?

A.   Yeah.

Q.   Later on you state Tuesday is when you went to the thrift store; right?

A.   Yeah.

Q.   Tuesday is when you went to the pawn shop to retrieve bullets?

A.   Yeah.

Q.   Okay.  And Tuesday actually is the night that Robert Delahunt, Leta Kagen and Roland Wear are killed; is that right?

A.   I didn't know that.

Q.   Okay.  Then going on to the next page, page ten.

You start again just after halfway down there's a somewhat long statement by you.  You start off.  You say they were talking about killing and then -- and the guy -- but they were planning to stay there.  They were planning to do it Thursday to kill the husband too but then it ended up

SCANNED

PD PCR Anderson 019317

happening earlier.

A. Uh-huh.

Q. So, you are talking there about this plan to kill them and that's when Detective Cooper stops you at the bottom of the page and asks what you remember saying jokingly.

Right?

A. Uh-huh.

Q. So, when you first were talking about the killings, he had to stop you and have you go back to the statement you made about killing them and taking the truck --

A. Uh-huh.

Q. -- right?

Okay. Then on page fourteen, I want to go over this paragraph again. We've been over it a couple of times but you said about a third of the way down you start off with yes, I did and that's after Detective Cooper said you had a role to play.

Right?

A. Uh-huh.

Q. And you said I was laying on the bed with Robert and then Frank grabbed his head. Detective Cooper says well, what was going on between you and Robert. And you say we were kissing and Frank grabbed his head.

So, you kind of skipped over the part that you were kissing when you first started telling him about that; is

SCANNED
PD PCR Anderson 019318

that right?

A. What? You confused me.

Q. Well, when you first were telling him about it, you just said you were laying there on the bed and Frank grabbed his head; right?

A. Uh-huh.

Q. You didn't mention anything about kissing?

A. No.

Q. Then on the next page, the very last statement that you make on that page is you're talking about both teamed up to kill him there. I know that a couple times the trailer door would open and I thought that Bobby and Frank had ditched me or something. I'd walk over there and they asked me get them water. I had gotten them clothes.

And then Detective Cooper stopped you again and said you're jumping ahead of yourself. They're in the trailer. They're fighting. They have the knife. You say yes. He continues asking you how long did they fight. Approximately an hour and a half. And then he says okay. Did Bobby ask you to get something for him during the fight. You said yes. He said what did he ask you to get him. You said water. He said what else. Water and then Frank asked me to get matches.

And finally down at the bottom Cooper said did Bobby not ask you to get him something specific. And you finally say

SCANNED

PD PCR Anderson 019319

97

he specifically asked me to get him a rock okay.

Right?  Is that correct?

A.  Yeah.

Q.  During the time when you described it, you left off the part about getting him a rock.  Detective Cooper had to ask you several questions before you finally told him yes, you got him a rock?

A.  Uh-huh.

Q.  Okay.  And then going back in page -- back to page thirteen which, ironically, is after that you are talking about getting bullets.

A.  Yeah.

Q.  And you said that at the top of the page he had gotten two bullets from a girl that lived a little bit away from the trailer.

A.  Uh-huh.

Q.  Cooper said Carmen.  You say yeah, Carmen.  He'd gotten two bullets from her.  He said well, didn't you go over there with him.  And you say yes, I did.

So, when you first told Detective Cooper about getting bullets, you didn't mention that you had gone there with him until he asked specifically if you had gone with him; right?

A.  Yes.

Q.  And those are the same things that you left out in your story to Jeff Hedrich.  Getting the bullets, getting the

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

SCANNED

PD PCR Anderson 019320

rocks, that you said let's kill them and take the truck and about kissing Robert.  Those are the things you left out in your story to Jeff Hedrich also; right?

A.  Yes.  Well, I don't remember but --

MR. CARLISLE:  No more questions.

THE COURT:  All right.  Ms. Lane, you can step down.  Thank you very much.

THE WITNESS:  Thank you.

MR. ENGAN:  Your Honor, may we approach for a minute?

THE COURT:  Yes.

(Off-the-record discussion at the Bench between the Court and Counsel.)

(The witness was excused.)

THE COURT:  All right.  Counsel, you may proceed.

(A prospective witness entered the courtroom.)

THE COURT:  All right.  Ma'am, if you would just come up here and give your name to the Clerk and she will swear you in.

Thereupon --

CHERYL L. KARP, Ph.D.,

was called as a witness by the Defense, and having been first duly sworn, was examined and testified as follows:

THE COURT:  All right.  Ma'am, you can have a seat

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019321

SCANNED

right over here if you would, please.

DIRECT EXAMINATION

BY MR. ROSENTHAL:

Q.  Would you state your name for the jury.

A.  It is Cheryl L. Karp, Ph.D.

Q.  And where is your office?  Do you have an office?

A.  Yes, I do.  In Tucson.  It is in the Tucson Medical Park, Tucson, Arizona.

Q.  And what is the exact address?

A.  5190 East Farness, Suite 112, Tucson, Arizona.

Q.  And you said Ph.D.  What does that mean?

A.  That I am a doctor in the field of psychology.

Q.  And what is your training and background?

A.  It is in -- I am a licensed psychologist.  My specialty area and my training has been working with children and working with adults.  You are trained really to work with adults but do an extra specialty to be able to assess and do therapy with children as well.

Q.  Tell the jury about your education and background. Where did you go to school?

A.  I attended the University of Arizona and I did an internship in pediatrics at the University Medical Center.  I did some research with the University of Arizona and the Department of -- well, it would be the Department of Economic

PD PCR Anderson 019322

Security in training families to use consultation methods in hopes that there would be less children placed in foster care. That was like a two-year project that I was in charge of.

I have done research in family therapy to train parents also in having more tools to guide children. That was published in Child Development.

I then went on to specialize in the field of child trauma so that I did have to work for the Department of Economic Services and I worked under a contract with them to do evaluations of children who had been suspected of being victims of child physical or sexual or emotional abuse. I went -- I continued to work in that field and in my private practice as well.

I then went on to be the clinical director of psychology and ran a trauma program at a youth psychiatric hospital in Tucson and then in addition to my private practice, I did about fifty percent of time in private practice and fifty percent in the hospital and I was the clinical director of a trauma program in another youth psychiatric facility so over the last -- I finished my degree in 1978 so I have been in private practice since that time.

I also taught at the University of Arizona in child development and in learned theory.

Q. And do you have some publications?

PD PCR Anderson 019323

A.   Yes.   I do have numerous publications and a book that I wrote that was co-authored with my husband who is an attorney so it is actually a legal text for domestic court by the name of Domestic Torts; Family Violence and Conflict and Sexual Abuse.   That was published -- it was originally published or, actually, we were requested by the Shepherd's/McGraw-Hill their legal division to write this book incorporating legal and psychological theories understanding different violent situations within families so that it covers spousal abuse.   It covers child abuse.   It covers sexually-transmitted diseases.   It covers all different kinds of tort action or action people have in a case of domestic violence.

Q.   And --

A.   Then I went on to write two other texts where I co-authored that are of a psychological nature that are Treatment Strategies for Abused Children that covers emotional, physical and sexual abuse.

And then the most recent is Treatment Strategies for Abused Adolescents.   Those publications were -- those books were published by Sage Publications out of California.

Q.   And in this particular case with Kim Lane, my office hired you to do some work on her case; correct?

A.   Yes, you did.

Q.   And what other types of agencies do you do work for?

PD PCR Anderson 019324

A.   I would say principally I have worked lots with the F.B.I., Federal Bureau of Investigations.  I do almost all of their evaluations in Tucson that have to do with child sexual abuse on the Reservation.  They are the police agency for the federal land and so when there is a question both of a child who -- who may have been abused or if there is a question of a child who may be abusing others, they will refer them to me and so I am part of the investigative team to do evaluations of those cases.

I also work with other attorneys who ask me to do evaluations of clients of theirs and I also work quite a lot with the Yuma prosecutor's office -- with the County Attorney's Office in Yuma whenever there is a case of child sexual abuse.

Q.   That would be the same level Mr. Carlisle would be for the State here?

A.   That's correct.

Q.   And do you remember what we talked about?  What sort of work I asked you to do in this case?

A.   Yes.  You asked that I evaluate Kim Lane.

Q.   Is that the sort of thing you do in these cases often?

A.   Yes.  I will evaluate and/or use my expertise on cases that involve some act of violence or where the person perhaps was the victim of a traumatic situation.

PD PCR Anderson 019325

Q.   And did I give you some background information?

A.   Yes, you did.

Q.   What did I give you?  What did I supply to you?

A.   I gave me some statements that had been given to the police by Kim and by the other defendants Frank Anderson and Robert Poyson in addition to any other witness statements and most recently I received statements from her school, from people that were -- who lived in the community who knew her that could provide collateral information that would be additional information to support the background that Kim had given me when I met with her.

Q.   And the latest compilation of information that I gave you, you received that after you had done the other tests?

A.   Yes.

Q.   And so, tell the jury what tests you performed on Kim.

A.   I did a battery of tests which is common when you are doing an evaluation on someone.  You try not to rely on one test to tell you about that person so I did the Minnesota Multiphasic Personality Inventory for Adolescents which is called the MMPI-A.  I gave the Millon Adolescent Clinical Inventory which is referred to as the MACI.  That is also a personality inventory to try to understand her personality better.  I gave the Jesness Inventory which looks at

SCANNED

PD PCB Anderson 019326

personality also and it is geared more to understanding children who may come before the juvenile court system.

I gave a Youth Self Report which sort of understands how persons see themselves, how they report themselves. I gave the Trauma Symptom Checklist for Children to understand whether or not there was any kind of a profile which would suggest that there is trauma that is involved here.

I gave the Thematic Apperception Test which is always good to have. It is a projective kind of test that would be where you show a picture and the person tells you a story about it. That gives a more projective sense of the person. And I gave to her the projective drawings to assess her maturity level and to assess how she kind of views the world through illustrations.

And then I did a forensic history questionnaire that is very detailed to again understand her history and understand her, who she is, how she sees herself and the situation that she is in.

Q. Let me stop you there for a minute. I know you have to get into her own background that she told you but were you able to make some findings based upon these tests results?

A. Yes.

Q. And why don't you go through them and tell the jury what you were -- what your findings were and what you base them on.

PD PCR Anderson 019327
SCANNED

A.    Again, I am not using one test to come to my conclusions.  I give many tests to try and figure out the profile and dynamics that Kim was presenting to me through the various tests and then I look across the different tests to see if how, you know, what her personality is like.

And what my findings were was that she presented on the tests as an -- as an adolescent who was very immature, very passive-dependent would be the best way to describe it.  Where she is very quiet, kind of shy.  That there is a part of her that is not very assertive.  That she has a lot of difficulties being able to express herself.  That she is easily lead by others.  That she is in more a dependent kind of role where she is kind of deferring to other people in making decisions around her.

The tests also suggested and were -- was pretty consistent across all of the tests that she was depressed and anxious.  That those were -- she had a lot of symptoms of depression and anxiety.

I also had given her -- which I failed to mention -- the verbal section of the Wechsler Intelligence Scale to assess what her intellectual level was at verbally, how she interacted with people, how she can explain herself which came out in the borderline lower average area.  She I think was around eighty-four in her ability to relate to the world and her intellectual abilities which is a low area of

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCB Anderson 019328

functioning which kind of went along with her passive-dependency and her yielding to others and her immature view of the world and her inability to take care of herself.

Q.   And the tests suggest a low intellectual ability?

A.   Yes.   Around low average to borderline range of around -- I think I gave the range of seventy-nine to ninety-one.   I think I came up with eighty-four.

Q.   Okay.   And -- and what else did that test indicate to you about her characteristics?

A.   That what -- when she is confronted in a -- where her security is challenged, where she is having a threat to herself that she tends to, you know, pull within herself and that she cannot discharge her feelings in an angry way.   That she turns into more a passive way and that she will defer to others around her.

Q.   And -- and after you do that test -- well, let me ask you how long do the tests take?

A.   Well, I had -- she came in for a -- pretty much almost two days of testing.

Q.   And she was brought there by a sheriff's officer?

A.   Yes, she was.

Q.   But was she -- was she unshackled in your office?

A.   Yes.   I had them take off her iron wear.

Q.   Okay.   And did you run some tests on her to

PD PCR Anderson 019329

SCANNED

determine whether she was -- was more likely to be truthful or untruthful to you?

A.  Well, in all of the tests there is a tendency to understand whether a person is being forthright and one of the tests, on the MMPI-A, there was the tendency to want to look better so that it was looking like she was exaggerating her own virtuous side.  On the Millon she did the exact opposite.  She tended to be more self-defeating and really kind of negative about herself so -- and the other tests all supported her more negative side which I see generally throughout all of them.  She was very candid about herself and about her personality and about who she is and so it was a pretty fair assessment of her personality.

Q.  So, the point of running all of these tests is to determine consistency in a person?

A.  Consistency across the tests, you know, to see if there are certain things that come up in all the tests that give me a good idea that this is who she is.

Q.  And did you have her do some drawings for you?

A.  Yes, I did.

Q.  Why did you do that?

A.  As I stated before, it was sort of to give an idea of her maturity level.  Her I.Q. test come out kind of low and I wanted to see, you know, how she relates to the world, what her view is, whether she is -- whether it shows some

PD PCR Anderson 019330

SCANNED

tensions, whether it will show another aspects of her.

And what it revealed was a very child-like nature. That she is very, very immature. Her -- I asked that she draw a picture of a boy, a picture of a girl, a picture of a man and a picture of a woman and she drew a picture of a young boy who she called John and he was just a very happy-go-lucky kind of fantasy. Just kind of -- this was a very immature, very youngful kind of child-like picture.

Another one of a girl named Kinsey also had this real kind of youthful, child-like, naive. That is another word that came up consistency in her testing was this naive view of the world that she was naive, very impressionable, very young.

Her view of a house was also very basic. It was just a little house with curtains and a little kid peeking out, you know. Doing this for diagnosis, you know, may be that there are secrets hidden behind this curtain. We often look at something like that but I didn't do a full assessment of that through the projective drawing so that I am not going to comment on that other than to say that that is supported. Again, this is a very youthful, very young way of looking at the world.

Her tree was the same thing, you know. There was a heart on the tree and just very simple, you know, very young, very child-like, very immature.

PD PCR Anderson 019331

Q.  Are you able with any degree of medical probability, able to put a working age on her -- on her intelligence?

A.  To a psychological certainty, I can say that her measure does fall somewhere between -- her verbal intelligence is somewhere between seventy-nine and ninety-one so that is in the low average and it is supported through the I.Q. testing in addition to her -- her drawings.  It is like at the time she was being evaluated, she was fifteen years old but she presented as this child more like ten.  Really young, very, very immature.

Q.  When did you see her?

A.  I saw her in I believe it was July but I am not sure of the exact month.

Q.  That's close enough.  Approximately July of what year?

A.  Of 1997.

Q.  And what history did she give you?  I assume that you take a history in these cases; correct?

A.  I take a very thorough history.  Not only do I take a history in my clinical interview with her but I also give her a form to fill out that she fills out overnight between two days that's very extensive.  That gives a history of her family, how she was raised, you know, something about each of her parents.

What that shows me was that she as a child that her

PD PCB Anderson 019332

SCANNED

parents divorced when she was quite young and she was living with her mother for a short period of time then she lived with her father. She said her father abuses, according to not only her report but according to reports of other family members and -- and her ex-stepmother's history of her father, he has a history of alcohol abuse and drug abuse and that he would share alcohol with her.

She then began being physically abused by her father and at the time that she ran away from home, it was because of the incident of being physically abused. That seemed to be a chronic problem in her home life.

Q. Did she tell you how long she had intended to run away from home for?

A. For a few days to try and cool things down.

Q. And this was at a time before she ran away with Frank Anderson?

A. Yes, it was.

Q. And -- and so what did she tell you about that incident?

A. She told me that she wanted -- she was hoping to -- she wanted to get away. That she had been -- her father had banged her head against a wall and she had had enough of the physical abuse and wanted to get away for a few days. I think that she said three days to just cool down and be able to get away from it.

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

SCANNED

PD PCR Anderson 019333

And then her brother had left and gone back to live with his mother and at that time she was feeling isolated at home and feeling more threatened because of that and so she was trying to decide what to do.

Q.   And what did she decide to do?

A.   Well, she spoke with Frank Anderson and his wife about her dilemma, about the problems she was having and he said that he would help her run away.  That he would find a place for her to stay and she told me that she was hoping that she could run away and stay there a few days.

Q.   And what did she tell you happened?

A.   Well, when they very first left she said that -- that Frank Anderson started talking to her all about the -- it sounds pretty ludicrous -- but he started talking to her about the Mafia and a gang -- a gang that he was involved in. She always referred to that as the Mafia and he started scaring her with his involvement in it and she felt at first frightened by it and then she felt that -- that she was sort of trapped into -- into going away longer than what she intended to go away for.

Q.   Do you think that that factor of the Mafia was significant in her -- her leaving with Frank Anderson?

MR. CARLISLE:  Objection.

THE COURT:  On what basis?

MR. CARLISLE:  Well, he is asking her if she thinks

PD PCR Anderson 019334

that was a factor and just the way it is phrased, I want to make sure that she is basing this on some medical diagnosis or something to that effect.  I feel that's a vague question.

THE COURT:  I'll sustain the objection.  I will allow you to ask her what Kim Lane told her but I am -- your last question does not make it clear whether you are asking her to speculate as to why Kim Lane ran away.

Rephrase the question.

Q.  (BY MR. ROSENTHAL)  Well, based upon the information that she gave you and the fact that he began talking about the Mafia, do you have an opinion based upon your expertise whether that was a significant factor in her leaving?

MR. CARLISLE:  Objection as far as her testifying about Miss Lane's state of mind at the time that it happened. I think that she can testify about traits but she cannot testify about the state of mind of the Defendant at the time that it happened.

THE COURT:  I'll sustain the objection.  I believe you are asking her to speculate as to why she did something at the time and I won't allow you to do that but I will allow her to certainly relate things that the Defendant told her or relate diagnoses that she may have made based upon tests, taking of history, et cetera.

Q.  (BY MR. ROSENTHAL)  Based upon -- based upon these facts, did you form a diagnosis regarding Kim Lane?

PD PCR Anderson 019335

A.   Yes, I did.

Q.   And what was that diagnosis?

A.   Well, there were several different diagnoses that -- that I established that were going on with her.

In regard to the testing and the history that she gave me, it appeared that she was in a state at the time when he was talking about the Mafia and about running away, the fear was pretty intense at that point and it was my opinion that she was in more of a hostage situation rather than wanting to go away for like for an extended period of time.

We referred to the depression that she was exhibiting at the time of her testing with me and that goes back pretty much -- it had been there for a while -- the depression part and anxiety.  When you couple that with the situation of being scared, she was in a state of what we call learned helplessness where --

MR. CARLISLE:  Objection as to she was in a state of.  I think she can, again, offer her opinion as to traits but not her mental state at the time.

THE COURT:  I'll overrule the objection.

I will allow you to continue with your response.

THE WITNESS:  My feeling is that learned helplessness is a very important state in how she presented when I saw her as she explained this to me.

Learned helplessness is a phrase that is equated with

PD PCR Anderson 019336

SCANNED

battered persons -- a person who has been abused and is in a situation where they don't feel they have a way out.  This was started with an experiment done originally with dogs and it was done by a psychologist by the last name of Sellerman and he would take these dogs and have them in a big like kennel like and on one side of it there would be an apparatus that would shock the dogs and on the other side it would be -- it would be -- would be nothing so, of course, the dogs move over to the other side.

They put up a barrier so that the dogs couldn't get to the other side and the dogs just laid down and when they first tried to get out and found they couldn't get out, they just laid down and absorbed the shock.  They then removed the barrier so that they could get to the other side and the dogs wouldn't move.  The dogs just stayed there.

Also, Lenore Walker in Denver has done extensive research in battered women and also learned helplessness. She says that is the giving in to a state of mind that they're in and they see no way out.  She has tried to explain why some people don't leave a situation that seems threatening and learned helplessness is one of the reasons.

They have also done experiments with human subjects where they rang a bell instead of shocking them and they did the same thing so, they did that not just with animals but with humans also and it really helps us to understand the

PD PCR Anderson 019337

behavior of people that are placed into a threatened situation.

Q. (BY MR. ROSENTHAL)  Were there other diagnoses that you made?

A. Another diagnosis that I -- that I made and I talked about is the Stockholm Syndrome which is one based on an actual bank robbery that occurred in Stockholm, Sweden in 1973 and in that bank robbery the hostages started to identify with their captors and saw the police as the bad guys rather than the good guys and psychologists really couldn't, you know, understand the dynamics of what was going on, why they did do that and they found out that there was a certain mentality that happened when people are taken hostage that even given a situation where they can escape, they didn't escape because they tended to see the captors as the good guys.

So, understanding how this relates to people who have been in a threatening situation or who have been battered or who have been mistreated, there are some psychologists who did research to try and understand how the Stockholm Syndrome applies to battered women.  That was the group that they picked and they found that certain elements need to be in place and one was that they felt no -- that they felt like their life was in -- that people were in charge of their life.  That they felt that they were in control of them and

SCANNED

PD PCR Anderson 019338

that they felt threatened and but that there were little acts of kindness where at times that person would be acting real nice to them and that combination set up what is called trauma bonds so the person actually feels bonded to that person and at times really feels that they have a very good relationship going.

That sort of convinces them they do because they don't see any way out and then their mind set actually changes where they actually feel that they are -- that these people are taking good care of them so that -- that's why the hostages in the Stockholm Syndrome felt that their captors were really good people because they felt that their life was threatened, that they were dependent on them and that they had acts of kindness.  That combination strengthened this bond that would in other senses seem really sick.

It would seem like, you know, how could that happen but it did happen and it helps us to understand why people do things that -- that don't seem normal.  That there are relationships where people get set up in various situations where people end up becoming dependent on that person and behave in a way that is different than what normally they would be -- would behave in.

Q.  Now, is that another diagnosis that you made -- that bonding for Kim?

A.  Yes, I did.  That's part of the Stockholm Syndrome.

PD PCR Anderson 019339

Q.   And did Kim relate to you that sometimes Frank Anderson would be kind to her?

A.   Yes.   That she felt that he was, you know, taking care of her.   Remember, he was forty-eight years old.   She was fourteen years old and you have a person who you are dependent on for your life to take care of you and you think that he is removing you from an abusive situation so that kind of sets up the whole dynamics right away where that person is being kind then he throws in comments about the Mafia and it, you know, sets up the fear.

Then you throw in threats that he actually made to her so that you have this combination of the kindness and the threats and her dependency on him.   Then you throw in her basic personality profile which is a passive-dependent person who is dependent on other people to take care of her and doesn't seem to be very assertive.

Her teachers described her as being shy, passive, you know.   Her principal described her that way.   That there is this person who doesn't take charge and then depression was a diagnostic category and anxiety that she has fits with learned helplessness.   She presented as being depressed and anxious.

MR. ROSENTHAL:   Thank you very much.   That's all I have.

THE COURT:   All right.   Cross-examination,

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019340

Mr. Carlisle?

CROSS-EXAMINATION

BY MR. CARLISLE:

Q. Now, when you are evaluating somebody, in order to be objective, you try to get as much information as possible; is that correct?

A. That's correct.

Q. And before you did your evaluation of Kimberly Lane, you were given police reports?

A. Yes, I was.

Q. You were given the transcript of statements that Bobby Poyson, Frank Anderson and Kimberly Lane had made?

A. That's true. That's correct.

Q. And you reviewed all those?

A. Yes, I did.

Q. Did you rely on that to make your diagnosis?

A. Well, I used -- that's part of background information.

Q. Okay. One of the things that Kimberly Lane told you is that she thought that they were going to stay in Kingman for quite a while; is that right?

A. Yes. That's correct.

Q. She also told you that Frank Anderson had told her once they arrived in Chicago that what he stated about the

PD PCR Anderson 019341

Mafia was untrue?

A.  I don't believe she told me that.

Q.  And she also told you that she had made a false allegation against her stepfather when she was living with her mother; is that correct?

A.  Yes.  She did tell me that.

Q.  Okay.  Now, you are familiar with the D.S.M.; is that correct?

A.  Yes, I am.

Q.  Can you tell us what that is, please?

A.  That's the Diagnostic and Statistical Manual of Mental Disorders.  It is the Bible, if you will, of mental health used by professionals to make diagnoses of people.

Q.  And in the D.S.M., is there a disease that -- or diagnosis called Stockholm Syndrome?

A.  No, there isn't.  It falls under depression and it would fall under anxiety disorder.

Q.  There --

A.  It is what is the description of the behavior that happened during certain situations that falls within post-traumatic stress disorder.

Q.  There are several hundred pages of the diagnostic definitions in that manual; is that correct?

A.  Well, there is certain categories of diagnoses so that you can put a diagnostic statement to go with insurance

PD PCR Anderson 019342

SCANNED

codes.   That's what it is for.

Q.   There's --

A.   There are certain kinds of behavior that is not covered in the D.S.M. that would be sort of subcategories of diagnoses that have -- that change every four or five years.

Q.   Okay.   There's nothing in there that says this is a diagnosis that you associate with the Stockholm Syndrome?

A.   No, we don't have that.   That is covered under post-traumatic stress disorder and depression.

Q.   You also don't have anything that says this is a diagnosis you could associate with battered-women syndrome?

A.   No, they don't.   That's -- that's covered under post-traumatic stress disorder and depression.

Q.   Okay.   And if -- if Kimberly Lane was not feeling the threats -- was not feeling threatened by Frank Anderson, then the Stockholm Syndrome wouldn't apply as much because one of the elements is that -- is that they have to be threatened; is that correct?

A.   That's correct.

Q.   Okay.   And indicated that people in the Stockholm Syndrome are not likely to try to escape if they can; is that correct?

A.   That's correct.

Q.   So, if she tried to escape, that would show that the bond was not that strong over her; is that correct?

PD PCR Anderson 019343

A.   Not necessarily.  I think there are many people who are in a hostage situation and may have stayed in the situation and at times they have moments of lucidity where they actually try to escape from it.

Just as battered women who are in a hostage situation many of them do end up getting to court and getting a divorce or go to a battered woman's shelter so that I understand what you are saying.  Ordinarily if they then try to escape they no longer fit the criteria.

Q.   Okay.  Let's talk about the testing part.  You only did the verbal part of the Wechsler or the WSIC; is that correct?

A.   Yes.  That's correct.

Q.   There are two different parts of that test?

A.   Performance is a non-verbal part of the test and it looks at spatial kinds of abilities and looks at the ability to perceive situations that are -- that are non-verbal.

Q.   And you need to really do both parts of the test to get a comprehensive resultant I.Q.?

A.   Yes.

Q.   You would agree with that?

A.   By doing the performance you get a fuller picture of a person so full -- full, you know, ability to see the person.

Q.   And also isn't it the kind of test that is sensitive

122

to anxiety?

A.  Well, the performance part is especially sensitive to anxiety.

Q.  What about the verbal part?

A.  What about it?

Q.  The verbal part is also sensitive at least a little bit to anxiety?

A.  Well, some but not like the performance part which is where you really see depression scores if there was anxiety present.

Q.  So, you are saying there wouldn't be depression scores on the verbal part if somebody was experiencing a good deal of anxiety?

A.  A person feeling anxiety or depression or feeling manic, of course, you would see on it both tests.  You will see more balance on the performance because that one is actually timed.

Q.  Okay.  And somebody that has been in jail for several months and is facing charges is probably going to be anxious?

A.  Yes.

Q.  And depressed?

A.  Yes.

Q.  You also indicate on the I believe MMPI-A that she had an unwillingness to disclose personal information; right?

PD PCR Anderson 019345

A.   Yes.  On that one test.

Q.   And that decreases the validity of that test?

A.   Well, yes, to a certain level which is why I give more than one test in order to establish that.

Q.   Okay.  And, in fact, she refused to answer some of the questions on the MMPI-A; is that correct?

A.   Well --

Q.   She failed to answer some of the questions?

A.   Well, yeah.  I can't say she refused.  She may not have understood some of the questions but she didn't answer some of the questions.

Q.   One of the questions that she didn't answer was when I am cornered to tell that portion of the truth which is not likely to hurt me.  Is that correct?

A.   I don't know.

Q.   So --

A.   There were only two questions that she didn't answer.  I don't know if that is one of them.

Q.   Okay.  Before the -- before your evaluation, you did not actually interview Frank Anderson; did you?

A.   No, I did not.

Q.   Okay.  You didn't actually interview Bobby Poyson?

A.   No.  I believe that both are in prison or in jail.

Q.   Right.  So, you just relied on their written statements or transcribed statements?

PD PCR Anderson 019346

A.   That's correct.

Q.   And would it make a difference in your evaluation knowing whether or not they had a dependent personality as well?

A.   Well, it wouldn't make a difference as far as what her personality is or the situation she was in.  It may make a difference as far as understanding them.

Q.   So, it wouldn't make any difference in the dynamics of this if Frank Anderson was diagnosed as having a dependent personality disorder?

A.   No, it would not.  When you look at a forty-eight year old man and a fourteen year old girl, you know, it would not change my opinion as far as who is the more dynamic person in that relationship.

MR. ENGAN:  Your Honor, I hate to interrupt but may we have a short five minute bathroom break?

THE COURT:  Yes, we may.

Let's take about a five minute break.  During the break, remember my admonitions and we will be back here in about five minutes.

(There was a break in the proceedings from 2:20 p.m. until 2:30 p.m.)

(The following was held in open court.)

THE COURT:  Thank you.  Be seated.

This is a continuation of Cause Number CR-96-1057, State

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019347

versus Kimberly Lynn Lane.  Show the presence of the Defendant, Counsel and the presence of the jury panel.

And you may proceed with cross-examination, Mr. Carlisle.

MR. CARLISLE:  Thank you, your Honor.

Q.  (BY MR. CARLISLE)  Now, I believe on direct you indicated that she was like a ten year old girl.  That was your assessment.  In your report you indicate that she is more like a ten to twelve year old girl?

A.  I said she behaved like a ten and twelve year old girl and in some circumstances well below that.

Q.  You also did a background history; is that correct?

A.  Yes, I did.

Q.  She had a significant drug history; is that correct?

A.  Yes, she did.

Q.  Did she indicate that she used marijuana approximately four times a week?

A.  Yes.

Q.  And used alcohol approximately three times a week?

A.  That's correct.

Q.  And she tried speed two or three different times?

A.  Yes.

Q.  And she had sex with a couple of different boys before she met Frank Anderson; is that correct?

A.  I believe she said she had sex once with two

PD PCR Anderson 019348

SCANNED

126

different boys.

Q.   Okay.   You also indicated you read the confession that Bobby Poyson had given; right?

A.   Yes, I did.

Q.   Now, during his confession, Bobby Poyson talked about Kim Lane's involvement; is that correct?

A.   You know, I read -- when I read one of the statements -- I don't know if it was a confession.  I read one statement where it did describe everything.

Q.   Okay.

MR. ROSENTHAL:  Can we approach, your Honor?

THE COURT:  Yes.  Come on up.

(Off-the-record discussion at the Bench between the Court and Counsel.)

Q.   (BY MR. CARLISLE)   Handing you what has been marked as State's Exhibit 76.

Is that a statement that was given by -- is that a statement by Bobby Poyson that you were given?

A.   It could be.  I am not positive but it could be.

Q.   Okay.  And do you recall a transcript of a taped statement?

A.   Yes.  I recall that I had a transcript of a taped statement that I read in I guess July of '97 or probably before that -- June.

Q.   Okay.  And one thing you did was made sure you

PD PCR Anderson 019349

reviewed that statement?

A. Yes, I did.

Q. You did review all the police reports --

A. Yes, I did.

Q. -- is that correct?

And one of the things you wanted to do was to determine the truthfulness and credibility Kim Lane was being in talking to you?

A. One, I don't think that -- that I am there to -- to assess her truthfulness through reading their statements but what I did was I wanted to get background information on what happened and I wanted to get their perceptions of what happened so that I could just use it as part of background information gathering.

Q. Okay. So, you wanted to have as thorough a background as you could get; is that correct?

A. That's correct.

Q. But you wanted to be objective in making your evaluation?

A. That's correct.

Q. All right. So, to be objective in making an evaluation you gathered all the information you could and reviewed it all before you sat down with Kimberly Lane?

A. Well, I don't know if I reviewed it all before I sat down with her. I reviewed -- as I stated before, you know, I

PD PCR Anderson 019350

128

was getting information all along but, you know, I sat down and had an interview with her at one point and I can't say for sure when in that that I read all of the reports but I read that along with doing an interview with her. I don't know if I had read the entire statement prior to seeing her. I had received it prior to seeing her I believe and then I reviewed some of the stuff after so that I don't know the exact chronology of how I did it.

Q. Okay. But at some point in time you did review everything and in making sure that you were objective, you took everything into account including background information when making your diagnosis; is that correct?

A. Well, in evaluating her -- I didn't necessarily use that background information in evaluating her but in order to understand the whole dynamics of the picture of what happened, I used that as part of my background information but that's correct.

Q. But, isn't that part of your diagnosis was what you are saying is that you knew what happened?

A. Well, that's -- I could pull from things that seemed to be consistent just like I did with the tests. Like in the statement it talks about that he had admitted that he had scared her with talks of the Mafia so that corroborated some of the statements that she had made so I look for consistency across all different measures. That would be one of them.

PD PCR Anderson 019351

That's true.

Q. Okay. That would be something that you would take into account in making your diagnosis?

A. I would.

Q. Okay. And, in fact, would that be something you would rely on in making your diagnosis?

A. I don't know that I would rely on but I would say that that would be one of the things that I did take into account.

Q. Okay. Now, one of the things that Mr. Poyson talks about is Kim Lane's involvement in this case; is that correct?

A. As far as I can remember.

MR. ROSENTHAL: Excuse me. I believe this would be the time that I would like to ask the jury be excused so that we can look into this issue more fully.

THE COURT: All right. Ladies and gentlemen, we have an issue that we need to take up without you being here and I know that it seems like we just took a break but we are going to take another one so step out and we'll call you back in here when we are ready for you. Be careful.

(The jury left the courtroom at 2:39 p.m.)

(The following was held out of the presence

of the jury.)

THE COURT: And you can step down, Dr. Karp, if you

SCANNED

PD PCR Anderson 019352

would like.

THE WITNESS: Sure.

THE COURT: All right. The record will reflect that the jury has now left the courtroom.

I should also indicated that at the last Bench conference we had discussed the likelihood that Mr. Carlisle was going to be getting into specific statements that were made by Mr. Poyson and/or Mr. Anderson concerning the Defendant's involvement in this case and we discussed in very general terms Rule 701 through Rule 706 of the Rules of Evidence; specifically, the rule that deals with opinions and expert testimony.

And I at least suggested to Counsel that it appeared to me that Mr. Carlisle was going to attempt to lay foundation to be allowed to question Dr. Karp concerning the specific statements made by Poyson and Anderson.

And, Mr. Rosenthal, I believe that I'll treat this as your having an objection to make at this point so go ahead and state your objection on the record.

MR. ROSENTHAL: Well, earlier on we filed a motion that was granted about not getting in to testimony of the -- statements from the co-defendants in this case and now, of course, Dr. Karp indicated that she reviewed those statements and used them as kind of to see what is consistent from Kim Lane's testimony or her statements to her in her evaluation.

PD PCR Anderson 019353

She has not said that she has relied on any of those things and -- and I am not sure what Mr. Carlisle is going to ask her further and whether she is going to say that she relied on anything from those statements so that's why we need to do an offer of proof to see exactly how this goes before we let this testimony in before without the jury hearing it.

THE COURT:  All right.  So, I am assuming then that at least your request at this point would be that we have Dr. Karp resume the stand and that we have further questioning out of the presence of the jury to determine whether the appropriate foundation could be laid?

MR. ROSENTHAL:  That would be my first position and then if that doesn't work, I will try to look for something else.

THE COURT:  All right.  And don't tell me.  Keep me in suspense.

So all right.  Mr. Carlisle, what would be your position?

MR. CARLISLE:  Your Honor, I think that under Rule 705 it indicates that an expert may in any event be required to disclose underlying facts or data on cross-examination.

I think that she testified that she did use these in making her evaluation.  She wouldn't let me say rely on but

PD PCR Anderson 019354

SCANNED

she did say that she used them in making her evaluation so I think that under the rules, I have the right to cross-examine her about underlying facts and data and that's specifically statements Bobby Poyson made that she used to decide whether Kim Lane was consistent or inconsistent in her evaluation so that would be the State's position.

THE COURT:  And anything further on that issue, Mr. Rosenthal?

MR. ROSENTHAL:  No, your Honor.

THE COURT:  Well, I guess the concern that I have, I think Dr. Karp's testimony was maybe less than what Mr. Carlisle would have hoped it would have been and I think you certainly got her to acknowledge that to some extent she relied upon Poyson and Anderson confirming that they had threatened Kim in sort of corroborating her diagnosis and I'm assuming that what the State would like to do is use that as sort of a spring board to just go through the entire transcript and say this is what they said as far as the planning and just start from the very beginning and I don't think that you can do that.

My -- my feeling would be that if there are specific passages in the transcripts or specific statements that were made by Poyson and/or Anderson describing specific aspects of this incident that she relied upon -- that Dr. Karp relied upon in reaching the diagnosis that she testified about, I

would allow her to be questioned about that but to simply use sort of as entry into this forbidden room the fact she acknowledged that was one thing that corroborated her diagnosis, I don't think that's enough.

And, certainly, Counsel, if you want to, you know, certainly I don't necessarily want to go through what may be a painful process sort of like pulling a tooth in front of the jury trying to lay foundation that's not going to go anywhere and I guess certainly we can do this out of the presence of the jury if you all want to and I am not sure if my comments are discouraging anyone from -- from following a particular course of action.  Certainly the Defense suggested that an offer of proof out of the presence of the jury would be appropriate.

Mr. Carlisle, do you want to put Dr. Karp back on the stand and attempt to lay further foundation to allow you to question her under what would probably be Rule 705?

MR. CARLISLE:  Yes, your Honor.

THE COURT:  All right.  Dr. Karp, why don't you come back and resume the stand.

And, Mr. Carlisle, you may proceed.

Q.   (BY MR. CARLISLE)  Okay.  Do you recall a statement made by Bobby Poyson about Kim Lane saying why don't we just kill them and take their truck?

A.   I probably did read that.  I do not recall but --

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019356

Q.  Would it refresh your recollection if you were to see a copy of --

A.  Sure.

Q.  Okay.

A.  Oh.  I do recall that there had been some joking.

Q.  Okay.  And Mr. Poyson indicates that although this started as a joke, he took it serious; is that correct?  He took it very seriously; is that correct?

MR. ROSENTHAL:  That's immaterial, your Honor.  We don't know what Bobby Poyson did with that statement so I don't see any purpose at all in that statement.

THE COURT:  Well, we are, of course, offering this to lay foundation as to whether she relied upon this in reaching her conclusions so that might be an objection to make in front of the jury but not an objection to make here so I will overrule the objection.

THE WITNESS:  No.  Well, what I see here from what you've shown me and I do recall that there was talk about there being -- I think I referred in my report about joking. That he admits that he thought she was joking and then he takes it seriously but he thought that she was joking about it.  That she did it in a joking manner.

Q.  (BY MR. CARLISLE)  Okay.  But he also says that in a joking manner but it's -- she's also serious in her expressions; is that correct?

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019357

A.   Well, no, not that she said but that he interprets her.

Q.   Isn't he also the one that interprets it as whether she is joking?

A.   But he admits this is his interpretation.  He says but her laugh and her smile.  Definitely he is interpreting that as being devilish so that I would use that to support my diagnosis of her.  That was his interpretation of how he saw her laugh.

I would take from here that there was some consistency that she said that there was some joking going about that and that he admits that yes, she was joking but that he read something in to it.  I don't see that mental state so I don't know if he has a mental disorder, if he has problems with perceptions.  I don't know why he would look at a laugh and interpret it a different way.

Q.   Okay.  Well, you look at laugh and interpret that as joking and you said that with her mental state you see that it was a joke?

A.   She has said that they were laughing so I see that laughing is joking.

Q.   Okay.  So, are you saying that you only took consistent statements and used them in your diagnosis?

A.   I used my testing of her to make my diagnosis.  I used this, as I said before, as background information.  I

PD PCR Anderson 019358

said there were some consistencies, yes, that I can make across some of the things that were stated in the things. I did not rely on them to form my opinion of her. They were helpful background information that did explain things as far as, you know, their perception of the situation.

Q. All right. Can you turn to page two seventeen of the transcript, please.

Down at the bottom they are numbered.

A. Yeah. Yes, sir.

Q. Okay. On that page Bobby Poyson is talking about her helping in that she was getting a rock; is that correct?

A. Yes. That's correct.

Q. Okay. And he indicates there she was being helpful. That she was -- appeared a little frightened and, actually, that's not his exact words but that she is being helpful and that she was the one who came and asked them for help; is that correct?

A. Well, it says that she -- he admits that she was panicking to a point but that she was trying to be helpful at that time.

Q. Okay. And he said that she's the one that came and asked them if they needed any help; is that correct?

A. That's correct.

Q. Okay. Now, would that have any impact on your diagnosis that she wasn't able to act independently at all on

PD PCR Anderson 019359

137

her own and that she was only doing this because she felt coerced by them to do it?

A.   Well, it sure does not give me enough information to say it is consistent with what she told me as far as -- or consistent with the diagnosis I made as far as the Stockholm Syndrome and learned helplessness state of mind she was in, the immature, passive-dependency, the reliance on them so, actually, the fact that she would help them I would not use that to make my diagnosis because I did not see the interest of that but I would say that none of the statements are contradictory to that.

Q.   And I guess maybe I am just really confused here. You are saying you didn't use any description of the actual events that happened in making your diagnosis?

A.   I would say that I used them as part of my background information.  To make my diagnosis I interview the person and I also take into account any background information.  That would be very helpful for me, yes.

Q.   Okay.  And when you say take into account, you are saying that somehow it would make a difference in using it in making your diagnosis?

A.   Well, I would have to assess those people as to their veracity and to assess their statements, I would have to have a lot more information like a psychological profile of them.  I mean, it would be dangerous for me to use that to

PD PCR Anderson 019360

formulate the diagnosis.  My diagnosis is -- is a very special thing.  It's something that is gathered from -- really from my observations and my testing of her.

Now, I, of course, want background information because I include that as part of my report.  I include it as a background description.  I am interested in their versions but I can't go further than that by saying okay, I rely on what they say as being the truth let's say.

I am really not the trier of fact but for me to say that what they're saying is accurate or not accurate, I don't know their mental state.  I don't know what went into that so I think that it would be -- it would be difficult for me to use that as part of the foundation of my opinion.  I think that as far as the background information, I guess you can call anything part of the foundation, you know, you are relying on as far as information gathering.

Q.  Okay.  So, maybe I didn't phrase my last question correctly because I acknowledge that I didn't understand your answer although I think it lasted a long time.

MR. ROSENTHAL:  I object to that comment by the Prosecutor, your Honor.

THE COURT:  All right.  We are out of the presence of the jury so I can handle more posturing than I normally would and I can overlook it and ignore it.

So, go ahead and get to your point, Mr. Carlisle.

PD PCR Anderson 019361

Q.   (BY MR. CARLISLE)   You did take into account -- you did rely on the circumstances of what happened when you made your diagnosis; didn't you?

I mean, you are saying that she was suffering from Stockholm Syndrome.  It wasn't just based on the tests.  It is also based on what she did in this particular situation.  Is that not a fair statement?

A.   Well, perception of what she did.

Q.   Okay.

A.   Not necessarily what other person's perceptions are.  It is her perception of the situation she was in.

Q.   Okay.  I guess what I am asking is you are saying that -- well, let me rephrase it.

If she was never threatened, if she was never coerced to do something then the Stockholm Syndrome wouldn't apply no matter what her mental profile was; is that correct?

A.   Well, her perceptions of being threatened are what are important here.  However, of course, anything that corroborates that would be helpful.

MR. CARLISLE:  All right.  I think that pretty much ends my offer of proof, your Honor.

THE COURT:  Yeah, I think it pretty much does.

I can appreciate the attempt you are making, Mr. Carlisle, but I don't think that you have laid sufficient foundation.

PD PCR Anderson 019362

SCANNED

I think that she has pretty much indicated that she did not rely upon statements of Poyson and/or Anderson in making her diagnosis and that these statements therefore would not be admissible under Rule 705 and that will perhaps end this area of inquiry.

Is there anything else we need to address just while we are in here and the jury is not in here?

MR. ROSENTHAL:  No, your Honor.

MR. ENGAN:  Actually, your Honor, I don't know that you want me to go ahead and make a record regarding Mr. Carlisle's continued drawing out of new points on his examination but at some point I would like to do so.

THE COURT:  Yeah.  This is sort of in the middle of something else but since the jury is out, yeah, I guess we might as well take that up now.

And you did indicate -- and I think it was at the end of Mr. Carlisle's recross-examination of your client -- you indicated that you were concerned that he was bringing out new points and that you felt that you ought to have an opportunity to conduct what I would label as re-redirect so go ahead and state the basis of your request.

MR. ENGAN:  Well, your Honor, I do not wish to suggest that you run your court like Judge Ito's and allow Counsel to continue talking back and forth until there is nothing left to say and everything has been repeated several

PD PCR Anderson 019363

SCANNED

times but Mr. Carlisle did bring up several points about how Kim's statements to Cooper were different from the statements she made to Hedrich regarding the rock and regarding whether she remembers this being Tuesday specifically and the trip to go get bullets from Carmen May. I see no reason why he could not have asked those questions on cross-examination.

I pretty much strictly followed his cross-examination on my redirect as I was trying to bring out points that he made in trying to get Kim's explanation of these points as much as possible and I did not go beyond those bounds and I was surprised Mr. Carlisle was bringing up new areas that I was not allowed to respond to.

In addition, he brought up an interesting point regarding whether or not Kim was wearing a band-aid to cover up her tattoo which lead to a question of what that was. I know we certainly didn't contest the fact she does have a tattoo and she was advised I think more than once not to display such and cover it if possible. Since then Mr. Carlisle apparently found out about that and brought that up when the Defense had no opportunity to respond -- respond to the same thing.

Regarding the questions, yes, I have shown Kim Lane the type of questions she could expect when she was on the stand. Mr. Carlisle did not specifically address that until I did not have an opportunity to respond.

PD PCB Anderson 019364

I think that I should have been given that opportunity or Mr. Carlisle should not have been allowed to ask these questions during his last opportunity without giving the Defense an opportunity to respond.

THE COURT:  I disagree with very little of what you said and, in all candor, I kept expecting that I would hear an objection because Mr. Carlisle was going beyond the scope of redirect examination and I was fully prepared to grant that objection but I didn't hear the objection and I guess I didn't know whether you were putting all of your eggs in the re-redirect basket rather than your objection basket but you let him do that.  You did not object and I have never allowed re-redirect in my courtroom.

And I don't necessarily portray my courtroom as trying to be like or not like Judge Ito but I have never subscribed to the theory that questioning of witnesses consists of no, I didn't/yes, you did until everyone just becomes exhausted and can't say anything more so, recross is pretty much the end of what anyone is allowed on questioning.

And I think I would have sustained objections to several of the areas of questioning that Mr. Carlisle asked but there were no objections and there will not be any further questioning to address.

One thing that you mentioned and I was concerned enough about this to write it down.  That was the issue of the

PD PCR Anderson 019365

tattoo. I would note that there was no objection made to the question as to whether Mr. Engan told her to cover up her tattoo and I may very well have sustained an objection to that. The objection that was made was to the fact that she had a tattoo and that she covered it up and the reason that I allowed that in was that I felt that was admissible just because she was perhaps attempting to portray herself to the jury as something that she was not. In other words, a person that did not have a tattoo.

And at least part of the reason that I thought about this issue was I know that there was a question asked very early in the trial as to why a police officer would wear his uniform to came in to testify and there was the suggestion that he was maybe attempting to portray himself in a way that was misleading to the jury and I just felt that it was fair for Mr. Carlisle to ask a similar question of your client.

So, anything further that anyone wants to put on the record while the jury is gone?

MR. ENGAN:  No, your Honor.

MR. CARLISLE:  No, your Honor.

THE COURT:  All right.  Let's get the jury back in here and we all will stay here in place until they get here.

(The jury entered the courtroom at 3:03 p.m.)

(The following was held in open court.)

THE COURT:  All right.  The record will reflect that

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019366

the jury has now returned to the courtroom.

And, ladies and gentlemen, I really apologize for having to send you out of here this way.  I know that when things come up and I tell you to leave and you know that we are in here talking about things behind your backs, you sort of get the impression that there are secrets that we are keeping from you and that there are things that are going on in this trial that we don't want you to know about and, of course, the reason you have that impression is because that's exactly what we are doing.

But the fact is that there are some times legal issues that come up during the course of a trial.  We try to anticipate ahead of time everything that is going to happen and have a hearing and rule on that before they come up.  Sometimes it is just not possible to do that and then it becomes necessary for us to send you out so that we can resolve something kind of mid-trial and we try to minimize this and keep it down as little as possible but it is just difficult to foresee everything that can come up and now you are back and we are ready to continue.

So, Mr. Carlisle, you may continue with your cross-examination.

MR. CARLISLE:  Thank you.

Q.  (BY MR. CARLISLE)  So, basically, the only statements you relied on were statements by Miss Lane; is

PD PCR Anderson 019367

145

that correct?

A.   I would say that I relied on the testing that I did. I did obtain background information as I shared with you.  I did take that into account but I had already formulated my opinion and -- and gave my diagnosis but as I stated earlier, I did receive statements by the principal and teacher that I did know of before I testified.

Q.   Before you made your diagnosis though, the only statement that you relied on was the statement by Kimberly Lane?  I am talking as far as statements go not as far as relying on your tests.

A.   Yes.  On my tests and my interpretation of the tests and -- and how she described her impression of what happened. That would be, you know, I think where the problem with relied on and diagnoses is that in order to form a diagnosis, it is usually based on testing and my observation of the behavior of the person.  That's how I formulate, you know, a diagnosis and then I use things as collateral or use background information.  That is very helpful.

Q.   But you are not going to come with a diagnosis of Stockholm Syndrome based just on testing.  You have to take her perceptions and what she has to say about what happened; right?

A.   That -- yes, that's true.

Q.   Okay.  So, her statements to you would be the only

PD PCR Anderson 019368

statements that you rely on in doing your diagnosis other than your testing but as far as statements go, that would be the only ones that you relied on?

A.   For the diagnosis of her personality.  Trying to formulate a diagnosis of her personality, yes, that's true.

Q.   Okay.  Now -- and you were, obviously, hired by the Defense in this case to do this diagnosis; is that correct?

A.   I was hired by them to evaluate their client.  Yes, I was.

Q.   Was that a flat rate or do you charge per hour?

A.   Charge per hour.

Q.   What -- how much do you charge per hour?

A.   I charge one hundred fifty dollars per hour.

Q.   How long did it take you to review all the documents in this case?

A.   I don't have a breakdown in front of me.  I would say that it took between -- probably took about four hours.

Q.   So, that would be six hundred dollars?

A.   Well, it might take less than that but I bill for the evaluation, too.  That rate was like fifteen hundred so that included the two days of testing and observations of her so maybe it was less time than that reviewing documents.

Q.   So, originally just fifteen hundred dollars just to come up with a diagnosis; is that correct?

A.   To evaluate her.

SCANNED

PD PCR Anderson 019369

Q.  Okay.  Well, didn't you actually come up with a diagnosis after she was evaluated?

A.  Well, you know, I think that the diagnosis is part of the evaluation so it -- that would be -- yeah, that -- that, you know, writing the report and coming up with a diagnosis is just part of the -- of the report.

Q.  Okay.  Then, in addition to that, you did receive other documents later that you had to review?

A.  That's correct.

Q.  And how long did that take?

A.  Oh, I don't know.  Took another hour.

Q.  Okay.  You also conducted a telephone interview with me; is that correct?

A.  Which you were billed for, yes.

Q.  How much was I billed for that?

A.  I think one hundred or one hundred fifty dollars.

Q.  Okay.  You came up here today; is that right?

A.  Yes.  That's correct.

Q.  And did you drive up here or did you fly?

A.  I flew.

Q.  And do you charge for your travel time?

A.  I will charge for the traveling.  I don't charge at a hundred fifty dollars an hour for time when I am not working on the case but I do charge for time missing from my work.

PD PCR Anderson 019370

Q.  Okay.  How much do you charge for that?

A.  I haven't yet so I don't know.

Q.  Okay.  You also charge for your testimony here today?

A.  No, I do not charge for my testimony.  I charge for the time that I am spending away from my office.

Q.  Okay.  So, that's all day today?

A.  It would be from -- I think I was called to testify at 1:30 this afternoon.

Q.  But you had to travel up here?

A.  The time away from my office but you were asking about testifying.  That would be for the amount of time spent on the witness stand.

Q.  Okay.  And you also charge though for time it took to travel up here because you are away from your office; is that correct?

A.  I -- like I stated before, I charge for the time that I am missing from my office as far as the time.  If I missed three appointments this morning because I wasn't there then there will be a charge for my missed time at work.

Q.  Okay.  And you will be charging for the time it takes you to travel back if you are missing appointments because of that as well?

A.  That's correct.

Q.  Okay.  You indicated that you don't charge a

PD PCR Anderson 019371

hundred fifty dollars for your travel time so would it just be a flat rate?

A.  No.  It is my clinical time.  When I am doing anything for a patient or doing evaluations for the F.B.I. or whatever, because that's probably a major expense, I do.  If it is for other people, it is a hundred fifty dollars an hour for clinic.  My clinic rate, which is my low rate, is one hundred dollars an hour and that's what I charge for my time actually missed from clinical patients.

Q.  Okay.  So, for travel time you charge a hundred dollars an hour.  Is that an accurate statement?

A.  Well, whatever time I may be missing.  Like if it takes longer than that for travel plus three hours that I am missing from my practice, that's what I am charging for.

Q.  Okay.  And is the rate that you are testifying at, is that charged at your clinical rate or is that a flat rate?

A.  That's two hundred dollars an hour.

Q.  Okay.  While you are here with us, that's when you charge two hundred dollars an hour?

A.  That's correct.

Q.  In fact, recently your -- your focus at least as far as your publications and what not has been on the legal arena; is that correct?

A.  I do a fair amount of publications on the legal arena.  I would say not most recent.  My most recent book I

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019372

wrote on treatment strategies for abused adolescents. That was just published and was out in publication a few months ago.

Q. But the recent trend say in the past five or six years in your -- what you do seems to be focused more on the legal arena; is that correct?

A. Actually, that's not correct. The last two publications I have were treatment for abused children and then treatment strategies for adolescents. I believe those were the last two publications I have had. You can certainly correct me if I am wrong. I could have an article that was published in between --

Q. Okay.

A. -- that was of a legal nature.

MR. CARLISLE: Okay. No more questions.

THE COURT: Any redirect, Mr. Rosenthal?

MR. ROSENTHAL: Just a couple of questions.


REDIRECT EXAMINATION

BY MR. ROSENTHAL:

Q. Doctor, Kim Lane has told her story and it took almost a full days of testimony. She did not appear to be emotionally upset during the entire time. Does that -- is that consistent with somebody with your diagnosis?

MR. CARLISLE: Objection.

PD PCR Anderson 019373

SCANNED

THE COURT:  Because it assumes facts not in evidence?

MR. CARLISLE:  Yes, your Honor.

THE COURT:  All right.  I'll sustain the objection. You can rephrase the question if you want in the form of a hypothetical but I believe that it is up to the jury to assess how the Defendant appeared during her testimony.

Q.  (BY MR. ROSENTHAL)  Assume that Kim Lane testified during basically the entire course of her testimony and did not break down, didn't cry, didn't appear to be visually upset.  Is that consistent with some of the diagnoses that you have made?

A.  Yes, it is.

Q.  Why would that be?

A.  Because of the -- I explained that I gave her the Trauma Symptom Checklist for Children and she did have evidence of post-traumatic stress and in that usually to defend against emotion or defend against the trauma of what you have been through, you tend to either minimize or you tend to disassociate or you tend to deny that you are -- that anything happened so what you are doing is compartmentalize. You fragment so you start to put them away so you separate your emotions from the impact of what happened so you compartmentalize your feelings and disassociate from them, separate from them your feelings so that would be consistent.

PD PCR Anderson 019374

Q.   I can't remember if Mr. Carlisle asked you but I believe that you -- you mentioned on cross-examination that you only gave one-half of the Wichell --

A.   Wechsler.

Q.   -- Wechsler test to Kim.

Why was that?

A.   Just because of time.  The Wechsler has a verbal section and a performance section.  The performance section takes time to do the whole thing because it is timely and you are trying to get an overall guesstimate of her mental ability and, you know, the test measures special things.  Measure of inability is the calculation section on the Wechsler.  That would be very low.

Just going by that, I decided to give all of the verbal just to have a better understanding not because I am going to say in solid in stone but because of her I.Q., I would not want to give both sections.  If I wanted to get an idea of her functioning, it would be helpful to give that.

Q.   So, it was one test then that just gave you rather than a definitive number, gave you a general area of what she was?

A.   That's right.  Just general.

MR. ROSENTHAL:  Thank you.  That's all I have.

THE COURT:  Any recross, Mr. Carlisle?

MR. CARLISLE:  No, your Honor.

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019375

SCANNED

153

THE COURT:  All right.  Dr. Karp, you are excused. You are free to leave and go about your business or you can remain if you want and I thank you for attending.

THE WITNESS:  Thank you.

(The witness was excused.)

MR. ENGAN:  The Defense would call Charity Anzalone, your Honor.

(A prospective witness entered the courtroom.)

THE COURT:  All right.  Ma'am, if you would come up here and give your name to the Clerk and she will swear you in.

THE PROSPECTIVE WITNESS:  Okay.

Thereupon --

CHARITY ANZALONE,

was called as a witness by the Defense, and having been first duly sworn, was examined and testified as follows:

THE COURT:  All right.  Ma'am, you can have a seat right over here if you would, please.

THE WITNESS:  Okay.

DIRECT EXAMINATION

BY MR. ENGAN:

Q.  Would you introduce yourself to the jury, please.

A.  My name is Charity Anzalone.

SCANNED
PD PCR Anderson 019376

154

Q.  And how old are you, Charity?

A.  Twenty-two.

Q.  Are you nervous?

A.  Yeah.  Just a little.

Q.  Were are you from?

A.  Lancaster, California.

Q.  How long have you lived in Lancaster?

A.  I was born here or there.

Q.  Lancaster is about how far from L.A.?

A.  I'd say hour and a half.  I don't know my miles.

Q.  Okay.  Do you know Kimberly Lane?

A.  Yes, I do.

Q.  How do you know her?

A.  She is a good friend.

Q.  Do you know about how long ago you met Kim?

A.  About five years.

Q.  Where were you living when you met Kim Lane?

A.  Lancaster Trailer Park.

Q.  And what street is that on?

A.  Division Street.

Q.  Is that the same trailer park Kim lived in?

A.  Yes, it is.

Q.  Do you still live there today?

A.  No, I don't.

Q.  Why not?

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019377

12

A.   Got tired of the environment.

Q.   Okay.  Speaking of the environment, describe for us, if you would, what the Lancaster Trailer Park is like.

A.   It is a horseshoe-shaped pile of trash.

Q.   Do you know how many trailers are there?

A.   About twenty-one.

Q.   And are the trailers well-maintained or rundown?

A.   Not at all.  All rundown.

Q.   Just take your time.  I can tell you are nervous.

Is the trailer park in town or out somewhere?

A.   It is out of town.  It is still considered Lancaster but it is -- it is out a little bit.

Q.   And what, if anything, is in the vicinity of the trailer park?

A.   Waste management.  A dump.

Q.   Any stores or anything like that?

A.   No.

Q.   Can you tell us the kind of people that the trailer park has.  Do they tend to be middle income or low income?

A.   Very low.

Q.   How long did you live at the trailer park before you moved out?

A.   About four years.  We lived there before but we moved out.  Moved back about four years ago.

Q.   Did the people who live at the trailer park from

SCANNED

PD PCR Anderson 019378

your knowledge and experience, are they long-term residents or transient?

A.  Just stop in.  It's live there until they can't pay their rent and then they move out or are evicted.

Q.  Do you remember how you met Kim?

A.  My boyfriend at the time husband now was best friends with Kim's father Cecil.

Q.  And how did you come to meet Kim through him?

A.  We -- my now husband spent a lot of time at Cecil's and I went with him over there to Dawn and Cecil's house.

Q.  How old was Kim when you first met her?

A.  I think eleven, twelve.

Q.  Did you have any -- any responsibility for -- toward her?  Did you baby sit her and her brother or anything like that?

A.  About three years ago, four.  Yeah.

Q.  You did baby sit her?

A.  Yeah.  Uh-huh.

Q.  And you stated earlier you consider her to be your friend?

A.  Yes.  More like a sister.

Q.  Tell us what Kim is like.

A.  Very sweet, quiet.  When you get to know her, she's outgoing.

Q.  Did you ever do any activities together?

PD PCR Anderson 019379

SCANNED

A.    We used to.

Q.    Are you okay?

A.    Yeah.

Q.    Did you know Cecil Lane?

A.    Yeah.

Q.    Have you ever been able to observe Cecil Lane interact with Kim Lane?

A.    Yeah.  Uh-huh.

Q.    How does their relationship appear to be to you?

A.    Like total strangers.  Like -- not like father and daughter at all.

Q.    Okay.  When you say total strangers, can you give us an example of things that you have seen personally -- not things you have heard but things that you have seen or heard Cecil doing in relation with Kim?

A.    Well, the first one, they lived in different trailers.  Cecil and his girlfriend Cheryl lived in a trailer and Alan and Kim lived in another.

Q.    Did you ever have a chance to visit the trailer Kim lived in?

A.    Yeah.

Q.    What was that trailer like?

A.    Broken windows.  It was just torn up, you know.

Q.    Was it dirty or clean?

A.    Kim kept it clean as best that she could.

PD PCR Anderson 019380

SCANNED

Q. Was there any food in the trailer that you could see?

A. No.  Not at all.

Q. Was there adequate heating, lights and utilities?

A. Utilities, yes, because the landlord pays those.

Q. How many times did you go see Kim in her trailer?

A. She mostly came to my house.

Q. Cecil Lane in your experience, is he a drinker?

A. Yeah, very heavily.

Q. How do you know this?

A. Because every time you see him, he's got some type of alcohol in his hands.

Q. Do you know what people look like that are impaired by alcohol?

A. Yeah.

Q. And how often would you say Cecil would be impaired?

A. Pretty much every night.  Takes quite a bit to get him drunk.  I mean, he was an every day drinker, you know, steady.  Very steady.

Q. Did Kim have enough clothing when you knew her?

A. No.  Not enough, you know, too big.

Q. Did Kim, as far as you know, ever skip school?

A. Yeah.

Q. Did her dad ever make her go to school?

A. No.

PD PCR Anderson 019381

Q.  Do you know why?

A.  Yeah.  He didn't care.

Q.  How can you say that?

A.  How can I?

Q.  Can you describe your perception of whether or not you think Cecil was a good father to Kim?

A.  I don't think he was a father to her at all.

Q.  Why not?

A.  He treats her like garbage.  Like somebody you put on a shelf and if you want to bring it out, you bring it out.

Q.  Did you ever see him actually discipline her in any way?

A.  Discipline her, no.  Beat her, yes.

Q.  How many times did you see that?

A.  Only twice.  Majorly, twice.

Q.  And when you say beat her, are you describing one punch or throw her to the ground or describe that for us if you would.

A.  Well, one time he -- she was at a friend of her's Jackie and he drug her by the hair down the stairs and into another yard where Cheryl and him lived.  I guess he was taking her in the house but they didn't make it very far.  They were fighting in the yard and he broke her toe.

Q.  How did he break her toe?

A.  I don't know if he stomped on it or what he did.

PD PCR Anderson 019382

SCANNED

Maybe held her down by her feet and stomped on them. I don't know. I am not sure but I know her toe was broken.

Q. Did he use abusive language toward her?

A. Not really. He mostly ignored her.

Q. Are you familiar with Dawn Lane?

A. Yes.

Q. Who is Dawn Lane?

A. Cecil's I guess soon-to-be ex-wife. I don't think that they are divorced yet.

Q. Do you know roughly how many years ago Dawn was with Cecil Lane?

A. They were together when I met Cecil five years ago.

Q. Okay. Did you ever see Dawn interact with Kim?

A. All the time.

Q. And was that pleasant or unpleasant?

A. Very unpleasant.

Q. How?

A. Well, disciplined her a couple of times. She tied her to a tree.

Q. Did you see that?

A. Yes. I didn't see I mean not her being tied. I did see her tied to a tree.

Q. You saw Kim tied to a tree?

A. Yes.

Q. Did you untie her?

PD PCR Anderson 019383

A.   No.

Q.   How long was she tied to a tree?

A.   I'd say about two hours if not longer.

Q.   How about Cheryl Wilson.  Do you know Cheryl Wilson?

A.   Yes.

Q.   Who is Cheryl Wilson?

A.   Cecil's current girlfriend.

Q.   And how long has Cheryl Wilson been in Kim's life?

A.   I'd say two and a half, three years.

Q.   And have you ever seen Cheryl interact with Kim?

A.   No.

Q.   You've never seen them together at all?

A.   Not -- a couple times when I used to baby sit Kim and Alan.  In the beginning when Cecil and Cheryl were first together, she would take them places.  She would take them to the park, take them to the store -- Kim and Alan that is.  That's about it.

As soon as, you know, things got comfortable that was it, you know.  She was done, you know, paying any attention to the children, you know, from that point.

Q.   Did Cheryl drink?

A.   Yeah.

Q.   How do you know?

A.   I seen her.

Q.   Frequently?

PD PCR Anderson 019384

SCANNED

A.   Every night.

Q.   To what point?

A.   I'd say at least a twelve-pack of beer a night.

Q.   So, would she be drunk when you would see her later that evening?

A.   Yeah.  She maintains her beer good.

Q.   Did you ever see how Cecil treated Cheryl?

A.   Like a princess.  Anything -- anything she wants or her daughter.

Q.   Versus Kim who was treated how?

A.   Well, Kim and Alan were totally neglected totally and Cheryl and her daughter were taken care of.

Q.   One of the first things you said when I asked what your relationship with Kim was like, you said that she was a real good friend.  I think you said being like my sister; right?

A.   Yeah.

Q.   Would you come in here and lie for her?

A.   No.

MR. ENGAN:  No further questions.

THE COURT:  Cross-examination, Mr. Carlisle?

CROSS-EXAMINATION

BY CARLISLE:

Q.   Since we know you are very close, you wouldn't want

PD PCR Anderson 019385

to see anything bad happen to her --

A. No, I don't.

Q. -- right?

Although all this was happening, you never told anybody about it?

A. No.

Q. You indicated that both Cheryl and Cecil drank. Did Kim ever drink?

A. Yes.

Q. Okay. And did Kim smoke marijuana?

A. Yeah.

Q. About four times a week?

A. Yeah, I'd say.

Q. Okay. You said most of the time that she would come over to your place; is that right?

A. Yes.

Q. So you didn't go over --

A. Couple of times to get her to bring her over to my house. I would walk with her.

Q. Did you know that she would go into other trailers?

A. What?

Q. Do you know that she would go into the other trailer?

A. After Cheryl woke up.

Q. Okay. Did she ever go into the other trailer?

PD PCR Anderson 019386

SCANNED

A.  No.

Q.  You never saw her go into the other trailer?

A.  I went in there I think twice in my life.

MR. CARLISLE:  Okay.  No more questions.

THE COURT:  Any redirect, Mr. Engan?

MR. ENGAN:  No, your Honor.

THE COURT:  All right.  Ms. Anzalone, you are excused.  You are free to leave and go about your business or you can remain if you want and I thank you for attending.

THE WITNESS:  Thank you.

(The witness was excused.)

MR. ENGAN:  The Defense calls Chris Starr, your Honor.

(A prospective witness entered the courtroom.)

THE COURT:  All right.  Sir, if you would come up here and give your name to the Clerk and she will swear you in.


Thereupon --

DAVID C. STARR,

was called as a witness by the Defense, and having been first duly sworn, was examined and testified as follows:

THE COURT:  All right.  Sir, you can have a seat right over here if you would, please.

THE WITNESS:  Okay.

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019387

DIRECT EXAMINATION

BY MR. ENGAN:

Q.   Would you introduce yourself to the jury.

A.   Yes.  My name is David C. Starr.

Q.   And do you go by Chris?

A.   Yes.

Q.   Where are you from?

A.   Lancaster, California.

Q.   How long have you lived in Lancaster?

A.   Off and on since I was sixteen years old.

Q.   How long have you lived the last time you have been in Lancaster?

A.   Four years.

Q.   Where in Lancaster do you live?

A.   Off Division, 47455, Lancaster Mobile Home Trailer Park.

Q.   Do you know Kim Lane?

A.   Yes.

Q.   How do you know Kim?

A.   I was friends with her father and she used to baby sit my -- my son.

Q.   And how long have you known her?

A.   Approximately four years.  Three to four years. Maybe three and a half.

Q.   Okay.  So it sounds like -- would it be fair to say

PD PCR Anderson 019388

you met her father first?

A.   Yes.

Q.   Where did you meet him?

A.   My landlord's auto shop.  He owns a car dealership and what is it -- auto shop and smog repair.

Q.   Okay.  And how did you come to meet Kim Lane?

A.   I met her through her father and I seen her around the trailer park a few times and I spoke with her, you know, a few times and she started to baby sit my son then.

Q.   How old was your son?

A.   Four years old.  He's five now.  Just turned five.

Q.   How old was he went Kim baby sat him?

A.   He was three, three and a half.

Q.   Do you think that you know Kim pretty well?

A.   As well as I can know anybody, yeah.

Q.   What do you think of her?

A.   I thought of her as a very good person.  I trusted her with my son so -- I mean, that spoke -- that spoke for a lot.  I don't trust just anybody with my son so I trusted her.  I trusted her to be in my house by herself.

Q.   Did you ever have any problems with her?

A.   Never.

Q.   Did you ever see her interact with her dad Cecil?

A.   Maybe a little bit communication but nothing really -- nothing bad.

PD PCR Anderson 019389

Q.  Do you know who Dawn Lane is?

A.  Yes.

Q.  Who is Dawn Lane?

A.  Dawn was Cecil's ex-wife.

Q.  Did you ever see Kim interact with her at all?

A.  A little bit for what I knew.

Q.  Okay.  Hold on just a second.

A.  Okay.

Q.  What we need to hear from you today is things you have personally seen not from what you might have heard from other people and things like that.

A.  Yeah.

Q.  Have you ever seen her with Dawn?

A.  Yes.

Q.  Have you ever seen Dawn discipline her in any way?

A.  Yes.

Q.  What form of discipline did Dawn use on Kim?

A.  I saw Kim on a tree stump sitting there all day from like I would say nine o'clock in the morning to like three in the afternoon.

Q.  Why was she sitting on a tree stump?

A.  I have no idea.  Dawn said she put her there.

Q.  How many times had you seen this?

A.  Once.

Q.  How long ago was this?

PD PCR Anderson 019390

SCANNED

A. Two and a half years, two years ago.

Q. Have you ever seen any other instances between Dawn and Kim other than that?

A. No.

MR. ENGAN: No further questions.

THE COURT: Cross-examination, Mr. Carlisle?

CROSS-EXAMINATION

BY MR. CARLISLE:

Q. You indicated that you think that you knew Kim Lane pretty well; is that correct?

A. Yes, sir.

Q. Did you ever see her smoke marijuana?

A. No.

Q. Did you know that she smoked marijuana or not?

A. Not that I know of. I never hung around her to know. I never went places with her friends so -- there is a great difference in our ages. I never hung around her.

Q. Did you know that she would smoke marijuana four times a week?

A. No.

Q. Okay. Did you ever see her drunk?

A. No.

Q. Did you know that she drank alcohol?

A. No. No, sir.

Q.   So, would it surprise you if she used to get drunk about three times a week?

A.   No, that wouldn't surprise me.

Q.   But you never saw it?

A.   I never saw it.

Q.   Did you ever see her smoke cigarettes?

A.   Maybe once or twice I seen her have a cigarette walking around.

Q.   Just once or twice the entire time you knew her?

A.   Yeah.  I never really, you know, saw -- watched her and what she was doing.

Q.   So, would it surprise you that if she used to smoke two packs of cigarettes per day?

MR. ENGAN:  Objection; relevance.

THE COURT:  I'll sustain the objection.

Q.   (BY MR. CARLISLE)  And how many times total did Kim Lane baby sit for you?

A.   Approximately four to six times I would say.  Maybe a couple more times than that but approximately.

Q.   Four to six maybe some more than that?

A.   Yeah.  Maybe couple more but I think between four and six.

Q.   Do you remember being interviewed by me --

A.   Yes, sir.

Q.   -- this morning?

PD PCR Anderson 019392

A.  Yes.

Q.  Do you remember telling me during that interview that she had baby sat two to four times?

A.  Yes.

Q.  And that the entire time you knew her, you saw her maybe a total including baby sitting ten to twelve times?

A.  Yes, in front -- between in front of my house and baby sitting, yes.

MR. CARLISLE:  Okay.  No more questions.

THE COURT:  Any redirect, Mr. Engan?

REDIRECT EXAMINATION

BY MR. ENGAN:

Q.  Did Kim ever ask you to feed her?

MR. CARLISLE:  Objection; beyond the scope of cross.

THE COURT:  Well, you asked about the number of times that he had contact.  I'll overrule the objection.

You can answer the question.

THE WITNESS:  She has said she was hungry but she never asked me to feed her.

Q.  (BY MR. ENGAN)  From what you observed, was Cecil a good father to her or not?

A.  No, sir.

MR. ENGAN:  No further questions.

THE COURT:  Any recross, Mr. Carlisle?

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019393

MR. CARLISLE:  No, your Honor.

THE COURT:  All right.  Mr. Starr, you are excused. You are free to leave and go about your business or you can remain if you want and I thank you for attending.

THE WITNESS:  Thank you, sir.

(The witness was excused.)

MR. ENGAN:  Your Honor, I am sorry.  We need another five minute break.

THE COURT:  Okay.  Why not -- let's take -- are you going to have any further witnesses?

MR. ENGAN:  One further witness, your Honor.

THE COURT:  All right.  Let's take about a five minute break.  Remember my admonitions and we will see you back here in a few minutes.

(There was a break in the proceedings from 3:40 p.m. until 3:50 p.m.)

(The following was held out of the presence of the jury.)

THE COURT:  Thank you.  Be seated.

This is a continuation of CR-96-1057, State versus Kimberly Lynn Lane.  Show the presence of the Defendant, Counsel and the absence of the jury panel.

And I understand that the Defense is going to rest at this time; is that correct?

MR. ROSENTHAL:  Yes.

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019394

MR. ENGAN: Yes, your Honor.

THE COURT: And I also understand from talking to Counsel informally that Mr. Carlisle would like to get a ruling on the admissibility of various aspects of the statements that were made by either Poyson and/or Anderson and this sort of goes back to the motion that had been made some time earlier by the Defense seeking to preclude those statements.

And just to reiterate what I think we discussed at the time. My position would be that a statement made by either Poyson or Anderson would be admissible as a declaration against penal interest only to the extent that the statement exposes themselves or the declarant to criminal penalty and, therefore, it would not include statements that would tend to implicate the Defendant.

And at least my initial reaction would be that if anything doesn't implicate her, then it may not be relevant but I understand that Mr. Carlisle may have some other issues that he wants to go through and try to convince me why they would be relevant.

So, I think probably the easiest way to do this, Mr. Carlisle, is rather than speak in general terms, if you can simply identify which specific statements by which of the persons you want to introduce and why you think that they would be relevant.

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

SCANNED

PD PCR Anderson 019395

Go ahead.

MR. CARLISLE:  Thank you, your Honor.

I guess the first statement and it is in the scheme of things probably a fairly minor statement but a statement that is important nonetheless would be the statement that Bobby Poyson made to Eric Cooper about when it was that he cut the phone line.  Specifically, he was talking about the murders of all three people.  He indicates to Eric Cooper that he cut the phone line just before the murder of Leta Kagen and Roland Wear at approximately twelve o'clock midnight.

The State believes that that is a statement that should be admissible against penal interest because it was part of his whole plan as far as killing them and getting away with it.  Not calling the police helps in committing the murders also and it would not implicate Kim Lane because she is not someone that had anything to do with the cutting of the phone line so the State believes that that statement should be admissible and we should be allowed to use that statement.

Also I guess and I am not positive but I believe he made a statement to the effect that Carmen May came over and gave him a note and that he went back with her to get the bullets and Kim Lane was with him.  Obviously, any mention of Kim Lane being with him would implicate her but I think the fact that she came over to give him a note and they went back together would be admissible as long as any reference to Kim

PD PCR Anderson 019396

SCANNED

Lane was left out of -- out of that part of the discussion.

And -- could I have a moment, your Honor --

THE COURT:  Sure.

MR. CARLISLE:  -- just to look real quick?

Those are the two statements that I want to get in mainly.

He also made a statement about the whole plan all along was to kill all three but he may not necessarily -- some of these statements may not necessarily implicate Kim Lane. They are implying all three were planning so I think even without mentioning her by name, he is still implicating her or implying she was part of it.  He does say the whole plan was to kill all three or the plan all along was to kill all three and if he doesn't make reference to her, I think that that would be also a statement that we would like to get in.

THE COURT:  All right.  So, again, just to identify this with as much specificity as possible.  You are talking about three statements by Bobby Poyson:  Number one, that he cut the phone line just before the murder of Kagen and Wear; number two, that Carmen came over to give him a note and they went back together to get the bullets; and then, number three -- and this maybe isn't as clear -- that the plan all along was for all three people to get killed.

So, Defense, response?

MR. ENGAN:  Well, on the first point that

PD PCR Anderson 019397

Mr. Carlisle raised regarding the phone line being cut and so forth, I think it is pretty clear that was an act in furtherance of the conspiracy that Poyson was engaging in to eventually kill these people and take their truck which was the subject of our pretrial motion. We believe that should be precluded on that basis.

But perhaps more to the point, Kim never testified that Bobby told her beforehand that the line had been cut. She simply testified that she tried to use the phone, she picked it up and it was not working. She also testified that some time after that Mr. Anderson tried to make a phone call and he hung it back up without saying anything also implying that the phone was not working. This was before Poyson supposedly cut the line.

The only thing that we presented was that the phone did not work. We did not present evidence that the phone line was cut and given the fact the phone line was laying along the surface of the ground apparently out there in Golden Valley, it is not too surprising that the phone would not work before Poyson took it upon himself to cut the line.

Regarding Carmen May coming over to give Poyson this note, as far as I could tell, Carmen May's alleged action either under Kim's version of what happened or under Poyson's version of what happened does not call either Kim or Poyson in to any increased criminal liability from her actions. It

is a different version of the story.

I don't think that Poyson's version is entirely any more credible than Kim's and, clearly, on both points Poyson is not available for any cross-examination or meaningful explanation of the incident.  It is simply the fact Poyson's version is different.  I don't think it should be allowed in as a method of attacking Kim's statements when neither one of them really makes any difference in this case as far as I could tell.

Finally, regarding Poyson's kind of general statement about we had this plan not directly implicating Kim but simply by implying she was somehow along on this, I think that it is pretty obvious that it is contended by us that Poyson all along is the murderer who killed three people.  The only thing we have seen that makes it sound like perhaps he didn't actually intend to kill these three people is Kim's testimony that when she ran outside and was surprised that Anderson actually attacked Delahunt he kind of said no, that it was a joke.  That wasn't supposed to happen but then he went ahead and took over and did kill everyone but I don't see the point of bringing in just this statement that Poyson might have made that sort of generally implicates Kim as being involved in this plot particularly when he is not available for cross-examination.

We would oppose on that ground.

PD PCR Anderson 019399

THE COURT: Anything further, Mr. Carlisle?

MR. CARLISLE: No, your Honor.

THE COURT: Well, the unavailability of Mr. Poyson is really a prerequisite to this exception even applying because in looking at Rule 804 subsection b subsection 3, which talks about a statement which at the time of its making is so far contrary to the declarant's pecuniary or proprietary interest or so far tended to subject the declarant to civil or criminal liability -- and just looking at the phone line issue, I can certainly see that admitting that he cut the phone line would subject him to criminal liability because it makes more likely the fact this was a premeditated murder and it would make it more likely that this was a plan or a scheme.

The problem that I have in analyzing this is that it is hard for me to identify how the timing of when he cut the line is against his penal interest. The fact that he did it before the two murders is relevant but whether he did it immediately after Delahunt was murdered, whether he did it before Delahunt was murdered, whether he did it immediately before Kagen and Wear were murdered doesn't really expose him to any more criminal liability and I think insofar as his statement includes a time element -- in other words, when he cut it -- I don't think the issue of when he cut the line really exposes him to any more criminal liability.

And I know that in analyzing this statement, I am really nit-picking and dividing his statement into little compartments but when talking about an exception to the hearsay rules which arguably would allow a statement to come in to evidence without the Defendant having any sort of right of confrontation or right to cross-examine the declarant, I think that it is appropriate to do so and I know that there are cases that have sort of removed from statements those parts of statements that implicate some other person to only the person who is on trial.  I think that that way of looking at these statements is probably consistent with what I am doing here.

On the Carmen May testimony, I am hard pressed to see how the fact Carmen May came over and gave him a note and then they went back together is exposing him to any more criminal liability than simply going over there and getting the bullets and I really don't see how this is against his penal interest.

And, of course, it is the fact that a person wouldn't normally say something that exposes them to criminal liability and that the statements are therefore more trustworthy, that is sort of the foundation of this exception to the hearsay rule and I really -- unless I don't understand the theory for which this is being offered -- I don't see how that would be against Bobby Poyson's penal interest.

And then the fact that all three of them planned to kill all three of the victims, if, in fact, that is what the State would want to offer, I think that is clearly meant to implicate the Defendant Kim Lane as being part of the conspiracy and I think that would go beyond the limitation of the exception which is that only that part of the statement which implicates the declarant is going to be admissible.

So, I would rule for that reason that none of the three statements by Bobby Poyson would be admissible under Rule 804(b)(3) and it is ordered precluding the State from seeking to elicit testimony concerning these statements.

And, Counsel, I have a hearing that I have to do which will probably take about ten minutes at the end of the day. I have no other initial appearances so I can go as late as a quarter to five today.

Does the State want to get started on their rebuttal case?

MR. CARLISLE: No, your Honor.

THE COURT: Okay. Maybe we can do something else productive with our time. I have -- I have a set of jury instructions that are made up which I am thinking we might be able to actually get settled and I'd just like to be as productive today as possible.

So, why don't we get the jury in here and get them sent out and then we may be able to try to do what we can so --

SCANNED

PD PCR Anderson 019402

180

MR. ROSENTHAL:  Excuse me.  On that matter, I would ask that we settle the instructions after we have had time to review them at our leisure and discuss them among ourselves. I don't feel comfortable with only having a few minutes.

THE COURT:  I kind of anticipated that maybe that would be something you would rather do so -- and I really don't feel comfortable with the concept of my ramming these instructions down your throat without giving you any time to react although everybody probably at least suspects that the end result is going to be same but at least you will feel as if it goes down more smoothly if you have some time to digest it and think that it is your choice to swallow them instead of mine so maybe we won't try to settle them.  Maybe we won't do anything today but I can at least get them into your hands so --

MR. CARLISLE:  Your Honor --

THE COURT:  Yes?

MR. CARLISLE:  -- might I make a suggestion?

I imagine any rebuttal case I have won't be too long so maybe we can have the jury come back later than 9:30.  That way we can have time in the morning to settle the jury instructions so that we would not have to take a break between -- that very long break between my rebuttal case, if any, and closing statements.

THE COURT:  I'll tell you what.  Maybe we should be

PD PCR Anderson 019403

shooting for ten o'clock tomorrow.  I know I have some status hearings tomorrow which are now taking longer than they used to so we may not even get to your rebuttal until ten.

Maybe if we have them come back at ten then we've got some more options so that's what we will do.  We won't do anything more today.

And let's have the jury brought back in so we can break for the day.

(The jury returned to the courtroom at 4:10 p.m.)

(The following was held in open court.)

THE COURT:  All right.  The record will reflect that the jury has now returned to the courtroom.

This is probably not going to surprise you too much.  Most of what we have been doing is becoming pretty apparent thus far but we have brought you back in here just to send you home for the day.

Let's come back at ten o'clock tomorrow morning and just so you will have an idea as to where we are schedule-wise and, actually, just to make it more clear.  I did this out of the presence of the jury but the Defense is resting at this time.

Is that correct, Mr. Engan?

MR. ENGAN:  Yes, your Honor.

THE COURT:  All right.  So, ladies and gentlemen, when we come back tomorrow, I understand that the State is

SCANNED

PD PCR Anderson 019404

going to have a rebuttal case that they are going to present which is probably not going to last very long and then we will probably be in the position to allow the Attorneys to begin their final arguments to you some time before noon tomorrow.  When the case actually gets to you will depend upon how long the final arguments are.

So, we are very close to finishing up the testimony in this case and we will be beginning final arguments some time tomorrow so that gives you just some idea of where we are time-wise.

Let's come back at ten o'clock tomorrow morning.

Between now and then -- and, hopefully, this will be almost the last time you have to hear me say this.  I feel that I should have you read it back to me because I can see that you know it but don't discuss this case either among yourselves or with anyone else.  Don't talk to any of the parties involved in the case.  Don't form an opinion as to what your verdict will be until the case has been turned over to you.

Do you allow yourselves to be exposed to any possible media coverage.  Don't visit any of the places that have been referred to.

Leave the transcripts that you have on the seats that you are in or just on the bar.  Don't take them with you.

And, Counsel, stick around.  I have a packet of things

PD PCB Anderson 019405

183

to give you within the next few minutes.

And we will see you back here at ten o'clock tomorrow morning.

(The proceedings were concluded at 4:12 p.m.)

PD PCR Anderson 019406

184

## Certificate of Reporter

I, Sandra R. Brice, Official Reporter in the Superior Court of the State of Arizona, in and for the County of Mohave, do hereby certify that I made a shorthand record of the proceedings had at the foregoing entitled cause at the time and place hereinbefore stated;

That said record is full, true and accurate;

That the same was thereafter transcribed under my direction; and

That the foregoing one hundred eighty-three (183) typewritten pages constitute a full, true and accurate transcript of said record, all to the best of my knowledge and ability.

Dated this 13th day of November, 1998.


*Sandra R. Brice*
Sandra R. Brice, Official Reporter

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019407