# EXHIBIT 9

# EXHIBIT 9

ORIGINAL

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MOHAVE

STATE OF ARIZONA,                )
                                 )
                Plaintiff,       )    1 CA-CR 98-0565
                                 )
        vs.                      )    Cause No. CR-96-1047
                                 )
KIMBERLY LYNN LANE,              )    JURY TRIAL - VOLUME VII
                                 )
                Defendant.       )
_____)

FILED
JUL 2 6 2001
VIRLYNN TINNELL
CLERK SUPERIOR COURT
BY: _____ DEPUTY

DIVISION 1
COURT OF APPEALS
STATE OF ARIZONA
FILED
NOV 1 8 1998
GLEN D. CLARK, CLERK
By _____

Before the Honorable Steven F. Conn, Judge


Wednesday, May 27, 1998
10:30 a.m.
Kingman, Arizona


Reporter's Transcript of Proceedings


Appearances:

    For the State:          Derek Carlisle
                            Deputy County Attorney
                            315 North 4th Street
                            Kingman, Arizona 86401


    For the Defendant:      Larry S. Rosenthal
                            Mohave County Legal Defender

                            Eric J. Engan
                            Deputy Legal Defender
                            313 Pine Street
                            Kingman, Arizona 86401

Reported by:  Sandra R. Brice, Official Reporter

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019408

(The proceedings resumed following the taking of the evening recess.)

(The following was held out of the presence of the jury.)

THE COURT: Thank you. Be seated.

All right. This is a continuation of CR-96-1057, State versus Kimberly Lynn Lane. Show the presence of the Defendant, Counsel and the absence of the jury panel.

I understand from informal discussion that the State is not going to be presenting any further evidence.

Is that correct?

MR. CARLISLE: Yes, your Honor.

THE COURT: All right. I have distributed to both Counsel a packet of proposed jury instructions. I have not received any proposed instructions from either Counsel. I say that not to fault you but just to indicate that there have been no instructions submitted other than the ones that I have given to you.

I'd like to go through them --

MR. ROSENTHAL: May I approach with one instruction?

THE COURT: Sure.

MR. ROSENTHAL: Thank you.

THE COURT: All right. I received an instruction which I think is virtually identical to one that is already in the packet. I assume that you submitted yours because you

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

SCANNED

PD PCB Anderson 019409

like it better than mine.

What I propose to do at this time is go through the instructions and the forms of verdict.  I will identify them for the record following which I am give each Counsel an opportunity to place on the record any objections to either the instructions or the forms of verdict.  And unless I indicate otherwise, all reference to the RAJI numbering system will be to the old RAJI numbering system.

I will be giving RAJI Standard Instruction Number 1 entitled Duty of Jurors.  It starts out "I will now tell you the rules you must follow to decide this case."

I will be giving RAJI Standard Instruction Number 2 entitled Rulings of the Court.  It starts out "you must find the facts from the evidence."

I will be giving RAJI Standard Instruction Number 3 entitled Arguments of Counsel.  It starts out "in the opening statements and closing arguments."

I will be giving RAJI Standard Instruction Number 5 entitled Credibility of Witnesses.  It starts out "you must decide the accuracy of each witness's testimony."

I will be giving RAJI Criminal Instruction Number 1.01 entitled Information Is Not Evidence.  It starts out "the State has charged the Defendant with the crimes."

I will be giving the standard instruction on presumption of innocence/reasonable doubt which is mandated by the

SCANNED

PD PCR Anderson 019410

Arizona State Supreme Court case State versus Portillo.  It starts out "the State has the burden of proving the Defendant guilty beyond a reasonable doubt."

I will be giving what I believe is RAJI Criminal Instruction Number 1.09 entitled Jury Not To Consider Penalty.  It starts out "in deciding whether the Defendant is guilty or not guilty."

I will be giving an instruction drafted by the Court which defines the two elements of conspiracy to commit first degree murder.  It starts out "the crime of Conspiracy to commit First Degree Murder has two elements."  I would again point out that there is no element to this offense that there be an overt act because of the first degree murder charge.

I will be giving a two-page instruction defining first degree murder.  This is pretty much my standard instruction that I give on occasions where first degree murder is being charged or prosecuted under alternative premeditated and felony-murder theories which are not charged in separate counts.  The instruction starts out "the crime of First Degree Murder may be committed in two different ways."

It discusses the concept that it is not necessary that the jury agree unanimously on what type of first degree murder it was that was committed.  And if Counsel have any questions on that, I could direct you to an entire line of cases that support that proposition.

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019411

The instructions then goes on to define the elements of first degree murder premeditated and sets forth the statutory definition of premeditation.  And then it also sets forth the elements of first degree murder under a felony-murder theory with the only applicable underlying offense or offenses being robbery or armed robbery and I am assuming everyone would agree that would be the only ones that would apply.  And then the instruction ends with language about the mental state under felony-murder.  Again, that's a two-page instruction.

I will be giving an instruction which sets forth the statutory definitions for any words or phrases which are used in the instructions defining the elements of the offenses which words or phrases have specific definitions within the criminal code.

I am just realizing that I -- I don't see the armed robbery instruction in here which -- oh, here it is.  Just a little later.  Okay.

I will be giving an instruction on the type of agreement that is necessary for the offense of conspiracy and this is probably based on case law.  It starts out "conspiracy to commit First Degree Murder does not require a written, formal or definite agreement."

I will be giving an instruction setting forth the general principles of conspiracy or conspirator liability. It starts out "a conspirator is liable for all criminal

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019412

acts."

I will now be giving an instruction drafted by the Court which sets forth the six elements of armed robbery. It starts out "the crime of Armed Robbery has six elements."

I will be giving an instruction which is straight out of the statute that defines the phrase in the course of as it relates to the robbery charge. It starts out "the phrase in the course of in the elements for the offense of armed robbery."

I will be giving what is my standard accomplice liability instruction that incorporates 13-301 and 13-303 setting forth the general principles of accomplice liability and defines accomplice. It starts out "a person is criminally accountable for the conduct of another."

I will be giving what is my mere presence instruction which I would think you would like better than the one you submitted but my mere presence instruction starts out "the Defendant's guilt cannot be established by her mere presence at a crime scene."

I will be giving what is the new RAJI Standard Criminal Instruction Number 13 entitled Non-Defense To Criminal Liability/Absence Of Other Participants. It starts out "it is no defense to the crime charged against the Defendant in this case."

Just to address the objection that is made by every

PD PCR Anderson 019413

defense attorney every time I give this instruction, this instruction, obviously, does not preclude you from arguing that someone else committed this crime.  It simply means that the jury is not to consider why those other people are not being tried at the same time as the Defendant.

I will be giving an instruction which really only occurred to me the other day.  That's the instruction on temporary intoxication.  This is directly out of the statute 13-503.  I am giving this instruction despite the fact that this case has not been tried with even a suggestion that intoxication was an issue.  No one other than the Defendant has made any reference to that.  No one questioned her about it.  No one else was questioned about it.  Of course, no one could have been questioned about it but the Defendant repeatedly made comments suggesting that she may not have understood or recalled things that were happening or be responsible for things that she could have said because she was drunk at the time and I think that this is an appropriate instruction to give under those circumstances.  It starts out "temporary intoxication resulting from the voluntary consumption of alcohol."

I will be giving a re-working of the voluntariness instruction.  This is essentially the new RAJI Standard Criminal Instruction Number 6 with added to it the reference to the Miranda decision and the Illinois state law and I will

PD PCR Anderson 019414

do the same thing that I did on the Poyson case.

I have a list of probably seven different appellate decisions which would uphold the proposition that the Miranda issue is not for the jury to decide. And more for just making a record than anything else, those cases include probably the most recent case which is State versus Amaya-Ruiz. That's A-m-a-y-a hyphen R-u-i-z, 166 Arizona 152, a 1990 case. And that probably leads one to the other cases which I will just identify without giving the citations, State v. Daniels, State v. Cobb, State v. Stone, State v. Brooks, State v. Linden and State v. Fulminante. The instruction starts out "you must not consider any statements made by the Defendant to a law enforcement officer."

I will be giving an instruction which I drafted specifically in response to the objection and motions to suppress/preclude which had been filed by the Defense concerning the avowals of a factual nature that were made by Detective Cooper during the interview. And this is an instruction which seeks perhaps inartfully to make it clear to the jury that they should not accept anything that Detective Cooper said as being the truth unless they are convinced that the Defendant during the interview essentially agreed with or adopted the facts as set forth.

It also tells the jury that it is not for Detective

PD PCR Anderson 019415

Cooper to decide whether she was telling the truth during the interview. It is for them to make that decision. The instruction starts out "in Detective Cooper's interview with the Defendant."

I will be giving the new RAJI Criminal Instruction Number 24 entitled Direct and Circumstantial Evidence. It starts out "evidence can be divided into direct and circumstantial evidence."

I will be giving the new RAJI Standard Criminal Instruction Number 25 entitled Expert Testimony. It starts out "the rules of evidence ordinarily do not permit the opinion of a witness to be received as evidence."

I will be giving RAJI Criminal Instruction Number 1.10 entitled Closing Verdict or Closing Instruction. It starts out "all twelve of you must agree on a verdict."

There will be ten verdict forms. They will read as follows: Number one, guilty, Count One, First Degree Murder, Robert Delahunt; number two, not guilty, Count One, First Degree Murder, Robert Delahunt; number three, guilty, Count Two, Conspiracy to Commit First Degree Murder; number four, not guilty, Count Two, Conspiracy to Commit First Degree Murder; number five, guilty, Count Three, First Degree Murder, Leta Kagen; number six, not guilty, Count Three, First Degree Murder, Leta Kagen; number seven, guilty, Count Four, First Degree Murder, Roland Wear; number eight, not

PD PCR Anderson 019416

guilty, Count Four, First Degree Murder, Roland Wear; number nine, guilty, Count Five, Armed Robbery; and, number ten, not guilty, Count Five, Armed Robbery.

I have considered the possibility of lesser-included instructions; specifically, the possibility of second degree murder as a lesser-included within first degree murder.  I don't believe that the evidence in this case would support a finding that there was a lack of premeditation in this case.

Also, I considered the possibility of a robbery as opposed to an armed robbery and I think that the evidence really doesn't suggest that there is an issue as to whether the taking of the property was achieved with force or, excuse me, was achieved through the use of a deadly weapon or dangerous instrument so, I don't see this as being a case in which lesser-included offenses would be appropriate.  And I would also note no one has requested that I do that.

Mr. Carlisle, do you have anything to place on the record at this time concerning either the instructions or the forms of verdict?

MR. CARLISLE:  Only that the State would ask that you read the instructions before closing arguments.  I talked with Mr. Rosenthal and Mr. Engan who indicated that they would not oppose that.

Obviously, you won't read the final instruction and you will still have some housekeeping matters to take care of

before the jury actually goes in to deliberate but I would ask that you read the instructions first.

THE COURT:  All right.  Is that the only thing you want to put on the record concerning the instructions?

MR. CARLISLE:  Yes, your Honor.

THE COURT:  All right.  And, Counsel, the way I have done this in the past is that I would come in and before you all begin your final arguments, I would read all of the instructions up until the last instruction that I read immediately before going through the verdict forms.  I would stop at that point, allow you to make your opening -- make your final arguments at the end of which I would then read the last instruction about all ten of you -- all twelve of you must agree and then I will go through the ten forms of verdict and then just go through some housekeeping matters and then discharge them.

And is that agreeable to the Defense?

MR. ROSENTHAL:  Yes.

MR. ENGAN:  Yes, your Honor.

THE COURT:  All right.

MR. ROSENTHAL:  When Eric and spoke about this with Mr. Carlisle -- I am not sure how long it will take before the closing arguments actually begin but -- and I don't believe Mr. Carlisle opposes this -- but we would like the schedule set up so that Mr. Carlisle does his argument.  We

PD PCR Anderson 019418

do ours and then Mr. Carlisle does his rebuttal argument all in one block.  We don't want the lunch break between any of the arguments.

THE COURT:  Yeah.  I was afraid that was going to be something that we were going to have to talk about and maybe we can talk about that at the end although, we are probably pretty close to the end.

Does the Defense have anything that you want to put on the record concerning the instructions or the forms of verdict?

MR. ROSENTHAL:  Your Honor, the only thing I want to talk about was your instruction dealing with mere presence and I believe that your second sentence on that instruction should read as follows.  The fact that the Defendant may have been present and had knowledge -- I would ask that you insert and had knowledge -- does not in and of itself make the Defendant guilty of the crime charged.

I believe that the instruction -- instruction that I offered would not be necessary if you simply add those three words and I think that your instruction is defective by not having those words.

That's all.

THE COURT:  Of course, there is a reason that we call this a mere presence instruction and don't call it a mere knowledge instruction and that's probably because the

PD PCR Anderson 019419

SCANNED

presence is more an issue of physicality and serves to establish that one is at a particular scene and the issue that the cases have addressed is whether just being able to establish that ought to be enough and, of course, the cases say it isn't.

A mere knowledge type instruction really gets more into a gray area where knowledge is at least an element of some of these offenses and I think you would have to agree that it is not a crime to know that someone else is committing a crime and watch them do it and do nothing to stop it but I am not really aware of any authority that would require a jury to be instructed on that concept and on mere presence there, in fact, is a recent case that does require that to be given.

So, I appreciate what you are telling me.  Certainly, you are free to argue that position and there is nothing in these instructions that is going to suggest to the jury that the Defendant can be found guilty just because she knew something was happening but I don't believe that it is necessary for me to instruct the jury on that.

MR. ROSENTHAL:  Will the record reflect that I have made an offer regarding my mere presence instruction and you are -- you are rejecting that?

THE COURT:  That's correct.  Your submitted instruction will be submitted and made a part of the record.

MR. ROSENTHAL:  And I want the record to reflect my

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019420

14

objection to your instruction on mere presence.

THE COURT: I thought that was pretty clear from the dialogue we just had.

MR. ROSENTHAL: Thank you.

THE COURT: Anything further concerning the instructions or forms of verdict, Mr. Rosenthal?

MR. ROSENTHAL: No, your Honor.

THE COURT: And let's talk about scheduling.

If -- if I bring them in here within the next two minutes and start reading the instructions, that will probably take about fifteen minutes and if knowing how -- knowing just traditionally how the State often argues these cases, I would be willing to let Mr. Carlisle argue and then break for lunch and come back although it may be that neither party wants to do that because I may be sending them out of here forgetting about what Mr. Carlisle had -- has said. Have them come back after an hour and have the Defense argue then have Mr. Carlisle argue a second time.

Would you oppose doing that, Mr. Carlisle?

MR. CARLISLE: I believe that's precisely what Mr. Engan is trying to avoid.

THE COURT: All right. So -- and I won't try to figure this out. I would almost think that the Defense would like nothing more than for us all to leave after Mr. Carlisle stops talking, but then maybe you are concerned that they

PD PCR Anderson 019421

will spend the whole hour thinking about what he said and reflecting on it.

So, Mr. Engan, your desire, I assume, would be to not do what I just suggested and have the final arguments run uninterrupted?

MR. ENGAN: That's correct, your Honor.

I don't know how big of a breakfast the jury had but I would say that I anticipate my argument lasting probably twenty to twenty-five minutes. Mr. Carlisle told me that his opening argument will last about twenty-five minutes and then his concluding argument about half an hour so that perhaps we can go into the lunch hour if that would be appropriate.

THE COURT: Well, I would be delighted if you all stick to the time frames just indicated and, you know, I would have no problem with -- with keeping them in here until at least one o'clock. I have done that in cases before and if you all think that your estimates are realistic, I could easily see us getting this case wrapped up before one o'clock; maybe having the jury go out to lunch and then come back afterward.

So, if you all -- based on the time frames that you are giving me, I think we can go ahead and get this done and argued and then break for lunch. So, let's go ahead and do that.

And do either of you need more than a couple minutes

PD PCR Anderson 019422

SCANNED

before we get the jury in here and get started?

MR. CARLISLE: No, your Honor.

MR. ENGAN: No.

THE COURT: All right. Let's take about a two or three minute break so everyone can use the bathroom that needs to and then we will get started.

(There was a break in the proceedings from 10:57 a.m. until 11:03 a.m.)

(The following was held in open court.)

THE COURT: Thank you. Be seated.

This is a continuation of CR-96-1057, State versus Kimberly Lynn Lane. Show the presence of the Defendant, Counsel and the presence of the jury panel.

Ladies and gentlemen, I appreciate your patience. I know we are about an hour late getting started but we have been doing productive things during that period of time.

The Attorneys have now completed the presentation of the evidence in this case so we are going to proceed with the final arguments.

We are going to vary somewhat from the order of events that I described at the beginning of the trial. I am going to be reading to you most of the jury instructions now before the Attorneys argue the case.

And the reason why the Attorneys often prefer to do it in this order is so that you will already have heard me read

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019423

the instructions so that they will be able to argue about the instructions knowing that you already heard them and won't have to be standing up saying the Judge will tell you this and you all be sitting there thinking well, we won't believe that until we actually hear the Judge do it so, this way you will have heard what the law is in this case and the Attorneys will be able to argue the law knowing that already happened so, we will proceed.

I will now tell you the rules you must follow to decide this case.  I will instruct you on the law.  It is your duty to follow the law.  It is also your duty to determine the facts.

You must determine the facts only from the evidence produced in court.  You should not guess about any fact.  You must not be influenced by sympathy or prejudice.  You must not be concerned with any opinion you may feel I have about the facts.  You are the sole judges of the facts.

You must take account of all my instructions on the law. You are not to pick out one instruction or part of one and disregard the others.  However, after you have determined the facts you may find that some instructions do not apply.  You should then consider the instructions that do apply together with the facts as you have determined them.  Decide the case by applying the law in these instructions to the facts.

You must find the facts from the evidence.  The evidence

PD PCR Anderson 019424

which you are to consider consists of testimony of witnesses and exhibits. At times I decided whether testimony and exhibits should be admitted. When an objection to a question was sustained, you are to disregard the question and you are not to guess what the answer to the question might have been. When testimony was ordered stricken from the court record, you are not to consider that testimony as evidence.

Do not concern yourselves with the reasons for these decisions. Admission of evidence in court is governed by rules of law.

In the opening statements and closing arguments the lawyers have talked to you about the law and the evidence. What the lawyers said is not evidence but it may help you understand the law and the evidence.

You must decide the accuracy of each witness's testimony. Take into account such things as his ability and opportunity to observe, his memory, his manner while testifying, any motive or prejudices he might have and any inconsistent statements he might have made. Consider his testimony in light of all of the evidence in the case.

The State has charged the Defendant with the crimes of Conspiracy to Commit First Degree Murder, Murder in the First Degree and Armed Robbery. The charges are not evidence against the Defendant. You must not think that the Defendant is guilty just because she has been charged with a crime.

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019425

SCANNED

The Defendant has pled not guilty.  The Defendant's plea of not guilty means that the State must prove every part of the charges beyond a reasonable doubt.

The State has the burden of proving the Defendant guilty beyond a reasonable doubt.  In civil cases it is only necessary to prove that a fact is more likely true than not or that its truth is highly probable.  In criminal cases such as this, the State's proof must be more powerful than that.  It must be beyond a reasonable doubt.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the Defendant's guilt.  There are very few things in this world that we know with absolute certainty and in criminal cases the law does not require proof that overcomes every doubt.

If based on your consideration of the evidence you are firmly convinced that the Defendant is guilty of the crime charged, you must find her guilty.  If, on the other hand, you think there is a real possibility that she is not guilty, you must give her the benefit of the doubt and find her not guilty.

In deciding whether the Defendant is guilty or not guilty, do not consider the possible punishment.

The crime of Conspiracy to Commit First Degree Murder has two elements.  In order to determine that the Defendant committed the crime of Conspiracy to Commit First Degree

PD PCR Anderson 019426

Murder, you must find that:  Number one, the Defendant agreed with one or more persons that at least one of them or another person would engage in conduct constituting the crime of First Degree Murder; and, number two, the Defendant did so with the intent to promote or aid the commission of the crime of First Degree Murder.

The crime of First Degree Murder may be committed in two different ways which are referred to as premeditation murder and felony-murder.  In order to determine that the Defendant committed the crime of First Degree Murder, it is not necessary that all twelve of you agree that it was premeditated or that all twelve of you agree that it was felony-murder.  However, it is necessary that all twelve of you agree that the Defendant committed First Degree Murder.

The crime of First Degree Murder premeditated has three elements.  In order to determine that the Defendant committed the crime of First Degree Murder premeditated, you must find that:  Number one, the Defendant caused the death of another person; and, number two, the Defendant did so with premeditation; and, number three, the Defendant intended or knew that her conduct would cause death.

Premeditation means that the Defendant acts with either the intention or the knowledge that she will kill another human being when such intention or knowledge precedes the killing by a length of time to permit reflection.  An act is

PD PCR Anderson 019427

SCANNED

not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion.

The crime of First Degree Murder felony-murder has four elements. In order to determine that the Defendant committed the crime of First Degree Murder felony-murder, you must find that: Number one, the Defendant committed or attempted to commit the offense of robbery or armed robbery; and, number two, the Defendant did so acting either alone or with one or more other persons; and, number three, the Defendant or another person caused the death of any person; and, number four, the death was caused in the course of and in furtherance of the robbery or armed robbery or the immediate flight from the robbery or armed robbery.

First Degree Murder felony-murder requires no specific mental state other than what is required for the commission of robbery or armed robbery.

Intentionally or with the intent to means, with respect to a result or to conduct, that a person's objective is to cause that result or to engage in that conduct.

Knowingly means, with respect to conduct or to a circumstance, that a person is aware or believes that her conduct is of that nature or that the circumstance exists.

Property means anything of value.

Force means any physical act directed against a person as a means of gaining control of property.

PD PCR Anderson 019428

SCANNED

Threat means a verbal or physical menace of imminent physical injury to a person.

Dangerous instrument means anything that under the circumstances in which it is used, attempted to be used or threatened to be used is readily capable of causing death or serious physical injury.

Deadly weapon means anything designed for lethal use and includes a firearm.

Conspiracy to Commit First Degree Murder does not require a written, formal or definite agreement. You may infer the existence of an agreement from the conduct of the parties if it seems reasonable to do so based on the evidence.

A conspirator is liable for all criminal acts committed by a co-conspirator during and in furtherance of the conspiracy.

The crime of Armed Robbery has six elements. In order to determine that the Defendant committed the crime of Armed Robbery, you must find that: Number one, the Defendant took property of another person; and, number two, the Defendant took the property from the other's person or immediate presence; and, number three, the Defendant did so against the other person's will; and, number four, in doing so the Defendant threatened or used force against any person; and, number five, the Defendant threatened or used force with the

SCANNED

PD PCR Anderson 019429

intent either to coerce the surrender of the property or to prevent resistance to her taking or retaining the property; and, number six, in the course of doing so the Defendant or an accomplice used or threatened to use a deadly weapon or dangerous instrument.

The phrase in the course of in the elements for the offense of Armed Robbery includes any of the Defendant's acts beginning with the initiation of and extending through the flight from a robbery.

A person is criminally accountable for the conduct of another if the person is an accomplice of such other person in the commission of an offense.

Accomplice means a person who, with the intent to promote or facilitate the commission of an offense:  Number one, solicits or commands another person to commit the offense; or, number two, aids, counsels, agrees to aid or attempts to aid another person in planning or committing the offense; or, number three, provides means or opportunity to another person to commit the offense.

The Defendant's guilt cannot be established by her mere presence at a crime scene or mere association with another person at a crime scene.  The fact that the Defendant may have been present does not in and of itself make the Defendant guilty of the crime charged.

It is no defense to the crime charged against the

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019430

Defendant in this case that another person or persons not now on trial might have participated or cooperated in the crime. You should not guess the reason for the absence from the courtroom of such other person or persons. The only matter before you for your decision is the guilt or innocence of the Defendant.

Temporary intoxication resulting from the voluntary consumption of alcohol is not a defense for any criminal act or requisite state of mind.

You must not consider any statements made by the Defendant to a law enforcement officer unless you determine beyond a reasonable doubt that the Defendant made the statements voluntarily.

The Defendant's statement was not voluntary if it resulted from the Defendant's will being overcome by a law enforcement officer's use of any sort of violence, coercion or threats or by any direct or implied promise however slight. You must give such weight to the Defendant's statement as you feel it deserves under all the circumstances.

The issue of whether any statements by the Defendant were obtained in compliance with the Miranda decision or were obtained in compliance with Illinois state law are legal issues for my determination alone and should not be considered by you.

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

SCANNED

PD PCR Anderson 019431

In Detective Cooper's interview with the Defendant, he made various factual assertions or statements to the Defendant regarding how he believed the crimes in question were committed or how Mr. Poyson or Mr. Anderson said they were committed.  You should not assume that Mr. Poyson or Mr. Anderson did, in fact, make such statements or that such statements were true.

You should treat such assertions or statements as an interview technique used by Detective Cooper.  You should not accept them as being the Defendant's version of what happened unless you determine that the Defendant during the interview agreed with them or adopted them as her own version.  Whether any specific response or non-response by the Defendant constituted an agreement with or adoption of Detective Cooper's statements is factual matter for you to determine.

During the interview, Detective Cooper made various assertions or statements to the Defendant as to whether he thought she was telling the truth.  These should also be treated as an interview technique used by Detective Cooper. Whether the Defendant was telling the truth during her interview with Detective Cooper is a factual matter for you to determine.

Evidence can be divided into direct and circumstantial evidence.  Direct evidence is the testimony of a witness who saw or heard an event.  Circumstantial evidence is the proof

PD PCR Anderson 019432

SCANNED

of a fact from which the existence of another fact may be inferred. You must determine the weight to be given to all the evidence without regard to whether it is direct or circumstantial.

The rules of evidence ordinarily do not permit the opinion of a witness to be received as evidence. However, a witness may testify as to an opinion on a subject upon which the witness has become an expert because of education, study or experience.

You should consider the opinion of an expert and should weigh the reasons, if any, given for it. However, you are not bound by any expert opinion. Given the expert opinion the weight that you believe it deserves.

And at this time we will proceed to final arguments. And let me just give you idea before we get started. We all agreed that we are desirous of completing the arguments and then breaking for lunch so I don't want any of you to think my god, it is the lunch hour. Maybe the Judge has forgotten or doesn't know what time it is.

I am aware that we are going in to the lunch hour and, hopefully, you all stocked up on some of the donuts that I hear you have in there so we are going to try to keep going and at least get the arguments done. Maybe we will take a short break between some of the arguments but we want to get this case argued and then we are going to break for lunch so,

PD PCR Anderson 019433

SCANNED

I just wanted to let you know what our general schedule is.

And, Mr. Carlisle, you may proceed.

MR. CARLISLE:  Thank you.

Good morning.  First of all, I want to thank you for paying so much attention.  I know some times the scheduling didn't go as everyone expected and you all were good at paying attention and coming here and listening to all the evidence in this case.

Now, the Judge just told you what the law is and me and Mr. Engan have the opportunity to argue about it for a bit of time.

Now, I get to go first and I get to go last because I have the burden of proving to you that the Defendant Kim Lane is guilty of these charges.

One of the instructions that the Judge just read to you was an accomplice instruction and that's going to be a fairly important instruction because the State is going to tell you Kim Lane is not the one who actually inflicted death.  She is not the one that caused the deaths.  She didn't shoot the people.  She didn't stab them.  She didn't take a rock and smash their head but she did act as an accomplice in this case.

And, basically, the Judge indicated what an accomplice is and to make it more simpler, all the accomplice statute is saying is that somebody who acts as an accomplice is guilty

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019434

if they're an accomplice to somebody else who is guilty.  In other words, if a person commits first degree murder, commits armed robbery and Kim Lane acted as an accomplice, then she is also guilty of first degree murder and she is also guilty of armed robbery.

The Judge read to you just now the elements for the various crimes that she is charged with.  I am going to go kind of backward to the way that she -- the way that he read them.

The last one that he read was the armed robbery statute.  The elements of that are, first, property of another person has to be taken.  What was taken in this case.  Well, the whole goal -- the whole reason that three people were killed was to take the truck; to take the truck and to go to Illinois so, that's one of the things taken.

Also, in order to take the truck they had to get the keys; the keys that were in Roland Wear's pocket so, they took the keys so that they could take the truck.

In addition, one other thing was taken and it was taken specifically by Kimberly Lane and that was the Coleman lantern that was in back of the truck so, there was various different things that were taken; various property of another person that was taken.

The second requirement is that it be taken from a person or a person's immediate presence.  Now, in this case Roland

PD PCR Anderson 019435

Wear was killed right out here.  That's where his body was found after being covered with trash.  That truck was parked -- the truck was parked right next to him.  His immediate presence means next to him and the truck was right next to him when it was taken.  In addition, his keys which had been in his pocket.  Those are also on his person -- on his person or immediate presence.  They were also taken.

The third element is against his will.  Obviously, that was taken against his will.  He did not freely give up his keys.  He did not freely give up his truck.

And then there is the use of force.  Now, in this case there are three dead people.  There, obviously, was force used in this case in order to get the truck.  That was the whole goal was to get the truck.

The next element is that there was the intent to coerce the surrender of property or to prevent resistance to retaining it.  Obviously, the force that was used against Roland Wear was used in order to get the actual keys.  The reason that they killed him was to get the keys to get the truck.  The reason all three of them were killed -- Leta Kagen, Roland Wear and Robert Delahunt -- was so that they could get away with the truck so that they could keep the truck and use it to get away and go to Chicago.  They were killed in order to prevent resistance to retaining the property.

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019436

Finally, the use of a deadly weapon or dangerous instrument.  Now, with respect to Robert Delahunt, there was a knife used to slash his throat.  It was driven into his skull.  There was a rock essentially used to smash his head.  Those are clearly items that used in the manner in which they had been used can cause serious physical injury or death and, in fact, they did cause death.

With respect to Leta Kagen, she was shot.  A firearm, clearly, is a deadly weapon.

With respect to Roland Wear, he was shot.  His head was smashed by a cinder block.  Again, a firearm is a deadly weapon.  The cinder block was used in a manner such that it could cause death.  It is a dangerous instrument.

Clearly, there was an armed robbery here.  The Judge read you that statute and indicated that these are all the elements.  He also said that an accomplice is criminally accountable.  In other words, since Kim Lane acted as an accomplice in this case, she is guilty of armed robbery.

What shows that she acted as an accomplice.  First, the intent to promote or facilitate the commission of the offense.  In other words, she intended to help or she intended to make it easier for them to commit the offense.

What does she do to make it easier.  What did she do to aid them.  Actually, there are a couple different things that -- couple different ways that you can act as an

PD PCR Anderson 019437

accomplice.  First, you can solicit or command another to commit an offense.  You can ask somebody else to commit an offense.

What was the testimony.  What did you hear on the tape.  On the tape she admitted she was the first one to say let's kill them or I think it was why don't you just kill them and take the truck.  Let's just kill them and take the truck.  She was asking them to kill them and take the truck.

Now, there are four different people she talked to in this case.  The first person she talked to was Jeff Hedrich.  When she talked to Jeff Hedrich she left that part off.  She didn't say anything about that.

The next day, just about a week and a half after the murders happened, she talked to Eric Cooper and she tried to skip over that part again.  Eric Cooper made her go back and talk about it and after he made her go back, she admitted that yes, I said that.  That's what she said on the tape.  She doesn't say on the tape I don't think I said that.  She said yeah, I remember saying that.

Then later she talked to Dave Hawkins and gave him a third version.  She said the third time there is no way -- no possible way I could ever say that no matter how much I hated somebody.

And then she gives her final version.  What she testified to on Friday was that well, she doesn't remember

PD PCR Anderson 019438

32

saying this but her two co-defendants said that she said it.

She started it off.  She solicited it.  Why.  Because she wanted to go to Chicago.  She was tired of staying in Golden Valley.  She didn't like Lancaster so she left there.  She didn't like Golden Valley.  She wanted to leave.  She wanted to go to Chicago.  Nobody else had any ties to Chicago.

Anderson talked about going to Chicago because he had Mafia ties but we know that was a lie.  He didn't really have any Mafia ties in Chicago.  He had no reason to go to Chicago.

Bobby Poyson had no reason to go to Chicago.  If he goes there, he doesn't know anybody who lives there.  He was living on the street for a few days because he didn't know anybody.  He had no reason to go to Chicago.

Kim Lane thought that she was going to have a better life in Chicago.  That's why she wanted to go there.  She was the only one who had any motivation to go to Chicago.

The second way that she can be an accomplice -- and it is an either or situation.  It is either she did the first or she did the second or she did the third.  The second is to aid, counsel or agree to aid or attempt to aid another person in planning or committing the offense.  In other words, aid either in planning the offense -- if she helps in any way in planning or helps in committing the offense.

SCANNED

PD PCB Anderson 019439

What did she do to help them commit the offense of armed robbery. Well, in order to commit the armed robbery, in order to take the property, the first thing they did was kill Robert Delahunt and she assisted that by distracting Robert Delahunt by being out there, by kissing him so that Frank Anderson can walk up behind him and grab his head and slash his throat. She knew she had a role to play. You listened to the tape. She said yes, I knew that was my role.

Now she changed her story and when she testified she said well, I thought that they were just trying to scare him but even if you believe that story -- and I think when you look at all the evidence you will not -- but if you believe that story, she is still guilty because why were they going to scare him.

They were going to scare him so that he didn't tell anybody their story. So that he didn't tell them that they were planning on taking the truck. They wanted to scare him so that they could steal -- take the truck and go to Chicago so, either way she is guilty of aiding them and if she aided somebody that committed an armed robbery, that makes her guilty of armed robbery.

Also, she aided in the actual murder of Robert Delahunt by bringing rocks; rocks that she admitted on the tape that were going to be used to do something with his head. Something with his head. Smashing his head and driving a

PD PCR Anderson 019440

knife through his skull, that's something that the rocks were being used for.

She also aided by getting them inside without being discovered to make sure that they could go get cleaned up so that Leta and Roland didn't notice the blood and didn't try to get away because Robert Delahunt was laying dead in the trailer.  She helped them get inside so that they wouldn't be discovered so that Roland and Leta couldn't get away.

And she also helped by going with Bobby Poyson to get bullets from Carmen May.

If you look at that, she aided them in committing these offense -- this offense by helping them do the things that they needed to do in order to prevent resistance to taking the property.  She wanted the truck.  She wanted to go to Chicago.

The next offense I am going to talk about is the conspiracy charge.  Now, in conspiracy there are basically two elements.  First of all, there must be an agreement.  It doesn't have to be a formal agreement.  It can just be an agreement and the Judge instructed you that you can determine whether or not there was an agreement based on somebody's actions so she doesn't have to say particularly well, do this and this and this and this and this.  If she adopts the agreement by her actions, she is guilty of conspiracy.

Now, what she does say was that she was the first one to

SCANNED

PD PCR Anderson 019441

say let's kill them and take the truck.  She planted the idea in everybody's mind.  On the tape she talked about the planning going on and that she was there.  She was part of the planning so she admits a couple of different times all three of them were planning although she denies it several times and you have to decide what you believe when you listen to the tape but she also adopts the agreement.  She had a role that she had to play.

Her role was to distract Robert Delahunt and she played that role.  She went out there and she was kissing him, distracting him.  Also making Frank Anderson -- giving him that push, making him angry enough so that he could take the knife and slash his throat so she had a role to play.  Her role was with respect to Robert Delahunt.  It was the intent -- her intent that three people would die and that she could go to Chicago so that she had the intent.  She was part of the plan; part of the agreement.

Now, with respect to -- sorry, my hands are cold -- with respect to the murder of Robert Delahunt, there are two different theories.  The first is that premeditated theory and, again, Kim Lane is not one that slashed his throat.  She is not the one that smashed his head with a rock.  She is not the one that drove the knife through his skull.  She acted as an accomplice.

We know she acted as an accomplice by going out into the

SCANNED

PD PCR Anderson 019442

trailer and distracting him. She acted as an accomplice by bringing the rock that was used to smash his head. She also acted as an accomplice by aiding in the planning of the crime. She aided in planning the crime so she acted as an accomplice.

Clearly, Robert's death was caused by a person who slashed his throat. His head was smashed. He had a knife stuck through his skull. It was premeditated. Throughout her statement she said that the plan -- the whole plan was to kill Robert. It was premeditated. She knew he was going to be killed. Frank Anderson was standing out there in the trailer with a knife that he took into the trailer with the specific intent to kill Robert Delahunt so it is clearly premeditated.

And the third element would be that she intended or knew that he was going to die. Clearly, they intended to kill him. He was struggling for an hour and a half. He has defensive wounds on his hands. He was doing his best to fight back and they killed him. Anderson intended to kill him. He knew that he was going to die. This is specifically a premeditated murder.

She acted as an accomplice in these ways -- by distracting Robert, by bringing rocks that were used to smash his head. She also acted as an accomplice by getting them inside to clean up so that they wouldn't be discovered so

SCANNED

PD PCR Anderson 019443

that the death wouldn't be discovered right away by Leta or Roland.

The other way she can be found guilty of the first degree murder of Robert Delahunt is felony-murder. That means she has to be committing an armed robbery or attempting to commit that. Now, I think I already laid out why she is guilty and why she was committing armed robbery.

She acted either alone or with one or more other persons. She was acting with Frank Anderson and Bobby Poyson. That one or -- that either her or another person caused death. Clearly, Frank Anderson and Bobby Poyson caused the death of Robert Delahunt. And that in the course of and in furtherance of the robbery. Any act in the course of and in furtherance of the robbery. Again, going back to what I said before. This was in the furtherance of the robbery because they wanted to prevent resistance to retaining the property. They killed him so that they could keep the truck so it was in the course of or in furtherance of the robbery.

With respect to the murder of Leta Kagen, again, it was clearly premeditated. All three of them were planning this out. They wanted to get bullets beforehand so that they could go and kill Leta Kagen. Clearly this was premeditated.

Her death was caused by a person Bobby Poyson shooting her and he intended or knew she was going to die. He

SCANNED

PD PCR Anderson 019444

38

intended to kill her. That's why he shot her. He shot her in the mouth hitting her brain stem and she died immediately.

She was an accomplice to that. She helped in the planning of it and I indicated -- as I indicated earlier, she was part of and aided in the planning of the offense. She also aided in the actual commission of the offense. She aided in that she helped them wash up so that they wouldn't be discovered so that they could continue on with their plan. She also aided in going with them to get bullets -- bullets from Carmen May.

With respect to the felony-murder, the exact same discussion we just had -- just had about Robert Delahunt. It is the exact same thing. She was committing a robbery. She was acting with Frank Anderson and Bobby Poyson and they caused the death of Leta Kagen and it was in order to get property and retain the property so she is guilty because the death was caused in furtherance of the robbery. She is guilty of the first degree murder of Leta Kagen.

With respect to Roland Wear, again, clearly, that was premeditated. That was the whole goal was to kill Roland Wear and take the truck. Premeditated.

Also, the bullets that I talked about and the plan beforehand. He was shot. He managed to struggle outside. He was killed by a cinder block to his head by Bobby Poyson. They intended to kill him. Again, his truck was outside.

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCB Anderson 019445

SCANNED

Let's go and run away.  Let's go in his truck and drive away after smashing his head and they intended to kill him.

Again, she was an accomplice on that for the same reasons she was an accomplice for Leta Kagen.  She got the bullets.  She helped them wash up so that Roland Wear wouldn't discover them so that they could get away.  Their half of the plan even happened a couple hours after Robert Delahunt was killed.

Again, with respect to felony-murder, she was committing a robbery and in the course of the robbery he was killed by another person but he was killed in furtherance of the robbery.

So, when you look at all the evidence in this case, you will find she is guilty of the five counts she is charged with.

THE COURT:  All right.  Counsel?

MR. ENGAN:  Thank you, your Honor.

Ladies and gentlemen, first I'd like to join Mr. Carlisle in thanking you for paying attention during the course of this trial.  This ran a littler longer than most trials and after sitting through a few trials you notice sometimes jurors are nodding off or just not paying attention during things that we think are pretty important.  We didn't see any of that during this trial.  You all paid very close attention.  Kim appreciates that because she knows that it is

PD PCR Anderson 019446

necessary for the system to function so, again, thank you.

One of the more interesting things about this trial is the fact really while the State has put on a lot of evidence, that there has not been a lot of discussion or disagreement from the Defense about most of the physical evidence and a lot of the evidence that's been put on in this trial.

What we do disagree on and what we are asking you to consider is what you think about that evidence.  What conclusions can be drawn from what you heard both from the testimony and evidence and from really the key to the State's case, the taped interview with Detective Cooper.  The conclusions you draw is what I am here -- really here to discuss.

That conclusion is is this girl here a murderer that killed three people and stole their pickup truck or is this a fourteen year old kid swept away by two people who were and are killers.

We talked about Kim's background.  She came from Lancaster.  She had very humble beginnings.  She was living out in a trailer park.  You may ask why are you playing a violin for Kim or why are you making it sound like we should pity her.  We don't ask you to pity her.  She really asks for your understanding.  Her background is important because it tells you why she fell in with these people and why she was essentially following their directives.

PD PCR Anderson 019447

41

She lived in the trailer park with her father who was an abusive person. He abused her. He drank alcohol and essentially was drunk most of the time. He really didn't have any use for her. He essentially told Kim get away from me. Leave me alone. I am trying to have a good time here with my girlfriend or my wife and her kids. You are kind of surplusage. You remind me of a relationship that failed. I don't want anything to do with you. Go to your trailer. Don't go to school. I don't care. Just go away.

He fed her one meal. Mainly she was reduced to going around scraping up what she could from other people in the trailer park. Two people were Chris Starr and Charity Anzalone.

Chris Starr trusted Kim. He liked her enough to leave her as a baby sitter of his son. Charity Anzalone obviously very highly considered or thought very highly of Kim but they were just two of the people Kim came to depend on because she had no real family support where she was.

Unfortunately, two of the other people Kim met there were Mary Anderson and, more critical to our case, Frank Anderson.

Now, you heard from Dr. Karp. Dr. Karp got up and told us she analyzed Kim. She studied her case. She administered tests to Kim. She told us about Kim and about her intelligence level back in July 1997 when Dr. Karp

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCB Anderson 019448

administered these tests.  She came to the conclusion that Kim in most areas had an I.Q. between ten years old and twelve years old.  In some instances below that so she is not a particularly bright person.  She is not real educated, not real quick on the draw.

What did Dr. Karp tell us.  She said Kim is someone who is naive.  Someone who is dependent.  Someone who is passive.  Someone who tends to react to conflict by withdrawing into herself, compartmentalizing herself into a shelf and going along with whatever the person suggests just hoping that the passage of events can go by without any harm to her.

Mr. Carlisle really didn't do much with her cross-examination so he retired to the old trick of saying well, how much are you paid to come here.  How much were you paid to do this.  Really, who cares.  Dr. Karp is a professional.  Of course she was paid to be here.  I am paid to be here.  Eric Cooper is paid to be here.  Derek Carlisle is paid to be here.  Judge Conn is paid to be here so what difference does that make but Mr. Carlisle couldn't think of anything else really to say so he retired to that note.

What Dr. Karp gave you is more background to help you realize the things Kim was going through because the most difficult thing in this trial and I mentioned it in my opening argument is that everyone here is an adult.  As every one of you sits here right now in this air-conditioned room,

SCANNED

PD PCR Anderson 019449

none of you are a fourteen year old girl essentially carried away by Frank Anderson from Lancaster and lead on a trip where she was alternatively respecting him and liking him and fearing him.

Frank Anderson was hand-picked for Kim. He said come with me and you will be happy. He said let's leave this trailer park. He put himself in the position as kind of the dad Kim didn't have at all. He was forty-eight. Kim was fourteen. And sometimes he was her boyfriend. Sometimes he was her protector but eventually he began molesting her.

But he was the type of person who really cared for her in Kim's eyes at the beginning who would provide her, through his connections with the Mafia, a big house, animals to play with and care for, doctors, food, all the things Kim never had. That's where he's coming from here.

Frank Anderson was making himself out to be some kind of a shiny knight that would sweep her away from all these miserable things and make a good life for her. She bought this hook, line and sinker because she is a gullible kid.

He also said well, I really love you honey and we'll go to Kentucky and get married and began forcing himself on her sexually.

Funny. Does this sound like a real nice guy who really cares about her. After all, she was dependent on him. He did feed her. He did make sure she got to sleep. Every once

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCB Anderson 019450

in a while he did provide transportation for her and he did seem to Kim to be the only person that at that time cared for her. What was the reality she got.

First, Kim did not like living in the trailer park but after that, who did she live with. Not a knight in shiny armor but a forty-eight year old man who exploited her, who molested her, who began to threaten her first of all before they even leave Lancaster by saying, you know, my friend on the phone says I ought to eliminate you. What does that mean. He said I ought to kill you.

From then he begins alternating between being nice to her, being affectionate towards her to begin taking control over her. He lies to her about the Mafia. He lied to her about having friends that were going to help them out, give them money and give them transportation. He directed her. He lead her around. She made none of the decisions of where they were going to go and what they were going to do. This was all at the behest of Frank Anderson.

He had his way with her and there again was providing food for her and providing transportation for her and eventually who showed her that he was someone who could commit murder and with the help of another, specifically Bobby Poyson, committed murder. That's the reality Kim Lane found herself in.

When you go back there to discuss this case, I'd be

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019451

willing to bet your comments will be this plan was stupid. This was not working. Why didn't she get out of there because that's the first thing I thought when I heard this case. Why did you go along with this guy. That may be what you are thinking.

Well, in Kim's mind Frank was lying to her about ninety percent of the time. Every once in a while something he said, some promise would actually come true. He did talk on the telephone to some mysterious person. She thought the conversation was real. He'd be on the phone every so often having lengthy conversations. As far as she knew, he was actually talking to someone.

Most of these connections that were going to help them fell through. There were no such people but every once in a while they would meet up with somebody and they would help her. They met up with people in Lancaster who helped Kim and helped Frank. They went to Palmdale. They didn't know anybody there. No Mafia connections. There was no help. They went to Bakersfield. Frank actually knew people in Bakersfield and they actually bought them tickets so that they could get to Las Vegas. So, even though Frank was wrong about so many things, in order to completely not dismiss what he was saying, Kim did have occasions when something he said worked out and showed that maybe Frank is right. Maybe he really does care about me. He is going to help me every once

PD PCR Anderson 019452

46

in a while.  Maybe he is sincere.

You heard on the tape Detective Cooper even asked if Frank was some kind of a con man.  Detective Cooper knew what was going on.  He's a police officer.  He's dealt with people of all sorts throughout the course of his career.  He knew what Frank Anderson really is and was.

He also promised this little girl a dream of going to Kentucky and getting married and Kim thought this would really work out if she just stuck with it.

She could go back home.  She could go back home and find herself in the same life which she had with really no future, no one who cares about her, no family to support her and her dad telling her you came back now.  You really screwed up. You ran away from this causing me all kinds of aggravation and face punishment from him.  She didn't want to do that so the alternative was Frank Anderson who kept promising he would keep working toward what was better than going home and being stuck with it.

She never said no to Frank Anderson.  She was able to resists his will on different occasions.  Frank Anderson twice proposed prostituting her to raise some money to get to the next destination.  That I believe was in Bakersfield and also Chicago.  She always said you can make money.  She didn't directly say I am not doing that.  No way.  She didn't say that.  Instead she talked him out of it generally

PD PCR Anderson 019453

SCANNED

47

convincing him that was not what he wanted to do. That was not a good thing to do.

Hitchhiking was the same way. He said I want you to stick your thumb out and get a ride. She didn't want to do that. She had never hitchhiked before but she didn't say no, I will not hitchhike, Frank. I am not doing it. Instead she talked her way out. No where else did she ever say no to Frank Anderson.

Finally, Frank Anderson and Bobby Poyson are saying all right. Go in the trailer and lie down with Delahunt. They're both telling her that. They're directing her. She couldn't talk her way out of that. She goes well, I don't see any harm in this. It is all a weird thing that doesn't seem real to me. I will do it and she did. No where did she ever say no to Anderson. No where did she ever say no to Bobby Poyson.

Let's talk about some of the witnesses that we heard from that referred to this property out there. I believe the very first witness the State put on was Elliot Kagen who lived out there apparently from time to time. What did he tell us about it. He said well, Golden Valley gets pretty dark out there at night. We don't have any streetlights out there. It is rare that a car comes by.

What about snakes. Oh, yeah, lots of snakes out there. That's why Leta used the .22 rifle to shoot a lot of snakes.

PD PCR Anderson 019454

SCANNED

Plenty of snakes out there.

Most interesting is what did he tell you about Bobby Poyson. He told you that Poyson bragged about being a killer, had been involved in gang things and was some kind of a bad dude. What else did he tell about what he thought upon realizing Leta Kagen, Roland Wear and Robert Delahunt had been murdered. He was surprised but at the same time he wasn't really surprised when he first learned who they thought did it -- Bobby Poyson.

Let's talk about Carmen May. Carmen May also feared Bobby Poyson. Carmen May enjoyed a boyfriend-girlfriend type relationship with Bobby Poyson but after a while she got tired of him. She wanted to break up. She was afraid to. She was afraid of Bobby Poyson because Poyson had talked to her about being a tough gang guy. They saw a drive-by shooting on t.v. Poyson said I've done that. He was playing with guns all the time, pointing a .22 around people. A tough gang guy. Why was she afraid to break up with him. You heard what she said. I was afraid that he might come back and shoot me. She feared Bobby Poyson. That was a justifiable fear.

The entire plan of tying people up, killing people, taking the truck just has an aura of unreality to it. Kim testified several times and she said throughout that interview with Detective Cooper that this just seemed to be

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019455

some kind of a joke.  I thought that they were joking around. Who would bring up something like that.  It didn't seem that was a real thing and it never seemed to be a real thing to Kim until it actually started.

It seemed to be some kind of a weird joke.  Some kind of unreality.  Some kind of aura that was going on out there and just didn't seem right.  It wasn't real until it actually began to happen.  She went along with this because she was told to and she didn't think anything was really going to happen.

Remember, again, this was a fourteen year old kid being told what to do by her so-called protector.  Her so-called boyfriend or so-called father figure Frank Anderson.  Join in that Bobby Poyson who said go lie down with Delahunt.  She does it then she finally realizes what is going on because now Frank pulls out a knife and is going for Delahunt.  She runs out.  She couldn't believe what was going on.  She tells Poyson he's going -- he's going to do it.  He's going to kill him.  He's going to kill him.  He's going to kill him.  She told you she was panicky at this point.  Her mind turned blank.

Again, I wonder what would I do.  What I would do is run the heck out of that area.  Probably you would have run the heck out of that area.  Kim didn't and that didn't occur. You heard that she was afraid to run off.  She was afraid of

PD PCR Anderson 019456

50

so many things at that point.  There had been threats made to her by Anderson and by Poyson who she thought was some kind of gangster.  She was afraid.

Now, I'd like to be able to say she was a hero and at the point she knows what is going on that she runs in and tells Leta and Roland these crazy guys are killing Robert.  Do something.  Let's get out of here.  Let's stop this.  Get your gun and shoot them or something.  That would have been a good way for this to come out.  Better than what did happen.  She didn't do that.  She is not a hero.  Okay.  She is a kid.  She is a kid who is not very bright and now she fell victim to something that was far, far beyond her control.

The State is going to try to get as many miles as possible out of the rocks and her getting these rocks.  The State is trying to imply or they will probably come right out and say she was getting these rocks because she knew they were going to take the rocks and drive the knife through Robert Delahunt's head or smash his skull in.  She didn't know what the rocks were for.

She was there.  She heard Poyson say get me a rock.  Again, this was not a request.  Poyson was ordering her to get him a rock.  She doesn't know what is going on in there.  She sees Anderson in the trailer in the twilight with a knife in his hand.  She gets the rock.  She doesn't know what it was for.  She thinks it was to prop the door open.  She had

SCANNED

PD PCR Anderson 019457

seen rocks used to prop the door open before. She didn't get a big rock. She gets a small rock. Poyson didn't like that rock. Get me a bigger rock. She gets a bigger rock.

I submit that if she knew what that rock was for, she would have gone out the first time and gotten a nice big rock; something to be used to smash in someone's skull. She did not. She got a small rock and was ordered again by Poyson to get a bigger rock.

By this time she is just acting in a panic. Her mind is blank. She again is not thinking. Remember, she is a fourteen year old with below her age intelligence. She goes along with this. Now she knows that is not a joke. These people are killers and they're going to kill me. She goes and gets some matches. She gets a glass of water and she gets the clothes.

She doesn't run away. That would have been a good thing to do. She doesn't warn Leta. She doesn't warn Roland. She just goes along and gets these things because now she is thinking I know I am next. They've already threatened me. Now they've shown what they're capable of doing. I am next. I better do what they say or I am going to get it. And she does.

She did try to call the police. She did try calling 911. The phone didn't work.

She did go along on the trip over to Carmen May's to get

PD PCR Anderson 019458

bullets.  She didn't get the bullets.  She was told by Poyson you're coming with me.  Let's go.  She went over there.  She didn't have any interaction with Carmen May.  None at all.  She did not ask her for bullets.  She merely went along in order to have Bobby Poyson get the bullets.  Then they went back.

Poyson is playing with the gun.  He points it at Kim.  In her mind she is thinking about the threats presented by these two people.  They just killed somebody and now Poyson is pointing a gun at her practicing what he is going to do to Leta and going to do to Roland just a few minutes later.

Some of the things the State did with this case particularly within the last day were disturbing.  The State was not satisfied with just presenting the facts and evidence as they are.  They wanted to show more things about Kim hoping that you are going to think that she's bad and you need to convict her.

The State asked did you talk with your Attorney.  Did you look at some questions that your Attorney told you he was going to ask.  Sure she did.  Of course she did do that.  Did Mr. Carlisle think I was going to put her up there and didn't know what she was going to say.

We all talk to our witnesses before they go up here.  We don't want surprises on the witness stand and we don't want out witnesses to be surprised by what they're going to be

PD PCR Anderson 019459

SCANNED

asked so, naturally, should you hold that against Kim.  No.

Then he said well, did Mr. Engan tell you to cover up your tattoo.  Oh, well, now you should convict Kim.  She's just some little trampy girl with a tattoo.  This is Kim's tattoo.  She has a heart on her wrist.  The State wants you to convict her for that.  Don't let them do that.  That's not what this case is about.  This is not about a tattoo.  Did we cover up her tattoo with a band-aid.  Yeah.  We didn't want you to be thinking about her tattoo.  We wanted you to be thinking about the facts and the evidence in this case.  The State wants you to be thinking about her tattoo.  Who cares.

The State also put on evidence that oh, there was blood smeared on the wall and, gee, one of the corrections officers heard her talk about smeared blood from a body on a wall and they're trying to make this girl out to be someone from the Mansion family that writes things in blood on walls after killing people.

Even the State conceded that Kim has no actual physical involvement in the killings.  She did not shoot anybody.  She did not stab anybody or slit their throat.  She did not smash anybody's head with a rock but what they want you to think is she is writing in blood on the wall.  She wiped her hands on the wall.

What the State is doing is overreaching.  They know they don't have enough evidence so they want to bring in all these

PD PCR Anderson 019460

SCANNED

other things to try to bias you against Kim Lane.  Don't let them do that.  Decide this case on the facts and evidence that you directly heard that have to do with this case.  Not irrelevant things designed to prejudice you against Kim.

One thing I want to talk about is what is called a compromise verdict.  She is charged with five offenses.  There are three counts of first degree murder.  She is charged with armed robbery and she is charged with conspiracy.  Now, of course, being optimistic, I hope you go in there and just say the State has not met their burden of proof beyond a reasonable doubt on any of the charges and you are going to acquit her.  Realistically speaking, there's a chance that won't happen.

What I would like to ask you to do is not go in there and be divided well eight to four and eight of you think she is not guilty and four think she is guilty and decide to just convict on one or two of the things and acquit on some of the other things and go home and feel that would be a just solution to this.

That would not be a just solution to this.  We call that a compromise verdict; getting the Defendant on one or two things.  That type of thing is not good for your deliberations because not only is it not fair to Kim but it is not fair to the deliberative process.

You have to decide each and every one of the counts.

You must decide each and every element of each count and you must decide whether the State has proven its case beyond a reasonable doubt as to each one of these counts.

Beyond a reasonable doubt is the highest burden of evidence. It is above clear and convincing evidence. You must be firmly convinced of Kim Lane's guilt in order to find her guilty. If you are not firmly convinced then you must give her the benefit of the doubt and you must acquit her. That is what it says in your jury instructions. Please, I ask you to take that duty very seriously.

Trials are mostly about evidence. They're about testimony. They're about arguments but they're also about fear. Kim is afraid that you might find her guilty. Mr. Rosenthal and I are afraid maybe we haven't done our jobs well enough. Maybe we have not presented the evidence that we might have to really put you in Kim's shoes.

I don't know what your backgrounds are but have you ever really, really been afraid and I don't mean you step off a curb and a car comes by and you jump back and say oh, I almost got run over because that's quick fear. You didn't get run over and the fear subsides.

Do any of you know what it is like to be afraid days at a time thinking people are going to kill me. They are going to turn me in and blame me for this. These people have absolute power over me. I have seen what they have done. I

56

14

am afraid for my life and it doesn't end.  It just goes on and on and on.

Kim survived.  She didn't want to resist her by this time captors taking them -- taking her with them.  She went along with that.  She went along with them and did what they said.

So, again, the same question I raised at the beginning of my closing argument and the same question that I said in my opening statement.  What this comes down to is how do you interpret this evidence.  Is this girl a killer.  Is this girl a murderer or is she a scared fourteen year old kid in the company of murderers.

After you consider the evidence during your deliberations, please let Kim go.

Thank you.

THE COURT:  All right.  Let's take about a five minute break and then we will come back and finish off arguments.

During the break, remember my admonitions.

(There was a break in the proceedings from 12:08 p.m. until 12:15 p.m.)

(The following was held in open court.)

THE COURT:  Thank you.  Be seated.

This is a continuation of Cause Number CR-96-1057, State versus Kimberly Lynn Lane.  Show the presence of the

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019463

Defendant, Counsel and the presence of the jury panel.

And, Mr. Carlisle, you may proceed.

MR. CARLISLE:  Thank you, your Honor.

One of the most important aspects of this case is going to be the credibility of the Defendant Kimberly Lane and her version of events and what you believe from her taped statement and what you believe from her testimony.

In talking about her credibility, it will be up to you to decide what to believe and what is credible.  What evidence has been presented that was credible and what was not credible.  In making that decision one of the things that you can rely -- that you should rely on is your common sense so I'd like to talk a little bit about common sense.

On the tape she talks about Frank Anderson pawning a pager on the day of the murders.  On Tuesday, the day the murders happened, they were pawning his pager -- trying to pawn Anderson's pager to buy bullets.  The bullets that were going to be used to shoot all three of the people.  That was the original plan.

But later when she testified, she said that on that day he was pawning his pager in order to get bullets for target practice not that they were planning this because her new story on the stand is that there wasn't a plan to kill anybody.  She didn't know that the plan was to kill anybody until on the way to Chicago.

PD PCB Anderson 019464

So, what makes more sense.  That on the day of the murders they were pawning this pager to buy bullets for target practice or that on the day of the murders, after they already talked about killing people the night before, that they tried to pawn this pager to buy bullets to kill three people.  You have to look and see what makes most common sense.

Another example is if all of this was just a joke then there would be no reason for people to say I am backing out. I want to back out.

Now, again she changes her -- her story on that.  She says -- on the tape she talks about Bobby and Robert both wanting to back out and she is saying that's part of the reason she didn't think that anything was going to happen because they both wanted to back out.  She was saying that that is why she didn't think Robert Delahunt was going to die.

When she testified she said well, no, that was after Robert already died they both came and said that they wanted to back out.

Use your common sense.  When is someone likely to make those statements.  And, again, if it is a joke, there would be no reason to back out.  If all this was just a big joke, you don't need to back out.  You don't back out of a joke. You back out if it is a plan; something that is really going

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019465

59

to happen.

Another thing that doesn't really make sense using common sense was -- is that she said she was too terrified to do anything when the murder -- murder of Robert Delahunt first started.  While they're busy smashing his head and cutting his throat, she's just too terrified to do anything.  Then they send her inside to get water so she's helping them clean up.  They are done.  This is already toward the end and then she is not terrified to do something.  Then she grabs the phone and calls 911.

Now, Eric Cooper asked her why she didn't call the police.  She didn't say she tried and the phone was dead.  She didn't say that.  But on the stand she said yeah, I did try to call 911.  She was inside if she tried to call 911.  Leta and Roland were right there.  Why didn't she just tell them.  What makes more common sense.

Another thing is after they had already gotten to Illinois, after they already made it to Evanston that she said Poyson told me to use a different name.  He wanted me to use the name Leah Poyson because he was trying to protect us from being found.

Mr. Engan made a big deal that -- that Elliot Kagen suspected Bobby Poyson right away and thought that he was involved in it.  That's a logical thought.  There is three dead people that all used to live there.  There are four

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019466

persons that used to live there that lived there for six months and he is gone now. What is the logical conclusion. Obviously, Bobby Poyson must have been involved somehow so who are the police going to be looking for right away. Bobby Poyson.

And what is he going to do. He, who told her to come up with this -- use this false name, registered with his name. He also used the address 2725 Yavapai where they left three dead bodies. That's not the smartest thing in the world to be doing. And then he tells her to use a different name. Does that make sense. Does that make common sense.

Also, with respect to Bobby Poyson, she said now in her testimony that she picked Poyson because she thought she could get away from him easier. That she didn't pick Anderson because Anderson could get her but that she picked Poyson and had Frank Anderson split up.

If this was the plan to get split up, did she pick Poyson because she was attracted to him, because she cared about him, because he was closer to her own age or is it because she thought she could get away from him easier. Does that make sense. Does that make common sense.

Bobby Poyson is the one that was smashing Robert Delahunt's head. Bobby Poyson is the one that took a gun and pulled the trigger and killed Leta Kagen. He shot Roland Wear and smashed in his head with a cinder block. Obviously,

PD PCR Anderson 019467

SCANNED

he is younger.  He is stocky but younger.  He is not a fifty year old man or almost fifty year old man.  What is going to make more sense.

When you go back there and analyze what you believe in this case, use your own common sense.

Mr. Engan made a big deal about the Defendant's tattoo and how I questioned her about that tattoo.

You have to look and see how she was testifying on the stand.  If what she was saying made sense.  Look at just her actions, how she was acting on the stand, how she appeared on the stand, her demeanor, the way she appeared, the way she was acting, the way she was talking.  That is my point.  Whether she sounded like she was coached or who she sounded like in talking.

The reason I asked about that tattoo isn't because people that have tattoos are bad.  It is just because she was hiding it.  She was trying to hide things from you.  The reason I pointed that out is to show what she was doing in this case.  Hiding things.

Now, another thing I want to talk about is just the inconsistencies in her own testimony.  In her testimony she indicated that right away the Mafia wanted to eliminate them.  They wanted to eliminate her.  They wanted her to die but throughout this, the whole goal is to get to Chicago.  Get to Chicago to live as basically a Mafia princess.  She was going

PD PCR Anderson 019468

toward the Mafia not running away from the Mafia.  Running toward the Mafia.

There were also inconsistencies and there are going to be twelve of you who deliberate and you can check your notes and -- and, you know, if I say something wrong, you can check them but another inconsistency is about the very first thing Frank was talking about the Mafia.  Frank was telling her the Mafia wanted her eliminated.  Then later on she said she never heard about the Mafia until on her way to Mohave.  That's another inconsistency in her testimony that you can take into account.

Another inconsistent is how shy she was.  She talked about being shy.  She also talked about how she met everybody in the trailer park.  And the thing -- the first night they were there -- maybe it was the second night they're at the trailer, she is having a food fight with Robert Delahunt.  Does that sound like somebody that -- that is shy.

And speaking of shy and I think naive was used by Dr. Karp.  Passive-dependent.  Does that sound like the picture of Kimberly Lane that you saw and the way she testified for a day and a half or almost two days and the way she came across on the tape.  You can make the decision on what she is really like and whether Dr. Karp's assessment is correct.

There's another inconsistency in her statement in that

she says when she came out of the trailer she was -- after Robert Delahunt's throat was slashed, she said she was terrified and paralyzed for twenty to thirty minutes. Later she came out and said well, I still didn't know whether this was a joke.

Now, if she thought it was a joke she wouldn't be terrified. She wouldn't be paralyzed. The reason she might be scared was because she knew somebody was being killed. The reason that she ran out of that trailer is because she knew somebody was being killed.

And I am not saying that she wasn't scared that they were actually going through with it. She probably was scared but it was all planned. It was part of the plan to kill them and to take the truck.

Another inconsistency in her testimony is when they get to Evanston, the first time she told us she said that Bobby Poyson filled out the paper work. The second time she said I filled out the paper work. I was talking to the interviewer. She interviewed me. That's just another inconsistency in her testimony. She wants you to think Bobby Poyson filled it out although she admitted she filled it out. She's the one that signed it.

And when I talk about inconsistencies, I also want you to think about this in a common sense wise. What makes more sense. Who put her name down as Kimberly Lynn Anderson. She

SCANNED

PD PCR Anderson 019470

did.  She admitted that was her picture.  Use your common sense.  She's the one that picked a different name later trying to hide her involvement.

And there are a lot of inconsistencies between her testimony and what she said on the tape.  Never any where on the tape does she say anything about Robert -- that the goal was just to scare Robert.  She doesn't mention that.  She says that they planned to kill him and that when Robert overheard they told him okay, we will tie him up instead of killing him.

And when you look at the or listen to the taped statement, you can consider if this was voluntary.  She willingly made that statement to Eric Cooper.  She said, you know, that's fine.  I want to talk to you.  She was willing to talk to him so, you know, there's no doubt that that was a voluntary statement.

There is also another inconsistency.  In the taped statement she indicated she was attracted to Robert Delahunt and that they were attracted to each other.  That's part of the reason she was kissing him.  Later when she testified she said he was like a brother to me and that she was very uncomfortable testifying or, excuse me, kissing him.

If she was very uncomfortable why didn't she not do it because she was able to stand up to Frank Anderson any time she wanted to.  She stood up to him when he said you need to

PD PCR Anderson 019471

SCANNED

prostitute.  She didn't prostitute.  He told her that he wanted to have sex.  She didn't want to have sex with him. She didn't have sex with him.  He told her that he wanted her to hitchhike.  She didn't want to hitchhike.  She didn't want to stand out there next to the road so she didn't.  She was able to stand up to Frank Anderson.

And that also goes to Dr. Karp's testimony.  She was not under this spell.  She was not under -- well, she was able to stand up to him.  She was able to resist.  She could do what she wanted to do.

The other aspect or other thing that goes into that is another inconsistency in her statement and in her testimony. Now she said that she was not afraid of Frank until after they got to Golden Valley and until after Robert Delahunt was killed.  She said after Robert Delahunt was killed, Frank changed.  That's what she said.  She was not afraid of Frank until then.

Another inconsistency is she was interviewed by Eric Cooper.  She was interviewed by Jeff Hedrich.  She was interviewed by Dave Hawkins.  To none of those three people did she ever say Frank threatened me.  Frank Anderson threatened me.  She never told them that one.

Now, when Eric Cooper was talking to her about the Mafia, she didn't say yeah, Frank Anderson threatened me with the Mafia and said that they were trying to kill me.  She

SCANNED

PD PCR Anderson 019472

didn't mention that.  She never mentioned that during the entire statement.  Eric Cooper at the end he said is there anything else that you want to tell me that you think is important.  That would be a very important thing.  She didn't mention it.  She never says that to anybody else.  Never once did she say that she was threatened by Frank.

And then, of course, the main inconsistency is throughout the taped statement -- and you can go ahead and listen to the taped statement again.  You can read the transcript again or listen to it.  Throughout the taped statement she talks about the plan is to kill not tie up. The plan is to kill.  She said that numerous times.  When Detective Cooper asked her about it she said yes.  Detective Cooper said that was the plan.  She said yes, that was the plan.

Detective Cooper knows what he's talking about. Detective Cooper knows Frank Anderson when he talks about him being a con man.  Detective Cooper did know what he was talking about in this case.  He kept talking to her and then he was saying okay, I need to stop you there because we need to cover these things that you skipped and she did skip it.

She tried to tell him the same story that she told Jeff Hedrich.  She tried to downplay her involvement; the very elements that made her -- that showed her involvement in this.  She tried to downplay her involvement about saying

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019473

let's just kill them and take the truck.  She tried to skip that.  She tried to skip over getting bullets.  She tried to skip over bringing rocks to Bobby Poyson.  She tried to skip over kissing Robert Delahunt.  She skipped over -- she tried to skip over these things that showed her active involvement, her participation and Eric Cooper stopped her and said let's go back and talk about these things that you skipped over.

He didn't put words in her mouth.  He said do you remember what you said.  She said yeah, I remember.  I said let's kill them and take the truck.

Another thing you can consider is that Kimberly Lane has demonstrated an ability to deceive, to lie to people.  She admitted she lied to Jeff Hedrich.  She also lied to Bobby Poyson and he believed her when she lied about her age.  She lied about her stepfather.  She lied and said that he molested me and make a false accusation or a false allegation.  That's something else you can keep in mind when deciding what to believe.

Now, what was the plan.  The whole plan was to kill these three people, take the truck and go to Chicago.  She intended for that to happen.

Now, even if you believe -- and I don't think you should believe her -- but if you believe that she didn't know what was going to happen or that she intended for it to happen, that what is required for the conspiracy is that she intended

PD PCR Anderson 019474

SCANNED

for three people to die.

An example is you may buy a lottery ticket. You may not have the expectation to actually win anything but the intent is there. Something you know. You intend for it to happen. That is what she did in this case. She intended for three people to die and they did.

And what shows that she actually expected to it happen. Well, they start talking about the plan and she started doing things to implement the plan; trying to sell the pager, getting the bullets, getting Robert Delahunt out there, kissing him, distracting him while Frank Anderson was there with the knife.

Kimberly Lane was the only one who had anything to gain by going to Chicago. Frank Anderson didn't. Bobby Poyson didn't. Bobby Poyson had lived there for six months without anything happening. Nobody died until Kimberly Lane and Frank Anderson showed up. Bobby Poyson had lived there for six months.

She also said that both Poyson and Anderson wanted to back out. Now, if Poyson wanted to back out and Anderson wanted to back out, who is left. Who wants to go forward with the plan. Kimberly Lane. She is the only one left. She wants to go forward with it if both of them want to back out.

What did she testify to. She said Poyson came up to her

PD PCR Anderson 019475

and told her that Anderson wanted to back out and Anderson came up and told her Poyson wanted to back out so they both know, from her testimony, that the other one wanted to back out and they both want to back out.  That leaves one person left who wants to go forward.  That is the person who has the most to gain by going to Chicago.

What do we know about her.  That she is capable of coming up with a scheme, coming up with a plan, manipulating people to get what she wants.

Just a couple of different examples of that.  For one, when she was ten and a half years old, she came up with a plan to get back to Lancaster.  She wanted to go back and live with her dad.  She didn't want to live with her mom anymore.  She came up with a plan.  I am going to accuse my stepfather of molesting me even though it is not true so that I can go back to Lancaster.  I am not even going to think about the consequences.  I am not going to worry about the consequences.  I am going to do that so that I can get what I want.  And she did.  She did implement that plan.  She did get what she wanted.  She got back to Lancaster.

Even on this trip she was able to manipulate Frank Anderson.  You can look at that as two possibilities now.  Either she really did like Bobby Poyson more than Frank Anderson -- which is what she said on the tape and she said on the stand that that was untrue -- or she came up with this

PD PCR Anderson 019476

plan just to separate the two and she told Frank Anderson a lie manipulating him telling him she liked Bobby Poyson better just to get rid of him.  She was able to manipulate him to get him out of the picture so, either way, she is able to manipulate people to use them to get what she wants.

As I indicated before, she was able to stand up to Frank Anderson when she wanted to.  She was not afraid of Frank until after Robert Delahunt was killed by her own statements.  She was not held hostage.  She was not under any threats until after that so Dr. Karp's analysis just does not apply.

What she is trying to do is downplay her involvement.  She wants you to think she doesn't have any blood on her hands either literally or figuratively.  The State is not saying she was drawing things with blood.  The State is saying that her involvement is more than she was letting on.  That when she was giving the rocks to Bobby Poyson, when she was helping kill them, she got blood on her hands.  You heard testimony about smears of blood on the walls of the trailer and that they couldn't get fingerprints because the blood was all smeared.  That's what Glenda Hardy indicated.

Now, I am not saying you shouldn't have any sympathy for Kimberly Lane because she had a rough childhood.  No.  You should feel sympathy for her.  You probably feel sorry for her.  Is that an excuse.  No.  Is that a reason why three people were killed.  Is that justification for killing three

PD PCR Anderson 019477

people and taking the truck. No.

There are a couple statements that are in there that I think are better than in her testimony and her taped transcript that are important. She said that the original plan was to shoot all three and get it over with. She suggested it. If Bobby Poyson shoots all three, she gets to go to Chicago. She doesn't have to think about the consequences of this either. It is quick, clean, easy, it is not bloody. It is not messy. It is not brutal. She doesn't have to think about the consequences.

That is not the way it worked out. It worked out where she had to get involved. She becomes more involved. She wants you to think she does not have any blood on her hands but she does. She is guilty on all five counts.

Thank you.

THE COURT: All right. Ladies and gentlemen, we are going to break for lunch now. Let's plan on coming back at a quarter to two. That gives you just over an hour for lunch.

During the lunch break -- and hopefully this will be the last time you have to hear me say this -- do not discuss the case either among yourselves or with anyone else. Don't talk to any of the parties involved in the case. Don't form an opinion as to what your verdict will be until the case has been turned over to you.

Do not allow yourselves to be exposed to any possible

PD PCR Anderson 019478

media coverage.  Don't visit any of the places that have been referred to.

When we come back at a quarter to two, I will have probably about five more minutes worth of stuff to go over with you.  We will also be designating two of you as the alternates at that time.

So, we will stand at recess and we will see you back here at a quarter to two this afternoon.

(There was a break in the proceedings from 12:45 p.m. until 1:50 p.m.)

(The following was held in open court.)

THE COURT:  Thank you.  Be seated.

This is a continuation of CR-96-1057, State versus Kimberly Lynn Lane.  Show the presence of the Defendant, Counsel and the presence of the jury panel.

To pick up with the instructions, all twelve of you must agree on a verdict.  All twelve of you must agree whether the verdict is guilty or not guilty.

When you go to the jury room you will choose a foreman who will be in charge during your deliberations and who sign any verdict.  You will be given ten forms of verdict on which to indicate your decision.  They read as follows.

Each of the verdict forms bears the following caption: "In the Superior Court of the State of Arizona, In and For the County of Mohave, State of Arizona, Plaintiff, versus

PD PCR Anderson 019479

Kimberly Lynn Lane, Defendant, Cause Number CR-96-1057, Verdict."

The first verdict form goes on to read: "We, the jury, duly impaneled and sworn in the above-entitled action, upon our oaths do find: The Defendant guilty, Count One, First Degree Murder, Robert Delahunt." There is a signature line for the foreman to sign.

This is the verdict that you will sign if all twelve of you agree that the State proved beyond a reasonable doubt that the Defendant committed the crime of First Degree Murder of Robert Delahunt.

The corresponding verdict form reads: "We, the jury, duly impaneled and sworn in the above-entitled action, upon our oaths do find: The Defendant not guilty, Count One, First Degree Murder, Robert Delahunt." And again there is a signature line for the foreman to sign.

This is the verdict form that you will sign if all twelve of you agree that the State failed to prove beyond a reasonable doubt that the Defendant committed the crime of First Degree Murder of Robert Delahunt.

So, Count One charges First Degree Murder with the victim being Robert Delahunt. There are two possible verdict forms; either guilty or not guilty. If you are able to reach a verdict as to Count One, you will sign the one verdict form that corresponds to your decision.

PD PCB Anderson 019480

74

And the rest of the verdict forms proceed in pretty much the same methodical manner.

The next verdict form reads:  "We, the jury, duly impaneled and sworn in the above-entitled action, upon our oaths do find:  The Defendant guilty, Count Two, Conspiracy to Commit First Degree Murder."  And there is a signature line for the foreman to sign if all twelve of you agree that the State proved beyond a reasonable doubt that the Defendant committed the crime of Conspiracy to Commit First Degree Murder.

And the corresponding verdict form reads:  "We, the jury, duly impaneled and sworn in the above-entitled action, upon our oaths do find:  The Defendant not guilty, Count Two, Conspiracy to Commit First Degree Murder."  There is a signature line for the foreman to sign if all twelve of you agree that the State failed to prove beyond a reasonable doubt that the Defendant committed the crime charged in Count Two which is Conspiracy to Commit First Degree Murder.

So, again, there are two possible verdict forms for Count Two which charges Conspiracy to Commit First Degree Murder; either guilty or not guilty.  If you are able to reach a verdict as to Count Two, you will sign the one verdict form that corresponds to your decision.

The next verdict form reads:  "We, the jury, duly impaneled and sworn in the above-entitled action, upon our

SCANNED

PD PCB Anderson 019481

oaths do find:  The Defendant guilty, Count Three, First Degree Murder, Leta Kagen."  Again, a signature line for the foreman to sign if all twelve of you agree that the State proved beyond a reasonable doubt that the Defendant committed the crime of First Degree Murder against Leta Kagen.

The corresponding verdict form reads:  "We, the jury, duly impaneled and sworn in the above-entitled action, upon our oaths do find:  The Defendant not guilty, Count Three, First Degree Murder, Leta Kagen."  Again, there is a signature line for the foreman to sign if all twelve of you agree that the State failed to prove beyond a reasonable doubt that the Defendant committed the crime of First Degree Murder of Leta Kagen.

So, again, Count Three charges First Degree Murder with the victim being Leta Kagen.  There are two possible verdict forms; either guilty or not guilty.  If you are able to reached a verdict as to Count Three, you will sign the one verdict form that corresponds to your decision.

The next verdict form reads:  "We, the jury, duly impaneled and sworn in the above-entitled action, upon our oaths do find:  The Defendant guilty, Count Four, First Degree Murder, Roland Wear."  There is a signature line for the foreman to sign if all twelve of you agree that the State proved beyond a reasonable doubt that the Defendant committed the crime of First Degree Murder of Roland Wear.

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

SCANNED

PD PCR Anderson 019482

The corresponding verdict form reads:  "We, the jury, duly impaneled and sworn in the above-entitled action, upon our oaths do find:  The Defendant not guilty, Count Four, First Degree Murder, Roland Wear."  And there is a signature line for the foreman to sign if all twelve of you agree that the State failed to prove beyond a reasonable doubt that the Defendant committed the crime of First Degree Murder of Roland Wear.

So, again, Count Four charges First Degree Murder with the victim being Roland Wear.  There are two possible verdict forms; either guilty or not guilty.  If you are able to reach a verdict, you will sign the one verdict form that corresponds to your decision.

The next verdict form reads:  "We, the jury, duly impaneled and sworn in the above-entitled action, upon our oaths do find:  The Defendant guilty, Count Five, Armed Robbery."  There is a signature line for the foreman to sign if all twelve of you agree that the State proved beyond a reasonable doubt that the Defendant committed the crime of Armed Robbery.

And the last verdict form reads:  "We, the jury, duly impaneled and sworn in the above-entitled action, upon our oaths do find:  The Defendant not guilty, Count Five, Armed Robbery."  There is a signature line for the foreman to sign if all twelve of you agree that the State failed to prove

PD PCB Anderson 019483

beyond a reasonable doubt that the Defendant committed the crime of Armed Robbery.

Again, Count Five charges Armed Robbery. There are two possible verdict forms; either guilty or not guilty. If you are able to reach a verdict as to Count Five, you will sign the verdict form that corresponds to your decision.

And not to keep belaboring the obvious. There are five separate charges in this case. You are going to have to make five separate decisions. There may be some interrelation between some of the charges and you will find that when you are examining the instructions but you still have to make five separate decisions; one for each of the five counts.

You can reach the same decision on all five counts. You can reach different decisions. Whatever you feel is appropriate based upon the law and the evidence.

Counsel, have I omitted or forgotten to give any instructions that I had previously indicated that I would be giving?

MR. CARLISLE: No, your Honor.

MR. ROSENTHAL: No, your Honor.

THE COURT: All right. Ladies and gentlemen, I am happy that all fourteen of you are still with us and this is always sort of the unpleasant part of the trial because all of you have been participating in this trial and paying very close attention but we have two extra people that we have to

PD PCR Anderson 019484

get rid of at this time.

So, the Clerk at this time will draw out the names of two of the jurors and those people will be designated as the alternates.

THE CLERK:  Barbara A. Merrill.  Robert E. McIntyre.

THE COURT:  All right.  Ms. Merrill and Mr. McIntyre, the two of you are hereby designated as the alternates.

And, first of all, I want to thank both of you for your participation in this case.  I know that it is sometimes a real letdown to get to this point of a trial and be ready after days of being told not to think or do anything about this case to not be able to finally put everything together and make a decision.  And I realize that can be a letdown and I appreciate very much the fact that you all have been here.

I believe that it is absolutely critical to have alternates during a jury trial of any length.  I have had dozens of cases before -- dozens of jury trials before where people have become sick or have had personal family emergencies come up that required us to excuse jurors in mid trial and if that had happened in this case, if we had not had extra people, then we would have had no option other than to just start the trial over again which would not be a good use of resources from my perspective and I do appreciate very much the fact the two of you have been here.

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019485

Just a couple comments.  After you leave here -- and that's going to be in a couple of minutes -- you will still not be able to discuss this case with anyone.  The reason for that is that if one of the other twelve people has managed to make it this far but becomes ill during the deliberations and has to be excused, what we will do is to contact one of you and bring you back in here and basically just toss you into the jury room and tell everyone to start over again.

Hopefully that won't happen but as long as there is the possibility that you could come back here and have to deliberate and have to make a decision, you cannot be discussing this case with anyone.

And if you may be wondering well, how will I know -- and, I guess, I skipped over what I meant to tell you.  You will not be able to discuss this case with anyone until the remaining jurors have been discharged and are no longer deliberating on this case.

And if you want to know how you would know when it is that you are allowed to talk about this case, probably the easiest thing for you to do would be to call up the courthouse and ask if the Lane jury is still deliberating and someone should be able to tell you that.  As soon as you are told that the jury is no longer deliberating and has been discharged then you can start talking about the case but don't until that point arrives.

PD PCR Anderson 019486

Your checks will be sent to you in the mail.  You do get paid for this even though you are not going to participate in the deliberations.

You can leave your notebooks on your seats.  We will collect them.  We will not do anything with them until we are absolutely certain that you are not going to be called back to participate in the deliberations.  Again, once we have reached that point, we will tear out any pages that have writing on them and throw them away.  No one will ever have a chance to see what you have written.

You can leave your juror's badge on your seat.

And at this time you both are free to leave and I do again thank you both very much for your participation in this case.

(The two alternate jurors were excused.)

THE COURT:  And the Bailiff will come forward at this time and be sworn in.

(Albert Morphew was sworn as the Bailiff.)

THE COURT:  All right.  Ladies and gentlemen, let me just explain what is going to happen next.  You will be going into the jury room in just a few minutes and once you get in there, you should select a foreman and begin your deliberations.

If you have taken any notes during the trial that you want access to and be able to refer to during your

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019487

deliberations, make sure that you take them with you.  If you have any personal effects -- jackets, sweaters, purses -- I would advise you to take them with you.  That's mostly just because I want them to be your responsibility and not mine and if you leave them in my jury box then I have to be responsible for them so take all your stuff with you.

Once you get in there, the Bailiff very shortly will be bringing in to you the exhibits which have been introduced in evidence.  He will be bringing in six sets -- written sets of the instructions that I have read to you before the final arguments of the Attorneys.  And he will also be bringing in the ten possible verdict forms.

Once you get in the jury room, any communications that you have with anyone will be through the Bailiff who will be immediately outside the door to the jury room.  If during your deliberations you have any messages that you want delivered to anyone, let the Bailiff know and we can call people up and tell them where you are and what you are doing.

I don't know if you have lead any of your family members or friends to believe that they are going to see you again at a specific time.  If it looks like you are still going to be here deliberating when someone may be expecting you somewhere else, let us know.  We can call people up and let them know what is going on and what you are doing.

If you are still deliberating at an hour that you feel

SCANNED

PD PCR Anderson 019488

would be appropriate for dinner -- more specifically, an hour that I feel would be appropriate for dinner -- we will provide dinner for you.  And I will tell you now just in case you are not familiar with this, we will not give you a blank check and send you out into the community so that you can find your dinner.

We have already located your dinner for you and it is probably sitting under a heating lamp just waiting for us to pick it up.  And I will tell you that we will feed you probably from Carl's Jr.  If you decide you want dinner, we will not excuse you to get dinner.  Rather, we will bring it in to you and that's what you will be looking at for dinner.

Also, I will tell you that I will not entertain any requests for dinner until at least six o'clock.  So, don't tell me at three o'clock that you want dinner because you won't get it.

I will allow you to deliberate as long as you want with a couple of provisos here.  Tonight you cannot deliberate any later than eight o'clock.  And my reason for eight o'clock isn't a very good one so I won't bother telling you but I have something going on -- a commitment that I want to honor that I would have to be out of here by eight o'clock so, eight o'clock is the latest that I will let you deliberate tonight.

If you are still deliberating at eight o'clock and you

SCANNED

PD PCR Anderson 019489

83

want to come back tomorrow, I will allow you to come back any time tomorrow that you want to. And I will let you deliberate tomorrow probably no longer than five o'clock and if you are still deliberating tomorrow, I think tomorrow I've probably got the best excuse in the world and that's my first born is graduating from high school tomorrow night and I don't plan on missing that so I probably won't let you deliberate beyond five o'clock tomorrow night.

If you come back tomorrow, I will provide lunch for you. We will even consider getting you lunch from some place that is different from where we get you dinner.

If you are deliberating say at five o'clock tonight and you decide you don't want to stay here until eight o'clock, just because I said that you can be here that late, if you decide that you want to come back tomorrow and resume your deliberations at a certain time, I have no problem with that.

I will allow you to structure your deliberations in whatever way you feel appropriate with the only limitation being that I won't allow you to go beyond eight o'clock tonight and I won't allow you to go beyond say five o'clock tomorrow.

And by my comments, I am not suggesting or telling you that I think your deliberations will or should take a certain amount of time. I am not even suggesting that I think you should or will reach a verdict or verdicts. I am just trying

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019490

to tell you that you can do this any way you want with the only limitations being the times that we have to be out of here by.

If you have any questions that come up during your deliberations, questions about what the law is, what you should be doing during your deliberations, what options are available to you, have the foreman write them out on a piece of paper, give them to the Bailiff and I will answer your questions as best I can.

I will tell you in advance that we do not have a transcript that is available of the testimony that has been presented during the trial so do not request to review a transcript of a certain witness's testimony during the trial. That is simply not available. You will have to rely upon your collective recollections as to what the testimony in this case has been.

And when, and if, you are able to reach a verdict in this case, let the Bailiff know and we will bring you back in here and find out what that verdict is.

So, at this time you should gather up your notes and any personal effects and leave with the Bailiff.

(The jury left the courtroom at 2:10 p.m. to begin their deliberations.)

(The following was held out of the presence of the jury.)

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCB Anderson 019491

THE COURT:  All right.  The record will reflect that the jury has now left the courtroom.

I did want to put something to the record just because I was not sure Counsel would have been aware of this or been concerned.

I think during the last five minutes of Mr. Engan's arguments, one of the jurors was busy scribbling a note which got passed forward and I had already thought to myself that I probably wasn't going to show that note to anyone because I didn't think that it would be fair if that were raising some issue about this case that Mr. Engan wouldn't have a chance to see it and Mr. Carlisle would have a chance and would have an opportunity to respond to it.

As it turns out, he wanted to take a break to go to the bathroom so, if any of you were concerned about that or wondered why I didn't show you the note, that's what the note was and we, in fact, did take a break to go to the bathroom.

Anything further that either Counsel need to place on the record at this time?

MR. ENGAN:  No, your Honor.

MR. CARLISLE:  No, your Honor.

THE COURT:  All right.  I don't have any idea how long the jury is going to take during their deliberations.

Also, I realize one thing I did not mention to them that I normally would is that they can listen to the tape.

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019492

SCANNED

Mr. Carlisle, since it is your exhibit, do you have your player available still or --

MR. CARLISLE:  I believe so.

THE COURT:  All right.  If we need one, I might have my Secretary give you a call to see if we can get that over here.  So, if they ask to listen to the tape, I will allow them to do that.

So, we will stand at recess.

(There was a break in the proceedings from

2:12 p.m. until 3:35 p.m.)

(The following was held out of the presence

of the jury.)

THE COURT:  Thank you.  Be seated.

This is a continuation of CR-96-1057, State versus Kimberly Lynn Lane.  Show the presence of the Defendant and Counsel and the absence of the jury panel.

I received a note from the jury which reads as follows: May we please have the copies of tape transcripts signed by Mr. Darrow who I am assuming is the foreman.

And I am assuming what they're asking for is to have individual copies of the transcripts provided to each of the jurors as was done during the trial so that they can listen to the tape and more easily follow along.

I would note that probably within ten minutes of the jury retiring, they did, in fact, request a tape recorder so

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

PD PCR Anderson 019493

SCANNED

it is fairly clear that they do want to listen to the tape and I would think that giving them each individual copies of the transcript would facilitate their being able to do that.

And, Mr. Engan and Mr. Rosenthal, you indicated informally that you don't have any objection to that.  Is that still your position?

MR. ROSENTHAL:  That's correct, your Honor.

THE COURT:  All right.  And, Mr. Carlisle, you have no objection; is that correct?

MR. CARLISLE:  That's correct, your Honor.

THE COURT:  All right.  And we will stand at recess.

Mr. Carlisle, why don't you -- since you seem to be the one that has these copies made, why don't you go ahead and get yours and if Counsel want to review them before sending them in, feel free to do so.  After all of you have had a chance to look at them, just bring them in and give them to me and I will give them to the Bailiff and send them in that way.

All right.  So, we will stand at recess.

(There was a break in the proceedings from 3:37 p.m. until 4:50 p.m.)

(The following was held in open court.)

THE COURT:  Thank you.  Be seated.

This is a continuation of Cause Number, CR-96-1057, State versus Kimberly Lynn Lane.  Show the presence of the

SUPERIOR COURT, DIVISION III, KINGMAN, ARIZONA

SCANNED

PD PCB Anderson 019494

Defendant, Counsel and the presence of the jury panel.

I received a note from the jury which reads as follows: We are going home at 4:30.  Be back at 9 o'clock a.m. tomorrow.

Of course, I assume what you are saying is can we leave. I realize I already made you work twenty minutes overtime so I have no problem with that.

So, we will break for the evening and come back at 9 o'clock tomorrow morning.  Actually, when you come back, we will already be in here doing other things.

And just so you will know, tomorrow when you come back will be different from how it has been before.  We are not going to do anything in court.  In other words, you are not going to have to wait until I am done in here and then bring you in here and have anything intelligent or really meaningful to say to you because I have pretty much exhausted that so, as soon as all twelve of you get back here, you can begin your deliberations.

Now, there is a sort of proviso to that.  I don't want you to start your deliberations until all twelve of you are here.  So, in other words, don't, you know, two or three of you agree among yourselves that let's meet back here at eight o'clock and form kind of a subcommittee and hammer out some of the issues and then report back to the other people once they get here.  So, don't start discussing the case

among yourselves until all twelve of you are here in the jury room with the door closed.

Any of you who may be car-pooling or riding up here together, there is no problem with doing that but don't talk about the case until all twelve of you are in the jury room.

Question?

A JUROR:  Are we supposed to meet back in here?

THE COURT:  No.  Go in the jury room and come in the way you usually do to get into the jury room and as soon as all twelve of you are here, we will close the door.  Don't resume your deliberations until all twelve of you are here. Just do what presumably you have been doing during the breaks thus far which is talking about anything that you want except this case.

Don't discuss this case either among yourselves or with anyone else until you come back tomorrow.  Don't talk to any of the parties that are involved in the case.

One thing that is different from what I have been telling you all along is that if you want to think about this case, feel free to do so.

If you want to form an opinion as to what your verdict is going to be, you are certainly free to do so as long as you come back here with open minds and are going to be willing to discuss the case with the other jurors.

Don't allow yourselves to be exposed to any possible

PD PCR Anderson 019496

SCANNED

media coverage.

I have to tell you in all honesty that I always feel nervous when I have a jury here in my clutches and send them home after they have been deliberating because I always imagine all kinds of horrible things that can happen like one of you not coming back or one of you picking up a newspaper or hearing something that you shouldn't hear so continue to be careful. Don't read any newspapers about this case. Don't listen to anything on the radio.

Don't talk to anyone about this case. You are still participating in this case so if anyone asks you, you can tell them that you have not reached a verdict yet and that you are still deliberating and cannot talk about this case.

Don't visit any of the scenes that have been referred to.

So, be back here at nine o'clock tomorrow morning. As soon as you all are here, we will close the door on you and you can resume your deliberations.

All right. So, have a nice evening and come back tomorrow at nine o'clock.

(The proceedings were concluded at 4:55 p.m.)

PD PCR Anderson 019497

<u>Certificate of Reporter</u>

I, Sandra R. Brice, Official Reporter in the Superior Court of the State of Arizona, in and for the County of Mohave, do hereby certify that I made a shorthand record of the proceedings had at the foregoing entitled cause at the time and place hereinbefore stated;

That said record is full, true and accurate;

That the same was thereafter transcribed under my direction; and

That the foregoing ninety (90) typewritten pages constitute a full, true and accurate transcript of said record, all to the best of my knowledge and ability.

Dated this 13th day of November, 1998.

Sandra R. Brice, Official Reporter

SUPERIOR COURT, DIVISION III,   KINGMAN, ARIZONA

SCANNED

PD-PCR-Anderson 019498