# EXHIBIT 11

# EXHIBIT 11

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MOHAVE

STATE OF ARIZONA,                   )
                                    )
                Plaintiff,          )
                                    )
        vs.                         )   No. CR-96-865
                                    )   Day 6
ROBERT ALLEN POYSON,                )   JURY TRIAL - VOL. VI
                                    )
                Defendant.          )
_____    )

Before the Honorable Steven F. Conn, Judge

March 9, 1998

9:07 a.m.

Kingman, Arizona

Reporter's Transcript of Proceedings

Appearances:

For the State:          Derek Carlisle
                        Deputy County Attorney
                        315 North 4th Street
                        Kingman, Arizona   86401

For the Defendant:      Billy K. Sipe
                        LAW OFFICE OF WILLIAM PORTER
                        820 East Beale
                        Kingman, Arizona   86401

                        Lee Novak
                        ATTORNEY AT LAW
                        212 North 4th Street, Ste. 10
                        Kingman, Arizona 86401

Reported by:   Jeanett Cochrane, RPR



PCR PD Anderson 004191

2

P R O C E E D I N G S

THE COURT: This is a continuation of Cause Number CR-96-865, State versus Robert Allen Poyson.

Show the presence of the Defendant, Counsel, and the absence of the jury panel.

And, Mr. Sipe, are you going to have any defense case to present?

MR. SIPE: Defense rests, Your Honor.

THE COURT: And, Mr. Sipe, the way that I would normally do this, and I think that it is probably preferred by the defense, is that I will not address this any further in front of the jury. I will not make you indicate in the presence of the jury that you are not going to present a case.

What I would do is just bring the jury in, tell them that we have completed the presentation of evidence and that the attorneys are now going to argue the case and simply proceed.

Is that agreeable to you?

MR. SIPE: Yes, it is, Your Honor.

THE COURT: I just want to acknowledge that I have distributed three more instructions or verdict forms to Counsel to address some of the matters that we discussed Friday. First of which is

PCR PD Anderson 004192

4

THE COURT: And is there anything further that any counsel want to place on the record before we proceed with the arguments?

MR. SIPE: Nothing from the defense.

MR. CARLISLE: No, Your Honor.

THE COURT: All right. Let's take just a couple minutes, however long it takes to get the jury in, and then let's get started.

(Recess from 9:10 to 9:12 a.m.)

THE COURT: This is a continuation of Cause Number CR-96-865, State versus Robert Allen Poyson.

Show the presence of the Defendant, Counsel, and the presence of the jury panel.

Ladies and gentlemen, the presentation of evidence in this case has now been completed. At this time the attorneys are going to have an opportunity to make their final arguments to you.

Mr. Carlisle will go first, then Mr. Sipe, then Mr. Carlisle will get to argue the case to you a second time.

So, Mr. Carlisle, you may proceed.

MR. CARLISLE: Thank you, Your Honor.

First of all, I wanted to thank you

5

all for paying so much attention during this trial. I know there has been a lot of different evidence presented to you, quite a bit of evidence.  I just wanted to thank you for paying attention and listening to all the evidence.

Secondly, with respect to that, I also know that there has been some fairly graphic and gruesome testimony presented to you.  And with respect to the pictures, I want to apologize.  It was my decision not to pass some of the pictures to you when you were hearing the testimony.

You will have the opportunity to look at all of the pictures that were admitted into evidence.  You can examine all of the evidence that has been admitted in this case.  You are going to be able to do that while you are back in the jury room deliberating, but I made the decision that while the people were testifying -- some of these pictures are of dead bodies that have been decomposing for a couple of days, and I made the decision not to show those to you.  But you will have the opportunity to look at any of the pictures you want to look at while you are back there in the jury room deliberating.  You can look at all the evidence that has been admitted in this case.

6

The Judge, after Mr. Sipe and I are done talking, the Judge is going to instruct you on the law. Now, there are five different counts in this case: There is Conspiracy to Commit First Degree Murder; there are three counts of First Degree Murder; there is one count of armed robbery. I am going to take them up a little out of order and start with armed robbery.

The Judge is going to tell you that the crime of armed robbery has six elements. And that in order to find the Defendant, Bobby Poyson, guilty, you have to find that he did all six of these elements.

The first element is that he took the property of another person. In this case he did take property of another person.

The second element is that he took the property from another person's person or immediate presence. Now, the items that he took from another person and from that person's person or immediate presence there is a couple of different things you can look at.

First of all, the whole point, the whole reason that Mr. Poyson, Mr. Anderson and Ms. Lane killed three people was to

PCR PD Anderson 004195

take the truck, and the truck was taken from Roland Wear's immediate presence.

Roland Wear was standing right next to the truck.  He was outside trying to get into the truck when the truck was taken.  He was killed so that the truck could be taken.  So that's the first thing that you can look at.

The second is the keys.  Mr. Poyson, the Defendant in this case, took the keys.  You heard testimony from Elliot Kagen that Roland Wear usually kept his keys in his overcoat.  You heard testimony from the confession that when Roland Wear was getting out of bed after he had been shot, Mr. Poyson heard the keys, heard the keys in his pocket, and the keys were found next -- a couple of feet away from the body.  Again, that's the immediate presence. It is within a couple of feet of the body in his presence.

And, finally, you heard about the wallet.  The Defendant took Roland Wear's wallet out of his back pocket.  The wallet has been admitted in evidence.  The wallet or the chain, he broke the chain off and then took the wallet.

So there's three different items that were taken, and you can consider any of those in

PCR PD Anderson 004196

8

deciding that he took property, and he took it from the person or presence of another person.

The third element is that he did so against the other person's will.  Now, clearly in this case Roland Wear was not agreeing to give him the truck, was not agreeing to give him the keys to the truck, did not agree to give him the wallet. That's why he was killed, because it was against his will.

Fourth, in doing so the Defendant threatened or used force against any person.  So you can consider any person.

And the Judge is going to tell you that in the course of -- the elements for the offense of armed robbery includes any of the Defendant's acts, beginning with the initiation of and extending through the night of the robbery.  So you can look at anything that did he from the time that they first started doing that, from the time that they first had the intent to use force to take these items.  That is one of the elements that we will get to.

And if any person is harmed, if any person has threatened or used force, in this case there are three different people.  He threatened,

PCR PD Anderson 004197

9

and he actually didn't threaten, he used force against Robert Delahunt, he killed him.  He used force against Leta Kagen, he killed her.  He used force against Roland Wear, he killed him.  So he did use force against three different people.

The fifth element is the Defendant threatened or used force with the intent either to coerce the surrender of the property or to prevent resistance to his taking or retaining the property.

In other words, if he wanted to get the property and used force to get the property, or he wanted to use force to keep the property.  And that's what he did with respect to all three people.

The reason all three people were killed is so that he could keep the truck, so that he could take the truck to Chicago.  If they -- in their conspiracy they killed them so that they wouldn't be turned in, so that they could keep the truck.

And if you use force to prevent resistance in taking or retaining the property, that's what this element is talking about.  And that's what he did.

He also used force against Roland Wear in order to take the property.  He killed

PCR PD Anderson 004198

10

Roland Wear so that he could actually take the property.

The last element is in the course of doing so the Defendant or an accomplice used or threatened to use a deadly weapon or dangerous instrument. Deadly weapon is anything that's designed for lethal use, like a gun. Dangerous instrument is anything in the manner in which it is used can cause serious physical injury or death.

In this case he used several dangerous instruments, and he used a deadly weapon. He used a gun. He used the gun to shoot Leta Kagen; he used the gun to shoot Roland Wear. He used several dangerous instruments. First he used the knife. He used the knife, the knife was used to slash Robert Delahunt's throat.

And the Defendant is responsible for the actions of an accomplice. He is criminally responsible for the actions of an accomplice. So Frank Anderson slits Robert Delahunt's throat, he's acting as an accomplice. He is responsible for that. That's the first use of a dangerous instrument.

Then he takes the rock and uses it to smash Robert Delahunt's head. He used the cinder

PCR PD Anderson 004199

11

block to smash his head.  He takes the knife and pounds it into Robert Delahunt's head with the rock. So those are all uses of a dangerous instrument.

Then when he uses the rifle as a club, he's using it as a dangerous instrument, something that can cause death when he's using it to hit Roland Wear.  And, finally, the last cinder block, the big, heavy cinder block, which is in evidence, and you can see how heavy that it is, that's also used as a dangerous instrument.  So when you look at the elements in this case all of the elements are met.  Bobby Poyson committed armed robbery.

With respect to the crime of Conspiracy to Commit First Degree Murder, the Judge is going to tell you that there are two elements to that.  First, the Defendant agreed with one or more persons that at least one of them or another person would engage in constituting the crime of First Degree Murder.

In this case the Defendant agreed with Frank Anderson and Kim Lane that they would kill three people.  That's the only agreement that's required, that they would kill three people.

Second, the Defendant did so with the

PCR PD Anderson 004200

12

intent to promote or aid in the commission of the crime of First Degree Murder. In other words, he did it, and he wasn't just blowing smoke. He did it, and he had the intent that those three people would die. And, in fact, those three people did die. And he killed them, and it was an intentional act.

So when you look at those two elements, those are the only two elements that you have to decide on to say that there is conspiracy.

There is a lot of evidence from his confession that they had a plan, that they planned this over the course of a couple of days. They planned it. He was looking for bullets, he couldn't find the bullets, they changed their plan.

They planned on slashing Robert Delahunt's throat, and then after they finished that they changed it again. They went next door to the neighbor's house, they got some more bullets, he went out, he cut the phone line, and then he killed them.

There was clearly a plan, an agreement among the people, among three people. They used Kim Lane to lure Robert Delahunt out. Originally Frank Anderson started by slashing Robert

PCR PD Anderson 004201

13

Delahunt's throat, so there was a plan.  There was a conspiracy among these three people, and it was made with the intent to actually kill the other people that lived there.  The three crimes are all First Degree Murder.

The Judge is going to instruct you that there are two different ways to commit First Degree Murder.  First of all, there is what is called premeditated First Degree Murder.  The elements of that are that the Defendant caused the death of another person; the Defendant did so with premeditation; and the Defendant intended or knew that his conduct would cause death.

Premeditation means that the Defendant acts with either the intention or the knowledge that he will kill another human being when such intention or knowledge precedes the killing by a length of time to permit reflection.

So, basically, in this case, going to each of the victims.  Robert Delahunt, you have to look at, did the Defendant cause the death?  Bobby Poyson caused the death of Robert Delahunt.

You look at the injuries that were testified to by the medical examiner, Dr. Nelson, first injury was the slashed throat.  Dr. Nelson

PCR PD Anderson 004202

14

testified that was before death, and that was not lethal. That was the injury caused by Frank Anderson.

The other injuries are the knife to the head, again that was not a lethal injury. The knife went in, and it didn't hit the brain, it came out his nose. The first injury was the one that was the lethal injury, the smashed skull, the fractured skull.

There is two different skull fractures that he talked about. He said the cause of death was the massive head trauma, the massive blunt force head trauma. That's what caused the death, and that was done by Bobby Poyson taking a rock and smashing Robert Delahunt's head, taking a cinder block and smashing Robert Delahunt's head, taking Robert's head and smashing it against the ground. That's what caused Robert Delahunt to die, that was the cause of death.

So the Defendant caused the death of another person. He did so with premeditation. Such was talked about, there was a whole plan, the plan was to kill Robert Delahunt. They talked about it, they talked about it over the course of at least a day, maybe even two days. So they talked about it.

PCR PD Anderson 004203

15

They knew what they were doing. They planned it out, and they clearly had time to think about it and reflect upon it. It was done with premeditation.

Finally, the Defendant intended or knew his conduct would cause death. The whole plan was to kill them. He knew that they were going to die. He intended to kill Robert Delahunt, and, in fact, you hear the confession, you can listen to the tape.

When Robert Delahunt was struggling, when Robert Delahunt won't die, he keeps trying other ways to kill him. He says to Kim Lane, go get me a cinder block. Kim Lane, go get me a rock, and he uses both of those to smash Robert Delahunt's head. He takes the knife, and he drives it into Robert Delahunt's ear. Why? Because he thinks that will kill him, and that doesn't kill him, so he continues to smash his head. He intended to kill Robert Delahunt.

The other way that First Degree Murder can be found, and the Judge is going to instruct you, not all 12 of you have to agree which of these two different ways of finding First Degree Murder happened. You only have to agree that one of the two apply. So not all 12 of you have to say

16

this was premeditated.  Not all 12 of you have to say this was felony murder.  The only thing that you have to decide is that all 12 of you agree that it was either felony murder or premeditated murder.

For the crime of felony murder you must find that the Defendant committed or attempted to commit the offense of robbery or armed robbery. I just talked about the offense of armed robbery.

Second, the Defendant did so acting either alone or with one or more other persons. Again, he was acting with Frank Anderson and Kim Lane.  The whole goal was to steal the truck and go to Chicago.

Third, the Defendant or another person caused the death of any person.  And, again, in this case the Defendant, Bobby Poyson, caused the death of Robert Delahunt.

And, finally, the Defendant was the one that caused it in the course of and in furtherance of the robbery or armed robbery or immediate flight.  And, again, this was in the course of the commission of the crime.

As I indicated, one of the elements of armed robbery is the intent to use force to prevent the taking or keeping of property,

PCR PD Anderson 004205

17

basically.  And the reason that Robert Delahunt was killed was so that they could take the truck.  It was in the course of the robbery.

With respect to Leta Kagen, there are, again, the two different kinds of First Degree Murder.  There is premeditated First Degree Murder, and there is felony murder.  Leta Kagen, the Defendant, Bobby Poyson, caused the death of Leta Kagen.  He shot her.  That was the only injury she had suffered was a gunshot wound that killed her instantly.  He did so with premeditation.

That was the plan.  They planned all along on killing Leta Kagen, even after Robert Delahunt was dead.  They still planned on going next door to get bullets so that they can implement their plan.  He had time to think about it.  He had time to know what he was doing, and he intended or knew that his conduct would cause death.  When he shot her he was intending to kill her.  That was his whole goal.

With respect to the felony murder, it is the exact same thing that I talked about with respect to Robert Delahunt.  All those factors apply to Leta Kagen.  It was in the course of robbery, because he killed her to prevent her from or -- he

PCR PD Anderson 004206

18

killed her in order to keep the property, not in order to keep the truck. So it was in the course of and in furtherance of the armed robbery.

Finally, with respect to Roland Wear, again, there are two different theories and two different ways that you can find First Degree Murder.

First of all, premeditated, he has to cause the death of Roland Wear. We heard testimony in his confession that he did cause the death of Roland Wear. He shot him. When that didn't work he hit him with the rifle, and he continued to hit him with the rifle until he was outside, until he knocked him to the ground.

And when he was on the ground and tried to get back up Frank Anderson hit him with the cinder block, knocked him back to the ground, and the Defendant went over and kicked him on the head, then took the cinder block and smashed his head, smashed his skull like an eggshell. He caused the death of Roland Wear. It was premeditated.

The whole reason that they killed Roland Wear was to take the truck. They had the plan, again. He had time to stop and reflect on it, he had even more time with respect to Roland Wear

PCR PD Anderson 004207

19

because he shot him, Roland Wear still wasn't dead. Roland Wear was able to make it outside, and the Defendant followed him outside and continued until he was dead.  He intended or knew that his conduct would cause death.

He intended to kill Roland Wear. When he shot him he intended to kill him.  When he followed him outside, when he continued to beat him with the rifle, and when he dropped the cinder block on Roland Wear's head, it was all because he intended or knew that his conduct would cause death.

And when you look at each different count, when you look at the elements, the Defendant has committed each of the crimes that are charged in this case, and you have to find him guilty of each of the different counts.

Thank you.

THE COURT:  Mr. Sipe.

MR. SIPE:  It is a great pleasure, ladies and gentlemen, to finally get the opportunity to talk to you about this case.  Judge Conn has instructed us over the last week to avoid each other like we have a disease.  That has now been lifted, and I can talk to you about this case, and it is a great pleasure for me to do so.

20

You have heard last week about three murders, three homicides, two of them graphic, gruesome, horrific.  However, as jurors, ladies and gentlemen, you have to put aside any emotions you have in this case.  You cannot be influenced by sympathy you may have to the victims, any horror that's been presented to you, or any prejudice against Bobby Poyson based on anything that you have heard.  You have to put your emotions away.

You decide this case only on the facts that you find beyond a reasonable doubt, and the law that you will be instructed on.  And we know it's unfair to ask you to put your emotions away. We all have human emotions.  We all have feelings. We all react to things emotionally.  And it is unfair to ask you to put those away, but it is required.  You have to.

You only decide this case on the facts and the law.  And you are stressed these things because the State has gone to great length in this trial to influence you, to prejudice you, to get you to ignore the facts and decide this case only on emotions, only on prejudice, only on sympathy or horror.

Couple of examples.  Last Tuesday,

PCR PD Anderson 004209

not once but twice, Mr. Carlisle tells you all the gross details about this case in his opening statement.  Twice to get to those emotions, to maybe get a feel of revenge.  He did it twice.

He talks about this knife wound.  He fails to tell you it is not the cause of death.  He has misled you in his opening statement, and actually there are three of them in trying to get you to think this caused a death.  This is a horrific injury, and he has been trying to convince you early on that it was a death.  It went through his brain to kill, and he only did that to invoke some emotion from you.

And we know late in the trial that Dr. Nelson tells us it wasn't the cause of death.  The State has tried to mislead you.  But there was very horrific things, and you can't be influenced by it or have sympathy towards Leta Kagen, Roland Wear and Robert Delahunt.  The State has gone to great lengths to try to get you to feel all this sympathy towards them, and it is a terrible thing that these three people died.

Mr. Carlisle brought out the point that the day this trial started Robert Delahunt would have turned 17.  The day after he was murdered

PCR PD Anderson 004210

22

Roland Wear would have turned 50. Now, did that help us understand and prove who committed these murders? No.

It is a very sad fact that the State brought them out to try to get some emotion out of you, to get you to ignore the facts or the lack of facts and convict on your human feelings.

He talks about Robert Delahunt was to start school the next day. It is a very, very sad thing to think about, horrible. And he brought it out not to show who committed these crimes, but to get that emotion from you.

He brought in evidence a picture of Robert Delahunt. We have all been able to look at this because it is in evidence, and it is sad to think about what happened to this boy. And he wants you to be sad. He wants to invoke that emotion so you will ignore the facts or lack of facts and convict because of that. And, again, you have to set it aside, as unfair as it is.

Every citizen charged with a crime is presumed innocent of that crime, whether a person is charged with shoplifting or triple homicide. There is a piece of paper in the file that says we charge someone with these crimes. We don't assume they

PCR PD Anderson 004211

23

must have done it, they are presumed innocent.

Bobby Poyson sits here with the presumption of innocence and will always be innocent unless the State can convince you -- convince you beyond a reasonable doubt otherwise.

Beyond a reasonable doubt.  It is the highest standard that we have in the criminal justice system.  It means more than a probability. It means more than suspicion.  It means more than speculation or unfounded theories.

It is evidence that you find beyond a reasonable doubt, which leaves you firmly convinced.  And keep that in mind, this is the highest standard in our system, beyond a reasonable doubt.  And every citizen is presumed innocent unless they convince you otherwise.

Any doubt, ladies and gentlemen, any doubt, based on the evidence or lack of evidence you have, you have to render a verdict of not guilty.

MR. CARLISLE:  Objection; misstating the law.

MR. SIPE:  That is the law.

THE COURT:  I will overrule the objection.  You can proceed.

The jury will be instructed on the

PCR PD Anderson 004212

24

burden of proof.

MR. SIPE:  Thank you.

You don't have to come up with six doubts or seven doubts or 20 doubts.  Your review of the evidence, if you have a doubt, the law requires you to return a verdict of not guilty.

Mere presence is insufficient to convict.  Judge Conn will instruct you on the mere presence at a crime scene or mere association with another person at a crime scene.  There is a common misconception that if someone is present when a crime happens they must be involved.  If they are present when a crime is occurring it makes them an accomplice.  I hear that all the time, and that's not the law.

If you were present it doesn't make you guilty.  If you are present and you know what happened, it doesn't make you guilty.  What makes you guilty is if you participate or you are the one who commits the crime, so keep that in mind.  Merely being there is not sufficient to convict on any of these charges.

The State, not Judge Conn, has chosen two different theories of murder.  Premeditated murder, where the State has to find that someone

PCR PD Anderson 004213

25

planned and premeditated and intentionally or knowingly killed someone, or felony murder, which is simply someone dies in the course of a felony crime.

And the State chose felony murder because it is a lot easier, obviously, to get a conviction. They know that they have problems with their case. They know premeditation is lacking. They know that they have deficiencies in this case -- which I will get to in a moment -- and because of that they have to choose another theory.

Well, let's find something easier. Let's go with armed robbery. Let's charge them with armed robbery, and if they convict them with that then it is felony murder. It is easier for him. That's the only reason that he has chosen that. But there is no armed robbery here, ladies and gentlemen. Make no mistake about that.

The State talks about three things that were taken for the armed robbery: Truck, keys, wallet. Who had the truck? Frank Anderson. The keys to his truck were in the ignition with Frank Anderson.

There was a wallet in evidence, which, based on some descriptions, sounds like it might have been Roland Wear's wallet. Who had that

PCR PD Anderson 004214

26

wallet? Frank Anderson. It was in a blue backpack with a photo of Kimberly Lane and Frank Anderson. So who had these items that the State says is the basis of armed robbery? Frank Anderson.

Some of the other elements, taking property from the person or their immediate presence against their will. There is no evidence in this case whatsoever that Bobby Poyson took property of any person, took property from them, from their immediate presence, against their will, or that he used force against the person with the intent to take that property. You have to read the whole instruction, not just bits and pieces that the State threw out.

Intent to coerce or surrender the property, there is no evidence whatsoever that Bobby Poyson did that. But the State wants you to believe that there is an armed robbery to make felony murder, to make that an easier conviction for you.

And when you go back there and deliberate, think about the elements of armed robbery, and the facts of this case, and there is no armed robbery on behalf of Bobby Poyson. There is no felony murder. Make no mistake about it.

Last Tuesday defense told you that

PCR PD Anderson 004215

27

there will be no physical evidence in this case showing that Bobby Poyson committed the crime he was charged with, and we were right.  We were right.  There is no physical evidence in this case whatsoever showing he committed these murders.  None.  And it is their evidence, their investigation, their burden of proof, and they have shown you nothing in the last week.

Let's talk about the four things that they did show us.  Glenda Hardy, there was a gun stock that had some fingerprints which she said belong to Bobby Poyson.  This gun stock was not shown to be involved in these crimes in any way, shape or form.  You remember that?  I specifically asked Detective Thompson about that, because it was her evidence.  Can you say that was involved in these crimes?  No.  No, I can't.

So how does that show that Bobby Poyson committed First Degree Murder?

Plus, we know Bobby Poyson lived on that property for seven months and shot a .22 all the time.  There are two different witnesses that talked about him shooting out there on the property, at junk vehicles.  Detective Thompson said there were so many .22 shells on the property that we

PCR PD Anderson 004216

couldn't even count them.  So obviously he shot this weapon.

This is an item at a house where he lived that he used, so his fingerprints are obviously going to be on this item that he used target shooting, and this item wasn't even shown to be the murder weapon.

Now, what's interesting about this item is that Robert Blackett, the serologist, said there was blood on it -- and we are going to get to him in a moment -- but that wasn't analyzed in any way, shape or form to see whose blood it was.

That might have been something important to find out if it was Roland Wear's blood.  The State believes he was beaten with this.  Well, we don't know, because they failed to do anything about it.

But as far as the evidence, as far as the fingerprints, it is meaningless.  It is an item he used for target shooting and testimony hasn't even been shown that it was the murder weapon.

Palm prints on a shelf.  Detective Steve Parker lists his evidence as SP then numbers. SP and then whatever.  SP-25 is a shelf from the small travel trailer.  Again, this is property where

PCR PD Anderson 004217

29

Robert Poyson lived for seven months.

Now, Glenda Hardy talks about it being SP-25(c), and I specifically asked Detective Parker, do you have something called SP-25(c), and she said no.  And it should concern you, ladies and gentlemen, that the State now has an item of evidence that's itemized differently than when it was seized.  And the officer who seized that item doesn't even know what SP-25(c) is.  That should concern you.

And there is a palm print on this shelf and in a place where Bobby Poyson lived, so what's that tell us, he touched a shelf in an area of a place where he lived.

You can't take the State on their -- at face value.  Remember, they tried to suggest this was a bloody palm print.  Remember that?  They are trying to say it was a bloody palm print.  They are trying to mislead you into saying it was blood.

What did we learn?  This item was not sent to Robert Blackett so he could tell us what it was.  It wasn't even sent to him because they want to come in here and prove to you beyond a reasonable doubt that this is a bloody palm print, and they need to send it to the serologist so he can say it

30

is blood and whose blood it is.

What did we learn about blood?  His exact quote, Robert Blackett said it is wrong to call anything blood without a chemical analysis. Wrong.  And you are a fool to do it, he said, because he's been fooled as an expert.  He has been doing this analysis for a long time, and he said you are a fool for doing it.  He's fooled.

And what did we learn?  Weapons, there are several items of evidence they sent to the DPS crime lab saying it's blood, but the DPS crime lab said, no, it's not blood.  We brought that out. The State was trying to mislead you.  Don't take them at face value.  They tried to mislead you about all this blood, and we learned, no, on a lot of these items there wasn't blood.

And don't let them mislead you.  They say it was a bloody palm print, and the palm print belonged to Bobby Poyson, a resident that lived there.  If they want to convince you beyond a reasonable doubt that it was blood then they should have done something about it to prove it, and they failed.

Couple of other things.  Glenda Hardy, you might remember Glenda Hardy, who was the

31

person with a box of paperwork that had to rustle through it to answer any question that was posed to her. She went to the scene of the accident on August 23rd, 1996, approximately a week after it occurred to process only the small travel trailer for fingerprint evidence. That's after 23 years of experience.

But what are some of the things she told us? I have not completed my analysis; I have several identifiable latent fingerprints which I have not yet identified. Do you remember that?

This is a triple homicide case with three potential suspects, and she was there a year and a half ago and she still hasn't done it? She's still working on it? She has latents that she has not yet identified? Does that concern you?

Her lab is in Lake Havasu City, Arizona, 60 miles from here. Can you imagine a more important case for them to work on than this, a triple homicide with three potential suspects? And what was her excuse that the State brought out? Time is short.

What did we need to give her, three years? Did we need 10 dead bodies to get these people motivated to bring this out? It is their

PCR PD Anderson 004220

32

burden of proof, their evidence, their investigation, and they did nothing. She did nothing for a year and a half. Ladies and gentlemen, there are still things in her lab that she could do that on, and she hasn't.

She was there in the small travel trailer. She told you she saw a lot of blood, or at least what she thought was blood. A lot of fingerprints, lots of fingerprints in this red substance. And that's what I am talking about.

I am not talking about fingerprints on items, innocuous items. We are talking about fingerprints in blood at the crime scene. That's what I am talking about. And they were there. She saw them. But time was short. Still working on it. Give me more time. This case isn't important. Absolutely unbelievable.

Couple of things that she said that were interesting as well. The filler tube for the vehicle, Robert Blackett said there was blood on it, human blood, and Glenda Hardy did tell us Bobby Poyson's fingerprints were not on that. That was an item of evidentiary value that the State brought in before you connected somehow with the homicides. Prints are on it, she identified them. Remember

PCR PD Anderson 004221

33

what she said, not Bobby Poyson's.

No prints from the knife. She talked about there is a lot of substance on it, so don't bother with it, it's a knife. Think how important that knife is in this case. No fingerprints, no attempt to fingerprint it. And she was there seven days after this was found, and she had done nothing for a year and a half.

And the State -- this is just one example. There are so many deficiencies in this case it is unbelievable. And instead of accepting that, instead of accepting that, the State has come up with the excuse, remember what they said about the fingerprints; well, maybe fingerprints are fragile, maybe when they sit out in the hot August sun they get destroyed, and so we really can't do anything because it all got destroyed.

Whose decision was it to wait seven days after they found the bodies? If the State knows that fingerprints are fragile, and they can be destroyed by the heat of the sun, and whatever else can destroy available evidence, why do we wait seven days to even do anything?

It was Mr. Carlisle that brought this out, this knowledge out about how fragile prints

34

are.  They knew that, why did they not go there immediately?  They had generators and lights.  Why didn't they go out there, collect some evidence, do some real work instead of doing it seven days later, knowing our evidence could be destroyed, but who cares?

And keep in mind, ladies and gentlemen, these are time frames before any statements are made in this case by any suspects. But they are doing nothing but letting the crime scene wither away in the heat.  But interestingly enough, we know that's not the point.  We know from their own testimony that there are many prints out there that she has that can be identified that she hasn't done.

So they have tried to mislead you into thinking there is nothing there, because it got destroyed by the heat.  If it was, it is their fault, number one; number two, we know it's not the case because there are prints in Havasu that she has done nothing with for a year and a half because time is short.

Mischelle Webb, that's another example that you cannot take the State on face value.  The State brought out that Mischelle Webb is

PCR PD Anderson 004223

35

a certified latent print examiner.  Do you remember that?  But what do we show you?  She is an intern. At the time she was an intern, still in school. Still in training; right?  But we allowed her to work on a triple homicide case, this intern who's in training.

She is certified by the police agency she works for.  We brought out that she is not IAI certified, the international certification board with their own set of standards, an agency Glenda Hardy is part of, but not Mischelle Webb.  Their own standards, their own certifications.  But the State doesn't tell you that.  They want to present her as some real expert here, but we showed you otherwise. You can't take them on face value.

Something that she said was interesting.  It is an exact science, fingerprinting, but what one person says is not a match another may say is a match.

Another area of just ineptness is that we received 265 pieces of evidence, identifiable latents.  And what did she say?  We stop at one.  Policy is we stop at one.  We find a fingerprint so we stop.  Do you think in a triple homicide case it is important to find out whose

.

PCR PD Anderson 004224

36

prints are on all these items, like the key in the ignition?

Items that might have been taken from the scene of the accident, don't you think it is important to find out whose prints are on all these items? No. Their policy is you stop at one. That's good enough for them. She went a little bit further because she was in training, oh, I did a few more just for experience.

What did she tell us? Well, on the outside of the vehicle -- again, assuming she has any credentials at all to render this opinion, that's something that you can decide -- on the exterior of the vehicle was a palm print from Bobby Poyson. He lived there. That was the only mode of transportation. You are going to expect that. And then in a letter in the vehicle there are four fingerprints of Bobby Poyson on a letter to him. Well, I guess we would expect to find fingerprints on items that are his. And that's all she told us.

And that, ladies and gentlemen, is the sum of the State's physical evidence. Innocuous prints tell us nothing. It doesn't prove beyond a reasonable doubt that this young man committed triple homicide.

PCR PD Anderson 004225

37

The State wants you to believe that, well, we don't have physical evidence because just nothing really existed.  The time that I spent with Detective Parker and Detective Thompson bringing out everything that they had that had evidentiary value, remember the time that I spent on that, and I wanted to show you, ladies and gentlemen, that there was a lot of evidence out there.  Crucial evidence which they didn't do anything with.

I don't want you to be mistaken and be persuaded by the State, that, well, this is just a case of no physical evidence.  No, that's not true, and we showed you that's not true.

It's their investigation, their evidence, their burden of proof.  They have done nothing for a year and a half to analyze this crucial evidence.  As Ms. Hardy said, I am still analyzing it, time is short.

Here's what I am talking about, ladies and gentlemen:  As far as no analysis that I brought out on some of the important things, there was a lot more.  Inside the main residence there was one or two, depending on who you believe, prints that appeared to be in blood.  Now, don't you think that would be really important to find out whose

PCR PD Anderson 004226

38

prints are on a shelf, or how about a bloody footprint, which perhaps is a signature from the killer, a bloody footprint, one or two?

We heard about it. I brought it out, not the State. I brought it out. And they did nothing with it. We didn't find out whose blood that was. We didn't find out whose shoe that belonged to.

Robert Blackett, in his report, said if shoes were submitted comparisons could be done. They had Bobby Poyson's shoes, they were not sent to the DPS crime lab. Imagine that. Imagine that. Bloody shoe prints, what they believe are bloody shoe prints, at a crime scene, and you have shoes from someone that you believe committed these murders, well, just put them aside, let's not do that analysis. Time is short.

Inside the main residence, again, depending on who you believe, one or two palm prints, again, that could be blood, some red unidentifiable substance, perhaps a signature from the killer.

Again, don't you think that would be something really important, to try to match that up? I brought it out. Don't you think that would

be really important for them to do, some work on that, try to match that palm print, find out whose blood it is? What did they do with it? Nothing.

We talked about all the bloody fingerprints in the small travel trailer where Robert Delahunt was found. Door frame, door, shelves, walls, ceiling, floor, all over. They did nothing with them. And they have them.

When I brought a lot of this out the State's theme was some cases are just more important than others. Sometimes blood is more important than other cases. And of course his own witnesses disagreed with the importance of blood. Right, some of them he was able to read pretty easily, oh, yeah, blood is not always important, but a lot of them said it is very important. Just use your common sense. If blood wasn't important why did they collect it all and talk about it?

Two of these murders were in closed quarters, where, according to the State, the perpetrator was injured, cut several times during the knife fight, his blood is going to be some place, or her blood. So it is very critical, very important in this case. And don't be misled by that, don't be misled that blood is not important.

PCR PD Anderson 004228

40

It is.  But their theme is it's not.

The State brought out that, well, if you have a victim and you have a pool of substance underneath him you probably don't need to analyze that because it is probably blood.  Well, it is probably from the victim.  Well, that's true.  I don't disagree there one bit.  What I am talking about is blood transfer.  Gone.

If you believe the State's theory, Bobby Poyson was cut, Bobby Poyson therefore bled.  If he killed two of these people in closed quarters his blood is going to be someplace.  It is going to be on the victims' clothing.  Oh, I forgot, we don't have the victims' clothing because they destroyed it.  Remember that.  If Bobby Poyson was cut, and he killed these people, he bled on the victims' clothing.

Dr. Nelson didn't destroy the clothing.  He knew the evidentiary value.  But these experienced homicide detectives who knew there was some closed-quarter fighting destroyed the clothes.  That's how experienced they are.  That's how good this case is.  That's how good this investigation is.  We have evidentiary things.  We know closed-quarter fighting, let's not keep it, let's

PCR PD Anderson 004229

41

destroy it.  That's what Steve Parker told us.

Again, what we are talking about is blood transfers, ladies and gentlemen, blood transfers.  And, for instance, if Roland Wear was killed by that block, prove it.  Show us it is his blood.

The State kind of brought up a commingling of blood, blood in a larger pool, you probably can't pull that out.  It might be true, but if Bobby Poyson was bleeding and beating people to death, his blood would be splattering places.  There would be blood droplets on things.  That's what I am talking about.

Again, we are talking about critical evidence here.  The knife, the cinder block, the rock, how about the blood smears in the main residence?  Using the detectives' words, identifiable prints.

How about footprints, do you remember we talked about doing maybe some tracking?  They don't really do that.  There are those bloody footprints, or what they believe is blood.  There are some footprints leading to and from the small travel trailer, but they didn't do anything with that.

PCR PD Anderson 004230

42

And one of the detectives brought out dusty footprints, and the State brought out, well, you would expect dusty footprints to be there from people who lived there. Oh, yeah. Well, sure. Their own argument means, as I have already shown you, all these prints by Bobby Poyson are innocuous. That's their own argument, you would expect to find prints from people that live in the house. I am not talking about dusty blood prints. Bloody footprints, perhaps a signature from the killer, that's what I am talking about.

What about this bloody shoe that Steve Parker found? Remember that in the small travel trailer? Remember, you have it, it is a photograph in the evidence. It is a bloody shoe. What did they do with that? Not sent to the DPS crime lab. Some blood smears were collected by Larry Traxler, of course what he thought were blood smears, and three of them turned out not to be.

Not only should these people have known what was important and what needed to be done in this case -- Robert Blackett, the serologist, remember what I brought out, that in October of '96 conversations Robert Blackett had with this man right here, and the case officer, and Steve Parker,

PCR PD Anderson 004231

43

remember what Robert Blackett said?  I need blood samples, I need blood standards to finish this analysis.  This is October '96.  I need clothing from the victims to complete my analysis.  He put this in writing to these people.  He had telephone conversations with these people.

So not only should they have had the expertise and experience to do these things on their own, they are even told by the serologist what to do, and they failed.  Of course we know it happened to the clothes, but they should have held on to that and sent it on.

They destroyed them because they knew that they could go down and get blood samples from Kimberly Lane, Robert Poyson and Frank Anderson. They could get a search warrant if needed to do fingerprints, blood.  That's what Robert Blackett said, they didn't do it.  They didn't do it, and they were told that's what they needed.

But in '96 -- and I brought this out, this is what Detective Parker told the DPS crime lab in writing -- currently blood, fingerprint, footwear samples are not available from the suspect in this case.  When they become available they will be forwarded immediately.  They will be forwarded

44

immediately.  He told this to the DPS crime lab in '96 when they are inquiring, we need more stuff.

Of course they had footwear and didn't send it.  They could have gotten blood samples, but failed to do so.  And these are things Blackett wanted.  And in anticipation that Robert Blackett was going to get these things from a competent police agency, he had done some preliminary testing, remember.

He said in anticipation that, I was going to get these things.  I did some enzyme testing.  He could have done DNA testing.  He is very experienced in that.  He talked about papers that he has written on it.  A very precise way to match whose blood is where.  The State did not even request it.  Did not even request it.

Now, he talked about that it might take a couple of months to do it.  Maybe that was too big of a burden to put on the State, because time is short after a year and a half.  Right.  But it wasn't even requested.

And, again, if the State is giving you evidence saying Roland Wear was killed by this, or Robert Delahunt was killed by this, they should show you that stuff.  They could have done it quite

45

easily.  Robert Blackett could have done it quite easily.  Closed-quarter fighting, blood transfer from Bobby Poyson on these items, no attempt to even try to do that.  None.  DNA testing would have been very precise, didn't do it.  Not even requested.

And what's troublesome is the State wouldn't even admit their failures.  They just keep trying to make excuse after excuse about why things were not done.

Let's talk about what this case is really about.  Statements.  Statements.

Although, keep in mind it is the State's burden of proof in this case, and the lack of physical evidence is very crucial, and the inept way in which they handled this or did nothing is very crucial.

Make no mistake about that.  We told you no physical evidence.  We showed you that.  We also showed you that it was all there.  They just chose to do nothing about it.

We also talked to you about the statement.  A false statement to a law enforcement officer is presumed to be involuntary.  All statements to a police officer are presumed involuntary.  When we think of involuntariness, I

PCR PD Anderson 004234

46

think the normal conception is someone being beaten with the hose, the light bulb in someone's face, the torture.  Yeah, that's involuntary, but that is not the level we are talking about.  That's not the level that you need for a statement to be involuntary.

Some of the factors courts consider are age, level of intelligence and education of the person being questioned, the length of the interrogation, the mental and physical condition of the person being questioned, coerciveness, environment of interrogation room, any depravation of food or sleep and the repeated and prolonged nature of questioning, and those are some of the factors that the courts traditionally consider.

You, ladies and gentlemen, as the jury, will consider all relevant factors.  All relevant factors in determining voluntariness.  And, again, you don't have to have someone being beaten up or tortured.  That's not what the law requires.

And it is the State's burden of proof to prove beyond a reasonable doubt voluntariness, so keep that in mind.  What you have heard, the presumption is they are not voluntary.  The presumption is they are not voluntary, and the State

PCR PD Anderson 004235

47

has to convince you beyond a reasonable doubt that they are.

Judge Conn will be giving you instructions about voluntariness, and it says if the State fails to prove beyond a reasonable doubt voluntariness you cannot consider any statements, you cannot consider any statement that is not voluntary, or what the State cannot show you is voluntary beyond a reasonable doubt. That's the instruction.

And the instruction tells you some other things: Coercion, promises, direct or implied promises, however slight -- I will get to that in a moment, but keep that in mind that's another thing to consider -- any promises, direct or implied, no matter how slight, renders the statement involuntary, and the instruction says that you can't consider it.

Let's talk about the first statement. Bobby was taken into custody at about 10:15 p.m. at that point the Illinois investigation concluded. Remember I brought out with Ralph Stegall that their investigation was to find Bobby Poyson and Kimberly Lane, and they found Bobby Poyson and Kimberly Lane, their investigation stopped. However, he wanted to

PCR PD Anderson 004236

do an interview immediately.  He had no permission from the Mohave County Sheriff's Department to do that.

He testified he did.  Remember that?  He said, yes, I had permission, I had talked to someone -- I don't know -- but I had permission.  But remember, one of the several things that I brought out, remember I brought out to him his sworn prior testimony when he was here in '97, the month of July.  Remember I talked about an interview I had with him on tape, and he agreed on that, yeah, during those time periods, yeah, I told you no permission, but now he had permission.

You will decide the accuracy of each witness in this case.  Among other things you will -- you will make your decision based on the manner while someone testifies and any inconsistent statements.  There are many inconsistent statements, and that was one of them.  No tape.  Could have taped it though.  Could have preserved what he said, but we won't bother with that.

But he wanted to strike quick.  This interview started at 10:40 p.m. opted to strike quick.  Bobby Poyson was taken into custody from a homeless shelter, been on the road maybe for several

PCR PD Anderson 004237

49

days.  Strike quick.

I wanted to do this immediately.  I could have let him sleep.  I could have let him have some food, some water -- these are the things that he said -- I could have made sure he was clear headed.  He could have, but he didn't.  Strike quick.

Here are the factors that render this statement not a voluntary one that you cannot consider:  10:40 to 12:45 a.m., late at night through early morning, Bobby Poyson was tired, fatigued, now he won't admit to that, he said, did not appear to be tired.  But, of course, I brought out prior sworn testimony and prior statements where he said he could have been.  Use your common sense. I think you all know approximate times.  You get tired when you go to bed, 10:40 to 12:45.  Do you think someone is going to be tired?

Depressed, frightened, upset.  These were his words.  Again, I had to drag them out of him from prior sworn testimony and prior statements on tape, but I wasn't trying to put words in his mouth.  These were his words that he finally admitted to from prior sworn testimony:  Depressed, frightened, upset.

PCR PD Anderson 004238

50

Remember Bobby just turned 20. Consider the mental condition, the very small room, 8 X 12 -- they won't admit it was very small, 8 X 12, very small room -- chained to the wall, remember that limited movement. They agreed he was chained to the wall with limited movement. No sleep, no rest, no bathroom break, no drink, no food, no breaks. Face to face with this young man in a very coercive atmosphere.

Again, think back to the manner in which he testified. When he was bringing each of these things out he wanted to make sure that he pointed out he didn't ask. You didn't give him any sleep, no, and he didn't ask. Remember that manner, kind of argumentative, volunteering things. I didn't have to ask, these are things that he was deprived of by the Government, by Ralph Stegall. He wanted to strike quick. And these are the conditions, among others, that existed that made this statement involuntary.

After this first involuntary statement, 12:45 in the morning, we don't let Bobby sleep or get any rest, what we do is move him to a mirror image room where Bobby Poyson sat between 12:45 a.m. and 2:55 a.m. by himself in a very small

PCR PD Anderson 004239

51

room chained to the wall.  Think what that's got to do to your mental condition, your physical condition.  Think about that coercive environment, one of the factors to consider.

Now, we want to talk to Bobby again, so we do need to make sure he is somewhat refreshed, so at 2:35 a.m. let's give him a burger, cheeseburger and some orange juice.  They did that. Because we are going to talk to him again, let's keep him fresh.

Then they come in again to strike at 2:55 a.m. to 3:25 a.m.  And, again, use your common sense.  The officer is trying to say at 2:55 he did not appear to be tired.  Of course not, but use your common sense, do you think someone is tired, fatigued?

Two officers -- here's the reason Jeff Hedrick was there -- he didn't tape these interviews, but he wanted to -- he was there to verify what Bobby Poyson said.  That was his testimony, so bring in my partner, Jeff Hedrick, let him witness the statements.

Well, he wasn't a witness in this case; was he?  You didn't hear from Jeff Hedrick, he didn't come in here and confirm anything that Ralph

PCR PD Anderson 004240

52

Stegall said.  And the State brought a lot of people from Illinois.  They brought a lot of people from Illinois who really said nothing, 1700 miles.  And you think Jeff Hedrick might have been someone kind of important to bring in from Illinois, because they brought all of these other people, some that had nothing to say about this case?  He was there, but we didn't hear from him.

With two officers the coercive environment doubles.  And, again, we have the same conditions as before.  His words, depressed, frightened, upset, chained to the wall, no sleep, rest, bathroom break, drink, food, breaks, nothing, and these are important factors to consider that existed.  I brought them out to show you these are not voluntary statements.

Promise, promise, any promise, direct or implied, no matter how slight, makes a statement involuntary.  Remember what he said again.  I had to bring it out from sworn testimony, had prior statements on tape, but he talked about a promise. Talk and I will let you sleep.

Now, he wouldn't admit that he said that on the first statement, but he did admit that in the second statement.  He talked about this

PCR PD Anderson 004241

53

promise.  He wouldn't call it a promise, but what do you call it when someone says talk and you can then sleep at 2:55 in the morning?  It is a promise.  Not an implied promise, a direct promise.  So keep that in mind, too.

Let's talk about Detective Cooper, talk about his testimony.

When Ralph Stegall testified, I asked him, prior to Eric Cooper's interview did you tell him about your interviews.  Yes.  About both of them, yes.  About everything that was said.  Yes.

Detective Cooper is the case officer, he has the privilege of sitting here with Mr. Carlisle listening to all the testimony in this case.  And I asked him the same question, did Ralph Stegall tell you anything about these interviews.  Yes, he did.  Yes, he did.

And I have a tape recorder, too, and I tape recorded Cooper's statements to me when me and the other attorneys interviewed him.  And I said, isn't it true, Detective Cooper, that when I interviewed you you said he didn't tell you these statements?  Yes, you told me that.  Prior inconsistent statement.

But remember when he volunteered,

54

which I was glad he did, he volunteered that, well, yeah, he told me about the statement, but what I meant to say was he just told me the basics. Basically, you know, he made some statement and there is a few details, that's all he really told me.

Okay. So you are saying you knew something about the prior statements. Yeah. Okay. Then we go a little bit farther on the tape, and I brought out in his own words, which you heard, no prior knowledge of the statement.

Remember that? At first he tried to kind of get around it when I showed that he made two completely inconsistent statements. He tried to justify it, but then I said to him that, no, he said in his own words no prior statements.

But of course he didn't conform his testimony to what he hears, does he? What he does is change testimony, sworn testimony. Because I brought out that under oath right here, he said the same thing. No prior knowledge, he didn't tell me anything about these statements. Didn't know what happened.

But of course Stegall tells us a different situation, and Cooper conforms to that,

PCR PD Anderson 004243

55

and maybe he forgot I taped our conversation, maybe he forgot his sworn testimony.  But the bottom line is he made two inconsistent statements under oath.  Ladies and gentlemen, there is no question about that, different statements from our interview.

And it's important, and here's why it is important:  Last year Detective Cooper wanted us to think he had no knowledge of these statements.  He testified to that.  He told us that on tape, and in the interview opted for us to think that when he showed up there was a clean slate between he and Bobby, that he didn't know anything about anything.

Oh, boy, this guy is just spitting out the same thing as before.  Everything that was said, it makes his statement much, much, less important, because it is window dressing at this point.  We don't know what was said off tape.

Bobby, we know you talked with three detectives this morning, tell us everything again.  It makes it much less important, and now he was trying to convince us otherwise.  This man was trying to convince us that when he did his interview it was a clean slate, and he is just spitting this out.  But, no, he knew everything.

And so this third statement is window

PCR PD Anderson 004244

dressing. It is a product of involuntary statements. It is window dressing. It makes it much, much less important.

Manner while testifying. Remember how argumentative Detective Cooper was? He wouldn't even answer my questions directly. Instead of admitting failures in this case, when I asked a question he wouldn't directly answer it.

Another question trying to justify, and what I thought was kind of interesting, is that I brought out from Steve Parker, do they have generators where they could go out and do a little crime investigation? Oh, yeah, we could have done that. Cooper wasn't even asked, but he volunteered when Mr. Carlisle asked him about coming back at 6 o'clock in the morning? Oh, we couldn't use our generators. Remember, he volunteered that. Manner while testifying.

And it is important and goes to credibility. He is the messenger. Make no mistake about it, and his inconsistencies speak for themselves. And it is not a small issue about what he knew prior to that third statement. It is major. And he tried to convince us otherwise last year, but he now knows that's not the truth.

PCR PD Anderson 004245

57

Incomplete Miranda warnings. Detective Cooper knows Miranda by heart, but to be careful he still reads them from a card to make sure. And he asked Bobby, repeat your rights back to me. Why? As he said, to make sure he understood each and every one of these important rights before we continue. But we know that Bobby didn't know his rights because he recited back incomplete rights and they didn't correct him on them, just went on with the interview.

Of course Eric Cooper knew the importance of it, and what's kind of funny is how the State wanted to bring out how Eric Cooper does all these Arizona interviews and no Illinois interviews, so he brought -- brought out that he does know of getting someone's consent before turning that tape on. And his testimony is -- and his testimony is I asked him for consent about a minute before I turned the tape on.

The tape was brought out right there in plain view. These are not issues. The law is, to make this legal is, did you get consent beforehand, and he says about a minute before the tape went on he got consent. He asked him for consent. But he just -- just happened to just

PCR PD Anderson 004246

58

forget to put it on the tape. Do you remember that? It was about a minute before the tape got turned on.

He knows Miranda is important right at the beginning of an interview on tape, but, boy, his memory is going bad. I just forgot to ask him again. And then about halfway through the interview he says, before I forget, you know the tape is turned on, Bobby, don't you. His words. Before I forget. Think about the words he chose to use. It is absolutely implausible. It makes no sense that he would have asked that consent.

Ladies and gentlemen, why would he use the words he used halfway through the tape, oh before I forget, and how could he just happen to forget this very extremely important right just beforehand? He never asked consent to tape. His own words speak for themselves. Again, witness credibility.

The third interview, once again, is window dressing. 8:38 to 10:36 p.m. he's not as gregarious as the one at 3:55 in the morning. August 24 '96, again, they had Bobby up until almost 4:00 in the morning that same morning. 20 years of age, depressed, frightened, sullen, down in the

PCR PD Anderson 004247

dumps, Eric Cooper's words, not words that I was trying to put in his mouth, his own words.

Once again, I had to drag out what he said under oath before and during our interview to get this, but those are his own words:  Small room, chained to the wall, shackled.  I have a question mark next to shackled because I asked Detective Cooper was he shackled, no.  Well, Detective Cooper, you testified before, don't you remember that?  Oh, yeah, I do.  So he might have been shackled because of his prior sworn testimony.

Two officers face to face, no food, no sleep, no rest or bathroom break.  There was some breaks during this, one or two to get more batteries for the tape machine, and that was it.  So we have the same factors as the other statement, relevant, important factors for voluntariness.  These are some of the factors to consider, and they are all present.  All of them.

Presumed involuntary, and when you think of the totality of all of the circumstances, age, level of intelligence and education, that comes across, mental and physical condition, officers' words, coercive, environment of the room, chained to the wall, tiny room, officers face to face, deprived

PCR PD Anderson 004248

60

of food and sleep, repeated questioning, prolonged questioning over and over.  These statements are not voluntary.  There is no question about that.

The State is going to stand up here in a few minutes and say if he didn't do it, as Mr. Sipe wants you to believe, how did he know all those details?  How did he know all these facts, which we have shown you he didn't know.  He didn't do it.

He was probably there when it happened.  When you witness an event you know what happens and you can repeat to someone what happened.  He lived there.  He went to Illinois.  He saw what happened.  He knew.  He knew.  That's how he would know the details.

Or on the 1680 miles to Chicago, Illinois he was probably told.  Imagine how interesting that trip was.  And he was probably told by Frank Anderson and Kimberly Lane what they did to those people.  Things that he might not have seen.  That's how he would know.  Plus, he didn't really know as much detail as the State thinks he knows.  Three people died.  He knows the manner, that's really about it.  You would know that if you saw it or someone told you.

There is some things that he wasn't

PCR PD Anderson 004249

right about.  He talked about bloody keys, no evidence of bloody keys.  He talked about the rock and the brick being buried in the burn barrel that someone told them about, now they are right on top, you can see it clearly.  He is saying, I killed Robert Delahunt by driving a knife through his skull, through his brain.  We know that's not true.

So there are things, there are details that Bobby Poyson offers in his involuntary statement that don't even match up with the physical evidence, so don't be fooled when the State comes in here and says he had to have done it because he knew all the details.

The State is going to offer he knew all these details because he killed them himself. Well, where is the corroboration?  If you believe that, Mr. Carlisle, Mr. Prosecutor, Mr. Government, if you believe that's how he knew all these things why don't you do something with the physical evidence instead of sitting on it for a year and a half and show us that he did this?

Last Monday Lee Novak stood up in front of all of you and asked you a very important question.  Will anyone convict just because someone said they did it.  Will you convict just because

PD PCR Anderson 004249a

62

quote, someone confesses?  No one raised their hand. Not one of you raised your hand because you knew, ladies and gentlemen, there has to be more than just saying I did it.  You knew at that time, and you still know you need corroboration before you can convict someone for these crimes.

Judge Conn, last Monday, asked if you knew what's at stake.  And you knew then, and you know now, you need more than someone spitting something out.  I want corroboration.  I want to be firmly convinced.  You don't want to have any reasonable doubts before you convict someone of these crimes, and you knew that.

And the words corroboration, why didn't they do anything with what they had?  That's what we are talking about.  The why.  Why would Bobby Poyson say these things?  Well, we touched on involuntariness in form, the nature, the totality of the circumstances surrounding these statements.  He knew what happened.

There are some other questions that came out in evidence -- I am not making this up -- protecting Kimberly Lane.  Remember, there was some evidence that he kind of maybe started liking Kimberly Lane, why he was protective of this

PCR PD Anderson 004250

63

14-year-old girl involved in this case. He was going to protect her.

He was afraid of Frank Anderson, Frank Anderson talking about Mafia ties, Italian Mafia. Then he later says, no, it's not true, he has got this poor kid confused, he doesn't know if he is coming or going. Afraid of Frank Anderson. I think you all have a pretty good idea of the type of person Frank Anderson is.

I think you heard enough testimony and description to know what kind of monster and animal he is, the type of 48-year-old man who would have a 14-year-old girlfriend then wants to take her to Kentucky and marry her. You heard some other descriptions of Frank Anderson, afraid of Frank Anderson. Level of cooperativeness, strange. Remember that.

Ralph Stegall, again, his own words, and I had to bring them out from prior testimony and statements, but level of cooperativeness, strange, keep that in mind that he thought this was strange. What he was saying. Very strange. And how about this statement by Bobby Poyson, according to the State, I might as well just go ahead and take the fall for all of it and go tell them that I did it

PCR PD Anderson 004251

64

all.

Now, I suppose the State wants you to believe that everything in these three statements but this. I might as well just go take the fall for all of it and go tell them I did it all because I am afraid of Frank Anderson, and I am protecting Kimberly Lane.

And also he is suicidal, he asks for death. The State brought that out. He asks for death. How do I ask for death, I confess to three murders and make the State execute me. That's how he asks for death. He is suicidal. That's why he would make these statements. Along with the involuntariness issue.

It makes sense that Frank Anderson, perhaps along with his 14-year-old girlfriend killed these three people on South Yavapai. I know the type of person he is. I know Bobby lived on South Yavapai for approximately seven months and there were no problems.

There was something offered about some mutual wrestling or perhaps fighting with Robert Delahunt. There was some mention protecting Robert Delahunt from Elliott Kagen and Roland Wear and Leta Kagen, but other than that, he worked, he

65

paid his rent, dutifully he gave them his food stamps, he baby-sat for these people, and there were no problems.

Anderson and Lane arrive from California and people start dying rapidly and horribly. That's when the murders started, when they came. Who had the truck; Frank Anderson. Who had Roland Wear's property; Frank Anderson. Who had Leta Kagen's property; Frank Anderson. Who had identification belonging to Leta Kagen; Frank Anderson. Who had identification belonging to Roland Wear; Frank Anderson. Who had the blue backpack with a photo of himself and his 14-year-old girlfriend inside of it; Frank Anderson. What was in that blue backpack, a wallet that sounds like it might have belonged to Roland Wear.

Of course the State wants you to think that Robert Poyson took that. But who had it, Frank Anderson. What property of these people from this armed robbery did Bobby Poyson have that the evidence showed? Zero. None. In came Frank Anderson and killed this family. There is no question about that.

And if the State wanted to convince you beyond a reasonable doubt that it was Bobby

PCR PD Anderson 004253

66

Poyson or Bobby Poyson was involved, they should have confirmed it based on their investigation, their physical evidence, but time is short.

The State must prove their case, and Judge Conn will tell you this, all of the case against the Defendant, with the evidence that the State itself gathers, therefore the Defendant is not required to testify. We have no burden of proof. We have no obligation, ladies and gentlemen, the State does. And they have failed in this case.

And what I have talked about in this case, ladies and gentlemen, are facts from this case. Beyond a reasonable doubt -- beyond dispute, these are not things that I have made up or some tactic to try to convince you otherwise. These are things that I brought out right here from the witness stand, because when you decide this case you have to decide it from the testimony, the facts that you find beyond a reasonable doubt from here. Not speculation, supposition, probabilities.

If you go back there and think Bobby probably did it, or Bobby was probably involved, that is not enough to convict. Think of what's at stake. You have to be firmly convinced beyond a reasonable doubt. If you have any doubt, a

PCR PD Anderson 004254

67

reasonable doubt, you can't convict.  It's their burden, not ours, and they have failed.

And we have shown you that through their own witnesses, through facts, and don't -- don't for one minute let the State stand up here and convince you and explain away their failures.  There is no justification for sitting on crucial evidence for one and a half years.

There is no explanation for going to a crime scene where you think evidence might be destroyed by the heat seven days later.  There is no justification for destroying victims' clothing, which they should have known had very important evidentiary value.  There is no excuse for failing to send blood samples to the crime lab at their request.  There is no justification for not trying to match up footprints, palm prints, bloody fingerprints.

What the State has offered us is four things that are very innocuous, by their own theory, about the footprints and dust.  That's all that they have offered us.  There was a lot of stuff there, and is still sitting somewhere for a year and a half.  There is no justification.  There cannot be a more important case than that that they could have

PCR PD Anderson 004255

68

worked on, and they didn't.

You said during jury selections you would not convict just because someone did it, because you want corroboration, and there isn't any.

We talked about the involuntariness of these statements, the conditions that existed, the facts that came out and the requirements for things. You need to think about these. You need to think about them carefully. It is obviously a very serious case with very serious consequences.

When you go back there and deliberate the 12 of you who will need to consider all the evidence or lack of evidence, and you need to consider these things. You cannot go back there -- and I don't mean to steal someone's thunder -- but you can't go back there and make a rush to judgment. You can't go back there and just think, well, he did it, we heard enough. That's all we need. You cannot do that in this case.

You cannot, you must not. You must think about these things and talk among yourselves and talk about the factors that existed, and the State's failures in this case, and this statement, I might as well just take the fall for all of it, and the mental and emotional state of this 20-year-old

PCR PD Anderson 004256

69

kid who was down on his luck, homeless, was brought in by a family, was doing pretty good by them, and then they say two people come and murdered them, and he goes along with them probably for self preservation. Think of his emotional state, asking for death because he is suicidal.

You need to think about these things carefully, ladies and gentlemen. And when you do that, it is going to be very clear that reasonable doubt does exist, based on the evidence and lack of evidence. And as hard as you think this may be you have to render a verdict of not guilty as to Bobby Poyson. I know you are going to be influenced by the fact that there are three dead people, and that's sad. It is terrible. But think about it.

And you are going to see some horrible photographs when you go back there, and the State wants you to be influenced by them. That's why you got them, and that's bad. That's terrible. But you can't be human. It is unfair, but you can't be human.

You have to think about the facts, the laws, and when you do that, ladies and gentlemen, as painful as this may be for you, you will find that the State has failed to prove Bobby

PCR PD Anderson 004257

70

Poyson guilty beyond a reasonable doubt.

THE COURT:  We are going to take a short break now, maybe about 10 minutes.

During the break remember my admonition.  You have heard it enough times already that I probably don't need to repeat it.  So let's take about a 10-minute break, and then we will proceed.

(Recess from 10:53 a.m. to 11:07 a.m.)

THE COURT:  This is a continuation of CR-96-865, State versus Robert Allen Poyson.

Show the presence of the Defendant, Counsel, and the presence of the jury panel.

Proceed, Mr. Carlisle.

MR. CARLISLE:  Thank you, Your Honor.

During his arguments Mr. Sipe made a big deal about two things:  Confessions not being voluntary and physical evidence.

Now, the judge is going to instruct you on what to find in the confession is voluntary. This is the entire instruction that he is going to read:  You must not consider any statements made by the Defendant to a law enforcement officer unless you determine beyond a reasonable doubt that the Defendant made the statements voluntarily.

PCR PD Anderson 004258

The Defendant's statement was not voluntary if it resulted from the Defendant's will being overcome by a law enforcement officer's use of any part of violence, coercion or threats or by any direct or implied promises, however slight.

You must give such weight to the Defendant's statement as you feel it deserves under all the circumstances.

The issue of whether any statements by the Defendant were obtained in compliance with the Miranda decision is a legal issue for the Judge's determination alone and should not be considered by you.

The statements in this case were voluntary. The Defendant, Bobby Poyson, was not overcome by any threat, by any violence, by any coercion, by any promise. There was no coercion. There were no threats, there was no violence, and there weren't any promises.

You have to, as the Judge will instruct you, you have to determine that beyond a reasonable doubt. What does that mean? It doesn't mean beyond any doubt. It means beyond a reasonable doubt. The judge is going to tell you that beyond a reasonable doubt doesn't mean that you are going to

72

know something with absolute certainty. There are very few things we know in this world with absolute certainty.

It means that you have to be convinced, that you have to be firmly convinced of this, that when you look at the confessions you will be firmly convinced that they were voluntary. There was no violence, there was no coercion, there were no threats, there were no promises.

Starting with Sergeant Stegall, he was the first person to interview Bobby Poyson, to interview the Defendant in this case. He interviewed him in Illinois. He interviewed him about half an hour after he was arrested, after the Defendant was arrested. Sergeant Stegall was in Illinois. He didn't know anything about this case. He didn't -- he had never been to the crime scene. He didn't know the details of this case. He interviews Bobby Poyson, and what happens? Bobby Poyson wants to confess, wants to tell him what happened. He wants to spill his guts, wants to get it off his chest. He wants to tell him what he did.

Looking at the credibility of witnesses, you can see how he was on the stand. You

PCR PD Anderson 004260

73

can see his manner, his style while he is talking. He is not the kind of person, the kind of officer --

MR. SIPE: Objection, Your Honor --

THE COURT: Overruled.

Continue.

MR. CARLISLE: You can look at his manner and decide whether he is the kind of officer that's going to threaten and intimidate someone, or if his style is such that he's going to just let the Defendant talk. And that's what he did. That's all he had to do in this case.

Now, maybe it was a little unusual for Bobby Poyson to come in here and to admit freely to all three of the crimes that he did, all three of the murders that he did, all of the crimes that he did. But he did admit it. He wanted to get it off his chest. He wanted to talk.

Now, granted, the first time that he told the story he did protect Kim Lane. He left her out of the story. He was protecting her. But then he told the story again the second time, the interview that went from 2:52 to 3:25, and remember, during that break he was left alone in the room. If he was tired, he could have slept. He was given a cigarette, he was given something to drink, he was

PCR PD Anderson 004261

74

given food.  He was given all those.  When he needed to, he was given the opportunity to go to the restroom.  He was given all of that.  He was not deprived of any of that during those interviews.

Also remember that these interviews took place in Illinois.  Bobby Poyson had been living in Arizona.  He was used to staying up late --

MR. SIPE:  Objection; facts not in evidence.

THE COURT:  I will allow the jury to rely upon their collective recollection as to what the testimony has been.

Proceed.

MR. CARLISLE:  Elliot Kagen told you that it was unusual when he went home at night for the lights to be out, because the people that lived there commonly stayed up late.

If you listen to his confession, listen to the taped confession, he talks about Kim Lane and Frank Anderson getting there, getting there between 10:00 and 11 o'clock at night.  And what do they do, he goes and he shows Kim Lane the animals that live there, the dogs and the cats, because they likes dogs and cats.  They go outside, she meets the

PCR PD Anderson 004262

75

animals, and then they go back in, and they play cards for a while. So they are up late that night.

The night of the murders, what happens, they -- he goes and he cuts the phone line shortly before midnight, then after midnight is when he kills Leta Kagen and Roland Wear. And he takes and he kills them, they load up the truck, and they start driving, they -- they don't stop in Kingman, they got all the way to Utah, and they keep driving. All of that happens late at night.

Bobby Poyson is somebody that's used to staying up late at night. When this interview starts it's only 8:30 in Arizona or 8:40 in Arizona. So although the second interview ends fairly late at night, it is not so late as to make the whole confession involuntary.

Also, Sergeant Stegall got up here and he testified, and what did he say? What did he tell you? The only time they talked about going to sleep was after the second interview. It was not a promise made to get him to confess. It was not a promise made before the interviews or during the interviews. They talked about it after the second interview. It was not a promise that was made in order to get him to confess. It was not a promise

76

that was made over and over that took away Bobby Poyson's will to resist, his ability to resist.

The third interview, the interview with Eric Cooper, that one is on tape. That one is in evidence. You can listen to it. You can listen to the tone of the Defendant in this case, Bobby Poyson. Listen to the matter of fact way that he is describing what happened. Does it sound coerced to you? Does it sound like there is any coercion at all?

You can listen to the end of the tape when they talk to him about that. When they asked him, and he says, no, there were no promises made. There were no threats, there was no duress of any kind. He was not mistreated by either the Evanston Police Department or the Illinois State police.

The other point is if you listen to that interview when Eric Cooper is talking, when Eric Cooper says, well, now, isn't this what you just told me, or isn't this what happened, and he makes a mistake Bobby Poyson corrects him. He says, no, that's not what I said, or that's not what happened. And he corrects him. And he tells him this is what happened.

That's the statement of somebody

PCR PD Anderson 004264

that's voluntarily making a statement. Eric Cooper is not spoon feeding him, not telling him what to say. It doesn't matter whether or not Eric Cooper knew the details of the interview, because he doesn't lead him. He doesn't say, all right, now isn't this what happened and say bla, bla, bla, bla, bla, right, and Bobby Poyson just fills in the gaps with a yes or no. Eric Cooper says, you know, what happened. After that what happened next. After that what happened next. And Bobby Poyson, the Defendant in this case, is the one that fills in those blanks.

You can look at the transcript. You can listen to the interview. Look who does all the talking. Look who does all the talking. It is Bobby Poyson. It is not Eric Cooper.

When you look at these interviews, these confessions, it is because he wanted to spill his guts. He wanted to tell somebody what had happened. And why did he want to tell them? Because he had just killed three people, and he felt bad about killing Robert Delahunt, but he still killed him.

What about the physical evidence? Every piece of evidence in this case corroborates

PCR PD Anderson 004265

the Defendant's confessions in this case. Every piece of evidence corroborates his confession.

Now, first of all, with Robert, what did the Defendant say, the plan was for Robert Delahunt to die out in the small trailer and that Frank Anderson was going to slash his throat. Where was the body found? The body is found in the small trailer. What wound did he have? He had a slashed throat. That slashed throat happened before, before he died.

In his confession he says he went out there, Frank Anderson had slashed his throat, that was the plan, to lure him out there. He had slashed his throat and that that wound wasn't fatal.

What happens next? He goes out to the trailer and he starts struggling. What evidence was out in the trailer? There is the palm print on the shelf. Look at the shelf, it is marked SP-25(c). On her reports, instead of just SP-25, look to see if there is an A and B, if there is two other prints that are on there that she wasn't able to identify. You can look for yourself.

Mr. Sipe brought out, well, there is all these other bloody fingerprints in the camp trailer that they didn't identify yet.

PCR PD Anderson 004266

79

Interesting, somewhat inconsistent. He is admitting all these other fingerprints are bloody fingerprints because he wants you to believe that the one that was identified to his client is not a bloody fingerprint, not a bloody palm print. They are all bloody prints out there, because this place is covered with blood, and you can see the picture of the victim, Robert Delahunt, laying there and see all the blood.

What was the next piece of evidence that's corroborated?  It says that he smashed Robert Delahunt's head with a rock and cinder block. Dr. Nelson testified that the injuries to Robert Delahunt's skull could not have been caused by a fist, they had to be caused by something more.  They had to have been caused by the rock and the cinder block.

He describes the rock and the cinder block.  He describes the cinder block as being pointed.  He tells us where the rock and the cinder block can be found.  Can be found in the burn barrel, and that's where they are found.  And the cinder block matches the description that the Defendant, Bobby Poyson, gave.

The Defendant talks about how when he

PCR PD Anderson 004267

80

first tried to pound the knife into Robert Delahunt's head it popped out. It didn't go all the way in so he had to do it again. Dr. Nelson testified that there were multiple wounds to the ear area. That would be consistent with somebody trying to put the knife in and having it pop out, trying to put the knife in again and having it pop out, trying to finally put it in again and having it go in. The wounds, the evidence is consistent with what he said.

Now, Mr. Sipe said that I misled you during my opening statement because I told you that the knife wound to the head was the lethal wound, and that that is inconsistent because Bobby Poyson's statements say that the knife wound was the lethal wound.

But this is what I read you during the opening statement. I read you, from the tape -- actually I read from the transcript of the tape that was introduced into evidence. These are the words of Bobby Poyson: I am going to put -- gonna put the knife by your fingers, I want you to put it in the ear. He put the knife in his ear, and he start -- I hit it twice and it bounced out. Then I panicked. I started looking for the knife again. I grabbed

PCR PD Anderson 004268

it, as I grabbed it Robert took it away from me, he slashed me right here in the face. Then I take the knife away from him, and I put it back in his ear, and as I just started hitting -- hitting the knife into his ear it went in, and then -- and then I started hitting him on the head with the rock. Robert was struggling but he wasn't struggling as hard. He started showing signs of being -- getting tired and being weak. And that's why I just started hitting him in the head with the rock.

The knife wound to the head wasn't fatal. That's the words of Bobby Poyson, that's what I told you during the opening.

What did kill him was smashing him in the head with the rock. And that's what he said.

He says that after it happened Frank Anderson sealed the door of the trailer with the stick. The stick is in evidence. There is a picture of the trailer as they found it, still sealed shut, still blocked shut with the stick, and the blood. The same kind -- the same type of blood was found on the rock and the cinder block in the burn barrel, as is on the pool of blood, as on the fence top, the gas novel extender that was found in the pool of blood next to the body, the same type of

82

blood as those three items.

One type of blood, and the other things that were examined had a different type of blood. So those three are from a different person than the other items, than the other blood that was found.

What did he do next? He went and got the bullets from Carmen May. That's what he says in his statement. She testified that he was given bullets by her. She gave him the bullets. She didn't give them to Frank Anderson, she didn't give them to Kim Lane, she gave the bullets to Bobby Poyson.

What did he do next? He went in and he shot Leta Kagen, shot her as she was laying in bed, naked, only covered by a sheet. And that's how she was found. Lying in bed, naked, only covered by a sheet.

Bobby Poyson says he shot her, and she died instantly. That's what Dr. Nelson, the medical examiner, testified to. That she died instantly when she was shot. And Bobby Poyson's fingerprint is on the trigger guard on the rifle.

Finally, with respect to Roland Wear, what did he say? First he says he shot Roland Wear,

PCR PD Anderson 004270

83

shot him in the mouth.  Dr. Nelson testified that a bullet entered his mouth, knocked out some teeth, lodged in his jaw.  Bobby Poyson said, next I heard Roland Wear reaching for the phone, hello, hello, hello, but he says he had already cut the phone line.  It has been cut.  The phone in the bedroom was off the hook.  Phone in the bedroom also had blood on it, same blood that's found on the stock of the rifle, same type of blood that's found in a pool, same type of blood that's leading from the bedroom outside.  There are five different places where that blood was found.  It goes from the phone, out the room, through the hallway towards the outside.

He says that Roland Wear was naked in bed, and he hears him putting on pants, hears the keys jingling as he puts on his pants.  Again, he's found, he's found only wearing pants.  That's the only thing that he's wearing when he is found.

He talks -- the Defendant says that he hit Roland Wear a couple of times, two or three times in the bedroom with the rifle butt.  There is another piece of the rifle butt, and it's found in the bedroom.  It breaks off in the bedroom.  It matches the other part of the rifle butt that's

PCR PD Anderson 004271

84

found in the wood pile next to the victim's body. They go together.  Both of those have blood on them. Both of those have the same type of blood as is found on the phone, found in the trail of blood.

He says that the victim was defending himself with the door, trying to block him, knock him off with the door.  The door is found in the hallway.  The door is found where he describes it as being.

He says that he slips and falls. Now, Mr. Sipe made a big deal about the bloody footprint, about the shoes.  Why would he slip and fall?  Because he steps in a pool of blood.  His feet get slippery and he slips.  You can look at the picture of the bloody footprint that I introduced into evidence.  You can look at the bottom of the shoes.  You can compare those two things yourself and say, does this shoe look like it made this footprint.

You look at the heel area.  There is a little circle in the heel.  You will see that on the bloody footprint, you will see that on the pair of shoes.  You can make that comparison yourself.

He says that he smashed -- the Defendant says he smashed Roland Wear's head with a

PCR PD Anderson 004272

85

cinder block. Roland Wear's head was smashed like an eggshell with the cinder block, which is covered with blood, which was found next to the body.

He says that he took Roland Wear's wallet with the chain out of his pocket. The wallet with the chain was found in the truck. And he says that he covered the body up. When the body was found it was found covered up.

They left in the truck. Now, Frank Anderson was the one that was arrested in the truck, but all three of them are accomplices, and as the Judge will instruct you, you are -- Bobby Poyson is liable as an accomplice to Frank Anderson having the truck. That was the whole goal. It was to steal the truck and to go to Illinois.

Even the little details. He talks about going back inside, getting a Coleman lantern. There is a picture in the back of the truck, there is clearly a Coleman lantern in the back of the truck.

He talks about how he and Kim Lane went to Chicago. That was the whole plan was to go to Chicago and go to a homeless shelter in Evanston. That's where they are arrested.

Frank Anderson is arrested going to

86

Kentucky, going south. Frank Anderson is arrested on August 19th. Bobby Poyson is not arrested -- or excuse me -- August 18th. Bobby Poyson isn't arrested until August 23rd. Mr. Sipe made a big deal about, well, he just confesses, just admitting all of this, but read the whole statement.

What would you have done if Frank Anderson had said, you know, the hell with you, I am going to be the leader and not you. I would have probably got out and went and turned myself in. But he didn't. He could have gone to turn himself in for almost a week, but he didn't.

I had already talked about turning myself in twice after we hit Wisconsin, and Frank started panicking all the time. Every time he saw a cop he always turned into somewhere and stopped and rested. Or if a cop followed us Frank would do the speed limit, and he kept looking back in the rearview mirror, just seeing if the cop started going. Then I -- I felt like, well, Frank is going to screw everything up, so I might as well just go take the fall for all of it, and go tell them that I did it all.

Take the fall for all of it, because he did do it. When you look at all the evidence in

PCR PD Anderson 004274

87

this case, when you listen to the tape, just listen to the tape. It's not coerced. He is freely giving that confession.

When you look at all the evidence in this case it corroborates with that confession. And when you tie it all together you are going to have to find Bobby Poyson guilty on all five counts.

Thank you.

THE COURT: I will now tell you the rules you must follow to decide this case. I will instruct you on the law. It is your duty to follow the law.

It is also your duty to determine the facts. You must determine the facts only from the evidence produced in court. You should not guess about any fact. You must not be influenced by sympathy or prejudice. You must not be concerned with any opinion you may feel I have about the facts. You are the sole judges of the facts.

You must take account of all my instructions on the law. You are not to pick out one instruction or part of one and disregard the others. However, after you have determined the facts, you may find that some instructions do not apply.

PCR PD Anderson 004275

88

You must then consider the instructions that do apply, together with the facts as you have determined them.

Decide the case by applying the law in these instructions to the facts.

You must find the facts from the evidence. The evidence which you are to consider consists of testimony of witnesses and exhibits. At times I decided whether testimony and exhibits should be admitted. When an objection to a question was sustained, you are to disregard the question, and you are not to guess what the answer to the question might have been. When testimony was ordered stricken from the court record, you are not to consider that testimony as evidence. Do not concern yourselves with the reasons for these decisions. Admission of evidence in court is governed by rules of law.

In the opening statements and closing arguments the lawyers have talked to you about the law and the evidence. What the lawyers said is not evidence, but it may help you to understand the law and the evidence.

You must not decide the accuracy of each witnesses' testimony. Take into account such

PCR PD Anderson 004276

89

things as his ability and opportunity to observe, his memory, his manner while testifying, any motive or prejudices he might have, and any inconsistent statements he might have made.  Consider his testimony in light of all of the evidence in the case.

The State has charged the Defendant with the crimes of Conspiracy to Commit First Degree Murder, Murder in the First Degree and Armed Robbery.  The charges are not evidence against the Defendant.  You must not think that the Defendant is guilty just because he has been charged with a crime.  The Defendant has pled "not guilty".  The Defendant's plea of "not guilty" means that the State must prove every part of all of the charges beyond a reasonable doubt.

The State has the burden of proving the Defendant guilty beyond a reasonable doubt.  In civil cases, it is only necessary to prove that a fact is more likely true than not or that its truth is highly probable.  In criminal cases such as this, the State's proof must be more powerful than that. It must be beyond a reasonable doubt.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the

PCR PD Anderson 004277

90

Defendant's guilt.  There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every doubt.  If, based on your consideration of the evidence, you are firmly convinced that the Defendant is guilty of the crime charged, you must find him guilty. If, on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty.

In deciding whether the Defendant is guilty or not guilty, do not consider the possible punishment.

The State must prove all of its case against the Defendant with the evidence that the State itself gathers.  Therefore the Defendant is not required to testify.  The decision on whether to testify is left to the Defendant.  You must not conclude that the Defendant is likely to be guilty because he does not testify.  You must not discuss this fact or let it affect your deliberations in any way.

The crime of Conspiracy to commit First Degree Murder has two elements.  In order to determine that the Defendant has committed the crime

PCR PD Anderson 004278

91

of Conspiracy to Commit First Degree Murder, you find that:

Number one, the Defendant agreed with one or more persons, that at least one of them or another person would engage in conduct constituting the crime of First Degree Murder;

AND, number two, the Defendant did so with the intent to promote or aid the commission of the crime of First Degree Murder.

The crime of First Degree Murder may be committed in two different ways, which are referred to as premeditated murder and felony-murder. In order to determine that the Defendant committed the crime of First Degree Murder, it is not necessary that all 12 of you agree that it was premeditated or that all 12 of you agree that it was felony-murder. However, it is necessary that each one of you determine that the Defendant committed at least one of the two types of First Degree Murder.

The crime of First Degree Murder (premeditated) has three elements. In order to determine that the Defendant committed the crime of First Degree Murder (premeditated), you must find that:

92

Number one, the Defendant caused the death of another person;

AND, number two, the Defendant did so with premeditation;

AND, number three, that the Defendant intended or knew that his conduct would cause death.

"Premeditation" means that the Defendant acts with either the intention or the knowledge that he will kill another human being, when such intention or knowledge precedes the killing by a length of time to permit reflection. An act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion.

The crime of First Degree Murder (felony-murder) has four elements. In order to determine that the Defendant committed the crime of First Degree Murder (felony-murder), you must find that:

Number one, the Defendant committed or attempted to commit the offense of robbery or armed robbery;

AND, number two, the Defendant did so acting either alone or with one or more other persons;

PCR PD Anderson 004280

93

AND, number three, the Defendant or another person caused the death of any person;

AND, number four, the death was caused in the course of and in furtherance of the robbery or armed robbery or the immediate flight from the robbery or armed robbery.

First Degree Murder (felony-murder) requires no specific mental state other than what is required for the commission of robbery or armed robbery.

The crime of Armed Robbery has six elements.  In order to determine that the Defendant committed the crime of Armed Robbery, you must find that:

Number one, the Defendant took property of another person;

AND, number two, the Defendant took the property from the other's person or immediate presence;

AND, number three, the Defendant did so against the other person's will;

AND, number four, in doing so, the Defendant threatened or used force against any person;

AND, number five, the Defendant

PCR PD Anderson 004281

94

threatened or used force with the intent either to coerce the surrender of the property or to prevent resistance to his taking or retaining the property;

AND, number six, in the course of doing so the Defendant or an accomplice used or threatened to use a deadly weapon or dangerous instrument.

Conspiracy to Commit First Degree Murder does not require a written, formal or definite agreement. You may infer the existence of an agreement from the conduct of the parties if it seems reasonable to do so based on the evidence.

A conspirator is liable for all criminal acts committed by a coconspirator during and in furtherance of the conspiracy.

"Intentionally" or with the "intent to" means, with respect to a result or to conduct, that a person's objective is to cause that result or to engage in that conduct.

"Knowingly" means with respect to conduct or to a circumstance, that a person is aware or believes that his conduct is of that nature or that the circumstance exists.

"Property" means anything of value.

"Force" means any physical act

PCR PD Anderson 004282

95

directed against a person as a means of gaining control of property.

"Threat" means a verbal or physical menace of imminent physical injury to a person.

"Dangerous instrument" means anything that under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or serious physical injury.

"Deadly weapon" means anything designed for lethal use and includes a firearm.

The phrase "in the course of" in the elements for the offense of Armed Robbery includes any of the Defendant's acts beginning with the initiation of and extending through the flight from a robbery.

A person is criminally accountable for the conduct of another if the person is an accomplice of such other person in the commission of an offense.

"Accomplice" means a person who, with the intent to promote or facilitate the commission of an offense:

Number one, solicits or commands another person to commit the offense;

PCR PD Anderson 004283

96

OR, number two, aids, counsels, agrees to aid, or attempts to aid another person in planning or committing the offense;

OR, number three, provides means or opportunity to another person to commit the offense.

The Defendant's guilt cannot be established by his mere presence at a crime scene or mere association with another person at a crime scene. The fact that the Defendant may have been present does not in and of itself make the Defendant guilty of the crime charged.

Evidence was presented in this case which may tend to show that the Defendant committed crimes other than those with which he is charged. Such evidence was not presented and may not be considered by you to determine that the Defendant is a bad person or that he has a disposition to engage in criminal conduct.

It is no defense to the crime charged against the Defendant in this case that another person or persons not now on trial might have participated or cooperated in the crime. You are not to guess the reason for the absence from the courtroom of such other person or persons. The only matter before you for your decision is whether the

PCR PD Anderson 004284

97

evidence establishes the Defendant's guilt.

You must not consider any statements made by the Defendant to a law enforcement officer unless you determine beyond a reasonable doubt that the Defendant made the statements voluntarily. The Defendant's statement was not voluntary if it resulted from the Defendant's will being overcome by a law enforcement officer's use of any part of violence, coercion or threats, or by any direct or implied promises, however slight.

You must give such weight to the Defendant's statement as you feel it deserves under all the circumstances.

The issue of whether any statements by the Defendant were obtained in compliance with the _Miranda_ decision is a legal issue for my determination alone and should not be considered by you.

Evidence can be divided into direct and circumstantial evidence. Direct evidence is the testimony of a witness who saw or heard an event. Circumstantial evidence is the proof of a fact from which the existence of another fact may be inferred. You must determine the weight to be given to all the evidence without regard to whether it is direct or

PCR PD Anderson 004285

circumstantial.

Rules of evidence ordinarily do not permit the opinion of a witness to be received as evidence. However, a witness may testify as to an opinion on a subject upon which the witness has become an expert because of education, study or experience. You should consider the opinion of an expert and should weigh the reasons, if any, given for it. However, you are not bound by any expert opinion. Give the expert opinion the weight that you believe it deserves.

All 12 of you must agree on a verdict. All 12 of you must agree whether the verdict is "guilty" or "not guilty". When you go to the jury room you will choose a foreman who will be in charge during your deliberations and who will sign the verdict forms.

You will be given 10 forms of verdict on which to indicate your decision. They read as follows:

Each of the verdict forms bear the following caption: In The Superior Court Of The State of Arizona In And For The County Of Mohave, State of Arizona, Plaintiff, versus Robert Allen Poyson, Defendant, Cause Number CR-96-865, verdict,

PCR PD Anderson 004286

99

and then the first verdict form reads the following:

We, the jury duly empaneled and sworn in the above-entitled action, upon our oaths, do find:  The Defendant guilty Count I, Conspiracy to Commit First Degree Murder.  There is a signature line for the foreman to sign.

This is the verdict form that you will sign if all 12 of you agree that the State has proved beyond a reasonable doubt that the Defendant committed the crime charged in Count I, Conspiracy to Commit First Degree Murder.

The corresponding verdict reads:  We the jury duly empaneled and sworn in the above-entitled action, upon our oaths, do find:  The Defendant not guilty Count I, Conspiracy to Commit First Degree Murder.  Then there is a signature line for the foreman to sign.

This is a verdict form that you will sign if all 12 of you agree that the State failed to prove beyond a reasonable doubt that the Defendant committed the crime charged in Count I, Conspiracy to Commit First Degree Murder.

So Count I charges Conspiracy to Commit First Degree Murder.  There are two possible

PCR PD Anderson 004287

100

verdict forms, guilty or not guilty.  If you are able to reach a verdict as to Count I you will sign the one verdict form that corresponds to your decision.

The next verdict form reads:  We, the jury duly empaneled and sworn in the above-entitled action, upon our oaths, do find:  The Defendant guilty Count II, First Degree Murder (Robert Delahunt).  And then the verdict form goes on to read:  Further, blank members of the jury found that the State proved beyond a reasonable doubt that the Defendant committed premeditated First Degree Murder.

This is the verdict form that you will sign if all 12 of you agree that the State proved beyond a reasonable doubt that the Defendant committed the crime of First Degree Murder charged in Count II against Robert Delahunt.

If you reach that verdict, in addition to signing the verdict form, you will also need to fill in a number, which is going to be anywhere between zero and 12, which represents the number of people on the jury who found, as part of their guilty verdict, that the State proved beyond a reasonable doubt that the Defendant committed the

crime of First Degree Murder against Robert Delahunt on a premeditated theory.

Again, remember you can find the Defendant guilty of First Degree Murder on either felony-murder, premeditated murder or both. And for reasons which you don't have to concern yourselves with, we simply need to know how many of the 12 of you, if you return this verdict, agree that the State proved beyond a reasonable doubt that the Defendant was guilty under a premeditated First Degree Murder theory.

So if you sign this verdict you have to not only sign the verdict, but you have to fill in the appropriate number.

The next corresponding verdict form reads: We, the jury duly empaneled in the above-entitled action, upon our oaths, do find: The Defendant not guilty Count II, First Degree Murder (Robert Delahunt).

And this has simply one signature line. This is the verdict form that you will sign if all 12 of you agree that the State failed to prove beyond a reasonable doubt that the Defendant committed the crime charged in Count II, First Degree Murder of Robert Delahunt.

PCR PD Anderson 004289

102

And if you find him not guilty then obviously you don't have to keep the score of who voted on what theory because you will have all agreed that the State failed to prove any one of the theories beyond a reasonable doubt.

So for Count II, First Degree Murder of Robert Delahunt, there are two possible verdict forms, either guilty or not guilty.  If you are able to reach a verdict as to Count II you will sign the one verdict form that corresponds to your decision.

The next four verdict forms are basically pretty much the same as the ones that I just went through.  It is just that they have different names of the alleged victims.

The next verdict form reads:  We, the jury duly empaneled in the above-entitled action, upon our oaths, do find:  The Defendant guilty Count III, First Degree Murder (Leta Kagen).

Further, blank members of the jury found that the State proved beyond a reasonable doubt that the Defendant committed premeditated First Degree Murder.

So, again, if you all 12 agree that the State proved beyond a reasonable doubt that the Defendant committed First Degree Murder of Leta

PCR PD Anderson 004290

103

Kagen as charged in Count III, you will sign on the foreman's signature line.  Also fill in the number of people who were satisfied that the State proved beyond a reasonable doubt that the Defendant was guilty under a premeditated murder theory.

Next verdict form reads:  We, the jury in the above-entitled action, upon our oaths, do find the Defendant not guilty Count III, First Degree Murder (Leta Kagen).

One place to sign for the foreman if all 12 of you agree that the State failed to prove beyond a reasonable doubt that the Defendant committed the crime of First Degree Murder of Leta Kagen as charged in Count III.

So, again, Count III charges First Degree Murder of Leta Kagen with two possible verdict forms:  Guilty or not guilty.  If you are able to reach a verdict as to Count III you will sign the one verdict form that corresponds to your decision.

Next verdict form reads:  We, the jury, duly empaneled and sworn in the above-entitled action, upon our oaths, do find:  The Defendant guilty Count IV, First Degree Murder (Roland Wear).

Further, blank members of the jury

104

found that the State has proved beyond a reasonable doubt that the Defendant committed premeditated First Degree Murder.

Again, a signature line for the foreman to sign if all 12 of you agree that the State proved beyond a reasonable doubt that the Defendant committed the crime of First Degree Murder of Roland Wear as charged in Count IV.

And, again, if you return this verdict you also have to fill in the number of jurors that returned this verdict, based upon a finding that the State proved beyond a reasonable doubt the Defendant's guilt was based on a premeditated First Degree Murder theory.

The next verdict form reads:  We, the jury, duly empaneled and sworn in the above-entitled action, upon our oaths, do find:  The Defendant not guilty Count IV, First Degree Murder (Roland Wear).

A signature line for the foreman to sign.  This is the verdict form that you will sign if all 12 of you agree that the State failed to prove beyond a reasonable doubt that the Defendant committed the crime charged in Count IV, First Degree Murder of Roland Wear.

So, again, Count IV charges First

PCR PD Anderson 004292

Degree Murder of Roland Wear.  You have two possible verdict forms, either guilty or not guilty.  If you are able to reach a verdict as to Count IV, you will sign the one verdict form that corresponds to your decision.

Next verdict form reads:  We, the jury duly empaneled and sworn in the above-entitled action, upon our oaths, do find:  The Defendant guilty Count V, Armed Robbery.

A signature line for the foreman to sign if all 12 of you agree that the State proved beyond a reasonable doubt that the Defendant committed the crime charged in Count V, Armed Robbery.

And the last verdict form reads:  We, the jury, duly empaneled and sworn in the above-entitled action, upon our oaths, do find:  The Defendant not guilty Count V, Armed Robbery.

A signature line for the foreman to sign if all 12 of you agree that the State failed to prove beyond a reasonable doubt that the Defendant committed the crime charged in Count V, Armed Robbery.

So again, as to Count V, which charges of Armed Robbery, you have two possible

106

verdict forms, either guilty or not guilty. If you are able to reach a verdict as to Count V, you will sign the one verdict form that corresponds to your decision.

Again, just to reiterate there are five separate counts of the indictment. Each count represents an allegation of a separate and distinct crime allegedly committed by the Defendant. That means that you have to make five separate decisions in this case.

You are going to find, perhaps, through the instructions, that there may be some relationship between some of these offenses, and that's because of the elements of some of the crimes that are charged.

But the fact remains that you have to make five separate decisions in this case, and you can reach different verdicts as to some of those charges. You can reach the same verdict as to all of those charges, whatever you feel is appropriate, based upon your understanding of the law.

And we still have all 14 of you here. I am very happy that none of you have become ill or had any sort of personal emergencies come up during the course of the trial. But we have two

PCR PD Anderson 004294

107

extra people, and we need to get rid of two of you.

So the clerk has written down all of your names on pieces of paper, and we will pull two of them out at this time.  And the people whose names are called will be designated as the alternates.

THE CLERK:  Delores Maldonado.

Stanley M. Koehler.

THE COURT:  All right.  Ms. Maldonado and Mr. Koehler, the two of you are hereby designated as alternates.  You are both going to be free to leave in just a minute.  Once you leave you still will not be allowed to discuss this case with anyone for a while.

The reason for that is that if, after you are excused, one of the other 12 people manage to get this far before having something go wrong and then has to be excused during the deliberations, what we will do is seek out one of you and bring you back and basically just send you back into the jury room and have the jury begin their deliberations all over again.  I have never had that happen yet, but I have heard of cases in which it has happened.  So as long as that remains a possibility, you cannot be discussing this case with anyone.

PCR PD Anderson 004295

108

If you are wondering, well, how will I know whether I can start talking about this case? Probably the easiest way to make that determination, if you want to be talking about the case, and you are not sure whether you can begin talking about it yet, would be to simply call up the courthouse and ask whether the Poyson jury is still deliberating. And until you have heard that they have been discharged, then you can't talk about the case.

As soon as you hear that they have been discharged then feel free to talk about the case. Of course, if you don't want to talk to anyone about the case then you don't really have to worry about this.

I want to thank you both very much for your participation in this case. I know that it's often a tremendous letdown to be designated as the alternate in a case because you have sat diligently throughout the entire trial, and every time you turn around I am telling you, don't think about the case, don't talk about the case, and you are finally at the point where you can start doing all these things that I have told you not to do, and I just tell you to leave because we don't really care about what you think about the case. And I

PCR PD Anderson 004296

109

understand that that can be kind of frustrating.

My feeling is that it is imperative that we have an alternate in every case. I have an alternate even in cases that are anticipated to last just a day because I have had cases in which people have become ill the first day of a trial, and actually not even come back after lunch, as hard as that might be to relate to. And I have had this happen where I have had to excuse people in dozens of cases before, and I think that it is an exercise of resources to have maybe one or two extra people kind of tag along during the trial just to make sure that if we lose someone we don't have to start the case over again.

So I thank you both very much for being here. You can leave your notebooks on your seat. We will secure them, and we won't do anything with them until we know for a fact that you are not going to be called back to deliberate.

You can leave your jurors' badges on your seat. Your checks will be sent to you in the mail at some point in time in the near future.

Again, I thank you both very much for being here, and you are both free to leave at this time.

PCR PD Anderson 004297

110

The bailiff will come forward to be sworn in.

(Albert Morphew is duly sworn as bailiff.)

THE COURT:  Ladies and gentlemen, let me explain to you what's going to happen next.  You will be going into the jury room in just a couple of moments here.  Once you get in there you should select a foreman and begin your deliberations.

If you have taken any notes during the trial, and you want to have access to them during your deliberations make sure that you take them with you.  If you have any personal effects, such as purses, or jackets or anything like that, I would ask that you take them with you just so that you will be in charge of them and not me.

Once you get into the jury room the bailiff will be bringing in to you the various exhibits which have been introduced into evidence in trial, you will be given six copies of the written instructions that I have just read to you, and he will be bringing in the 10 possible verdict forms.

I anticipate that we probably won't necessarily be sending in a tape player with the exhibits.  If during your deliberations you decide that you want a tape player so that you can listen

PCR PD Anderson 004298

111

to the tape which has been produced in evidence, just ask the bailiff, and we will round one up for you and send it in to you.

Once you retire into the jury room any communications that you will have with anyone other than yourself will be through the bailiff, who will be immediately outside the door to the jury room.  If you have any message that you want delivered to anyone during the course of your deliberations, let the bailiff know.

I don't know if you have led someone to believe that they are going to see you at some specific time.  And if it looks like you are not going to be able to see someone when you think they expect to see you, let us know, and we will call people up and tell them where you are and what you are doing.

I realize that it is the hour at which we have traditionally broken for lunch throughout this trial.  We are not going to break for lunch, just because I would like to use the time that we have available to the greatest advantage.

If during your deliberations you feel that lunch would be appropriate, let us know and we will provide lunch for you.  We will not send you

PCR PD Anderson 004299

112

out to lunch; we will go get lunch and bring it to you.  And it's a fast food type of favor that you are looking at, so you are probably not going to be likely to make a decision on lunch based upon getting a really good lunch out of this, but we will provide lunch to you, if you want it.

The only caveat that I will not entertain is a request for lunch until at least 1 o'clock, so you have to at least be out for an hour before I will give you lunch.

If you are deliberating in an hour that you feel dinner would be appropriate, let me know, and we will provide dinner for you.  We will even try to get your dinner from a different place than where we get your lunch, but it will be virtually indistinguishable.  I mean, if there is any of you that can tell the difference between Carl's Jr. and Burger King or Jack In The Box, you may appreciate the dinner is from a different place than lunch was.

And I also will not entertain a request for dinner until at least 6 o'clock.

I will normally let you deliberate as long as you want.  If you all are deliberating at some hour this afternoon and you decide that you

PCR PD Anderson 004300

113

would rather leave and come back tomorrow, and we assume in your deliberations you can make that decision at any time, as long as you pick a time to return that is agreeable to everyone.

I will normally allow you to deliberate as late into the evening as you want; however, I will not allow you to deliberate beyond 7:30 this evening.  Normally I would let you deliberate until 9 o'clock, but I have a commitment that I would like to honor tonight that I would have to be free by no later than 7:30.

By my comments I am not suggesting that I think that you will or it should take you a certain amount of time to reach a verdict in this case.  I am not even suggesting that I think you should reach a verdict in this case.

What I am trying to make sure that you understand is that I will allow you to conduct your deliberations in whatever way you want, with the only limitations being that we won't be deliberating or that you won't be deliberating beyond 7:30 tonight.

If you have any questions that come up during the course of your deliberations, questions that you want to address to me, as far as

PCR PD Anderson 004301

114

what the law is, or what you should be doing during your deliberations, or what positions you have, have the foreman write it out on a piece of paper, give it to the bailiff, and I will answer your questions as best I can.

Just to anticipate a question that I have received numerous times in the past, be aware that there is not a transcript that is being produced of this trial as we have been going along. You are going to have to rely upon your collective recollections as to what the evidence in this case has been, so don't send me out a note saying we want to review this witness's testimony or that witness's testimony. It is not available. You have to remember yourself what the evidence in this case has been.

And when and if you are able to reach a verdict in this case, let the bailiff know. We will bring you back into court, and we will find out what that verdict is. So at this time you should gather up your notes and any personal effects and leave with the bailiff.

The record will reflect that the jury has now left the courtroom.

Any Counsel have anything further to

115

place on the record at this time?

MR. SIPE:  No, Your Honor.

MR. CARLISLE:  No, Your Honor.

THE COURT:  All right.  Counsel, keep in touch.  I have no idea how long the deliberations are going to last.  I know I have a calendar this afternoon, and if there is anything going on with the jury that I need you to be here for, I am going to want to be able to get you here under relatively short notice, so just make sure that my secretary knows where you are going to be, if it is going to be somewhere other than your offices.

We will stand at recess.

(Recess 12:08 p.m. to 1:37 p.m.)

THE COURT:  This is a continuation of CR-96-865, State versus Robert Allen Poyson.

Show the presence of the Defendant, Counsel, and the presence of the jury panel.

And could I ask who the foreman is, please?

JURY FOREMAN McCLELLAND:  I am, Your Honor.

THE COURT:  Mr. McClelland, has the jury reached a verdict in this case?

JURY FOREMAN McCLELLAND:  We have.

PCR PD Anderson 004303

116

THE COURT:  Would you hand the verdict forms to the bailiff, please?

All right.  The clerk will read on the record the verdicts, omitting the captions.

THE CLERK:  We, the Jury duly empaneled and sworn in the above-entitled action, upon our oaths, do find:  The Defendant guilty Count I, Conspiracy to Commit First Degree Murder, Paul McClelland, Foreman.

We, the Jury duly empaneled and sworn in the above-entitled action, upon our oaths, do find:  The Defendant guilty Count II, First Degree Murder (Robert Delahunt).  Further, 12 members of the jury found that the State proved beyond a reasonable doubt that the Defendant committed premeditated First Degree Murder, Paul McClelland, foreman.

We, the jury duly empaneled and sworn in the above-entitled action, upon our oaths, do find:  The Defendant guilty Count III, First Degree Murder (Leta Kagen).  Further, 12 members of the jury found that the State proved beyond a reasonable doubt that the Defendant committed premeditated First Degree Murder, Paul McClelland, foreman.

We, the jury duly empaneled and sworn

117

in the above-entitled action, upon our oaths, do find:  The Defendant guilty Count IV, First Degree Murder (Roland Wear).  Further, 12 members of the jury found that the State proved beyond a reasonable doubt that the Defendant committed premeditated First Degree Murder, Paul McClelland, foreman.

We, the jury duly empaneled and sworn in the above-entitled action, upon our oaths, do find:  The Defendant guilty Count V, Armed Robbery, Paul McClelland, foreman.

THE COURT:  Do either counsel wish to have a jury polled?

MR. SIPE:  Yes, Your Honor.

THE COURT:  Ladies and gentlemen, the clerk is going to read the names of each of you individually.  After reading your names she is going to ask, are such your verdicts.  What we are asking at this time is whether you agree with each of the five verdicts that was just read, and also whether you agree that 12 of you made the decisions at this time, finding on the three First Degree Murder counts.

So if you agree with each of the five verdicts that were just read, when your name is called please answer yes.

PCR PD Anderson 004305

118

THE CLERK:  Paul McClelland, are such your verdicts?

JUROR McCLELLAND:  Yes.

THE CLERK:  Laura E. Woolsey, are such your verdicts?

JUROR WOOLSEY:  Yes.

THE CLERK:  James Poole, are such your verdicts?

JUROR POOLE:  Yes.

THE COURT:  Martin A. Prieto, are such your verdicts?

JUROR PRIETO:  Yes.

THE CLERK:  Jerome F. Schall, are such your verdicts?

JUROR SCHALL:  Yes.

THE CLERK:  William A. Provin, are such your verdicts?

JUROR PROVIN:  Yes.

THE CLERK:  John C. Colt, are such your verdicts?

JUROR COLT:  Yes.

THE CLERK:  Janice F. Stephenson, are such your verdicts?

JUROR STEPHENSON:  Yes.

THE CLERK:  Gay A. Jones, are such your

PCR PD Anderson 004306

119

verdicts?

JUROR JONES:  Yes.

THE CLERK:  Sandra L. Walters, are such your verdicts?

JUROR WALTERS:  Yes.

THE CLERK:  Alfred O. Thode, are such your verdicts?

JUROR THODE:  Yes.

THE CLERK:  Kaaren K. Little, are such your verdicts?

JUROR LITTLE:  Yes.

THE COURT:  Ladies and gentlemen, I would like to thank you very much for your participation in this case.  I know this was certainly not an easy case for anyone to have to be involved with, and I do thank you very much for the attention that you have given to the case.

Following your being excused you will be able to discuss the case with anyone, if you want to.  If you don't want to talk to anyone about the case you don't have to.  If anyone should persist in questioning you about the case over your objections, report it to me and I will take whatever action may be appropriate.

I understand that at least one of you

PCR PD Anderson 004307

120

inquired as to whether you could keep your juror's notes, and I have never had anyone ask me that before, but I can't think of any reason why you wouldn't be able to keep your notes. So if you want to keep your notes for some reason, feel free to do so, otherwise just leave your notebooks here, and we will collect them, and we will destroy any notes that you have taken.

Your checks will be sent to you in the mail.

The attorneys and the Defendant and I need to remain here and take care of some other business, so you are excused at this time. And, again, I thank you very much for your participation in this case, and you can leave your juror's badge on the seats.

The record will reflect that the jury has now left the courtroom.

Counsel, at this point what I would normally be inclined to do is to set this matter for a presentencing hearing with the understanding that the sentencing would probably be done on a date different from the presentence hearing. I think that the time frame that is contemplated by Rule 15.1(g) and Rule 15.2(g) contemplates that the

PCR PD Anderson 004308

121

hearing is set off at least 30 days, because there are things that have to be done within that time frame.

I am probably inclined to set this matter off for approximately 45 days, and to set it for a hearing starting at 9:30 in the morning, with the understanding that I would treat that for calendering purposes just as I would a trial, and we would continue the hearing until we were done.

Do either Counsel have or want any input on the scheduling, or do you have some different scheduling thoughts in mind?

MR. SIPE: Your Honor, I have no objection of you setting the hearing off for 45 days. You know, we have certainly done a lot of work in anticipation of this hearing already; However, it is hard to say whether we will be ready within 45 days or not, but we will do the best that we can to be ready during that time period. If not, we would request a continuance in writing, of course.

THE COURT: Mr. Carlisle, do you have any problem with 45 days?

MR. CARLISLE: No, Your Honor. I will be gone -- out of the state, actually out of the country, from May 2nd through May 8th, so I would

PCR PD Anderson 004309

122

prefer not to do it that week, obviously, but any other time would be fine.

THE COURT:  All right.  I think we were probably looking at setting it before then.

It is Ordered setting this matter for presentencing hearing beginning on Monday, April 20th, 1998, at 9:30 a.m.  And, again, I will assume that we will simply start on that day and continue until we are completed.  I am sure that sometime shortly before that hearing my secretary will be contacting you all just to get some idea as to how much time is anticipated to be used for that hearing.

And I realize we may very well be to the point where it is going to be primarily the defense that is going to be seeking to present evidence at this phase.

Counsel, it is always -- I understand that there are some -- not exactly controversy, but disputes in these cases as to whether a presentence report should be ordered.

It is my preference that a report be done because there are still two offenses in this case that are noncapital offenses, and there are two charges for which people can write letters, and the

PCR PD Anderson 004310

123

decision-making process on my part is going to be different from that involved in the capital cases.

I understand that there is an approach that realistically, and reasonably, says we don't get a presentence report because all you can do is receive information that may taint the finding as to the First Degree Murder charges.

Do either Counsel have any objection to my ordering and having prepared a presentence report in this case?

MR. SIPE:  I have no objection.

MR. CARLISLE:  No, Your Honor.

THE COURT:  It is Ordered directing the Mohave County Probation Department to prepare a written presentence report in this case.

It is Ordered directing the probation department to not address in any manner what they may feel to be an appropriate sentence on any of the charges in this case, and that specifically includes the First Degree Murder charges.

Mr. Poyson, someone from the probation department is going to be coming over to talk to you within the next few days.  They are going to be making a written report to me in this case which may contain information that I could

PCR PD Anderson 004311

124

treat as mitigation for the First Degree Murder charges. There is nothing about the presentence report that would be sufficient to gather and present to me any information that I could find as aggravating factors on the First Degree Murder charges.

And then I will also be receiving information that will help me to identify either aggravating or mitigating circumstances on the noncapital offenses for which you have been convicted.

If you have any question, in your mind, as far as whether you should talk to the probation department or cooperate with them, discuss that with your attorneys. I am certainly not going to be offended if you choose not to talk to them or to make any statements to them.

But if you have any question in your mind, or if you have any concerns about whether statements that you make to them could be used against you or could be to your detriment in the sentencing process, certainly discuss that with your attorneys.

Counsel, I haven't really looked through the file. Is the Defendant already being

125

held without bond?

MR. SIPE:  He is.

MR. CARLISLE:  Yes, Your Honor.

THE COURT:  It is Ordered affirming the prior order that the Defendant be held in custody without bond.

And, again, what I would tend to do is upon the completion of the presentence hearing, then set this matter for Judgment and Sentencing probably a week or so after that time.

Anything further at this time, Counsel?

MR. SIPE:  No.

MR. CARLISLE:  No, Your Honor.

THE COURT:  We will stand at recess.

The Defendant is remanded to the custody of the sheriff.

(Adjourned at 1:40 p.m.)

PCR PD Anderson 004313

126

CERTIFICATE OF REPORTER

I, Jeanett Cochrane, Registered Professional Reporter, Official Reporter in the Superior Court of the State of Arizona, in and for the County of Mohave, do hereby certify that I made a shorthand record of the proceedings had at the foregoing entitled cause at the time and place hereinbefore stated;

That said record is full, true and accurate;

That the same was thereafter transcribed under my direction; and

That the foregoing one hundred twenty-six (126) typewritten pages constitute a full, true and accurate transcript of said record, all to the best of my knowledge and ability.

Dated this 29th day of December, 1998.

_____

Jeanett Cochrane, RPR

PCR PD Anderson 004314