# EXHIBIT 23

# EXHIBIT 23

# Office of the Attorney General
## State of Arizona

# Capital Case Commission
## Final Report

## December 31, 2002

Janet Napolitano
Attorney General

# Table of Contents

Summary of Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.    Introduction to the Attorney General's Capital Case Commission . . . . . . . . . . . . . . . . . . . . . 1

    •    The Commission Membership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    Capital Punishment in Arizona . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    •    History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    •    The Capital Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    •    Trial Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        1.    Guilt Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        2.    Sentencing Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    •    Appeals Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        1.    Direct Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        2.    Post-Conviction Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        3.    Federal Habeas Corpus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    •    Execution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        1.    Competency to be Executed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        2.    Clemency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III.    Attorney General's Capital Case Commission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    •    The Subcommittees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        1.    Data Research Subcommittee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        2.    Pretrial Issues Subcommittee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        3.    Trial Issues Subcommittee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
        4.    Direct Appeal/PCR Subcommittee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    •    The Interim Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

IV.    Capital Case Commission Deliberations and Recommendations . . . . . . . . . . . . . . . . . . . . 14

    1.    Capital Litigation Resources Legislation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    2.    Audio or Video Recording of Interviews . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    3.    Minimum Age for Capital Punishment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    4.    Mental Retardation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    5.    Notice of Intent to Seek the Death Penalty Under Ariz. R. Crim. P. 15.1(g)(1) . . . . 16
    6.    Selection of Capital Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    7.    Competence of Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    8.    Legal and Judicial Education . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    9.    Mitigation Specialists . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

-ii-

10. Proposed Reforms to Rules 31 and 32 of the Arizona Rules of Criminal Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
11. Jury Deliberation in Capital Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
12. When a Peace Officer is Murdered . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
13. Victim Impact at Aggravation/Mitigation Hearings . . . . . . . . . . . . . . . . . . . . . . . . 21
14. Residual Doubt in Sentencing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
15. Clerks of Court and Court Reporters' Procedures . . . . . . . . . . . . . . . . . . . . . . . . . 22
16. File Repository . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
17. Competency to be Executed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
18. Maintaining Capital Case Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
19. Preservation of DNA Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
20. Use of F6 Aggravator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
21. Review of Capital Cases in Which Convictions Were Reversed, or Sentences Remanded or Modified by the Appellate Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
22. Race-neutral Decisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
23. Requests for a Moratorium on the Death Penalty in Arizona . . . . . . . . . . . . . . . . . 27

V. Comments by Commission Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

VI. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

# Summary of
# Attorney General Janet Napolitano's
# Capital Case Commission Recommendations

1.  *Statewide Capital Public Defender Office:* Create a statewide capital public defender office to represent capital defendants at the trial level in the rural counties and in statewide post-conviction relief proceedings.  Legislation that would establish such an office was defeated in the 2001 and 2002 State Legislative Sessions.   The Capital Case Commission deeply regrets that the Legislature did not address this need and urges the Legislature to pass legislation appropriating monies for capital litigation resources.

2.  *Audio/videotaping Interrogations and Confessions*: Urge law enforcement to audiotape or videotape all advice of rights, waiver of rights and questioning of suspects in all first-degree murder cases when feasible.  A protocol was drafted and presented to the Attorney General's Law Enforcement Advisory Board.  Although resource concerns were expressed, the Advisory Board concurred in sending the protocol to the Arizona Criminal Justice Commission for consideration.

3.  *Minimum Age*: Enact legislation that would make defendants under the age of 18 at the time of a crime ineligible for the death penalty.  Legislation introduced in the 2002 State Legislative Session failed.  It is anticipated that similar legislation will be reintroduced in the 2003 Regular Legislative Session.  (This recommendation was supported by a majority of the Commission, but was not a consensus recommendation.)

4.  *Mental Retardation*: Enact legislation that would (1) make mentally retarded defendants ineligible for the death penalty; and (2) require pre-trial mental retardation screening of all defendants facing the death penalty.  Legislation implementing this proposal was introduced in the 2001 Legislative Session and signed into law on April 26, 2001.

5.  *Death Penalty Notice*: Amend Rule 15.1(g)(1) of the Arizona Rules of Criminal Procedure to extend the time for filing the notice of intent to seek the death penalty to 60 days after arraignment to allow more reasoned deliberations regarding whether to seek the death penalty. Additional extensions of time would be available by stipulation of the parties and approval by the trial court. The Capital Case Commission's proposed change to Rule 15.1(g)(1) was adopted by the Arizona Supreme Court effective June 1, 2002.

6.  *Selection of Capital Cases*: Urge prosecutors to develop written policies regarding the identification of cases in which to seek the death penalty, including a provision to solicit or accept defense input before seeking the death penalty.  This recommendation will be submitted to the Arizona Prosecuting Attorneys' Advisory Council ("APAAC") for consideration.

-iii-

7.   *Competence of Defense Counsel*:  Amend Ethical Rule 1.1 to require all lawyers who represent capital defendants to comply with the standards set forth in Rule 6.8 of the Arizona Rules of Criminal Procedure (court-appointed counsel is already required to meet the experience and qualification standards set forth in Rule 6.8; the proposed rule would impose the same standards for privately-retained counsel).  Amend Ethical Rules 5.1, 5.2 and 5.3 to hold supervisors in public law offices responsible for supervising counsel appointed in capital cases and to ensure that subordinate attorneys' caseloads are such that they are able to render competent representation.  The Ethical Rule Review Group (ERRG) of the Arizona Bar Association recommended these changes.  As of the publication of this Report, public comment was pending.

8.   *Legal and Judicial Education*: Amend Rule 45(a) of the Rules of Arizona Supreme Court to (1) require attorneys to complete a minimum of six hours of continuing legal education in capital litigation, including ethical duties, within the preceding three years of being assigned a capital case; and (2) require judges to complete a minimum of six hours of continuing judicial education in capital litigation within the preceding three years of being assigned a capital case.  The Attorney General's Office will prepare a Petition to amend Rule 45(a) for submission to the Arizona Supreme Court on behalf of the Capital Case Commission.

9.   *Mitigation Specialists*: Amend Rule 15 of the Arizona Rules of Criminal Procedure to provide for the appointment of investigators and expert witnesses for indigent defendants.  The Capital Case Commission's proposed changes to Rule 15 were adopted with minor modifications by the Arizona Supreme Court effective June 1, 2002.

10.  *Considerations Regarding Requests for Extension of Time*: Amend Rules 31 and 32 of the Arizona Rules of Criminal Procedure to require courts to consider the rights of the victim and defendant to a prompt and final conclusion of the case when ruling on any request for extension of time.  The Capital Case Commission's proposed changes to Rules 31 and 32 were adopted by the Arizona Supreme Court effective June 1, 2002.

11.  *Jury Deliberations*: Oppose a Petition to Amend Rule 19.4 of the Arizona Rules of Criminal Procedure that would allow juries in criminal cases to deliberate the case before jury instructions are given by the court. The Attorney General's Office submitted comments opposing the Petition on behalf of the Capital Case Commission.  The Arizona Supreme Court denied the Petition to Amend Rule 19.4.

12.  *When a Peace Officer is Murdered*: Amend A.R.S. § 13–703(F)(10) to include the murder of an off-duty peace officer as an aggravating factor if the murder was motivated by the peace officer's status.  This recommendation was presented to the Attorney General's Law Enforcement Advisory Board, but the Board declined to pursue the recommendation at this time.

-iv-

13.    *Victim Impact at Aggravation/Mitigation Hearings*: Amend Rule 26.3 of the Arizona Rules of Criminal Procedure, the Comment, and Supreme Court Administrative Order 94–16 to provide that a sentence is not imposed in a capital case until seven days after a sentencing hearing at which the court considers aggravating and mitigating factors, the victim's family is given an opportunity to present information, and the defendant is allowed to present allocution. The Capital Case Commission's proposed changes to Rule 26.3 were adopted by the Arizona Supreme Court effective June 1, 2002.  That change, however, became inapplicable with the enactment of Arizona's new jury-sentencing statute in August 2002.

14.    *Residual Doubt in Sentencing*: Oppose adding residual doubt to Arizona's list of statutory mitigators found in A.R.S. § 13–703(G), acknowledging that trial judges have the authority to consider the strength of the government's case in determining the appropriate sentence. (Non-consensus recommendation.)

15.    *Clerks of Court and Court Reporters' Procedures:* (1) Amend Rule 31.9 of the Arizona Rules of Criminal Procedure to require clerks of court to notify all court reporters in capital cases within ten days of the filing of the notice of appeal to submit all transcripts to the Clerk of the Supreme Court; (2) require trial judges to order transcription of all trial proceedings and the gathering of the record on appeal in every first-degree murder case at the time the guilty verdict is returned; and (3) require  superior court clerks to enter a docketing code on all criminal calendars identifying cases in which the death penalty is sought.   The Commission's recommended changes were adopted by the Arizona Supreme Court effective June 1, 2002.

16.    *File Repository*: Create a repository in each county for all trial and appellate defense files in all capital cases so that post-conviction relief counsel can readily access files from a single location.  Additional discussion is needed with court administrators, prosecutors and defense counsel to implement this recommendation.

17.    *Competency to be Executed*: Commute death sentences to the maximum lawful sentence possible upon finding that the defendant has become incompetent to be executed after the issuance of a death warrant.  Legislation was introduced during the 2002 State Legislative Session, but failed.  It is anticipated that similar legislation will be reintroduced in the 2003 Regular Legislative Session.  (Non-consensus recommendation.)

18.    *Maintain Capital Case Data*: (1) Amend data collection procedures at superior courts, prosecuting attorneys' offices and at the Attorney General's Office to better capture descriptive data about defendants, victims and the death penalty process; and (2) establish a mechanism that will allow the Attorney General's Office to maintain Data Set I, and the Center for Urban Inquiry, College of Public Programs at Arizona State University to maintain Data Set II.   A subgroup of the Data/Research Subcommittee will continue to deliberate and develop processes and protocols to implement these recommendations.

19.    *Preservation of DNA Evidence*: Encourage that legislation be enacted that would require the preservation of all biological materials found at the scene of all unsolved homicides and in all capital cases until such time as a defendant can be provided an opportunity to request DNA testing of that evidence.  The Attorney General's Law Enforcement Advisory Board expressed concerns regarding a lack of resources to implement this proposal, but did not oppose the recommendation.   (Non-consensus recommendation.)

20.    *Use of the F6 Aggravator*: Encourage further study of the use of the A.R.S. § 13–703(F)(6) aggravating factor that a murder was committed in an especially cruel, heinous or depraved manner.  Concerns raised during Commission discussions were that the aggravator is overused and is vague.  Opposition to changing the F6 aggravator was based on a belief that this is an important aggravator in determining which cases stand out as being above the norm of first-degree murders, and the current terms are relatively well defined by case law. (Non-consensus recommendation.)

21.    *Race-Neutral Decisions*: Encourage all participants in the criminal justice system to promote practices that ensure race-neutral decisions, and encourage the use of the empirical data from Data Sets I and II in internal reviews and discussions regarding the death penalty process.

-vi-

# I. Introduction

In recent years, events across the country have raised the public's awareness of the death penalty and its administration. Since January, 1999, Arizona has executed 10 inmates and 117 prisoners are currently on Arizona's death row. Recognizing the need for a comprehensive study of the death penalty process in Arizona, Attorney General Janet Napolitano formed the Attorney General's Capital Case Commission in the summer of 2000 to study key issues and make recommendations to try to ensure that the death penalty process in Arizona is just, timely, and fair to defendants and victims. This Commission was not charged with and did not consider whether a moratorium or abolition of the death penalty was warranted.

## Commission Membership

The Capital Case Commission brought together persons with varied experience and distinct perspectives regarding the capital case pre-trial, trial, sentencing and appeal processes. Commission members include prosecutors, defense attorneys, trial and appellate judges, victims' rights advocates, citizens, and members of the Arizona Legislature. Members did not always agree, but were steadfast in their deliberations to overcome differences in an effort to reach consensus on issues. Commission members include:

The Hon. Janet Napolitano
Arizona Attorney General,
Chair

Mr. Paul Ahler
Maricopa County Attorney's
Office

Mr. Paul Babbitt
Coconino County Board of
Supervisors

Dr. Peg Bortner
Center for Urban Inquiry,
College of Public Programs
Arizona State University

Mr. James Bush
Fennemore Craig

Mr. Jose Cardenas
Lewis and Roca LLP

Hon. David R. Cole
Maricopa County Superior
Court Judge

The Hon. Steven Conn
Mohave County Superior
Court Judge

Sen. Chris Cummiskey
Arizona State Senate

Hon. Stanley G. Feldman
Arizona Supreme Court Justice

Mr. Jaime Gutierrez
Former Arizona State Senator

Mr. Charles Hastings
Yavapai County Attorney's
Office

Mr. Harold Higgins
Pima County Assistant Public
Defender

Sen. Marilyn Jarrett
Arizona State Senate

Mr. Christopher Johns
Maricopa County Deputy
Public Defender - Appeals
Division

Hon. Cindy Jorgenson
U.S. District Court Judge for
the State of Arizona

Mr. Michael Kimerer
Kimerer & LaVelle

Mr. Charles Krull
Maricopa County Deputy
Public Defender - Appeals
Division

Mr. Thomas LeClaire
Snell & Wilmer LLP

Ms. Gail Leland
Director, Homicide Survivors

Rep. John Loredo
Arizona House of
Representatives

Hon. James Moeller
Former Arizona Supreme
Court Justice

Ms. Patricia Orozco
Yuma County Attorney

Hon. Michael D. Ryan
Arizona Supreme Court Justice

Senator Tom Smith
Arizona State Senate

Mr. Lee Stein
Fennemore Craig

Mr. John Stookey
Osborn Maledon PA

Mr. Steven Twist
Viad Corporation.

Mr. Rick A. Unklesbay
Pima County Attorney's Office

George Weisz
Executive Assistant to the
Governor

Ms. Lois Yankowski
Pima Cty Assistant Legal
Defender, Appeals Section

The Commission acknowledges the following dedicated staff members from the Arizona Attorney General's Office who participated in Commission discussions and assisted in preparing this Report: Dennis Burke, Kent Cattani, Patrick Cunningham, Timothy Geiger, Michael Haener, Diane Saunders, and Pati Urias.

A Data/Research Subcommittee was the first of four subcommittees formed and was charged with compiling empirical data relating to the death penalty process. A Pre-Trial Issues Subcommittee, a Trial Issues Subcommittee and a Direct Appeal/PCR Subcommittee were each charged with analyzing issues relevant to the various stages of the death penalty process and to make recommendations to the Commission.

The Data/Research Committee, chaired by Dr. Peg Bortner, Director of the College of Public Programs' Center for Urban Inquiry at Arizona State University, prepared two data sets relating to the death penalty process in Arizona. Data Set I (Attachment "B") provides a statistical analysis of all cases in which a defendant was sentenced to death between 1974 and July 1, 2000. Data Set II (Attachment "C") offers a comparative analysis between capital cases charged between January 1, 1995, and December 31, 1999, and non-capital first-degree murder cases charged during that same period. The Attorney General commissioned a third study (Attachment "D") to attempt to estimate the incremental additional costs of prosecuting, defending and appealing a capital murder case compared to those in a non-capital murder case.

In March 2001, the Commission released an Interim Report (Attachment "A") detailing the deliberations of the subcommittees. After 24 months of study, the Commission releases this Final Report. The report includes Commission recommendations to improve the fairness and timeliness of the death penalty system, and the data studies described above. The report also includes Comments submitted by individual members of the Commission.

Many of the Commission recommendations were unanimously endorsed by members of the Commission. Other recommendations reflect a majority view, acknowledging strong differences of opinion on various issues. Some of the recommendations have already been put into place through legislation or through the rule-making process. Other recommendations have been rejected because of state budgetary or other concerns, and a few recommendations were rendered inapplicable when Arizona's death penalty statute was changed to provide for jury sentencing in capital cases. The change to jury sentencing resulted from a 2002 decision by the United States Supreme Court in *Ring v. Arizona*, 122 S. Ct. 2428 (2002), in which the Court held that a defendant in a capital case has a Sixth Amendment right to a jury determination of aggravating circumstances that make the defendant eligible for the death penalty. The Arizona Legislature enacted the new death penalty statute (Attachment "E") in an emergency session in August 2002. The new statute significantly changes the landscape of the capital litigation process in Arizona. Additional study and analysis will be required as the change is implemented across the state.

# II.  Capital Punishment in Arizona

## History

In *Furman v. Georgia,* 408 U.S. 238 (1972), the United States Supreme Court held that the death penalty as administered violated the United States Constitution Eighth Amendment prohibition against cruel and unusual punishment. A majority of the court found that the sentencing authority was not adequately guided in its discretion when imposing the death penalty, resulting in the death penalty being meted out in "arbitrary and capricious" ways. The decision effectively declared death penalty laws in 32 states unconstitutional and removed over six hundred prisoners from death rows around the country, including Arizona.

The following year, the Arizona Legislature enacted A.R.S. § 13–454, setting forth a new procedure for death penalty cases. The new statute provided for a separate sentencing hearing to be held before the trial court, rather than a jury, and enumerated six aggravating circumstances that could be considered in deciding whether to impose a death sentence: (1) prior conviction for which a sentence of life imprisonment or death was imposable; (2) prior serious offense involving the use or threat of violence; (3) grave risk of death to others; (4) procurement of murder by payment or promise of payment; (5) commission of murder for pecuniary gain; and (6) murder committed in an especially heinous, cruel or depraved manner. The Legislature subsequently added the following aggravating circumstances: (7) murder committed while in custody (effective Oct. 1, 1978); (8) multiple homicides (effective Sept. 1, 1984); (9) murder of a victim under 15 years of age (effective May 16, 1985) or of a victim 70 years of age or older (effective July 17, 1993); and (10) murder of a law enforcement officer (effective Sept. 30, 1988).

The State was then required to prove at least one of these aggravating circumstances beyond a reasonable doubt before the court could consider imposing the death penalty. If the State proved at least one of the aggravating circumstances, the defense was permitted to try to establish one of four statutory mitigating circumstances that were enacted in 1973: (a) the defendant's capacity to appreciate the wrongfulness of his conduct was impaired; (b) the defendant was under unusual and substantial duress; (c) the defendant's

participation in the crime was minor; or (d) the defendant could not reasonably foresee that his conduct would cause the death of another person. The court was then required to issue a special verdict setting forth its findings as to the existence or nonexistence of each of the circumstances set forth in the statute. The trial court then weighed the proven aggravating and mitigating circumstances and sentenced the defendant to death if the mitigation did not outweigh the proven aggravation.

In 1976, the United States Supreme Court decided three landmark cases relating to the constitutionality of post-*Furman* death penalty statutes. In *Gregg v. Georgia,* 428 U.S. 153 (1976)*,* the Court upheld Georgia's new statute which included statutory aggravating circumstances and required specific findings as to the circumstances of the crime and the character of the defendant. The Court also found that the new Georgia statute provided the sentencer with "adequate information and guidance." In *Woodson v. North Carolina,* 428 U.S. 280 (1976), the Court rejected North Carolina's mandatory imposition of the death penalty for any first-degree murder convictions. The Court found that the imposition of a mandatory death sentence without consideration of the circumstances of the crime and the character and record of the defendant violated the Eighth Amendment's proscription against cruel and unusual punishment. However, the United States Supreme Court rejected the argument that the death penalty was *per se* cruel and unusual punishment in *Proffitt v. Florida,* 428 U.S. 242 (1976)*.* In *Proffitt,* the Court held that the aggravating factor "especially heinous, atrocious or cruel" was valid as applied, upheld Florida's statutory procedures that required the consideration of specific aggravating and mitigating factors by the court, and the imposition of the death penalty only when aggravating factors outweigh mitigating factors. The Arizona death penalty statute, which provided for a procedure similar to that in Florida (separate guilt and penalty phases of the capital trial) was upheld as constitutional by the Arizona Supreme Court in 1976 in *State v. Richmond,* 114 Ariz. 186, 560 P.2d. 41 (1976).

In *State v. Bishop,* 118 Ariz. 263, 576 P.2d 122 (1978), the Arizona Supreme Court construed the list of mitigating circumstances enumerated in A.R.S. § 13–703(G) to be exclusive. Shortly after the *Bishop* decision, the Ohio statutory scheme limiting the presentation of mitigation was found to be improper by the United States Supreme Court in *Lockett v. Ohio,* 438 U.S. 586 (1978). The Court held that the Eighth and Fourteenth Amendments require that the sentencer not be precluded from considering as mitigation any aspect of the defendant's character or record, and any circumstance of the offense argued by the defendant as mitigating the sentence to less than death. Consequently, the Arizona Supreme Court in *State v. Watson,* 120 Ariz. 441, 586 P.2d. 1253 (1978), held Arizona's death penalty statute unconstitutional because of its limitation on the presentation of mitigation. However, the Court found that the unconstitutional portion of the statute was severable from the constitutional portion, and the Court remanded the case to allow the defendant to present any circumstance showing why the death penalty should not be imposed. After the Court's decision in *Watson,* all prisoners on death row were remanded for new sentencing hearings to allow presentation of any evidence tending to mitigate the sentence as described in *Lockett*.

In 1979, following the Arizona Supreme Court's decision in *Watson*, the Arizona legislature amended A.R.S. § 13–703(G) to allow either the State or the defendant to introduce into evidence any factor relevant in determining whether to impose a sentence less than death. In 1993, A.R.S. § 13–703(A) was amended to provide for a sentence of natural life, as an alternative to life imprisonment with the opportunity for parole after 25 years in prison.

In *Adamson v. Ricketts,* 865 F.2d 1011 (9th Cir. 1988), the United States Court of Appeals for the Ninth Circuit ruled that the Arizona death penalty statute was unconstitutional as imposed. The court's ruling was based on a denial of the defendant's right to jury sentencing, the arbitrariness of the aggravating circumstance of "especially heinous, cruel or depraved," the limitation on the sentencing court's consideration of mitigating circumstances, and the statutory presumption of death. The United States Supreme Court denied *certiorari* in *Adamson*, but granted review in *Walton v. Arizona,* 497 U.S. 639 (1990), to address similar issues. In *Walton,* the Court upheld Arizona's death penalty statute and specifically ruled that a judge, rather than a jury, can find aggravating circumstances and that the "especially heinous, cruel or depraved" circumstance provided sufficient guidance to satisfy the Eighth and Fourteenth Amendments.

In *Ring v. Arizona*,  122 S. Ct. 2428 (2002), the United States Supreme Court overruled *Walton* to the extent that it authorized a judge, rather than a jury, to determine aggravating circumstances that subject the defendant to the death penalty. In response to *Ring*, the Arizona legislature enacted a new death penalty sentencing statute (Attachment "E") that provides for jury sentencing in capital cases.

## The Capital Case

In Arizona, the death penalty may only be imposed for first-degree premeditated or felony murder. The prosecuting agency handling the case must, within sixty days of the arraignment of the defendant, file a notice of intent to seek the death penalty under Rule 15.1(g)(1) of the Arizona Rules of Criminal Procedure.

In determining whether to seek the death penalty the prosecutor may weigh many factors in addition to statutory mitigating factors enumerated in A.R.S. § 13–703(G). The prosecutor may also consider non-statutory mitigation information offered by the defendant, his family or his counsel, and information offered by the victim's family.

## Trial Process

Although capital murder trials are similar to any other felony trial, there are some distinct differences. The trial of a capital case is divided into two separate proceedings. The first is the guilt phase of the trial, at which the prosecutor presents factual evidence as to the defendant's guilt for the murder. The second phase is the sentencing proceeding, at which statutory aggravating circumstances is required to be proved beyond a reasonable doubt. If that requirement is met, the aggravating circumstances are weighed against any mitigation evidence proffered on the defendant's behalf.

### Guilt Phase

Once the prosecuting agency has filed the notice of intent to seek the death penalty, the defendant is assigned a second defense counsel under Rule 6.2 of the Arizona Rules of Criminal Procedure. Only attorneys meeting the heightened experience and skill standard set forth in Rule 6.8 of the Arizona Rules of Criminal Procedure can be appointed to represent a defendant in  a capital case. However, the defendant is free to retain counsel of his own choosing.

In a capital trial, jurors may be "death qualified." This refers to the process of questioning prospective jurors on their views of the death penalty and their ability to follow the trial court's instructions in light of those views. In this process, jurors may be removed for cause if their opposition to the death penalty will not allow them to apply the law or view the facts impartially. Jurors who are opposed to the death penalty will not be removed for cause if they avow that they will conscientiously apply the law to the facts of the case.

Once the capital murder trial has begun, it proceeds much like any other first-degree murder trial. The rules of criminal procedure and the rules of evidence apply in the same way they do in all other criminal trials.

### Sentencing Phase

Prior to August, 2002, sentencing was handled entirely by the trial judge without jury input. The prosecutor presented evidence regarding statutory aggravating circumstances and the defense presented evidence of mitigating circumstances. (The prosecutor could also present evidence of mitigation.) The trial court was also permitted to consider "victim impact" evidence. At the conclusion of the evidence, the trial judge issued a Special Verdict, detailing findings regarding aggravating and mitigating circumstances, and setting forth the sentence to be imposed.

With the enactment of Arizona's new death penalty statute, the sentencing process now has two phases. In the first phase, the prosecutor presents evidence relating to aggravating circumstances. If the jury determines that the State has not established at least one statutory aggravating circumstance, the defendant is no longer subject to the death penalty. The jury is dismissed and the trial judge decides the appropriate sentence. If the jury finds that there is at least one aggravating circumstance, the jury remains empaneled and considers any mitigating evidence presented by the defense or by the State, as well as victim impact evidence. The jurors then decide whether to impose a death sentence, assessing whether the proffered mitigation is sufficiently substantial to warrant leniency.

## Appeals Process

### Direct Appeal

Death penalty cases are automatically appealed to the Arizona Supreme Court. Prior to the enactment of Arizona's new death penalty sentencing statute, the Court independently reviewed the propriety of the death sentence. Under the new statute, the Arizona Supreme Court reviews the conviction and sentence for error, but does not independently determine whether to impose a death sentence.

Prior to *State v. White,* 168 Ariz. 500, 815 P.2d. 869 (1991), the Arizona Supreme Court engaged in a proportionality review of each case to determine whether the death penalty was excessive or disproportionate. This review is not constitutionally required and the Court no longer conducts such a review.

To the extent that the ruling of the Arizona Supreme Court addresses a federal constitutional issue, either of the parties can appeal a decision of that court directly to the United States Supreme Court by petitioning for a writ of certiorari.

### Post-Conviction Relief

Immediately following the final conclusion of the direct appeal to the Arizona Supreme Court, post-conviction relief (PCR) proceedings are initiated in the trial court. Post-conviction relief proceedings allow the defendant to raise claims relating primarily to whether: (1) trial counsel provided effective representation during the trial and sentencing hearing; (2) there is "newly-discovered" evidence that would have changed the verdict or sentence had it been presented at the time of trial; and (3) a change in the law that applies retroactively would probably change the conviction or sentence.

The trial court's decision on the post-conviction relief claims can be appealed to the Arizona Supreme Court by either party, and the parties may file a petition for writ of certiorari requesting the United States Supreme Court to review the decision of the Arizona Supreme Court.

### Federal Habeas Corpus

Under 28 U.S.C. § 2254, a state prisoner may seek relief in federal district court on claims that his federal constitutional rights were violated at trial or at sentencing. A federal constitutional claim may only be raised in federal court if it has first been raised in a procedurally appropriate manner in state court. During the federal habeas corpus proceeding, the federal court decides if the state court ruling conflicts with controlling United States Supreme Court authority.

If the prisoner's claim was not properly presented in state court, he can still pursue the claim in federal court if he establishes "cause and prejudice" for his failure to present the claim in state court or that failure to consider the claim would result in a "fundamental miscarriage of justice," based on actual innocence or ineligibility for the death penalty.

The decision of the United States District Court may be appealed by either party. The appeal from the United States District Court is taken to the United States Court of Appeals for the Ninth Circuit, and the parties may seek review of the decision of that court by filing a petition for writ of certiorari with the United States Supreme Court.

## Execution

The initial warrant of execution is issued by the Arizona Supreme Court to the Director of the Department of Corrections after the Court has affirmed the death sentence and either the first PCR proceeding is concluded or the period of time to file the PCR petition has expired. The warrant designates a twenty-four hour period for execution of the sentence between thirty-five and sixty days following the issuance of the warrant. If the initial warrant is stayed by any court, the Arizona Supreme Court is required to issue a subsequent warrant upon the State's request after the stay is lifted. Stays of execution will not be issued upon the filing of subsequent PCR petitions, except upon separate application for a stay made to the Arizona Supreme Court. The separate application must set forth particular issues appropriate for a successive PCR petition.

In 1992, a constitutional amendment was passed by Arizona voters changing the method of execution from lethal gas to lethal injection. Prisoners sentenced before November 23, 1992, have the choice of either lethal gas or lethal injection.

### Competency to be Executed

In Arizona, a prisoner is not subject to execution if found to be mentally incompetent or pregnant. A prisoner is not competent to be executed unless the prisoner understands that (1) he/she is being punished for murder, and (2) the punishment is death.

If the court finds that the prisoner is incompetent, he/she remains in the custody of the Department of Corrections until the Arizona Supreme Court reviews the trial court's finding. If the supreme court upholds the finding of the trial court, the prisoner is transferred to a licensed behavioral health or mental health facility operated by the Department of Corrections for competency restoration treatment. While the prisoner is being treated, the sentence is suspended.

The Department of Health Services is responsible for the restoration of competency treatment of the prisoner. During treatment, the chief medical officer of the State Hospital is required to file status reports with the superior court at sixty-day intervals until competency is restored. When the Department of Health Services believed the prisoner has been restored to competency, the prisoner is entitled to a hearing in the trial court to address the competency issue. Once there is a finding that the prisoner has been restored to competency, the Arizona Supreme Court orders the issuance of a death warrant.

### Clemency

The Arizona Board of Executive Clemency is a five member panel appointed by the governor and confirmed by the State Senate. The Board reviews all death sentences and determines whether to recommend to the governor reprieve, commutation or pardon, or to make no recommendation at all. The Board conducts a hearing in which the defendant and his attorney, the State's attorneys, and the victim's family and friends, as well as the public, are allowed to participate and provide statements regarding the prisoner and the crime.

If the Board recommends reprieve, commutation or pardon, the governor then has constitutional authority to grant the recommended relief to the prisoner. The governor may only take such action upon a recommendation by the Board.

# III.  Attorney General's Capital Case Commission

The Arizona Attorney General's Capital Case Commission was charged with reviewing the capital punishment process in Arizona in its entirety to ensure that it works in a fair, timely and orderly manner. To that end, the Commission examined the system beginning with the pre-trial process, and continuing through the trial process and the completion of the appellate process.

The Capital Case Commission was designed to encourage full debate and to enable the subcommittees of the Commission to work through the intricacies of death penalty litigation in Arizona. Commission meetings were held between September 2000 and July 2002. All Commission and subcommittee meetings were open to the public, and members of the public were allowed to speak and present written materials for consideration.

## The Subcommittees

## Data/Research Subcommittee:

**Commission Members:**
Peg Bortner, Chair, Center for Urban Inquiry, Arizona State University
Janet Napolitano, Arizona Attorney General
Michael D. Ryan, Arizona Supreme Court Justice
John A. Stookey, Osborn Maledon
Rick A. Unklesbay, Pima County Attorney's Office

**Other Participants:**
Paul Ahler, Maricopa County Attorney's Office
Dennis Burke, Attorney General's Office
Kent Cattani, Attorney General's Office
Patrick Cunningham, Attorney General's Office
Noel Dessaint, Arizona Supreme Court Clerk
Daryl Fischer, Arizona Department of Corrections
Timothy Geiger, Attorney General's Office
Donna Hallam, Arizona Supreme Court Staff Attorney
Paul McMurdie, Maricopa County Attorney's Office
Diane Saunders, Attorney General's Office

At the inception of the Capital Case Commission, the Data/Research Subcommittee was established to work in consultation with the Center for Urban Inquiry, College of Public Programs at Arizona State University to compile empirical data about the death penalty process in Arizona. The Subcommittee provided available information to the Capital Case Commission, responded to Commission requests for relevant information, maintained a record of research projects suggested by Commission deliberations, assessed the feasibility of further research, and assisted in the preparation of Commission recommendations.

Dr. Peg Bortner, Director of the Center for Urban Inquiry at Arizona State University, chaired the Data/Research Subcommittee for the Commission and designed research methods for the study of Arizona's capital cases in Data Sets I and II.  The  work on Data Sets I and II was  performed through services provided without charge by Dr. Bortner, Dr. Andy Hall, and their colleagues at the Center for Urban Inquiry.  The Attorney General and the Commission are deeply grateful for these services.

The Data/Research Subcommittee began meeting in the summer of 2000, and devised three areas of empirical research to be completed:

- Data Set I examines the characteristics of the 230 Arizona death penalty cases from 1974 through July 1, 2000 and focuses on:

    < the number and type of aggravating and mitigating factors found to exist by sentencing judges;
    < the number and type of conviction and sentence related remands, reversals or modifications in the appellate process of the cases;
    < case outcomes;
    < time intervals for key junctures in the sentencing and appellate process; and
    < defendant and victim profiles, including relationships between victims and defendants, and group characteristics such as age, race/ethnicity, gender, and county of residence.

    The Center for Urban Inquiry produced a Report to the Commission on Data Set I entitled "Summary of Death Sentence Process: Data Set I Research Report to Arizona Capital Case Commission, March 2001," (Attachment "B").  The Data/Research Subcommittee also made recommendations which, if implemented, would better capture this same data in the future in superior court clerks' offices, prosecuting attorneys' offices and within the Office of the Attorney General.   The Attorney General's Office intends to keep Data Set I updated.

- Data Set II is the study of all first-degree murder cases charged during a five-year period, January 1, 1995 through December 31, 1999 in all 15 counties and focuses on:

    < indictments and sentencing;
    < time intervals;
    < co-defendants' characteristics; and
    < defendants' characteristics.

    In a randomly-selected 62 percent of those cases, research was sought on:

    < prior criminal record;
    < type of defense counsel;
    < mental/behavioral health issues; and
    < victim characteristics.

Data Set II follows the paths taken in first-degree murder cases. It displays all indictments over that five-year period, cases where death was noticed, the number of cases that went to trial, the cases that resulted in convictions, and of those, the cases where the death sentence was imposed.

The Center for Urban Inquiry produced a Report to the Commission on Data Set II entitled "Summary of First-degree Murder Cases, 1995-1999: Data Set II Research Report to Arizona Capital Case Commission" (Attachment "C"). The Data/Research Subcommittee also made recommendations which, if implemented, would better ensure that this same data is captured in the future in superior court clerks' offices, prosecuting attorneys' offices, and within the Office of the Attorney General. The Center for Urban Inquiry intends to keep Data Set II current.

- Data Set III was conducted by Dr. Linda Williams of The Williams Institute under contract with the Office of the Attorney General. It is a smaller exploratory study of 30 cases and is an attempt to estimate the incremental costs of first-degree murder cases where the death penalty was sought and not sought. The study attempted to capture the following activities in each of the 30 cases:

  < the number of pretrial/trial motions filed and Arizona Superior Court minute entries recorded;
  < the number and cost of trial-related psychiatric/medical evaluations and exams;
  < the number and cost of trial-related special investigators;
  < the length and cost of jury trial;
  < the length and cost of aggravation/mitigation hearings;
  < the length of time from indictment to sentencing;
  < the cost of trial preparation/trial hours expended by defense and county attorneys; and
  < some specific state and county costs associated with appeals.

  Research concluded that only a portion of the data sought was available. Due to the small sample size, concerns were raised as to the "skewness" of the statistics. The habeas stage prosecution costs are not included. And, with the exception of costs associated with housing defendants from indictment to sentencing, the report does not reflect the costs of incarceration. Defendants who were charged with capital murder but ultimately sentenced to life imprisonment or a term of years are not captured in this study. With these disclaimers, the study, entitled "Case Study on State and County Costs Associated with Capital Adjudication in Arizona: Data Set III Research Report to Arizona Capital Case Commission" is included as Attachment "D."

  The Data/Research Subcommittee recommends that mechanisms for more accurately capturing cost data be implemented and further study be conducted on a larger sample of cases.

## Pre-Trial Issues Subcommittee:

Thomas L. LeClaire, Chair, Snell & Wilmer LLP
Paul W. Ahler, Maricopa County Attorney's Office
James M. Bush, Fennemore Craig
Jose Cardenas, Lewis and Roca LLP
Harold L. Higgins, Jr., Pima County Assistant Public Defender

Cindy K. Jorgenson, U.S. District Court for the State of Arizona
John A. Loredo. Arizona House of Representatives
Patricia A. Orozco, Yuma County Attorney
Lee Stein, Fennemore Craig
George Weisz, Executive Assistant to the Governor

**Issues Before the Pre-Trial Issues Subcommittee:**

1. How prosecutors identify cases in which to seek the death penalty
2. The statutory scheme of aggravating circumstances that define which defendants are death eligible
3. The minimum age for imposing the death penalty
4. The issue of mental retardation as it applies to eligibility for the death penalty
5. Residual doubt as a mitigating factor
6. Time lines for filing a notice of intent to seek the death penalty

## Trial Issues Subcommittee:

David R. Cole, Chair, Maricopa County Superior Court Judge
Steven F. Conn, Mohave County Superior Court Judge
Jaime Gutierrez, Former Arizona State Senator
Charles R. Hastings, Former Yavapai County Attorney
Marilyn Jarrett, Arizona Senator
Christopher Johns, Maricopa County Deputy Public Defender
Michael D. Kimerer, Kimerer & LaVelle
Gail Leland, Director, Homicide Survivors
John A. Stookey, Osborn Maledon PA
Rick A. Unklesbay, Pima County Attorney's Office

**Issues Before the Trial Issues Subcommittee**:

1. Trial defense attorney competence
2. Time lines for disclosure of intent to seek the death penalty
3. Conduct of an aggravation/mitigation hearing and death penalty sentencing
4. The use of mitigation experts in preparation of the defense case
5. The need for adequate trial defense attorneys for indigent defendants in Arizona
6. The issue of delay in investigating and trying a capital case in the trial courts

## Direct Appeal/PCR Subcommittee:

Michael D. Ryan, Chair, Arizona Supreme Court Justice
Paul J. Babbitt, Jr., Coconino County Board of Supervisors
Peg Bortner, Center for Urban Inquiry, Arizona State University
Chris Cummiskey, Arizona State Senate
Stanley G. Feldman, Arizona Supreme Court Justice
Charles Krull, Maricopa County Deputy Public Defender

James Moeller, Former Arizona Supreme Court Justice
Tom Smith, Arizona State Senate
Steven J. Twist, Viad Corporation
Lois Yankowski, Pima County Assistant Legal Defender

**Issues Before the Direct Appeal/PCR Subcommittee:**

1.    Qualifications for an appellate defense attorney
2.    The need to provide an adequate number of attorneys to handle PCR proceedings in Arizona capital cases
3.    The long time intervals in processing capital appeals in Arizona
4.    The need for a trial and appellate public defender office in Arizona
5.    Ariz. R. Crim. P. 32 governing PCR proceedings
6.    Whether Arizona needs to change its procedures to be able to "opt in" under the Federal Anti-Terrorism and Effective Death Penalty Act of 1996

## The Interim Report

On July 30, 2001, the Capital Case Commission produced an Interim Report (Attachment "A") that provided a summary of the issues and detailed the deliberations and recommendations returned by the subcommittees and the Commission.  The Interim Report offers more detail on subcommittee deliberations than is contained in this Final Report.

# IV.  Capital Case Commission Deliberations and Recommendations

## 1.    Capital Litigation Resources Legislation

In 2001, eight capital cases were being delayed at the post-conviction relief ("PCR") stage because no qualified lawyers were available to represent the defendants.  Some of those defendants had been waiting for over 18 months for a lawyer to be appointed to represent them at the PCR stage, which must be completed before a defendant pursues the final layer of appeals in federal court.  Exhibit 28 of the Data Set I Research Report (Attachment "B") shows time intervals for the PCR process.    Upon the recommendation of the Direct Appeal/PCR Subcommittee, the Commission initially endorsed draft legislation that would create a statewide capital public defender office to represent indigent capital defendants in post-conviction relief proceedings.

At a subsequent meeting, the Commission considered information provided by the defense bar, trial judges, and prosecutors regarding the need for a statewide public defender office for capital cases at the trial level, particularly in rural counties.  The Commission noted the difficulty recruiting public defenders in the rural counties and the lack of resources needed to bring competent lawyers from urban areas into the rural areas for capital defense work.  The Commission was unanimous in its belief that establishing a statewide public defender office for capital cases would be the best and most effective way to improve death penalty trials in Arizona.  Legislation was drafted that would include both trial defenders for rural Arizona and PCR defenders for all of Arizona.  The proposed bill was submitted to the 2001 and 2002 State Legislative Sessions, but failed.

The Capital Case Commission reaffirms the following statement:

> The Commission unanimously agrees that additional resources must be made available for capital cases and it deeply regrets the Legislature did not address this need this year. The objective of the Capital Case Commission "is to review the capital punishment process in Arizona in its entirety to ensure that it works in a fair, timely and orderly manner." A necessary condition of a "fair" capital system is competent defense representation. A necessary condition of a "timely and orderly" capital system is adequate resources for defense counsel and for prosecutors in cases where the death penalty is sought. The needs are particularly acute for defense counsel in all post-conviction relief proceedings, and for prosecutors and defense counsel at the trial level in the rural counties. The Commission therefore urges the Legislature to consider and pass legislation appropriating monies for capital litigation resources at the earliest possible opportunity.

The Capital Case Commission strongly recommends that resources legislation be reintroduced and adopted in the 2003 Regular Legislative Session.

## 2.    Audio or Video Recording of Interviews

The Commission deliberated regarding the issue of electronic recording of police interrogations. Some states require audio or video recording of interrogations and confessions based on court decision or statute. While there was discussion as to whether the adoption of a recording requirement is best dealt with by voluntary action of law enforcement agencies, the Trial Issues Subcommittee concluded that routine electronic recording of all custodial interrogations and confessions would be a major improvement in criminal procedure and should be encouraged.

Upon recommendation of the Capital Case Commission, the Attorney General's Office drafted a protocol that was considered and discussed by the Attorney General's Law Enforcement Advisory Board, which represents police agencies across Arizona. The Advisory Board agreed to submit the protocol to the Arizona Criminal Justice Commission for consideration. The proposed protocol follows:

> The Attorney General and the Capital Case Commission strongly recommend that law enforcement officers in Arizona record with audio tape or video tape the process of informing a suspect of his constitutional rights, the waiver of those rights by the suspect, and all questions and answers of that suspect during interrogation whenever feasible.

> Under the protocol, if the questioning occurs in a place of detention such as a police department, a sheriff's substation, or jail, the need for audio or video recording of the interrogation is even more pressing. However, even in these circumstances the discretion of the law enforcement officer is employed and recording should take place whenever feasible.

## 3.    Minimum Age For Capital Punishment

The United States Supreme Court has held that the United States Constitution does not prohibit the execution of defendants who were 16 years or older when they committed a murder. The federal government, and many states have imposed age 18 as the minimum at which a defendant is eligible for the death penalty. The United Nations and the American Bar Association recommend the higher minimum age.

Arguments in favor of changing the minimum age from 16 to 18 in Arizona are similar to those advanced in opposition to executing persons with mental retardation. A child or adolescent normally does not possess the level of moral responsibility and culpability that society expects of an adult. Arguments against enacting a minimum age center primarily on the fact that the defendant's age is already being considered to be a significant mitigating circumstance; the only cases involving 16 or 17-year-old defendants sentenced to death in Arizona have been ones with particularly egregious aggravating circumstances.

The Commission recommended by a vote of 15 to 8 that the death penalty in Arizona not apply to defendants who were under the age of 18 at the time of the murder. Legislation introduced in the 2002 State Legislative Session that would make defendants under the age of 18 at the time of their crime ineligible for the death penalty failed. It is anticipated that similar legislation will be reintroduced in the 2003 Regular Legislative Session.

## 4.      Mental Retardation

The death penalty is meant to be reserved for the most culpable offenders.  Many believe that  mentally retarded persons do not fall into the "most culpable" category.  Some persons with mental retardation suffer from substantial disabilities affecting reasoning, cognitive functioning, control of impulsivity, and understanding of the basic relationship between cause and effect.  Some argue that these disabilities hamper a defendant's ability to act with the level of culpability that would justify imposition of a death sentence.

Initial deliberations resulted in a recommendation from the Pretrial Issues Subcommittee, with some dissent, prohibiting the execution of defendants with mental retardation.  Later, the Commission debated whether current law, e.g., competence to stand trial, the insanity defense, a rigorous mitigation hearing and the competence to be executed statute, provided adequate safeguards to ensure that a mentally retarded person would not be executed in Arizona.  Ultimately, the Commission reached consensus that, as a matter of public policy, Arizona should not execute a defendant who is mentally retarded.  The Commission also recommended, with dissent, that a statute be enacted ensuring that the mentally retarded are not eligible for the death penalty.  Legislation codifying this recommendation was signed into law on April 26, 2001. The legislation requires a pre-trial screening for mental retardation in capital cases.

On June 20, 2002, the United States Supreme Court held that the execution of a mentally retarded defendant violates the Eighth Amendment to the U.S. Constitution. *Atkins v. Virginia*, 122 S. Ct. 2242 (2002).  Arizona's new statute remains significant, however, in that it provides a mechanism to ensure that the issue of mental retardation is considered early in the proceedings.

## 5.      Notice of Intent to Seek the Death Penalty Under Ariz. R. Crim. P. 15.1(g)(1)

On January 30, 2001, the Commission heard reports from both the Pre-Trial Issues Subcommittee and the Trial Issues Subcommittee recommending amendment of Rule 15.1(g) of the Arizona Rules of Criminal Procedure to extend the time for prosecutors to file a notice of intent to seek the death penalty.  The Commission agreed and recommended that Rule 15.1 be amended to extend the time for filing of death penalty notices to 60 days after arraignment with an additional extension of time available by stipulation from the parties and approval of the superior court judge.  This rule change is intended to allow the prosecutor to consider mitigating evidence presented by the defense before filing the notice and to allow the prosecutor more time to deliberate over the decision whether to seek the death penalty.

The Commission's recommendations for changes to Rule 15.1(g) was adopted by the Arizona Supreme Court effective June 1, 2002.

## 6.    Selection of Capital Cases

On March 28, 2001, the Commission received and approved the Pre-Trial Issues Subcommittee's unanimous recommendation that all prosecuting agencies involved in capital case prosecution adopt a written policy for identifying cases in which to seek the death penalty. Such policies should include soliciting or accepting defense input before deciding to seek the death penalty. This recommendation will be submitted to the Arizona Prosecuting Attorneys' Advisory Council for consideration.

## 7.    Competence of Counsel

The Commission deliberated extensively on the issue of competence of counsel in capital cases. The Data/Research Subcommittee identified the number of cases that were overturned based on ineffective assistance of counsel from 1974 through 2000, and reported in Exhibit 24 of the Data Set I Research Report that 19 defendants received a reversal, remand, or modification in their case based on ineffective assistance of counsel. Of the 19, 13 were granted resentencings and 6 defendants were granted new trials. For a review of the issues cited as the basis for reversals, remands and modifications for all 230 cases in Data Set I, see Exhibit 14 of the Data Set I Research Report, Attachment B.

There was initial support for a peer review program for capital defense attorneys. However, peer review was deemed too subjective, and was ultimately rejected. Commission members urge Superior Court judges to verify early in a capital case that counsel are competent under the standards in Rule 6.8. Commission members also urge judges to hold hearings, if necessary, to advise defendants regarding competency of counsel, as is done when issues arise regarding possible conflicts of interest on the part of defense counsel.

The Commission also addressed whether a finding of ineffective assistance of counsel should result in the mandatory reporting of that attorney to the State Bar, the mandatory removal of that attorney from the list of eligible attorneys to be appointed under Rule 6.8, or reporting to the county's appointing authority for indigent defense. On March 28, 2001, the Trial Issues Subcommittee recommended against mandatory reporting of defense attorneys when there is a finding by a court of ineffective assistance of counsel. There is already a duty incumbent on lawyers and judges to report ethical violations under Ethical Rule 8.3 of the Rules of Professional Responsibility. The Subcommittee noted that the reporting under Ethical Rule 8.3 is done on a case-by-case basis, and that a particular finding of ineffective assistance of counsel by a trial or appellate court may not correspond to an ethical violation. The Commission approved this recommendation.

The Trial Issues Subcommittee recommended, and the Commission concurred, that Ethical Rule 1.1 should be amended to include a provision regarding the competence of lawyers representing capital defendants as follows:

> A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation. A LAWYER WHO REPRESENTS A CAPITAL DEFENDANT SHALL COMPLY WITH THE STANDARDS SET FORTH IN ARIZ. R. CRIM.. P.

6.8 REGARDING STANDARDS FOR APPOINTMENT OF COUNSEL IN CAPITAL CASES.

The Subcommittee and the Commission also recommended that the Comment to Ethical Rule 1.1 be amended to include this best practice advice:

> BECAUSE THE AMERICAN BAR ASSOCIATION GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES RECOMMEND TWO LAWYERS BE ASSIGNED TO EVERY CAPITAL CASE, LAWYERS SHALL ENSURE THAT TWO LAWYERS REPRESENT EVERY CAPITAL DEFENDANT WHENEVER FEASIBLE IN TRIAL PROCEEDINGS.

The Arizona Bar Association's Ethical Rule Review Group considered the Commission's recommendations on competence and recommended an additional Comment in ER 1.1. The Ethical Rule Review Group also made several changes to the ethical rules governing the obligations of supervisors in public law offices. On November 22, 2002, the Board of Governors approved these changes and forwarded them to the Arizona Supreme Court recommending that they be adopted. Public comment will take place in 2003 on the Board of Governors proposed rules which are reprinted as Appendix "A."

## 8.     Legal and Judicial Education

The Trial Issues Subcommittee recommended to the Commission that Rule 45(a) of the Rules of Arizona Supreme Court be amended regarding continuing legal and judicial education. The proposed amendment would require (1) prosecutors to have at least six hours of continuing legal education in capital litigation, including education in ethical duties within the preceding three years of being assigned a capital case; and (2) judges to have at least six hours of judicial education in capital litigation within the preceding three years of being assigned a capital case. The Attorney General will prepare a Petition to amend Rule 45(a) for submission to the Arizona Supreme Court on behalf of the Capital Case Commission.

## 9.     Mitigation Specialists

The Commission approved the Trial Issues Subcommittee's recommendation to amend Rule 15 of the Arizona Rules of Criminal Procedure to provide for the appointment of investigators and expert witnesses for indigent defendants. This amendment will allow capital defendants to obtain mitigation specialists at county expense in all capital cases at the beginning of the case. The Attorney General's Office submitted the proposed amendment, which was adopted with minor modifications by the Arizona Supreme Court. The modifications related primarily to the Commission's recommendation that there be a prohibition against ex-parte requests for mitigation specialists. The final version of Rule 15.9, which became effective December 1, 2002, provides as follows:

**Rule 15.9** Appointment of Investigators and Expert Witnesses for Indigent Defendants

a.    An indigent defendant may apply for the assistance of an investigator and expert witness, and in a capital case an indigent defendant may also apply for the appointment of a mitigation specialist, to be paid at county expense if the defendant can show that such assistance is reasonably necessary to present a defense adequately at trial or sentencing.

b.    No ex parte proceeding, communication, or request may be considered pursuant to this rule unless a proper showing is made concerning the need for confidentiality. Any such proceeding, communication, or request shall be transcribed and made a part of the record available for appellate review.

c.    As used in the Rule, a "mitigation specialist" is a person qualified by knowledge, skill, experience, or other training as a mental health or sociology professional to investigate, evaluate, and present psycho-social and other mitigating evidence.

## 10.    Proposed Reforms to Rules 31 and 32 of the Arizona Rules of Criminal Procedure

The Commission considered reforms to Rules 31 and 32 to eliminate some of the prolonged time intervals in these appellate proceedings. The Commission noted that the Arizona Supreme Court's most recent changes to Rule 32 included a Comment specifically stating that:

The Supreme Court did not have the benefit of the comments of a statewide Commission which was empaneled that year by the Attorney General of Arizona to investigate and assess the administration of the death penalty in the State of Arizona. Accordingly, further amendments to Ariz. R. Crim. P. 32 may be necessary following the issuance of that Commission's recommendations. In particular, the topics of deadlines and victims' rights may need to be addressed at that time.

The Commission also considered victims' rights to a "prompt and final conclusion of the case after conviction and sentence" under the Arizona Constitution in Article 2, Section 2.1(10). The Commission tried to balance that right with the defendant's right to a fair appellate process, including adequate preparation time. Unable to reach consensus, the Commission asked the Direct Appeal/PCR Subcommittee to reconvene on the issue of the victim's right to a prompt and final conclusion in criminal cases and to debate any other rule changes to Rules 31 and 32 that specifically relate to the death penalty and that could reduce time intervals in the appellate process.

The Direct Appeal/PCR Subcommittee addressed whether a victim should have an opportunity to be heard in all appellate proceedings where there is a request for an extension of time. After hearing input from the Subcommittee, the Commission deliberated on two proposed Amendments to Rules 31.27 and 32. The Commission unanimously recommended the following rule change regarding appellate extensions:

*In any capital case, in ruling on any request for an extension of a time limit set in this rule, the court shall consider the rights of the defendant and any victim to prompt and final resolution of the case.*

*Comment: To implement the victim's right to a prompt and final conclusion of the case, see Ariz. Const. Art. 2, § 2.1(A)(10), the victim shall be permitted to file a statement with the court, at the inception of the proceeding, which expresses their views with respect to any extensions. Or, the victim can request, pursuant to A.R.S. § 13-4411, that the prosecutor's office communicate the victim's views to the court concerning any extensions.*

The Arizona Supreme Court adopted this proposed change, effective June 1, 2002. The Commission also considered a substitute motion proposed by Commission member Steve Twist that would create a victim's right to be heard in appellate motions for extensions of time. The Commission defeated the following proposed rule by a vote of 11 to 8.

*In any capital case, in ruling on any second or subsequent request for an extension by a party of more than 30 days, the court, after giving any victim who has filed a request pursuant to A.R.S. 13-4411, the opportunity to be heard in writing, shall consider the rights of the defendant and the rights of any victim to a prompt and final conclusion of the case.*

*Comment: To implement the victim's right to a prompt and final conclusion to their case, see Ariz. Const. Art. 2, § 2.1(A)(10), the victim, upon request, shall be permitted to be heard in writing with respect to any lengthy or repetitive extensions or the victim can request that the prosecutor's office communicate the victim's views to the court concerning any extensions.*

## 11.   Jury Deliberation in Capital Cases

In May 2000, Judges B. Michael Dann, Michael Brown, Robert Myers and Barry Schneider filed, on behalf of the Supreme Court Committee on the More Effective Use of Juries, a Petition to Amend Arizona's Rules of Court relating to juror discussions of the evidence during trial. The proposed rule change would allow jurors in criminal cases to deliberate before receiving final instructions by the trial judge at the close of the case.

The Trial Issues Subcommittee disagreed with the proposed amendments, reasoning that the sequence might give the prosecution an unfair advantage. The Subcommittee further noted that the United States Supreme Court has not approved such early deliberations in criminal cases. The Commission concurred with the recommendation of the Trial Issues Subcommittee and instructed the Attorney General's Office to submit comments opposing the Petition to Amend. Comments were filed and appear in Appendix D of the Interim Report. The Arizona Supreme Court denied the petition to amend the criminal rules.

## 12.    When a Peace Officer is Murdered

On March 28, 2001, the Commission heard a report from the Pre-Trial Issues Subcommittee regarding aggravating factors. The Subcommittee reported that the current statute provides for the possibility of capital punishment only in those cases in which "the murdered person was an on duty peace officer who was killed in the course of performing his official duties. . . ." A.R.S. § 13–703(F)(10).  If a police officer were murdered because of his status as a police officer, but the officer was in an off-duty capacity, current law would not authorize capital punishment.  By a vote of 7 to 1, the Subcommittee recommended extending the aggravating factor to include peace officers killed while not performing official duties as long as the murder was motivated by the peace officer's status.  The Commission approved the recommendation and proposed language (see Interim Report, Appendix D) that was brought before the Attorney General's Law Enforcement Advisory Board for consideration.  After extensive deliberation, however, the Attorney General's Law Enforcement Advisory Board rejected the recommendation based on its view that the additional aggravator is not necessary.

## 13.    Victim Impact at Aggravation/Mitigation Hearings

The Commission deliberated on the capital sentencing process and the need to ensure that victim impact evidence is presented to the court along with the defendant's allocution at a time when the court may thoughtfully consider such evidence prior to sentencing.  The Trial Issues Subcommittee recommended to the Commission that trial judges hear victim impact evidence during the aggravation and mitigation hearing before sentencing the defendant and filing the special verdict.  The Trial Issues Subcommittee also recommended an amendment to Rule 26.3 of the Arizona Rules of Criminal Procedure, the Comment to that Rule, and Administrative Order 94–16, to ensure that capital case sentencing is conducted in a proper sequence.  The Subcommittee's proposed rule, comment, and order appear in Appendix B of the Interim Report.

On May 15, 2001, the Commission edited the proposed amendments to Rule 26.3 to allow the victim to "be heard" at the aggravation and mitigation hearing, to allow the defendant the right of allocution and to require the court to set a sentencing date no earlier than seven (7) days after the aggravation/mitigation hearing in order to properly reflect on the events of the hearing.

The Capital Case Commission's proposed changes to Rule 26.3 were adopted by the Arizona Supreme Court effective June 1, 2002.   However, the changes relating to the timing of the aggravation/mitigation hearing have been rendered inapplicable because of the statutory change to jury sentencing in capital cases following the *Ring* decision.

## 14.    Residual Doubt in Sentencing

On March 28, 2001, the Commission received and approved the Pre-Trial Issues Subcommittee's report stating that residual doubt should not be added to Arizona's list of statutory mitigators found in A.R.S. § 13–703(G) largely because the strength of the government's proof of guilt may already be considered during the sentencing phase of a capital case.

At the January 22, 2002 Capital Case Commission meeting, Arizona Supreme Court Justice Stanley Feldman urged the Commission to reconsider making "residual" or "lingering doubt" a statutory mitigating circumstance. Both the Pretrial Issues and Direct Appeal/PCR Subcommittees agreed to re-examine the issue.

Current law appears to provide a basis for considering, as non-statutory mitigation, the strength of the government's case and residual doubt as to guilt. See *State v. Verdugo*, 112 Ariz. 288, 292, 541 P.2d 388, 392 (1975), and *State v. Pandeli*, 200 Ariz. 365, 26 P.2d 113 (2001). The Commission declined to recommend making residual or lingering doubt a statutory mitigating circumstance.

## 15. Clerks of Court and Court Reporters' Procedures

In its February and March, 2001 meetings, the Commission considered the prolonged time intervals in the direct appeal process for capital cases. These time intervals are depicted in Exhibits 25, 27 and 30 of the Data Set I Research Report. The Commission heard a report from the Direct Appeal/PCR Subcommittee regarding delays in the system due to missing court documents, pleadings and exhibits, and the difficulties in obtaining transcripts of trial proceedings. The Subcommittee met with elected court clerks and with court reporters from around Arizona.

On March 28, the Direct Appeal/PCR Subcommittee made three recommendations which were approved by the Commission. First, the Commission recommends amending Rule 31.9 of the Arizona Rules of Criminal Procedure so that the clerk of the court in capital cases will be required to notify all court reporters, within ten days of the filing of the notice of appeal, to compile all transcripts for submission to the Clerk of the Supreme Court. This rule change is designed to give the court reporters more timely notice and to expedite preparation of transcripts. Secondly, the Commission recommends as a best practice that trial judges order the transcription of all trial proceedings in every first-degree murder case at the time a guilty verdict is returned. This will cause reporters and clerks to begin the transcription process and the process of gathering exhibits, pleadings and minute entries well before the sentencing date. This practice will expedite transmission of the record in a capital case, and will hopefully preserve the record in a more disciplined fashion.

Thirdly, the Commission recommends as a best practice that superior court clerks enter a code on all criminal calendars that clearly identifies all first-degree murder cases for use by reporters and court clerks. No matter what code the local clerk ultimately selects, the calendar will communicate to the court reporter and to the courtroom clerks that the matter is potentially a capital case and that records should be assembled early and safeguarded with the utmost care. Court reporters will then know that transcripts must be readily available immediately after sentencing because the record in all capital cases must be sent to the Supreme Court within 45 days after the filing of the notice of appeal. The courtroom clerks will be put on notice that because this is a capital case, the attorneys will later request every piece of paper, pleading and minute entry in the case to ensure that the law was followed in the litigation of the case. The Commission concluded that these reforms will help to eliminate some of the prolonged time intervals in the capital case appellate process. The Commission's proposed Rule 31.9 is reprinted in Attachment A, Appendix D, paragraph 11.

The Capital Case Commission's recommended changes to Rule 31.9 were adopted by the Arizona Supreme Court effective June 1, 2002.

## 16.    File Repository

The Commission debated the issues of prolonged intervals in PCR proceedings (depicted in Exhibits 25, 28 and 31 of the Data Set I Research Report, Attachment B), and adopted two recommendations in this regard.  The Commission recommends that a repository be created in each county for all trial and appellate defense files so that PCR counsel can readily locate files from one location.  The repository must be controlled by the defense team, and strict confidentiality must be maintained.

Additional discussion is needed with court administrators, prosecutors and defense counsel in order to implement this recommendation.

## 17.    Competency to be Executed

The Commission first heard a report on the issue of competency to be executed on January 30, 2001, from Mr. James Bush on behalf of the Pre-Trial Issues Subcommittee.  The Commission considered Mr. Bush's written recommendations and heard a three-part recommendation from the Pre-Trial Issues Subcommittee.  First, the Pre-Trial Issues Subcommittee recommended that the Commission consider and debate a proposal that defendants found mentally incompetent after the issuance of a death warrant have their sentences converted to life imprisonment.  The Subcommittee reported that this factual scenario would arise in the context of a judicial competency hearing in which the defendant is found incompetent and will not regain competency.  Second, the Subcommittee recommended that the Commission consider and debate the current standards applicable to incompetence to determine if the standards as currently applied require modification.  Third, the Subcommittee recommended that the Commission consider changes to the statute under which Arizona conducts restoration to competency, A.R.S. §§ 13–4021 through 4024.

On February 28, 2001, the Commission again discussed the issue of competency to be executed.  The Commission asked the Pre-Trial Issues Subcommittee to reconsider the issue and make a recommendation.

On March 28, 2001, the Commission heard the report from the Pre-Trial Issues Subcommittee which reflected substantial debate at two meetings on March 13 and March 20, 2001. The Subcommittee reported that it had debated a Maryland statute that provides that a death sentence must be commuted to life imprisonment if a defendant becomes incompetent after being sentenced to death.  The Subcommittee also considered whether Arizona doctors should be prohibited from treating any defendant facing capital punishment so that Arizona policy would reflect that no restoration to competency may take place.  The Subcommittee voted 6 to 3 with one abstention to present the following recommendation to the Commission.

> The Pre-Trial Issues Subcommittee recommends to the Commission that Arizona change its legislation to require the commutation of a death sentence to the maximum sentence lawfully imposeable when the defendant is found incompetent after the issuance of a death warrant.

After deliberation, the Commission voted 12 to 8 with one abstention to accept the subcommittee's recommendation. Legislation was introduced in the 2002 State Legislative Session but failed. It is anticipated that similar legislation will be reintroduced in the 2003 Regular Legislative Session.

## 18.    Maintaining Capital Case Data

This endeavor was undertaken by the researchers and staff of the Center for Urban Inquiry, College of Public Programs at Arizona State University, with help from community members, county clerks offices, county attorney offices, county pretrial services, victim/witness programs, the Department of Corrections, the Arizona Supreme Court and the Arizona Attorney General's Office. Results of this comprehensive study of the death penalty in Arizona are displayed in Data Set I and Data Set II.

After twenty-four months of empirical data collection, it is the recommendation of the Commission that the Attorney General's Office and the Center for Urban Inquiry continue to gather data. The Attorney General's Office will continue to gather data to update Data Set I; and the Center for Urban Inquiry will maintain Data Set II.

Several recommendations of the Capital Case Commission require additional study, and the Commission accordingly recommends that a subgroup of the Data/Research Subcommittee continue to deliberate and develop processes and protocols to implement Commission recommendations.

## 19.    Preservation of DNA Evidence

The evolution of DNA testing now makes possible effective testing of biological materials left at crime scenes and comparisons with a defendant's DNA. This powerful evidence may be incriminating or exculpatory and can effectively prove guilt or innocence.

The preservation of DNA evidence was deliberated by the Trial Issues Subcommittee and the Direct Appeal/PCR Subcommittee. The Direct Appeal/PCR Subcommittee noted that A.R.S. § 13–4013 provides for DNA testing along with all other expert witness and investigative services when "reasonably necessary" to an adequate defense. Further, PCR DNA testing is required under A.R.S. § 13–4240 under carefully drawn standards enacted by the 2002 Legislature. The Direct Appeal/PCR Subcommittee did not support further legislation or court rule for the preservation and testing of evidence. Several concerns were raised with requiring law enforcement to preserve all evidence in every case in which the charge of murder is being investigated by a police agency. First, sometimes the consumption of all evidence is needed for a satisfactory chemical analysis and an ironclad rule requiring preservation of all evidence would harm the need to sometimes use the entire sample to conduct a reliable chemical test. Secondly, if there is an ironclad rule to keep all evidence in all cases in which first-degree murder is later charged, some defendants will not be charged with first-degree murder simply because many cases (such as missing person cases) do not begin as murder investigations.

The Trial Issues Subcommittee, however, noted that it is currently the practice of law enforcement in Arizona to retain evidence in all unsolved murder cases, as well as in all capital cases for an indefinite period of time. The Trial Issues Subcommittee therefore recommends to the Capital Case Commission that legislation be enacted that would require the preservation of all biological materials found at the scene of

all unsolved homicides and in all capital cases until such time as a defendant can be provided an opportunity to request DNA testing of that evidence.

The Attorney General's Law Enforcement Advisory Board deliberated, and not withstanding resource concerns, did not oppose the recommendation.   This recommendation will be presented to the Arizona Criminal Justice Commission for consideration.

## 20.    Use of the F6 Aggravator

A.R.S. § 13–703(F)(6) provides that it shall be an aggravating factor if the defendant commits murder in an especially cruel, heinous or depraved manner. Data Set I reveals that of the 228 people sentenced to the death penalty, 62.7% have the death penalty in place (or have been executed, or the death penalty reimposed after appeal), 30.3% received a lesser sentence, 3.1% were acquitted, and 3.5% have appeals pending.  Of these 228 people, 39 were sentenced to death based on a finding of the sole aggravator, (F)(6), cruel, heinous or depraved.  The (F)(6) aggravator was the leading single aggravator with (F)(5), pecuniary gain being second in 11 such cases.  Of the 39 cases, 45% were resentenced to death, 38.5% received a lesser sentence, 5% were acquitted, and 5% have appeals pending.

Some have concluded that these figures indicate a possible abuse of the (F)(6) aggravator and have questioned whether it is consistently applied and whether the aggravator is overly broad.  Others assert that a review of recent cases indicates that since the enactment of the natural life sentencing option, the number of cases in which the courts have found the (F)(6) aggravator have decreased.

The Pretrial Issues Subcommittee debated these issues at length and was unable to reach a consensus. The Subcommittee recommended to the Capital Case Commission that additional study be conducted of the (F)(6) aggravator that a murder was committed in an especially cruel, heinous or depraved manner.

## 21.    Review of Capital Cases in Which Convictions Were Reversed, or Sentences Remanded or Modified by the Appellate Court

In December 2000 and January 2001, the Commission agreed on a strategy for the review of cases in which substantive errors were found by reviewing appellate courts in Arizona.  The cases of conviction and sentence related reversals, remands and modifications are set forth in Exhibit 22 of the Data Set I Research Report (Attachment "B").

Of the 141 decisions resulting in a reversal, remand or modification, the Trial Issues Subcommittee decided to review the 7 cases in which not guilty verdicts were returned upon retrial and to review the 71 cases in which the defendant was sentenced to life imprisonment or a term of years after retrial or resentencing.  The Commission established a uniform set of guidelines to assist in examining these cases.  Commission members were asked to consider issues such as why the conviction or sentence was reversed; whether the error is likely to reoccur; whether safeguards were in place at the time of the original trial or have since been adopted; and whether Commission members recommend changes based on the cases reviewed.

The Trial Issues Subcommittee invited Commission members to join them for an in-depth study of the 78 cases.  The goal of the study was to determine whether additional recommendations for reform are needed.

On August 29, 2001, the Trial Issues Subcommittee held a retreat hosted by John Stookey and Osborn Maledon to discuss the analyses of the 78 cases in which a death sentence was overturned and the defendant found not guilty, given life imprisonment or given a term of years on resentencing. At a subsequent meeting held on March 20, 2002, the Trial Issues Subcommittee discussed the recommendations from the August 29, 2001 meeting and concluded:

$    It had been proposed that a survey of capital representation be conducted to get a current snapshot of the death penalty process in Arizona.  The Trial Issues Subcommittee later concluded that the survey as proposed could not be realistically accomplished.

$    That a recommendation be made to the Commission to affirm and emphasize its previous statement regarding the Legislature's failure to appropriate the additional resources needed at the trial and PCR level for capital cases.

$    That a recommendation be made to the Commission that would strengthen and enforce the Ethical Rules holding supervisors in public defenders= offices responsible for supervising counsel appointed in capital cases.

$    That a recommendation be made to the Commission that would change Rule 45(a) Continuing Legal Education Requirements for continuing legal and judicial education for prosecutors and judges before being assigned a capital case.  See Section 8, infra, for the Commission's precise recommendation on legal education of lawyers and judges who work on capital cases.

## 22.    Race-neutral Decisions

Data Set I shows that 69.1% of the defendants sentenced to death in Arizona are Caucasian; 15.7% Mexican American/Hispanic; 11.3% African American; and 1.7% Native American.   Further, we know that 81.9% of the victims of Caucasian defendants are Caucasian and 60.9% of the victims of defendants of other races are themselves of other races or ethnicities.

Data Set II indicates that of 260 Caucasian defendants charged with first-degree murder in Arizona over the past five years, 151 or 58% were noticed for the death penalty, 79 or 52% of those went to trial, 62 or 78% of those were convicted of first-degree murder and 18 or 29% of those received the death penalty. Conversely, of the 401 minority defendants charged with first-degree murder, 144 or 36% were noticed with the death penalty, 68 or 47% went to trial, 45 or 66% of those tried were convicted of first-degree murder and 11 or 24% of those convicted received the death penalty.   See Exhibit 15 of Data Set II for an in-depth analysis of this data.

Some Commission members conclude from these statistics that there does not appear to be a racial bias in the administration of the death penalty in Arizona.  Other Commission members conclude that there may be a bias based on the race of the victim, or that it is impossible to draw conclusions regarding bias in the system. (See Comment by John A. Stookey, infra.)

The Attorney General does not believe the statistics developed by the Data Subcommittee support an allegation of racial bias in the process. Statistics relating to the race of the victim are not necessarily informative regarding racism. An analysis of whether race plays a role in the process is more appropriately focused on the race of the *defendant*. Statistics developed by the Data Subcommittee show that Caucasian defendants are treated essentially the same as non-Caucasian defendants from indictment to conviction and sentencing. The only significant statistical difference noted in the process as it relates to the race of the defendant is that the conviction rate for Hispanic defendants is lower than that for Caucasian defendants and for non-Hispanic minority defendants. Caucasians do not appear to be treated more leniently than non-Caucasians. In fact, a Caucasian defendant who commits a murder similar to that committed by a non-Caucasian defendant is slightly more likely to receive the death penalty than a non-Caucasian defendant. Seventeen out of the 22 people executed in Arizona since the State's death penalty statute was amended in 1973 were Caucasian, and approximately 70% of the current death-row population in Arizona is Caucasian. Thus, any suggestion that Arizona's death penalty process reflects a racial bias appears to be unwarranted.

Statistics relating to the race of the victim may be misleading because they may relate to the type of murder committed rather than to the way the defendant is treated in the death penalty process. Some types of murders are less likely to be pursued as a capital case, not because of the race of the victim, but because of the nature of the murder. If, for example, a murder occurs during a gang incident, there is less likelihood of the death penalty being sought or imposed for a number of reasons. There may be some degree of fault on the part of the murder victim, there may be a problem with the credibility of witnesses to the crime, or an unwillingness on the part of witnesses to assist with the prosecution. If, as appears to be the case, the percentage of non-Caucasians involved in gang murders is higher than that for Caucasians, see Appendix B, Chart prepared by Maricopa County Attorney's Office, statistics relating to the race of the victim as an indicator of whether the death penalty will be sought or imposed may be skewed.

Commission members unanimously agree that it is the responsibility of all participants in the criminal justice system to promote practices that ensure that race-neutral decisions are made regarding defendants and victims when deciding whether to seek or impose capital punishment, and that participants in the system should use the empirical data from Data Sets I and II in internal reviews and discussions regarding the death penalty process.

## 23.    Requests for a Moratorium on the Death Penalty in Arizona

After the United States Supreme Court issued its ruling in *Ring v. Arizona* finding Arizona's death penalty statute unconstitutional, several members of the Commission urged the Commission to recommend a moratorium on the death penalty in Arizona. Those members of the Commission argued that the likelihood of error in capital cases, together with uncertainty resulting from the *Ring* decision, warranted such a moratorium. See Comment submitted by John A. Stookey, infra. A majority of Commission members, including the Attorney General, disagreed and declined to recommend a moratorium.

# V.  Comments by Commission Members

Commission members were invited to submit Comments to be included in Commission Reports.  Some Comments were previously submitted and are included in the Interim Report attached to this Report.  The Comments presented in the Interim Report and in this Final Report do not represent consensus views of the Commission and were not circulated for response from other Commission members.

**Comments by John A. Stookey.  Joined by: Peg Bortner, Jose Cardenas, Harold Higgins, Michael Kimerer, Charles Krull, Christopher Johns, and Lois Yankowski**

As the Introduction to the Final Report indicates, the issues of whether the death penalty should be eliminated or a moratorium placed on its imposition were never directly presented to the Commission.  However, it is my strong belief that the confluence of three factors that were or should have been before the Commission logically leads to the conclusion that, at a minimum, a moratorium should be imposed until such time as fundamental flaws in the capital system are corrected.  Those factors include:

Data collected by the Commission indicating that:

(a)    innocent persons have been wrongfully sentenced to death in Arizona;

(b)    the reversal rate in Arizona capital cases is disturbingly high; and

(c)    outcomes in capital cases are related in concerning ways to the race of the victim.

The Commission finding that capital indigent representation is significantly underfunded and understaffed, combined with Commission data showing that the most common reason for reversals in capital cases is ineffective assistance of counsel.

The fact that the Commission never looked at the implications of the *Ring* decision or of the new statute, which, if anything, would seem to increase the chances of wrong and inconsistent decision-making.

**I.    Data collected by the Commission warrant the elimination of the death penalty in Arizona or at least a moratorium to address whether and how these problems may be addressed.**

**A.  The Arizona capital system has wrongfully sentenced individuals to death.**  The recent total vindication of Ray Krone by DNA evidence and the acceptance of that vindication by the Maricopa County Attorney's Office is the most clear and visible example of the fact that Arizona has wrongfully sentenced people to death.  After the

-28-
35

Krone outcome, the question is not whether, but how many. The Capital Case Commission data demonstrate that 7 other individuals who were originally sentenced to death later had their convictions overturned, and were then found not guilty of the underlying offense on retrial. Additionally, 6 other individuals who were originally sentenced to death because of evidentiary issues, later had their sentences reduced to time served and were released from prison.

**B. The reversal rate in Arizona capital cases is very high**. Capital Case Commission Data demonstrate that Arizona's capital cases are reversed at a rate of approximately equal to 50%. This means there is a 50% chance that a person sentenced to death will have his or her conviction or sentence overturned on appeal at least once.

**C. The imposition of the death penalty is significantly related to the race of the victim.** For the period 1995 to 2000 for all first degree murder indictments for which data were available to the Capital Case Commission on race of both the victim and offender, there are significant differences in the way offenders who killed Caucasian victims are sentenced in comparison to those who killed Hispanic victims. For example, of the 316 first degree murder indictments for the murder of a Hispanic, only one case resulted in the death penalty. Put another way, only .3% of the 316 Hispanic first degree murder victims had their offenders sentenced to death. On the other hand, of the 277 Caucasian victims during the same period, 24 offenders were given the death penalty (8.7%).

The final Commission Report and Recommendations do not in any systematic way address the significance of these statistics gathered by the Commission itself. I do not believe that we can continue uninterrupted with a system that has demonstrably sentenced the innocent to death; has pervasive inconsistency and error, and makes decisions related in disturbing ways to the race of the victims. These data alone lead me to conclude either that the death penalty is a failed experiment in Arizona or that we must at least impose a moratorium to determine whether these flaws can be remedied.

## II.     Indigent representation is woefully underfunded and understaffed in Arizona.

The Commission itself recognized this problem and to its credit proposed legislation in two different sessions to establish a state-wide capital defenders office for Post-Conviction Relief representation and capital trial representation in the rural counties. Unfortunately the legislature chose not to pass the legislation. Although the Commission did not fully study this issue, it would seem irrefutable that with recent budget cuts and fiscal difficulties, the problems of funding adequate capital representation have indeed become worse.

These realities must be laid against the data collected by the Commission that the number one reason for reversals in capital cases is ineffective assistance of counsel. Even a cursory look behind those numbers shows that this is not merely a story about incompetent lawyers, but a story about underfunded and understaffed public defender

offices.  The Commission data further demonstrate the significance of these findings because nearly all capital cases in Arizona involve indigent defendants represented by public counsel.

The Commission's Final Report indicates that the Commission "regrets" that the legislature did not do anything to resolve this situation, but does not make any statements about what we as a state should do in the face of the failure of the legislature to act.  I believe that the only reasonable response to a system that seeks to impose the death penalty, but is so underfunded as to be unable to make the decision of who should live and who should die in a fair and equitable way, is to either eliminate that system or at least stop it until such time as adequate funding is provided.

### III.     The Commission did not address in any way the implications of the *Ring* decision and the new capital statute in Arizona.

The Final Report nearly totally ignores that during the last year the largest change in recent history in the Arizona death penalty system has occurred.  In the wake of the *Ring* decision, Arizona's death penalty statute was declared unconstitutional and replaced by a new and fundamentally different system.  Arizona has now moved from a system where all capital fact-finding and sentencing was done by a judge to one where all relevant decisions are made by a jury.

All of the data collected by the Commission were collected with regard to the old system and there has been no attempt by the Commission to address whether the new system will increase, decrease, or be irrelevant with regard to the flaws already identified by the Commission in the capital system.  For example, under the new statute, there is a substantially reduced safety net to prevent wrongful convictions and sentences.  Such a safety net might include: (1) the possibility for the trial judge to override capital sentences; (2) a life sentence when the jury is hung with regard to appropriate sentence; and (3) continued de novo independent review by the Arizona Supreme Court.  The new statute provides no opportunity for trial judge override; permits multiple juries when the original jury is hung on the sentence; and eliminates the longstanding provisions for independent review by the State Supreme Court.

Similarly, the new statute makes no attempt to reshape aspects of the old system that were particularly designed for judge sentencing that may no longer be appropriate for jury sentencing.  For example, Commission data show that the especially heinous, cruel, or depraved aggravator is the most commonly found aggravator to make a defendant death eligible in Arizona under the old system.  Case law on this aggravator has consistently made it clear that the inherent ambiguity of these terms was not problematic in Arizona because it was the judge, rather than the jury, that found capital facts.  However, now that the statute calls for the jury to make that decision, it would seem that some attempt must be made to further define and narrow that aggravator.  The Commission did not consider this issue.  Similarly, proportionality review has been eliminated in Arizona, but it would

seem plausible to consider seriously its reinstitution in the wake of potential inconsistencies of jury sentencing.  Again the Commission has not addressed this issue.

We also now know that the new system will be even more costly to operate than the old system.  Indeed in Maricopa County both the prosecutor and all indigent defense agencies have asked for substantial supplemental appropriations, which must be considered in the light of existing budget cuts.  The new system will in all likelihood accentuate the existing problems of indigent capital representation.  Again the Commission did not consider this issue.

Until such an evaluation of the new statute is conducted, I do not believe that we can, in good faith, say that the capital system should continue in Arizona.

## IV.    Conclusion.

The members of the Capital Commission have taken a significant step toward understanding and evaluating the death penalty in Arizona.  Most significantly that step has been to collect data and information about the operation of the system.  However, I believe that the Commission has not completed the work necessary to finish its review.  Most importantly, we have not fully addressed what I believe is the inevitable conclusion that ours is a fundamentally flawed system; flawed by incorrect decisions; high levels of inconsistency, inadequate funding for representation; and decisions related to what should be irrelevant factors, such as the race of the victim.  On top of that, we have not looked at all at the implications of the new system that has been instituted in the wake of *Ring*.

For these reasons, I respectfully suggest that the only appropriate recommendation for the Capital Case Commission based upon what we have learned over the last two years and what we now realize we still don't know is that, at a minimum, a moratorium should be imposed within the capital system until we can determine whether the observed flaws can be eliminated or whether our inability as a society to remedy these flaws should lead to the abolition of the death penalty in Arizona.

# VI.  CONCLUSION

Attorney General Napolitano expresses appreciation to Capital Case Commission members and staff for volunteering their time and talents to this effort.  The Commission provided a healthy forum in which to discuss and address concerns relating to the death penalty process in Arizona.

The data amassed by the Data/Research Subcommittee provides an unprecedented wealth of information and allows for a discussion of how the death penalty process works without resort to anecdotal histories. While the data may lead different people to reach different conclusions, its availability is invaluable in attempting to make reasoned conclusions about the death penalty in Arizona.

The recommendations proffered by the various subcommittees and the Commission are the result of extensive study and deliberation by prosecutors, defense attorneys, judges, victim advocates, and state legislators.  The Commission strongly urges that the recommendations set forth in the report be adopted to attempt to improve the death penalty process in Arizona.

Finally, this Report is not intended to be the final word on the death penalty, but rather a starting point for additional discussion and study.  Attorney General Napolitano recommends that all participants in the system continue to work together to try to ensure that the death penalty process is just, timely, and fair to defendants and victims.

# APPENDIX A

**ER 1.1.**        **Competence**

A lawyer shall provide competent representation to a client.  Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

**Comment**

**Legal Knowledge and Skill**

**[1]**      In determining whether a lawyer employs the requisite knowledge and skill in a particular matter, relevant factors include the relative complexity and specialized nature of the matter, the lawyer's general experience, the lawyer's training and experience in the field in question, the preparation and study the lawyer is able to give the matter and whether it is feasible to refer the matter to, or associate or consult with, a lawyer of established competence in the field in question.  In many instances, the required proficiency is that of a general practitioner.  Expertise in a particular field of law may be required in some circumstances.

**[2]**      A lawyer need not necessarily have special training or prior experience to handle legal problems of a type with which the lawyer is unfamiliar.  A newly-admitted lawyer can be as competent as a practitioner with long experience.  Some important legal skills, such as the analysis of precedent, the evaluation of evidence and legal drafting, are required in all legal problems.  Perhaps the most fundamental legal skill consists of determining what kind of legal problems a situation may involve, a skill that necessarily transcends any particular specialized knowledge.  A lawyer can provide adequate representation in a wholly novel field through necessary study.  Competent representation can also be provided through the association of a lawyer of established competence in the field in question.

**[3]**      In an emergency a lawyer may give advice or assistance in a matter in which the lawyer does not have the skill ordinarily required where referral to or consultation or association with another lawyer would be impracticable.  Even in an emergency, however, assistance should be limited to that reasonably necessary in the circumstances, for ill-considered action under emergency conditions can jeopardize the client's interest.

**[4]**      A lawyer may accept representation where the requisite level of competence can be achieved by reasonable preparation.  This applies as well to a lawyer who is appointed as counsel for an unrepresented person.  See also ER 6.2.

**Thoroughness and Preparation**

**[5]**      Competent handling of a particular matter includes inquiry into and analysis of the factual and legal elements of the problem, and use of methods and procedures meeting the standards of competent practitioners. It also includes adequate preparation. The required attention and preparation are determined in part by what is at stake; major litigation and complex transactions ordinarily require more ~~elaborate~~

**extensive** treatment than matters of lesser **complexity and** consequence.  **An agreement between the lawyer and the client regarding the scope of the representation may limit the matters for which the lawyer is responsible.  See ER 1.2(c).**

**Maintaining Competence**

**[6]**      To maintain the requisite knowledge and skill, a lawyer should **keep abreast of changes in the law and its practice,** engage in continuing study and education **and comply with all continuing legal education requirements to which the lawyer is subject**.  ~~If a system of peer review has been established, the lawyer should consider making use of it in appropriate circumstances.~~

**[7]      A lawyer, whether appointed or retained, who represents a defendant in a capital case shall comply with the standards for appointment of counsel in capital cases set forth in the Arizona Rules of Criminal Procedure.**

**ER 5.1.**          **Responsibilities of ~~a Partner or~~ Partners, Managers, and Supervisory Lawyers**

(a)      A partner in a law firm**, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm,** shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that all lawyers in the firm conform to the ~~rules~~ **Rules** of ~~professional~~ **Professional** ~~conduct~~ **Conduct**.

(b)      A lawyer having direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer conforms to the ~~rules~~ **Rules** of ~~professional~~**Professional** ~~conduct~~**Conduct**.

(c)      A lawyer shall be responsible for another lawyer's violation of the ~~rules~~ **Rules** of ~~professional~~ **Professional** ~~conduct~~ **Conduct** if:

        (1)      the lawyer orders or, with knowledge of the specific conduct, ratifies the conduct involved; or

        (2)      the lawyer is a partner **or has comparable managerial authority** in the law firm in which the other lawyer practices, or has direct supervisory authority over the other lawyer, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.


                                **Comment**

**[1]**      ~~Paragraphs~~ **Paragraph** (a) ~~and (b) refer~~ **applies** to lawyers who have ~~supervisory~~ **managerial** authority over the professional work of a firm ~~or legal department of a government agency~~. **See ER 1.0(c).** This includes members of a partnership, ~~and~~ the shareholders in a law firm organized as a professional corporation**, and members of other associations authorized to practice law**; lawyers having ~~supervisory~~**comparable managerial** authority in **a legal services organization or a** ~~the~~ law department of an enterprise or government agency; and lawyers who have intermediate managerial responsibilities in a firm.  **Paragraph (b) applies to lawyers who have supervisory authority over the work of other lawyers in a firm.**

**[2]      Paragraph (a) requires lawyers with managerial authority within a firm to make reasonable efforts to establish internal policies and procedures designed to provide reasonable assurance that all lawyers in the firm will conform to the Rules of Professional Conduct.  Such policies and procedures include, but are not limited to, those designed to detect and resolve conflicts of interest, identify dates by which actions must be taken in pending matters, account for client funds and property and ensure that inexperienced lawyers are properly supervised.**

**[3]**      ~~The~~ **Other** measures **that may be** required to fulfill the responsibility prescribed in ~~paragraphs~~ **paragraph** (a) ~~and (b)~~ can depend on the firm's structure and the nature of its practice.  In a small firm **of experienced lawyers**, informal supervision and ~~occasional admonition~~ **periodic review of compliance with the required systems** ordinarily ~~might be sufficient~~ **will suffice**.  In a large firm, or in practice

situations in which ~~intensely~~ difficult ethical problems frequently arise, more elaborate ~~procedures~~ **measures** may be necessary.  Some firms, for example, have a procedure whereby junior lawyers can make confidential referral of ethical problems directly to a designated senior partner or special committee.  See ER 5.2.  Firms, whether large or small, may also rely on continuing legal education in professional ethics.  In any event, the ethical atmosphere of a firm can influence the conduct of all its members and ~~a lawyer having authority over the work of another~~ **the partners** may not assume that ~~the subordinate lawyer~~ **all lawyers associated with the firm** will inevitably conform to the ~~rules~~**Rules**.

**[4]**     Paragraph (c)~~(1)~~ expresses a general principle of **personal** responsibility for acts of another.  See also ER 8.4(a).

**[5]**     Paragraph (c)(2) defines the duty of a **partner or other** lawyer having **comparable managerial authority in a law firm, as well as a lawyer who has** direct supervisory authority over performance of specific legal work by another lawyer.  Whether a lawyer has ~~such~~ supervisory authority in particular circumstances is a question of fact.  Partners ~~of a private firm~~ **and lawyers with comparable authority** have at least indirect responsibility for all work being done by the firm, while a partner **or manager** in charge of a particular matter ordinarily **also** has ~~direct authority over~~ **supervisory responsibility for the work of** other firm lawyers engaged in the matter.  Appropriate remedial action by a partner **or managing lawyer** would depend on the immediacy of ~~the partner's~~ **that lawyer's** involvement and the seriousness of the misconduct.  ~~The~~ **A** supervisor is required to intervene to prevent avoidable consequences of misconduct if the supervisor knows that the misconduct occurred.  Thus, if a supervising lawyer knows that a subordinate misrepresented a matter to an opposing party in negotiation, the supervisor as well as the subordinate has a duty to correct the resulting misapprehension.

**[6]**     Professional misconduct by a lawyer under supervision could reveal a violation of paragraph (b) on the part of the supervisory lawyer even though it does not entail a violation of paragraph (c) because there was no direction, ratification or knowledge of the violation.

**[7]**     Apart from this ~~rule~~ **Rule** and ER 8.4(a), a lawyer does not have disciplinary liability for the conduct of a partner, associate or subordinate.  Whether a lawyer may be liable civilly or criminally for another lawyer's conduct is a question of law beyond the scope of these ~~rules~~**Rules**.

**[8]**     **The duties imposed by this Rule on managing and supervising lawyers do not alter the personal duty of each lawyer in a firm to abide by the Rules of Professional Conduct.  See ER 5.2(a).**

**ER 5.2.        Responsibilities of a Subordinate Lawyer**

(a)        A lawyer is bound by the ~~rules~~ **Rules** of ~~professional~~ **Professional** ~~conduct~~ **Conduct** notwithstanding that the lawyer acted at the direction of another person.

(b)        A subordinate lawyer does not violate the ~~rules~~ **Rules** of ~~professional~~ **Professional** ~~conduct~~ **Conduct** if that lawyer acts in accordance with a supervisory lawyer's reasonable resolution of an arguable question of professional duty.

**Comment**

**[1]**        Although a lawyer is not relieved of responsibility for a violation by the fact that the lawyer acted at the direction of a supervisor, that fact may be relevant in determining whether a lawyer had the knowledge required to render conduct a violation of the ~~rules~~ **Rules**.  For example, if a subordinate filed a frivolous pleading at the direction of a supervisor, the subordinate would not be guilty of a professional violation unless the subordinate knew of the document's frivolous character.

**[2]**        When lawyers in a supervisor-subordinate relationship encounter a matter involving professional judgment as to ethical duty, the supervisor may assume responsibility for making the judgment.  Otherwise a consistent course of action or position could not be taken.  If the question can reasonably be answered only one way, the duty of both lawyers is clear and they are equally responsible for fulfilling it.  However, if the question is reasonably arguable, someone has to decide upon the course of action.  That authority ordinarily reposes in the supervisor, and a subordinate may be guided accordingly.  For example, if a question arises whether the interests of two clients conflict under ER 1.7, the supervisor's reasonable resolution of the question should protect the subordinate professionally if the resolution is subsequently challenged.

**ER 5.3.        Responsibilities Regarding Nonlawyer Assistants**

With respect to a nonlawyer employed or retained by or associated with a lawyer:

(a)        a partner**, and a lawyer who individually or together with other lawyers possesses comparable managerial authority** in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer;

(b)        a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and

(c)        a lawyer shall be responsible for conduct of such a person that would be a violation of the ~~rules~~ **Rules** of ~~professional~~ **Professional** ~~conduct~~ **Conduct** if engaged in by a lawyer if:

        (1)        the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or

(2)      the lawyer is a partner **or has comparable managerial authority** in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

## Comment

**[1]**      Lawyers generally employ assistants in their practice, including secretaries, investigators, law student interns, and paraprofessionals.  Such assistants, whether employees or independent contractors, act for the lawyer in rendition of the lawyer's professional services.  **Law enforcement officers generally are not considered associated with government lawyers, for purposes of this Rule.**  A lawyer ~~should~~ **must** give such assistants appropriate instruction and supervision concerning the ethical aspects of their employment, particularly regarding the obligation not to disclose information relating to representation of the client, and should be responsible for their work product.  The measures employed in supervising nonlawyers should take account of the fact that they do not have legal training and are not subject to professional discipline.

**[2]      Paragraph (a) requires lawyers with managerial authority within a law firm to make reasonable efforts to establish internal policies and procedures designed to provide reasonable assurance that nonlawyers in the firm will act in a way compatible with the Rules of Professional Conduct.  See ER 5.1, Comment [1].  Paragraph (b) applies to lawyers who have supervisory authority over the  work of a nonlawyer.  Paragraph (c) specifies the circumstances in which a lawyer is responsible for conduct of a nonlawyer that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer.**

# APPENDIX B

The Maricopa County Attorney's Office prepared the following chart showing the race of the defendant in different types of murder cases. The numbers within the boxes represent an individual case from Maricopa County's files. The same number may appear more than once if there are co-defendants in a particular case.

## MURDER CASES IN MARICOPA COUNTY BETWEEN JANUARY, 1995 AND DECEMBER 31, 1999 CATEGORIZED BY TYPE OF MURDER AND BY RACE OF THE DEFENDANT

| | **Gangs** (a) Drive By (b) Assault (c) Retribution | **Drugs** (a) Debt Collection (b) Rip Off (c) Retaliation | **Sex** (a) Assault (b) Assault with Child | **Other** (a) Retaliation for Testimony (b) Murder for Hire (c) Cop Kill (d) Officer Assault (e) Vehicular Crimes |
|---|---|---|---|---|
| **Caucasian** | 440 (a), 524 (c), 529 (a) | **236 (b), 236 (b), 238 (b), 238 (b), 289, 435, 436, 561, 563** 430 (b), 431 (b), 527 | **156 (a), 211, 372, 385 (a), 386 (a), 449 (a), 473 (a), 608 (a), 614 (a), 614 (a), 614 (a), 652 (a)** | **85 (b), 86 (b), 87 (b), 115 (c), 117 (b), 139 (a), 140 (a), 269 (d), 329 (b), 330 (b), 354 (b), 355 (b), 424 (b), 425 (b) 426 (b), 564, 620, 620, 622 (a)** 428 (e), 523 (a) |
| **Non-Caucasian** | **33, 136 (a), 137 (a), 199 (a), 199 (a), 205, 243, 388, 394, 395, 396, 405, 405, 489, 549, 556, 656** 125, 200 (a), 200 (a), 232, 244, 256, 314, 315, 316, 317, 323, 326, 333, 440 (a), 440 (a), 502, 539 (c), 540 (c), 579 (c), 590, 601 (a) | **122 (b), 122 (b), 127 (b), 127 (b), 133 (c), 134 (c), 135 (c), 148 (c), 167 (b), 167 (b), 247, 293 (d), 370 (b), 371 (b), 522 (b)** 220 (a), 382, 412, 474 (b), 553 (b), 554 (b), 596 (b), 621 (b), 649 (b), 658 (c) | **170 (b)** | **446 (e)** 445 (e), 445 (e), 445 (e), 519, 624, 703 |

**Bold = Death Alleged**

| | **Family Violence** (a) Spouse on Spouse (b) Baby Death (c) Boyfriend/Girlfriend (d) Family Member/Family Member (e) Child Abuse (f) Roommate/Roommate | **Assault** (a) Retribution (b) Fight (c) DOC Assault (d) Debt Collection | **Kidnapping** | **Robbery** (a) Robbery Gone Bad (b) Home Invasion |
|---|---|---|---|---|
| **Caucasian** | **2 (a), 17 (b), 39 (d), 42 (d), 91 (a), 92 (a), 93 (a), 141 (f), 169 (e), 174 (f), 185 (d), 186 (d), 197 (a), 198 (a), 207 (c), 207 (c), 214 (f), 215 (d), 216 (d), 217 (d), 218 (d), 224 (d), 224 (d), 257 (a), 306 (d),  309 (a), 309 (a), 345 (d), 346 (d), 360, 483 (e), 555 (d), 575 (e), 576 (e), 631 (a), 651 (e)**   45 (a), 46 (e), 119 (a), 225 (c), 231 (d), 240 (d), 352 (c), 365 (d), 366 (a), 399 (f), 419 (a), 421 (a),  422 (c), 439, 444 (a) | **3 (a), 78, 79 (a), 80 (a), 81 (a), 131 (a), 144 (b), 149 (b), 161 (d), 184 (a), 233 (b), 234 (b), 258, 273 (c), 274 (c) 275 (c), 283, 451, 465**   53 (b), 105, 106, 162, 165, 173, 248, 249, 255, 259, 282, 328, 333, 335, 350, 357, 358, 375, 390, 392, 393, 409 | **461, 462, 464, 647** | **25 (a), 26 (a), 27 (a), 59 (a), 59 (a), 67 (b), 121, 152, 153, 154, 155, 195, 196, 212, 213, 272, 278, 281, 313, 318 (a), 319 (a), 335, 336, 347, 407, 417, 417, 448, 468, 469, 513, 538, 538, 567, 568, 569, 580,591, 591, 591, 591, 592, 592, 592, 592, 603, 645, 659**   66,  177, 178, 219, 235, 260, 267, 279, 280, 296, 297, 298, 320, 320, 321, 321, 322, 322,  327, 362, 363, 364, 387, 526 |
| **Non-Caucasian** | **24 (a), 188 (f),  262 (c), 299 (d), 300 (d), 340 (b), 383 (d), 571 (e), 571 (e), 585 (e), 607 (e), 619 (a), 619 (d), 653 (a)**   147 (d), 190 (d), 230 (d), 270 (a), 271 (d), 324 (b), 341 (d), 427 (c) | **34 (b), 34 (b), 73 (a), 74 (a), 158 (a), 159 (a), 183, 183, 183, 242 (b), 242 (b), 242 (b), 307, 307, 337, 337, 368, 587, 587, 587**   118, 130, 150, 151, 182, 201, 202, 204, 239, 261, 268, 290, 292, 302,  334, 339, 356, 406, 408, 410 (a), 411, 416, 418, 433, 438, 441 | **611, 612, 700** | **5(a), 6 (a), 9 (a), 67 (b), 126, 143, 166, 194, 209, 210 (b), 254 (b), 254 (b), 254 (b), 342, 343, 344, 374 (b), 374 (b), 374 (b), 401, 402, 404, 450, 538, 588, 589, 618, 618, 618, 628, 632, 633**   129, 138, 142, 160, 181, 206, 221, 222, 250, 252 (b), 253 (b), 263, 284, 285, 287, 288, 384 |

**Bold = Death Alleged**