KRISTIN K. MAYES
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

ANDREW STUART REILLY
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
2005 N. CENTRAL AVENUE
PHOENIX, ARIZONA 85004
TELEPHONE: (602) 542-4686
CLDOCKET@AZAG.GOV
(STATE BAR NUMBER 029138)

ATTORNEYS FOR RESPONDENTS

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Frank Winfield Anderson,<br><br>　　　　Petitioner,<br><br>　　-vs-<br><br>Ryan Thornell, et al.,<br><br>　　　　Respondents. | CV 23–08023–PCT–GMS<br><br>**ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**(DEATH PENALTY)** |

Respondents, pursuant to Rule 5 of the Rules Governing § 2254 Cases, hereby answer the Petition for Writ of Habeas Corpus. For the reasons set forth in the following Memorandum of Points and Authorities, Respondents respectfully request that the petition be denied and dismissed with prejudice.

### MEMORANDUM OF POINTS AND AUTHORITIES

**I.    FACTUAL AND PROCEDURAL BACKGROUND.**

In 1998, a jury found Petitioner Frank Winfield Anderson guilty of armed robbery, conspiracy to commit first-degree murder, and three counts of first-degree murder, and he was sentenced to death for each of the three murders. *State v. Anderson*, 111 P.3d 369, 375, ¶ 1 (Ariz. 2005) ("*Anderson II*"); *see also State v. Anderson*, 4 P.3d 369, 372, ¶ 1 (Ariz. 2000) ("*Anderson I*"). On appeal, the Arizona Supreme Court reversed the convictions "because the trial court failed to permit defense counsel to attempt to rehabilitate jurors with respect to answers in a

written questionnaire indicating opposition to the death penalty." *Anderson II*, 111 P.3d at 375–76, ¶ 1 (citing *Anderson I*).  Anderson was again convicted on all counts and sentenced to death for each of the three murders following a retrial. *Id.* at 376, ¶¶ 1–2.

The Arizona Supreme Court summarized Anderson's crimes in its opinion affirming his convictions and sentences, and these facts must be presumed correct. 28 U.S.C. § 2254(e)(1).

In late July 1996, Anderson, then forty-eight years old, and Kimberly Lane, his fourteen-year-old traveling companion, left their homes in Lancaster, California and traveled to Nevada.  On August 10, 1996, the two were hitchhiking in Las Vegas and were picked up by a man who knew a family near Kingman that took in boarders. The man drove Anderson and Lane to a residence in Golden Valley, approximately seventeen miles from Kingman.  The residence was the home of Leta Kagen, her fifteen-year-old son Robert Delahunt, her husband Elliot Kagen, and Roland Wear.  Robert Poyson, then nineteen, had also been staying there for about six months.

Anderson and Lane stayed at the Kagen home for several days. They decided to move on, but had no means to leave Golden Valley. Anderson, Lane, and Poyson therefore decided to kill the residents of the Kagen home and steal Wear's pickup.  On August 13, while Elliot Kagen was attending a sick friend in Kingman, the three set their plan into action.

At approximately 8:00 p.m., Lane lured Delahunt to a trailer at the rear of the Kagen property, where Lane and Delahunt began kissing on a mattress.  Anderson, who had previously placed a knife in the trailer, grabbed Delahunt and sliced his throat.  Anderson and Delahunt then began to struggle for control of the knife.

Lane left the trailer as Poyson entered and joined the struggle. Anderson eventually put the tip of the knife in Delahunt's ear and held him while Poyson pounded the knife until the tip emerged through Delahunt's nose.  Poyson then beat Delahunt's head with a rock until he died.

After Delahunt was killed, Anderson, Lane, and Poyson went back to the Kagens' trailer home.  Leta Kagen and Wear went to sleep several hours later, unaware of Delahunt's fate.  Around midnight,

2

Poyson grabbed a rifle that was kept in the trailer home. With Anderson carrying a lantern for light, Poyson and Anderson entered the bedroom where Kagen and Wear were sleeping. Poyson shot Kagen, killing her almost instantly. He fired again, hitting Wear in the jaw. Wear leapt out of bed and Poyson hit him over the head with the butt of the rifle. Anderson hit Wear with the lantern, which shattered. Wear ran outside, pursued by Anderson and Poyson. Anderson handed a cinder block to Poyson, who beat Wear over the head until he was dead.

After covering up Wear's body and stealing some items from the residence, Anderson, Lane, and Poyson left Golden Valley in Wear's pickup. With Anderson driving, the trio headed east on Interstate 40. Several days later, Anderson was stopped in Illinois while driving alone in Wear's truck. An Illinois state trooper ran the license plate number and found that the truck was connected with a multiple homicide in Arizona. Anderson was arrested. A search of the truck revealed a purse containing identification and credit cards belonging to Kagen and Wear.

After his arrest, Anderson was interrogated three times. Each interview was preceded by *Miranda* warnings; each time Anderson waived his rights. Although Anderson initially denied any involvement in the Golden Valley murders, by the end of the third interview he had confessed to involvement in the crimes.

At trial, Anderson sought to minimize his participation in the homicides. He claimed that the murders and robbery were not premeditated and that he never intended for any of the victims to die. He admitted to slicing Delahunt's throat but claimed that he did so because he thought Delahunt was sexually assaulting Lane and because Delahunt bit Anderson when he intervened. Anderson testified that, after slicing Delahunt's throat, he watched Poyson beat Delahunt to death but did not participate or assist. He also claimed that he had no prior knowledge that Poyson was going to shoot Kagen or Wear and that he was simply an observer of those crimes. He testified that he felt threatened by Poyson and failed to intervene out of fear.

*Anderson II*, 111 P.3d at 376–77, ¶¶ 3–10 (footnote omitted).

As noted above, a jury found Anderson guilty on all counts, but prior to sentencing, the Supreme Court decided *Ring v. Arizona*, 536 U.S. 584 (2002), and

1   the legislature amended Arizona's capital sentencing scheme, assigning to juries
2   the responsibility for finding aggravating circumstances proven and determining
3   whether a death sentence should be imposed.  *Id.* at 377, ¶ 11.  A new jury was then
4   empaneled and unanimously found multiple aggravating factors for each murder.
5   *Id.* at ¶ 12.  Specifically, the jury found "that the murders of Delahunt and Wear
6   were motivated by pecuniary gain, A.R.S. § 13–703(F)(5), were especially cruel,
7   heinous or depraved, [] § 13–703(F)(6), and were committed during the
8   commission of another homicide, [] § 13–703(F)(8)."  *Id.* at ¶ 12 n.2.[1]  "The jury
9   found that the murder of Kagen was motivated by pecuniary gain and committed
10  during the commission of another homicide."  *Id.*  The jury "concluded that any
11  mitigating factors were not sufficiently substantial to call for leniency," and the
12  "superior court accordingly imposed three death sentences."  *Id.* at ¶ 12.

13      The Arizona Supreme Court affirmed his convictions and sentences, *id.* at
14  391–93, ¶¶ 132–37, and the United States Supreme Court denied Anderson's
15  petition for certiorari, *Anderson v. Arizona*, 546 U.S. 895 (mem.).  Anderson filed a
16  timely petition for post-conviction relief in 2010, raising numerous claims for
17  relief, which were all denied and dismissed over multiple orders and following an
18  evidentiary hearing.  *See* PCR Rulings dated May 4, 2011, October 4, 2016,
19  September 6, 2018, and September 23, 2020.  The post-conviction court
20  subsequently denied Anderson's request for rehearing on February 11, 2021, and
21  Anderson's petition for review was summarily denied by the Arizona Supreme
22  Court on November 1, 2022.

23      Anderson timely filed the instant petition for writ of habeas corpus with this
24  Court on October 10, 2023.  Dkt. #21.

25

26

_____

27  [1]  Arizona's capital sentencing statutes have since been reorganized and
    renumbered, and Respondents cite the statutes as they were in the direct appeal
28  opinion, unless otherwise noted, in an attempt to reduce confusion.

**II.     STATEMENTS OF TRANSCRIPTS AND RECORDS.**

On August 14, 2023, this Court received the state court record.  Dkt. #20.

**III.     PRELIMINARY CONSIDERATIONS.**

Anderson states that he "reserves his right to seek leave to amend his petition . . . ."  Dkt. #21, at 12.  Anderson cannot, however, "reserve" a right to amend his petition.  Amendments are strictly regulated by Fed. R. Civ. P. 15 and LVCiv 15.1.  Additionally, AEDPA's 1-year statute of limitations applies to an amended petition on a claim-by-claim basis.

Anderson also states that he "hereby incorporates by reference each of the exhibits to his petition into each and every one of his claims for relief as if fully set forth herein."  Dkt. #21, at 13.  But, in federal habeas proceedings, a petitioner may only incorporate by reference an appended exhibit through clear and repeated references to that exhibit; merely attaching documents to the petition, without clear, repeated incorporations by reference throughout the petition, is insufficient to incorporate the facts and legal issues from those documents into the petition.  *See Dye v. Hofbauer*, 546 U.S. 1, 4 (2005); *see also Walton v. Hill*, 652 F. Supp. 2d 1148, 1170–71 (D. Or. 2009) (stating that is it not preferable, but a petition could explicitly incorporate by reference arguments set out in exhibits).

**IV.     AEDPA STANDARDS.**

    **A.     *Exhaustion and procedural default.***

Before a state prisoner advances his claims in a federal habeas corpus petition, he must exhaust those claims in the state courts "by invoking one complete round of the State's established appellate review process."  *O'Sullivan v. Boerckel*, 526 U.S.  838, 845 (1999).  State exhaustion requires a prisoner to "'fairly present' his claims in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim."  *Baldwin v.  Reese*, 541 U.S.  27, 29 (2004).

Further, habeas corpus relief is available only for custody that violates the Federal Constitution, laws, or treaties. 28 U.S.C. § 2254(a). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). Additionally, under the independent state grounds principle, a federal habeas court generally may not review a claim if the state court's denial of relief rests upon an independent and adequate procedural state ground. *Coleman v. Thompson*, 501 U.S. 722, 728 (1991).

Claims may be procedurally barred from federal habeas review based upon an express bar or an implied bar. *See Robinson v. Schriro*, 595 F.3d 1086, 1100 (9th Cir. 2010). If a state court *expressly* applied a procedural bar when the petitioner attempted to raise the claim in state court, and that state procedural bar is both "independent" and "adequate," review of the merits of the claim by a federal habeas court is barred. *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991). A procedural bar may be implied where state procedural rules would render futile a return to state court. In such cases, the claim is deemed technically exhausted but procedurally defaulted. *Coleman*, 501 U.S. at 735 n.1 (claims are barred from habeas review when not first raised before state courts and those courts "would now find the claims procedurally barred").

## B. *Cause and prejudice.*

This Court may review a procedurally defaulted claim only if the petitioner alleges and proves both "cause" for the procedural default and "actual prejudice" arising from the alleged constitutional error, *Manning v. Foster*, 224 F.3d 1129, 1132–33 (9th Cir. 2000), or if the petitioner establishes that a fundamental "miscarriage of justice" has occurred. *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992). Generally, the ineffective assistance of state post-conviction counsel does not provide cause to excuse the procedural default of a claim. *Coleman,* 501 U.S. at 752. However, the Supreme Court held in *Martinez v. Ryan*, 566 U.S. 1 (2012),

1   that the ineffective assistance of post-conviction counsel *may* provide cause to
2   excuse the procedural default of a claim of ineffective assistance of trial counsel.
3   *Id.* at 17.  In *Shinn v. Ramirez*, 596 U.S. 366 (2022), the Supreme Court held that
4   28 U.S.C.  § 2254(e)(2)'s requirements for presenting new evidence applies to
5   claims whose defaults are excused under *Martinez*.  The requirements of §
6   2254(e)(2) also apply to new evidence presented to determine whether cause and
7   prejudice exists under *Martinez*.  *Ramirez*, 596 U.S. at 389.

8        **C.    *AEDPA's bar against relitigation.***

9        Congress set forth in AEDPA "a difficult to meet and highly deferential
10  standard for evaluating state-court rulings, which demands that state-court
11  decisions be given the benefit of the doubt."  *Cullen v. Pinholster*, 563 U.S. 170,
12  181 (2011) (quotations and citations omitted); *see also Harrington v. Richter*, 562
13  U.S. 86, 102 (2011).  This deferential standard bars relitigation of federal claims
14  unless the petitioner can establish that the state court's adjudication of a claim
15  "was contrary to, or involved an unreasonable application of, clearly established
16  Federal law," or "was based on an unreasonable determination of the facts in light
17  of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

18       A state court decision is "contrary to" clearly established Supreme Court
19  precedent when the court has applied a rule of law that contradicts the governing
20  law set forth in Supreme Court precedent, or has encountered a set of facts that are
21  "materially indistinguishable" from a Supreme Court decision and yet reached a
22  different result than the Supreme Court.  *Early v. Packer*, 537 U.S. 3, 8 (2002).
23  "For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is
24  different from an *incorrect* application of federal law.'"  *Richter*, 562 U.S. at 101
25  (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).   "A state court's
26  determination that a claim lacks merit precludes federal habeas relief so long as
27  fairminded jurists could disagree on the correctness of the state court's decision."
28  *Id.* (quotation marks omitted).

1    This Court should grant habeas relief only if the state court's error actually

2    prejudiced a prisoner—the error must have "had substantial and injurious effect or

3    influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619,

4    637–38 (1993) (quotations omitted); *see also Brown v. Davenport*, 142 S. Ct. 1510,

5    1517 (2022) ("When a state court has ruled on the merits of a state prisoner's

6    claim, a federal court cannot grant relief without first applying both the test this

7    Court outlined in *Brecht* and the one Congress prescribed in AEDPA.").   This

8    Court must apply *Brecht*'s standard even if the state court did not conduct a

9    harmless error analysis.  *Bains v. Cambra*, 204 F.3d 964, 977–78 (9th Cir. 2000).[2]

10   And if the state court conducted a harmless-error analysis, the prisoner can only

11   obtain relief if the state court's harmless-error determination was unreasonable.

12   *Davis v. Ayala*, 576 U.S. 257, 269–70 (2015).

13       **D.    *Ineffective assistance of counsel.***

14       Anderson cannot prevail on his claims that counsel were ineffective unless

15   he proves both that counsel's performance fell below an "objective standard of

16   reasonableness," and any deficient performance prejudiced the defense.

17   *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984).  But courts "must indulge

18   a strong presumption that counsel's conduct falls within the wide range of

19   reasonable professional assistance."  *Id.* at 689.  To prove deficient performance, a

20   defendant must "overcome the presumption that, under the circumstances, the

21   challenged action might be considered sound trial strategy."  *Id.* (marks omitted).

22       To establish prejudice, a defendant must show that counsel's errors were so

23   serious that they deprived him of a fair trial.  *Strickland*, 466 U.S. at 687.  A

24   defendant must show "a reasonable probability that, but for counsel's

25   unprofessional errors, the result of the proceeding would have been different."

26   _____

27   [2] *But see* n.3, *infra*.

28

1  *Id.* at 694.  "A reasonable probability is a probability sufficient to undermine
2  confidence in the outcome."  *Id.*[3]

3  Moreover, when analyzing a claim under *Strickland*, the reviewing court
4  cannot substitute its own judgment for that of the original sentencer; rather, the
5  reviewing court must determine whether the sentencer *in the defendant's case*
6  would have rendered a different verdict:

> [W]hen a defendant challenges a conviction, the question is
> whether there is a reasonable probability that, absent the errors, the
> factfinder would have had a reasonable doubt respecting guilt.  When
> a defendant challenges a death sentence such as the one at issue in this
> case, the question is whether there is a reasonable probability that,
> absent the errors, the sentencer—including an appellate court, to the
> extent it independently reweighs the evidence—would have
> concluded that the balance of aggravating and mitigating
> circumstances did not warrant death.

*Strickland*, 466 U.S. at 695.

Finally, when claims have been resolved under *Strickland* by a state court,
habeas review is subject to double deference because the court must give "both the
state court and the defense attorney the benefit of the doubt."  *Burt v. Titlow*, 571
U.S. 12, 15 (2013); *see also Richter*, 562 U.S. at 105 ("When § 2254(d) applies,
the question is not whether counsel's actions were reasonable. The question is
whether there is any reasonable argument that counsel satisfied *Strickland's*
deferential standard."); *Murray v. Schriro*, 882 F.3d 778, 826 (9th Cir. 2018)
(noting "the double deference applicable to AEDPA claims of ineffective assistance
of counsel").

---

[3] Where a habeas petition governed by AEDPA alleges ineffective assistance of
counsel under *Strickland*, the Ninth Circuit "appl[ies] *Strickland's* prejudice
standard and do[es] not engage in a separate analysis applying the *Brecht*
standard." *Musladin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009).

1  **V.    ARGUMENT.**

2        Anderson raises numerous claims for relief, and Respondents address each

3  allegation in turn, addressing procedural default, where appropriate, and then the

4  merits of each claim.    For the following reasons, this Court should reject each

5  claim, deny a certificate of appealability, and dismiss the petition.

6        **A.    *The trial court did not deprive Anderson of a unanimous verdict or***

7              ***commit <u>Simmons</u>[4] error (Claim One).***

8        Anderson first argues his "death sentences are invalid under the federal

9  constitutional guarantees of due process, right to a jury trial, effective assistance of

10  counsel, equal protection, and a reliable sentence," because: he was denied a

11  unanimous sentencing verdict (Claim One(A)); he was denied the right to

12  affirmatively instruct the jury regarding his parole ineligibility (Claim One(B));

13  and trial and appellate counsel were ineffective in failing to raise Claims One(A)

14  and One(B) (Claim One(C)).  Dkt. #21, at 13.

15              *1.    The jury's sentencing verdict was unanimous (Claim One(A)).*

16        Anderson asserts the jury "was deprived of the ability to render a unanimous

17  penalty verdict" because the trial court incorrectly instructed the jury on Arizona

18  law by "stat[ing] 'life' meant 'life imprisonment with or without the possibility

19  parole.'"  Dkt. #31, at 11–13.

20              **a.    Procedural status.**

21        To properly exhaust the instructional-error claim Anderson raises in Claim

22  One(A), he was required to present it during his direct appeal to the Arizona

23  Supreme Court.    He failed to do so, however.    As a result, and for the reasons

24  previously discussed at length in Respondents' Response to Motion for Stay and

25  Abeyance, Dkt. #40, and Response to Notice of Supplemental Authority in Support

26

27  ─────────────────

28  [4] *Simmons v. South Carolina*, 512 U.S. 154 (1994).

of Motion to Stay, Dkt. #50, Respondents maintain Claim One(A) is technically exhausted but procedurally defaulted because Anderson failed to properly present the claim to the state courts and a return to state court to raise the claim now would be futile. *See Coleman*, 501 U.S. at 735 n.1; Ariz. R. Crim. P. 32.1(d)–(h); 32.2(a) & (b). As a result, and for the reasons previously asserted, this Court should dismiss the claim as procedurally defaulted.

### b.    Claim One(A) is meritless.

In Claim One(A), Anderson asserts the verdict forms for each first-degree murder improperly failed to allow the jury to unanimously find a non-death sentencing option. Dkt. #21 at 16–17. Specifically, Anderson complains the verdict form allowed the jurors to select death or "life in which case [Anderson] shall be sentenced to life imprisonment with or without parole." *Id.* Anderson argues that meant the jury could only choose to unanimously agree that Anderson should be sentenced to life with or without parole, "which is not a unanimous verdict even if every juror agreed to check the life box." Dkt. #31, at 11–12.

This Court, after considered Anderson's and Respondents' arguments, concluded the claim is "plainly meritless." Dkt. #52, at 8–9. This Court explained:

> First, the Supreme Court has held that the jury unanimity rule, established as applicable to the states in *Ramos*, does not apply retroactively on federal collateral review. *Edwards v. Vannoy*, 593 U.S. 255, 259 (2021). Second, Anderson's allegations do not suffice to demonstrate that the jury verdict posed a risk of a non-unanimous verdict. Anderson was entitled only to a unanimous determination by the jury "whether death is the appropriate sentence." *See* A.R.S. § 13-703.01(H). The trial court properly instructed the jury, under Arizona law, that it was tasked with determining whether the proffered mitigation was sufficiently substantial to call for leniency. (RT 11/12/02 at 11–12.) If the jury unanimously determined that it was not, then Arizona law required the imposition of a death sentence. *See* A.R.S. § 13-703(E). Having unanimously determined that the mitigation was not sufficiently substantial to call for leniency, the jury had no occasion to consider other potential sentences or whether the court would impose a sentence of life with the possibility of parole.

1    Accordingly, Claim 1(A) is meritless . . . .

2    *Id.* at 9.

3    Respondents' again maintain their argument, and this Court's reasoning and

4    conclusion were and remain sound; Claim One(A) is plainly meritless.  This Court

5    should therefore deny and dismiss the procedurally defaulted and meritless claim.

6          2.      *Anderson's* <u>Simmons</u> *claim is meritless (Claim One(B)).*

7    Anderson asserts next that the trial court violated his due process rights,

8    pursuant to *Simmons*, by incorrectly instructing the jury that he could receive a

9    release-eligible sentence. Dkt. #21, at 19–25.

10         **a.**     **Relevant law.**

11   In *Simmons*, the Supreme Court held that, when a capital defendant's future

12   dangerousness is at issue and state law does not provide the possibility of a parole-

13   eligible sentence, the defendant is entitled, upon request, to so inform the jury.  In

14   2008, the Arizona Supreme Court held that *Simmons* did not apply in Arizona

15   because state law did not prohibit capital defendants from receiving release-

16   eligible sentences.  *State v. Cruz* (*Cruz I*), 181 P.3d 196, 207, ¶ 42 (Ariz. 2008).  In

17   2016, the Supreme Court decided *Lynch v. Arizona*, 578 U.S. 613 (2016), finding

18   that *Simmons* did in fact apply in Arizona.

19   The Arizona Supreme Court acknowledged *Lynch*'s holding that *Simmons*

20   applied in Arizona but concluded that *Lynch* did not represent a significant change

21   in the law under Arizona Rule of Criminal Procedure 32.1(g).[5]  *State v. Cruz* (*Cruz*

22   *III*), 598 U.S. 17, 24–25 (2023).  The Supreme Court disagreed, holding that "the

23   Arizona Supreme Court's application of Rule 32.1(g) to *Lynch* was so novel and

24   unfounded that it does not constitute an adequate state procedural ground."  *Id*. at

25

26   _____

27   [5] Rule 32.1(g) permits post-conviction relief if "there has been a significant change in the law that, if applicable to the defendant's case, would probably overturn the defendant's judgment or sentence."  Ariz. R. Crim. P. 32.1(g).

28

29.   Accordingly, Respondents have not disputed that *Simmons* claims are not precluded in a successive petition for post-conviction relief under Rule 32.1(g).

**b.    The *Simmons* claim in Claim One(B) is meritless.**

In Claim 19 of his Supplemental Petition for Post-Conviction relief, Anderson raised a combined claim that the trial court erred by instructing the jury that he could receive a release-eligible sentence and that counsel were ineffective for failing to object and request a *Simmons* instruction.  Supp. PCR Petition, at 2–9.  The post-conviction court rejected the claim, stating:

> E. Failure to Request Jury Instruction Regarding Possible Natural Life Sentence
>
> Anderson asserts that his trial counsel was ineffective for failing to request a jury instruction regarding the possibility of a natural life sentence pursuant to *Simmons v. South Carolina*, 114 S.Ct. 2187 (1994).  The State correctly notes that future dangerousness was not an issue. Further, Anderson argued that he would never be released from prison.  Anderson's counsel told the jury "There's no chance he's ever going to get out" and that he would be "locked up for the rest" of his life.
>
> It was reasonable for trial counsel to not request such a jury instruction under the circumstances.  The Court finds trial counsel's failure to request a jury instruction regarding the possibility of a natural life sentence reasonable and not evidence of ineffective assistance.

PCR Ruling 09/23/20, at 10.

The post-conviction court's ruling was not contrary to or an unreasonable application of clearly established federal law, nor based on an unreasonable determination of the facts.  A *Simmons* violation occurs only if a trial court *rejects* a defendant's request to inform the jury of his parole-ineligibility.  *See Lynch*, 578 U.S. at 615 (In *Simmons*, "the trial court refused to permit defense counsel to tell the jury that the only alternative sentence to death was life without parole."); *Ramdass v. Angelone*, 530 U.S. 156, 165 (2000) (*Simmons* "concluded that due process entitled the defendant to inform the jury of parole ineligibility, either by a

jury instruction or in arguments by counsel."); *O'Dell v. Netherland*, 521 U.S. 151, 167 (1997) (*Simmons* provides a "narrow right of rebuttal . . . to defendants in a limited class of capital cases.").

Thus, for *Simmons* to apply, Anderson was required to *ask the court* to instruct the jury that he would be ineligible for parole. *State v. Bush*, 423 P.3d 370, 388, ¶ 75 (Ariz. 2018). Because he did not do so, "the trial court neither refused to instruct, nor prevented [Anderson] from informing, the jury regarding his parole ineligibility," and no *Simmons* violation occurred.[6] *Id.*; *see also Townes v. Murray*, 68 F.3d 840, 850 (4th Cir. 1995) ("[T]he fact that a jury was not informed of the defendant's parole ineligibility would not violate the defendant's due process rights, as recognized by *Simmons*, if that lack of information was due to the defendant's own inaction . . . . [T]he defendant's right, under *Simmons*, is one of opportunity, not of result.").

Anderson admits he did not request a parole-ineligibility instruction. *See, e.g.*, Dkt. #21, at 22 ("Trial counsel neither objected, moved for mistrial, nor requested a positive *Simmons* instruction informing the jurors that Anderson could never be released."). He asserts that, because parole was unavailable and his future dangerousness was at issue, *Simmons* required the trial court to sua sponte instruct the jury that he could not receive a parole-eligible sentence. Anderson, however, identifies no clearly established federal law requiring a trial court to sua sponte instruct a jury that the defendant is parole-ineligible. Anderson, therefore, has not established that the post-conviction court's reasoning is "inconsistent with the holding in a prior decision of [the Supreme Court]." *Richter*, 562 U.S. at 102.

---

[6] In *Payne v. Thornell*, the district court held that the petitioner, who did not request a parole-ineligibility instruction, had "no hope of prevailing on his *Simmons* claim" in state court because "[t]he Arizona Supreme Court's decision in *Bush* . . . correctly explains the due process holding of *Simmons* and validates their argument that Payne has failed to present a colorable claim." 679 F.Supp.3d 931, 936 (D. Ariz. June 28, 2023) (quotation marks omitted).

Anderson, nonetheless, asserts the post-conviction court "did not expressly address Anderson's substantive [*Simmons*] claim, so this Court's review is de novo." Dkt. #21, at 25. But Anderson is incorrect; an "express" ruling is not required. And, even if one were, it is clear the post-conviction court concluded *Simmons* did not apply to Anderson's case and, therefore, counsel were not ineffective for not requesting the instruction. PCR Ruling 09/23/20, at 10. This is an appropriate analysis because, again, *Simmons* is a narrow right of rebuttal. *O'Dell*, 521 U.S. at 167. A *Simmons* instruction is only meant "to ensure that the jury is not misled about a defendant's future incarceration status when assessing evidence of his future dangerousness." *United States v. Fields*, 516 F.3d 923, 942 (10th Cir. 2008). "[T]he defendant's right, under *Simmons*, is one of opportunity, not of result." *Townes v. Murray*, 68 F.3d 840, 850 (4th Cir. 1995). Thus, if counsel were not ineffective because there was no reason to request a *Simmons* instruction, as the post-conviction court found, then necessarily no *Simmons* error occurred, as well.

However, even if the post-conviction court's ruling was somehow unclear, this Court must then treat the situation as one in which a silent denial was made and apply the deferential *Richter* test—that is, it must determine whether there was *any* reasonable argument that *could* support the denial and then apply AEDPA deference to that argument. *See Chavez v. Brnovich*, 42 F. 4th 1091, 1100 (9th Cir. 2022) (citing *Cannedy v. Adams*, 706 F.3d 1148, 1162 n.7 (9th Cir. 2013)). And, as discussed, a fairminded jurist could have reasonably concluded that no error occurred because the prerequisite for a *Simmons* instruction did not exist and, therefore, the instruction was not necessary "to ensure that the jury is not misled about a defendant's future incarceration status when assessing evidence of his future dangerousness." *Fields*, 516 F.3d at 942.

Anderson contests the post-conviction court's determination that his future dangerousness was not at issue. Dkt. #21, at 23–25. He asserts future

1   dangerousness was inherent in the crimes, and he complains the State
2   "emphasiz[ed] the number of victims" and noted "Anderson's prior acts of
3   stealing, associating with prostitutes, and his relationship with Kim Lane as a way
4   to paint Anderson as someone likely to be dangerous in the future." *Id.* at 25.  He
5   is mistaken.  None of the record cites provided by Anderson show the State even
6   alluding to Anderson's dangerousness or his future.

7       It was undisputed throughout the penalty phase that, while Anderson was a
8   major participant in the murders, Poyson had inflicted the fatal blows on all three
9   victims.  *See, e.g.*, R.T. 11/25/02, at 180–81, 253.  It was further undisputed that
10  Anderson would die in prison, regardless of whether he could receive a parole-
11  eligible life sentence, because he was 54 years old at the time.  *See, e.g.*, *id.* at 225–
12  26, 246.  Anderson's future—whether potentially dangerous or otherwise—was
13  never in any doubt or ever a consideration.  The sole issue before the jury was
14  whether Anderson was deserving of death for these murders and nothing more.

15      The post-conviction court's decision rejecting Anderson's *Simmons* claim
16  was not contrary to, or an unreasonable application of, clearly established federal
17  law and did not rest on an unreasonable application of the facts.  And for the same
18  reasons, any claimed *Simmons* error could not have had a "substantial and injurious
19  effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 623.
20  Claim One(B) should be denied.

21          *3.    Counsel were not ineffective for not requesting a __Simmons__*
22              *instruction (Claim One(C)).*

23      In Claim One(C), Anderson asserts trial and appellate counsel were
24  ineffective for failing to raise Grounds One(A) and One(B) in state court.  Dkt.
25  #21, at 25–27.

26          **a.    Exhaustion.**

27      In Claim 19 of his Supplemental Petition for Post-Conviction Relief,
28  Anderson alleged, in part, that trial and appellate counsel were both ineffective for

1    not raising the *Simmons* issue at trial and appeal respectively.  *See* Supp. PCR

2    Petition, at 2–11.  Anderson, however, did not raise a separate claim that counsel

3    were ineffective regarding the supposed non-unanimous verdict.  *Id.*  Moreover,

4    while Anderson argued trial counsel were ineffective regarding the *Simmons* issue

5    in his petition for review to the Arizona Supreme Court, he did not reassert that

6    appellate counsel were similarly ineffective in that petition for review.  *See* Petition

7    for Review, at 69 (arguing "PCR court erred and abused its discretion by finding

8    that trial counsel were not ineffective when . . .").  As a result, the only claim

9    properly exhausted from this subsection is the claim that trial counsel were

10   ineffective for failing to request a *Simmons* instruction.  *See Hurles v. Ryan*, 752

11   F.3d 768, 779–80 (9th Cir. 2014).

12        The remaining claims of ineffective assistance of trial and appellate counsel

13   are therefore technically exhausted but procedurally defaulted.  Anderson does not

14   identify any circumstances that would excuse the default of these claims.  And

15   because the claims would now be untimely and precluded in a successive petition

16   for post-conviction relief, they are procedurally defaulted.

17        *Martinez* does not provide cause to excuse the procedural default because, as

18   set forth below, the trial-counsel-ineffectiveness claim fails on the merits.  566

19   U.S. at 14 ("To overcome the default, a prisoner must also demonstrate that the

20   underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which

21   is to say that the prisoner must demonstrate that the claim has some merit.");

22   *Sexton*, 679 F.3d at 1157 ("PCR counsel would not be ineffective for failure to

23   raise an ineffective assistance of counsel claim with respect to trial counsel who

24   was not constitutionally ineffective."); *see also Davila v. Davis*, 582 U.S. 521,

25   524–25 (2017) (declining to extend *Martinez*'s exception to defaulted claims of

26   appellate counsel's ineffectiveness).

27

28

1

**b.     Claim One(C) is meritless.**

2

**i.     Counsel were not deficient.**

3      As discussed, Claims One(A) and One(B) are meritless. This Court

4  correctly determined the non-unanimity claim in Claim One(A) is plainly

5  meritless, Dkt. #52, at 8–9, and, as a result, neither trial nor appellate counsel were

6  ineffective for not objecting or appealing on that basis. *See Boag v. Raines*, 769

7  F.2d 1341, 1344 (9th Cir. 1985) ("Failure to raise a meritless argument does not

8  constitute ineffective assistance."); *see also Rupe v. Wood*, 93 F.3d 1434, 1445 (9th

9  Cir. 1996) ("[F]ailure to take a futile action can never be deficient performance.").

10      The post-conviction court also correctly held that Anderson's *Simmons*

11  argument in Claim One(B) was meritless and that trial counsel were therefore not

12  ineffective for not presenting the claim. PCR Ruling 09/23/20, at 10. As discussed

13  in detail above, the rebuttal right from *Simmons* did not apply in Anderson's

14  penalty phase because a *Simmons* instruction was not necessary to "ensure that the

15  jury [wa]s not misled about [Anderson's] future incarceration status when

16  assessing evidence of his future dangerousness." *See Fields*, 516 F.3d at 942.

17  Again, Anderson's future was never in doubt—it was undisputed he would die in

18  prison if not sentenced to death—and it is pure speculation that the jury was

19  influenced by any possible release because its unavailability for Anderson was

20  never in doubt. Anderson, therefore, has not demonstrated deficient performance.

21  *Strickland*, at 687–94; *see also, e.g.*, *United States v. Taylor*, 802 F.2d 1008, 1110

22  (9th Cir. 1986) (holding vague or speculative claims may be summarily rejected).

23

**ii.     Anderson was not prejudiced.**

24      Counsel also cannot demonstrate prejudice from any ineffectiveness in

25  counsels' decision not to object to Claims One(A) and One(B) because any error

26  was cured by the Arizona Supreme Court's independent review. *Strickland*

27  prejudice requires a reviewing court to consider "whether there is a reasonable

28  probability that, absent the errors, the sentencer—*including an appellate court, to*

1    *the extent it independently reweighs the evidence*—would have concluded that the

2    balance of aggravating and mitigating circumstances did not warrant death." 466

3    U.S. at 695 (emphasis added).    The "appellate court" here was the Arizona

4    Supreme Court, which independently reviewed Anderson's death sentence and

5    cured any possible prejudice resulting from the trial court's references to parole.

6        On independent review, the supreme court "reviews the entire record and

7    independently considers whether a capital sentence is not only legally correct, but

8    also appropriate." *State v. Roseberry*, 353 P.3d 847, 849, ¶ 13 (Ariz. 2015).  The

9    supreme court does not defer to the jury's findings and "will modify a death

10   sentence to a life sentence if warranted." *Id.* at 849–50, ¶ 13.  "[I]ndependent

11   review serves as a constitutional means to cure sentencing errors." *Id.* at 850, ¶ 14

12   (citing *Clemons v. Mississippi*, 494 U.S. 738, 748–50 (1990)) (independent review

13   cured trial court's error in instructing jury that a causal nexus was required for

14   mitigation); *see also McKinney v. Arizona*, 589 U.S. 139, 144 (2020) ("*Clemons*

15   reweighing is a permissible remedy for an *Eddings* error.").

16       This is so because the Constitution does not require a jury to impose a death

17   sentence.  *See McKinney*, 589 U.S. at 144 ("[I]n a capital sentencing proceeding

18   just as in an ordinary sentencing proceeding, a jury (as opposed to a judge) is not

19   constitutionally required to weigh the aggravating and mitigating circumstances or

20   to make the ultimate sentencing decision within the relevant sentencing range.");

21   *Clemons*, 494 U.S. at 745 ("Any argument that the Constitution requires that a jury

22   impose the sentence of death or make the findings prerequisite to imposition of

23   such a sentence has been soundly rejected by prior decisions of [the Supreme

24   Court].").  Accordingly, "state appellate courts can and do give each defendant an

25   individualized and reliable sentencing determination based on the defendant's

26   circumstances, his background, and the crime." *Id.* at 749.

27       In *Roseberry*, the Arizona Supreme Court considered the defendant's claim

28   that appellate counsel was ineffective in failing to assert the trial court incorrectly

instructed the jury it could consider only mitigation evidence that had a causal nexus to the crime. 353 P.3d at 848, ¶ 8.  The court explained that "any error in the jury instruction was cured when this Court considered all mitigation evidence in its independent review of the entire record and found it insufficient to call for leniency." *Id.* at 849, ¶ 12.  As a result, "any deficiency in appellate counsel's performance was cured by [the supreme court's] independent review." *Id.* at 850, ¶ 18.  Likewise, the Arizona Supreme Court's independent review of Anderson's sentence cured any error in the trial court's penalty phase instructions, and thus Anderson "did not suffer prejudice, as that term is defined in *Strickland*." *Id.*

The supreme court's discussion of the aggravation and mitigation in Anderson's case shows that it did not consider the possibility that Anderson might one day be released when it affirmed his death sentence.  The court first determined that it could not "be sure that the jury unanimously found a proper basis for the (F)(6) aggravator for the murders of Wear and Delahunt" and, therefore, did not "consider the jury's findings of the (F)(6) aggravator in [its] consideration of the appropriate sentence for the murders of Delahunt and Wear." *Anderson II*, 111 P.3d at 389, ¶ 130.  Then, after independently reviewing the evidence supporting the two aggravating circumstances found by the jury, the court affirmed those findings.  *Id.* at ¶¶ 132–33.  The court then turned to Anderson's mitigation and concluded the mitigating factors were not sufficiently substantial to call for leniency. *Id.* at 399, ¶¶ 134–37.

The possibility that Anderson might one day be released on parole was not a factor in the Arizona Supreme Court's independent review.  That review, then, cured any error and prevents a finding of *Strickland* prejudice from counsels' supposed ineffectiveness at the penalty phase.  Claim One(C) should be denied.

## B.    *Retrial counsel were not ineffective (Claim Two).*

Next, in Claim Two, Anderson argues his death sentences are invalid because the trial court improperly appointed counsel who were unqualified to

represent him in his capital proceeding and ultimately rendered ineffective assistance in those proceedings.  Dkt. #21, at 31.

       *1.    Counsel were not unqualified to represent Anderson in his capital retrial.  (Claim Two(A)).*

Anderson asserts the trial court improperly appointed counsel who were unqualified to represent Anderson during his capital proceedings.  Dkt. #21, at 31–45.  Specifically, Anderson asserts: the trial court's appointment of counsel violated Arizona's criminal rules and the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ("the ABA Guidelines"); lead counsel, Kehm, lacked the qualifications and proficiency necessary to be appointed lead counsel in a capital cases under Arizona's criminal rules and the ABA Guidelines; and second chair, Sutherland, lacked the qualifications and proficiency necessary to be appointed counsel in a capital case under Arizona's criminal rules and the ABA Guidelines.  *Id.*

       **a.    Claim Two(A) does not allege a federal constitutional claim.**

"[A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court *only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States*."  28 U.S.C. § 2254(a) (emphasis added); *see Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").  As noted, in Claim Two(A), Anderson asserts the trial court violated Arizona's criminal rules when it appointed trial counsel and that appointed counsel did not meet the minimum qualifications necessary for appointment in a capital case under Arizona's criminal rules and the ABA Guidelines.  Dkt. #21, at 31–45.  Such a claim, however, does not allege a violation of a federal constitutional provision.  Accordingly, he has not stated a claim for which this Court may grant relief.

1    Moreover, even if Anderson's claim could be read to allege a federal due
2   process violation, it would still substantively remain a state-law claim.  Anderson
3   "may not . . . transform a state-law issue into a federal one merely by asserting a
4   violation of due process." *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996);
5   *see also Poland v. Stewart*, 169 F.3d 573, 584 (9th Cir. 1999) ("Federal habeas
6   courts lack jurisdiction . . . to review state court applications of state procedural
7   rules.").  Rather, federal habeas courts "accept a state court's interpretation of state
8   law, and alleged errors in the application of state law are not cognizable in federal
9   habeas corpus." *Langford*, 110 F.3d at 1389 (citation omitted).  Because Anderson
10  asserts only that the state court violated the state's criminal rules and the ABA
11  guidelines, this Court should dismiss Claim Two(A) as not cognizable.

12              **b.    Exhaustion.**

13    Anderson asserts he properly presented these claims "to the state courts in
14  subsection II(A) – (C) of his state PCR Petition." *Id*. at 49.  But the claims
15  Anderson raised in subsection II(A) – (C) were not ineffective-assistance-of-
16  counsel claims, as Anderson now asserts in this petition.   Rather, Anderson
17  challenged the trial court's *selection and appointment of* counsel—not counsel's
18  subsequent *effectiveness* or lack thereof.   Anderson argued respectively: (1) the
19  trial court improperly appointed counsel under Arizona's Rules of Criminal
20  Procedure and the ABA Guidelines; (2) appointed counsel lacked the qualifications
21  necessary to be appointed under Arizona's Rules of Criminal Procedure and the
22  ABA Guidelines; and (3) the trial court's appointment improperly created a
23  conflict of interest between the trial court and counsel. *See* PCR Petition, at 5–17.

24    In fact, Anderson separately raised ineffective-assistance-of-counsel claims
25  later in section III of his petition for post-conviction relief, which he aptly titled,
26  "Claims of Ineffective Assistance of Counsel for Deficient Performance with
27  Resulting Prejudice under *Strickland*." *Id.* at 17.  Accordingly, the post-conviction
28  court did not consider the selection-of-counsel claims from subsection II(A) – (C)

under *Strickland*'s framework and correctly rejected them as non-cognizable and/or not raising a colorable claim in a post-conviction-relief proceeding.  *See* PCR Ruling 05/05/11, at 1–2; PCR Ruling 09/23/20, at 2–5.

Moreover, claims that the trial court violated Arizona's Rules of Criminal Procedure regarding appointed counsel are raiseable before and during trial and on direct appeal, including claims related to counsel satisfying the requirements under Arizona's Criminal Rules of Procedure, the ABA guidelines, and the Rules of Professional Conduct.  *See State v. Hausner*, 280 P.3d 604, 630–31, ¶¶ 123–26 (Ariz. 2012) (rejecting claim that the trial court abused its discretion in denying counsel's motion to withdraw); *State v. Lee*, 944 P.2d 1204, 1215 (Ariz. 1997) (denying claim that the trial court abused its discretion in denying defendant's request for second trial counsel).

Appellate counsel could have therefore challenged the manner in which the trial court selected and appointed counsel at trial or on appeal but elected not to do so.  This further supports the post-conviction court's finding that the claims, as raised in Anderson's petition for post-conviction relief, were neither cognizable in those proceedings, nor colorable.  Consequently, the claim is also procedurally defaulted because it was not properly presented to the state courts, and Arizona's procedural rules will not allow a return to state court to exhaust the claim in a subsequent post-conviction-relief proceeding.

Finally, to the extent this Court determines Claim Two(A) is a cognizable federal claim, and that Anderson properly exhausted it as a federal claim in the state courts, the post-conviction court's decision rejecting the claim was not contrary to, or an unreasonable application of, clearly established federal law and did not rest on an unreasonable application of the facts.

### c.      Claim Two(A) is meritless.

Anderson asserts the trial court violated Arizona's criminal rules in selecting and appointing counsel and claims counsel did not meet the minimum

qualifications necessary to represent him during his capital proceeding under Arizona's criminal rules and the ABA Guidelines. Dkt. #21, at 31–45.

The post-conviction court rejected the claim that counsel were unqualified, holding:

**Trial Counsel's 'Competence'**

[Anderson] also claims his trial counsel was not competent; or, put another way, was not qualified under Rule 6.8, A.R.Crim.P. [Anderson] cites no case law which indicates he is entitled to 'competent' counsel as opposed to effective counsel and the court is unaware of any. This claim is not cognizable.

**The Trial Court's Selection of Counsel**

As indicated in this court's previous denial of his request for discovery, the court finds [Anderson's] claims regarding the trial court's selection of counsel are not cognizable. There is no case law this court is aware of which prevents a trial court from appointing counsel for a defendant. Moreover, the court finds the claim is not colorable. Any prejudice suffered by [Anderson] from trial counsel's appointment would be the result of ineffectiveness, not the selection process that was utilized.

PCR Ruling 05/06/11, at 2.

Anderson reasserted the claim as a structural-error claim, which the post-conviction court again rejected, finding:

A,    Trial Counsel's Qualifications

Anderson was represented by Thomas Kehm and Douglas Sutherland during his retrial and resentencing. Kehm was a contract attorney assigned criminal cases in Mohave County, including non-capital homicide cases. Kehm had at some point resigned from the State Bar of Arizona in lieu of disbarment. His contract for defense services was eventually not renewed due to concerns of alleged deficient performance.

Doug Sutherland was an experienced civil litigator and trial attorney with some experience in non-capital criminal defense work. Sutherland did not meet the qualifications of Rule 6.8(A)(2), A.R.Crim.P. Sutherland testified that he and Kehm attended CLE training on capital defense issues shortly after their appointment.

Neither attorney attended training on how to present mitigation evidence to a capital jury.

Anderson argues that his defense team's general lack of qualifications constitutes structural error. The purpose of the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial. *Weaver v. Massachusetts*, 137 S.Ct. 1899, 1907 (2017).

Structural error is not subject to harmless error analysis for a few reasons. *See, Id.* at 1908. First, an error may be deemed structural if the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest. *Id.* Second, an error may be structural if the effects of the error are simply too hard to measure. *Id.* Third, an error may be structural if it always results in fundamental unfairness, such as the denial of an attorney or failure to give a reasonable doubt jury instruction. *See, Id.*

The first two categories of structural error do not apply in this case. The perceived violation allegedly resulted in a wrongful conviction or death sentence. Further, the effects of the alleged error are not at all hard to measure. If the Court finds structural error, Anderson will be entitled to a reversal of his death sentence.

The Court finds the facts of this case do not constitute the third category of structural error. Anderson does not cite any cases which hold that counsel's failure to meet the qualifications of Rule 6.8, A.R.Crim.P. (or American Bar Association guidelines for that matter) constitutes structural error and this Court is unaware of any. Further, an attorney's wrongful act or disbarment arising out of some separate incident does not automatically give rise to a presumption that his performance in all other cases is ineffective. A relatively inexperienced criminal lawyer can provide effective representation, especially if he has significant courtroom experience in other areas of law.

The Court finds Anderson has failed to establish that the appointment of Kehm and Sutherland as counsel constitutes structural error.

PCR Ruling 09/23/20, at 4–5.

The post-conviction court's denial of the claim was not contrary to, or an unreasonable application of, clearly established federal law and did not rest on an

1   unreasonable application of the facts.  The "standards set forth in Rule 6.8(b)" of

2   the Arizona Rules of Criminal Procedure do not govern a federal claim of

3   ineffective assistance of counsel in these habeas proceedings any more than the

4   ABA Guidelines.  *See Bobby v. Van Hook*, 558 U.S. 4, 8–9 (2009) (recognizing that

5   it was inappropriate to apply the 2003 version of the ABA's guidelines to review

6   the performance of trial counsel during a trial that occurred years prior to the

7   adoption of those guidelines and asserting such guidelines are "only guides").

8       In fact, it does not matter, for the purposes of these proceedings, whether

9   counsel satisfied the standards in Ariz. R. Crim. P. 6.8(b).[7]  Rather, the sole issue is

10  whether counsels' performance was "objectively reasonable" based upon the

11  information reasonably available at the time.  *Strickland*, 466 U.S. at 689–90

12  (stating that, in assessing whether counsel's performance was deficient under

13  *Strickland*, the test is whether counsel's actions were objectively reasonable at the

14  time of the decision).  This applies equally to the ABA Guidelines, as well; they are

15  "only guides" and not a substitute for S*trickland*'s "objective reasonableness" test.

16  *Id.*; *see also, e.g.*, *Van Hook*, 558 U.S. at 8–9.

17      Moreover, the 2003 version of the ABA Guidelines dramatically changed

18  and greatly expanded the scope of an attorney's duties from similar guidelines

19  previously issued.  *Van Hook*, 558 U.S. at 8. And neither the trial court, nor

20  Anderson's counsel, had access to the 2003 revisions of the ABA Guidelines.

21  Thus, the trial court and counsel may not be faulted for not following or satisfying

22  the updated and greatly expanded guidelines.  *See Strickland*, 466 U.S. at 689–90.

23      Anderson also points to no clearly established federal law demonstrating that

24  the trial court unconstitutionally selected counsel and that counsel failed to meet

25  the minimum qualifications necessary to represent Anderson.  In fact, federal law

---

[7] Respondents do not concede, and the record does not show, counsel failed to meet the qualifications necessary for their respective appointments.

1 "presume[s] that the lawyer is competent" unless *his conduct* demonstrates
2 otherwise. *United States v. Cronic*, 466 U.S. 648, 658 (1984). And even just one
3 day of preparation can be deemed enough to render effective assistance. *See*
4 *United States v. Mills*, 760 F.2d 1116, 1122 n.8 (11th Cir. 1985). Thus, Anderson's
5 argument that the post-conviction court improperly rejected Claim Two(A) fails.
6 *See Carey v. Musladin*, 549 U.S. 70, 77 (stating that when there is no Supreme
7 Court holding regarding the issue presented on habeas review, "it cannot be said
8 that the state court 'unreasonably applied clearly established Federal law'") (citing
9 28 U.S.C. § 2254(d)(1)); *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) ("[I]t is
10 not 'an unreasonable application of' 'clearly established Federal law' for a state
11 court to decline to apply a specific legal rule that has not been squarely established
12 by [the Supreme Court].") (citing *Wright v. Van Patten*, 552 U.S. 120, 123 (2008)).

13 Nonetheless, citing *Powell v. Alabama*, 287 U.S. 45 (1932), Anderson asserts
14 the trial court's appointment of counsel was per se prejudicial and requires
15 automatic reversal. Dkt. #21, at 32. Anderson is mistaken. *Powell*—the only case
16 where the Supreme Court has found circumstances so egregious that *no* attorney
17 could have provided effective assistance—is easily distinguishable:

18   *Powell* . . . involved the infamous trial of several African-
19 American men who faced the death penalty for raping a white woman
20 on a train in Alabama . . . . [T]he [trial] court appointed all members
of the bar as counsel for purposes of arraignment. On the day of the
21 trial six days later, a lawyer from another state appeared, but stated
22 that he had not had an opportunity to prepare the case . . . . The [trial]
23 court [however] decided that the out-of-state lawyer would represent
the defendants with whatever help the local bar could provide.

24 *Glover v. Miro*, 262 F.3d 268, 277–78 (4th Cir. 2001) (internal citations and
25 quotation marks omitted).

26 No meaningful comparison can be made between the circumstances
27 surrounding the appointment of counsel in Anderson's retrial and the appointment
28 of counsel in *Powell*. The defendants in *Powell* were "young, ignorant, illiterate,

surrounded by hostile sentiment, haled back and forth under guard of soldiers, charged with an atrocious crime regarded with especial horror in the community where they were to be tried, were thus put in peril of their lives within a few moments after counsel for the first time charged with any degree of responsibility began to represent them." *Powell*, 287 U.S. at 57–58.   Whereas, Anderson's appointed counsel were experienced attorneys and were provided with ample time to both familiarize themselves with the case and Anderson and prepare for his retrial.   There is simply no basis to presume prejudice based on the trial court's appointment of counsel in this case.   *See Glover*, 262 F.3d at 277 ("Since 1984, the time the Court articulated the tests for actual and per-se prejudice in *Strickland* and *Cronic*, it has never once found per-se prejudice under this third prong of *Cronic*.").   Thus, in addition to being not cognizable and procedurally defaulted, Claim Two(A) is meritless and should be dismissed.

       2.     *The trial court did not create a conflict of interest or undermine the reliability of the adversarial process (Claim Two(B)).*

Anderson asserts next that the "selection of defense counsel by Judge Chavez created an employment relationship that made Kehm subservient to the court" and, therefore, "created a conflict of interest."   Dkt. #21, at 45–49.

### a.    Exhaustion.

Anderson again asserts this claim was presented "to the state courts in subsection II(A) – (C) of his state PCR Petition."   *Id*. at 49.   Like Claim 2(A), however, Claim Two(B) does not raise a claim of ineffective-assistance-of-counsel.   Instead. Claim Two(B) raises a claim that the trial court erred in not sua sponte protecting Andersons's right to counsel free from conflicts of interest, which is raiseable on direct appeal.   *See State v. Duffy*, 453 P.3d 816, 822–23, ¶¶ 13–15 (Ariz. App. 2019).   However, to the extent this Court determines Anderson properly exhausted Claim Two(B) as a federal claim in the state courts, the post-conviction court's decisions rejecting Anderson's appointment-of-counsel claims,

1    *see supra* Section V(B)(1)(c), were not contrary to, or an unreasonable application

2    of, clearly established federal law and did not rest on an unreasonable application

3    of the facts.

4                    **b.    Claim Two(B) is meritless.**

5        Anderson asserts the "selection of defense counsel by Judge Chavez created

6    an employment relationship that made Kehm subservient to the court," "created a

7    conflict of interest," and was per se prejudicial.  Dkt. #21, at 45–49.

8        Although ordinarily the burden is on the habeas petitioner to establish his

9    trial counsel rendered ineffective assistance, *Strickland*. 466 U.S. at 687, the

10   Supreme Court has determined that certain "circumstances are so likely to

11   prejudice the accused that the cost of litigating their effect in a particular case is

12   unjustified," *Cronic*, 466 U.S. at 658; *see also Cuyler v. Sullivan*, 446 U.S. 335,

13   349–50 (1980) ("[A] defendant who shows that a conflict of interest actually

14   affected the adequacy of his representation need not demonstrate prejudice in order

15   to obtain relief."). This is because the Sixth Amendment includes the right to

16   conflict-free counsel.  *See, e.g.*, *United States v. Mett*, 65 F.3d 1531, 1534 (9th Cir.

17   1995), *cert. denied*, 519 U.S. 870 (1996).

18       However, "until a defendant shows that his counsel actively represented

19   conflicting interests, he has not established the constitutional predicate for his

20   claim of ineffective assistance."  *Sullivan*, 446 U.S. at 350.  "[I]n order to succeed

21   on a claim based on an alleged conflict, there must be a showing of an *actual*

22   conflict, namely that a defendant's attorney is representing conflicting interests."

23   *Plumlee v. Mastro*, 512 F.3d 1204, 1210 (9th Cir. 2008) (en banc).  An "actual

24   conflict of interest" means "a conflict *that affected counsel's performance*—as

25   opposed to a mere theoretical division of loyalties."  *Mickens v. Taylor*, 535 U.S.

26   162, 171 (2002).

27       Anderson has failed to state any facts to establish that counsel actively

28   represented conflicting interests.  Anderson asserts "Judge Chavez admonished

1   Kehm and Sutherland, both on an off the record, to keep costs down." Dkt. #21, at

2   46.  But the context of those comments specifically concerned travel expenditures

3   for witnesses to and from Mohave County when testifying; they do not

4   demonstrate the trial court was withholding or otherwise improperly limiting funds

5   requested by counsel for investigative purposes.  R.T. 10/02/02, at 3–4; R.T.

6   10/22/02, at 14–15.

7        Anderson nonetheless complains the trial court apparently urged counsel to

8   use their time and resources effectively, efficiently, and economically.  Dkt. #21, at

9   45–47.  But this does not even begin to state an actual conflict of interest between

10  the trial court and counsel.  And until Anderson "shows that his counsel actively

11  represented conflicting interests, he has not established the constitutional predicate

12  for his claim." *Sullivan*. 446 U.S. at 350: *see also Plumlee*, 512 F.3d at 1210 ("In

13  this context, however, as the Supreme Court cases make clear, we are talking about

14  legal conflicts of interest—an incompatibility between the interests of two of a

15  lawyer's clients, or between the lawyer's own private interest and those of the

16  client.").  As such, Anderson's conflict-of-interest claim is inapposite and cannot

17  warrant habeas relief.

18       Ultimately, Anderson has the burden of showing that his counsel "made

19  errors so serious that counsel was not functioning as the 'counsel' guaranteed the

20  defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.  The test is that

21  of "reasonably effective assistance" within "the wide range of reasonable

22  professional assistance."  *Id.* at 687, 689. If counsel's performance constituted

23  unreasonable professional error, Anderson must then further show a reasonable

24  probability that, but for counsel's errors, the result of the proceeding would have

25  been different. *Id.* at 694.

26       Anderson's attempt to equate counsel's "reasonably effective assistance" to

27  the amount of time and money counsel utilized is unavailing.  Again, the Supreme

28  Court has made clear that attorneys are presumed competent, and "the burden rests

1    on the accused to demonstrate a constitutional violation." *Cronic*, 466 U.S. at 658.

2    That counsel could, or even should, have spent more time and/or money on a

3    particular case does not by itself demonstrate a constitutional violation.  Any

4    prejudice suffered by a defendant from an unnecessarily frugal or idle trial counsel

5    would be the result of objective ineffectiveness, not presumed based solely

6    counsel's frugality or idleness.  As with Claim Two(A), there is simply no basis to

7    presume per se prejudice based purely on counsels' use of their time and county

8    resources, as Anderson argues.  *See Glover*, 262 F.3d at 277 (stating that since

9    articulating the tests for actual and per se ineffectiveness in 1984, the Supreme

10    Court has never found per se prejudice under *Cronic*'s third prong).  As a result, in

11    addition to being procedurally defaulted, Claim Two(B) is meritless and should be

12    denied and dismissed.

13            *3.    Trial counsel did not fail to investigate or present mitigation*

14               *evidence (Claim Two(C)).*

15        In Claim Two(C), Anderson asserts multiple claims that trial counsel failed

16    to adequately investigate, develop, and present reasonably available mitigation

17    evidence during the penalty phase.  Dkt. #21, at 50–76.

18            **a.    Relevant facts.**

19        During his post-conviction relief proceedings in state court, Anderson

20    alleged multiple claims of ineffective assistance of trial counsel for supposedly

21    failing to sufficiently investigate and present mitigation.  Following an evidentiary

22    hearing, the post-conviction court rejected Anderson's claims, finding:

23            Anderson alleges that Kehm and Sutherland were ineffective

24            for failing to enlist the services of an investigator and mitigation
        specialist, failing to conduct a reasonable investigation, failing to call

25            lay witnesses including Anderson's mother, and failure to present

26            expert risk assessment evidence.

27            The state correctly argues that neither the Supreme Court of the
        United States nor the Arizona Supreme Court has imposed a duty to

28            assemble a qualified defense team.  However, such investigative

experts are often employed to help counsel provide effective assistance. A failure to assemble a defense team capable of effectively representing a capital defendant can result in a successful IAC claim.

Kehm and Sutherland relied heavily on the work of Anderson's experienced former counsel, Ken Everett. Everett testified that he employed a strategy of "2 experts + family + beg for life" and opined that he did the best that he could under the prevailing circumstances or norms of capital representation in Mohave County. Everett testified that in hindsight, and based on the greater resources afforded capital defendants in the metropolitan Phoenix area, he believes his representation fell below a standard of care and Anderson did not receive a fair sentencing.

Kehm and Sutherland enlisted the help of forensic psychologist James Thall and mitigation expert Holly Wake. Both Thall and Wake testified regarding Anderson's relatively low intelligence and limited educational success, his lack of work skills, his diminished social skills, his generally peaceful nature and how easily he can be dominated by others, particularly women. Thall, Wake and other witnesses were able to testify about Anderson's dysfunctional family history and how that history contributed to his behavior.

Anderson's PCR counsel presented compelling testimony from Dr. Mark D. Cunningham, PhD. Dr. Cunningham is board certified in clinical and forensic psychology. Dr. Cunningham testified that Thall or Wake could have testified about the numerous risk factors present in Anderson as a result of his childhood traumas. He testified that but-for Anderson's developmental adversities, he would not have been in a relationship with a 14-year-old girl and would not have participated in these crimes. He opined that Wake and Thall should have discussed the connection between childhood experiences and moral development. Cunningham testified that he had never observed a history of childhood instability like Anderson's.

Cunningham acknowledged that Thall made a correct analysis but did not link it to Anderson's moral development. For instance, Cunningham testified that the defense team failed to effectively illustrate the impact of Anderson's educational instability and ongoing sexual abuse at home, the abandonment by Anderson's father, parental neglect, peer alienation and harassment, failed military service, reliance on a dominating and mentally disturbed spouse, and transience.

Cunningham testified that it was unlikely Anderson was the leader of Poyson and Lane, or that Poyson and Lane dominated him. Cunningham opined that the murders occurred as a result of the synergy between three psychologically damaged and psycho-socially immature individuals. Cunningham testified that this theory should have been presented to the jury.

Anderson presented testimony from several lay witnesses. David White, Anderson's stepson, noted that Anderson was not a violent person and he "gave more than he took." White described Anderson as boastful, perhaps to a ridiculous degree. When Anderson was in the Army he told White he was a "super spy" and had invented a new Morse code. He also described Anderson's history of drug use and having spent time in a mental institution.

Lillian Hamel testified that she had not seen [Anderson] since he was 18 or 19, approximately 30 years prior to the murder.

Santana Molina was married to Peggy White, daughter of Anderson's wife, Mary White. Molina testified that Mary and Anderson would "yell their lungs out" at each other. He said they were not clean people and they lived out of their car at times. Molina testified that Mary was controlling of Anderson, and Anderson was always boastful about the type of work he was doing. He described Anderson as a smart man but would constantly lose arguments to his wife because she would manipulate him.

Mary Jacqueline Shepard, daughter of Mary White, testified that she has known Anderson since age 3. She testified Anderson was not a leader and not a violent person. She said Anderson was not a smart person and was known to tell "tall tales." She testified that when she was 12 Anderson fondled her genitals.

Kathryn Langlier (Meeker), Anderson's niece, testified about the history of molestation and sexual abuse that she and Anderson suffered from their grandfather, brother, and mother's drunken boyfriends.

Dina Swader testified that she met Anderson in California in the mid-90's. She testified that Anderson helped her with clothing, a place to stay, and employment. She testified that she became intimate with Anderson after a few months. She testified about the verbal and emotional abuse Anderson suffered from Mary, as well as Anderson's drug use. Swader testified that Anderson was jailed for arson shortly

after she found out she was pregnant.  Swader described Anderson as good at following directions, and if he was asked to murder someone he would.

Anderson's PCR counsel presented a masterful case.  However, the standard for determining IAC is not to measure trial counsel's performance with what the best lawyers would have done, or even what most good lawyers would have done.  *See, Coleman v. Calderon, supra.*  Perhaps Kehm and Sutherland could have conducted a more exhaustive investigation, retained more experts, presented more witnesses, attended more training, and spent more time in preparation.  However, Kehm and Sutherland were far from passive observers.  Their reliance on the work of their predecessor, an experienced criminal defense attorney with capital experience, was not unreasonable.  Their utilization of Thall and Wake was not unreasonable.  The Court notes that Anderson does not dispute that many of the facts of his upbringing and personality traits were presented to the jury.  Rather, Anderson complains of the alleged lack of preparation and the manner in which the information was presented.

The failure to utilize lay witnesses was not inherently ineffective.  As Ken Everett testified, you have to "take the good with the bad" when it comes to lay witnesses.  Indeed, the lay witnesses may have presented a more complete picture of Anderson as a human being.  However, that picture is not entirely favorable to the defense.  It includes Anderson's history of dysfunctional sexual relationships, his molestation of a 12-year old relative, his drifting, unstable lifestyle, his capacity for dishonesty, his being jailed for arson, his willingness to follow others, and his apparent willingness to commit murder if asked.

Further, Sutherland testified that he was skeptical a jury would be sympathetic to Anderson's traumatic childhood since he was 48 when he participated in the murders.  Arizona courts have held that evidence of a difficult family background may not be entitled to much mitigating weight if the defendant is an adult when he commits murder. *See generally, State v. Garcia*, 224 Ariz. 1, 22 ¶107 (2010) (difficult family background given little weight because the defendant was thirty-nine at the time of the murder).

Anderson compares his case to *Porter v. McCollum*, 130 S.Ct. 447 (2009).  This reliance is misplaced given the significant factual

34

differences.    Porter was convicted of two counts of first-degree murder for killing his ex-girlfriend and her new beau.  130 S.Ct. at 448.  He was sentenced to death on the first count but not the second.  The court noted the jury knew hardly anything about Porter other than the facts of his crime when they imposed sentence.  *Id.* at 449.

Porter's PCR counsel discovered evidence of Porter's abusive childhood, his heroic military service and the trauma he suffered because of it, his long-term substance abuse, and his impaired mental health and mental capacity.  *Id.*  The U.S. Supreme Court chronicled Porter's heroic military service during wartime and noted that "[o]ur Nation has a long tradition of according leniency to veterans in recognition of their service, especially for those who fought on the front lines as Porter did."  *Id.* at 450-451, 455.  The U.S. Supreme Court noted the aggravating factors against Porter were "not as substantial as the sentencing judge thought."  *Id.* at 454.

Anderson's jury heard testimony about his traumatic background, his relatively low intelligence, his peaceful and helpful nature, his predisposition to follow others, and his allegedly minor participation in the murders.  While Anderson served in the military for a period of time his accomplishments pale in comparison to Porter, who was a legitimate war hero.  The jury also heard about Anderson's romantic relationship with a 14-year-old, Anderson and his codefendants' plot to kill three innocent victims who gave them a place to stay, how Anderson helped restrain a victim while Poyson pounded a knife into his skull with a rock, and how the trio committed multiple murders just to steal a truck.

The Court finds Kehm's and Sutherland's investigation and presentation of mitigating evidence was not perfect.  However, the Court does not find their performance ineffective.  To do so would engage in "20/20 hindsight" and disregard the deference that should be given to trial counsel's performance.

PCR Ruling 09/23/20, at 5–9.

The post-conviction court further addressed prejudice, holding:

The PCR proceedings rightfully focus on Anderson, his rights, and whether or not he received a fair trial and sentencing that passes Constitutional muster.  However, the facts of the case bear revisiting.  These murders occurred nearly 25 years ago.  For those of us who have spent their careers in the criminal justice system, we risk

becoming desensitized to even the most atrocious crimes, especially with the passage of time.

Anderson was 48 years old and traveling with Kim Lane, a 14-year-old girl. They hitchhiked from Las Vegas to Leta and Elliot Kagan's home in Golden Valley, Arizona. Leta, Elliot, their 15-year-old son Robert Delahunt and friend Ronald Wear lived at the property. The Kagans opened up their home to travelers from time to time. Nineteen-year-old Robert Poyson had been staying with the Kagans for about six months when Anderson and Lane arrived.

Anderson and his co-defendants decided to kill the residents of the Kagan home to steal Wear's pickup truck within just three days of Anderson and Lane's arrival.

On August 13, 1996, Elliot Kagan was away from home visiting a sick friend. Anderson planted a knife in a trailer. Lane lured Delahunt there and started kissing him. Anderson grabbed Delahunt and sliced his throat. A struggle for control of the knife ensued.

Lane left the trailer as Poyson entered and joined the struggle. Anderson put the tip of the knife in Delahunt's ear and held him while Poyson pounded the knife until the tip emerged through Delahunt's nose. Poyson then beat Delahunt's head until he died.

Anderson, Poyson and Lane then went into the Kagen's home. They waited until Leta Kagen and Wear went to sleep several hours later. Anderson grabbed a lantern and Poyson grabbed a rifle. Poyson shot Kagen, killing her almost instantly.

Poyson shot Wear in the jaw. Wear jumped out of bed and struggled with Poyson and Anderson. Poyson hit Wear in the head with the butt of the rifle and Anderson hit him in the head with the lantern, shattering it. Wear attempted to flee. Anderson and Poyson chased him out of the trailer. Anderson picked up a cinder block and gave it to Poyson, who then used it to beat Wear over the head until he died.

Anderson, Lane and Poyson stole some items from the Kagen home and left in Wear's truck. Anderson was found driving Wear's truck in Illinois several days later.

Even if Anderson had established ineffective assistance of counsel, the Court remains convinced that he cannot establish prejudice. The mitigating evidence, no matter how eloquently

presented, would not lead a reasonable juror to reach a different decision in light of the facts of the case.

V.    CONCLUSION

The Court has reviewed and carefully considered the testimony, evidence and arguments presented throughout the PCR proceedings. The Court has reviewed its file and the transcripts of trial proceedings. The Court finds no structural error.  The Court finds Anderson has failed to establish ineffective assistance of counsel, either on individual claims or collectively.  In the alternative, and assuming *arguendo* Anderson can establish ineffective assistance of counsel, the Court finds Anderson did not suffer any prejudice as a result.

PCR Ruling 09/23/20, at 11–13.

> **b.    Counsel did not fail to seek mitigation resources or conduct any independent mitigation investigation.**
>
> > i.    Counsel did not fail to seek mitigation resources.

Anderson first claims counsel were ineffective for not filing "any motions seeking additional funding for the mitigation investigation, nor did they file a special action with the Arizona Supreme Court to contest the trial court's funding limitations." Dkt. #21, at 51. As already noted, however, the trial court's supposed admonishments regarding funding specifically concerned travel expenditures for witnesses to and from Mohave County to testify and did not show the trial court was somehow withholding or otherwise limiting funds to counsel for investigative purposes.  R.T. 10/02/02, at 3–4; R.T. 10/22/02, at 14–15.

Anderson cites nothing in the state court record to support his claim that counsel was underfunded or that the trial court improperly denied specific funding requests.  He also does not explain how much extra funding counsel should have sought, what those monies would have been used for, or identify any substantial mitigation counsel failed to present because of their failure to request additional funds.  Dkt. #21, at 51–52. Accordingly, Anderson cannot demonstrate either deficient performance or prejudice resulting from counsel's failure to request additional funds.  This court should therefore dismiss the claim.  *See Pinholster*,

563 U.S. at 189 (stating counsel is "strongly presumed to have rendered adequate assistance," and should not have a reviewing court "second-guess counsel's assistance."); *see, also, e.g.*, *Dunn v. Reeves*, 594 U.S. 731, 739 (2021) ("[E]ven if there is reason to think that counsel's conduct 'was far from exemplary,' a court still may not grant relief if '[t]he record does not reveal' that counsel took an approach that no competent lawyer would have chosen.").

### ii. Counsel did not fail to conduct a constitutionally adequate mitigation investigation.

Anderson asserts that resentencing counsel was ineffective because they re-retained the mitigation specialist from Anderson's prior trial, relied too much on prior counsels' mitigation work, and did not conduct enough "further investigation" of their own. Dkt. #21, at 52–53. Even if Anderson is correct that counsel erred in not playing a more "active role in the mitigation investigation" prior to the retrial, he has not established that no reasonable attorney would have done so. *See Strickland*, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."). Nor has he alleged that the mitigation presentation would have been different had counsel not relied on the same mitigation specialist and mitigation work by prior counsel. Anderson has therefore not shown either deficient performance or prejudice resulting from counsels' actions.

### b. Counsel did not fail to further investigate Anderson's family.

Anderson asserts next that trial counsel were ineffective for failing to investigate Anderson's family further and call them as witnesses, in particular Anderson's mother. Dkt. #21, at 54. Anderson asserts this was error because Anderson's mother could have testified about Anderson being molested as a child, being born prematurely, suffering seizures as a child, and attending numerous

schools due to the family's transient lifestyle.  *Id.*  Counsel, however, elicited testimony of this very evidence from other witnesses during the penalty phase.  *E.g.* R.T. 11/25/02, at 21–22, 44–7.  And this Court must presume that counsel made a reasonable, strategic decision to elicit this testimony from witnesses other than Anderson's mother.  *See Strickland*, 466 U.S. at 689.  Anderson also does not explain how cumulative testimony from his mother on these matters would have somehow been more persuasive or influential.  Thus, Anderson cannot demonstrate either deficient performance or prejudice resulting from counsel's supposed failure in further investigating his family.

> ### c.  Counsel did not fail to investigate and present evidence about Anderson's mental health.
>
> #### i.  Counsel did not fail to provide context for Dr. Thall's evaluation.

Anderson argues counsel were ineffective in failing to provide context for Dr. Thall's evaluation.  Dkt. #21, at 55–56.  Anderson complains that, while Dr. Thall administered testing and testified that Anderson intelligence was "low-average," Thall failed to more fully expound on that intelligence finding and explain how Anderson's other development factors affected Anderson.  *Id.*

Regardless of whether Dr. Thall could have expounded on or better articulated his opinions and the effects of Anderson's "low-average" IQ to the jury, counsel were permitted to rely on his expertise and opinions.  *See Crittenden v. Ayers*, 624 F.3d 943, 966 (9th Cir. 2010) ("Attorneys are entitled to rely on the opinions of properly selected, adequately informed and well-qualified experts."); *Earp v. Cullen*, 623 F.3d 1065, 1077 (9th Cir. 2010) ("An expert's failure to diagnose a mental condition does not constitute ineffective assistance of counsel, and [a defendant] has no constitutional guarantee of effective assistance of experts."); *see also Sims v. Brown*, 425 F.3d 560, 585–86 (9th Cir. 2005) ("Attorneys are entitled to rely on the opinions of mental health experts, and to impose a duty on them to investigate independently of a request for information

1    from an expert would defeat the whole aim of having experts participate in the

2    investigation."). Counsel, therefore, did not render ineffective assistance in

3    retaining and relying on Dr. Thall's expertise and opinions.

4                    ii.    Counsel did not err in not consulting with and

5                           retaining Dr. Watson.

6    Anderson also asserts counsel were ineffective for not retaining Dr. Dale

7    Watson who "was asked to complete a comprehensive neuropsychological

8    evaluation of Anderson in conjunction with the state postconviction proceedings."

9    Dkt. #21, at 56–57. Again, however, counsel were permitted to rely on Dr. Thall's

10   expert opinion and were not required seek out additional experts. *See Babbitt v.*

11   *Caldero*n, 151 F.3d 1170, 1174 (9th Cir. 1998) (stating that counsel's decision not

12   to consult with additional experts is "not unreasonable" when "counsel did retain

13   medical experts whom he thought well-qualified"); *see also Stokley v. Ryan*, 659

14   F.3d 802, 813 (9th Cir. 2011) ("[N]either of the experts counsel hired

15   unequivocally stated that Stokley should be examined by a neuropsychologist—

16   and counsel was under no obligation to seek neuropsychological testing in the

17   absence of any such recommendation."). The claim should be denied.

18                   iii.   Counsel did not err in not consulting with and

19                          retaining Dr. Cunningham.

20   Anderson further asserts "counsel failed to present any evidence from a

21   mental health professional that would have contextualized Anderson's life to the

22   jury." Dkt. #21, at 57. Anderson details the testing and testimony by Dr.

23   Cunningham during Anderson's post-conviction proceeding, which Anderson

24   asserts is more compelling and provides better context for understanding his

25   actions leading up to and during the murder. *Id.* at 57–64. Specifically, Anderson

26   asserts Dr. Cunningham's report and testimony provides better context regarding,

27   among other things, the effects of Anderson's: "disturbed family system"; birth and

28   developmental complications; transient and nomadic youth and adulthood;

1   sexually abusive father; and their combined effects.  *Id.*

2        To be sure, the post-conviction court lauded Dr. Cunningham's testimony,

3   PCR Ruling 09/23/20, at 6, but it ultimately concerned, albeit in more detail, much

4   of the same evidence that counsel presented during Anderson's penalty phase.

5   Indeed, Dr. Cunningham himself "acknowledged that Thall made a correct

6   analysis" and merely criticized Dr. Thall for not sufficiently "link[ing]" the social

7   history to Anderson's development and actions leading up to and during the

8   murder.  *Id.*  In the end, however, Cunningham testified that Anderson's mental

9   health conditions made it "unlikely Anderson was the leader of Poyson and Lane,

10  or that Poyson and Lane dominated him."   *Id.* at 7. Accordingly, the post-

11  conviction court concluded that counsel were not ineffective in retaining and

12  relying on Dr. Thall, as opposed to Dr. Cunningham.  *Id.* at 8.

13       The post-conviction court's determination was not contrary to or an

14  unreasonable application of clearly established federal law or based on an

15  unreasonable determination of the facts.  There is no clearly established federal law

16  to support Anderson's claim that counsel were ineffective for not seeking out and

17  retaining Dr. Cunningham.  S*ee Atwood v. Ryan*, 870 F.3d 1033, 1064 (9th Cir.

18  2017) "[T]he Supreme Court's precedent does not support the theory that if

19  counsel had 'nothing to lose' by pursuing a defense, then counsel is deficient for

20  failing to pursue it . . . .  An argument that counsel could have relied on any

21  number of hypothetical experts whose insight might possibly have been useful is

22  speculative and insufficient to establish that counsel was deficient.") (cleaned up).

23  Thus, any argument that the post-conviction court improperly rejected this claim

24  fails. *See Musladin*, 549 U.S. at 77; *Mirzayance*, 556 U.S. at 122.

25              **d.**     **Counsel did not fail to gather additional evidence**

26                    **from Anderson's family members.**

27       Anderson reasserts counsel were ineffective for failing to further investigate

28  Anderson's family, who could have corroborated sexual abuse by Anderson's

father and spoken to the transient and unstable lifestyle Anderson endured.  Dkt. #21, at 65–68.  As discussed, however, counsel already presented evidence during the penalty phase that Anderson's father was abusive and sexually molested Anderson.  Counsel further presented substantial evidence during the penalty phase that Anderson's relationship with Mary was dysfunctional.

Indeed, as the post-conviction court specifically noted, "Anderson does not dispute that many of the facts of his upbringing and personality traits were presented to the jury. Rather, Anderson complains of the alleged lack of preparation and the manner in which the information was presented."  PCR Ruling 09/23/20, at 8.   Anderson, however, again fails to explain how additional cumulative testimony on these matters would have been more persuasive or influential coming from these different witnesses.   Anderson, therefore, cannot demonstrate either deficient performance or prejudice resulting from counsel's supposed failure in gather further information from his family.  *See Wong v. Belmontes*, 558 U.S. 15, 21–23 (2009) (holding that the failure to present cumulative mitigation evidence at sentencing did not prejudice the defendant).

### e.    Anderson was not prejudiced.

Even if Anderson could demonstrate that counsel performed deficiently in investigating and presenting mitigation, he has not established "a reasonable probability that, absent the errors, the sentence . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.  This standard is highly demanding and "requires an evaluation of the strength of all the evidence and a comparison of the weight of aggravating and mitigating factors."  *Thornell v. Jones*, 602 U.S. 154, 171–72 (2024).  The "reasonable probability" standard further requires a "'substantial,' not just 'conceivable,' likelihood of a different result."  *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (quoting *Pinholster*, 563 U.S. at 189).

As explained above, counsel were not deficient in choosing their mitigation strategy, and they presented much of the same information Anderson now asserts they should have. The additional evidence Anderson proffers would have been largely cumulative to the mitigation that was already presented. Moreover, to the extent Anderson relies on evidence outside the state court record to support his claims, this Court may not consider that evidence—either on the claims' merits or to determine cause and prejudice to excuse their defaults—unless Anderson can satisfy the diligence requirement in 28 U.S.C. § 2254(e)(2), which Anderson has not attempted to do. *See Ramirez*, 596 U.S. at 389.

Ultimately, "where the aggravating factors greatly outweigh the mitigating evidence, there may be no 'reasonable probability' of a different result," even if the petitioner presents "substantial evidence of the kind that a reasonable sentencer might deem relevant to the defendant's moral culpability." *Jones*, 602 U.S. at 165 (quotations omitted). And as the Arizona Supreme Court specifically noted, *Anderson II*, 111 P.3d at 398, ¶ 133, the aggravators proven here are particularly "compelling" and especially weighty under Arizona law, *see State v. Garza*, 163 P.3d 1006, 1022, ¶ 81 (Ariz. 2007) (stating that the multiple-homicides aggravator gets "'extraordinary weight'"); *State v. Poyson*, 475 P.3d 293, 302, ¶ 42 (Ariz. 2020) (stating that the pecuniary-motivation aggravator is "particularly weighty").

Indeed, there are "*no* cases in which the Arizona Supreme Court has vacated the judgment of death in a case involving multiple murders." *Jones*, 602 U.S. at 170. "The absence of such a case strongly suggests that [Anderson] has no reasonable probability of escaping the death penalty." *Id.* at 171. This is particularly true where Anderson has failed to present additional, substantial evidence that a reasonable sentencer might deem relevant to his moral culpability. Accordingly, even if counsel were deficient, Anderson cannot prove prejudice and is therefore not entitled to habeas relief. *See id.* This Court should dismiss the meritless claims.

4. *Trial and post-conviction counsel were not ineffective for failing to investigate and present reasonably available mitigation evidence (Claim Two(D)).*

Anderson claims "trial and postconviction counsel were ineffective for failing to more fully investigate Anderson's life history for mitigation evidence and to present such evidence to the jury and postconviction court, respectively." Dkt. #21, at 77–104.

### a. Exhaustion.

Anderson acknowledges that he did not present any of the seven sub claims in Claim Two(D) to the state courts. *Id.* at 104. Anderson, however, does not identify any circumstances that would excuse the defaults of these claims. *Id.* And because the ineffective-assistance-of-counsel claims would now be untimely and precluded in a successive petition for post-conviction relief, they are all procedurally defaulted. *See, e.g.*, *State v. Spreitz*, 39 P.3d 525, 526, ¶ 4 (Ariz. 2002) ("[Arizona's] basic rule is that where ineffective assistance of counsel claims are raised, or could have been raised, *in a Rule 32 post-conviction relief proceeding*, subsequent claims of ineffective assistance will be deemed waived and precluded."). Indeed, this Court has already concluded that Anderson is precluded from returning to state court to raise Claim Two(D), including all seven of its sub claims and, therefore, they are technically exhausted but procedurally defaulted. Dkt. #52, at 27.

Moreover, to the extent he believes the default may be excused under *Martinez*, he is incorrect. Because the claims are insubstantial, post-conviction counsel was not ineffective in failing to present them. *See Martinez*, 566 U.S. at 14 ("To overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.").

b.    **Counsel were not ineffective in investigating and presenting mitigation evidence.**
i.    <u>Counsel were not ineffective regarding Anderson's military service.</u>

Anderson first claims counsel were ineffective for providing an incomplete or inaccurate picture regarding Anderson's military service during the Vietnam War.  Dkt. #21, at 77–83.  Anderson specifically faults trial counsel for asking Anderson if his time in Vietnam was "short," and post-conviction counsel for eliciting testimony from Dr. Cunningham that Anderson's struggles during his time in the Army were due to his adaptive deficits.  *Id.* at 77–78.  Anderson then recounts his time in the military in some detail, recharacterizing his level of success in the military, and explaining the reasons he believes his career did not continue.  *Id.* at 78.

Counsel used evidence of Anderson's less than stellar military service to support their claims that Anderson had been the victim of unfortunate circumstances brought about by his unhealthy familial relationships and adaptive deficits.  This was reasonable in the circumstances, and Anderson's attempts at revisiting his military service and painting it in a different, more-favorable light does not demonstrate deficient performance.

Anderson also cannot demonstrate that he was prejudiced by prior counsels' strategic decisions to use Anderson's military career to support their respective mitigation theories.  As Anderson admits in his habeas petition, his military record was less than stellar, involving multiple instances of discipline for being absent without leave and/or failing to report, and Anderson was ultimately involuntarily "separated from service."  Dkt. #21, at 78–83.  Accordingly, Anderson's military record, however he would like it characterized, would have been given little, if any mitigating weight.  Indeed, only "on rare occasions" has the Arizona Supreme Court "found that a defendant's military record warranted consideration as a

1  mitigating circumstance." *See State v. Kayer*, 984 P.2d 31, 46–47, ¶ 55 (Ariz.
2  1999).  Anderson's military record is not one of the rare occasions in which a
3  defendant's military record would warrant consideration as a mitigating
4  circumstance.  Thus, Anderson cannot show any deficient performance or
5  prejudice related to his prior military experience.  The procedurally defaulted and
6  meritless claim should be denied.

7          ii.    Counsel were not ineffective regarding Anderson's
8                 transient and dysfunctional lifestyle.

9          Anderson asserts counsel were ineffective for not presenting evidence of his
10 transient and dysfunctional lifestyle.  Dkt. #21, at 83–87.  In this claim, Anderson
11 details some of the many moves he made throughout his transient childhood and
12 states that nomadic lifestyle continued into adulthood.  *Id.*  Again, however,
13 counsel presented testimony and evidence that Anderson "moved about 70 plus
14 times" and "went to 50 schools" as an adolescent.  *E.g.* R.T. 11/25/02, at 21.  And
15 Anderson does not explain how cumulative testimony about some of the specific
16 moves, which he proffers here, would have somehow been more persuasive or
17 influential.  Thus, Anderson has failed to carry his burden and demonstrate either
18 deficient performance or prejudice resulting from counsel's supposed failure.  The
19 procedurally defaulted and meritless claim should be denied.

20         iii.   Counsel were not ineffective regarding Dependent
21                Personality Disorder.

22         Anderson argues counsel were ineffective for not presenting evidence of his
23 Dependent Personality Disorder.  Dkt. #21, at 88–92.  Specifically, Anderson
24 asserts counsel should have reutilized Dr. Thomas Thomas, who had diagnosed
25 Anderson as having dependent personality disorder and testified on his behalf

26
27
28

before a judge at Anderson's sentencing in 1998.[8]  *Id.* at 88–90.  Anderson further complains that counsel did not call additional lay witnesses who would have testified that Mary and Poyson were controlling and that Anderson was subservient.  *Id.* at 90–92.

As the post-conviction court correctly noted, however, Anderson had already been convicted and sentenced to death; thus it was reasonable for counsel to consider alternate strategies on retrial.  PCR Ruling 09/23/20, at 11.  Indeed, this Court must presume counsel made a reasonable, strategic decision when deciding between alternate strategies. *See Strickland*, 466 U.S. at 689.  Moreover, as previously discussed, and found by the post-conviction court, many of the facts regarding his personality traits, including his supposed obedience to more domineering personalities, was presented to the jury.  Anderson, therefore, has failed to demonstrate either deficient performance or *Strickland* prejudice for this procedurally defaulted claim.  It should be denied.

iv.    <u>Counsel were not ineffective regarding Anderson's supposed cognitive impairments, including whether he is in a dissociative state.</u>

In this claim, Anderson now challenges Dr, Cunningham's "view and scope" of the abuse Anderson's father inflicted.  Dkt. #21, at 92–95.  In doing so, Anderson proffers opinions by Dr. Matt Mendel, a psychologist retained by federal habeas counsel, who "found that Anderson's primary response to the ongoing trauma of sexual abuse by his father was to 'go somewhere else in his mind' or

---

[8] Anderson also proffers a new opinion by Dr. Cheryl Paradis, a clinical and forensic psychologist retained by federal habeas counsel, who "found that, despite the overwhelming evidence that Anderson's adaptive functioning was deficient, this area was not fully assessed by prior mental health experts or presented in prior court proceedings."  Dkt. #21, at 91.  This new opinion from a new expert retained by federal habeas counsel was not properly presented to the state courts and may not be considered by this Court in light of Anderson's failure to demonstrate that he can meet the requirements set out in 28 U.S.C. § 2254(e)(2).  *See Ramirez*, 596 U.S. at 389.

dissociate." *Id.* at 92–93.  This new opinion from a new expert retained by federal habeas counsel was not properly presented to the state courts and may not be considered by this Court, because Anderson fails to meet the conditions set out in 28 U.S.C. § 2254(e)(2). *See Ramirez*, 596 U.S. at 389.

Moreover, both Dr. Thall and Dr. Cunningham were highly qualified experts and counsel cannot be found to have been ineffective in relying on their opinions. *See, e.g.*, *Crittenden*, 624 F.3d at 966 ("Attorneys are entitled to rely on the opinions of properly selected, adequately informed and well-qualified experts."); *Earp*, 623 F.3d at 1077 ("An expert's failure to diagnose a mental condition does not constitute ineffective assistance of counsel, and [a defendant] has no constitutional guarantee of effective assistance of experts."). Counsel was therefore not ineffective, as Anderson claims.  This procedurally defaulted and meritless claim should be denied.

v.     <u>Counsel were not ineffective for not investigating brain damage.</u>

Anderson asserts next that counsel were ineffective for failing to investigate and present evidence that Anderson suffered from brain damage.  Dkt. #21, at 96–100.  Anderson's birth complications, delayed development, and alleged exposure to lead paint do not demonstrate that he has brain damage.  Regardless, neither Dr. Thall, nor Dr. Cunningham, recommended that Anderson be assessed for brain damage; thus, even if this was somehow error on the part of the experts, counsel was not deficient in not to pursuing such evidence. *See, e.g.*, *Crittenden*, 624 F.3d at 966; *Earp*, 623 F.3d at 1077.  The claim is meritless, in addition to being procedurally defaulted, and it should be denied and dismissed.

vi.     <u>Counsel were not ineffective regarding Anderson's supposed cooperation with law enforcement.</u>

Anderson asserts counsel were ineffective in presenting evidence that Anderson cooperated with law enforcement and assisted with the arrest of his co-

48

1    defendants.  Dkt. #21, at 101–02.  Anderson, however, did present evidence and

2    argue his supposed cooperation with police should be considered a mitigating

3    circumstance.  *Id.*  Indeed, during its de novo review, the Arizona Supreme Court

4    explicitly considered Anderson's supposed cooperation and rejected it.  "Nor can

5    Anderson's limited cooperation with the police be viewed as substantial

6    mitigation."  *Anderson II*, 111 P.3d at 399, ¶ 136.  The minimal information and

7    cumulative evidence that Anderson offers in this claim does not undermine the

8    supreme court's conclusion or demonstrate deficient performance or prejudice.  He

9    therefore cannot obtain relief on the claim.

10                          vii.    <u>Counsel were not ineffective regarding Poyson's</u>

11                                <u>relative culpability.</u>

12        Anderson asserts finally that counsel were ineffective in demonstrating that

13   "Poyson was the more culpable actor in the offenses and he controlled Anderson

14   during the crimes."  Dkt. #21, at 102–04.  As discussed, Anderson presented

15   evidence and argued extensively during the penalty phase that Poyson was the

16   more domineering and most morally culpable for the three murders.  Indeed, it was

17   undisputed that Poyson inflicted the fatal blows, but it is also a fact that Anderson

18   played a substantial role in the murders.  *See Anderson II*, 111 P.3d at 399, ¶ 136

19   ("Given Anderson's substantial role in each of the murders, we reject his

20   characterization of his participation as minor.").  And the supreme court already

21   rejected Anderson's claim that he was "controlled" by Poyson, and the minimal,

22   cumulative evidence Anderson provides in this claim does nothing to undermine

23   that determination.  *See id.* at ¶ 135 ("[T]here is simply no credible evidence that

24   Anderson was coerced into committing these murders.").  Anderson has not shown

25   deficient performance or prejudice, and this procedurally defaulted and meritless

26   claim should be dismissed.

27

28

1

2

3

    5.  *Trial counsel were not ineffective for not impeaching Detective Cooper's assertion that Anderson's interview statements were voluntary (Claim Two(E)).*

4

5

6

  Anderson asserts trial counsel were ineffective for not moving to suppress Anderson's interview statements and impeaching Detective Cooper's assertion that Anderson's statements were voluntary.  Dkt. #21, at 104–12.

7

      **a.  Exhaustion.**

8

9

10

11

12

13

14

15

16

17

18

  Anderson acknowledges he did not present this claim to the state courts.  *Id.* at 112.  Anderson, however, does not identify any circumstances that would excuse the default of these claims.  And because the claim would now be untimely and precluded in a successive petition for post-conviction relief, it is procedurally defaulted.  *See Spreitz*, 39 P.3d at 526, ¶ 4; *Coleman*, 501 U.S. at 735 n.1.  Again, this Court has already concluded that Anderson is precluded from returning to state court to raise Claim Two(E), and, therefore, the claim is technically exhausted but procedurally defaulted.  Dkt. #52, at 27.[9]  To the extent he believes the default may be excused under *Martinez*, he is incorrect.  Because the claims are insubstantial, post-conviction counsel was not ineffective in failing to present them.  *See Martinez*, 566 U.S. at 14.

19

      **b.  Claim Two(E) is meritless.**

20

21

22

  Anderson asserts trial counsel were ineffective for not moving to suppress Anderson's interview statements and impeaching Cooper's assertion that the statements were voluntary.  Dkt. #21, at 104–12.  In *Anderson I*, however, the

23

24

25

26

27

28

---

[9] To the extent Anderson raises a sub claim that post-conviction counsel was ineffective, such a claim is procedurally defaulted because he failed to assert it in state court.  The claim is also not cognizable because AEDPA specifically prohibits federal courts from granting relief on a claim that post-conviction counsel was ineffective.  *See* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").

Arizona Supreme Court rejected Anderson's claim that his statements to police were involuntary:

> [Anderson] makes two arguments questioning the admissibility of his taped confessions. First, he asserts that he was not brought before a magistrate within twenty-four hours of arrest, as required by Arizona law, thereby denying him his right to consult with counsel. Second, [Anderson] claims that because he was sleep deprived, one of his statements was involuntary.
>
> Confessions are presumed to be involuntary, and the State has the burden of proving by a preponderance of the evidence that the confession was voluntary. *See State v. Amaya–Ruiz*, 166 Ariz. 152, 164, 800 P.2d 1260, 1272 (1990). Absent clear and manifest error, the trial judge's ruling will not be disturbed on appeal. *See State v. Rivera*, 152 Ariz. 507, 513, 733 P.2d 1090, 1096 (1987).
>
> Upon arrest in Illinois on August 18, 1996, [Anderson] was given his *Miranda* rights, taken to the local police station, and processed. This included a four and one-half hour interview with Investigator Steven Shields. The interview began at about 9:00 p.m. and concluded at 1:30 a.m. This interrogation is not challenged. The following day, [Anderson] was interviewed by Investigator Shields and Detective Cooper of the Mohave County Sheriff's Office from 11:00 p.m. until "a few hours into the morning." The timing of the interview was due to Cooper's late arrival from Arizona. Upon arrival in Arizona on September 2, 1996, [Anderson] was interviewed a third time, after which he was brought before a magistrate, fourteen days after his arrest. A motion to suppress the second and third interviews for failure to provide an attorney in a timely manner was filed on February 18, 1997. A suppression hearing was held to determine the voluntariness of [Anderson's] statements. The trial judge found no coercion by the interviewers and concluded that [Anderson] made a voluntary, knowing, and intelligent waiver of his right to counsel.
>
> The purpose of the initial appearance is to advise the defendant of the charges against him and to inform him of his right to counsel and to remain silent. *See State v. Van Dyke*, 127 Ariz. 335, 621 P.2d 22 (1980). [Anderson] claims that by failing to bring him before a magistrate within the twenty-four hour period provided by Arizona law, or some other amount of time less than fourteen days, he was deprived of his right to counsel. [Anderson's] argument fails because the Arizona Rules of Criminal Procedure do not apply to Illinois, and

there is no claim that the Illinois rules were violated. [Anderson] was brought before an Arizona magistrate within 24 hours of entering Arizona, thus complying with Arizona law. [Anderson] was read his *Miranda* rights before making any statements and several times during the course of his interviews. He also signed an explicit waiver of his right to counsel. Therefore, [Anderson] was not denied his right to counsel due to the failure to bring him before a magistrate within twenty-four hours of his arrest in Illinois.

[Anderson] also challenges the second interview on the basis that he was sleep deprived at the time of the interview. Twenty-one hours elapsed between the first and second interviews. [Anderson] provided no evidence that he was prevented from sleeping during this time period or that he informed the officers he was too tired to continue with the interview. Furthermore, he was provided food and drink as well as cigarette and bathroom breaks during the interview. *See State v. Scott*, 177 Ariz. 131, 865 P.2d 792 (1993) (failure to ask for food, medication or sleep, coupled with a lack of evidence that any request would not be granted, satisfies the State's burden to establish the voluntariness of a confession). There being no evidence indicating a lack of sleep, a request for more sleep, or that the police withheld sleep or other necessities to elicit a confession, we conclude that the State has met its burden of establishing the prima facie voluntariness of [Anderson's] statements.

4 P.3d at 381–82, ¶¶ 31–35.

The Arizona Supreme Court reasonably rejected Anderson's claim that his statements were involuntary under the totality of the circumstances, and Anderson has proffered nothing in these proceedings to show the supreme court's holding was 'inconsistent with the holding in a prior decision of the Supreme Court.'" *See Cook v. Kernan*, 948 F.3d 952, 968–69 (9th Cir. 2020). Applying AEDPA deference, then, the ruling was not contrary to or an unreasonable application of clearly established federal law or based on an unreasonable determination of the facts and, therefore, undermines Anderson's ineffective-assistance-of-counsel claim.

Indeed, the trial court would have been bound by the supreme court's decision and could not have modified or otherwise disregarded its determination

that Anderson's statements were voluntary. *See State v. Smyers*, 86 P.3d 370, 374, ¶ 15 n. 4 (Ariz. 2004); *see also McKay v. Indus. Comm'n*, 438 P.2d 757, 759 (1968) ("Whether prior decisions of the highest court in a state are to be disaffirmed is a question for the court which makes the decisions. Any other rule would lead to chaos in our judicial system."). Counsel were therefore not deficient for not reasserting a failed argument or making a futile motion.

Counsel were also not ineffective in cross-examining Detective Cooper, as Anderson now claims. Counsel effectively impeached Cooper by eliciting testimony that he had lied repeatedly during a sexual assault investigation and resigned from the police force for his repeated lies. R.T. 10/04/01, at 63–64, 74–75. While Anderson asserts counsel could have been more aggressive during cross-examination, and points to additional, tangentially related matters that counsel could have also explored, this does not demonstrate ineffective assistance. *See State v. Bigger*, 492 P.3d 1020, 1026, ¶ 11 (Ariz. 2021) ("The scrutiny of counsel's performance must be highly deferential and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight.'") (quoting *Strickland*, 466 U.S. at 689)); *see also, e.g.*, *Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000) (stating that an attorney's "tactical decisions at trial, such as refraining from cross-examining a particular witness or from asking a particular line of questions, are given great deference and must [] meet only objectively reasonable standards").

Furthermore, Anderson's mere speculation that "the jury could have disregarded Anderson's statements" if "trial counsel effectively impeached Cooper," Dkt. #21, at 105, is "plainly insufficient" to establish *Strickland* prejudice. *Gonzalez v. Knowles*, 515 F.3d 1006, 1016 (9th Cir. 2008) (citing *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997)). Anderson has therefore failed to show either deficient performance or prejudice, and this Court should dismiss this procedurally defaulted and meritless claim.

1
2
3

      6.      *Trial counsel were not ineffective for not advising Anderson he could allocute instead of testifying during the penalty phase (Claim Two(F)).*

4

     Anderson asserts trial counsel were ineffective for not advising him that he

5

could allocute and, instead, directing him to testify during his penalty phase. Dkt.

6

#21, at 112–13.

7

           **a.    Exhaustion.**

8

     Anderson asserts that he raised the claim as Claim 3 in his petition for post-

9

conviction relief and that the post-conviction court did not address the claim. *Id.* at

10

113.  PCR Petition, at 36.  Regardless, Anderson did not raise the claim in his

11

petition for review to the Arizona Supreme Court, nor does he claim otherwise;

12

thus, he failed to properly exhaust the claim in state court. *See O'Sullivan,* 526

13

U.S. at 845.[10]  And because reasserting the claim would now be deemed untimely

14

and precluded in a successive petition for post-conviction relief, it is procedurally

15

defaulted. *Martinez* does not provide cause to excuse the procedural default

16

because, as set forth below, the trial-counsel-ineffectiveness claim fails on the

17

merits. *See Martinez*, 566 U.S. at 14; *Sexton*, 679 F.3d at 1157.

18

           **b.    Claim Two(F) is meritless.**

19

     Without citing to anything in the state court record, Anderson asserts counsel

20

failed to advise him of his right to allocute and, instead, directed him to testify at

21

his sentencing. Dkt. #21, at 112–13. Anderson's uncorroborated, self-serving, and

22

conclusory assertion is insufficient to establish that counsel provided ineffective

23

assistance. *See Chang v. United States*, 250 F.3d 79, 86 (2nd Cir. 2001); *see also,*

24

---

25

[10] To be sure, Anderson asked the supreme court "review all claims raised below in his PCR Petition and Supplemental PCR Petition, and grant him post-conviction relief."  But such an attempt to raise claims on appeal by incorporation or by reference is not permitted in Arizona. *See State v. Bortz*, 821 P.2d 236, 238 (Ariz. App. 1991); *see also, e.g.*, *State v. Bolton*, 896 P.2d 830, 838 (Ariz. 1995) ("Failure to argue a claim on appeal constitutes waiver of that claim.").

26
27
28

1   *e.g.*, *Jones v. Gomez*, 66 F.3d 199, 204–05 (9th Cir. 1995) (stating that mere

2   speculation or conclusory assertions, without reference to the record or other

3   documentary evidence, "fall far short" from stating a valid ineffective-assistance-

4   of-counsel claim); *Strickland*, 466 U.S. at 690 (stating a petitioner "making a claim

5   of ineffective assistance must identify the acts or omissions of counsel that are

6   alleged not to have been the result of reasonable professional judgment").

7        Moreover, even if Anderson's testimony may have ultimately been unhelpful

8   to other aspects of his defense, that does not demonstrate that Anderson should not

9   have testified at his sentencing, as Anderson's argument presupposes. The Supreme

10  Court has flatly "rejected this kind of paternalistic projection of incompetence on

11  to a criminal defendant." *United States v. Martinez*, 883 F.2d 750, 761 (9th Cir.

12  1989), *vacated on other grounds by*, 928 F.2d 1470 (9th Cir. 1991) (citing *Adams v.*

13  *U.S. ex rel. McCann*, 317 U.S. 269, 279 (1942)).   An act that is strategically

14  unwise, self-defeating, or even resulted in "consequences [that were] not what [the

15  defendant] would wish" is not necessarily borne from legal incompetence. *Id.*

16        Indeed, as the post-conviction court noted when addressing whether trial

17  counsel were ineffective for having Anderson testify during the guilt phase:

18        It is easy to criticize [] strategic decisions through the lens of
19     hindsight.  But disagreements in trial strategy will not support an IAC
        claim so long as the challenged conduct had some reasoned basis.
20     Anderson had been convicted and sentenced to death previously
        without his testimony or Lane's testimony.  It was reasonable for trial
21     counsel to consider an alternate strategy on retrial.  Further, the jury
        would have been presented with damaging other-act evidence
22     pursuant to A.R.S. s 13–752(G), even without Anderson's testimony.
23
        The decision to . . . have Anderson testify [was] risky and
24     ultimately not successful.  However, the strategy decisions had some
        reasoned basis and therefore do not constitute ineffective assistance.
25

26  PCR Ruling 09/23/20, at 11.

27        Under AEDPA, the post-conviction court's ruling regarding counsel's

28  decision to have Anderson testify during the guilt phase was not contrary to or an

1    unreasonable application of clearly established federal law or based on an

2    unreasonable determination of the facts, and applies equally to the instant claim

3    regarding Anderson's testimony during the penalty phase. *See Richter*, 562 U.S. at

4    99 ("When a federal claim has been presented to a state court and the state court

5    has denied relief, it may be presumed that the state court adjudicated the claim on

6    the merits in the absence of any indication or state-law procedural principles to the

7    contrary."). Trial counsel's conduct must be judged "on the facts of the particular

8    case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690.

9    And, despite Anderson's request to the contrary, this Court may "neither second-

10   guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight .

11   . . ." *Matylinsky v. Budge*, 577 F.3d 1083, 1091 (9th Cir. 2009), *cert. denied*, 130

12   S.Ct. 1154 (2010). As a result, and when considered in context, the decision to

13   have Anderson testify during the penalty phase "had some reasoned basis" and

14   therefore the post-conviction court reasonably rejected the instant ineffective-

15   assistance-of-counsel claim. *See Richter*, 562 U.S. at 99.

16       Regardless, Anderson had the ultimate authority to decide whether to testify

17   on his own behalf during the guilt and penalty phases, *e.g. Wainwright v. Sykes*,

18   433 U.S. 72, 93 n. 1 (1977), and he does not even allege—let alone demonstrate—

19   that, "but for" counsel's supposed failure in not advising him to allocute, he would

20   not have testified during the penalty phase, *see Hill v. Lockhart*, 474 U.S. 52, 57

21   (1985). Anderson, therefore, fails to carry his burden and prove *Strickland*

22   prejudice from trial counsel's purported failure in not advising him to allocute.

23   The claim should be denied.

24       7.    *Trial counsel were not ineffective for not adequately*
            *impeaching Lane with her prior statements (Claim Two(G)).*
25

26       Anderson asserts trial counsel were ineffective for not adequately

27   impeaching Lane with her prior statements. Dkt. #21, at 114–24.

28

56

### a.    Exhaustion.

Anderson acknowledges that he did not present this claim to the state courts. *Id.* at 122, 124.  And because the claim would now be untimely and precluded in a successive petition for post-conviction relief, it is procedurally defaulted.  *See Spreitz*, 39 P.3d at 526, ¶ 4; *Coleman*, 501 U.S. at 735 n.1.  *Martinez* does not provide cause to excuse the procedural default because, as set forth below, the trial-counsel-ineffectiveness claim fails on the merits.  *See Martinez*, 566 U.S. at 14; *Sexton*, 679 F.3d at 1157.

### b.    Claim Two(G) is meritless.

Anderson asserts trial counsel inadequately impeached Lane with her supposed prior inconsistent statements during the guilt and penalty phases, which, Anderson claims, impacted his "conviction for premeditated murder, as well as his moral culpability at the penalty hearing, because Lane's unimpeached testimony framed him as the driver of the murder."  Dkt. #21, at 114–15.  Anderson specifically complains that counsel failed to more aggressively confront and impeach Lane on, among other things: (1) her role in the murders; (2) whether there had been a plan to commit the murders; (3) specifics about her sexual relationship with Anderson; and (4) whether she also had a romantic relationship with Poyson.  *Id.* at 116–19.  Anderson then compares counsel's cross-examination with the cross-examination conducted by the State during Lane's trial and declares that counsel's supposed deficiencies unfairly magnified Anderson's culpability in the murders.[11]  *Id.* at 120–23.

_____

[11] Any evidence or testimony from Lane's criminal proceedings that was not properly presented to or before the state courts in Anderson's proceedings may not be considered by this Court.  because Anderson was not diligent in presenting it to the state courts and because he fails to meet the conditions set out in 28 U.S.C. § 2254(e)(2).  *See Ramirez*, 596 U.S. at 389.  Regardless, any direct comparison between counsel's impeachment of Lane during Anderson's criminal proceeding with the State's impeachment of Lane during her criminal proceedings is wholly irrelevant and holds no persuasive value on whether counsel effectively cross-

(continued ...)

1    "[C]ounsel's tactical decisions at trial, such as refraining from cross-

2    examining a particular witness or from asking a particular line of questions, are

3    given great deference and must . . . meet only objectively reasonable standards."

4    *Dow v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000) (citing *Strickland*, 466 U.S. at

5    688–89); *see also, e.g.*, *Gustave v. United States*, 627 F.2d 901, 905 (9th Cir. 1980)

6    (stating an attorney's decision about how to impeach a witness "is obviously a

7    matter of trial tactics").  Indeed, "cross-examination is a sharp two-edged sword

8    and more criminal cases are won by not cross-examining adverse witnesses, or by

9    a very selective and limited cross-examination of such witnesses, than are ever

10   won by demolishing a witness on cross-examination."  *United States v. Clayborne*,

11   509 F.2d 473, 479 (D.C. Cir. 1974).

12   Ultimately, Anderson points to relatively minor inconsistencies in Lane's

13   prior statements and testimony and complains that counsel could have confronted

14   Lane more aggressively on her precise role in, and actions leading up to and

15   during, the murders.  But courts have repeatedly recognized that it is a reasonably

16   sound strategy not to badger or press a potentially sympathetic witness on cross-

17   examination, especially an alleged victim.  *See, e.g.*, *Silva v. Woodford*, 279 F.3d

18   825, 852 (9th Cir. 2002) (finding that defense counsel's limited cross-examination

19   was reasonable where more aggressive cross-examination might have generated

20   sympathy for the witness).  And Lane's potential vulnerability as a sexual abuse

21   victim of Anderson made it strategically sound for counsel not to more

22   aggressively badger or confront her on cross-examination about every possible

23   inconsistency.

24   The record, as a whole, demonstrates counsel effectively cross-examined

25   Lane and elicited testimony from her concerning her role leading up to and

26   participation during the murders.  Anderson's complaint in this habeas petition that

27   _____

( ... continued)

28   examined Lane during Anderson's trial.

1  counsel could have conducted a better cross-examination if he had just asked some

2  additional, or more persuasive, questions of Lane ignores the realities of cross-

3  examination, particularly cross-examination of confederates in a criminal trial.  *See*

4  *People v. Ervin*, 990 P.2d 506, 531(Cal. 2000) ("Cross-examination is always a

5  risky process—even experienced counsel conducting a brilliant cross-examination

6  might inadvertently elicit damaging disclosures, a risk inherent in the tactical

7  decision to conduct cross-examination.").  This is why trial manuals and trainings

8  are rife with examples of the "one last question" on cross-examination that resulted

9  in an adverse result and courts "rarely second-guess counsel's cross-examination

10 tactics, despite the elicitation of seemingly damaging testimony." *Id.*

11      Anderson also fails to carry his burden and demonstrate prejudice for

12 counsel's supposed deficient performance in cross-examining Lane.  Anderson

13 claims the supposedly inadequate impeachment impacted his "conviction for

14 premeditated murder, as well as his moral culpability at the penalty hearing,

15 because Lane's unimpeached testimony framed him as the driver of the murder."

16 Dkt. #21, at 114–15.  The jury, however, also convicted Anderson of felony first-

17 degree murder for all three murders, so any potential impact on his premeditated

18 first-degree-murder convictions would not have altered the outcome.  *See State v.

19 Tucker*, 68 P.3d 110, 120, ¶ 50 (Ariz. 2003) (stating that felony murder and

20 premeditated murder are simply two different forms of the single crime of first-

21 degree murder in Arizona).  Similarly, Anderson's involvement in, and moral

22 culpability for, the murders would not have changed regarding any of the supposed

23 additional impeachment of Lane that Anderson identifies.  Anderson admitted to

24 slicing Delahunt's throat and holding Delahunt's head, while Poyson pounded a

25 knife through Delahunt's ear.  Anderson then aided Poyson as he shot and killed

26 Kagen and Wear.  Thus, Anderson cannot demonstrate the prejudice necessary to

27 warrant habeas relief for the claim, and it should therefore be denied.  *See

28 Strickland*, 466 U.S. at 694 (prejudice requires a reasonable probability that the

result of the proceeding would have been different absent the alleged error).

> 8.    *Trial counsel were not ineffective for not objecting to the jury instructions on premeditation and accomplice liability (Claim Two(H)).*

Anderson asserts trial counsel were ineffective for not objecting to the jury instructions on premeditation and accomplice liability, which Anderson alleges were defective.  Dkt. #21, at 124–28.

### a.    Exhaustion.

Anderson acknowledges this ineffective-assistance-of-counsel claim was not presented to the state courts.  *Id.* at 126, 128.  And because the claim would now be untimely and precluded in a successive petition for post-conviction relief, it is procedurally defaulted.  *See Spreitz*, 39 P.3d at 526, ¶ 4; *Coleman*, 501 U.S. at 735 n.1.  *Martinez* does not provide cause to excuse the procedural default because, as set forth below, the trial-counsel-ineffectiveness claim fails on the merits.  *See Martinez*, 566 U.S. at 14; *Sexton*, 679 F.3d at 1157.  And Anderson identifies no exception to procedural default that would apply to this claim.  Accordingly, it is procedurally defaulted and should be dismissed on that basis.

### b.    Claim Two(H) is meritless.

The trial court instructed the jury on premeditation as follows:

> The crime of first degree murder, premeditation, requires proof of the following three things:

> One, [Anderson] caused the death of another person; and, two, [Anderson] intended or knew that he would cause the death of another person; and, three, [Anderson] acted with premeditation.

> Premeditation means that [Anderson's] intention or knowledge existed before the killing long enough to permit reflection.  However, the reflection differs from the intent or knowledge that conduct will cause death.  It may be as instantaneous as successive thoughts in the mind, and it may be proven by circumstantial evidence.  It is this period of reflection, regardless of its length, which distinguishes first degree murder from intentional or knowing second degree murder.  An act is not done with premeditation if it is the instant effect of a

sudden quarrel or heat of passion.

R.T. 10/09/01, at 133–34.

Relying on *State v. Thompson*, 65 P.3d 420 (Ariz. 2003), Anderson argues the premeditation instruction was unconstitutionally vague. Dkt. #21, at 124–26. Anderson is mistaken. The jury instruction given at Anderson's trial was more similar to the alternative instruction approved in *Thompson* because it correctly distinguished between a defendant's reflection and action and specifically stated that an act that is the "instant effect of a sudden quarrel or heat of passion" is not premeditated. *See State v. Kiles*, 213 P.3d 174, 180, ¶¶ 17–19 (Ariz. 2009).

Anderson's quarrel with the accomplice-liability instruction is similarly unavailing. The trial court instructed the jury:

> A person is criminally accountable for the conduct of another if the person is an accomplice of such other person in the commission of the offense.
>
> An accomplice is a person who, with intent to promote or facilitate the commission of an offense, aids, counsels, agrees to aid, or attempts to aid another person in planning or committing the offense.

R.T. 10/09/01, at 129.

Without citing any legal authority, Anderson asserts the instruction "allowed the jury to find Anderson guilty of premeditated murder without also finding he had the specific intent required for that offense." Dkt. #21, at 126–28. But the jury was explicitly instructed: "Intentionally or with intent to as used in these instructions means that a person's objective is to cause that result or engage in the conduct." R.T. 10/09/01, at 129. Accordingly, to find Anderson guilty of premeditated first-degree murder based on accomplice liability, the jury necessarily had to find that he acted with premeditation. Indeed, the prosecutor argued, in accordance with the overwhelming evidence, that Anderson planned and intended, with premeditation, to participate in the murders, even if he did not ultimately inflict the fatal blows. *Id.* at 11–14; *see also, e.g.*, *id.* at 16 (noting "[Anderson]

1    himself admitted in the interview with Detective Cooper, 'We planned it.'").  Thus,

2    the accomplice-liability instruction was not deficient, as Anderson claims, and

3    overwhelming evidence demonstrated Anderson's guilt of premeditated first-

4    degree murder under a theory of accomplice liability.  Trial counsel were therefore

5    not ineffective for not objecting to the complained-of instructions because any

6    objection would have been futile.

7    Regardless, the jury also unanimously found Anderson guilty of felony first-

8    degree murder for all three victims.  R.T. 10/09/01, at 153–54.  As a result, the

9    supposed error with the premeditation and accomplice liability instruction was

10   harmless in the circumstances.  *See State v. Thornton*, 929 P.2d 676, 685 (Ariz.

11   1996) ("Error, if any, in not giving this instruction is harmless because felony

12   murder does not require a finding of premeditation."); *see also Tucker*, 68 P.3d at

13   120, ¶ 50 (felony murder and premeditated murder are simply two different forms

14   of the single Arizona crime of first-degree murder).  Anderson, therefore, cannot

15   establish prejudice.  Claim Two(H) should be denied.

16              9.    *Trial counsel were not ineffective for not moving for a change*
17                    *of venue (Claim Two(I)).*

18   Anderson asserts trial counsel were ineffective for not moving for a change

19   of venue "due to the existence of prejudicial pre-trial publicity that undermined

20   Anderson's ability to receive a fair and impartial jury as well as a reliable

21   sentence." Dkt. #21, at 128–31.

22              a.    **Exhaustion.**

23   Anderson acknowledges he did not present this claim to the state courts.  *Id.*

24   at 131. And because the claim would now be untimely and precluded in a

25   successive petition for post-conviction relief, it is procedurally defaulted.  *See*

26   *Spreitz*, 39 P.3d at 526, ¶ 4; *Coleman*, 501 U.S. at 735 n.1.  *Martinez* does not

27   provide cause to excuse the procedural default because, as set forth below, the

28   trial-counsel-ineffectiveness claim fails on the merits.  *See Martinez*, 566 U.S. at

14; *Sexton*, 679 F.3d at 1157.

### b.    Claim Two(I) is meritless.

Anderson asserts "counsel were ineffective in failing to move for a change of venue due to the existence of prejudicial pre-trial publicity that undermined Anderson's ability to receive a fair and impartial jury as well as a reliable sentence." Dkt. #21, at 128. Anderson supports his claim by pointing to a news article published in the Arizona Republic five years prior to his resentencing and asserting, without citation to the record, that pre-trial news coverage reached the jury pool and influenced the prospective jurors." *Id.* at 128–31.[12]

"The standards governing a change of venue ultimately derive from the due process clause of the fourteenth amendment which safeguards a defendant's [S]ixth [A]mendment right to be tried by 'a panel of impartial, 'indifferent' jurors.'" *Harris v. Pulley*, 885 F.2d 1354, 1361 (9th Cir. 1988) (quoting *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)). If the trial court is unable to seat an impartial jury owing to "prejudicial pretrial publicity or an inflamed community atmosphere," due process requires the court to grant a motion for a change of venue. *Id.* (quoting *Rideau v. Louisiana*, 373 U.S. 723, 726 (1963)).

The prejudicial effect of pervasive publicity is tested under the presumed prejudice or the actual prejudice standards. "Prejudice is presumed when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime." *Id.* (quoting *Rideau*, 373 U.S. at 726–27). Given that virtually every case of any consequence will be subject to some press coverage, the presumed prejudice principle is rarely

---

[12] Anderson also asserts counsel should have used articles Poyson's counsel had accumulated, Dkt. #21, at 130, but, any evidence that was not properly presented to the state courts in Anderson's own proceedings may not be considered by this Court because Anderson was not diligent in presenting it to the state courts. *See* 28 U.S.C. § 2254(e)(2); *see also Ramirez*, 596 U.S. at 389.

applicable and reserved for an "extreme situation." *Id.* (quoting *Mayola v. Alabama*, 623 F.2d 992, 997 (5th Cir. 1980)). Under the actual prejudice standard, 'a court must determine if the jurors demonstrated actual partiality or hostility that could not be laid aside." *Id.* at 1363 (citing *Murphy v. Florida*, 421 U.S. 794, 800 (1975)). "Jurors need not, however, be totally ignorant of the facts and issues involved." *Id.* (quoting *Murphy*, 421 U.S. at 800). "The relevant question is not whether the community remembered the case, but whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant." *Id.* (quoting *Patton v. Yount*, 467 U.S. 1025, 1035 (1984)).

The record demonstrates some prospective jurors were aware of the case, but that alone is insufficient to warrant a change of venue. *See Harris*, 885 F.2d at 1361. And the majority of prospective jurors did not recall hearing about the case or demonstrate any fixed opinions, actual partiality, or hostility that could not be set aside. Anderson does not point to a single juror who was ultimately empaneled that expressed any such hostility. Dkt. #21, at 130–31. Accordingly, the trial court was, in fact, able to seat a fair and impartial jury, and, as a result, Anderson cannot show that trial counsel should have motioned for a change of venue or that such a motion would have been successful. Anderson has therefore failed to demonstrate either deficient performance or prejudice, and the claim should be denied.

> 10. *Trial counsel were not ineffective for failing to maintain Anderson's sentencing date post-*Ring *(Claim Two(J)).*

Anderson argues trial counsel were ineffective "agreeing to continue Anderson's sentencing hearing" when "Arizona had no mechanism for imposing the death penalty." Dkt. #21, at 132–36.

### a.    Exhaustion.

Anderson correctly asserts he presented this claim in his post-conviction proceeding, which the post-conviction court rejected. *Id.* at 135. Anderson's assertion that he raised the claim on page 47 of his petition for review to the

Arizona Supreme Court is mistaken, however, because that page merely listed allegations of trial counsel's deficient performance made by Mr. Stazzone. PFR, at 46–47. No substantive argument concerning counsels' supposed deficient performance post-*Ring* were made therein. Thus, Anderson did not properly present the claim to the Arizona Supreme Court. *See Bolton*, 896 P.2d at 838; *see also, e.g.*, *State v. Stefanovich*, 302 P.3d 679, 683, ¶ 16 (Ariz. App. 2013) (failure to "develop the argument in any meaningful way" waives claim).

And because Anderson did not properly raise the claim in his petition for review to the Arizona Supreme Court, he failed to properly exhaust the claim. *See O'Sullivan*, 526 U.S. at 845. Anderson may not return to state court to reassert the claim now, so it is technically exhausted but procedurally defaulted. *Martinez* does not provide cause to excuse the procedural default because, as set forth below, the trial-counsel-ineffectiveness claim fails on the merits. *See Sexton*, 679 F.3d at 1157. Anderson also does not identify the cause and prejudice or fundamental miscarriage of justice necessary to excuse the default, and the claim should therefore be denied and dismissed on that basis.

Additionally, to the extent this Court determines Anderson properly exhausted Claim Two(J) as a federal claim in the state courts, the post-conviction court's decision rejecting the claim was not contrary to, or an unreasonable application of, clearly established federal law and did not rest on an unreasonable application of the facts.

### b.    Claim Two(J) is meritless.

Anderson argues trial counsel were ineffective for "agreeing to continue Anderson's sentencing hearing" when "Arizona had no mechanism for imposing the death penalty. Dkt. #21, at 132–36. Anderson raised this claim in his successive petition for post-conviction relief, which was rejected on the merits:

> Anderson argues that trial counsel should have demanded an immediate sentencing hearing because there was no constitutional sentencing scheme after *Ring* []. *Ring* held that Arizona's capital

sentencing procedure was unconstitutional. The death penalty remained a potential punishment for Anderson, even before the Arizona legislature amended the sentencing statute to comply with *Ring*. The Court finds the failure of Anderson's trial counsel to request an immediate sentencing hearing does not constitute ineffective assistance of counsel.

PCR Ruling 09/23/2020, at 9.

The post-conviction court's ruling was not contrary to, or an unreasonable application of, clearly established federal law and did not rest on an unreasonable application of the facts. The court correctly noted that *Ring* held only that Arizona's capital sentencing procedure was unconstitutional—*not* that the death penalty was unconstitutional or otherwise not a potential punishment for Anderson's first-degree-murder convictions. As a result, counsel could not have unilaterally forced the trial court into conducting an aggravation and sentencing hearing in the month following *Ring*, as Anderson summarily asserts. Indeed, there is nothing in the record to suggest, let alone demonstrate, that Anderson or the State would have been adequately prepared for such a hearing, or that the trial court would have conducted an expedited aggravation and sentencing hearing post-*Ring* if counsel had requested one.

Anderson's argument that counsel were ineffective for "failing to pursue an agreed upon disposition" is similarly unavailing. Dkt. #21, at 136. First, Anderson cites no evidence suggesting counsel did not attempt to pursue an agreed upon disposition. Thus, like the forced, expedited sentencing claim, the "agreed upon disposition" claim fails for a lack of factual support. *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief."); *Gomez*, 66 F.3d 199 at 205 (habeas relief not warranted where claims for relief are unsupported by facts).

Second, even if trial counsel opted against "pursuing an agreed upon disposition," as Anderson summarily claims, Anderson cannot establish deficient

1  performance.  There is no constitutional right to a plea bargain.  *Weatherford v.*
2  *Bursey*, 429 U.S. 545, 561 (1977); *Nunes v. Mueller*, 350 F.3d 1045, 1052 (9th Cir.
3  2003).  As a result, the decision to pursue an agreed upon disposition with the
4  prosecutor is the type of strategic decision wholly within counsels' purview.  *See*
5  *Brown v. Doe*, 2 F.3d 1236, 1246 (2d Cir. 1993) (holding that the decision by
6  counsel not to pursue plea bargaining could be considered reasonable strategy and
7  stating that "it is not necessary that the defendant have counsel who recommends
8  that a plea bargain be pursued")

9       Counsel were plainly aware of *Ring* and its potential impact on Arizona's
10  capital sentencing procedures.  Counsel were further aware of the sentencing
11  options available for Anderson's first-degree murder convictions and that stipulated
12  sentences could conceivably be reached with the State.  Consequently, if, as
13  Anderson claims, trial counsel elected to forego potential disposition discussions
14  with the prosecutor, then that decision was necessarily a strategic one that cannot
15  be second-guessed in these federal habeas proceedings.  *See Silva v. Woodford*, 279
16  F.3d 825, 844 (9th Cir. 2002) (noting that Supreme Court precedent dictates
17  counsel commits no error when he or she makes an informed strategic decision);
18  *see also Aguilar v. Alexander*, 125 F.3d 815, 820–21 (9th Cir. 1997) (rejecting
19  claim that counsel was ineffective for not pursuing plea negotiations more
20  aggressively and noting "differences in the strategy, tactics, and styles of defense
21  attorneys" with respect to handling plea negotiations).

22       Regardless, even assuming counsel unreasonably failed to pursue an agreed
23  upon disposition, Anderson cannot demonstrate prejudice from the supposed
24  deficient performance.  The prosecutor had no duty to extend a plea deal to
25  Anderson.  *See Weatherford*, 429 U.S. at 561 (explaining that the decision whether
26  to offer plea agreement is a matter of prosecutorial discretion because there is no
27  constitutional right to a plea bargain).  And nothing in the record indicates that the
28  prosecutor would have agreed to a particular disposition—let alone that he was

1   even willing to entertain discussions.  *See United States v. Boone*, 62 F.3d 323, 327

2   (10th Cir. 1995) (finding no *Strickland* prejudice for counsel's failure to negotiate a

3   plea because nothing in record suggested the prosecutor was willing to enter into a

4   plea agreement).

5        Anderson cannot show that counsel could have forced an expedited

6   aggravation and sentencing hearing and failed to pursue an agreed upon disposition

7   post-*Ring*.  And even assuming error, there is nothing in the record to suggest that

8   attempts to force an expedited hearing or pursue an agreed disposition would have

9   been entertained, let alone successful.  Accordingly, the claim fails both *Strickland*

10  prongs and cannot entitle Anderson to habeas relief.

11              11.    *Trial counsel were not ineffective for not challenging the*
12                      *supposed duplicitous indictment (Claim Two(K)).*

13       Anderson argues trial counsel were ineffective for not timely challenging the

14  supposed duplicitous indictment prior to his retrial.  Dkt. #21, at 136–40.

15               **a.    Exhaustion.**

16       Anderson asserts he "raised this claim on his second direct appeal."  *Id.* at

17  140.  Anderson is mistaken.  Ineffective assistance of trial counsel claims cannot

18  be raised or considered on direct appeal in Arizona.  *See State ex rel. Thomas v.*

19  *Rayes*, 153 P.3d 1040, 1044, ¶ 20 (Ariz. 2007) ("We therefore hold, consistent with

20  *Spreitz*, that a defendant may bring ineffective assistance of counsel claims *only* in

21  a Rule 32 post-conviction proceeding—not before trial, at trial, or on direct

22  review.").  Presenting an underlying substantive claim is not sufficient to properly

23  exhaust a related ineffective-assistance-of-counsel claim.  *See Edwards v.*

24  *Carpenter*, 529 U.S. 446, 451–53 (2000).  Additionally, the Arizona Supreme

25  Court denied the underlying substantive claim because Anderson had waived the

26  claim at trial.  Thus, even the underlying duplicitous-indictment claim was not

27  properly presented to the state courts.

28

1    And because the ineffective-assistance-of-trial-counsel claim would now be

2    untimely and precluded in a successive petition for post-conviction relief, it is

3    procedurally defaulted.  *See Spreitz*, 39 P.3d at 526, ¶ 4; *Coleman*, 501 U.S. at 735

4    n.1.  *Martinez* does not provide cause to excuse the procedural default because, as

5    set forth below, the ineffective-assistance-of-trial-counsel claim fails on the merits.

6    *See Martinez*, 566 U.S. at 14; *Sexton*, 679 F.3d at 1157.  Anderson identifies no

7    other exception to procedural default that would apply to this claim.  Accordingly,

8    it is procedurally defaulted and should be dismissed on that basis.

9    To the extent this Court determines that it may consider the merits of Claim

10   Two(K), the Arizona Supreme Court's decision rejecting Anderson's duplicitous-

11   indictment claim was not contrary to, or an unreasonable application of, clearly

12   established federal law and did not rest on an unreasonable application of the facts.

### b.    Claim Two(K) is meritless.

14   Anderson argues trial counsel were ineffective for not timely challenging

15   the supposed duplicitous indictment prior to his retrial.  Dkt. #21, at 136–40.

16   The Arizona Supreme Court, however, previously rejected Anderson's

17   argument on appeal that the indictment was duplicitous:

18   
19   Anderson argues that the indictment counts charging armed
     robbery, conspiracy to commit murder, and first-degree murder were
20   each duplicitous.  An indictment is duplicitous if it charges more than
     one crime in the same count.  *State v. Axley*, 132 Ariz. 383, 392, 646
     P.2d 268, 277 (1982).  Duplicitous indictments are prohibited because
21   they fail to give adequate notice of the charge to be defended, present
22   the potential of a non-unanimous jury verdict, and make a precise
     pleading of prior jeopardy impossible in the event of a later
23   prosecution.  *State v. Davis*, 206 Ariz. 377, 389 ¶ 54, 79 P.3d 64, 76
24   (2003).

25   The State contends that Anderson waived these arguments.  We
     agree.  Before his first trial, Anderson moved for a more specific
26   indictment.  The superior court denied the motion and Anderson
27   challenged that denial in his first appeal.  Given our disposition of the
     case on other grounds, we declined to address the issue, noting instead

28

that "the case can be remanded for a new indictment or the indictment may be amended prior to [Anderson's] new trial to avoid any confusion as to the charges that [Anderson] must meet." *Anderson I*, 197 Ariz. at 325 ¶ 29, 4 P.3d at 380.

Anderson did not renew his attack on the indictment before the second trial. Instead, he first raised the issue at the close of the State's case-in-chief in a motion for acquittal pursuant to Arizona Rule of Criminal Procedure 20. The superior court denied the motion, ruling that Anderson had waived the argument by not raising it prior to trial.

Arizona Rule of Criminal Procedure 13.5(e) provides that "[n]o issue concerning a defect in the charging document shall be raised other than by a motion filed in accordance with Rule 16." Rule 16.1(b) requires that such motions be filed at least twenty days before trial; Rule 16.1(c), in turn, provides that any motion not timely filed is "precluded."

We require pretrial objections to an indictment in order to allow correction of any alleged defects before trial begins. If a defendant makes a timely objection, the State can remedy any duplicity by filing a new indictment charging multiple counts, thus exposing a defendant to multiple penalties. *See State v. Rushton*, 172 Ariz. 454, 456, 837 P.2d 1189, 1191 (App. 2002). By failing to object before trial and later seeking dismissal of allegedly duplicitous counts, a defendant seeks to have his cake and eat it too: he avoids the potential of multiple punishments by depriving the State of the opportunity to amend, and then attempts to avoid any punishment at all. *See id.* ("While defendant risked, in the alternative, the possibility of a non-unanimous guilty verdict on the single charge as alleged, his failure to object to the indictment indicates a risk he was willing to take. Defendant simply gambled and lost and cannot now be heard to complain.").

Because the first appeal left the issue unresolved, Anderson was not relieved of the obligation to raise the objection anew after remand. *See United States v. Gomez*, 67 F.3d 1515, 1526 n. 13 (10th Cir.1995) ("[I]t is fundamental that, in cases where a new trial has been ordered, objections made during the first proceeding do not preserve issues for appeal in the second.") (citing *United States v. Hill*, 60 F.3d 672, 675 n. 2 (10th Cir. 1995)); *Robison v. State*, 888 S.W.2d 473, 484–85 (Tex. Crim. App. 1994) (holding that objection at first trial does not preserve error for appellate review of second trial). By failing to

object before the second trial, Anderson traded the risk of a non-unanimous jury for the reward of only one potential sentence on each of the challenged counts and therefore waived any objection.

Even absent this waiver, Anderson's claims of a duplicitous indictment are unavailing. The three counts charging murder each listed a separate victim and thus were not duplicitous. The same is true of the conspiracy count, which alleged a conspiracy to murder "other residents" at the Kagen address. As Anderson concedes, a single conspiracy count may allege multiple objects. *See* A.R.S. § 13–1003(C) (1989); *State v. Ortiz*, 131 Ariz. 195, 639 P.2d 1020 (1981), *disapproved on other grounds by State v. Gretzler*, 135 Ariz. 42, 659 P.2d 1 (1983).

The armed robbery allegation was not duplicitous on its face. It alleged a single crime, namely that Anderson "committed armed robbery" at the Kagen residence on August 13, 1996. Anderson argues, however, that the indictment's failure to specify any alleged victim or property taken created the possibility of a non-unanimous jury verdict because the State offered evidence at trial of robberies of different victims. Anderson contends that the jurors may not have unanimously agreed that Anderson committed armed robbery of any particular victim. This complaint is not really targeted at the indictment, but rather at the jury instructions and verdict forms that failed to expressly require jury unanimity as to any one victim. Because Anderson requested these jury instructions and verdict forms, he invited any error. *See State v. Logan*, 200 Ariz. 564, 565–66 ¶ 9, 30 P.3d 631, 632–33 (2001) (holding that we will not reverse a criminal conviction on the basis of error invited by the defendant, regardless of whether the error is fundamental).

*Anderson II*, 111 P.3d at 377–79, ¶¶ 13–20.

The supreme court's analysis and conclusion regarding Anderson's duplicitous-indictment claim was not contrary to, or an unreasonable application of, clearly established federal law and did not rest on an unreasonable application of the facts. An indictment is duplicitous if it charges separate crimes in the same count. *See State v. Whitney*, 768 P.2d 638, 642 (Ariz. 1989); *State v. Hamilton*, 868 P.2d 986, 993 (Ariz. App.1993). Duplicitous indictments are prohibited because they fail to give adequate notice of the charge, present a hazard of a non-

1  unanimous jury verdict, and make a precise pleading of double jeopardy
2  impossible in the event of a subsequent prosecution. *See Whitney*, 768 P.2d at 642;
3  *Hamilton*, 868 P.2d at 993. "However, in order to prevail on an arguably
4  duplicitous indictment, defendant must demonstrate that he was actually prejudiced
5  thereby." *Hamilton*, 868 P.2d at 993.

6      As the Arizona Supreme Court correctly explained, "The three counts
7  charging murder each listed a separate victim and thus were not duplicitous. The
8  same is true of the conspiracy count, which alleged a conspiracy to murder "other
9  residents" at the Kagen address. As Anderson concedes, a single conspiracy count
10  may allege multiple objects." *Anderson II*, 111 P.3d at 378, ¶ 19. Regarding the
11  armed-robbery count, it is not duplicitous on its face. *Id.* at 378–79, ¶ 20. And, as
12  the Arizona Supreme Court noted, Anderson's complained-of ambiguity could
13  have been cured prior to trial by the State filing a new indictment charging
14  additional counts of armed robbery. *Id.* at 378, ¶ 17. But counsel elected not to
15  risk receiving any additional counts by objecting to the armed robbery count as
16  duplicitous.

17      Anderson has failed to produce evidence showing counsels' reasons for not
18  challenging the armed-robbery count as duplicitous. Absent such evidence,
19  Anderson cannot overcome the presumption that counsel made a tactical decision
20  not to object. *See Chandler v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir.
21  2000) ("An ambiguous or silent record is not sufficient to disprove the strong and
22  continuing presumption . . . . '[W]here the record is incomplete or unclear about
23  [counsel's] actions, we will presume that he did what he should have done, and that
24  he exercised reasonable professional judgment.'") (quoting *Williams v. Head*, 185
25  F.3d 1223, 1228 (11th Cir. 1999)).

26      Moreover, Anderson has not even alleged, let alone demonstrated, that he
27  lacked adequate notice of the charges against him such that he could not
28  adequately prepare a defense or that he was actually prejudiced by the supposed

duplicitous indictment.  Accordingly, Anderson has failed to demonstrate either deficient performance or prejudice necessary to warrant habeas relief on the claim. Claim Two(K) should be denied.

> 12.    *Anderson was not denied a fair trial and resentencing or post-conviction proceeding due to counsel's supposed cumulative error (Claim Two(L)).*

Anderson finally asserts the cumulative impact of counsel's supposed errors deprived Anderson of a fair trial, resentencing, and post-conviction proceeding. Dkt. #21, at 140–42.

### a.    Exhaustion.

Anderson raised, and the post-conviction court, rejected a cumulative-error claim regarding trial counsel's supposed ineffectiveness.  The post-conviction court's rejection of the claim was not contrary to or an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

### b.    Claim Two(L) is meritless.

For the reasons discussed supra, Anderson has failed to demonstrate the post-conviction court's findings on each claim that trial counsel were not ineffective at trial and resentencing were either an unreasonable application of *Strickland*, or that those findings were based on unreasonable factual determinations.  There is therefore no cumulative error to consider.  *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002) (stating that when "there is no single constitutional error . . . there is nothing to accumulate to a level of a constitutional violation").  Moreover, even assuming Anderson has demonstrated some error occurred, he has not shown that counsel's alleged ineffectiveness resulted in several substantial errors.  *See Parle*, 387 P.3d at 1045 ("The cumulative error doctrine in habeas recognizes that, even if no single error were prejudicial, where there are *several substantial errors*, their cumulative effect may nevertheless be so

1    prejudicial as to require reversal.") (Emphasis added and internal quotation
2    omitted).  Consequently, Anderson is not entitled to relief on a cumulative-error
3    claim.  *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011) ("Because we
4    conclude that no error of constitutional magnitude occurred, no cumulative
5    prejudice is possible.").  Claim Two(L) should be denied.

6          **C.    *The State did not violate* Brady *(Claim Three).***

7          Anderson argues his convictions and death sentences are "invalid under the
8    federal constitutional guarantees of due process, a fair trial, and a reliable sentence
9    due to the State's failure to disclose critical impeachment material about Detective
10   Cooper."  Dkt. #21, at 142–51.  As this Court has already determined, Anderson's
11   *Brady* claim is technically exhausted but procedurally defaulted.  Dkt. #52, at 9–
12   18.  And, as discussed in further detail below, the claim also fails on the merits.

13               **1.      Procedural status.**

14         As noted, this Court has already determined correctly that Anderson cannot
15   present this *Brady* claim in a successive petition for post-conviction relief under
16   Rule 32.1(e) as a newly-discovered evidence.  *Id.* at 9–18.  And "[b]ecause there is
17   no remaining state court remedy with respect to Anderson's *Brady* allegations,
18   Claim Three is technically exhausted but procedurally defaulted.  *Id.* at 18.  Indeed,
19   Anderson admits the claim was not raised in state court, and he does not
20   sufficiently present any argument that he can overcome his failure to do so.  *Id.* at
21   151.  Instead, citing *Banks v. Dretke*, 540 U.S. 668 (2004), Anderson summarily
22   appears to assert in a footnote that he can overcome the procedural default of the
23   claim.  *Id.* at 13 n.1.  He is mistaken.

24         In *Banks*, the Supreme Court explained that the cause and prejudice showing
25   necessary to overcome a defaulted *Brady* claim "'parallel[s] two of the three
26   components of the alleged *Brady* violation itself.'"  *Banks*, 540 U.S. at 691
27   (quoting *Strickler v. Greene*, 527 U.S. 263, 282 (1999)).  Thus, the required
28   showing of cause corresponds to the *Brady* requirement that the petitioner show

that the state suppressed the evidence. *See id.* ("[A] petitioner shows 'cause' when the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence . . . ."). The showing of prejudice required to excuse a procedural default corresponds to the *Brady* prejudice requirement. *See id.* ("[C]oincident with the third *Brady* component (prejudice), prejudice within the compass of the 'cause and prejudice' requirement exists when the suppressed evidence is 'material' for *Brady* purposes."). Accordingly, even if *Banks* applies, for the same reasons that Anderson's *Brady* claim fails, he has failed to demonstrate the cause and prejudice necessary to excuse the procedural default under *Banks*. As a result, the claim is procedurally defaulted, without excuse.

## 2. The State did not violate *Brady*.

The Due Process Clause of the Fourteenth Amendment provides that no state shall deprive "any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV. Substantive due process protects individuals against arbitrary and unreasonable government action which deprives a person of life, liberty, or property. *Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1234 (9th Cir. 1994). Procedural due process does not protect the actual deprivation of the life, liberty, or property in question, but it ensures that individuals are given ample opportunity to challenge the government action. *Carey v. Piphus*, 435 U.S. 247, 259 (1978).

Due process rights are violated when the state fails to disclose "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The prosecution's duty to disclose favorable evidence is not dependent upon a request from the accused, and even an inadvertent failure to disclose may constitute a violation. *United States v. Agurs*, 427 U.S. 97, 107 (1976). *Brady* and its progeny "illustrate the special role played by the American prosecutor in the search for truth in criminal trials." *Strickler*, 527 U.S. at 281.

The State's duty to comply with its obligations under *Brady* is ongoing and continues to bind the prosecution even after conviction and sentencing. *Thompson v. Goldsmith*, 979 F.2d 746, 749–50 n.2 (9th Cir. 1992).

In *Brady*, the Supreme Court held that a defendant's due process rights are violated when the state fails to disclose to the defendant prior to trial "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. There are three components of a true *Brady* violation:

> The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

*Strickler*, 527 U.S. at 281–82 (finding no *Brady* violation because petitioner failed to establish that there was a reasonable probability that his conviction or sentence would have been different had the information been disclosed).

The terms "material" and "prejudicial" are used interchangeably to describe the third *Brady* component. *Bailey v. Rae*, 339 F.3d 1107, 1116 n.6 (9th Cir. 2003); *see also Benn v. Lambert*, 283 F.3d 1040, 1053 n.9 (9th Cir. 2002) ("Evidence is not 'material' unless it is 'prejudicial,' and not 'prejudicial' unless it is 'material.'"). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682. In assessing materiality, courts examine the undisclosed evidence item by item and consider the cumulative effect of all the suppressed evidence. *See Kyles v. Whitley*, 514 U.S. 419, 436–37 (1995). To be material under *Brady*, undisclosed evidence must be admissible—*Brady* claims cannot be based on inadmissible evidence. *See Wood v. Bartholomew*, 516 U.S. 1, 6 (1995).

Not every violation of the duty to disclose, however, constitutes a *Brady* violation. In *Strickler*, the Supreme Court stated that "there is never a real *Brady* violation unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." 527 U.S. at 281. For purposes of determining prejudice, the withheld evidence must be analyzed "in the context of the entire record." *Agurs*, 427 U.S. at 112.

Additionally, as noted, in a *Brady* claim, the cause and prejudice necessary to excuse the procedural default of the claim "parallel two of the three components of the alleged *Brady* violation itself." *Strickler*, 527 U.S. at 282. Thus, in order to excuse his procedural default, a defendant must show the evidence was suppressed by the State, either willfully or inadvertently, and that prejudice ensued. *Id.*

a.     The Kingman Police Department report.

Anderson argues the state violated *Brady* by failing to disclose a "more detailed and extensive report from the Kingman Police Department (KPD), who originally investigated the report of Cooper [allegedly] sexually assaulting Griffith." Dkt. #21, at 144. Anderson asserts that failing to disclose the KPD report "violated *Brady* and *Giglio*[13] because the report detailed that Cooper was criminally investigated by the KPD, rather than merely investigated internally by the MCSO, as the State had led the trial court to believe." *Id.*

First, the alleged conduct occurred years after Detective Cooper's involvement in Anderson's case, and there was insufficient evidence to prosecute Cooper. Dkt. #25-6, at 6. Regardless, even if Detective Cooper had been charged *and* convicted, it would still not have been necessarily admissible for impeachment purposes. *See State v. Winegardner*, 413 P.3d 683, 687, ¶ 12 (Ariz. 2018) (noting that "criminal offenses that primarily involve stealth, such as burglary, or force,

---

[13] *Giglio v. United States*, 405 U.S. 150 (1972).

1    such as robbery or assault, do not inherently demonstrate a trait of untruthfulness"

2    and holding that "the phrase 'dishonest act or false statement' should be construed

3    narrowly to include only those crimes that involve deceit, untruthfulness, or

4    falsification").   As a result, even assuming that information was not disclosed,

5    Anderson cannot demonstrate that a sexual assault allegation against Cooper was

6    material.   *See Henry v. Ryan*, 720 F.3d 1073, 1080 (9th Cir. 2013) ("[T]o be

7    material under *Brady*, evidence must be admissible as evidence or capable of being

8    used to impeach a government witness.") (quotation and quotation marks omitted).

9          Anderson's assertion that the KPD report contained additional evidence,

10   including "taped interviews, physical evidence such as clothes, hair, the bedspread,

11   ejaculate, DNA evidence, photographs, and a polygraph" also cannot support a

12   *Brady* violation.   Dkt. #21, at 144.   Anderson has not demonstrated that he was

13   either wholly unaware, or that the prosecutor failed to disclose, that physical

14   evidence had been collected during the Griffith investigation.   Regardless, the

15   physical evidence that was gathered during the KPD investigation "such as clothes,

16   hair, the bedspread, ejaculate, DNA evidence, photographs, and a polygraph"

17   would not have been admissible at Anderson's trial.   *See* Ariz. R. Evid. 608(b)

18   (providing that attacks on a witness's credibility based on specific instances of

19   conduct, other than conviction of a crime, may not be proved by extrinsic

20   evidence).   And, such evidence cannot be material for *Brady* purposes because it

21   would not be admissible at Anderson's trial and, therefore, there is no possibility of

22   a different outcome.   *See United States v. Kennedy*, 890 F.2d 1056, 1059 (9th

23   Cir.1989) (citing *United States v. Ranney*, 719 F.2d 1183, 1190 (1st Cir.1983)).

24         Moreover, even assuming the additional evidence could have been admitted,

25   Anderson has not demonstrated that it would have further refuted or undermined

26   Cooper's testimony.   The *Brady* disclosures detailed Cooper's history of alleged

27   misconduct, and Cooper testified that he repeatedly lied while being investigated

28   for improper sexual contact while on duty and that he was scared of a sexual

1    assault allegation against him.  R.T. 10/04/01, at 63–64.  Accordingly, anything

2    admissible from the police report would have been cumulative to the evidence

3    already heard by the jury and, therefore, cannot warrant habeas relief on the Brady

4    claim.  *See Strickler*, 527 U.S. at 281; *see also, e.g.*, *United States v. Kohring*, 637

5    F.3d 895, 902 (9th Cir. 2011) (stating that "if suppressed [*Brady*] evidence is

6    'merely cumulative,' then the failure to disclose is not a violation"); *United States*

7    *v. Diaz–Rodriguez*, 478 F.2d 1005, 1008 (9th Cir. 1973) ("A new trial is not

8    automatically required whenever the prosecution's files subsequently reveal[]

9    evidence of possible utility to the defense but of unlikely weight in altering the

10   verdict.").  Consequently, Anderson's *Brady* claim regarding the KPD report fails.

11          Anderson asserts that Detective Cooper's improper sexual encounters

12   "reveal a deeper issue: that Cooper had a pattern of coercing victims and suspects

13   in his investigations using unsanctioned and illegal methods, in some cases to alter

14   the outcome of the investigation."  Dkt. #21, at 147–48.  Even if true, however,

15   Anderson has not alleged that Cooper tried to improperly coerce Anderson into

16   making his inculpatory statements during his interviews.  *See id.*  Nor is there a

17   reasonable basis to do so.  Indeed, Cooper's subsequent misconduct derived from

18   an improper sexual motivation with women he encountered during the course of

19   his duties.  No such motivation existed with Anderson, and Cooper's subsequent

20   sexual misconduct with women does not support a claim that Anderson's

21   confessions were somehow coerced or involuntary, as Anderson claims.[14]

22          Anderson's reliance on *Milke v. Ryan*, 711 F.3d 998 (9th Cir. 2013), is

23   similarly unavailing.  Dkt. #21, at 149–50.  In *Milke*, the detective at issue had

24   _____

25   [14] Again, it is important to note that, in *Anderson I*, the Arizona Supreme Court
     found that Anderson's confessions were in fact voluntary.  4 P.3d at 381–82, ¶ 35.
26   Anderson did not challenge the voluntariness of his confessions in his subsequent
     appeal, and therefore, any voluntariness claim would now be technically exhausted
27   but procedurally defaulted in these proceedings.  *See* Ariz. R. Crim. P. 32.2(a)(3);
     *see also Coleman*, 501 U.S. at 735 n.1.
28

1  provided the only evidence linking Milke to the murder of her son.  *Id.* at 1022.

2  That is, the only evidence of guilt was Milke's unrecorded, uncorroborated, and

3  unwitnessed confession to the detective, and, as a result, the Ninth Circuit

4  characterized Milke's trial as "a swearing contest" between her and the detective.

5  *Id.* at 1000, 1002.

6        Anderson, however, was stopped while driving alone in Wear's truck.

7  *Anderson*, 111 P.3d at 376, ¶ 8.  Anderson's interviews with Detective Cooper were

8  also recorded, and he ultimately confessed to his involvement in the murders and

9  that they were premeditated, which was corroborated by both Lane and Poyson.

10  *Id.* at 376, ¶ 9; *see also id.* at 380–81, ¶¶ 31–36. Anderson later retracted his

11  confession and testified at trial, attempting to minimize his participation in and

12  culpability for the murders.  *Id.* at 377, ¶ 10.  But the jury rejected Anderson's

13  testimony and found him guilty on all counts.  *Id.* at ¶ 11.

14        Additionally, Milke's jury never heard testimony about the detective's

15  pattern of lying and misconduct.  Again, however, Cooper explicitly testified that

16  he had been investigated for a sexual assault allegation levied against him and had

17  lied repeatedly during that investigation.  R.T. 10/04/01, at 63–64.  Cooper further

18  testified that he resigned because he lied during that investigation.  *Id.* at 74–75.

19  *Milke* is therefore not on point.

20                  b.   Why Yavapai County Attorney declined to prosecute.

21        Anderson acknowledges that the Yavapai County Attorney declined to

22  prosecute Cooper because there was "insufficient evidence."  Dkt. #21, at 150.  He,

23  nonetheless, quarrels with the weight of the evidence and speculates "the

24  resolution of the case against Cooper constituted a benefit to him that was not

25  disclosed to the defense."  *Id.*  There is nothing to support Anderson's allegation,

26  and his mere speculation cannot support such a conclusory *Brady* claim.  *See, e.g.*,

27  *Runningeagle v. Ryan*, 686 F.3d 758, 769 (9th Cir. 2012) ("[T]o state a *Brady*

28  claim, [a petitioner] is required to do more than merely speculate" about potentially

favorable and material evidence.).

Moreover, the Supreme Court has been very clear that prosecutors possess wide discretion in deciding "whether or not to prosecute, and what charges to bring or file . . . ." *Wayte v. United States*, 470 U.S. 598, 607 (1985). And exercising "'some selectivity in enforcement is not in itself a federal constitutional violation' so long as 'the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.'" *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)). Anderson's argument does not allege the Yavapai County Attorney used any such "unjustifiable standard" when it declined to prosecute Detective Cooper due to insufficient evidence. Rather, Anderson merely complains that it should have nonetheless pursued charges against Cooper despite the evidentiary insufficiencies. This is not a sufficient basis to challenge the Yavapai County Attorney's decision not to prosecute Cooper and cannot constitute a sufficient constitutional basis for Anderson to obtain habeas relief in these proceedings.

In addition to being technically exhausted and procedurally defaulted, Anderson's *Brady* claim fails on the merits. Claim Three should be dismissed.

> **D.    *The Arizona Supreme Court properly reweighed the aggravating and mitigating circumstances and imposed a valid death sentence (Claim Four).***

In Claim Four, Anderson claims his death sentences are invalid "due to the jury's finding of invalid aggravating circumstances, and due to the Arizona Supreme Court's failure to provide close appellate scrutiny of Anderson's death sentence." Dkt. #21, at 151. Anderson further claims his appellate counsel "was ineffective in failing to ensure that all mitigation evidence from the first sentencing hearing was argued to the Arizona Supreme Court as part of its independent reweighing." *Id.* at 161. Claim Four is technically exhausted but procedurally defaulted, and it also fails on the merits.

### 1.    Procedural status.

Anderson argued on appeal, and the Arizona Supreme Court found, that the jury had improperly found the "especially heinous, cruel or depraved" aggravator ("(F)(6) aggravator") for the murders of Delahunt and Wear.  *Anderson II*, 111 P.3d at 396–98, ¶¶ 119–31.  As a result, the supreme court did "not consider the jury's findings of the (F)(6) aggravator in [its] consideration of the appropriate sentence for the murders of Delahunt and Wear."  *Id.* at 389, ¶ 130.  Nonetheless, following its de novo review of the jury's aggravation and sentencing findings, the supreme court affirmed the death sentences for each of the three murders.  *Id.* at 399, at ¶ 137.  Anderson admits the claim was not raised in state court, and he does not present any argument that he can overcome his failure to do so.  *Id.* at 163.  Consequently, Claim Four is technically exhausted but procedurally defaulted, and it should be denied and dismissed on that basis.  For the following reasons, the claim also fails on the merits.

### 2.    The Arizona Supreme Court properly reweighed the aggravating and mitigating circumstances and imposed a valid death sentence.

Anderson argues the Arizona Supreme Court failed to provide close appellate scrutiny of his death sentences and appellate counsel were ineffective for not ensuring that all the mitigation from his first sentencing was before the supreme court during its de novo review.  Dkt. #21, at 158–63.  The Arizona Supreme Court reviewed the jury's aggravation and sentencing findings, as follows:

> We review de novo the jury's determination that the death penalty is warranted.  A.R.S. § 13–703.04.  When we determine that an aggravating circumstance has been found erroneously, we must "independently determine if the mitigation . . . is sufficiently substantial to warrant leniency in light of the existing aggravation."  A.R.S. § 13–703.04(B).  *See Carreon*, 210 Ariz. at 73 ¶ 96, 107 P.3d at 919.

In making this determination, we do not simply consider the number of aggravating and mitigating factors, but instead consider the "quality and strength" of each. *Id.* at ¶ 97 (quoting *State v. Greene*, 192 Ariz. 431, 443 ¶ 60, 967 P.2d 106, 118 (1998)). In this case, the "quality and strength" of the (F)(5) and (F)(8) aggravating circumstances are compelling. The evidence convincingly established that Anderson planned and carried out the murders of three victims in order to steal a pickup truck.

Anderson urged the following mitigation: (1) his turbulent childhood, including sexual abuse by his father and lack of stability, caused in part by frequent moves and attendance at more than fifty schools; (2) his below-average I.Q. and "follower" personality; (3) his relatively minor participation in the crimes compared with Poyson; (4) his acting under duress and fear of Poyson; (5) the comparatively lenient eight-year sentence that Lane received; (6) his cooperation with police by confessing to participation in the murders; (7) his good record as an inmate; and (8) his embrace of religion and Christian ministry to fellow inmates.

We conclude that these mitigating factors are not sufficiently substantial to call for leniency. Although there was evidence at trial that Anderson's I.Q. was below average and that he did not have a leader-type personality, he was not mentally retarded, unable to make his own decisions, or lacking the capacity to judge right from wrong. We similarly cannot give much weight to Anderson's fear of Poyson; there is simply no credible evidence that Anderson was coerced into committing these murders.

Moreover, Anderson's childhood troubles do not in any way explain his decision, decades later at age forty-eight, to kill three innocent people to steal a pickup. Given Anderson's substantial role in each of the murders, we reject his characterization of his participation as minor. Nor can Anderson's limited cooperation with the police be viewed as substantial mitigation. And, while Lane received a far more lenient sentence than Anderson under her plea bargain with the State, her involvement in the murders was far less substantial than Anderson's and she was but fourteen years old at the time of the murders.

There was evidence that Anderson has been a model inmate and has made efforts to assist fellow inmates through his Christian ministry. While laudable, these mitigating facts are not nearly

substantial enough to call for leniency in light of the aggravating circumstances. Exercising independent review pursuant to A.R.S. § 13–703.04(B), we therefore affirm the death sentence for each of the three murders.

*Anderson II*, 111 P.3d at 398–99, ¶¶ 132–37 (footnotes omitted).

Relying on *Clemons v. Mississippi*, 494 U.S. 738 (1990), Anderson asserts "the Arizona Supreme Court failed to apply close appellate scrutiny of Anderson's death sentence." Dkt. #21, at 158–61. While "meaningful appellate review" is necessary to ensure that the death penalty is not imposed in an arbitrary or irrational fashion, *Pulley v. Harris*, 465 U.S. 37, 54 (1984) (Stevens, J., concurring); *Parker v. Dugger*, 498 U.S. 308, 321 (1991), the Supreme Court has never held that "independent" or "de novo" review of death sentences is constitutionally mandated, *see Walton v. Arizona*, 497 U.S. 639, 655–56 (1990) *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002). The Constitution requires only that an appellate court "consider whether the evidence is such that the sentencer could have arrived at the death sentence that was imposed," not whether the appellate court itself would have imposed a death sentence. *Clemons*, 494 U.S. at 749. Regardless, the Arizona Supreme Court specifically conducted a de novo review when it upheld Anderson's death sentences, and such a review was not constitutionally deficient, as Anderson claims. *See McKinney*, 589 U.S. at 143–44 (reaffirming *Clemons*' rule that a state appellate court may uphold a death sentence after a reweighing the permissible aggravating and mitigating evidence).

Additionally, Anderson's apparent sub claim—that appellate counsel was ineffective—is unexhausted because, as he admits, he did not fairly present it to the state courts. Dkt. #21, at 163. The claim is therefore procedurally defaulted because he is precluded from presenting it to the state courts in a successive post-conviction proceeding by Rule 32.2(a)(3) and (b). *See* Ariz. R. Crim. P. 32.1(d)–

1   (h), 32.2(a) & (b); *Beaty*, 303 F.3d at 987; *Ortiz*, 149 F.3d at 931–32; *Carriger*, 971

2   F.2d at 333.  Any alleged ineffectiveness of post-conviction counsel cannot serve

3   as cause because the claim does not allege trial counsel's ineffectiveness.  *See*

4   *Davila*, 582 U.S. at 524–25; *Hunton*, 732 F.3d at 1126–27.  And any alleged

5   ineffectiveness of appellate counsel cannot constitute cause because the claim is

6   itself procedurally defaulted and Anderson has not excused the default.  *See*

7   *Edwards*, 529 U.S. at 552.  Finally, to the extent Anderson is asserting a

8   fundamental miscarriage of justice, it is insufficient to demonstrate, based on new

9   evidence, that no reasonable juror would have convicted him.  *See Schlup*, 513

10   U.S. at 327.  Any ineffective-assistance-of-appellate-counsel sub claim should

11   therefore be dismissed as procedurally defaulted.

12       Regardless, as Anderson acknowledges, "The record on appeal also included

13   the record from the first sentencing hearing."  Dkt. #21, at 161.  And the Arizona

14   Supreme Court specifically noted that the record before it was accurate and

15   complete when it reviewed the jury's findings de novo.  *See Anderson II*, 111 P.3d

16   at 398, ¶ 132 n. 24.  ("We may remand a case 'for further action if the trial court

17   erroneously excluded evidence or if the appellate record does not adequately

18   reflect the evidence presented.' A.R.S. § 13–703.04(C).  This is not such a case.").

19   And even assuming the supreme court did not consider Dr. Thomas' testimony, as

20   Anderson claims, it would not have altered the court's finding that "there is simply

21   no credible evidence that Anderson was coerced into committing these murders."

22   *See Anderson II*, 111 P.3d at 399, ¶ 135. This is particularly true "[g]iven

23   Anderson's substantial role in each of the murders."  *Id.* at ¶ 136.  As a result, even

24   if error occurred, any error would be harmless in the circumstances.  Claim Four

25   should be rejected in its entirety.

26      **E.**    ***The prosecutors did not commit misconduct (Claim Five).***

27       Anderson makes several arguments that the prosecutor engaged in various

28   forms of misconduct, violating his rights under the Fifth, Sixth, Eighth, and

Fourteenth Amendments.  Dkt. #21, at 163–75.  Respondents separately address the procedural status and merits of each allegation below.

First, however, the Supreme Court set out the clearly-established federal law governing prosecutorial-misconduct claims in *Darden v. Wainwright*, 477 U.S. 168 (1986).  *Parker v. Matthews*, 567 U.S. 37, 46 (2012).  Under *Darden*, a prosecutor's comments violate the Constitution "only if they so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Id.* (quotations omitted).  "[T]he *Darden* standard is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations.'"  *Id.* at 48 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

The "appropriate standard of review for a prosecutorial-misconduct claim is 'the narrow one of due process, and not the broad exercise of supervisory power.'" *Darden*, 477 U.S. at 181 (quoting *Donelley v. DeChristoforo*, 416 U.S. 637, 642 (1974)).  And in determining whether constitutional misconduct occurred, the prosecutor's remarks must be examined in the context in which they were made. *See Greer v. Miller*, 483 U.S. 756, 765−66 (1987) (citing *Darden*, 477 U.S. at 179, and *DeChristoforo*, 416 U.S. at 639).

> 1.    *The prosecutor did not commit misconduct regarding evidence of Anderson's sexual relationship with Lane (Claim Five(A)).*

Anderson asserts first that the prosecutor committed misconduct because the "introduction of Anderson's sexual relationship with Lane was so prejudicial it violated Anderson's due process rights."  *Id*. at 163–65.

### a.    Exhaustion.

On direct appeal, Anderson argued evidence of his sexual relationship with Lane "poisoned [his trial] from the outset, was extremely prejudicial and irrelevant and should have been kept out of trial entirely."  Opening Brief at 95.  Anderson did not, however, assert that this constituted a specific federal constitutional violation.  *Id*.  Indeed, Anderson did not identify or cite a single federal case or

provision—or any state authority for that matter—in his entire argument section for the claim. *Id.* Instead, Anderson appeared to acknowledge impermissibly raising the claim as an ineffective-assistance-of-trial-counsel claim. *See id.* (noting "[i]neffective assistance of counsel claims are to be raised in the first instance in petitions for post-conviction relief" but claiming this alleged error by counsel was "patent on the record" and warranted relief on appeal).

Anderson, therefore, failed to fairly present Claim Five(A) as a federal claim to the state courts. *See, e.g.*, *Insyxiengmay v. Morgan*, 403 F.3d 657, 668 (9th Cir. 2005) ("A petitioner fairly and fully presents a claim to the state court for purposes of satisfying the exhaustion requirement if he presents the claim: (1) to the proper forum, (2) through the proper vehicle, and (3) by providing the proper factual and legal basis for the claim."). And because Anderson may not return to state court to present a federal claim, this claim is technically exhausted but procedurally defaulted. Anderson does not identify the cause and prejudice or fundamental miscarriage of justice necessary to excuse the default. Nevertheless, to the extent this Court determines that Anderson presented a federal claim, the state court's rejection of this claim should be entitled to AEDPA deference.

### b.    Claim Five(A) is meritless.

During voir dire, the prosecutor briefly referred to Kimberly Lane as Anderson's "girlfriend." R.T. 10/01/01, at 18. The prosecutor did not reference any sexual relationship between them. Defense counsel, however, later told the prospective jurors that Anderson and Lane had a sexual relationship in order to inquire about whether the jurors could remain fair and impartial in spite of Anderson's improper sexual relationship with Lane. *Id.* at 63. Counsel stated:

> At the time these events occurred, the evidence will show she was about 14 years of age. There is probably going to be testimony that the other individual, Mr. Poyson, and Frank Anderson may have engaged in sexual relations with Ms. Lane. You're not here to determine that issue. They're not – no one is on trial for that. But

1    that's a fact that people may find disturbing, and it might affect their
2    ability to weigh the evidence.

3         Once again, given the fact that there may be evidence that Ms.
4    Lane engaged in sexual relations with Mr. Anderson and the other
     individual Mr. Poyson, would those facts – would that fact affect your
5    ability to sit fairly and impartially on this case?

6   *Id.* Two prospective jurors said it would affect their ability to remain fair and

7   impartial, and those two jurors were struck for cause. *Id.* at 63, 65, 316–22.

8        During the State's opening statement at trial, the prosecutor again only

9   referred to Lane as Anderson's "girlfriend." R.T. 10/02/01, at 24–25, 29. The

10  prosecutor did not say they were engaged in a sexual relationship. Defense

11  counsel, however, intentionally reiterated that Lane and Anderson were in a sexual

12  relationship in his opening statement. "We basically alerted you to the fact that

13  there was going to be some evidence of a relationship between an adult male, Mr.

14  Anderson, and an underage female. And we all know that is illegal. There are

15  laws against that in Arizona. But Mr. Anderson is not on trial for that." *Id.* at 48.

16  Counsel then acknowledged that their "relationship at least on two, three occasions

17  had been sexual between them." *Id.* at 49. Counsel then asserted it was this sexual

18  relationship that caused Anderson to become "extremely protective" of Lane and

19  "[j]ealous of anyone that came near [her]." *Id.*

20       After the State rested, Anderson testified in his own defense and admitted to

21  having a sexual relationship with Lane, which Anderson claimed she instigated.

22  R.T. 10/05/01, at 19. After Anderson testified he had a sexual relationship with

23  Lane, defense counsel elicited testimony from Anderson that he had become

24  "very" protective of Lane and had a "temper." *Id.* at 20. Anderson would later

25  claim that he was protecting Lane from being sexually assaulted when he slashed

26  Delahunt's throat. *Id.* at 32–34.

27       As noted above, Anderson subsequently argued on appeal the evidence of

28  his sexual relationship with Lane "poisoned [his trial] from the outset, was

1  extremely prejudicial and relevant and should have been kept out of trial entirely.

2  Opening Brief at 95.  The Arizona Supreme Court rejected the claim, holding:

3              Anderson argues that evidence of his sexual relationship with
4       Lane, who was fourteen years old at the time of the crimes, "poisoned
        [the] proceedings from the outset, was extremely prejudicial and
5       irrelevant and should have been kept out of trial entirely." Anderson
6       concedes, however, that his own counsel elicited evidence of
        Anderson's sexual relationship with Lane during the testimony of
7       both Anderson and Lane.  Any error was thus plainly invited.

8  *Anderson II*, 111 P.3d at 382, ¶ 44 (internal citation and footnote omitted).

9       Anderson asserts in the instant petition the state supreme court's finding

10 "was an unreasonable determination of the facts" because the State "was the first to

11 characterize Lane as Anderson's 'girlfriend.'"  Dkt. #21, at 165.  But the record is

12 clear; it was Anderson—*not* the prosecutor—who first commented on and elicited

13 testimony about his sexual relationship with Lane.  As a result, the introduction of

14 the complained-of evidence cannot constitute prosecutorial misconduct.  *See, e.g.*,

15 *Adcock v. Haws*, 2012 WL 868798, at *13 (E.D. Cal. Mar. 13, 2012) (holding there

16 is no prosecutorial misconduct where the contested testimony was elicited by

17 defense counsel).

18      Moreover, because counsel knew Anderson would testify about his sexual

19 relationship with Lane, counsel appropriately inquired during voir dire whether

20 prospective jurors could remain fair and impartial in spite of that evidence.  R.T.

21 10/01/01, at 18.  Their sexual relationship was also an integral part of Anderson's

22 proffered defense that he had become very protective of Lane due to their

23 relationship and was defending her from a sexual attack when he slit Delahunt's

24 throat.  The prosecutor, therefore, did not commit any misconduct in subsequently

25 questioning Anderson and/or Lane on the nature or specifics of their sexual

26

27

28

relationship.[15]  *See, e.g.*, *United States v. Pruitt*, 839 F. App'x 90, 93 (9th Cir. 2020), *cert. denied*, 142 S.Ct. 503 (2021) (finding that the government did not engage in prosecutorial misconduct in using cell-phone evidence because the defendant had opened door to its use); *United States v. Caballero*, 277 F.3d 1235, 1249–50 (10th Cir. 2002) (finding no prosecutorial misconduct where defense questioning invited testimony characterizing defendant in an unfavorable light).

Accordingly, the Arizona Supreme Court correctly accepted Anderson's concession on appeal that his trial counsel was responsible for first commenting on and then eliciting the complained-of evidence. *Anderson II*, 111 P.3d at 382, ¶ 44. Thus, any error was "plainly invited," as the supreme court found. *Id.*; *see also, e.g.*, *State v. Moody*, 94 P.3d 1119, 1148, ¶ 111 (Ariz. 2004) (finding a party invited error where he elicited the testimony in question).  Anderson has therefore failed to establish that the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  This Court should deny Claim Five(A) because it is procedurally defaulted and meritless.

> 2.   *The prosecutor did not make contradictory arguments (Claim Five(B)).*

Anderson asserts next that the prosecutor committed misconduct by relying "on contradictory theories and arguments in each of the three cases," which "violated Anderson's constitutional rights."  Dkt. #21, at 166.

---

[15] Anderson takes specific issue with supposed "wholly irrelevant questioning about whether Lane and Anderson had sex while she was menstruating." Dkt. #21, at 164. The question was not wholly irrelevant, as Anderson claims, however. When considered in context, the question was relevant and consequential because it concerned whether: (1) Anderson had "pushed" or forced the sexual relationship on Lane, as Lane asserted; and (2) Anderson had been truthful when he told police that he believed Lane was pregnant around that time. *See* R.T. 10/05/01, at 92–93.

1

#### a.    Procedural Status.

2      As Anderson notes, he presented this prosecutorial-misconduct claim in his

3   petition for post-conviction relief, and the post-conviction court dismissed the

4   claim on the merits.[16]  *Id.* at 170.   The court held as follows:

5           Anderson identifies several areas of testimony, evidence and
6       argument that allegedly demonstrate clear prosecutorial misconduct.
        *See,* Defendant/Petitioner's Supplemental Pleading, pp. 9–11.  This
7       Court agrees that the State's argument that Anderson "pounded the
        life out of" Delahunt is not supported by evidence (RT 11/25/2002 at
8       221).  A more accurate statement reflecting Anderson's involvement
9       as an accomplice would have been, "Anderson helped Poyson pound
        the life out of Delahunt" or even "Anderson and Poyson pounded the
10      life out of Delahunt."  To the extent the statement was improper, it
11      was harmless in light of the overwhelming evidence of Anderson's
        participation.  The statement was, also cured by the jury instructions.
12      However, neither this statement, nor any of the other alleged
13      inconsistencies, demonstrate prosecutorial misconduct.

14          Anderson compares this case to *Thompson v. Calderon*, 120
15      F.3d 1045 (9th Cir. 1997).  In *Thompson*, the prosecutor presented
        fundamentally inconsistent theories in the trials of two co-defendants
16      charged with the same murder.  *See, Thompson*, 120 F.3d at 1054–56
17      (9th Cir. 1997).  The prosecutor's theories were so fundamentally
        different that they could not be reconciled with one another.  *See, Id.*
18      The *Thompson* case is distinguishable in this regard.  The facts and
19      holdings of *Nguyen v. Lindsey*, 232 F.3d 1236 (9th Cir. 2000), are
        more on point.

20          In *Nguyen v. Lindsey*, the prosecutor obtained murder
21      convictions against two rival gang members - Phung and Nguyen --
        for the death of an innocent bystander caught in the crossfire of a gun
22      battle.  At Phung's trial the prosecutor argued that Phung had fired the
23      first shot.  *Id.* at 1238.  At Nguyen's trial the prosecutor introduced
        into evidence Nguyen's own statement that Cholo, a passenger in his
24      car, fired the first shot.  *See, Id.*  Nguyen sought post-conviction relief,

25

---

26   [16] While, the post-conviction court determined the claim was not precluded, its
     legal analysis on the matter was lacking.  The procedural misconduct claim should
27   have been deemed precluded for failing to raise it on direct appeal.  Regardless, as
     discussed below, the claim fails on the merits.
28

arguing the prosecutor's use of the inconsistent evidence of which gang fired the first shot violated his due process rights.  *See, Id.*

The 9th Circuit Court of Appeals acknowledged that the prosecutor made different arguments at each trial as to who fired the first shot, but the arguments were consistent with the evidence actually adduced at each trial. 232 F.3d at 1240.  The Court noted that it is not shocking or unusual that "the evidence came in somewhat differently at each trial."  *Id.*  The Court observed that the prosecution's theory in both trials was that those who take part in gang warfare are equally responsible for the death of an innocent bystander.  *Id.* at 1240-41.  The Court held that the prosecutor's theory was not inconsistent in any fundamental way.  *Id.* at 1241.

The State's overriding theory of the case was that Anderson, Lane and Poyson all played key roles in the deaths of Ms. Kagen, Wear and Delahunt.   Anderson was clearly a major participant.  He planted a knife, ambushed Delahunt, and cut Delahunt's throat.  He helped subdue Delahunt and held a knife so that Poyson could pound it into Delahunt's ear.  Anderson held a lantern to assist Poyson as he shot Ms. Kagen and Wear.  He broke the lantern over Wear's head in an effort to stop him from getting away.  Anderson supplied Poyson with the cinder block that was used to kill Wear.

Anderson asserts that the State argued Lane deserved the maximum sentence at her trial, but then argued that her minimal involvement justified her minimal sentence at his trial (*State v. Lane* R/T 9/25/98, pp. 13-14; *State v. Anderson* R/T 11/25/2002, pp. 209-10, 214-221).  Lane received three life sentences for her involvement in the murders, but those sentences were reversed on appeal.  The State then chose to enter a plea agreement with Lane and she was sentenced to eight years in prison.  Whether this occurred due to the State's reluctance to try the case again, or a change in the State's opinion that a lesser sentence was justified, is mere speculation and irrelevant.  The State's theory did not somehow become "inconsistent" as a result and there was no prejudice to Anderson.

The disparity of Lane's sentence was raised as a mitigating factor to the Anderson sentencing jury.   The State's evolved perspective regarding an appropriate outcome for Lane's case did not deprive Anderson from raising this mitigating factor, nor did it prevent the jury from considering it.  Further, the State's position that Lane may have had less involvement that Anderson is supported by

the evidence.  Lane did not cut Delahunt's throat.  She did not steady the knife for Poyson to pound it into his ear.  She did not shoot Ms. Kagen or Wear.  She did not bludgeon Wear to death or provide Poyson with the cinder block to do so.

The Court finds that the State's theory of case was not inconsistent in any fundamental way.  The Court finds that the State did not deny Anderson his due process rights by presenting - intentionally or otherwise - inconsistent, false and misleading evidence and argument.

Superior Court Order 09/06/18, at 4–6.

Anderson further raised the claim in his petition for review to the Arizona Supreme Court, which summarily denied the petition.  The superior court's decision dismissing the claim is therefore the last reasoned state court decision and entitled to AEDPA deference.

### b.    Claim Five(B) is meritless.

First, Anderson asserts the prosecutor argued at Lane's trial that she was the most culpable defendant and then improperly argued at Anderson's trial that he was the most culpable.  Dkt. #21, at 166–68.  The complained-of statements, however, do not concern the relative culpability of the Lane and Anderson, and are not contradictory, as Anderson claims.

It is entirely consistent to argue both that Lane was a victim of Anderson but also "a catalyst" to the murders.  In fact, both statements are true.  Anderson ran away with Lane, a 14-year-old girl and had an improper sexual relationship with her. Lane was therefore clearly Anderson's victim. But Lane could also reasonably be called a "catalyst" to the murders because, as she admitted to Detective Cooper, she suggested killing the victims and taking the truck.

It is also equally true that "[n]obody died until Anderson arrived," which the prosecutor argued in response to the proffered mitigation that Anderson was merely "a follower" who was threatened by Poyson and "acted at the direction or through threats and intimidation."  R.T. 11/25/02, at 210–11.  And the prosecutor

did not minimize Lane's involvement, as Anderson claims. Dkt. #21, at 168. Instead, the prosecutor was highlighting the many conflicting claims and statements made by Anderson and, in doing so, specifically acknowledged that Lane had gathered the rock and given it to Poyson before Poyson used it to pound the knife through Delahunt's ear. R.T. 11/25/02, at 214–15.

Regardless, as the post-conviction court correctly found, "the State's overriding theory of the case was that Anderson, Lane and Poyson all played key roles in the deaths of Ms. Kagen, Wear and Delahunt." Superior Court Order 09/06/18, at 5. It was also undisputed that "Poyson inflicted the fatal blows on each [victim]." R.T. 11/25/02, at 180–81, 253. This was consistent with the prosecutor's theme throughout the closing that all three played critical roles in planning the murders, despite the differing levels of involvement in actually carrying out the murders. *Id.* at 219 ("And [Anderson] instigated, organized – and there's no brains to the outfit. Don't get me wrong. I'm not saying anybody was the brains of the outfit.").

Second, Anderson again takes issue with a statement made at his penalty phase when the prosecutor supposedly said that Anderson "pounded [the life] out of [Delahunt]." Dkt. #21, at 169 (citing R.T. 11/25/02, at 221). But, again, it was undisputed that, while Anderson had cut Delahunt's throat, Anderson did not inflict the fatal blow to any of the victims—Poyson did. R.T. 11/25/02, at 180–81, 253. And the prosecutor specifically acknowledged that Lane got the rock that Poyson used to hammer the knife through Delahunt's head. *Id.* at 214–15. Indeed, immediately before the complained-of statement, the prosecutor said Anderson "held" Delahunt's head while the knife was pounded into it. *Id.* at 221. ("How did [Delahunt] die? By having a knife driven through his head held by [Anderson] after [Delahunt's] throat was slashed."). Anderson has therefore failed to demonstrate the prosecutor made contradictory statements.

1    Importantly, Anderson did not object to the statement as it was made, nor
2    did he address it in his rebuttal, which commenced directly after the complained-of
3    statement. Accordingly, this Court should not interpret the complained-of
4    statement in the most damaging way, as Anderson has done so here. *See Donnelly*,
5    416 U.S. at 647 (stating "a court should not lightly infer that a prosecutor intends
6    an ambiguous remark to have its most damaging meaning or that a jury, sitting
7    through lengthy exhortation, will draw that meaning from the plethora of less
8    damaging interpretations"). Rather, when read in context, R.T. 11/25/02, at 221,
9    the prosecutor's argument that Delahunt's head was "held by [Anderson] after
10   [Delahunt's] throat was slashed" reflects an "accurate statement" that Anderson
11   and Poyson worked together to "pound the life out of Delahunt." *See* Superior
12   Court Order 09/06/18, at 5. And because all three criminal proceedings shared this
13   common view of how the crimes occurred, and did not differ in any fundamental
14   way, Anderson's due process claim fails on the merits. *See, e.g.*, *United States v.*
15   *Fulks*, 683 F.3d 512, 523–25 (4th Cir. 2012) (finding no due process violation
16   because the prosecution, at best, presented an inconsistent argument and did not
17   rely upon factual theories that were inconsistent at the core of its case); *United*
18   *States v. Paul*, 217 F.3d 989, 998 (8th Cir. 2000) (emphasizing that a due process
19   violation occurs only when the prosecution presents inconsistent theories and relies
20   upon factually inconsistent and irreconcilable evidence at the separate trials of
21   different defendants for the same offense); *Beathard v. Johnson*, 177 F.3d 340, 348
22   (5th Cir. 1999) (finding no due process violation where the prosecutor "presented
23   essentially the same two versions of the facts" but offered inconsistent arguments).
24   Moreover, even if the prosecutor's argument in Anderson's trial had been
25   fundamentally inconsistent with the arguments in Lane's and Poyson's trials, the
26   superior court's decision rejecting the claim cannot be said to be contrary to, or an
27   unreasonable application of, clearly established federal law. This is because the
28   Supreme Court has never held that the Due Process clause prevents a State from

1 | prosecuting defendants based on inconsistent theories.  *See Fotopoulos v. Sec'y,*
2 | *Dep't of Corr.*, 516 F.3d 1229, 1235 (11th Cir. 2008) (citing *Bradshaw v. Stumpf*,
3 | 545 U.S. 175, 190 (2005) ("This Court has never hinted, much less held, that the
4 | Due Process Clause prevents a State from prosecuting defendants based on
5 | inconsistent theories.") (Thomas, J. concurring)).

6 | And even under Ninth Circuit precedent, Anderson must show "the
7 | prosecutor knowingly uses false evidence or acts in bad faith." *Nguyen v. Lindsey*,
8 | 232 F.3d 1236, 1240 (9th Cir. 2000); *see Dean v. Pliler*, 203 Fed. Appx. 897, 898
9 | (9th Cir. 2006) ("A finding of misconduct from inconsistent prosecutorial positions
10 | between two trials requires an inconsistency between the underlying theories of
11 | guilt.").  But Anderson does not suggest that the prosecutor used "false evidence"
12 | or acted in bad faith, and therefore he has not even alleged, let alone established, a
13 | due process violation under *Nguyen* or *Thompson* to warrant habeas relief.

14 | Finally, any claimed error did not have a "substantial and injurious effect or
15 | influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 623.   As
16 | discussed, the State shared a common view of what provoked the three murders
17 | and how they were ultimately carried out in all three criminal proceedings.
18 | Anderson points to a few isolated, unobjected-to, and out-of-context statements
19 | that were made in a lengthy capital proceeding, but it was undisputed that Poyson
20 | inflicted the fatal blows to each victim.  R.T. 11/25/02, at 180–81, 253.   As a
21 | result, even if the prosecutor somehow erred in making the isolated statements, it
22 | would still not entitle Anderson to habeas relief.  *See id.* at 639 (finding a
23 | prosecutor's improper references to defendant's post-arrest silence not reversible
24 | error when they "were infrequent, comprising less than two pages of the 900-page
25 | trial transcript in this case"); *see also, e.g.*, *Hall v. Whitely*, 935 F.2d 164, 165–66
26 | (9th Cir. 1991) (stating a prosecutor's comment about defendant's heroin use was
27 | "isolated moment in a three day trial").  Claim Five(B) should be denied.

28 |

3.      *The prosecutor did not argue that the jury could not consider mitigation lacking a causal nexus to the murders (Claim Five(C)).*

Anderson finally asserts the prosecutor committed misconduct when he: (1) "misled the jury about the admissibility of the proffered mitigation evidence"; and (2) improperly argued the law required the imposition of the death penalty.  Dkt. #21, at 170–75.

### a.      Procedural status.

On direct appeal, Anderson argued the prosecutor's questions and argument violated the Eighth Amendment by improperly imposing a "causal nexus" requirement to Anderson's proffered mitigation.  O.B. at 86–90.  The Arizona Supreme Court rejected the claim on the merits.  *Anderson II*, 111 P.3d at 391–92, ¶¶ 95–97.  As a result, Anderson properly exhausted Claim Five(C)(1), and the supreme court's rejection of the claim is entitled to AEDPA deference.

Regarding Claim Five(C)(2), however, Anderson only summarily asserted on appeal that the prosecutor committed misconduct by making various statements during the guilt, aggravation, and penalty phases, including that the law "required" the imposition of the death penalty.  O.B. at 84–85.  Anderson did not even attempt to explain how or why those statements constituted misconduct, let alone how they violated the federal constitution.  *Id.*  Such a conclusory argument is insufficient to fairly present a federal due process claim.  *See Castillo v. McFadden*, 399 F.3d 993, 1002 (9th Cir. 2005) ("Exhaustion demands more than drive-by citation, detached from any articulation of an underlying federal legal theory.").  Accordingly, Claim Five(C)(2) is technically exhausted and procedurally defaulted and should be denied and dismissed on that basis.  *See id.*  To the extent this Court determines Anderson fairly presented a federal claim, the state court's rejection of the claim should be entitled to AEDPA deference.

1

### b.    Claims Five(C)(1) and Five(C)(2) are meritless.

2

#### i.    Claim Five(C)(1)

3    In Claim Five(C)(1), Anderson argues the prosecutor "misled the jury by

4  arguing that a causal nexus was required before it could consider proffered

5  mitigation.   Dkt. #21, at 171–73.   Anderson takes particular issue with the

6  prosecutor's  cross-examination  of  mitigation  witnesses  and  argument  during

7  closing that proffered mitigating evidence—namely, Anderson's pneumonia as a

8  child and whether he legally divorced his first wife before marrying again—was

9  neither relevant, nor mitigating. *Id.* at 172–73.

10   Anderson raised the claim on direct appeal, and the Arizona Supreme Court

11  denied the claim, stating:

12       Anderson also objects to various questions and comments made
13   by the prosecution about his proffered mitigation evidence.  Because
     Anderson did not object to any of these comments or questions, we
14   review only for fundamental error.  *State v. Gendron*, 168 Ariz. 153,
     154, 812 P.2d 626, 627 (1991).
15

16       First, Anderson complains that during cross-examination of
     Anderson's mitigation expert the prosecution questioned the expert's
17   lack of formal education "to make any connection between upbringing
     and adult conduct."  The prosecutor then emphasized that the expert's
18   testimony was merely her personal "opinion as to what happened in
     childhood, that affects adult behavior."  Anderson also objects to the
19   State's closing argument, during which the prosecutor emphasized
     that a psychologist called by the defense to offer mitigation evidence
20   "didn't  testify  about  any  links,  any  connections  between  the
     defendant's upbringing and him murdering people.  Nothing in his
21   childhood  caused  that."    Finally,  Anderson  points  out  that  the
22   prosecution, during its penalty phase opening statement, told the jury
     that it would have to decide whether any mitigation evidence was
23   relevant.
24
25       None of these statements was improper.  While *Eddings* and
     various  other  Supreme  Court  decisions  dictate  a  liberal  rule  of
26   admissibility  for  mitigating  evidence,  they  still  leave  it  to  the
27   sentencer to "determine the weight to be given to relevant mitigating
     evidence." *Eddings*, 455 U.S. at 114–15, 102 S.Ct. 869.  Once the
28

jury has heard all of the defendant's mitigation evidence, there is no constitutional prohibition against the State arguing that the evidence is not particularly relevant or that it is entitled to little weight. The prosecutor's various comments and questions here simply went to the weight of Anderson's mitigation evidence and were not improper.

*Anderson II*, 111 P.3d at 391–92 ¶¶ 95–97.

The ruling was not an unreasonable application of clearly established federal law. A sentencer must consider all relevant mitigating evidence presented by a defendant, including mitigation lacking a causal connection to the offense. *See Tennard v. Dretke*, 542 U.S. 274, 284–85 (2004). The sentencer may, however, consider any causal connection (or lack thereof) in assigning weight to a defendant's mitigation. *Poyson v. Ryan*, 879 F.3d 875, 888 (9th Cir. 2018).

In context, the prosecutor cross examined Anderson's mitigation witnesses and argued that the proffered evidence was not proven and, even if it had been, the evidence had minimal mitigating value by discounting its relationship to the murder. There is nothing impermissible about challenging mitigation witnesses in that manner and making that argument. *See, e.g.*, *Underwood v. Royal*, 894 F.3d 1154, 1171–72 (10th Cir. 2018) (finding that the state court reasonably applied clearly established federal law in denying petitioner's *Eddings* claim where the prosecutor "attacked the quality and strength" of petitioner's mitigating evidence); *United States v. Johnson*, 495 F.3d 951, 978 (8th Cir. 2007) ("[A]s long as the jurors are not told to ignore or disregard mitigators, a prosecutor may argue, based on the circumstances of the case, that they are entitled to little or no weight."). The prosecutor did not tell the jurors they could not consider Anderson's mitigating evidence and, therefore, did not commit misconduct, as he claims.

Moreover, even if the prosecutor's comments had been impermissible, any error was cured by the trial court's instructions. The court instructed that "[t]he attorneys' remarks, statements, and arguments are intended to help you understand the evidence and apply the law. The remarks of counsel are not evidence." R.T.

11/26/02, at 5–6.

The court then stated:

> Mitigating circumstances are those which in fairness and mercy may extenuated or reduce the degree of moral culpability or blame. The determination of which circumstances are mitigating is for you to resolve under the facts and circumstances of this case. In making the determination of mitigation, you should consider as mitigating circumstances any factor or factors presented by the defendant or the State that are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record, the strength of the State's case or any of the circumstances of the offense.

*Id.* at 6–7. It then listed the 18 mitigating circumstances proposed by defense counsel. *Id.* at 7–10.

The trial court further instructed the jury:

> All 12 of you had to unanimously agree that the State proved beyond a reasonable doubt the existence of a statutory aggravating circumstance. However, you as jurors do not have to agree unanimously that a mitigating circumstance has been proved to exist. Each juror may consider any mitigating circumstance found by that juror in determining the appropriate penalty.
>
> .    .    .
>
> In determining whether a mitigating factor exists concerning the defendant's character, background, or history, or the nature and circumstances of the crime, you must first determine whether a particular factor concerning the defendant's character, background or history, or the nature or circumstances of the crime has been established by the evidence. If a particular factor has been established by the evidence, you must then determine whether that factor is mitigating in nature, considering all of the facts and circumstances of the case.
>
> Mitigating factors do not constitute a defense or excuse for the murder of which the defendant has been convicted. They are factors that in fairness and mercy may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Once you individually determine what facts in mitigation exist, you must unanimously determine if those factors are – sufficiently substantial to call for leniency in light of the aggravation you have found and considering all of the facts and circumstances in this case.

*Id.* at 10–12.

Indeed, the Arizona Supreme Court correctly rejected Anderson's causal-nexus instruction claim on direct appeal because the trial court's instructions imposed no causal nexus on Anderson's proffered mitigating evidence. *Anderson II*, 111 P.3d at 391, ¶¶ 93–94. The trial court's instructions defined mitigating evidence extremely broadly, as "any factor or factors presented by the defendant or the State that are relevant in determining whether to impose a sentence less than death." R.T. 11/26/02, at 6–7. And because the arguments of counsel do not have the same force as instructions from the court, and jurors are presumed to follow such instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000), the jury knew it could consider all of Anderson's proffered mitigating evidence. The Arizona Supreme Court's denial of this claim was therefore not an unreasonable application of clearly-established federal law. And any error was then further cured by the Arizona Supreme Court's de novo review of the jury's sentencing determination. *See McKinney*, 589 U.S. at 144.

## ii. Claim Five(C)(2)

Anderson asserts is Claim Five(C)(2) that the prosecutor improperly cited the relevant statutory language and argued Arizona law "required" the imposition of the death penalty. Dkt. #21, at 173–74.

On direct appeal, Anderson made various conclusory allegations that the prosecutor committed misconduct when he argued to the jury that the law "required" the imposition of the death penalty. O.B. at 84–85. Anderson, however, had not objected to the statements below and, on appeal, "provide[d] no explanation as to what was allegedly improper about each statement." *Anderson II*, 111 P.3d at 383, ¶ 47. As a result, regarding the complained-of "required"

1    statements, the Arizona Supreme Court summarily rejected Anderson's argument

2    because they were "substantially accurate statements" and "do not come close to

3    constituting fundamental error." *Id.* at ¶ 48; *see also id.* at ¶ 48 n.10.

4         Under Arizona's death penalty statute, the sentencer "shall impose a

5    sentence of death if the court finds one or more of the aggravating circumstances

6    enumerated in [the statute] and that there are no mitigating circumstances

7    sufficiently substantial to call for leniency." A.R.S. § 13–703(E) (West 1996).

8    "[U]nder A.R.S. § 13–703(E), the trial court must impose a sentence of death if it

9    finds the existence of one statutory aggravating factor and does not find the

10   existence of any mitigating factor . . . . A death sentence is thus required

11   regardless of the trial court's belief that a life sentence is appropriate." *State v.*

12   *Beaty*, 762 P.2d 519, 533–34 (Ariz. 1988); *see also State v. Jordan*, 672 P.2d 169,

13   173 (Ariz. 1983) ("Where one or more statutory aggravating circumstance is

14   found, and no mitigation exists, the statute requires the death penalty.") (quoting

15   *State v. Gretzler*, 659 P.2d 1, 13 (1983) (en banc)).

16        This language in Arizona's death penalty statute has been upheld as

17   constitutional by the Supreme Court. *See Walton v. Arizona*, 497 U.S. 639, 651–52

18   (1990) (plurality opinion) (evaluating Arizona's death penalty statute and

19   reaffirming that if a sentencer was not precluded from considering all relevant

20   mitigation, a "statute requiring the imposition of the death penalty if aggravating

21   circumstances were found to exist but no mitigating circumstances were present" is

22   constitutional), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584

23   (2002). As a result, Anderson fails to show the prosecutor committed any

24   misconduct when he correctly stated the controlling statutory language.

25        Anderson argues nonetheless that the prosecutor violated due process when

26   correctly citing the statutory language because, "[w]hile the State may argue that

27   the aggravators, weighed against mitigators, require death under the statute, they

28   may not argue that the aggravators require death when they have previously argued

that competent mitigation evidence must be excluded." Dkt. #21, at 174. But the proffered mitigating evidence was never "excluded," as Anderson claims. And, as previously discussed, the prosecutor's challenges to and argument against the relevant, mitigating-weight of the proffered mitigating evidence was permissible. Accordingly, even if Anderson had properly exhausted Claim Five(C)(2) as a federal claim in state court, the Arizona Supreme Court's decision rejecting the claim was not contrary to, or an unreasonable application of, clearly established federal law and did not rest on an unreasonable application of the facts. And any error was then further cured by the Arizona Supreme Court's de novo review of the jury's sentencing determination. *See McKinney*, 589 U.S. at 144. The claim should be denied.

**F.**     ***The trial court did not err in allowing the state to present relevant and admissible evidence to the jury (Claim Six).***

In Claim Six, Anderson argues the trial court violated "the federal constitutional guarantees of due process, confrontation, and reliable sentence" when it allowed the State to present: "inflammatory and gruesome photographs" (Claim 6(A)); and "hearsay statements from Kim Lane and Bobby Poyson" (Claim 6(B)). Dkt. #21, 175–81. Anderson presented similar claims to the Arizona Supreme Court during his direct appeal, which were rejected on the merits. The supreme court's rejection of the claims was not contrary to, or an unreasonable application of, clearly established federal law and did not rest on an unreasonable application of the facts. Anderson is thus not entitled to habeas relief on the claims.

**1.     Procedural status.**

Anderson raised a claim similar to Claim 6(A) in Argument 31 of his opening brief on direct appeal, which purported to allege violations of the Fifth, Sixth, Eighth, and Fourteenth Amendments. O.B. at 91. But Anderson relied primarily on four Arizona Supreme Court decisions that considered the admission of gruesome photographs under Arizona's evidentiary rules—*not* the federal

1    constitution.  *Id.* at 91–93.  And Anderson's summary citation of *Spears v. Mullin*,

2    343 F.3d 1215 (10th Cir. 2003), in his opening brief did not include a pin-cite, nor

3    did it identify which federal theory that case supported.  *See id.* at 92–93.  Such an

4    argument was therefore insufficient to fairly present a federal due process claim.

5    *See Castillo*, 399 F.3d at 1002 ("Exhaustion demands more than drive-by citation,

6    detached from any articulation of an underlying federal legal theory.").

7    Accordingly, the claim is technically exhausted but procedurally defaulted and

8    should be denied and dismissed on that basis.  *See id.*  Moreover, as discussed

9    below, even if the gruesome-photographs claim was properly exhausted, it fails on

10   the merits.

11        In Claim 6(B), Anderson asserts the admission of hearsay statements made

12   by Lane and Poyson violated the Confrontation Clause.  Dkt. #21, at 180–81.

13   Anderson summarily presented a similar *Bruton*[17] claim to the Arizona Supreme

14   Court on direct appeal, O.B. at 76, but, as the supreme court noted in denying the

15   claim: (1) "Because Lane testified at trial, Anderson has no valid *Bruton* objection

16   to the use of her statements"; and (2) "Anderson refers to the interrogation

17   generally but fails to point to any specific statement that he contends was admitted

18   in violation of *Bruton*."  *Anderson II*, 111 P.3d at 380–81, ¶¶ 31–36.  As a result,

19   the supreme court found that Anderson had failed to properly present a *Bruton*

20   claim for the court's consideration and that he had only preserved a challenge to

21   the use of his own statements during the interview.  *Id.* at ¶¶ 33–36.  Anderson,

22   therefore, did not fairly present a *Bruton* claim to the Arizona Supreme Court.  *See*

23   *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996) (stating that the fair presentation

24   of a federal claim requires both the operative facts and the federal legal theory on

25   which the claim is based).  Consequently, Claim 6(B) is also technically exhausted

26

27   ──────────────

28   [17] *Bruton v. United States*, 391 U.S. 123 (1968).

but procedurally defaulted and should be denied and dismissed on that basis.  And, as discussed below, even if Anderson had properly raised a *Bruton* claim, the claim fails on the merits.

### 2.    Relevant facts.

#### a.    *Gruesome-photographs claim.*

At trial, the State introduced as evidence five photographs of the murdered victims during the guilt phase and four additional photographs during the aggravation phase.  Anderson argued on appeal that the trial court erred in admitting the photographs because they were too gruesome, but the Arizona Supreme Court rejected the claim, stating:

> In his first appeal, Anderson challenged the admission of fourteen photographs.  *Anderson I*, 197 Ariz. at 325–26 ¶ 30, 4 P.3d at 380–81.  Because we reversed on other grounds, we declined to address this issue.  We did, however, observe that some of the photographs were cumulative and some were "arguably overly prejudicial" because of their "extremely gruesome" nature and "slight probative value."  *Id.*  We suggested that the prosecution and trial judge "utilize suitable discretion to ensure that unnecessary and otherwise overly prejudicial photographs are not introduced on retrial."  *Id.*
>
> In this appeal, Anderson challenges the admission of nine photographs.  Five were first admitted into evidence during the guilt phase and four during the aggravation phase.
>
> A trial court's decision to admit a photograph is reviewed for abuse of discretion.  *State v. Murray*, 184 Ariz. 9, 28, 906 P.2d 542, 561 (1995).  Three factors go into the decision: (1) the photographs relevance, (2) its "tendency to incite passion or inflame the jury," and (3) its "probative value versus potential to cause unfair prejudice."  *Id.*  Photographs may be relevant
>
> > to prove the corpus delecti, to identify the victim, to show the nature and location of the fatal injury, to help determine the degree or atrociousness of the crime, to corroborate state witnesses, to illustrate or explain testimony, and to corroborate the states theory of how and why the homicide was committed.

*State v. Chapple*, 135 Ariz. 281, 288, 660 P.2d 1208, 1215 (1983).

We begin from the premise that "any photograph of the deceased in any murder case [is relevant] because the fact and cause of death are always relevant in a murder prosecution." *State v. Spreitz*, 190 Ariz. 129, 142, 945 P.2d 1260, 1273 (1997) (quoting *Chapple*, 135 Ariz. at 288, 660 P.2d at 1215). "There is nothing sanitary about murder, and there is nothing in Rule 403, Ariz. R. Evid., that requires a trial judge to make it so." *State v. Rienhardt*, 190 Ariz. 579, 584, 951 P.2d 454, 459 (1997). Photographs must not be introduced, however, "for the sole purpose of inflaming the jury." *State v. Gerlaugh*, 134 Ariz. 164, 169, 654 P.2d 800, 805 (1982).

We have reviewed the photographs at issue and conclude that their admission was not improper. We acknowledge that several of the photographs are quite gruesome, showing human decomposition accelerated by high temperatures during the three days between the murders and the discovery of the victims' bodies. Several photos show bloating, skin slippage and discoloration in addition to the injuries inflicted by Anderson and Poyson. The photos were relevant, however, to corroborate the State's theory of the case and to prove its allegation that the murders were committed in an especially cruel or depraved manner.

The most disturbing photograph shows Delahunt's disfigured head with a knife inserted through the ear and emerging through the nose. But given the photograph's strong relevance in rebutting Anderson's claim that he did not participate in the killing of Delahunt, we do not find its probative value outweighed by its potential to cause unfair prejudice. The photograph illustrates an injury that a sole attacker would likely have had great difficulty inflicting on a struggling victim. The evidence was highly probative in refuting Anderson's trial testimony that he did not assist in the killing and in corroborating his statement to police that he helped Poyson pound the knife into Delahunt's ear.

We also find no abuse of discretion in the admission of the other contested photographs. We have examined each photograph and find that the probative value of each is not outweighed by any prejudicial effect. *See* Ariz. R. Evid. 403. Moreover, the record reveals that the superior court was mindful of our admonition in *Anderson I* to avoid unnecessary duplication of potentially disturbing photographs.

1    *Anderson II*, 111 P.3d at 381, ¶¶ 37–43.

2                    b.    *Bruton* claim.

3          Anderson summarily attempted to raise a *Bruton* claim on direct appeal, and

4    the Arizona Supreme Court rejected it because *Bruton* was inapplicable to Lane

5    because she testified at trial and, regarding Poyson's statements, Anderson had not

6    properly objected at trial or sufficiently presented a *Bruton* challenge on appeal:

> Anderson argues that the trial court erred by admitting into
> evidence certain portions of the third interrogation, which was
> conducted by Detective Eric Cooper of the Mohave County Sheriff's
> Office.  That interrogation occurred after Cooper had interviewed both
> Poyson and Lane, and Cooper used information obtained from the two
> co-conspirators when he questioned Anderson. At trial, defense
> counsel objected to the interrogation as inadmissible hearsay to the
> extent that it contained statements attributed by Cooper to Poyson or
> Lane.   The superior court overruled the objection, finding that
> Anderson had adopted any such statements.  Anderson argues that this
> ruling violated the rule of *Bruton v. United States*, 391 U.S. 123, 126,
> 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), prohibiting the use of a non-
> testifying co-defendant's statements.
>
> Because Lane testified at trial, Anderson has no valid *Bruton*
> objection to the use of her statements. *Nelson v. O'Neil*, 402 U.S. 622,
> 626–27, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971).  Therefore, the focus
> must be on any statements attributed by Cooper to Poyson during the
> interrogation.
>
> The trial record identifies only one objection to a specific
> statement attributed to Poyson.  On appeal, Anderson refers to the
> interrogation generally but fails to point to any specific statement that
> he contends was admitted in violation of *Bruton*.  Anderson therefore
> has failed to preserve for our consideration any issues regarding the
> statements not specifically identified.
>
> In the one statement clearly objected to, Cooper stated, "Bobby
> and Kim both said this whole thing was premeditated." Anderson did
> not immediately respond to the statement.  After a brief exchange, the
> following dialogue transpired:
>
> > COOPER: Okay. But the three of you had talked
> > about  doing  this,  of  killing  Robert,  Leta  and

Roland.  As a matter of fact, Bobby wanted to kill Elliot, too, right?  Remember him telling you that?

ANDERSON: (Unintelligible) when they talked about it the ... when Bobby talked about it the one, one day.  I, I remember that now but it was more in a, I guess, maybe tryin' to feel you out, a kidding mood, you know.  He says the only way you'll ever get outta here is by killin' 'em all.  That's the only way you'll ever get ....

Later in the interrogation, Anderson stated that "[t]he only thing is on the set-up on the trailer is originally when this was all scheduled out, it was supposed to be after Roland got, uh, after Elliot got home because Elliot was supposed to have money."  Anderson also stated, "yeah, it was all premeditated."

An admission by a defendant is not hearsay.  Ariz. R. Evid. 801(d)(2)(A).  A statement by a third party offered against a defendant who has "manifested an adoption or belief in [the statement's] truth" is similarly not hearsay.  *Id.* R. 801(d)(2)(B).  Adoption occurs when a defendant affirmatively agrees to statements made in his presence, or expounds on the statements by adding his own "explanations and comments."  *See State v. Daugherty*, 173 Ariz. 548, 550, 845 P.2d 474, 476 (App. 1992).  Because Anderson agreed with and expounded on the statement about premeditation attributed to Poyson, the superior court correctly found that Anderson adopted the statement.

*Anderson*, 111 P.3d at 380–81, ¶¶ 31–36.

### 3.    The    Arizona    Supreme    Court    reasonably    rejected Anderson's gruesome-photographs and *Bruton* claims.

As an initial matter, State evidentiary rulings generally cannot form an independent basis for federal habeas relief.  *See, e.g.*, *Rhoades v. Henry*, 638 F.3d 1027, 1034 n.5 (9th Cir. 2011) (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991)).  "[H]abeas relief is available for wrongly admitted evidence only when the questioned evidence renders the trial so fundamentally unfair as to violate federal due process."  *Jeffries v. Blodgett*, 5 F.3d 1180, 1192 (9th Cir. 1993); *see also Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009); *Briceno v. Scribner*, 555 F.3d 1069, 1077 (9th Cir. 2009).  "Only if there are *no* permissible inferences

1   the jury can draw from the evidence can its admission violate due process.  Even

2   then, the evidence must be of such quality as necessarily prevents a fair trial."

3   *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) (quotation and marks

4   omitted); *see also Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998)

5   (stating that an evidentiary ruling may be challenged only if it rendered the trial so

6   fundamentally unfair that it violated due process).  As a result, to the extent

7   Anderson asserts the State courts misapplied Arizona's evidentiary rules, such

8   claims are not cognizable in these proceedings.

9           *a.    Anderson's gruesome-photo claim is meritless.*

10          Relying on *Spears*, Anderson argues the admission of gruesome photographs

11  unfairly persuaded the jury to sentence him to death. Dkt. #21, at 175–79.  *Spears*

12  is inapposite, however.  "In *Spears*, which was decided under Oklahoma law,

13  whether a crime was heinous, atrocious, or cruel depended on whether the

14  defendant had inflicted unnecessary suffering while the victim was still conscious."

15  *United States v. Brown*, 441 F.3d 1330, 1363 (11th Cir. 2006) (citing *Spears*, 343

16  F.3d at 1226–27). The gruesome photographs were specifically proffered in *Spears*

17  to prove conscious physical suffering by the victim, but the evidence demonstrated

18  that only two of the more than fifty stab wounds were inflicted prior to the victim's

19  death or loss of consciousness.  *Spears*, 343 F.3d at 1227–28.  As a result, the

20  relevance and probative value of those photographs to proving the Oklahoma

21  aggravator was minimal at best.

22          Arizona's cruelty aggravator is different, however. *See, e.g.*, *State v. Tucker*,

23  160 P.3d 177, 189–90, ¶¶ 31–33 (Ariz. 2007).  The few photographs admitted in

24  Anderson's trial were also directly relevant, admissible, and offered for a proper

25  purpose.  The photographs showed the violent and horrific nature of the victims'

26  deaths.    And, as the Arizona Supreme Court held, the most objectionable

27  photograph was especially relevant to rebut Anderson's testimony that he did not

28  participate in Delahunt's protracted and extremely violent murder. *Anderson II*,

111 P.3d at 382, ¶ 41.  Additionally, the prosecutor specifically refrained from gratuitously showing them to the jury during the penalty phase.  *See* R.T. 11/25/02, at 187.

Anderson's reliance on *Spears* is therefore unavailing because there was a "logical connection" between the complained-of photographs introduced at Anderson's trial "and the proposition they were offered to prove."  *See Thornburg v. Mullin*, 422 F.3d 1113, 1129 (10th Cir. 2005) (distinguishing *Spears*).  Thus, even if Anderson properly and fairly presented a federal claim concerning the admission of the gruesome photographs to the State courts, it fails on the merits.

### b.    Anderson's <u>Bruton</u> claim is meritless.

Citing *Lee v. Illinois*, 476 U.S. 530 (1986), and *Bruton*, Anderson argues statements Detective Cooper attributed to Lane and Poyson "must be subject to the truth-finding function of confrontation and cross-examination."  Dkt. #21, at 180–81.  In *Bruton*, the Supreme Court held that a defendant is deprived of his rights under the Confrontation Clause when a non-testifying co-defendant's confession, which names the defendant as a participant in the crime, is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant.  391 U.S. at 135–36.

First, as the Arizona Supreme Court correctly noted, Lane testified at Anderson's trial and therefore *Bruton* is therefore inapplicable to her statements. *Anderson II*, 111 P.3d at 380–81, ¶¶ 31–36 (citing *Nelson v. O'Neil*, 402 U.S. 622 (1971)).  Second, Poyson was not tried jointly with Anderson, and "*Bruton* applies only where co-defendants are tried jointly" and, therefore, "inapplicable when the non-testifying codefendant is severed out, as was the case here."  *United States v. Mitchell*, 502 F.3d 931, 965 (9th Cir. 2007); *see also, e.g.*, *Cruz v. New York*, 481 U.S. 186, 198 (1987) ("Of course, defendants may be tried separately and *Bruton* problems avoided.") (White, J., dissenting); *United States v. Johnson*, 581 F.3d 320, 326 (6th Cir. 2009) ("[T]he *Bruton* rule guards against a risk that arises in

1  joint trials, and [the co-defendants] were not tried together.").

2      Moreover, *Bruton*'s narrow rule is limited to instances where the co-
3  defendant's statement is so "powerfully incriminating" that the jury is unable to
4  follow limiting instructions directing that the statements cannot be used against the
5  non-testifying co-defendant. *Richardson v. Marsh*, 481 U.S. 200, 208 (1987).
6  *Richardson* "specifically exempts a statement, not incriminating on its face, that
7  implicates the defendant only in connection to other admitted evidence." *Mason v.*
8  *Yarborough*, 447 F.3d 693, 695 (9th Cir. 2006). That Lane and Poyson said in
9  their interviews the murders were premeditated was not so powerfully
10  incriminating and unfairly prejudicial because Anderson's own statements
11  admitting that the murders were premeditated were properly admitted as evidence
12  at his trial under Arizona law. *See Anderson II*, 111 P.3d at 381, ¶ 36.

13      To the extent Anderson challenges the admission of their statements as
14  evidentiary error under state law, such a claim is not cognizable. A state court's
15  evidentiary ruling is not subject to federal habeas review unless the ruling violates
16  federal law, either by infringing upon a specific federal constitutional or statutory
17  provision, or by depriving the defendant of the fundamentally fair trial. *See Harris*,
18  465 U.S. at 41; *Jammal*, 926 F.2d at 919–20. A federal court may not disturb a
19  state court's decision to admit evidence unless the admission of the evidence was
20  arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *See*
21  *Walters*, 45 F.3d at 1357; *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir. 1986).
22  The decision to admit the statements by Lane and Poyson did not render the trial
23  fundamentally unfair and was not arbitrary. Accordingly, there is no other federal
24  constitutional claim on the basis of the trial court's ruling.

25      In any event, any error in the admission of the complained-of testimony was
26  harmless in the circumstances. *See Slovik v. Yates*, 556 F.3d 747, 755 (9th Cir.
27  2009) ("Confrontation Clause errors are subject to harmless error analysis."). As
28  discussed, in light of Anderson's own admission that the murders were

1    premeditated, the complained-of statements by Lane and Poyson could not have

2    had a "substantial and injurious effect or influence in determining the jury's

3    verdict." *Brecht*, 507 U.S. at 637.  Anderson, therefore, cannot obtain habeas relief

4    on his *Bruton* claim, even if it were not procedurally defaulted.  Claim 6(B) should

5    be denied.

6    **G.**   ***The Constitution does not prohibit a criminal justice system that***

7    ***utilizes elected judges (Claim Seven).***

8    Anderson further argues his "convictions and death sentences are invalid

9    under the federal constitutional guarantees of due process, a fair trial, an impartial

10   tribunal, and a reliable sentence due to the system for electing judges in Mohave

11   County, Arizona."  Dkt. #21, at 181–83.  Anderson acknowledges he has not

12   presented the claim in state court, but he asserts a biased trial court "constitutes

13   structural error and is prejudicial per se" and, therefore, this Court may nonetheless

14   consider it.  *Id.* at 183.  That is incorrect because a judicial bias claim is a

15   constitutional claim that has long been cognizable in Arizona on direct appeal.  *See*

16   *State v. Neil*, 425 P.2d 842, 844 (Ariz. 1967).  Anderson was therefore required to

17   properly exhaust the judicial-bias claim in state court before raising the claim in

18   this federal habeas proceeding.  Because he did not do so, the claim is technically

19   exhausted and procedurally defaulted, and the claim should be denied and

20   dismissed on that basis.  *See Brown v. Stewart*, 103 F.3d 137, 137 (9th Cir. 1996).

21   Anderson's judicial-bias claim is also meritless.  It is well within Arizona's

22   prerogative to allow for judicial elections in Mohave County.  *See, e.g.*, *Chisom v.*

23   *Roemer*, 501 U.S. 380, 401–02 (1991); *Kramer v. Union School Dist. No. 15*, 395

24   U.S. 621, 629 (1969) (holding that states have wide latitude to determine if certain

25   public offices are filled by appointment or by elections).  Anderson also points to

26   nothing in the record that shows the specific, elected judge was biased against him.

27   To be sure, the Due Process Clause guarantees a criminal defendant the right

28   to a fair and impartial judge.  *See In re Murchison*, 349 U.S. 133, 136 (1955); *see*

1   *also, e.g.*, *Rhoades v. Henry*, 598 F.3d 511, 519 (9th Cir. 2010) ("Due process

2   requires that trials be conducted free of actual bias as well as the appearance of

3   bias."). Judicial bias that amounts to a due process violation, and therefore

4   requires judicial disqualification, is presumed in cases where "the adjudicator has a

5   pecuniary interest in the outcome and in which he has been the target of personal

6   abuse or criticism from the party before him." *Withrow v. Larkin*, 421 U.S. 35, 47

7   (1975). Due process also requires recusal "if the judge acts as 'part of the

8   accusatory process.'" *Crater*, 491 F.3d at 1132 (quoting *Murchison*, 349 U.S. at

9   137). "To succeed on a judicial bias claim, however, the petitioner must overcome

10  a presumption of honesty and integrity in those serving as adjudicators.'" *Larson*

11  *v. Palmateer*, 515 F.3d 1057, 1067 (9th Cir. 2008) (quoting *Withrow*, 421 U.S. at

12  47).

13          For example, in *Liteky*, the Supreme Court held that a judge's conduct at trial

14  may be "characterized as bias or prejudice" only when "it is so extreme as to

15  display clear inability to render fair judgment" or "display[s] a deep-seated

16  favoritism or antagonism that would make fair judgment impossible." 510 U.S. at

17  551, 555. "[J]udicial remarks during the course of a trial that are critical or

18  disapproving of, or even hostile to, counsel, the parties, or their cases" will only

19  establish bias when "they reveal such a high degree of favoritism or antagonism as

20  to make fair judgment impossible." *Id.* at 555. As the Supreme Court explained:

21          *Not* establishing bias or partiality, however, are expressions of
22          impatience, dissatisfaction, annoyance, and even anger, that are within
            the bounds of what imperfect men and women, even after having been
23          confirmed as federal judges, sometimes display. A judge's ordinary
            efforts at courtroom administration—even a stern and short-tempered
24          judge's ordinary efforts at courtroom administration—remain
25          immune.

26  *Id.* at 555–56; *see also Larson*, 515 F.3d at 1067 ("In the absence of any evidence

27  of some extrajudicial source of bias or partiality, neither adverse rulings nor

28  impatient remarks are generally sufficient to overcome the presumption of judicial

1  integrity.").

2      Anderson has not presented any evidence of the trial judge's actual bias.

3  Dkt. #21, at 181–83.  Instead, he speculates the judge was subject to "populist

4  pressures" when denying certain expenditure requests.  *Id.*  But "judicial rulings

5  alone almost never constitute a valid basis" for finding bias or partiality.  *Liteky*,

6  510 U.S. at 555.  Moreover, "Supreme Court precedent reveals only three

7  circumstances in which an appearance of bias—as opposed to evidence of actual

8  bias—necessitates recusal." *Crater*, 491 F.3d at 1131. None of those circumstances

9  were present here.  The judge had no "direct, personal, substantial pecuniary

10  interest" in the outcome and did not become "embroiled in a running bitter

11  controversy" with Anderson or defense counsel.  The judge also did not act as part

12  of the accusatory process.  Indeed, Anderson makes no such claim.  Anderson has

13  therefore failed to even allege an appearance of bias.

14      Ultimately, Anderson's judicial-bias claim is based on pure speculation and

15  two adverse rulings on requested expenditures, which are insufficient to overcome

16  the presumption of judicial integrity.  *See Liteky*, 510 U.S. at 555.  Anderson has

17  thus failed to show the judge was biased, and, as a result, Claim Seven also fails on

18  the merits.

19      **H.**    ***Anderson's cumulative error claim is procedurally defaulted and he***

20          ***cannot excuse the default; it is also meritless (Claim Eight).***

21      Next, Anderson contends "the impact of cumulative errors" in his case

22  deprived him of his constitutional right to a fair trial under the Fifth, Sixth, Eighth,

23  and Fourteenth Amendments.  Dkt. #21, at 183–84.  Anderson acknowledges he

24  never raised the claim in state court, either on direct appeal or in post-conviction

25  relief proceedings.  *Id.* at 184.  It is therefore procedurally defaulted.  *See* Ariz. R.

26  Crim. P. 32.1(d)–(h), 32.2(a) & (b); *Beaty*, 303 F.3d at 987; *Ortiz*, 149 F.3d at 931–

27  32; *Carriger*, 971 F.2d at 33.  Anderson does not attempt to excuse the default, and,

28  therefore, this Court should deny the claim on that basis.  *See Wooten v. Kirkland*,

540 F.3d 1019, 1025 (9th Cir. 2008) ("Briefing a number of isolated errors that turn out to be insufficient to warrant reversal does not automatically require the court to consider whether the cumulative effect of the alleged errors prejudiced the petitioner."); *see also Solis v. Garcia*, 219 F.3d 922, 930 (9th Cir. 2000) (affirming the district court's refusal to consider cumulative-error claim because it was not fairly presented to the state courts).

The claim is also meritless. The Ninth Circuit has stated, "The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers*, 410 U.S. at 290 n.3). However, to give rise to a due process violation, the combined effect of multiple errors must have rendered the trial "fundamentally unfair." *Id.* Even if this Court were to address this claim on the merits, Anderson would still not be entitled to habeas relief because he has failed to establish the existence of any constitutional error in his trial. Consequently, he cannot have been prejudiced by the cumulative effect of those claimed errors, when no error occurred. *See Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005) ("Because we find no merit in Boyde's claims of constitutional error in the guilt phase of his trial, we also reject his contention that he was prejudiced by the cumulative effect of the claimed errors."); *Rupe*, 93 F.3d at 1445 (stating that there was "no reason to reverse for cumulative error" where no error occurred).

Moreover, Anderson has only argued generally and summarily that he was prejudiced as the result of cumulative error. By failing to explain precisely how any errors converged to result in cumulative prejudice, he falls far short of meeting *his* burden to establish that he is entitled to habeas relief. *See Pinholster*, 563 U.S. at 181; *Lambert*, 393 F.3d at 970 n.16. Consequently, even if this claim were not procedurally defaulted, it would fail on the merits. It should be dismissed.

1
2

## I.    *The Constitution does not prohibit executing individuals who suffer from physical ailments or mental impairments (Claim Nine).*

3
4
5
6
7
8
9

Anderson asserts in Claim Nine that his "death sentences are invalid under federal constitutional guarantees of due process, equal protection, and freedom from cruel and unusual punishments due to his advanced age and serious medical conditions that render his execution unconstitutional" under the Eighth and Fourteenth Amendment.  Dkt. #21, at 184–86.  Specifically, Anderson points to various physical limitations and/or ailments that he currently endures and asserts that he "has also been presenting symptoms of dementia." *Id.* [18]

10
11
12
13
14
15
16
17
18
19
20
21

Anderson concedes he has never presented this claim to the state courts but asserts that his failure to do so does not bar this Court from considering it on the merits because it concerns a categorical bar on the death penalty.  *Id.* at 186. Anderson is mistaken. This Court may not consider the claim without first allowing the state courts an opportunity to adjudicate the claim.  *See, e.g.*, *Apelt v. Ryan*, No. CV-98-00882-PHX-ROS, 2015 WL 5119670 at *6 (D. Ariz. Sep 1, 2015) (staying Apelt's habeas proceeding following the Supreme Court's decision in *Atkins v. Virginia*, 536 U.S. 304, 321 (2002), to permit him to return to state court and exhaust an *Atkins* claim)); *see also, e.g.*, *Brown v. Smith*, No. 19-CV-01796-ADA, 2023 WL 2938295 (E.D. Cal. April 13, 2023) (collecting cases staying federal habeas proceedings to allow petitioners to exhaust their *Atkins* claims).

22
23
24

Regardless, the Eighth and Fourteenth Amendments do not prohibit the execution of individuals who suffer from physical ailments or mental impairments, as Anderson claims.  The Supreme Court did not hold in *Atkins* or *Roper v.*

25

_____

26
27
28

[18] Respondents neither concede, nor deny, that Anderson suffers from any of the physical limitations or ailments he identifies or that he presents symptoms of dementia.

1    *Simmons*, 543 U.S. 551 (2005)—nor has it ever held—that the Constitution

2    categorically prohibits the execution of individuals who suffer from physical

3    ailments or mental impairments.

4            In concluding that intellectually disabled individuals should be exempt from

5    a death sentence, the Court primarily relied on the fact that there were a large

6    number of States that had already prohibited the execution of the intellectually

7    disabled.   *Atkins*, 536 U.S. at 315–16.   The Court found that this consensus

8    provided "powerful evidence that today our society views [intellectually disabled]

9    offenders as categorically less culpable than the average criminal."  *Id*. at 316.  In

10   addition, intellectual disability, the Court held, diminishes personal culpability and

11   the impairments of the intellectually disabled make the death penalty less

12   defensible as retribution for past crimes and less likely to have a deterrent effect.

13   *Id*. at 319–20.

14           Following *Atkins*, the Court in *Roper* decided whether it is permissible under

15   the Eighth Amendment to execute a juvenile offender who was older than 15 but

16   younger than 18 when he committed a capital crime.  543 U.S. at 555.  In holding

17   that the Eighth Amendment prohibits the execution of juvenile offenders, the Court

18   again looked at whether there was a national consensus sufficient to label the

19   execution of juvenile offenders cruel and unusual, and the differences between

20   juvenile offenders, as a class, compared to adult offenders.  *Id*. at 562–74.  Finding

21   there was objective indicia of consensus among the States against the execution of

22   juvenile offenders—a majority of the States had rejected the imposition of the

23   death penalty on juvenile offenders under 18—the Court held that the Eighth

24   Amendment prohibits the imposition of the death penalty on juvenile offenders

25   who were under the age of 18 when their crimes were committed.  *Id*. at 578.

26           Anderson's argument attempts to expand the application of *Atkins* and *Roper*

27   to individuals with physical ailments and/or mental impairments.  But there is no

28   objective indicia of a consensus among the States against executing people with

physical ailments and/or mental impairments.  Accordingly, numerous courts have considered similar arguments and consistently rejected the proposition that the Eighth Amendment prohibits such executions.  *See, e.g.*, *Bucklew v. Precythe*, 883 F.3d 1087, 1091 (8th Cir. 2018) ("The Supreme Court has not recognized a categorical exemption from the death penalty for individuals with physical ailments or disabilities."); *see also, e.g.*, *Doerr v. Ryan*, No. CV-02-582-PHX-PGR, 2010 WL 582198, * 3 (D. Ariz. Feb. 11, 2010) ("[T]he authorities that have considered the scope of *Atkins* have all rejected the proposition that the Eighth Amendment prohibits execution of the mentally ill.").  Thus, the Constitution does not prohibit the execution of individuals with physical impairments or mental impairments.

Moreover, to the extent Anderson relies on *Ford v. Wainwright*, 477 U.S. 399 (1986), to argue that executing a person with dementia violates the Eighth Amendment, his argument fails because dementia is meaningfully distinct from insanity and intellectual disability.  *Ford* "established that . . . the Eighth Amendment prohibits the execution of the insane."  *See In re Neville*, 440 F.3d at 221.  A claim that Anderson has dementia or is otherwise incompetent to be executed is different, however, and such a claim does not become ripe until an execution date has been set.  *See Panetti*, 551 U.S. at 942; *Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998).  This Court should deny habeas relief and dismiss the claim.

J.    ***The Arizona Supreme Court reasonably rejected Anderson's claim that the change in capital sentencing procedures following <u>Ring</u> violated his due process rights (Claim 10).***

Finally, relying on *Coleman v. McCormick*, 874 F.2d 1280 (9th Cir. 1989), Anderson asserts that applying Arizona's new death penalty statute in his case violated "the federal constitutional guarantees of due process, effective assistance of counsel, equal protection, and a reliable sentence because trial counsel

1   anticipated a judicial sentencing in preparation for trial and was forced to litigate

2   Anderson's sentence before a jury." Dkt. #21, at 186–88. Anderson raised this

3   claim on direct appeal in Argument 16 from his Opening Brief, and he claims the

4   Arizona Supreme Court failed to consider it on the merits. *Id.* at 187. Anderson is

5   mistaken.

6       The Arizona Supreme Court rejected numerous claims raised by Anderson

7   that his due process rights were violated because he had separate juries for his guilt

8   and aggravation/penalty phases. *Anderson*, 111 P.3d at 389, ¶¶ 81–86. Pertinently,

9   relying on its prior decision in *Ring III*, the supreme court confirmed "a defendant

10   holds no absolute right to a penalty trial with the same judge or jurors who heard

11   the evidence on guilt" and that "the ability to re-sentence capital defendants by a

12   new jury is implicit in the Supreme Court's death penalty jurisprudence." *Id.* at

13   ¶ 81 (quotation and internal marks omitted). Such a holding is more than sufficient

14   to confirm the presumption that the Arizona Supreme Court resolved the federal

15   claim on the merits. *See Richter*, 562 U.S. at 99 ("When a federal claim has been

16   presented to a state court and the state court has denied relief, it may be presumed

17   that the state court adjudicated the claim on the merits in the absence of any

18   indication or state-law procedural principles to the contrary."). And Anderson's

19   mere conclusory assertion does not overcome the presumption that the supreme

20   court adjudicated the claim on the merits. *See id.* at 99–100. Accordingly,

21   Anderson is not entitled to de novo review, as he claims.

22       Anderson's reliance on *Coleman* is also misplaced. Coleman was convicted

23   and sentenced to death under a statute that mandated a death sentence when a

24   defendant was found guilty of aggravated kidnapping. 874 F.2d at 1282. The

25   Montana Supreme Court subsequently determined the law was unconstitutional

26   because it prevented the trial court from consider mitigating circumstances before

27   imposing a death sentence. *Id.* As a result, the case was remanded for a

28   resentencing pursuant to a new statute that required a separate sentencing hearing

where the trial court would determine whether there was any aggravating and/or mitigating circumstances. *Id.* If at least one aggravating factor existed, and there were no mitigating circumstances sufficiently substantial to call for leniency, the trial court was required to impose death. *Id.* at 1285. Coleman was then resentenced to death. *Id.*

The Ninth Circuit later reversed the second death sentence, explaining that a "defendant is due at least that amount of process which enables him to put on a defense during trial knowing what effect such a strategy will have on the subsequent capital sentencing, the results of which may be equally if not more critical to the defendant than the conviction itself." *Id.* at 1288. The Ninth Circuit further reasoned that because Coleman had "made countless tactical decisions at trial aimed solely at obtaining [his] acquittal, without even a hint that evidence . . . would be considered as either mitigating or aggravating factors," the due process violation was pervasive and not harmless error. *Id.* at 1289.

But "*Ring II* impacted only the identity of the trier of fact at sentencing, not the process itself." *State v. Murdaugh*, 97 P.3d 844, 853, ¶ 44 (Ariz. 2004). And Anderson, unlike Coleman, knew prior to the guilt phase that there would be a sentencing phase involving the presentation and consideration of aggravating and mitigating circumstances if he was convicted of first-degree murder. Thus, while the sentencer changed from a judge to a jury, the Arizona Supreme Court reasonably concluded no due process violation occurred. *See id.*; *see also, e.g.*, *Ellison v. Thornell*, No. CV-16-8303-PHX-DWL, 2024 WL 942283 at *54 (D. Ariz. Mar. 5, 2024). Indeed, Anderson does not point to any clearly established federal law to the contrary. The claim fails on the merits and should be dismissed.

## VI.    CONCLUSION.

Based on the foregoing authorities and arguments, Respondents respectfully request that the Petition for Writ of Habeas Corpus be denied and dismissed with prejudice.

RESPECTFULLY SUBMITTED this 13th day of December, 2024.

Kristin K. Mayes
Attorney General

Jason D. Lewis
Deputy Solicitor General /
Section Chief of Capital Litigation

s/ Andrew Stuart Reilly
Assistant Attorney General

Attorneys for Respondents

**CERTIFICATE OF SERVICE**

I hereby certify that on December 13, 2024, I electronically transmitted the attached document to the Clerk's Office using the ECF System for filing and served the attached document using ECF, who is a registered participant of the ECF System:

Rene L. Valladares
Sunita_Villadroin@fd.org

David Anthony
David_Anthony@fd.org

Benjamin A. Gerson
Benjamin_gerson@fd.org

Lisa C. Brunner
Lisa_Brunner@fd.org

David H. Harshaw, III
David_Harshaw@fd.org

Heather Erica Williams
Heather_williams@fd.org

Petitioner's Counsel

s/ CIA